## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **CLEVELAND BROWNS FOOTBALL COMPANY LLC**<br>76 Lou Groza Boulevard<br>Berea, Ohio 44017<br><br>        **Plaintiff,**<br><br>**vs.**<br><br>**THE CITY OF CLEVELAND**<br>601 Lakeside Avenue<br>Room 227<br>c/o Mark D. Griffin, Chief Law Officer<br>Cleveland, Ohio 44114<br><br>        **Defendant.**<br><br>**Please also serve:**<br><br>**OHIO ATTORNEY GENERAL**<br>Dave Yost<br>30 East Broad Street, 14th Floor<br>Columbus, Ohio 43215 | **Case No. _____**<br><br>**Judge _____**<br><br><br>**COMPLAINT FOR DECLARATORY JUDGMENT** |

Plaintiff Cleveland Browns Football Company, LLC (the "Browns") for its Complaint against Defendant the City of Cleveland ("City") alleges as follows:

### I.      INTRODUCTION

1.      The Browns bring this action seeking a declaratory judgment finding that Ohio Rev. Code § 9.67 is unconstitutional on its face and as applied to the Browns, or in the alternative finding that the Browns' intention to develop a domed stadium in the City of Brook Park, Ohio, and, after the expiration of its current lease obligations, play its home games at that site, does not trigger or violate the requirements of R.C. 9.67.

2. The Browns own the rights to the Cleveland Browns football franchise (the "Team"), a franchise within the National Football League. The Team currently plays home games at Huntington Bank Field ("HBF"), which is leased by an affiliate of the Browns, Cleveland Browns Stadium Company LLC ("StadCo") pursuant to the terms of a lease agreement with the City that expires in 2029 (the "HBF Lease").

3. Upon expiration of the HBF Lease, the Team will have no right or obligation to continue to play at HBF, nor will there be any obligation for there to be taxpayer funds used to support HBF or the Browns or the Team's use of HBF. Neither the City, nor StadCo, is any under obligation to renew the HBF Lease, and the HBF Lease requires StadCo to surrender the premises to the City upon expiration.  In fact, the HBF Lease has specifically negotiated provisions restricting relocation of the Team, all of which expire at the end of the term.

4. HBF is an open-air stadium facility located on the shores of Lake Erie in downtown Cleveland, Ohio. Given the limitations of an open-air facility at this location, HBF is currently only used for major events 10 to 12 times per year. Yet, HBF occupies a significant footprint on Cleveland's downtown lakefront.

5. Since 2017, well over a decade prior to the expiration date for the HBF Lease, the Browns have planned for such expiration and worked in a good-faith, open, and transparent manner with the City to develop a long-term, sustainable stadium solution that would benefit the Team's loyal fans, the Cleveland lakefront, the region, and the people of Northeast Ohio.

6. With the City at the table and by their side, the Browns painstakingly and thoroughly investigated the costs and benefits for renovation of HBF over the course of several years.  They also explored other sites in Cleveland, and at the City's request recently conducted a detailed analysis of the feasibility of building a new stadium and mixed-use development at the

2

Burke Lakefront Airport site in downtown Cleveland.  The City was supportive of a potential Browns' move to a new stadium on the Burke Lakefront site, and made a financial offer in support of such move.

7.      As a result of this exhaustive, years-long work, conducted in cooperation and in a spirit of transparency with the City, the Browns concluded that investing billions of private and public dollars in a stadium on the lakefront, does not result in the greatest benefit for the Team's fans or impact for the City or Northeast Ohio. Instead, the Browns recently indicated to the City that they intend to focus on a domed stadium option in the City of Brook Park, Ohio, which is adjacent to the City. In connection with such communication, the Browns also publicly and privately reiterated their commitment to continue their significant philanthropic efforts in the City of Cleveland after the potential move to Brook Park, which include supporting education, youth sports, volunteerism, economic mobility, reentry, and many other community and charitable causes.

8.      The Brook Park option would support an estimated 50 to 70 event days per year, will drive significant economic activity in the City, County, Northeast Ohio region and State, will open up the HBF lakefront location for improved development and year-round activity, will make it feasible for the Team to remain in the Greater Cleveland Area for generations to come.

9.      However, the City has stated its opposition to the Browns' efforts to make the dome stadium in Brook Park a reality, and has likened the construction of a stadium in Brook Park, which borders the City, to the decision made by a previous owner of the Browns, Art Modell, to move the franchise over 400 miles away to Baltimore, Maryland in 1995.

10.     In the aftermath of Art Modell's actions in 1995, Ohio enacted Revised Code Section 9.67, known informally as the "Modell Law", which imposes certain vague,

unconstitutional restrictions on the owner of a professional sports team playing most of its home games at a tax-supported facility.

11.     On May 6, 2024, the Cleveland City Council passed Emergency Ordinance 391-2024, authorizing and directing the City's Director of Law to enforce the provisions of the Modell Law against the Browns.  In recent days, City Law Director Mark Griffin has made it clear that the City plans to take legal action against the Browns in connection with the Brook Park stadium option.  Indeed, on October 22, 2024, Mr. Griffin told local reporters that the City is compiling information, researching law, and evaluating its next steps "before moving forward with formal litigation action – which will likely occur in the coming weeks" to enforce the Modell Law, noting that the City will do "everything we can" to keep the Team in downtown Cleveland, including filing a lawsuit under the Modell Law to "require the Browns to make their team available for local purchasers who will keep the team in the City of Cleveland."[1]  These and other similar statements and threats of litigation have caused uncertainty regarding the Browns' legal rights and obligations in connection with the domed stadium project and the Team's potential options after the 2028 season.  The Browns do not desire conflict with the City, but have brought this action to resolve their uncertainty and obtain clarity regarding their rights and obligations, and to enable them to move forward for the benefit of the Team's fans and the region.

12.     The Browns dispute that the Modell Law is constitutional or enforceable, and in any event, deny any violation of the Modell Law.  Given the City's Emergency Ordinance and repeated comments to news media of its intentions to sue the Browns under the Modell Law or otherwise enforce that statute, the Browns are left with no choice but to come to this Court for relief, and seek a declaration that the Modell Law is unconstitutional, both *per se* and as-applied,

---

[1] http://www.news5cleveland.com/sports/browns/battle-over-new-browns-stadium-could-play-out-in-court (last accessed Oct. 23, 2024)

and in the alternative, that even if enforceable, the Browns have not taken any action that would trigger or violate that law.

## II.    PARTIES, JURISDICTION, AND VENUE

13.    The Browns are a Delaware limited liability company with their principal place of business at 76 Lou Groza Boulevard, Berea, Ohio 44017.  The Browns are the business entity that own and operate the Team.

14.    The City is a municipal corporation organized under the laws of the State of Ohio and is located at 601 Lakeside Avenue, Cleveland, Ohio 44114.

15.    This Court has subject matter jurisdiction over the Browns' federal declaratory judgment claims pursuant to 28 U.S.C. §§ 1331 and 2201.

16.    This Court has supplemental jurisdiction over the Browns' state-law claim for declaratory relief that they are not in violation of Ohio Rev. Code § 9.67 pursuant to 28 U.S.C. §§ 1367(a) and 2201 because this state-law claim and the Browns' federal claims arise from a common nucleus of operative fact and because the Browns' state-law claim is so related to their federal claims that they form part of the same case or controversy.

17.    This Court may exercise personal jurisdiction over the City because the City is located within this forum and because this forum has an interest in adjudicating this dispute.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the City is located in the Northern District of Ohio and because a substantial part of the property that is the subject of this action is situated in the Northern District of Ohio.

## III.    BACKGROUND

19.    In 1996, in the aftermath of the Browns NFL franchise move from Cleveland, Ohio to Baltimore, Maryland, Ohio enacted R.C. 9.67, known informally as the Modell Law, imposing

certain limitations on owners of professional sports teams utilizing tax supported facilities within the state.

20.     R.C. Section 9.67 states as follows.

No owner of a professional sports team that uses a tax-supported facility for most of its home games and receives financial assistance from the state or a political subdivision thereof shall cease playing most of its home games at the facility and begin playing most of its home games elsewhere unless the owner either:

(A) Enters into an agreement with the political subdivision permitting the team to play most of its home games elsewhere;

(B) Gives the political subdivision in which the facility is located not less than six months' advance notice of the owner's intention to cease playing most of its home games at the facility and, during the six months after such notice, gives the political subdivision or any individual or group of individuals who reside in the area the opportunity to purchase the team.

21.     The Modell Law does not contain or incorporate any supporting definitions of its operative terms, and it includes many vague terms.  For example, "opportunity to purchase," "elsewhere," "area" and "notice" are not defined or explained in the statute.

22.     Moreover, the Modell Law does not contain any exceptions or carve-outs for circumstances in which the statute would interfere with the terms of any contract applicable to the professional sports team in question, or the owner, such as (a) a negotiated lease for the facility in question with specific non-relocation provisions and, critically, a defined term after which such provisions expire, or (b) contractual provisions with a national sports league governing or restricting the terms on which a particular sports franchise may be sold or relocated.

23.     In August 2012, the current owners of the Browns acquired the Team, and consistent with NFL rules, NFL team owners unanimously approved that purchase in October 2012.

24.     As part of the acquisition of the Team, the Browns took ownership subject to the existing franchise agreement (the "NFL Franchise Agreement"), which provides the terms pursuant to which the Team is permitted to play as an NFL team.

25.     Under the NFL Franchise Agreement, the Browns became subject to certain contractual obligations with the NFL concerning the ability to sell the Team at a later date, including but not limited to, ultimate approval of other NFL team owners of such a potential sale.

26.     The Franchise Agreement also allows the Browns to relocate the Team and play games outside of HBF only if the NFL agrees.

27.     In connection with its acquisition of the Team, the Browns affiliate, StadCo, was assigned certain rights and obligations under a lease for HBF, where the Team plays most of its home games.  The HBF Lease expires in 2029. The HBF Lease does not automatically renew, StadCo is under no obligation to renew the HBF Lease, and neither is the City. In other words, the time for which the Team is to play at HBF is set to naturally expire under the operation of the HBF Lease in 2029, and the Team has no right, or obligation, to play at HBF after expiration of the HBF Lease.

28.     The Browns and StadCo have at all times complied with the terms of the HBF Lease, and the Team will continue to play most of its home games at HBF through the remainder of that HBF Lease term, *i.e.*, through the 2028 NFL season.

29.     In 2017, over a decade before the HBF Lease for HBF was set to expire, the Browns began working in cooperation with the City on options for potential renovation of HBF and other future stadium options.

30.     Following many years of cost benefit analysis and consideration of multiple stadium options conducted in cooperation with the City, the Browns recently indicated to the City

that they would be focusing on a domed stadium option in the City of Brook Park, which neighbors the City. The Browns would not begin playing any games in the potential Brook Park domed stadium until after the expiration of the HBF Lease.

31.     In May of 2024, the City passed Emergency Ordinance 391-2024, authorizing and directing the City Law Director to enforce the Modell Law against the Browns.

32.     In October of 2024, the City Law Director, and certain City Council members and other City officials, made numerous statements to the effect that the City intended to take action against the Browns and would seek to enforce the Modell Law to prevent the Team from playing at a stadium in Brook Park, or outside the City.

33.     In comments to local media, the City Law Director conceded that the Modell Law interferes with the Browns' contractual arrangements with the NFL and NFL rules, noting that the City itself would not purchase the Team because "[m]y understanding of the NFL is they prohibit cities from doing that."[2]

34.     Moreover, the City Law Director admitted that the purpose of the City's enforcement of the Modell Law is to give local purchasers a preference over other individuals who may be located in states other than Ohio, stating that the City is prepared to "file a lawsuit to require the Browns to make their team available for local purchasers who will keep the team in the City of Cleveland."[3]

35.     Plainly, based on the City's emergency ordinance and recent statements of City officials, the City takes the position that the Modell Law is constitutional and enforceable and that

---

[2] https://www.news5cleveland.com/sports/browns/battle-over-new-browns-stadium-could-play-out-in-court

[3] *Id.*

the Browns' indication that they are pursuing the option of a stadium in Brook Park violates that statute.

36.     The Browns deny that the Modell Law is constitutional and deny any violation of that statute.

## COUNT I
### Declaratory Judgment – Violation of Due Process – Void for Vagueness

37.     The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

38.     Pursuant to 28 U.S.C. § 2201, there is a real and justiciable controversy between the Browns and the City concerning whether R.C. 9.67 is a valid and enforceable statute.

39.     The City takes the position that the Browns must comply with R.C. 9.67, which the Browns deny.

40.     The statute is so vague and ambiguous that neither the Browns nor any other owner of a professional sports franchise in Ohio has fair notice about what conduct the statute contemplates or forbids.

41.     It is a basic principle of due process that a statute is void for vagueness if its prohibitions are not clearly defined. *Memphis Ctr. For Reprod. Health v. Slatery*, No. 20-5969, 2020 U.S. App. LEXIS 36780, at *4-5 (6th Cir. Nov. 20, 2020) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

42.     To survive a void for vagueness challenge, a statute must "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. . ." *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 341-42 (6th Cir. 2007) (quoting *Colautti v. Franklin*, 439 U.S. 379, 390, 99 S. Ct. 675, 58 L. Ed. 2d 596 (1979)).

43.     R.C. 9.67 vaguely requires the owner of a professional sports team who relocates the team "elsewhere," to either: (i) enter into an agreement with the local political subdivision; or (ii) give "six months' advance notice of the owner's intention to cease playing most of its home games at the facility" and give individuals "who reside in the area" the "opportunity" to purchase the team. R.C. 9.67(B).

44.     None of these terms provide a person of ordinary intelligence with any notice whatsoever as to what conduct is covered by the statute or what is required to comply.

45.     For example, how far must a team move to be located "elsewhere"?  Is a new stadium across the street "elsewhere"?  A different location within the same city?  Outside the City but within the same county?  Outside Northeast Ohio?  Outside the State of Ohio?

46.     Similarly, an owner must give "six months' advance notice of the owner's intention" to move the team.  R.C. 9.67(B).  But when does an owner manifest the "intention" to move the team?  At the beginning of the planning stage?  When renderings are unveiled publicly? When land for the new stadium is under contract?  When construction begins?  When the new stadium is ready for use?  The statute gives no guidance when an owner attempting to comply with the statute must send this notice.

47.     The statute is also unclear what "area" is covered when it requires that "individuals who reside in the area" must have the opportunity to purchase the team.  *Id*.  Does this include all residents in the City of Cleveland?  Cuyahoga County?  Northeast Ohio?  The State of Ohio? Again, the statute fails to specify which individuals have an opportunity to purchase the team and which offers an owner must consider.

48.     The statute also does not specify what kind of "opportunity" must be given to those individuals who want to purchase the team.  Must all offers be considered?  And how much

consideration should each offer receive?  How much due diligence are prospective buyers entitled to?  Must a privately owned team open its books and records to the entire public? Must the prospective buyer agree to keep the team at the current facility?  Again the statute is silent where it must be precise.

49.     Rather than meet their obligation to draft laws that are "clearly defined" and provide "fair notice" to the public, Ohio lawmakers swayed to the political pressures of the day by enacting a symbolic yet incomprehensible statute that is impermissibly vague and unconstitutional.

50.     Therefore, R.C. 9.67 is void for vagueness, is unconstitutional, and cannot be enforced as to the Browns.

51.     As a result, the rights, status, or other legal obligations of the Browns and the City are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 is unconstitutional will terminate the uncertainty and controversy which has given rise to this proceeding.

## COUNT II
### Declaratory Judgment – Violation of Dormant Commerce Clause

52.     The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

53.     Pursuant to 28 U.S.C. § 2201, there is a real and justiciable controversy between the Browns and the City concerning whether the Art Modell Law, R.C. 9.67 is a valid and enforceable statute.

54.     The City takes the position that the Browns must comply with R.C. 9.67 and that the statute is constitutional, which the Browns deny.

55.     The Commerce Clause of the United States Constitution affirmatively grants Congress the power to "regulate Commerce … among the several States." U.S. Const. art. I, § 8.

11

56.     The dormant Commerce Clause, in consequence, restricts states from enacting laws that discriminate against interstate commerce by advantaging in-state firms or disadvantaging out-of-state rivals.  *See, e.g., Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 370-7 (2023); *Department of Revenue of Ky. v. Davis*, 553 U. S. 328, 337-338 (2008).

57.     The dormant Commerce Clause further restricts states from placing burdens on interstate commerce that are clearly excessive when compared with putative local benefits.  *Nat'l Pork Producers Council*, 598 U.S. at 377 (2023); *Pike v. Bruce Church, Inc.*, 397 U. S. 137, 142 (1970).

58.     R.C. 9.67 violates the dormant Commerce Clause by advantaging in-state economic actors and disadvantaging out-of-state rivals by, among other things, giving Ohio political subdivisions and Ohio residents preferential treatment and special rights with respect to purchase of professional sports organizations that is not afforded to residents of states other than Ohio.

59.     R.C. 9.67 violates the dormant Commerce Clause by placing excessive burdens on interstate commerce without advancing any legitimate local interest.

60.     R.C. 9.67 has no connection to public safety, health, or well-being.

61.     As a result, the rights, status, or other legal obligations of the Browns and the City are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 is unconstitutional will terminate the uncertainty and controversy which has given rise to this proceeding.

<u>COUNT III</u>
**Declaratory Judgment – Violation of Contract Clause**

62.     The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

63.     Pursuant to 28 U.S.C. § 2201, there is a real and justiciable controversy between the Browns and the City concerning whether R.C. 9.67 is a valid and enforceable statute.

64.     The Browns and the NFL are parties to the NFL Franchise Agreement, which provides the terms pursuant to which the Team is permitted to play as an NFL franchise.

65.     The Franchise Agreement prohibits the Browns from selling the Team without the express written consent of the NFL.

66.     The Franchise Agreement also allows the Browns to relocate the Team and play games outside of HBF Stadium where the NFL agrees.

67.     The City takes the position that R.C. 9.67 may be enforced as to the Browns to either prevent the Browns from exercising their rights pursuant to the NFL Franchise Agreement to move the Stadium or to force a sale of the Team in direct contravention of the terms of the NFL franchise agreement.

68.     The Browns maintain that they: (i) may exercise their rights pursuant to the NFL Franchise Agreement to move the Stadium; and (ii) cannot give others an opportunity to purchase the Team in compliance with R.C. 9.67 without breaching the Franchise Agreement.

69.     Article I, Section 10 of the United States Constitution states, in relevant part, "No state shall . . . pass any . . . Law impairing the Obligation of Contracts."

70.     This clause is generally referred to as the "Contract Clause."

71.     In analyzing whether or not a statute violates the federal Contract Clause, courts have imposed a two-part test: (1) did the state law operate as a substantial impairment of a

13

contractual relationship; and (2) is the state law appropriately and reasonably drawn in a way that advances a significant and legitimate public purpose.

72.     R.C. 9.67 substantially impairs the Browns' NFL Franchise Agreement and purports to void fundamental terms of the NFL Franchise Agreement by: (1) depriving the Browns of a critical bargained-for value in the form of the option to move the Stadium; or (2) forcing the Browns to offer the Team for purchase in direct contravention of the terms of the NFL Franchise Agreement.

73.     If the Browns were to comply with the statute, they would be in breach of the NFL Franchise Agreement.

74.     Complying with R.C. 9.67 would require the Browns to breach the NFL Franchise Agreement and, therefore, the statute violates the Contract Clause.

75.     R.C. 9.67 was not appropriately and reasonably drawn in a way that advances a significant and legitimate public purpose.

76.     Therefore, R.C. 9.67 violates the Contract Clause and is unconstitutional and cannot be enforced as to the Browns.

77.     As a result, the rights, status, or other legal obligations of the Browns and the City are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 will terminate the uncertainty and controversy which has given rise to this proceeding.

## COUNT IV
### Declaratory Judgment – Violation of Privileges and Immunities Clause

78.     The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

79.     Pursuant to 28 U.S.C. § 2201, there is a real and justiciable controversy between the Browns and the City concerning whether R.C. 9.67 is a valid and enforceable statute.

80.     The City takes the position that the Browns must comply with R.C. 9.67, which the Browns deny.

81.     The Privileges and Immunities Clause of the United States Constitution provides that a state may not enact laws that discriminate against citizens of other states.   U.S. Const. art. 4, § 2; *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449 (2019); *Alerding v. Ohio High Sch. Athletic Ass'n*, 779 F.2d 315, 317 (6th Cir. 1985).

82.     R.C. 9.67 violates the Privileges and Immunities Clause by creating opportunities for Ohio citizens at the expense of similar opportunities for citizens of other states by giving local Ohio residents the opportunity to purchase the Team that is not afforded to residents of states other than Ohio.

83.     As a result, the rights, status, or other legal obligations of the Browns and the City are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 is unconstitutional will terminate the uncertainty and controversy which has given rise to this proceeding.

## COUNT V
### Declaratory Judgment – Unconstitutional As Applied

84.     The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

85.     Even if a statute has some permissible use, it may be unconstitutional as applied to a particular party.  *See Carroll v. City of Cleveland*, 522 Fed. App'x 299, 306 (6th Cir. 2013).

86.     As described in Counts I through IV above, R.C. 9.67 is unenforceable against the Browns because it violates the: (I) Dormant Commerce Clause; (II) Contract Clause; (III) Privileges and Immunities Clause; and (IV) Due Process Clause, all of the United States Constitution.

15

87.    Even if there is some permissible use for R.C. 9.67 as applied to others, it is unenforceable as enforced against the Browns. For example, the City Law Director himself concedes that, as applied to the Browns, R.C. 9.67 would violate NFL rules and contractual arrangements with the Browns.

88.    Therefore, R.C. 9.67 is unconstitutional as applied to the Browns.

89.    As a result, the rights, status, or other legal obligations of the Browns and the City are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 is unconstitutional as applied to the Browns will terminate the uncertainty and controversy which has given rise to this proceeding.

**COUNT VI – In The Alternative to COUNTS I-V**
**R.C. 9.67 – Compliance with the Modell Law**

90.    The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

91.    R.C. 9.67 requires that the owner of a professional sports team that uses a tax-supported facility for most of its home games and receives financial assistance from the state or a political subdivision thereof shall not cease playing most of its home games at that facility unless it (i) enters into an agreement with the political subdivision; or (ii) give "six months' advance notice of the owner's intention to cease playing most of its home games at the facility. . ."

92.    The requirements of R.C. 9.67 have no application in the case of the Browns, as the duration for which the Team is set to play at HBF is spelled out in the HBF Lease between the City and StadCo, and all parties know already that the HBF Lease is set to expire in 2029.

93.    When the HBF Lease expires in 2029, the Team will no longer be playing at a facility supported by tax-payer funds as contemplated by R.C. 9.67.

16

94.    The Browns have not yet broken ground on or even finalized a deal for any new stadium and have repeatedly stated their intention for the Team to continue to play most of its home games at HBF through the remainder of the HBF Lease term, well into 2029.

95.    The Browns have no right or obligation for the Team to continue to play at HBF beyond the expiration of the HBF Lease in 2029.

96.    Similarly, the City has no obligation to renew the term of the HBF Lease beyond 2029.

97.    R.C. 9.67 does not require the Browns or the City to sign a new lease and is plainly intended to prevent a team that is currently playing in a tax-supported facility from moving from that location.  The Browns have not, and do not intend, to move while they are obligated to play at HBF.  In short, R.C. 9.67 simply does not apply to the matter of where the Team will play its home games after the expiration of the HBF Lease, and the City already has full knowledge of the duration of that lease.

98.    Therefore, the Browns are entitled to a declaration from this Court that the Browns' actions do not trigger or violate R.C. 9.67.

**WHEREFORE**, the Browns respectfully request that this Court:

A.    Enter a declaratory judgment finding that R.C. 9.67 is unconstitutional *per se* because it violates:

> i.    the Due Process Clause of the United States Constitution
>
> ii.    the Dormant Commerce Clause of the United States Constitution;
>
> iii.    the Contract Clause of the United States Constitution; and
>
> iv.    the Privileges and Immunities Clause of the United States Constitution;

B.    A judgment finding that R.C. 9.67 is unconstitutional as applied to the Browns;

C.    In the alternative, if this Court finds that R.C. 9.67 is constitutional, a judgment finding that the Browns' actions do not trigger or violate R.C. 9.67;

D.    An award of Plaintiff's reasonable attorney's fees and costs; and

E.    Such other necessary and proper relief, both legal and equitable, including attorney's fees and other costs, as this Court deems just and proper.

DATED:      October 24, 2024

<div style="margin-left:40%">

Respectfully submitted,

*/s/ Anthony C. White*
Anthony C. White (0062146)
Robert F. Ware (0055515)
Kip T. Bollin (0065275)
Thomas M. Ritzert (0085370)
Kyle A. Hutnick (0095673)
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114
Phone: (216) 566-5500
Fax: (216) 566-5800
Tony.White@ThompsonHine.com
Rob.Ware@ThompsonHine.com
Kip.Bollin@ThompsonHine.com
Thomas.Ritzert@ThompsonHine.com
Kyle.Hutnick@ThompsonHine.com

*Attorneys for Plaintiff*

</div>