## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **CLEVELAND BROWNS FOOTBALL COMPANY LLC,** | ) ) | **Case No. 1:24-CV-01857-DAR** |
| 76 Lou Groza Boulevard | ) | |
| Berea, Ohio 44017, | ) | **Judge David A. Ruiz** |
| | ) | |
| **Plaintiff,** | ) ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **THE CITY OF CLEVELAND,** | ) | |
| 601 Lakeside Avenue | ) | |
| Room 227 | ) | |
| c/o Mark D. Griffin, Chief Law Officer | ) | |
| Cleveland, Ohio 44114, | ) | |
| | ) | |
| **Defendant.** | ) ) | |
| | ) | |
| **Please also serve:** | ) | |
| | ) | |
| **OHIO ATTORNEY GENERAL** | ) | |
| Dave Yost, | ) | |
| 30 East Broad Street, 14th Floor | ) | |
| Columbus, Ohio 43215. | ) | |

### AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Cleveland Browns Football Company LLC (the "Browns") for its Amended Complaint against Defendant the City of Cleveland ("City") alleges as follows:

## I.      INTRODUCTION

1.      The Browns bring this action seeking a declaratory judgment finding that Ohio Rev. Code § 9.67 is unconstitutional on its face and as applied to the Browns, or in the alternative, finding that the Browns' intention to develop a domed stadium in the City of Brook Park, Ohio, and, after the expiration of its current lease obligations, play its home games at that site, does not trigger or violate the requirements of R.C. 9.67.

2.      The Browns own the rights to the Cleveland Browns football franchise (the "Team"), a franchise within the National Football League ("NFL"). The Team currently plays home games at Huntington Bank Field located on Cleveland's lakefront ("HBF"), which is leased by an affiliate of the Browns, Cleveland Browns Stadium Company LLC ("StadCo"), pursuant to the terms of an April 26, 1996, lease agreement with the City that expires in 2029 (the "HBF Lease").

3.      Upon expiration of the HBF Lease, the Team will have no right or obligation to continue to play at HBF, nor will there be any obligation for there to be taxpayer funds used to support HBF, the Browns, or the Team's use of HBF.

4.      Neither the City, nor StadCo, is under any obligation to renew the HBF Lease, and the HBF Lease requires StadCo to surrender the premises to the City upon expiration. In fact, the HBF Lease has specifically negotiated provisions restricting relocation of the Team, all of which expire at the end of the term.

5.      HBF is an open-air stadium facility located on the shores of Lake Erie in downtown Cleveland, Ohio. Given the limitations of an open-air facility at this location, HBF is currently only used for major events 10 to 12 times per year. Yet, HBF occupies a significant footprint on Cleveland's downtown lakefront.

6.      Since 2017, well over a decade prior to the expiration date for the HBF Lease, the Browns have planned for such expiration and worked in a good-faith, open, and transparent manner with the City to develop a long-term, sustainable stadium solution that would benefit the Team's loyal fans, the Cleveland lakefront, the region, and the people of Northeast Ohio.

7.      Over the course of several years, with the City at the table and by their side, the Browns painstakingly and thoroughly investigated the costs and benefits of renovating HBF. They

2

also explored other sites in Cleveland, and at the City's request, recently conducted a detailed analysis of the feasibility of building a new stadium and mixed-use development at the Burke Lakefront Airport site in downtown Cleveland. The City was supportive of a potential Browns move to a new stadium on the Burke Lakefront site and made a financial offer in support of such move. Unfortunately, such financial offer was insufficient to absorb the vastly increased costs of developing on the Burke Lakefront Airport site, and, in light of the uncertainty and risks involved in closing of the airport, the City could not provide a definitive timeline for site availability which is a critical element of planning for a project of this scale.

8.     As a result of this exhaustive years-long work, conducted in cooperation and in a spirit of transparency with the City, the Browns concluded that investing billions of private and public dollars in a stadium on the lakefront does not result in the greatest benefit for the Team's fans or positive impact for the City or Northeast Ohio. Instead, the Browns recently indicated to the City that they intend to focus on a domed stadium option in the City of Brook Park, Ohio, which is adjacent to the City. In connection with such communication, the Browns also publicly and privately reiterated their commitment to continue their significant philanthropic efforts in the City after the potential move to Brook Park, which include supporting education, youth sports, volunteerism, economic mobility, reentry, and many other community and charitable causes.

9.     The Brook Park option would support an estimated 50 to 70 event days per year, including at least an additional 6 to 10 major concerts and events (i.e., 50,000 people per event), would drive significant economic activity in the City, County, Northeast Ohio region, and State, would open up the HBF lakefront location for improved development and year-round activity, and would make it feasible for the Team to remain in the Greater Cleveland area for generations to come.

10.     However, despite: (a) the Browns' transparency with the City; (b) the fact that the City will have received the full value of its bargain under the HBF Lease; and (c) the fact that the Browns have repeatedly confirmed that the HBF Lease will be performed in full prior to expiration, the City seeks to use extracontractual measures that were not a part of the Parties' business relationship or negotiations to thwart the Browns' ability to exercise its bargained-for contractual rights (after performing its bargained-for obligations).

11.     Indeed, the City has stated its opposition to the Browns' efforts to make the dome stadium in Brook Park a reality, and has inaccurately likened the construction of a stadium in Brook Park, on land that borders the City, to the decision made by a previous owner of the Browns, Art Modell, to move the franchise over 400 miles away to Baltimore, Maryland in 1995.

12.     In early 1996, in the aftermath of Art Modell's actions, the NFL and the City announced that the NFL would bring a new NFL team to Cleveland to play in a to-be-constructed stadium, which today is HBF. On April 26, 1996, the City and the NFL entered into the HBF Lease and a Franchise Commitment Agreement (the "FCA") pursuant to which the new team and stadium could be built.

13.     After the City's agreements with the NFL were already in effect, Ohio enacted Revised Code Section 9.67, known informally as the "Modell Law," effective June 20, 1996. The Modell Law imposes certain vague, unconstitutional restrictions on the owner of a professional sports team playing most of its home games at a tax-supported facility.

14.     On May 6, 2024, the Cleveland City Council passed Emergency Ordinance 391-2024, authorizing and directing the City's Director of Law to enforce the provisions of the Modell Law against the Browns. City Law Director Mark Griffin also has made it clear that the City plans to take legal action against the Browns in connection with the Brook Park stadium option. Indeed,

4

on October 22, 2024, Mr. Griffin told local reporters that the City is compiling information, researching law, and evaluating its next steps "before moving forward with formal litigation action – which will likely occur in the coming weeks" to enforce the Modell Law, noting that the City will do "everything we can" to keep the Team in downtown Cleveland, including filing a lawsuit under the Modell Law to "require the Browns to make their team available for local purchasers who will keep the team in the City of Cleveland."[1] These and other similar statements and threats of litigation have caused uncertainty regarding the Browns' legal rights and obligations in connection with the domed stadium project and the Team's potential options after the 2028 season. The Browns do not desire conflict with the City but have been compelled to bring this action to resolve this uncertainty and obtain clarity regarding their rights and obligations, and to enable the Browns to move forward for the benefit of the Team's fans and the region.

15.    The Browns dispute that the Modell Law is constitutional or enforceable, and, in any event, deny any violation of the Modell Law. Given the City's Emergency Ordinance and repeated comments to news media of its intentions to sue the Browns under the Modell Law or otherwise enforce that statute, the Browns are left with no choice but to come to this Court for relief, and seek a declaration that the Modell Law is unconstitutional, both *per se* and as-applied, and in the alternative, that even if enforceable, the Browns have not taken any action that would trigger or violate that law.

---

[1]    http://www.news5cleveland.com/sports/browns/battle-over-new-browns-stadium-could-play-out-in-court    (last accessed Oct. 23, 2024).

## II.      PARTIES, JURISDICTION, AND VENUE

16.      The Browns are a Delaware limited liability company with their principal place of business at 76 Lou Groza Boulevard, Berea, Ohio 44017. The Browns are the business entity that own and operate the Team.

17.      The City is a municipal corporation organized under the laws of the State of Ohio and is located at 601 Lakeside Avenue, Cleveland, Ohio 44114.

18.      This Court has subject matter jurisdiction over the Browns' federal declaratory judgment claims pursuant to 28 U.S.C. §§ 1331 and 2201.

19.      This Court has supplemental jurisdiction over the Browns' state-law claim for declaratory relief that they are not in violation of Ohio Rev. Code § 9.67 pursuant to 28 U.S.C. §§ 1367(a) and 2201 because this state law claim and the Browns' federal claims arise from a common nucleus of operative fact and because the Browns' state law claim is so related to their federal claims that they form part of the same case or controversy.

20.      This Court may exercise personal jurisdiction over the City because the City is located within this forum and because this forum has an interest in adjudicating this dispute.

21.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the City is located in the Northern District of Ohio and because a substantial part of the property that is the subject of this action is situated in the Northern District of Ohio.

### III.      BACKGROUND

A.      **The NFL's Teams are Financially Interdependent and Subject to NFL Rules.**

22.      The NFL is comprised of 32 member teams. Each team operates as a franchise and agrees to be subject to the NFL's oversight and to abide by the NFL's bylaws and other rules.

23.     Due to the large number of member teams in a variety of different jurisdictions, the NFL's success depends on its ability to oversee and coordinate with each of its member teams nationwide.

24.     The NFL's member teams have a symbiotic relationship where each member team's success or drawing power financially affects other teams nationwide.

25.     For example, the NFL contracts with television networks to air games for each of the member teams nationwide. The revenues from those television network contracts are divided equally among member teams.

26.     NFL member teams also share revenue from ticket sales. The capacity and quality of a team's stadium impacts ticket sales and prices, and thus these factors for one team's playing venue impact revenue for the other 31 NFL member franchises.

27.     Accordingly, decisions about whether to renovate or build a new stadium have economic impact well beyond the city and state in which that stadium is located.

28.     This level of interdependence is why, among other reasons, adding and removing member teams from the league, and other significant operational changes by member teams such as changing the location and venue for home games, must be approved by the NFL and its members.

29.     Interfering with the symbiotic relationship among NFL member teams inflicts substantial harm on interstate commerce.

**B.      The City Entered Into the HBF Lease and FCA to Bring the Browns Back to Cleveland.**

30.      In November 1995, then-owner of the Browns, Art Modell, announced that he was moving the Team from Cleveland, Ohio to Baltimore, Maryland, in part due to the aging conditions of Cleveland's Municipal Stadium, where the Team was playing home games.

31.      In the midst of intense public outcry following the announced move and following discussions with the City, in February 1996 the NFL announced that it would approve a new NFL team to play home games in Cleveland.

32.      On April 26, 1996, the City and the NFL entered into two agreements necessary to create a new team and stadium: the HBF Lease and the FCA.

33.      In the FCA, the NFL agreed to approve a new Cleveland NFL Franchise that would participate in the NFL's league structure and be subject to all of the NFL's bylaws and other rules.

34.      The City and the NFL (standing in the shoes of a future owner), entered into the 30-year HBF Lease where the City agreed to build a new stadium for the expansion team.

35.      All NFL franchises, including the team contemplated by the FCA, must be bound by the NFL's franchise agreement (the "NFL Franchise Agreement").

36.      The NFL Franchise Agreement sets forth the terms pursuant to which the Team is permitted to play as an NFL team.

37.      Under the NFL Franchise Agreement, the Browns became subject to certain contractual obligations with the NFL concerning the ability to sell the Team at a later date, including but not limited to, ultimate approval by other NFL team owners of such a potential sale.

38.      The Franchise Agreement also allows the Browns to relocate the Team and play games outside of HBF only if the NFL agrees.

39.     Under Section 4.3 of the NFL Constitution, relocation of any NFL franchise outside of its home territory requires the prior approval by affirmative vote of three-fourths of the existing member clubs of the league.

40.     In or about September 1998, the Browns entered into an Expansion Franchise Agreement where the Browns acquired the rights to own and operate the Team as a new member of the NFL.

41.     In connection with the Browns' acquisition of the Team, the Browns affiliate, StadCo, was assigned certain rights and obligations under a lease for HBF, where the Team plays most of its home games. The HBF Lease expires in 2029. The HBF Lease does not automatically renew, StadCo is under no obligation to renew the HBF Lease, and neither is the City. In other words, in accordance with the terms the City originally negotiated with the NFL, the time for which the Team is to play at HBF is set to naturally expire under the operation of the HBF Lease in 2029, and the Team has no right, or obligation, to play at HBF after expiration of the HBF Lease. Rather, the Team has the obligation to surrender the HBF premises to the City upon expiration of the HBF Lease.

42.     The Browns and StadCo have complied with the terms of the HBF Lease, and as required by the HBF Lease the Team will continue to play most of its home games at HBF through the remainder of the HBF Lease term, i.e., through the 2028 NFL season.

**C.    Ohio Passed the Modell Law in Response to the Abrupt Relocation of the Browns to Another State.**

43.     Effective June 20, 1996, Ohio enacted R.C. 9.67, known informally as the Modell Law, imposing certain limitations on owners of professional sports teams utilizing tax supported facilities within the state.

44.     R.C. 9.67 states as follows:

9

No owner of a professional sports team that uses a tax-supported facility for most of its home games and receives financial assistance from the state or a political subdivision thereof shall cease playing most of its home games at the facility and begin playing most of its home games elsewhere unless the owner either:

(A) Enters into an agreement with the political subdivision permitting the team to play most of its home games elsewhere;

(B) Gives the political subdivision in which the facility is located not less than six months' advance notice of the owner's intention to cease playing most of its home games at the facility and, during the six months after such notice, gives the political subdivision or any individual or group of individuals who reside in the area the opportunity to purchase the team.

45.     The Modell Law does not contain or incorporate any supporting definitions of its operative terms, and it includes many vague and undefined terms.

46.     For example, the Modell Law does not specify what is meant by "financial assistance," and there are no analogous statutes or rules from which a definition can be ascertained.

47.     Nor does the statute indicate what is meant by "political subdivision," or if a facility can be supported by more than one "political subdivision." If there can be more than one political subdivision, then which political subdivision would have priority or apply? In this case, the Brook Park site is located within Cuyahoga County, which is the same county within which the existing lakefront stadium is located.

48.     The statute also does not state whether the term "elsewhere," refers to any location different than the tax-supported facility, or instead a location outside of a relevant "political subdivision," which is itself an undefined term.

49.     Nor does the statute provide any guidance to owners about how to send advance "notice," to whom "notice" should be sent, or what the "notice" must contain.

50.     The statute does not provide any guidance to owners about what constitutes the "opportunity" that must be afforded to potential buyers hoping to purchase the team, or how much a potential purchaser must be able to bring to the table in order to be a truly bona fide potential

10

purchaser. For example – does anyone who offers $25 for the team get treated as a potential buyer under the Modell Law? Does the buyer have to keep the team within the existing stadium or political subdivision? The statute does not require the team to remain within the political subdivision. The statute does not provide that the City gets to approve a successful buyer.

51.     Nor is the statute clear on what "area" individuals must reside in to be eligible for an opportunity to purchase the team.

52.     Moreover, the Modell Law does not contain any exceptions or carve-outs for circumstances in which the statute would interfere with the terms of any contract applicable to the professional sports team in question, or the owner, such as: (a) a negotiated lease for the facility in question with specific non-relocation provisions and, critically, a defined term after which such provisions expire; or (b) contractual provisions with a national sports league governing or restricting the terms on which a particular sports franchise may be sold or relocated.

53.     On its face, the Modell Law also discriminates against interstate commerce by providing "individuals who reside in the area" (i.e., in Ohio) with an opportunity to purchase the Team, to the exclusion of individuals outside Ohio.

**D.      The City Has Threatened to Prematurely Enforce the Modell Law.**

54.     In August 2012, the current owners of the Browns acquired the Team, and consistent with NFL rules, NFL team owners unanimously approved that purchase in October 2012.

55.     In 2017, over a decade before the HBF Lease was set to expire, the Browns began working in cooperation with the City on options for potential renovation of HBF and other future stadium options.

11

56.     Following many years of cost benefit analysis and consideration of multiple stadium options conducted in cooperation with the City, the Browns recently indicated to the City that they would be focusing on a domed stadium option in the city of Brook Park, Ohio, which neighbors the City. The Browns would not begin playing any games in the potential Brook Park domed stadium until after the expiration of the HBF Lease.

57.     In May 2024, the City passed Emergency Ordinance 391-2024, authorizing and directing the City Law Director to enforce the Modell Law against the Browns.

58.     In October 2024, the City Law Director, certain City Council members, and other City officials, made numerous statements to the effect that the City intended to take action against the Browns and would seek to enforce the Modell Law to prevent the Team from playing at a stadium in Brook Park, or outside the City. As reported by one Cleveland news outlet, Cleveland Law Director Mark Griffin stated: "We're gonna move forward because that's the law. We're gonna move forward because that is what the Cleveland city ordinances require us to do."[2]

59.     The City has made it clear it will attempt to arbitrarily enforce the Modell Law now, years before the HBF Lease will expire in 2029, and despite the Browns' compliance with the terms of the HBF Lease.

60.     In comments to local media, the City Law Director conceded that the Modell Law interferes with the Browns' contractual arrangements with the NFL and the NFL rules, noting that the City itself would not purchase the Team because "[m]y understanding of the NFL is they prohibit cities from doing that."[3]

---

[2] https://www.wkyc.com/article/sports/nfl/browns/cleveland-browns-art-modell-law-haslam-sports-group-domed-stadium-brook-park-city-council-bibb-administration/95-55370573-81c9-4a29-af21-fe3bebcdfe9f (last accessed 11/15/2024).

[3] https://www.news5cleveland.com/sports/browns/battle-over-new-browns-stadium-could-play-out-in-court.

61. Moreover, the City Law Director admitted that the purpose of the City's enforcement of the Modell Law is to give local purchasers a preference over other individuals who may be located in states other than Ohio, stating that the City is prepared to "file a lawsuit to require the Browns to make their team available for local purchasers who will keep the team in the City of Cleveland."[4]

62. Plainly, based on the City's emergency ordinance and recent statements of City officials, the City takes the position that the Modell Law is constitutional and enforceable and that the Browns' indication that they are pursuing the option of a stadium in Brook Park violates that statute.

63. The City will have received the full benefit of its bargain with the Browns at the conclusion of the HBF Lease, as the Browns have repeatedly reiterated that they fully intend to perform under the terms of the HBF Lease through its expiration in 2029.

64. The Browns specifically negotiated terms in the HBF Lease that provide the Browns with certain express and implied rights when the HBF Lease expires in 2029, including terms concerning relocation, wind-up, and surrender of the premises. The City now seeks to use the Modell Law to impose extracontractual terms on the Browns that would ultimately prevent the Browns from exercising those bargained-for contractual rights at the end of the HBF Lease term and would cause the Browns to violate the terms of other agreements like the NFL Franchise Agreement.

65. R.C. 9.67, even if found to be constitutional, which the Browns dispute, is simply inapplicable where, as here, the HBF Lease does not expire until 2029 and the Browns have made

---

[4] *Id.*

it clear to the City that the Team will continue to play most of its home games at HBF until that agreement expires.

66.     Based on the City's position, the Browns had no choice but to seek a ruling from this Court as to the enforceability and current inapplicability of the Modell Law.

67.     The Browns deny that the Modell Law is constitutional and deny any violation of that statute.

**COUNT I**
**Declaratory Judgment – Violation of Due Process – Void for Vagueness**
**Unconstitutional As Applied**

68.     The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

69.     Pursuant to 28 U.S.C. § 2201, there is a real and justiciable controversy between the Browns and the City concerning whether R.C. 9.67 is a valid and enforceable statute.

70.     The City takes the position that R.C. 9.67 prevents the Browns from building a new stadium in Brook Park, Ohio, which the Browns deny.

71.     The statute is so vague and ambiguous that no owner of a professional sports franchise in Ohio has fair notice about what conduct the statute contemplates or forbids.

72.     It is a basic principle of due process that a statute is void for vagueness if its prohibitions are not clearly defined. *Memphis Ctr. For Reprod. Health v. Slatery*, No. 20-5969, 2020 U.S. App. LEXIS 36780, at *4-5 (6th Cir. Nov. 20, 2020) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

73.     To survive a void for vagueness challenge, a statute must "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. . ." *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 341-42 (6th Cir. 2007) (quoting *Colautti v. Franklin*, 439 U.S. 379, 390, 99 S. Ct. 675, 58 L. Ed. 2d 596 (1979)).

14

74.     R.C. 9.67 vaguely requires the owner of a professional sports team who relocates the team "elsewhere," to either: (i) enter into an agreement with the local political subdivision; or (ii) give "six months' advance notice of the owner's intention to cease playing most of its home games at the facility" and give individuals "who reside in the area" the "opportunity" to purchase the team. R.C. 9.67(B).

75.     However, the statute does not include any definitions for its terms, nor does it provide any guidance for giving notice under the statute or what kind of opportunity to purchase the team is sufficient to satisfy the statute.

76.     The statute's terms do not provide a person of ordinary intelligence with any notice whatsoever as to what conduct is covered by the statute or what is required to comply.

77.     For example, how far must a team move to be located "elsewhere"? Is a new stadium across the street "elsewhere"? A different location within the same city? Outside the City but within the same county? Outside the region? Outside the State of Ohio?

78.     Similarly, what constitutes "an agreement … permitting the team to play …elsewhere"? And when must that "agreement" be entered into? Does a lease containing relocation restrictions during the lease term that expire with the lease term suffice to satisfy R.C. 9.67(A)? Or must an owner enter into a new agreement with a political subdivision after giving "advance notice" of an "intention to cease playing" at the current facility?

79.     R.C. 9.67(B) requires an owner to give "six months' advance notice of the owner's intention" to move the team. But when does an owner manifest the "intention" to move the team? At the beginning of the planning stage? When renderings are unveiled publicly? When land for the new stadium is under contract? When construction begins? When the new stadium is ready for

use? When written notice of a date certain for the move is provided? The statute gives no guidance when an owner attempting to comply with the statute must send this notice.

80.     The statute is also unclear what "area" is covered when it requires that "individuals who reside in the area" must have the opportunity to purchase the team. *Id.* As applied to the Browns, does the statute's requirements include all residents in the City of Cleveland? Cuyahoga County? Northeast Ohio? The State of Ohio? Again, the statute fails to specify which individuals have an opportunity to purchase the team and which offers an owner must consider. The statute is also silent on the role of the applicable professional sports league, despite each professional league playing a dispositive role in the transfer of team ownership rights.

81.     The statute also does not specify what kind of "opportunity" must be given to those individuals who want to purchase the team. What time frame constitutes a sufficient "opportunity"? Days? Weeks? Months? Must all offers be considered? May individuals located outside of the "area" bid at the same time individuals located within the "area"? How much consideration should each offer receive? How much due diligence are prospective buyers entitled to? Must the prospective buyer agree to keep the team at the current facility? Again the statute is silent where it must be precise.

82.     Rather than meet their obligation to draft laws that are "clearly defined" and provide "fair notice" to the public, Ohio lawmakers, influenced by the understandable emotion of the beloved Browns leaving Ohio, swayed to the political pressures of the day by enacting a symbolic yet incomprehensible statute that is impermissibly vague and unconstitutional.

83.     Indeed, as currently constructed, even if R.C. 9.67 were triggered and applied to the facts of the case, the Browns could not be sure of their obligations under the statute and would have to expend a significant amount of time, money, and resources in attempting to fulfill the

requirements of the statute. What is more, without any way of knowing when it has fully complied, the City could continue to "move the goalposts," and ask more and more from the Browns all under the guise of requiring full compliance with R.C. 9.67.

84.     In addition, the Browns would have no way to dispute such requirements under the statute as currently written because there is no process to appeal any assertion by the City that the Browns have acted in contravention of R.C. 9.67 and no guidelines for what evidence would be needed to support such an assertion.

85.     In these ways, and more, the vagueness and ambiguity in the Modell Law authorizes or even encourages arbitrary and discriminatory enforcement.

86.     Therefore, R.C. 9.67 is void for vagueness, is unconstitutional, and cannot be enforced as to the Browns or any other Ohio professional sports team.

87.     As a result, the rights, status, or other legal obligations of the Browns and the City are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 is unconstitutional will terminate the uncertainty and controversy which has given rise to this proceeding.

**COUNT II**
**Declaratory Judgment – Violation of Contract Clause**
**Unconstitutional As Applied**

88.     The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

89.     Pursuant to 28 U.S.C. § 2201, there is a real and justiciable controversy between the Browns and the City concerning whether R.C. 9.67 is a valid and enforceable statute.

90.     The HBF Lease and the FCA were effective as of April 26, 1996, and predate the effective date of the Modell Law on June 20, 1996.

17

91.     The HBF Lease and the FCA made the Browns subject to the NFL Franchise Agreement, which provides the terms pursuant to which the Team is permitted to play as an NFL franchise.

92.     The Franchise Agreement prohibits the Browns from selling the Team without the express written consent of the NFL.

93.     Relocation of any NFL franchise outside of its home territory requires the prior approval by affirmative vote of three-fourths of the existing member clubs of the league.

94.     The Franchise Agreement also allows the Browns to relocate the Team and play games outside of HBF Stadium where the NFL agrees.

95.     The City takes the position that R.C. 9.67 may be enforced as to the Browns to either prevent the Browns from exercising their rights pursuant to the NFL Franchise Agreement to move the Stadium or to force a sale of the Team, all in direct contravention of the terms of the NFL franchise agreement.

96.     The Browns maintain that they: (i) may exercise their rights pursuant to the NFL Franchise Agreement to move the Stadium; and (ii) cannot give others an opportunity to purchase the Team in compliance with R.C. 9.67 without breaching the Franchise Agreement.

97.     Article I, Section 10 of the United States Constitution states, in relevant part, "No state shall . . . pass any . . . Law impairing the Obligation of Contracts."

98.     This clause is generally referred to as the "Contract Clause."

99.     In analyzing whether or not a statute violates the federal Contract Clause, courts have imposed a two-part test: (1) did the state law operate as a substantial impairment of a contractual relationship; and (2) is the state law appropriately and reasonably drawn in a way that advances a significant and legitimate public purpose.

100.     R.C. 9.67 substantially impairs the Browns' NFL Franchise Agreement and purports to void fundamental terms of the NFL Franchise Agreement by: (1) depriving the Browns of a critical bargained-for value in the form of the option to move the Stadium; or (2) forcing the Browns to offer the Team for purchase in direct contravention of the terms of the NFL Franchise Agreement.

101.     If the Browns were to comply with the statute and provide an opportunity to purchase the Team through a sale not approved by the NFL, they would be in breach of the NFL Franchise Agreement. Accordingly, complying with R.C. 9.67 would require the Browns to breach the NFL Franchise Agreement and, therefore, the statute violates the Contract Clause.

102.     R.C. 9.67 was not appropriately and reasonably drawn in a way that advances a significant and legitimate public purpose.

103.     Therefore, R.C. 9.67 violates the Contract Clause and is unconstitutional and cannot be enforced as to the Browns.

104.     As a result, the rights, status, or other legal obligations of the Browns and the City are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 is unconstitutional will terminate the uncertainty and controversy which has given rise to this proceeding.

### COUNT III
**Declaratory Judgment – Violation of Dormant Commerce Clause**
**Facially Unconstitutional and Unconstitutional As Applied**

105.     The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

106.     Pursuant to 28 U.S.C. § 2201, there is a real and justiciable controversy between the Browns and the City concerning whether the Art Modell Law, R.C. 9.67, which is currently the only law of its kind in the nation, is a valid and enforceable statute.

107.     The City takes the position that the Browns must comply with R.C. 9.67 and that the statute is constitutional, which the Browns deny.

108.     The Commerce Clause of the United States Constitution affirmatively grants Congress the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8.

109.     The dormant Commerce Clause, in consequence, restricts states from enacting laws that discriminate against interstate commerce by advantaging in-state firms or disadvantaging out-of-state rivals. *See, e.g., Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 370-7 (2023); *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-338 (2008).

110.     The dormant Commerce Clause further restricts states from placing burdens on interstate commerce that are clearly excessive when compared with putative local benefits. *Nat'l Pork Producers Council*, 598 U.S. at 377 (2023); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

111.     R.C. 9.67 violates the dormant Commerce Clause on its face.

112.     Specifically, the text of R.C. 9.67 violates the dormant Commerce Clause by advantaging in-state economic actors and disadvantaging out-of-state rivals by, among other things, giving Ohio political subdivisions and Ohio residents preferential treatment and special rights with respect to purchase of professional sports organizations that is not afforded to residents of states other than Ohio.

113.     R.C. 9.67 also violates the dormant Commerce Clause on its face by placing excessive burdens on interstate commerce without advancing any legitimate local interest.

114.    R.C. 9.67 also violates the dormant Commerce Clause as-applied to the Browns.

115.    For example, each of the NFL member teams are financially interdependent such that each member team's success or drawing power financially affects other teams nationwide.

116.    NFL member teams divide proceeds from television contracts equally and share revenue from ticket sales.

117.    Decisions about relocating the stadium in which the Team plays have nationwide economic impact.

118.    This type of revenue sharing, financial interdependence, and top-down League governance is true of all major American professional sports leagues.

119.    As applied, R.C. 9.67 violates the dormant Commerce Clause by interfering with the symbiotic relationship among NFL member teams nationwide, which inflicts substantial harm on interstate commerce.

120.    R.C. 9.67 has no connection to public safety, health, or well-being.

121.    As a result, the rights, status, or other legal obligations of the Browns and the City are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 is unconstitutional will terminate the uncertainty and controversy which has given rise to this proceeding.

## COUNT IV – In The Alternative to COUNTS I-III
### Declaratory Judgment – R.C. 9.67 Does Not Apply

122.    The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

123.    R.C. 9.67 requires that the owner of a professional sports team that uses a tax-supported facility for most of its home games and receives financial assistance from the state or a political subdivision thereof shall not cease playing most of its home games at that facility unless

21

it (i) enters into an agreement with the political subdivision; or (ii) gives "six months' advance notice of the owner's intention to cease playing most of its home games at the facility . . . ."

124.    The requirements of R.C. 9.67 have no application in the case of the Browns, as the duration for which the Team is set to play at HBF is spelled out in the HBF Lease between the City and StadCo, and all parties know already that the HBF Lease is set to expire in 2029.

125.    When the HBF Lease expires in 2029, the Team will no longer be obligated to play most of its home games at a facility supported by tax-payer funds as contemplated by R.C. 9.67.

126.    The Browns have not yet broken ground on or even finalized a deal for any new stadium and have repeatedly stated their intention for the Team to continue to play most of its home games at HBF through the remainder of the HBF Lease term.

127.    The Browns have no right or obligation for the Team to continue to play at HBF beyond the expiration of the HBF Lease in 2029, and, in fact, must surrender the HBF premises to the City upon expiration of the HBF Lease. The HBF Lease is therefore an agreement permitting the Team to play most of its home games elsewhere as contemplated by R.C. 9.67(A).

128.    Like the Browns, the City also has no obligation to renew the term of the HBF Lease beyond 2029.

129.    R.C. 9.67 does not require the Browns or the City to sign a new lease and is plainly intended to prevent a team that is playing in a tax-supported facility from moving from that location during the term of the applicable lease. The Browns have not, and do not intend, to move while they are obligated to play at HBF. In short, R.C. 9.67 simply does not apply to the matter of where the Team will play its home games after the expiration of the HBF Lease, and the City already has full knowledge of, and indeed, specifically negotiated the duration of that lease.

130.   What is more, R.C. 9.67 was enacted to address concerns raised in response to the Browns previously being moved out of the state of Ohio – which facts do not exist here.

131.   Therefore, the Browns are entitled to a declaration from this Court that the Browns' actions do not trigger or violate R.C. 9.67.

**WHEREFORE**, the Browns respectfully request that this Court:

A.   Enter a declaratory judgment finding that R.C. 9.67 is unconstitutional *per se* because it violates the dormant Commerce Clause of the United States Constitution;

B.   Enter a declaratory judgment finding that R.C. 9.67 is unconstitutional as applied to the Browns because it violates:

    i.   the Due Process Clause of the United States Constitution;

    ii.   the Contract Clause of the United States Constitution; and

    iii.   the dormant Commerce Clause of the United States Constitution;

C.   In the alternative, if this Court finds that R.C. 9.67 is constitutional, a judgment finding that the Browns' actions do not trigger or violate R.C. 9.67;

D.   An award of Plaintiff's reasonable attorney's fees and costs; and

E.   Such other necessary and proper relief, both legal and equitable, including attorney's fees and other costs, as this Court deems just and proper.

DATED:   November 15, 2024

Respectfully submitted,

*/s/ Anthony C. White*
Anthony C. White (0062146)
Robert F. Ware (0055515)
Kip T. Bollin (0065275)
Thomas M. Ritzert (0085370)
Kyle A. Hutnick (0095673)
THOMPSON HINE LLP
3900 Key Center

127 Public Square
Cleveland, OH 44114
Phone: (216) 566-5500
Fax: (216) 566-5800
Tony.White@ThompsonHine.com
Rob.Ware@ThompsonHine.com
Kip.Bollin@ThompsonHine.com
Thomas.Ritzert@ThompsonHine.com
Kyle.Hutnick@ThompsonHine.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was filed electronically on November 15, 2024 and counsel of record will receive a notice of filing through the Court's electronic filing system in accordance with Fed. R. Civ. P. 5(b)(2)(E) and this Court's Local Rules.

<u>*/s/ Anthony C. White*</u>
Anthony C. White (0062146)