# EXHIBIT A

Case: 1:24-cv-01857-DAR Doc #: 12 Filed: 11/

UNITED STATES DISTRIC
NORTHERN DISTRICT O

CLEVELAND BROWNS FOOTBALL          )
COMPANY LLC,                       )

Berea, Ohio 44017,                 )

              Plaintiff,           )
                                   )
vs.                                )

                                   )
THE CITY OF CLEVELAND,             )

Room 227                           )
c/o Mark D. Griffin, Chief Law Officer   )
Cleveland, Ohio 44114,             )

              Defendant.           )
                                   )
Please also serve:                 )

OHIO ATTORNEY GENERAL              )
Dave Yost,                         )
30 East Broad Street, 14th Floor   )
Columbus, Ohio 43215.              )

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

**CLEVELAND BROWNS FOOTBALL COMPANY LLC,**
76 Lou Groza Boulevard
Berea, Ohio 44017

**CLEVELAND BROWNS STADIUM COMPANY LLC,**
76 Lou Groza Boulevard
Berea, Ohio 44017

**HASLAM SPORTS GROUP, LLC,**
76 Lou Groza Boulevard
Berea, Ohio 44017

**JHAC, LLC,**
76 Lou Groza Boulevard
Berea, Ohio 44017

**Plaintiffs,**

**vs.**

**THE CITY OF CLEVELAND,**
c/o Mark D. Griffin, Law Director
601 Lakeside Avenue, Room 227
Cleveland, Ohio 44114

**MARK D. GRIFFIN**, in his official capacity,
601 Lakeside Avenue, Room 227
Cleveland, Ohio 44114

**Defendants.**

**Please also serve:**

**OHIO ATTORNEY GENERAL,**
c/o Dave Yost
30 East Broad Street, 14th Floor
Columbus, Ohio 43215

**Case No. 1:24-CV-01857-DAR**

**Judge David A. Ruiz**

**SECOND AMENDED COMPLAINT ~~FOR DECLARATORY JUDGMENT~~**

~~Plaintiff Cleveland Browns Football Company LLC (the "Browns") for its Amended~~

~~Complaint against Defendant the City of Cleveland ("City") alleges as follows:~~

~~I.      INTRODUCTION~~
~~1.      The Browns bring this action seeking a declaratory judgment finding that Ohio Rev. Code § 9.67 is unconstitutional on its face and as applied to the Browns, or in the alternative, finding that the Browns' intention to develop a domed stadium in the City of Brook Park, Ohio, and, after the expiration of its current lease obligations, play its home games at that~~

~~site, does not trigger or violate the~~

~~requirements of R.C. 9.67.~~

~~2.~~ ~~The Browns own the rights to the Cleveland Browns football franchise (the~~ ~~"Team"), a franchise within the National Football League ("NFL"). The Team currently plays~~ ~~home games at Huntington Bank Field located on Cleveland's lakefront ("HBF"), which is~~ ~~leased by an affiliate of the Browns, Cleveland Browns Stadium Company LLC ("StadCo"),~~ ~~pursuant to the terms of an April 26, 1996, lease agreement with the City that expires in 2029~~ ~~(the "HBF Lease").~~

## INTRODUCTION

1.      The Cleveland Browns and their owner bring this action to secure a thriving future for the team and its place in the City it calls home. In February 2029, less than four years from now, the Browns' thirty-year lease of Huntington Bank Field from the City will expire. The Browns' owner, the Haslam family, has been working for years to identify the best long-term stadium for the team after their lease ends—one that will be worthy of the franchise and its fans and also fiscally sensible for the City, the County, and the State.

2.      At the request of the City and its then-Mayor Frank Jackson, the Browns spent four years and several million dollars to produce a comprehensive economic development plan for the City's lakefront, long divided from the rest of downtown—one that would support the massive renovation that Huntington Bank Field would need to serve as the Browns' home after 2029. In 2021, the Browns unveiled that plan: a $450 million proposal to connect the lakefront to downtown by land bridge over the Shoreway and create a new development of restaurants, shops, and offices easily accessed by foot and car from Cleveland's central business district. Again with the City and Mayor's encouragement, the Browns then spent years working with architects, engineers, and

public planners to create a detailed plan for a renovation of the stadium and related infrastructure improvements to be completed by 2029.

3.      ~~Upon expiration of the HBF Lease, the Team will have no right or obligation to continue to play at HBF, nor will there be any obligation for there to be taxpayer funds used to support HBF, the Browns, or the Team's use of HBF.~~But in the past four years, the City has made little effort to partner with the Browns to realize these ambitious development plans. Despite years of discussions, the City still does not have an actionable plan for connecting the lakefront to downtown on any timeline, let alone one that can be executed by 2029. The City nevertheless clings to the idea of a lakefront stadium renovation. The City thus proposes to pour its scarce dollars into refurbishing a stadium that is already thirty years old, with no realistic prospect that the renovation will create either sustainable economic development on the lakefront or a sustainable home for the Browns. This short-sighted

4.      ~~Neither the City, nor StadCo, is under any obligation to renew the HBF Lease, and the HBF Lease requires StadCo to surrender the premises to the City upon expiration. In fact, the HBF Lease has specifically negotiated provisions restricting relocation of the Team, all of which expire at the end of the term.~~

5.      ~~HBF is an open-air stadium facility located on the shores of Lake Erie in downtown Cleveland, Ohio. Given the limitations of an open-air facility at this location, HBF is currently only used for major events 10 to 12 times per year. Yet, HBF occupies a significant footprint on Cleveland's downtown lakefront.~~

6.      ~~Since 2017, well over a decade prior to the expiration date for the HBF Lease, the Browns have planned for such expiration and worked in a good-faith, open, and transparent manner with the City to develop a long-term, sustainable stadium solution that would benefit the Team's loyal fans, the Cleveland lakefront, the region, and the people of Northeast Ohio.~~

7. Over the course of several years, with the City at the table and by their side, the Browns painstakingly and thoroughly investigated the costs and benefits of renovating HBF. They

proposal would cost its taxpayers hundreds of millions of dollars and leave them with nothing more than they have now—a deteriorating open-air stadium that sits idle most of the year.

4.      After years of study, the Haslam family has proposed a far superior solution: a world-class domed stadium, the first in Ohio, anchoring an entertainment district at a site in Brook Park less than a mile from the City line and next to Hopkins International Airport—all at *zero* cost to the City. Because it will be covered, the Brook Park stadium could be used year-round, no matter the weather, not just for Browns games, but also for other major sporting events, concerts, and shows, attracting events and visitors that now bypass the City. And the City would be unburdened of the expenses of the lakefront stadium—expenses it has struggled to fund and that exceed the revenue generated by Browns' home games there.

5.      The Haslams' proposal is a fiscally sound solution for the City that will keep the Browns in the heart of the greater metropolitan area for at least another fifty years. Instead of recognizing the benefits of the Haslams' proposal, the City seeks to hold the Browns hostage to its own failure of vision. Instead of a new domed facility that can drive significant economic activity year-round, the City insists on sticking with an aging, uncovered stadium that is used only a dozen or so times annually. Instead of a sustainable new home for the Browns, transformational for Cleveland and Northeast Ohio, the City insists on a wasteful and expedient renovation at City taxpayer expense. The City's myopic approach harms not only the Browns, but also the County and the City's own residents. The City's plan will cost Cleveland far more, and provide it far less. Whatever interests the City is seeking to serve, they are not those of its taxpayers, its NFL club, or its loyal fans.

6.      To justify its ill-advised opposition to a stadium in Brook Park, the City invokes the so-called "Modell Law"—named after Art Modell, the prior Browns owner who tried to take

~~also explored other sites in Cleveland, and at the City's request, recently conducted a detailed~~

~~analysis of the feasibility of building a new stadium and mixed-use development at the Burke~~

~~Lakefront Airport site in downtown Cleveland. The City was supportive of a potential Browns~~

~~move to a new stadium on the Burke Lakefront site and made a financial offer in support of such~~

~~move. Unfortunately, such financial offer was insufficient to absorb the vastly increased costs of~~

~~developing on the Burke Lakefront Airport site, and, in light of the uncertainty and risks involved~~

~~in closing of the airport, the City could not provide a definitive timeline for site availability~~

~~which is a critical element of planning for a project of this scale.~~

~~8.      As a result of this exhaustive years-long work, conducted in cooperation and in a~~

~~spirit of transparency with the City, the Browns concluded that investing billions of private and~~

~~public dollars in a stadium on the lakefront does not result in the greatest benefit for the Team's~~

~~fans or positive impact for the City or Northeast Ohio. Instead, the Browns recently indicated to~~

~~the City that they intend to focus on a domed stadium option in the City of Brook Park, Ohio,~~

~~which is adjacent to the City. In connection with such communication, the Browns also publicly~~

~~and privately reiterated their commitment to continue their significant philanthropic efforts in the~~

~~City after the potential move to Brook Park, which include supporting education, youth sports,~~

~~volunteerism, economic mobility, reentry, and many other community and charitable causes.~~

~~9.      The Brook Park option would support an estimated 50 to 70 event days per year,~~

~~including at least an additional 6 to 10 major concerts and events (i.e., 50,000 people per event),~~

~~would drive significant economic activity in the City, County, Northeast Ohio region, and State,~~

~~would open up the HBF lakefront location for improved development and year-round activity,~~

~~and would make it feasible for the Team to remain in the Greater Cleveland area for generations~~

~~to come.~~

Case: 1:24-cv-01857-DAR Doc #: 12 Filed: 11/15/24 4 of 25. PageID #: 57

10.     However, despite: (a) the Browns' transparency with the City; (b) the fact that the City will have received the full value of its bargain under the HBF Lease; and (c) the fact that the Browns have repeatedly confirmed that the HBF Lease will be performed in full prior to expiration, the City seeks to use extracontractual measures that were not a part of the Parties' business relationship or negotiations to thwart the Browns' ability to exercise its bargained for contractual rights (after performing its bargained for obligations).

11.     Indeed, the City has stated its opposition to the Browns' efforts to make the dome stadium in Brook Park a reality, and has inaccurately likened the construction of a stadium in Brook Park, on land that borders the City, to the decision made by a previous owner of the Browns, Art Modell, to move the franchise over 400 miles away to Baltimore, Maryland in 1995.

12.     In early 1996, in the aftermath of Art Modell's actions, the NFL and the City announced that the NFL would bring a new NFL team to Cleveland to play in a to be constructed stadium, which today is HBF. On April 26, 1996, the City and the NFL entered into the HBF Lease and a Franchise Commitment Agreement (the "FCA") pursuant to which the new team and stadium could be built.

13.     After the City's agreements with the NFL were already in effect, Ohio enacted Revised Code Section 9.67, known informally as the "Modell Law," effective June 20, 1996. The Modell Law imposes certain vague, unconstitutional restrictions on the owner of a professional sports team playing most of its home games at a tax-supported facility.

14.     On May 6, 2024, the Cleveland City Council passed Emergency Ordinance 391-2024, authorizing and directing the City's Director of Law to enforce the provisions of the Modell Law against the Browns. City Law Director Mark Griffin also has made it clear that the City plans to take legal action against the Browns in connection with the Brook Park stadium option. Indeed,

on October 22, 2024, Mr. Griffin told local reporters that the City is compiling information, researching law, and evaluating its next steps "before moving forward with formal litigation action – which will likely occur in the coming weeks" to enforce the Modell Law, noting that the City will do "everything we can" to keep the Team in downtown Cleveland, including filing a lawsuit under the Modell Law to "require the Browns to make their team available for local purchasers who will keep the team in the City of Cleveland."[1] These and other similar statements and threats of litigation have caused uncertainty regarding the Browns' legal rights and obligations in connection with the domed stadium project and the Team's potential options after the 2028 season. The Browns do not desire conflict with the City but have been compelled to bring this action to resolve this uncertainty and obtain clarity regarding their rights and obligations, and to enable the Browns to move forward for the benefit of the Team's fans and the region.

15.     The Browns dispute that the Modell Law is constitutional or enforceable, and, in any event, deny any violation of the Modell Law. Given the City's Emergency Ordinance and repeated comments to news media of its intentions to sue the Browns under the Modell Law or otherwise enforce that statute, the Browns are left with no choice but to come to this Court for relief, and seek a declaration that the Modell Law is unconstitutional, both *per se* and as applied, and in the alternative, that even if enforceable, the Browns have not taken any action that would trigger or violate that law.

---

[1] http://www.news5cleveland.com/sports/browns/battle-over-new-browns-stadium-could-play-out-in-court (last accessed Oct. 23, 2024).

the team to Baltimore. But the Haslams are nothing like Art Modell, and the Modell Law has no application here. The Haslams—all three generations of them—are unwavering in their commitment to Cleveland and the Browns. Faced with the City's failure to make progress on a plan to fund and execute the infrastructure improvements and other development initiatives necessary to make the lakefront a plausible long-term home for the Browns, the Haslams have identified a far better alternative—right here in Cuyahoga County, just over the City limit.

7. This is not a flight from Cleveland: it is a recommitment to Cleveland, promising *billions* in regional private investment. The City's invocation of the Modell Law must therefore be rejected, as a matter of federal constitutional principles, statutory construction, and simple common sense. The Cleveland Browns and their faithful fans are entitled to a world-class home right here in the Cleveland area, without undue burden on the taxpayer, and in a forum that befits the team and contributes to the community. Nothing in the Modell Law can or should operate to defeat those salutary objectives.

**PARTIES**

8. Cleveland Browns Football Company LLC owns and operates the Cleveland Browns NFL franchise. It is a Delaware limited liability company with its principal place of business at 76 Lou Groza Boulevard, Berea, Ohio 44017.

9. Cleveland Browns Stadium Company LLC is party to a lease of Huntington Bank Field from the City of Cleveland. It is a Delaware limited liability company with its principal place of business at 76 Lou Groza Boulevard, Berea, Ohio 44017.

10. JHAC, LLC, owned by the Haslam family, owns Cleveland Browns Football Company LLC and Cleveland Browns Stadium Company LLC. It is a Delaware limited liability company with its principal place of business at 76 Lou Groza Blvd, Berea, Ohio 44017.

## ~~II.     PARTIES, JURISDICTION, AND VENUE~~

11. Haslam Sports Group, LLC is the managing member of JHAC, LLC. It is a
~~16.     The Browns are a~~ Delaware limited liability company with ~~their~~its principal place of business at 76 Lou Groza ~~Boulevard~~Blvd, Berea, Ohio 44017. ~~The Browns are the business entity that own and operate the Team.~~

~~17~~12.   ~~The~~Defendant City ~~of Cleveland~~ is a municipal corporation organized under the laws of the State of Ohio~~ and is located at 601 Lakeside Avenue, Cleveland, Ohio 44114~~.

13. Mark D. Griffin is the Law Director of the City of Cleveland and is named only in his official capacity.

### JURISDICTION AND VENUE

~~18~~ 14.   This Court has subject matter jurisdiction ~~over the Browns' federal declaratory judgment claims pursuant to~~under 28 U.S.C. §~~§~~ 1331 and ~~2201~~.

~~19.     This Court has supplemental jurisdiction over the Browns' state law claim for declaratory relief that they are not in violation of Ohio Rev. Code § 9.67 pursuant to 28 U.S.C. §§ 1367(a) and 2201 because this state law claim and the Browns' federal claims arise from a common nucleus of operative fact and because the Browns' state law claim is so related to their federal claims that they form part of the same case or controversy.~~§ 1367(a) because this action presents federal questions arising under the U.S. Constitution and under 42 U.S.C. § 1983.

~~20~~15.   This Court ~~may exercise~~has personal jurisdiction over the City because the City is ~~located within this forum and because this forum has an interest in adjudicating this dispute.~~an Ohio

--

municipal corporation. This Court has personal jurisdiction over Griffin because he is a resident of Ohio and named in his official capacity as the Law Director of the City.

16. This Court has authority to order declaratory and injunctive relief under 28 U.S.C. § 2201 and § 2202, 42 U.S.C. § 1983, and Fed. R. Civ. P. 65.

~~21~~17. Venue is proper ~~in this Court pursuant to~~under 28 U.S.C. § 1391(b)(1) and (2) because the City is located

in ~~the Northern~~this District and Griffin is a resident of Ohio and because a substantial part of the ~~property that is the subject of this action is situated in the Northern~~events or omissions giving rise to the claims occurred in this District ~~of Ohio~~.

### ~~III. BACKGROUND~~

**~~A.    The NFL's Teams are Financially Interdependent and Subject to NFL Rules.~~**
~~22.    The NFL is comprised of 32 member teams. Each team operates as a franchise and agrees to be subject to the NFL's oversight and to abide by the NFL's bylaws and other rules.~~

## **BACKGROUND**

### **A.** **Owner Art Modell tries to move the Browns to Baltimore—years before their stadium lease expires—and the City sues to enforce the full lease term**

~~23.~~ ~~Due to the large number of member teams in a variety of different jurisdictions, the NFL's success depends on its ability to oversee and coordinate with each of its member teams nationwide.~~

~~24~~18.   The ~~NFL's member teams have a symbiotic relationship where each member team's success or drawing power financially affects other teams nationwide.~~Cleveland Browns have been a member of the National Football League since

1950. Each NFL team operates as a franchise, subject to the NFL's rules and oversight. Because

~~25.~~ ~~For example, the NFL contracts with television networks to air games for each of the member teams nationwide. The revenues from those television network contracts are divided equally among member teams.~~member teams share certain revenues and jointly bear certain costs, their operations are financially

~~26.~~ ~~NFL member teams also share revenue from ticket sales. The capacity and quality of a team's stadium impacts ticket sales and prices, and thus these factors for one team's playing venue impact revenue for the other 31 NFL member franchises.~~

~~27.~~ ~~Accordingly, decisions about whether to renovate or build a new stadium have economic impact well beyond the city and state in which that stadium is located.~~

~~28.~~ ~~This level of interdependence is why, among other reasons, adding and removing member teams from the league, and other significant operational changes by member teams such as changing the location and venue for home games, must be approved by the NFL and its members.~~

~~29.~~ ~~Interfering with the symbiotic relationship among NFL member teams inflicts substantial harm on interstate commerce.~~

--

interdependent. NFL rules accordingly require the league's approval of significant operational changes by member teams, including a move or significant renovation of a team's home stadium.

19.     In 1973, an affiliate of the Cleveland Browns, then owned by Art Modell, entered into a lease agreement with the City for Municipal Stadium. That lease, and the contemplated sublease between the affiliate and the Browns, obligated the owners of the Browns to use the stadium for the team's regular season home games through the twenty-five-year term of the lease—that is, until the end of 1998.

20.     In 1995, however—three years before the lease expired—Modell announced that he was moving the Browns to Baltimore. Modell (then represented by the same firm that represents the City in this action) argued that a subsequent agreement between the affiliate and the Browns relieved the team of its obligation to use the stadium during the lease term. And as Modell saw it, even if the Browns were still subject to the lease, the City was entitled only to damages for breach of the agreement.

21.     The City sued to enforce the lease agreement. It sought not simply an award of damages for breach of contract, but an order requiring Modell and the Browns to keep their promise to play in Municipal Stadium for the full lease term. That specific promise, the City argued, "is what the City bargained for in the Lease." And "[t]o allow the Browns to repudiate the

Lease agreement, three years before its expiration, would deny the City the essential benefit of its bargain."

**B.** **The City ~~Entered Into~~, the ~~HBF Lease~~NFL, and ~~FCA to Bring~~ the Browns ~~Back to Cleveland.~~ reach a new lease bargain on a new stadium**

~~30.~~  ~~In November 1995, then-owner of the Browns, Art Modell, announced that he was moving the Team from Cleveland, Ohio to Baltimore, Maryland, in part due to the aging conditions of Cleveland's Municipal Stadium, where the Team was playing home games.~~

~~31.~~  ~~In the midst of intense public outcry following the announced move and following discussions with the City, in February 1996 the NFL announced that it would approve a new NFL team to play home games in Cleveland.~~

~~32~~22.  ~~On April 26,~~In February 1996, the City and the ~~NFL entered into two agreements necessary to~~Browns reached a settlement that included the NFL—a necessary party because its approval is required to move a franchise or create a new one.

23.  Under the settlement, Modell was permitted to transfer the existing Browns franchise to Baltimore, but was required to surrender the Browns' name and records to a new franchise, to be located in Cleveland. In exchange, the City was required to build, with funding assistance from the NFL, a new stadium on the site of Municipal Stadium, to be leased to the new Browns franchise for a thirty-year term.

24.  That new bargain was memorialized in several interrelated agreements, including a Stadium Financing Agreement, Lease by Way of Concession (attached as Ex. A), and Franchise Commitment Agreement (attached as Ex. B).

25.  The Lease by Way of Concession, dated April 26, 1996 ("Lease"), governed the ~~create a~~lease of the new ~~team and~~ stadium~~: the HBF~~—today called Huntington Bank Field. The NFL executed the Lease ~~and the FCA.~~"as

~~33.~~  ~~In the FCA, the NFL agreed to approve a new Cleveland NFL Franchise that would~~

~~--~~

~~participate in the NFL's league structure and be subject to all of the NFL's bylaws and other rules.~~

~~34.     The City and the NFL (standing in the shoes of a future owner), entered into the~~ a nominee for the New Owner" of the Browns franchise and committed to assign the Lease to the new owner, once identified. As a result of that assignment, the new owner would assume "all of the terms of this Lease and all of the obligations and liabilities of Lessee." *See* Ex. A, § 3.

26.     The Lease provides that its term extends thirty years from "the February 1st prior to the first season" in which the new Browns franchise participates in the NFL. *See* Lease, § 6(a), (b). That season began in the fall of 1999. The Lease term thus ends on February 1, 2029.

~~30-year HBF~~27.     ~~Under the~~ Lease ~~where~~, the City agreed to build a new stadium ~~for~~, subject to the ~~expansion team.~~NFL's financing commitments. *See* Ex. A, § 4.

35. ~~All NFL franchises, including the team contemplated by the FCA, must be bound by the NFL's franchise agreement (the "NFL Franchise Agreement").~~

36. ~~The NFL Franchise Agreement sets forth the terms pursuant to which the Team is permitted to play as an NFL team.~~

37. ~~Under the NFL Franchise Agreement, the Browns became subject to certain contractual obligations with the NFL concerning the ability to sell the Team at a later date, including but not limited to, ultimate approval by other NFL team owners of such a potential sale.~~

38. ~~The Franchise Agreement also allows the Browns to relocate the Team and play games outside of HBF only if the NFL agrees.~~

39. ~~Under Section 4.3 of the NFL Constitution, relocation of any NFL franchise outside of its home territory requires the prior approval by affirmative vote of three-fourths of the existing member clubs of the league.~~

40. ~~In or about September 1998, the Browns entered into an Expansion Franchise Agreement where the Browns acquired the rights to own and operate the Team as a new member of the NFL.~~

28. The City also agreed to pay for specified "Capital Repairs," including emergency capital repairs, during the Lease term. *See* Ex. A, § 14.

29. Under the Lease, the Browns' owner agreed to pay $250,000 in annual rent and to pay for routine stadium maintenance and for any stadium alterations or improvements. *See* Ex. A, §§ 7, 11.

--

30.    The Browns' owner also agreed that the Browns would play "for not less than thirty (30) years, all regular season home games" in the new stadium, as well as other games (such as post-season games) that could be played in the new stadium. The Browns' owner also agreed that "during the Term of this Lease," the Browns would play at least half of pre-season home games in the new stadium. *See* Ex. A, § 9(a).

31.    The Browns' owner also agreed that, "throughout the Term of this Lease," it shall "maintain . . . its rights to play professional football in the City of Cleveland, Ohio," and "be obligated to play home games of the Franchise at the New Stadium in Cleveland, Ohio, as provided in this Lease." *See* Ex. A, § 9(b).

32.    The Lease provisions obligating the Browns to play games in the new stadium during the Lease term are expressly subject to "the City's right to specific performance of [those] obligations." *See* Ex. A, § 22(e).

33.    If the stadium is damaged, or the City fails to fulfill its repair obligations, such that the Browns are prevented from playing at least half of their regular season home games there, the Lease provides that the Browns' owner has "the right to extend the Term of this Lease for one (1) additional Lease Year." *See* Ex. A, § 20(c).

34.    With that single exception (which has not eventuated), neither party has the right or obligation to extend or renew the Lease for any period beyond its term.

~~41~~35.   ~~In connection with~~The Lease provides that the Browns~~' acquisition~~ "shall, on the expiration of the ~~Team, the Browns affiliate,~~term hereby granted, or upon the earlier termination of the Lease, peaceably and quietly leave, surrender or yield up unto the City the Leased Premises." *See* Ex. A, § 28(a).

~~StadCo, was assigned certain rights and obligations under a lease for HBF, where the Team plays most of its home games. The HBF Lease expires in 2029. The HBF Lease does not automatically renew, StadCo is under no obligation to renew the HBF Lease, and neither is the City. In other words, in accordance with the terms the City originally negotiated with the NFL, the time for which the Team is to play at HBF is set to naturally expire under the operation of the HBF Lease in 2029, and the Team has no right, or obligation, to play at HBF after expiration of the HBF Lease. Rather, the Team has the obligation to surrender the HBF premises to the City upon expiration of the HBF Lease.~~

~~42.    The Browns and StadCo have complied with the terms of the HBF Lease, and as required by the HBF Lease the Team will continue to play most of its home games at HBF through the remainder of the HBF Lease term, i.e., through the 2028 NFL season.~~

**C.    To deter a would-be Modell, Ohio ~~Passed~~passes the "Modell Law ~~in Response to the Abrupt Relocation of the Browns to Another State.~~"**

36.    In June 1996—after the execution of the parties' settlement, the Lease, and related ~~43.    Effective June 20, 1996, Ohio~~agreements—the Ohio General Assembly enacted R.C. 9.67~~, known informally as the Modell~~. Born of outrage over Modell's flight to Baltimore—without warning and years before the Browns' stadium lease with the City expired—the law seeks to deter an owner tempted to try the same gambit. Known as the Modell Law, ~~imposing certain limitations on owners of~~it is a legislative response to the risk that another owner of a professional sports ~~teams utilizing tax supported~~team might seek to deprive the State or an Ohio city of the benefit of their bargains in supporting a team's ~~facilities within the state~~home facility with taxpayer dollars.

44~~37~~.   ~~R.C. 9.67 states as follows~~In its entirety, the Modell Law provides:
~~Case: 1:24-cv-01857-DAR Doc #: 12 Filed: 11/15/24 10 of 25. PageID #: 63~~

No owner of a professional sports team that uses a tax-supported facility for most of its home games and receives financial assistance from the state or a political subdivision thereof shall cease playing most of its home games at the facility and begin playing most of its home games elsewhere unless the owner either:

> (A) Enters into an agreement with the political subdivision permitting the team to play most of its home games elsewhere;

> (B) Gives the political subdivision in which the facility is located not less than six months' advance notice of the owner's intention to cease playing most of its home games at the facility and, during the six months after such notice, gives the political subdivision or any individual or group of individuals who reside in the area the opportunity to purchase the team.

45~~38~~.   The Modell Law ~~does not contain or incorporate any supporting definitions of its~~—consistent with its nickname, text, and evident purpose—has

never been used to punish owners who act nothing like Modell. The Modell Law has never been applied to an owner whose team has affirmed its intention to play games as required by its stadium lease until the expiration of the lease. Nor has the Modell Law ever been applied to an owner who ~~operative terms, and it includes many vague and undefined terms.~~

~~46.     For example, the Modell Law does not specify what is meant by "financial assistance," and there are no analogous statutes or rules from which a definition can be ascertained.~~

~~47.     Nor does the statute indicate what is meant by "political subdivision," or if a facility can be supported by more than one "political subdivision." If there can be more than one political subdivision, then which political subdivision would have priority or apply? In this case, the Brook Park site is located within Cuyahoga County, which is the same county within which the existing lakefront stadium is located.~~

~~48.     The statute also does not state whether the term "elsewhere," refers to any location different than the tax-supported facility, or instead a location outside of a relevant "political subdivision," which is itself an undefined term.~~

49. ~~Nor does the statute provide any guidance to owners about how to send advance "notice," to whom "notice" should be sent, or what the "notice" must contain.~~

50. ~~The statute does not provide any guidance to owners about what constitutes the "opportunity" that must be afforded to potential buyers hoping to purchase the team, or how much a potential purchaser must be able to bring to the table in order to be a truly bona fide potential~~

has publicly committed to keeping the team in the metropolitan area—and proposed investing well over a billion dollars to build a new local stadium to uphold that promise.

**D.** **The City builds the new stadium and the Browns' new owner assumes the Lease**

39.     The City broke ground on the new stadium in 1997 and completed construction in 1999. Meanwhile, Al Lerner acquired the new Browns franchise in 1998. As required by the Lease terms, the new Browns franchise assumed the Lease (through its affiliate, Cleveland Browns Stadium Company LLC).

**E.** **The Haslam family acquires the Browns and invests deeply in the team, in Cleveland, and in Ohio**

40.     The Haslam family acquired the Browns in 2012. Professional sports are not the family's first family business. Jim Haslam founded Pilot Corporation in 1958. His son, Jimmy Haslam, started at the travel center company as a teenager, pumping gas, and eventually working his way up to CEO and chairman. He built Pilot into the fifth-largest private company in the country before selling it to Berkshire Hathaway in 2024. Jimmy and Dee Haslam's daughter, Whitney Haslam Johnson, worked at Pilot for twenty years before it was sold. Dee, meanwhile, has built a successful career as an executive producer and founder of RIVR Media, a production company that has produced over 3,000 television episodes for twenty-one different networks.

41.     After buying the Browns, the Haslam family brought its business skills, financial resources, and civic pride to Northeast Ohio. The Haslams currently own the Browns through the Haslam Sports Group, headquartered just outside Cleveland, in Berea. Jimmy is the chairman and Dee is the CEO, and both are managing partners. Whitney is also a managing partner, and her husband, James Wood "JW" Johnson III, is executive vice president and a partner. The Johnsons live with their three sons in Cuyahoga County.

42.    In his first press conference as a new owner of the Browns, Jimmy Haslam assured the community that there was "zero chance" his family would "move the team out of Cleveland." Within a year of the purchase, the Haslams and the Browns announced a $120 million plan to improve the stadium by reconfiguring seats to improve fan sightlines, modernizing the exterior, adding escalators, and upgrading concession offerings. The Haslams agreed to fund upfront the entirety of the expense—$120 million—to allow the upgrades to be made by 2015. The City reimbursed just one-quarter of that cost, over fifteen years.

43.    The Haslams have exhibited the same civic commitment in serving other great Cleveland institutions. They have committed funding to install synthetic turf fields at sixteen public schools in the metropolitan Cleveland area. They have been significant supporters of Cleveland's healthcare institutions—donating $20 million to University Hospitals to create the Haslam Sports Innovation Center, and $30 million to the Cleveland Clinic in the last two years alone. Led by Dee Haslam, the Cleveland Browns Foundation was a founding member of the Stay in the Game! Attendance Network, a public/private partnership combatting chronic absenteeism of schoolchildren throughout Ohio and now supporting nearly 380,000 students. Dee has also been an enthusiastic supporter of the City and its most important business and cultural organizations, serving as a director of the Greater Cleveland Partnership, the United Way of Greater Cleveland (Executive Council), University Hospitals Systems, the Cleveland Orchestra, and the Rock & Roll Hall of Fame. In all, the Haslams and the Browns have contributed more than $150 million to worthy causes in Northeast Ohio since the family purchased the team.

---

purchaser. For example—does anyone who offers $25 for the team get treated as a potential buyer under the Modell Law? Does the buyer have to keep the team within the existing stadium

or political subdivision? The statute does not require the team to remain within the political subdivision. The statute does not provide that the City gets to approve a successful buyer.

51.    Nor is the statute clear on what "area" individuals must reside in to be eligible for an opportunity to purchase the team.

52.    Moreover, the Modell Law does not contain any exceptions or carve outs for circumstances in which the statute would interfere with the terms of any contract applicable to the professional sports team in question, or the owner, such as: (a) a negotiated lease for the facility in question with specific non-relocation provisions and, critically, a defined term after which such provisions expire; or (b) contractual provisions with a national sports league governing or restricting the terms on which a particular sports franchise may be sold or relocated.

53.    On its face, the Modell Law also discriminates against interstate commerce by providing "individuals who reside in the area" (i.e., in Ohio) with an opportunity to purchase the Team, to the exclusion of individuals outside Ohio.

**D̶F.    The City Has Threatened to Prematurely Enforce the Modell Law. Haslam family expands its commitment to professional sports in Ohio**

54.    In August 2012, the current owners of the Browns acquired the Team, and consistent with NFL rules, NFL team owners unanimously approved that purchase in October 2012.

55.    In 2017, over a decade before the HBF Lease was set to expire, the Browns began working in cooperation with the City on options for potential renovation of HBF and other future stadium options.

44.    In 2017, the private operator of the Columbus Crew, a Major League Soccer team, announced that it planned to move the team to Austin, Texas—even though the team had more than five years left on its stadium lease with the State of Ohio. Faced with a professional sports

team threatening to move to another state in the middle of its lease, the State of Ohio sued—invoking the Modell Law to argue that the team was required to stay in Columbus or face a forced sale process.

45.     The Haslams stepped in, recognizing that the Crew "belong[ed] in Columbus." In December 2018, the Haslams reached an agreement to become co-investors in the team and keep it in Columbus. And Haslam Sports Group promptly contributed more than $220 million toward the construction of a new state-of-the-art stadium and training facility for the team. Lower.com Field and the OhioHealth Performance Center opened in 2021.

46.     Haslam Sports Group has not stopped at improving the facilities of the Crew. It has committed $10 million to fund a public sports park in Northeast Columbus. And it has supported Columbus City Schools and other neighboring school districts through soccer pitch projects as well as its Stay in the Game! and Soccer in Schools programs. In 2024, the Haslams continued their commitment to healthcare initiatives, donating $2 million to Pelotonia, a Columbus organization devoted to raising funds for cancer research.

**G.     The City asks the Browns to develop a plan to create a vibrant lakefront economic development integrated with the downtown business district**

47.     Under its terms, the Browns' Lease of their current stadium, Huntington Bank Field, ends in February 2029. The stadium—hastily constructed in two years after Modell's flight to Baltimore—will by then be thirty years old. As both the Browns and the City have long understood, that stadium will be incapable of serving as an adequate—let alone first-rate—home for the Browns without an extensive and costly renovation and surrounding infrastructure improvements.

48.     As an open-air facility, the current stadium is used only for eight to ten Browns games and a handful of non-Browns events per year. All in all, Huntington Bank Field is typically

56.    Following many years of cost benefit analysis and consideration of multiple stadium options conducted in cooperation with the City, the Browns recently indicated to the City that they would be focusing on a domed stadium option in the city of Brook Park, Ohio, which neighbors the City. The Browns would not begin playing any games in the potential Brook Park domed stadium until after the expiration of the HBF Lease.

57.    In May 2024, the City passed Emergency Ordinance 391-2024, authorizing and directing the City Law Director to enforce the Modell Law against the Browns.

58.    In October 2024, the City Law Director, certain City Council members, and other City officials, made numerous statements to the effect that the City intended to take action against the Browns and would seek to enforce the Modell Law to prevent the Team from playing at a stadium in Brook Park, or outside the City. As reported by one Cleveland news outlet, Cleveland Law Director Mark Griffin stated: "We're gonna move forward because that's the law. We're gonna move forward because that is what the Cleveland city ordinances require us to do."[2]

59.    The City has made it clear it will attempt to arbitrarily enforce the Modell Law now, years before the HBF Lease will expire in 2029, and despite the Browns' compliance with the terms of the HBF Lease.

60.    In comments to local media, the City Law Director conceded that the Modell Law interferes with the Browns' contractual arrangements with the NFL and the NFL rules, noting that the City itself would not purchase the Team because "[m]y understanding of the NFL is they prohibit cities from doing that."[3]

_
https://www.wkyc.com/article/sports/nfl/browns/cleveland-browns-art-modell-law-haslam-sports-group-domed-st

~~adium brook park city council bibb administration/95 55370573 81e9 4a29 af21 fe3bebedfe9f (last accessed 11/15/2024).~~

~~https://www.news5cleveland.com/sports/browns/battle over new browns stadium could play out in court.~~

used for no more than a dozen events a year. The stadium, like the rest of the lakefront, is separated from the downtown business district by the Shoreway—a 50 mile-per-hour highway—and rail lines. Those site limitations have long made it impossible for the stadium or other lakefront attractions to anchor a revitalized downtown, by blocking easy pedestrian and transit access that could connect the central business district with the lakefront.

49.     A comprehensive project to develop and integrate the lakefront with the downtown business district has long been on the wish list of the City and its administrators. So in 2017, knowing that the Browns would need to plan for a home that served their needs in 2029 and beyond, Mayor Frank Jackson asked the Browns to present a vision to connect the lakefront to downtown and transform it into an area of economic vitality.

50.     Working with the City, Dee and Jimmy Haslam led that project. They spent years generating a plan that would serve the public's interest in economic renewal and create a lakefront neighborhood that could support a home for the Browns in the decades following the Lease expiration. The Browns commissioned and funded a planning study by Nelson Byrd Woltz, a renowned landscape architecture firm known for ambitious public development projects across the country.

51.     The Browns unveiled the plan in May 2021. It contemplated transforming the Shoreway into a wide, attractive boulevard and building a wide landscaped land bridge over the boulevard as well as a new transit hub, which would link the downtown business district to a lakefront revitalized by new mixed-use development.

**H.     Encouraged by the City, the Browns present a plan for a renovated stadium in a redeveloped lakefront newly connected to downtown**

52.     In November 2021, the Browns met with Mayor-elect Justin Bibb to discuss his priorities and plans for the lakefront. Encouraged by his stated support for a redeveloped lakefront

--

with new infrastructure links to downtown, the Browns began investigating a potential renovation of the existing stadium for use after the Lease ended in 2029. The Browns assembled and funded a team of experts—real estate developers, financial advisors, architects, designers, engineering firms, construction companies, and consultants—to create detailed renovation plans and cost estimates.

53.     After more than a year of work, in early 2023, the Browns presented a renovation plan to the City and County. The more modest version of that plan would adequately renovate the aging stadium to extend its life by about twenty years. But even that plan would cost approximately $1 billion in upfront funding. That renovation plan depended on substantial infrastructure improvements, such as the land bridge over the Shoreway and new transit hub, that would not only link the renovated stadium and surrounding development to the central business district, but also drive economic activity in the lakefront that would help fund the renovation costs, either through taxes on increased revenues or private financing.        Those infrastructure improvements would cost hundreds of millions of dollars—in addition to the $1 billion cost of renovating the stadium.

**I.      After the City repeatedly fails to step up with a viable funding plan for a renovated stadium in a lakefront linked to downtown, the Browns begin exploring a new domed stadium alternative that can generate greater revenue**

54.     Serious engagement on the renovation plan thus required the City and the County to present a clear path to obtaining the necessary public funding on the necessary timeline—that is, in time to complete renovations by the 2029 NFL season. Although the Browns engaged in months of back-and-forth with the City and the County, neither offered a viable proposal to provide the public funding on which the renovation plan depends.

55.     If renovation of the lakefront stadium were indeed the priority the City claims it is, the City would have responded to the funding challenge with creativity and urgency. But as months passed, it became clear to the Browns that it was imperative to develop a plan for a new home for the Browns that did not depend on significant public funding from the City—public funding that the City appeared to have neither the will nor the ability to offer.

56.     The Browns therefore took a hard look at other sites for a new stadium in Cleveland and its immediate vicinity, ultimately focusing on the possibility of constructing a new domed stadium. A dome is an economic game-changer for the increasingly forbidding math required to justify the massive private and public investment of a major stadium renovation or construction—especially for an NFL stadium, which hosts only eight to ten team home games a year. A dome makes a stadium an all-weather, all-season facility—one that can be used year-round for dozens of major events. The revenue generated by a regular schedule of events—summer and winter, rain or shine—and the related boost to restaurants, shops, and hotels makes private financing cheaper and easier to attract. And more important, because a dome multiplies by several times the economic impact and tax revenues a stadium can generate, it significantly relieves the burden of public funding that a new stadium or stadium renovation would otherwise impose on local taxpayers. Among the multiple positive follow-on effects of this economic development: more jobs for City and area residents.

57.     None of this is possible at the lakefront, because putting a dome on Huntington Bank Stadium is not feasible. Because the stadium sits close to Burke Lakefront Airport, building height restrictions imposed by the Federal Aviation Authority foreclose a renovation that would add a dome. There are no plans to close that airport. And even if it is possible to secure the necessary regulatory and other approvals to shut it down (an open question), the timeline for doing

so is highly speculative. What's more, adding a dome to an existing facility is an expensive and structurally complicated undertaking. It's doubtful that the returns would justify the massive investment when the facility is already thirty years old.

6158.    Moreover,In October 2023, the Browns informed the City Law Director admitted that the purpose of the City'sthat they were considering other enforcement of the Modell Law is to give local purchasers a preference over other individuals who may be located in states other than Ohio, stating that the City is prepared to "file a lawsuit to require the Browns to make their team available for local purchasers who will keep the team in the City of Cleveland."4

sites—in or near Cleveland—that could support a domed stadium.

**J.    The Browns propose a new domed stadium a few miles southwest of Cleveland that will cost the City and its taxpayers nothing**

59.    A vacant site in Brook Park, a suburb bordering Cleveland to the southwest, looked especially promising. The site lies less than a mile from the City limits, near Hopkins International Airport, and close to the Browns' training facility in Berea. And it has ample space for mixed-use development that would benefit from a year-round calendar of events, as well as substantial room for parking—a perennial challenge at the existing stadium site. And its proximity to two major highways makes it easily accessible not only to fans throughout the Cleveland area, but also to those in Central Ohio and the rest of the state. In March 2024, the Browns acquired an option to purchase the Brook Park site to ensure its availability for future stadium development.

60.    In April 2024, the Browns presented the County with a detailed proposal for a new stadium on the Brook Park site—along with a plan for funding it. Construction of a new domed stadium that will last at least fifty years with proper capital maintenance was projected to take approximately three and a half years and cost $2.4 billion. In recent years, new NFL stadiums have been financed with a majority of public investment. But the Haslams proposed that private

funding contribute at least half the construction cost—$1.2 billion, plus any cost overruns. As for

the other half to come from public funding, the Haslams proposed that it be divided among the

State, the County, and Brook Park—with the vast majority supported by incremental taxes and

fees on revenues generated by the new stadium development, and the remainder supported by

modest new taxes that would be paid by visitors. That fiscally disciplined allocation is possible only because of the dome and the adjacent mixed-use development it will anchor. The state and local revenues from additional year-round use of the stadium beyond Browns games—projected to be more than $6.3 billion over a thirty-year lease term—will enable construction of a world-class sports and entertainment facility that in time will pay for itself.

61.    A new stadium development in Brook Park would give the City and its residents the benefits of one of the most ambitious and spectacular NFL stadium projects less than a mile from City limits at *zero* cost to the City and its taxpayers. The Browns appreciate that even today, the City is struggling to satisfy its obligations to fund capital repairs to the existing stadium, as well as to the facilities of other professional sports teams in Northeast Ohio. The Brook Park proposal frees the City and its taxpayers from any stadium funding obligations, as well as the substantial expenses the City incurs as a result of operations on Browns game days. A new stadium in Brook Park would also expand the City's options for redeveloping the lakefront—by freeing up prime lakefront real estate currently occupied by the stadium for other public and commercial uses.

62.    ~~Plainly, based on the City's emergency ordinance and recent statements of City officials, the City takes the position that the Modell Law is constitutional and enforceable and that the Browns' indication that they are pursuing the option of a stadium in Brook Park violates~~ Careful attention to Cleveland's fiscal resources and how they can best be deployed counsels in favor of City and County officials giving the Brook Park proposal fair consideration. Certainly, the City's taxpayers and residents deserve that ~~statute~~.

63.    ~~The~~ Yet the City ~~will have received the full benefit of its bargain with the Browns at                                        the conclusion of the HBF Lease, as the Browns have repeatedly reiterated that they fully intend to perform under the terms of the HBF Lease through its expiration in 2029.~~ responded with

knee-jerk hostility to the Brook Park plan—though it still had not presented a viable funding plan of its own for a stadium renovation or new lakefront development. On May 6, the City passed Emergency Ordinance 391-2024, "direct[ing]" its lawyers to "fully enforce" the Modell Law "to keep the Cleveland Browns in the City of Cleveland and to protect the interests of the taxpayers of the City with regard to their investment in the lakefront stadium."

64. The Browns specifically negotiated terms in the HBF Lease that provide the Browns with certain express and implied rights when the HBF Lease expires in 2029, including terms concerning relocation, wind up, and surrender of the premises. The City now seeks to use the Modell Law to impose extracontractual terms on the Browns that would ultimately prevent the Browns from exercising those bargained for contractual rights at the end of the HBF Lease term and would cause the Browns to violate the terms of other agreements like the NFL Franchise Agreement.

65. R.C. 9.67, even if found to be constitutional, which the Browns dispute, is simply inapplicable where, as here, the HBF Lease does not expire until 2029 and the Browns have made

*Id.*

~~it clear to the City that the Team will continue to play most of its home games at HBF until that agreement expires.~~

~~66.    Based on the City's position, the Browns had no choice but to seek a ruling from this Court as to the enforceability and current inapplicability of the Modell Law.~~

~~67~~64.   The City did not explain how the Browns ~~deny that~~could possibly violate the Modell Law ~~is constitutional and deny any violation of~~ by looking for a new stadium home in the Cleveland area *after* their Lease of the current stadium expires. Or how the City's refusal to consider a plan to build a world-class stadium less than a mile from City lines, at no expense to City taxpayers, could possibly be in taxpayers' interests.

**K.    The City presents a proposal for funding a stadium renovation that would cost Cleveland taxpayers hundreds of millions of dollars and do nothing to make the stadium a magnet for economic development**

65.    In August 2024—more than a year after the Browns had presented a stadium ~~that statute.~~

~~COUNT I~~
~~Declaratory Judgment – Violation of Due Process – Void for Vagueness~~
~~Unconstitutional As Applied~~

~~68.    The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.~~

~~69.    Pursuant to 28 U.S.C. § 2201, there is a real and justiciable controversy between the Browns~~renovation plan and its costs to the City ~~concerning whether R.C. 9.67 is a valid and enforceable statute.~~  the City publicly released its funding proposal. That

~~70.    The City takes the position that R.C. 9.67 prevents the Browns from building a new stadium in Brook Park, Ohio, which the Browns deny.~~

~~71.    The statute is so vague and ambiguous that no owner of a professional sports~~

~~franchise in Ohio has fair notice about what conduct the statute contemplates or forbids.~~

~~72.    It is a basic principle of due process that a statute is void for vagueness if its prohibitions are not clearly defined. *Memphis Ctr. For Reprod. Health v. Slatery*, No. 20-5969, 2020 U.S. App. LEXIS 36780, at \*4-5 (6th Cir. Nov. 20, 2020) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).~~

~~73.    To survive a void for vagueness challenge, a statute must "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. . ." *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 341-42 (6th Cir. 2007) (quoting *Colautti v. Franklin*, 439 U.S. 379, 390, 99 S. Ct. 675, 58 L. Ed. 2d 596 (1979)).~~

proposal confirmed what the Browns already suspected—that the City does not have a realistic or fiscally sensible solution to the massive public and private investment required to fund a stadium renovation.

66.    The City's funding proposal acknowledged that a stadium renovation would cost at least approximately $1 billion. But the City proposed to contribute just $20 million—less than 2%—in upfront construction costs, then dribble out $347 million over the thirty-year term of a new lease. And the City offered only the speculative hope, not a clear plan or commitment, that the State and County would help shoulder the City's public funding contribution. The City's proposal thus left to the Haslams and the Browns the responsibility of generating a plan to fund virtually the entire upfront cost of renovating the City-owned stadium. None of the public-private partnerships that have funded NFL stadium projects in recent history have forced the team to bear such heavy costs at the outset of the project.

67.    The City's proposal also capped its responsibility to pay for capital repairs, at $94 million. But it has long been standard for NFL stadium leases to divide the burden of repair and maintenance costs between team owners and the government lessors—with no cap. The existing

Lease, for example, requires the Browns' owner to pay for all routine maintenance and any alterations or improvements, while the City is responsible for all capital repairs.

68.     And the City's proposal came with no plan for funding all of the hundreds of millions of dollars in infrastructure improvements necessary to connect the lakefront and a renovated stadium to downtown—or even a date for delivering that plan. An open-air stadium cut off from downtown is what the City has now. And such a stadium cannot generate the revenue needed to fund a massive private or public investment in a stadium renovation. The City's proposal is based on the unrealistic idea that the Browns will nonetheless pay the majority of the more than $1 billion necessary to fund a renovation of a stadium in an isolated lakefront.

69.     Recognizing that a domed stadium offers substantial economic benefits that an open-air stadium never can, the City asked the Browns in September 2024 to evaluate the feasibility of building a domed stadium adjacent to the current stadium, on the site of Burke Lakefront Airport. But the City has no authority to shut down Burke Lakefront Airport to replace it with a stadium. Nor does the City have any way to ensure that it will ever obtain the regulatory approvals required to do so, let alone soon enough to make Burke Lakefront Airport an alternative stadium site.

70.     The Haslams and the Browns, however, remain committed to working with the City and County to find the best new home for the Browns in the Cleveland area—not just the best home for the team and their fans, but the most fiscally responsible solution for local residents and taxpayers. So they spent hundreds of thousands of dollars working with engineering firms and consultants to determine if a domed stadium at Burke Lakefront Airport is a realistic alternative to one in Brook Park.

74.     R.C. 9.67 vaguely requires the owner of a professional sports team who relocates the team "elsewhere," to either: (i) enter into an agreement with the local political subdivision; or (ii) give "six months' advance notice of the owner's intention to cease playing most of its home games at the facility" and give individuals "who reside in the area" the "opportunity" to purchase the team. R.C. 9.67(B).

75.     However, the statute does not include any definitions for its terms, nor does it provide any guidance for giving notice under the statute or what kind of opportunity to purchase the team is sufficient to satisfy the statute.

76.     The statute's terms do not provide a person of ordinary intelligence with any notice whatsoever as to what conduct is covered by the statute or what is required to comply.

77.     For example, how far must a team move to be located "elsewhere"? Is a new stadium across the street "elsewhere"? A different location within the same city? Outside the City but within the same county? Outside the region? Outside the State of Ohio?

78.     Similarly, what constitutes "an agreement ... permitting the team to play ...elsewhere"? And when must that "agreement" be entered into? Does a lease containing relocation restrictions during the lease term that expire with the lease term suffice to satisfy R.C. 9.67(A)? Or must an owner enter into a new agreement with a political subdivision after giving "advance notice" of an "intention to cease playing" at the current facility?

79.     R.C. 9.67(B) requires an owner to give "six months' advance notice of the owner's intention" to move the team. But when does an owner manifest the "intention" to move the team? At the beginning of the planning stage? When renderings are unveiled publicly? When land for the new stadium is under contract? When construction begins? When the new stadium is ready for

71.    It isn't. Because of ground characterizations and other site disadvantages, building a domed stadium at Burke Lakefront Airport would cost $3.3 billion—far more than the $2.4 billion cost of a domed stadium in Brook Park. And even that figure assumes construction begins in 2026—unrealistic given the regulatory approvals necessary to shut down and potentially relocate the airport—again, approvals that might never be obtained. With each year of delay, that $3.3 billion estimate, already prohibitively high, rises substantially. And, like a renovation of the current stadium, a new stadium at Burke Lakefront Airport would require hundreds of millions of dollars in associated infrastructure investment—in highway connections, transit access, and parking facilities. A stadium in Brook Park, situated just off the highway, would require less than $100 million in infrastructure investment.

72.    After the impracticality of replacing Burke Lakefront Airport with a new stadium became clear, the Haslams issued a public statement explaining their decision to focus their planning efforts on a new stadium in Brook Park. As they explained, they had worked since 2017 with the City and Mayor "to find the optimal long-term solution for our stadium." And they had "learned through our exhaustive work that renovating our current stadium will simply not solve many operational issues and would be a short-term approach."

73.    "With more time to reflect," they explained, "we have also realized that without a dome, we will not attract the type of large-scale events and year-round activity to justify the magnitude of this public-private partnership." Ultimately, the Haslams explained, "[t]he transformational economic opportunities created by a dome far outweigh what a renovated stadium could produce with around ten events per year." And, the Haslams added, whether the Browns' home is inside City lines or just beyond them, "Cleveland and Northeast Ohio are the fabric of the Browns and that will always be the case."

use? When written notice of a date certain for the move is provided? The statute gives no guidance when an owner attempting to comply with the statute must send this notice.

80. The statute is also unclear what "area" is covered when it requires that "individuals who reside in the area" must have the opportunity to purchase the team. *Id.* As applied to the Browns, does the statute's requirements include all residents in the City of Cleveland? Cuyahoga County? Northeast Ohio? The State of Ohio? Again, the statute fails to specify which individuals have an opportunity to purchase the team and which offers an owner must consider. The statute is also silent on the role of the applicable professional sports league, despite each professional league playing a dispositive role in the transfer of team ownership rights.

81. The statute also does not specify what kind of "opportunity" must be given to those individuals who want to purchase the team. What time frame constitutes a sufficient "opportunity"? Days? Weeks? Months? Must all offers be considered? May individuals located outside of the "area" bid at the same time individuals located within the "area"? How much consideration should each offer receive? How much due diligence are prospective buyers entitled to? Must the prospective buyer agree to keep the team at the current facility? Again the statute is silent where it must be precise.

82. Rather than meet their obligation to draft laws that are "clearly defined" and provide

"fair notice" to the public, Ohio lawmakers, influenced by the understandable emotion of the beloved Browns leaving Ohio, swayed to the political pressures of the day by enacting a symbolic yet incomprehensible statute that is impermissibly vague and unconstitutional.

83. Indeed, as currently constructed, even if R.C. 9.67 were triggered and applied to the facts of the case, the Browns could not be sure of their obligations under the statute and

~~would have to expend a significant amount of time, money, and resources in attempting to fulfill the~~

**L.      The City tries to invoke the Modell Law—against owners nothing like Modell**

74.      Days after the Haslams' statement, Cleveland Law Director Mark Griffin said the City would "move forward" with enforcing the Modell Law against the Browns and the Haslams. Again, the City did not explain how the Modell Law could possibly apply to them—a team and owner who are facing a lease expiration on an aging stadium and doing nothing more than prudently searching for the best long-term stadium home in the Cleveland area, well within the team's NFL-defined home territory.

75.      Planning a new stadium in Brook Park, less than a mile from Cleveland's southwestern border, for use after the Browns' current stadium lease expires, bears no resemblance to Modell's attempt to remove the Browns to another state, years before their stadium lease expired. The City may seek to score cheap points by implausibly casting the Haslams as today's Modell, abandoning Cleveland. But the City should know better—especially since it is now represented by the very same firm that represented Modell when the City sued to enforce the Browns' stadium lease in 1995. No one thinks an NFL team leaves its city by building a stadium within a metropolitan area, rather than within city lines. The NFL's rules, in place long before the Browns signed their current stadium Lease, make this clear: they define a team's home territory as encompassing a 75-mile radius beyond the franchise city. Brook Park is less than a mile from Cleveland. Plenty of NFL teams have their home stadium in suburbs of their home city. The Dallas Cowboys play in Arlington. The San Francisco 49ers play in Santa Clara. The Los Angeles Rams and Chargers play in Inglewood. The Buffalo Bills play in Orchard Park. The Washington Commanders play in Summerfield, Maryland. And the New York Giants and Jets

don't even play in New York State, but in Rutherford, New Jersey. But no one is confused about which city any of these teams calls home.

76.     The City's threats prompted the Brown to seek to protect their right to find the best new home for their franchise after the expiration of the Lease, whether within Cleveland or in the broader metropolitan area that has always claimed the City and the Browns as its own. They therefore brought this suit in October, seeking to stop the enforcement of the Modell Law against them as unconstitutional and plainly contrary to the Modell Law's plain words and intended application.

77.     The Haslams and the Browns, however, have been and remain committed to working together with the City and County "to find the optimal long-term solution for our stadium." Even as the City has threatened them with the Modell Law, they have continued to seek a dialogue with the Mayor and County officials. They have not simply urged the City and County to fairly consider the Brook Park proposal. They have for their part also continued to engage with the City on its preferred proposal—a stadium renovation—by seeking answers from the City about their concerns so they can be sure to accurately assess each proposal's costs and benefits.

78.     The Browns have also sought to collaborate with the City to objectively evaluate both the renovation proposal and the Brook Park proposal, offering detailed answers—in writing— to the City's questions and urging continued engagement to find a solution satisfactory to all. The City reciprocated with its own lawsuit. In mid-January, making good on its threat, the City sued the Haslams and the Browns in state court, claiming that they violated the Modell Law.

79.     Even now, the City has not explained how the Modell Law could apply to a team that has complied and will comply with each of its contractual commitments to the City, that has played and will play its home games in its stadium until the expiration of its lease, and whose owners have committed to keeping the team in the Cleveland area long after the lease expires. The City appears to believe that a law passed after the Browns signed a contract with the City can

somehow render the contract's terms meaningless, and require the Browns to play all their home games, forever, in a stadium of the City's choosing, without regard to fiscal responsibility, the needs of the team and its fans, or the condition of the facility.

80.    The City's threatened application of the Modell Law is unreasonable on its face—as well as unconstitutional. The City's suit is a legally meritless and fiscally irresponsible attempt to handcuff the Browns to an aging stadium long after their contractual obligations end. Its strategy is apparently to run out the clock so the Browns are unable to bring the Brook Park stadium to fruition by 2029, and so hold the team, its fans, and the community hostage to an inferior alternative and the political whims of city managers. The City's obstinance is hurting the very people it is claiming to help—not just the Browns and their fans in the City, its suburbs, and beyond—but also Cleveland residents and taxpayers.

81.    The Browns thus require prompt relief from the City's unlawful campaign to enforce the Modell Law. Because the current stadium lease expires after the 2028 season, the new stadium must be completed by mid-2029 for the Browns to be able to use it in time for the 2029 season. Because a new stadium in Brook Park is expected to take at least forty months to construct, the Browns will need to break ground by early 2026 to meet that deadline. Absent prompt relief, the uncertainty created by the City's attempt to enforce the Modell Law against them will unlawfully impair their ability to exercise their contractual and legal rights to call a new stadium home in 2029.

~~requirements of the statute. What is more, without any way of knowing when it has fully complied,~~

~~the City could continue to "move the goalposts," and ask more and more from the Browns all~~

~~under the guise of requiring full compliance with R.C. 9.67.~~

~~84.~~ ~~In addition, the Browns would have no way to dispute such requirements under the~~

~~statute as currently written because there is no process to appeal any assertion by the City that the~~

~~Browns have acted in contravention of R.C. 9.67 and no guidelines for what evidence would be~~

~~needed to support such an assertion.~~

~~85.~~ ~~In these ways, and more, the vagueness and ambiguity in the Modell Law authorizes~~

~~or even encourages arbitrary and discriminatory enforcement.~~

~~86.~~ ~~Therefore, R.C. 9.67 is void for vagueness, is unconstitutional, and cannot be~~

~~enforced as to the Browns or any other Ohio professional sports team.~~

~~87.~~ ~~As a result, the rights, status, or other legal obligations of the Browns and the City~~

~~are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 is~~

~~unconstitutional will terminate the uncertainty and controversy which has given rise to this~~

~~proceeding.~~

~~**COUNT II**~~
~~**Declaratory Judgment – Violation of Contract Clause**~~
~~**Unconstitutional As Applied**~~

~~88.~~ ~~The Browns incorporate the allegations set forth in the preceding paragraphs of this~~

~~Complaint as if fully rewritten herein.~~

~~89.~~ ~~Pursuant to 28 U.S.C. § 2201, there is a real and justiciable controversy between~~

~~the Browns and the City concerning whether R.C. 9.67 is a valid and enforceable statute.~~

~~90.~~ ~~The HBF Lease and the FCA were effective as of April 26, 1996, and predate the~~

~~effective date of the Modell Law on June 20, 1996.~~

~~=~~

91.     The HBF Lease and the FCA made the Browns subject to the NFL Franchise Agreement, which provides the terms pursuant to which the Team is permitted to play as an NFL franchise.

92.     The Franchise Agreement prohibits the Browns from selling the Team without the express written consent of the NFL.

93.     Relocation of any NFL franchise outside of its home territory requires the prior approval by affirmative vote of three-fourths of the existing member clubs of the league.

94.     The Franchise Agreement also allows the Browns to relocate the Team and play games outside of HBF Stadium where the NFL agrees.

95.     The City takes the position that R.C. 9.67 may be enforced as to the Browns to either prevent the Browns from exercising their rights pursuant to the NFL Franchise Agreement to move the Stadium or to force a sale of the Team, all in direct contravention of the terms of the NFL franchise agreement.

96.     The Browns maintain that they: (i) may exercise their rights pursuant to the NFL Franchise Agreement to move the Stadium; and (ii) cannot give others an opportunity to purchase the Team in compliance with R.C. 9.67 without breaching the Franchise Agreement.

## CAUSES OF ACTION

### FIRST CLAIM
### Violation of Art. 1, § 8 and § 10, and the Fourteenth Amendment of the U.S. Constitution
### (Against the City of Cleveland)

82.     Plaintiffs re-allege each of the preceding paragraphs as if set forth again in full.

83.     The Browns' Lease of the stadium, now called Huntington Bank Field, from the City became effective on April 26, 1996 and expires on February 1, 2029.

84.     The Lease does not impose any obligation on the Browns to play games in, or

--

otherwise use, the stadium after its term ends.

85. The City has no right to unilaterally extend the Lease for any period, and the parties have not agreed to any extension or renewal of the Lease.

86. On May 6, 2024, the City passed Emergency Ordinance 391-2024, through which "the Director of Law," Mark D. Griffin, was "authorized and directed to fully enforce the provisions of" the Modell Law against Plaintiffs.

87. The City contends that the Modell Law may be enforced to either prevent the Browns from exercising their rights to move to a new home stadium or to force their sale to a new owner, in direct contravention of the terms of the Lease and related agreements, including among others the Franchise Commitment Agreement.

88. The City's attempt to enforce the Modell Law against Plaintiffs violates their bargained-for rights under the Lease and related agreements, in violation of the Contracts Clause 97. of Article I, Section 10 of the United StatesU.S. Constitution, which states, in relevant part, "No [n]o state shall . . .

pass any . . . Law impairing the Obligation of Contracts."

89. The City contends that the Modell Law may be enforced to discriminate between in-state and out-of-state economic interests by, among other things, giving Ohio political

98.    This clause is generally referred to as the "Contract Clause."

99.    In analyzing whether or not a statute violates the federal Contract Clause, courts have imposed a two-part test: (1) did the state law operate as a substantial impairment of a contractual relationship; and (2) is the state law appropriately and reasonably drawn in a way that advances a significant and legitimate public purpose.

Case: 1:24-cv-01857-DAR Doc #: 1230-1 Filed: 11/15/24 1903/18/25 26 of 25183. PageID #: 72306

100. R.C. 9.67 substantially impairs the Browns' NFL Franchise Agreement and purports to void fundamental terms of the NFL Franchise Agreement by: (1) depriving the Browns of a critical bargained-for value in the form of the option to move the Stadium; or (2) forcing the Browns to offer the Team for purchase in direct contravention of the terms of the NFL Franchise Agreement.

101.    If the Browns were to comply with the statute and provide an opportunity to purchase the Team through a sale not approved by the NFL, they would be in breach of the NFL Franchise Agreement. Accordingly, complying with R.C. 9.67 would require the Browns to breach the NFL Franchise Agreement and, therefore, the statute violates the Contract Clause.

102. R.C. 9.67 was not appropriately and reasonably drawn in a way that advances a significant and legitimate public purpose.

103.    Therefore, R.C. 9.67 violates the Contract Clause and is unconstitutional and cannot be enforced as to the Browns.

104.    As a result, the rights, status, or other legal obligations of the Browns and the City are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 is unconstitutional will terminate the uncertainty and controversy which has given rise to this proceeding.

**COUNT III**

**Declaratory Judgment – Violation of Dormant Commerce Clause
Facially Unconstitutional and Unconstitutional As Applied**

105.    The Browns incorporate the allegations set forth in the preceding paragraphs of this

Complaint as if fully rewritten herein.

subdivisions and residents preferential treatment and special rights with respect to the purchase of professional sports organizations.

90.     The Modell Law also interferes with the financial relationships within the NFL, including between and among NFL franchises and their owners.

91.     The Modell Law places excessive burdens on interstate commerce without advancing any legitimate local interest.

92.     The Modell Law, and the City's attempted enforcement thereof, violates both facially and as applied to Plaintiffs here, the Commerce Clause of Article 1, Section 8 of the U.S. Constitution, which grants Congress the power to "regulate Commerce . . . among the several States."

93.     The Modell Law is so vague and indefinite that it fails to provide the Browns and their owner fair notice whether their contemplated conduct is forbidden by the statute and thus encourages arbitrary and erratic enforcement in violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

94.     The statute is impermissibly vague and indefinite because, among other things, it fails to provide adequate notice as to whether its requirements are triggered when the Browns have complied and will comply with all game usage obligations of the lease agreement for the facility in which they are currently playing most of their home games; what agreements can satisfy its requirement of "an agreement with the political subdivision permitting the team to play most of its home games elsewhere"; the nature, including the timing, of any financial assistance the Browns must receive for their owner to be presently subject to the Modell Law; any discernible or consistent standard for determining the time of "the owner's intention to cease playing most of its home games at the facility"; the nature of the required "six months' advance notice" and the

manner in which it can be adequately provided; any definition of the "area" in which a "group of individuals" must reside in order to be entitled to an "opportunity to purchase the team"; and the nature of the "opportunity to purchase the team" that must be given by the owner, including any actions the owners must affirmatively undertake, in order to satisfy the statute.

95.     The City's attempt to enforce the Modell Law against Plaintiffs violates the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

96.     The City is also liable to Plaintiffs for redress under 42 U.S.C. § 1983 because the City's attempt to enforce the Modell Law deprives Plaintiffs of rights, privileges, or immunities secured by the Constitution and laws of the United States.

97.     The City's attempt to enforce the Modell Law against Plaintiffs is causing and will cause Plaintiffs to suffer damages, including costs incurred as a result of any delays in obtaining approvals and financing for, or in commencing the construction of, a new stadium at Brook Park.

98.     Plaintiffs seek a declaration that the City's attempt to enforce the Modell Law against them violates the U.S. Constitution.

99.     Plaintiffs seek injunctive relief to enjoin the City from enforcing the Modell Law against them, including by bringing or prosecuting suit, in violation of the U.S. Constitution.

100.    Absent declaratory and injunctive relief, Plaintiffs will suffer irreparable harm.

**SECOND CLAIM**
**Violation of Art. 1, § 8 and § 10, and the Fourteenth Amendment of the U.S. Constitution**
**(Against Mark D. Griffin, in his official capacity as Law Director of the City of Cleveland)**

101.    Plaintiffs re-allege each of the preceding paragraphs as if set forth again in full.

102. The Browns' Lease of the stadium, now called Huntington Bank Field, from the City became effective on April 26, 1996 and expires on February 1, 2029.

103.   The Lease does not impose any obligation on the Browns to play games in, or otherwise use, the stadium after its term ends.

~~106.   Pursuant to 28 U.S.C. § 2201, there is a real and justiciable controversy between the Browns and the City concerning whether the Art Modell Law, R.C. 9.67, which is currently the only law of its kind in the nation, is a valid and enforceable statute.~~

~~107~~104.       The City ~~takes the position that the Browns must comply with R.C. 9.67 and~~                                 that the statute is constitutional, which the Browns deny.~~ has no right to unilaterally extend the Lease for       any       period,       and       the       parties have not agreed to any extension or renewal of the Lease.

105. On May 6, 2024, the City passed Emergency Ordinance 391-2024, through which "the Director of Law," Mark D. Griffin, was "authorized and directed to fully enforce the provisions of" the Modell Law against Plaintiffs.

106. The City, by and through its Director of Law, contends that the Modell Law may be enforced to either prevent the Browns from exercising their rights to move to a new home stadium or to force their sale to a new owner, in direct contravention of the terms of the Lease and related agreements, including among others the Franchise Commitment Agreement.

107.   The City's attempt to enforce the Modell Law, by and through its Director of Law, against Plaintiffs violates their bargained-for rights under the Lease and related agreements, in violation of the Contracts Clause of Article I, Section 10 of the U.S. Constitution, which states, in relevant part, "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts."

108. ~~The Commerce Clause of the United States Constitution affirmatively grants Congress the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8.~~

109. ~~The dormant Commerce Clause, in consequence, restricts states from enacting laws that discriminate against interstate commerce by advantaging in state firms or disadvantaging out of state rivals. *See, e.g., Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 370 7 (2023); *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 337 338 (2008).~~

110. ~~The dormant Commerce Clause further restricts states from placing burdens on interstate commerce that are clearly excessive when compared with putative local benefits. *Nat'l Pork Producers Council*, 598 U.S. at 377 (2023); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).~~

111. ~~R.C. 9.67 violates the dormant Commerce Clause on its face.~~

112. ~~Specifically, the text of R.C. 9.67 violates the dormant Commerce Clause by advantaging in state economic actors and disadvantaging out of state rivals~~108. The City, by and through its Director of Law, contends that the Modell Law may be enforced to discriminate between in-state and out-of-state economic interests by, among other things, giving Ohio political subdivisions and ~~Ohio~~ residents preferential treatment and special rights with respect to the purchase of professional sports organizations ~~that is not afforded to residents of states other than Ohio~~.

109. The Modell Law also interferes with the financial relationships within the NFL, including between and among NFL franchises and their owners.

113. ~~R.C. 9.67 also violates the dormant Commerce Clause on its face by placing~~ 110.The Modell Law places excessive burdens on interstate commerce without advancing any legitimate local interest.

114.    R.C. 9.67 also violates the dormant Commerce Clause as applied to the Browns.

115. For example, each of the NFL member teams are financially interdependent such
that each member team's success or drawing power financially affects other teams nationwide.

116. NFL member teams divide proceeds from television contracts equally and share
revenue from ticket sales.

117. Decisions about relocating the stadium in which the Team plays have nationwide
economic impact.

118.    This type of revenue sharing, financial interdependence, and top-down League
governance is true of all major American professional sports leagues.

119.    As applied, R.C. 9.67 violates the dormant Commerce Clause by interfering with
the symbiotic relationship among NFL member teams nationwide, which inflicts substantial harm
on interstate commerce.

120.    R.C. 9.67 has no connection to public safety, health, or well-being.

121.    As a result, the rights, status, or other legal obligations of the Browns and the City
are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 is
unconstitutional will terminate the uncertainty and controversy which has given rise to this
proceeding.

**COUNT IV   In The Alternative to COUNTS I-III**
**Declaratory Judgment   R.C. 9.67 Does Not Apply**

~~122~~111.        The ~~Browns incorporate the allegations set forth in the preceding paragraphs~~
~~of this~~Modell Law, and the City's attempted enforcement thereof, by and through its

Director of Law, violates both facially and as applied to Plaintiffs here, the Commerce Clause of Article 1, Section 8 of the U.S. Constitution, which grants Congress the power to "regulate Commerce . . . among the several States."

112.    The Modell Law is so vague and indefinite that it fails to provide the Browns and their owner fair notice whether their contemplated conduct is forbidden by the statute and thus encourages arbitrary and erratic enforcement in violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

Complaint as if fully rewritten herein.

123.    R.C. 9.67 requires that the owner of a professional sports team that uses a tax-supported facility for most of its home games and receives financial assistance from the state or a political subdivision thereof shall not cease 113.    The statute is impermissibly vague and indefinite because, among other things, it fails to provide adequate notice as to whether its requirements are triggered when the Browns have complied and will comply with all game usage obligations of the lease agreement for the facility in which they are currently playing most of its their home games at that facility unless ; what agreements can satisfy its requirement of "Case: 1:24-cv-01857-DAR Doc #: 12 Filed: 11/15/24 22 of 25. PageID #: 75 it (i) enters into an agreement with the political subdivision; or (ii) gives "six months' advance notice of permitting the team to play most of its home games elsewhere"; the nature, including the timing, of any financial assistance the Browns must receive for their owner to be presently subject to the Modell Law; any discernible or consistent standard for determining the time of "the owner's intention to cease playing most of its home games at the facility . . . ."; the nature of the required "six months' advance notice" and the manner in which it can be adequately provided; any definition of the "area" in which a "group of individuals" must reside in order to be entitled to an "opportunity to purchase the team"; and the nature of the "opportunity to purchase the team" that must be given by the owner, including any actions the owners must affirmatively undertake, in order to satisfy the statute.

--

124.    The requirements of R.C. 9.67 have no application in the case of the Browns, as the duration for which the Team is set to play at HBF is spelled out in the HBF Lease between the City and StadCo, and all parties know already that the HBF Lease is set to expire in 2029.

125. When the HBF Lease expires in 2029, the Team will no longer be obligated to play most of its home games at a facility supported by tax-payer funds as contemplated by R.C. 9.67.

126. The Browns have not yet broken ground on or even finalized a deal for any new stadium and have repeatedly stated their intention for the Team to continue to play most of its home games at HBF through the remainder of the HBF Lease term.

127. The Browns have no right or obligation for the Team to continue to play at HBF beyond the expiration of the HBF Lease in 2029, and, in fact, must surrender the HBF premises to the City upon expiration of the HBF Lease. The HBF Lease is therefore an agreement permitting the Team to play most of its home games elsewhere as contemplated by R.C. 9.67(A).

128. Like the Browns, the City also has no obligation to renew the term of the HBF Lease beyond 2029.

129.    R.C. 9.67 does not require the Browns or the City to sign a new lease and is plainly intended to prevent a team that is playing in a tax-supported facility from moving from that location during the term of the applicable lease. The Browns have not, and do not intend, to move while they are obligated to play at HBF. In short, R.C. 9.67 simply does not apply to the matter of where the Team will play its home games after the expiration of the HBF Lease, and the City already has full knowledge of, and indeed, specifically negotiated the duration of that lease.

Case: 1:24-cv-01857-DAR Doc #: 12 Filed: 11/15/24 23 of 25. PageID #: 76

130.    What is more, R.C. 9.67 was enacted to address concerns raised in response to the Browns previously being moved out of the state of Ohio – which facts do not exist here.

131.    Therefore, the Browns are entitled to a declaration from this Court that the Browns' actions do not trigger or violate R.C. 9.67.

==

~~**WHEREFORE**, the Browns respectfully request that this Court:~~

~~A.      Enter a declaratory judgment finding that R.C. 9.67 is unconstitutional *per se*~~
~~because it violates the dormant Commerce Clause of the United States Constitution;~~

~~B.      Enter a declaratory judgment finding that R.C. 9.67 is unconstitutional as applied~~
~~to the Browns because it violates:~~

~~i.      the Due Process Clause of the United States Constitution;~~

~~ii.      the Contract Clause of the United States Constitution; and~~

~~iii.      the dormant Commerce Clause of the United States Constitution;~~

~~C.      In the alternative, if this Court finds that R.C. 9.67 is constitutional, a judgment~~
~~finding that the Browns' actions do not trigger or violate R.C. 9.67;~~

114.    The City's attempt to enforce the Modell Law, by and through its Director of Law, against Plaintiffs violates the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

115.    The City, by and through its Director of Law, is also liable to Plaintiffs for redress under 42 U.S.C. § 1983 because the City's enforcement of the Modell Law, by and through its Director of Law, deprives Plaintiffs of rights, privileges, or immunities secured by the Constitution and laws of the United States.

116.    Plaintiffs seek a declaration that the City's attempt to enforce the Modell Law, by and through its Director of Law, against them violates the U.S. Constitution.

117.    Plaintiffs seek injunctive relief to enjoin the City's Director of Law from enforcing the Modell Law against them, including by bringing or prosecuting suit, in violation of the U.S. Constitution.

118.    Absent declaratory and injunctive relief, Plaintiffs will suffer irreparable harm.

**THIRD CLAIM**
**In the alternative to the First and Second Claims**
**(Against the City of Cleveland and Mark D. Griffin, in his official capacity as Law Director of the City of Cleveland)**

119.    The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

120. The requirements of the Modell Law have no application to any action the Browns or their owner take to cease the playing of their home games at Huntington Bank Field after the Browns' lease of that facility from the City of Cleveland expires by its terms.

121.    The Modell Law does not require a professional sports team or its owner to play in a facility without a lease agreement or to enter into a new lease agreement for a facility. As confirmed by the circumstances of its enactment, the Modell Law is plainly intended to prevent

a team that is playing in a tax-supported facility from abandoning that facility during the term of the applicable lease. The Browns have no intention of playing, and will not play, most of their home games at another facility during the term of their lease of Huntington Bank Field.

122.    Plaintiffs are therefore entitled to a declaration that any action by the Browns to cease playing most of their home games at Huntington Bank Field after their lease of that facility expires does not trigger or violate the Modell Law.

**WHEREFORE**, the Browns pray for an order and judgment:

A.    Declaring, pursuant to 28 U.S.C. § 2201, that the Modell Law violates the U.S. Constitution and is unenforceable;

B.    Declaring, pursuant to 28 U.S.C. § 2201, that any action by the Browns to cease playing most of their home games at Huntington Bank Field after their existing lease of that facility expires does not trigger or violate the Modell Law;

C.    Granting permanent injunctive relief prohibiting the Defendants and their officers and agents from attempting to enforce the Modell Law against Plaintiffs on the basis of any action by the Browns to cease playing most of their home games at Huntington Bank Field after their existing lease of that facility expires;

D.    ~~An award of Plaintiff's reasonable attorney's fees and costs; and~~Awarding Plaintiffs damages for the costs incurred as a result of the City's attempted enforcement of the Modell Law;

E.    ~~Such other necessary and proper relief, both legal and equitable, including attorney's fees and other costs, as this Court deems just and proper.~~

--

E.      Awarding Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C.

        § 1988 and any other applicable statute or regulation;

F.      Granting such further relief as the Court may deem proper.

DATEDDated: November 15 March 18, 20242025

Respectfully submitted,

*/s/ Anthony C. White*
Anthony C. White (0062146)
Robert F. Ware (0055515)
Kip T. Bollin (0065275)
Thomas M. Ritzert (0085370)
Kyle A. Hutnick (0095673)
THOMPSON HINE LLP
3900 Key Center

Case: 1:24-cv-01857-DAR Doc #: 12 Filed: 11/15/24 24 of 25. PageID #: 77

127 Public Square
Cleveland, OH 44114
Phone: (216) 566-5500
Fax: (216) 566-5800
Tony.White@ThompsonHine.com
Rob.Ware@ThompsonHine.com
Kip.Bollin@ThompsonHine.com
Thomas.Ritzert@ThompsonHine.com
Kyle.Hutnick@ThompsonHine.com

William Savitt (*pro hac vice forthcoming*)
Bradley R. Wilson (*pro hac vice forthcoming*)
Anitha Reddy (*pro hac vice forthcoming*)
Adam M. Gogolak (*pro hac vice forthcoming*)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
Phone: (212) 403-1000
Fax: (212) 403-2000
wdsavitt@wlrk.com
brwilson@wlrk.com
areddy@wlrk.com
amgogolak@wlrk.com

*Attorneys for* ~~Plaintiff~~Plaintiffs

Case: 1:24-cv-01857-DAR Doc #: 12 Filed: 11/15/24 25 of 25. PageID #: 78

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed electronically on November 15, 2024

and counsel of record will receive a notice of filing through the Court's electronic filing system in

accordance with Fed. R. Civ. P. 5(b)(2)(E) and this Court's Local Rules.

/s/ Anthony C. White

Anthony C. White