# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **CLEVELAND BROWNS FOOTBALL COMPANY LLC,**<br>76 Lou Groza Boulevard<br>Berea, Ohio 44017<br><br>**CLEVELAND BROWNS STADIUM COMPANY LLC,**<br>76 Lou Groza Boulevard<br>Berea, Ohio 44017<br><br>**HASLAM SPORTS GROUP, LLC,**<br>76 Lou Groza Boulevard<br>Berea, Ohio 44017<br><br>**JHAC, LLC,**<br>76 Lou Groza Boulevard<br>Berea, Ohio 44017<br><br>                **Plaintiffs,**<br><br>vs.<br><br>**THE CITY OF CLEVELAND,**<br>c/o Mark D. Griffin, Law Director<br>601 Lakeside Avenue, Room 227<br>Cleveland, Ohio 44114<br><br>**MARK D. GRIFFIN**, in his official capacity,<br>601 Lakeside Avenue, Room 227<br>Cleveland, Ohio 44114<br><br>                **Defendants.**<br><br>**Please also serve:**<br><br>**OHIO ATTORNEY GENERAL,**<br>c/o Dave Yost<br>30 East Broad Street, 14th Floor<br>Columbus, Ohio 43215 | Case No. 1:24-CV-01857-DAR<br><br>**Judge David A. Ruiz**<br><br><br><br>**SECOND AMENDED COMPLAINT** |

## INTRODUCTION

1.      The Cleveland Browns and their owner bring this action to secure a thriving future for the team and its place in the City it calls home.  In February 2029, less than four years from now, the Browns' thirty-year lease of Huntington Bank Field from the City will expire.  The Browns' owner, the Haslam family, has been working for years to identify the best long-term stadium for the team after their lease ends—one that will be worthy of the franchise and its fans and also fiscally sensible for the City, the County, and the State.

2.      At the request of the City and its then-Mayor Frank Jackson, the Browns spent four years and several million dollars to produce a comprehensive economic development plan for the City's lakefront, long divided from the rest of downtown—one that would support the massive renovation that Huntington Bank Field would need to serve as the Browns' home after 2029.  In 2021, the Browns unveiled that plan: a $450 million proposal to connect the lakefront to downtown by land bridge over the Shoreway and create a new development of restaurants, shops, and offices easily accessed by foot and car from Cleveland's central business district.  Again with the City and Mayor's encouragement, the Browns then spent years working with architects, engineers, and public planners to create a detailed plan for a renovation of the stadium and related infrastructure improvements to be completed by 2029.

3.      But in the past four years, the City has made little effort to partner with the Browns to realize these ambitious development plans.  Despite years of discussions, the City still does not have an actionable plan for connecting the lakefront to downtown on any timeline, let alone one that can be executed by 2029.  The City nevertheless clings to the idea of a lakefront stadium renovation.  The City thus proposes to pour its scarce dollars into refurbishing a stadium that is already thirty years old, with no realistic prospect that the renovation will create either sustainable economic development on the lakefront or a sustainable home for the Browns.  This short-sighted

-1-

proposal would cost its taxpayers hundreds of millions of dollars and leave them with nothing more than they have now—a deteriorating open-air stadium that sits idle most of the year.

4.      After years of study, the Haslam family has proposed a far superior solution: a world-class domed stadium, the first in Ohio, anchoring an entertainment district at a site in Brook Park less than a mile from the City line and next to Hopkins International Airport—all at *zero* cost to the City.  Because it will be covered, the Brook Park stadium could be used year-round, no matter the weather, not just for Browns games, but also for other major sporting events, concerts, and shows, attracting events and visitors that now bypass the City.  And the City would be unburdened of the expenses of the lakefront stadium—expenses it has struggled to fund and that exceed the revenue generated by Browns' home games there.

5.      The Haslams' proposal is a fiscally sound solution for the City that will keep the Browns in the heart of the greater metropolitan area for at least another fifty years.  Instead of recognizing the benefits of the Haslams' proposal, the City seeks to hold the Browns hostage to its own failure of vision.  Instead of a new domed facility that can drive significant economic activity year-round, the City insists on sticking with an aging, uncovered stadium that is used only a dozen or so times annually.  Instead of a sustainable new home for the Browns, transformational for Cleveland and Northeast Ohio, the City insists on a wasteful and expedient renovation at City taxpayer expense.  The City's myopic approach harms not only the Browns, but also the County and the City's own residents.  The City's plan will cost Cleveland far more, and provide it far less. Whatever interests the City is seeking to serve, they are not those of its taxpayers, its NFL club, or its loyal fans.

6.      To justify its ill-advised opposition to a stadium in Brook Park, the City invokes the so-called "Modell Law"—named after Art Modell, the prior Browns owner who tried to take

-2-

the team to Baltimore.  But the Haslams are nothing like Art Modell, and the Modell Law has no application here.  The Haslams—all three generations of them—are unwavering in their commitment to Cleveland and the Browns.  Faced with the City's failure to make progress on a plan to fund and execute the infrastructure improvements and other development initiatives necessary to make the lakefront a plausible long-term home for the Browns, the Haslams have identified a far better alternative—right here in Cuyahoga County, just over the City limit.

7.      This is not a flight from Cleveland: it is a recommitment to Cleveland, promising *billions* in regional private investment.  The City's invocation of the Modell Law must therefore be rejected, as a matter of federal constitutional principles, statutory construction, and simple common sense.  The Cleveland Browns and their faithful fans are entitled to a world-class home right here in the Cleveland area, without undue burden on the taxpayer, and in a forum that befits the team and contributes to the community.  Nothing in the Modell Law can or should operate to defeat those salutary objectives.

**PARTIES**

8.      Cleveland Browns Football Company LLC owns and operates the Cleveland Browns NFL franchise.  It is a Delaware limited liability company with its principal place of business at 76 Lou Groza Boulevard, Berea, Ohio 44017.

9.      Cleveland Browns Stadium Company LLC is party to a lease of Huntington Bank Field from the City of Cleveland.  It is a Delaware limited liability company with its principal place of business at 76 Lou Groza Boulevard, Berea, Ohio 44017.

10.     JHAC, LLC, owned by the Haslam family, owns Cleveland Browns Football Company LLC and Cleveland Browns Stadium Company LLC.  It is a Delaware limited liability company with its principal place of business at 76 Lou Groza Blvd, Berea, Ohio 44017.

11.     Haslam Sports Group, LLC is the managing member of JHAC, LLC.  It is a Delaware limited liability company with its principal place of business at 76 Lou Groza Blvd, Berea, Ohio 44017.

12.     Defendant City of Cleveland is a municipal corporation organized under the laws of the State of Ohio.

13.     Mark D. Griffin is the Law Director of the City of Cleveland and is named only in his official capacity.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1367(a) because this action presents federal questions arising under the U.S. Constitution and under 42 U.S.C. § 1983.

15.     This Court has personal jurisdiction over the City because the City is an Ohio municipal corporation.  This Court has personal jurisdiction over Griffin because he is a resident of Ohio and named in his official capacity as the Law Director of the City.

16.     This Court has authority to order declaratory and injunctive relief under 28 U.S.C. § 2201 and § 2202, 42 U.S.C. § 1983, and Fed. R. Civ. P. 65.

17.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because the City is located in this District and Griffin is a resident of Ohio and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## BACKGROUND

**A.    Owner Art Modell tries to move the Browns to Baltimore—years before their stadium lease expires—and the City sues to enforce the full lease term**

18.     The Cleveland Browns have been a member of the National Football League since 1950.  Each NFL team operates as a franchise, subject to the NFL's rules and oversight.  Because member teams share certain revenues and jointly bear certain costs, their operations are financially interdependent.  NFL rules accordingly require the league's approval of significant operational changes by member teams, including a move or significant renovation of a team's home stadium.

19.     In 1973, an affiliate of the Cleveland Browns, then owned by Art Modell, entered into a lease agreement with the City for Municipal Stadium.  That lease, and the contemplated sublease between the affiliate and the Browns, obligated the owners of the Browns to use the stadium for the team's regular season home games through the twenty-five-year term of the lease— that is, until the end of 1998.

20.     In 1995, however—three years before the lease expired—Modell announced that he was moving the Browns to Baltimore.  Modell (then represented by the same firm that represents the City in this action) argued that a subsequent agreement between the affiliate and the Browns relieved the team of its obligation to use the stadium during the lease term.  And as Modell saw it, even if the Browns were still subject to the lease, the City was entitled only to damages for breach of the agreement.

21.     The City sued to enforce the lease agreement.  It sought not simply an award of damages for breach of contract, but an order requiring Modell and the Browns to keep their promise to play in Municipal Stadium for the full lease term.  That specific promise, the City argued, "is what the City bargained for in the Lease."  And "[t]o allow the Browns to repudiate the

Lease agreement, three years before its expiration, would deny the City the essential benefit of its bargain."

**B.  The City, the NFL, and the Browns reach a new lease bargain on a new stadium**

22.     In February 1996, the City and the Browns reached a settlement that included the NFL—a necessary party because its approval is required to move a franchise or create a new one.

23.     Under the settlement, Modell was permitted to transfer the existing Browns franchise to Baltimore, but was required to surrender the Browns' name and records to a new franchise, to be located in Cleveland.  In exchange, the City was required to build, with funding assistance from the NFL, a new stadium on the site of Municipal Stadium, to be leased to the new Browns franchise for a thirty-year term.

24.     That new bargain was memorialized in several interrelated agreements, including a Stadium Financing Agreement, Lease by Way of Concession (attached as Ex. A), and Franchise Commitment Agreement (attached as Ex. B).

25.     The Lease by Way of Concession, dated April 26, 1996 ("Lease"), governed the lease of the new stadium—today called Huntington Bank Field.  The NFL executed the Lease "as a nominee for the New Owner" of the Browns franchise and committed to assign the Lease to the new owner, once identified.  As a result of that assignment, the new owner would assume "all of the terms of this Lease and all of the obligations and liabilities of Lessee."  *See* Ex. A,  § 3.

26.     The Lease provides that its term extends thirty years from "the February 1st prior to the first season" in which the new Browns franchise participates in the NFL.  *See* Lease, § 6(a), (b).  That season began in the fall of 1999.  The Lease term thus ends on February 1, 2029.

27.     Under the Lease, the City agreed to build a new stadium, subject to the NFL's financing commitments.  *See* Ex. A, § 4.

28.     The City also agreed to pay for specified "Capital Repairs," including emergency capital repairs, during the Lease term.  *See* Ex. A, § 14.

29.     Under the Lease, the Browns' owner agreed to pay $250,000 in annual rent and to pay for routine stadium maintenance and for any stadium alterations or improvements.  *See* Ex. A, §§ 7, 11.

30.     The Browns' owner also agreed that the Browns would play "for not less than thirty (30) years, all regular season home games" in the new stadium, as well as other games (such as post-season games) that could be played in the new stadium.  The Browns' owner also agreed that "during the Term of this Lease," the Browns would play at least half of pre-season home games in the new stadium.  *See* Ex. A, § 9(a).

31.     The Browns' owner also agreed that, "throughout the Term of this Lease," it shall "maintain . . . its rights to play professional football in the City of Cleveland, Ohio," and "be obligated to play home games of the Franchise at the New Stadium in Cleveland, Ohio, as provided in this Lease."  *See* Ex. A, § 9(b).

32.     The Lease provisions obligating the Browns to play games in the new stadium during the Lease term are expressly subject to "the City's right to specific performance of [those] obligations."  *See* Ex. A, § 22(e).

33.     If the stadium is damaged, or the City fails to fulfill its repair obligations, such that the Browns are prevented from playing at least half of their regular season home games there, the Lease provides that the Browns' owner has "the right to extend the Term of this Lease for one (1) additional Lease Year."  *See* Ex. A, § 20(c).

34.     With that single exception (which has not eventuated), neither party has the right or obligation to extend or renew the Lease for any period beyond its term.

35. The Lease provides that the Browns "shall, on the expiration of the term hereby granted, or upon the earlier termination of the Lease, peaceably and quietly leave, surrender or yield up unto the City the Leased Premises." *See* Ex. A, § 28(a).

**C. To deter a would-be Modell, Ohio passes the "Modell Law"**

36. In June 1996—after the execution of the parties' settlement, the Lease, and related agreements—the Ohio General Assembly enacted R.C. 9.67. Born of outrage over Modell's flight to Baltimore—without warning and years before the Browns' stadium lease with the City expired—the law seeks to deter an owner tempted to try the same gambit. Known as the Modell Law, it is a legislative response to the risk that another owner of a professional sports team might seek to deprive the State or an Ohio city of the benefit of their bargains in supporting a team's home facility with taxpayer dollars.

37. In its entirety, the Modell Law provides:

No owner of a professional sports team that uses a tax-supported facility for most of its home games and receives financial assistance from the state or a political subdivision thereof shall cease playing most of its home games at the facility and begin playing most of its home games elsewhere unless the owner either:

(A) Enters into an agreement with the political subdivision permitting the team to play most of its home games elsewhere;

(B) Gives the political subdivision in which the facility is located not less than six months' advance notice of the owner's intention to cease playing most of its home games at the facility and, during the six months after such notice, gives the political subdivision or any individual or group of individuals who reside in the area the opportunity to purchase the team.

38. The Modell Law—consistent with its nickname, text, and evident purpose—has never been used to punish owners who act nothing like Modell. The Modell Law has never been applied to an owner whose team has affirmed its intention to play games as required by its stadium lease until the expiration of the lease. Nor has the Modell Law ever been applied to an owner who

-8-

has publicly committed to keeping the team in the metropolitan area—and proposed investing well over a billion dollars to build a new local stadium to uphold that promise.

### D. The City builds the new stadium and the Browns' new owner assumes the Lease

39.     The City broke ground on the new stadium in 1997 and completed construction in 1999.  Meanwhile, Al Lerner acquired the new Browns franchise in 1998.  As required by the Lease terms, the new Browns franchise assumed the Lease (through its affiliate, Cleveland Browns Stadium Company LLC).

### E. The Haslam family acquires the Browns and invests deeply in the team, in Cleveland, and in Ohio

40.     The Haslam family acquired the Browns in 2012.  Professional sports are not the family's first family business.  Jim Haslam founded Pilot Corporation in 1958. His son, Jimmy Haslam, started at the travel center company as a teenager, pumping gas, and eventually working his way up to CEO and chairman.  He built Pilot into the fifth-largest private company in the country before selling it to Berkshire Hathaway in 2024.  Jimmy and Dee Haslam's daughter, Whitney Haslam Johnson, worked at Pilot for twenty years before it was sold.  Dee, meanwhile, has built a successful career as an executive producer and founder of RIVR Media, a production company that has produced over 3,000 television episodes for twenty-one different networks.

41.     After buying the Browns, the Haslam family brought its business skills, financial resources, and civic pride to Northeast Ohio. The Haslams currently own the Browns through the Haslam Sports Group, headquartered just outside Cleveland, in Berea.  Jimmy is the chairman and Dee is the CEO, and both are managing partners.  Whitney is also a managing partner, and her husband, James Wood "JW" Johnson III, is executive vice president and a partner.  The Johnsons live with their three sons in Cuyahoga County.

42. In his first press conference as a new owner of the Browns, Jimmy Haslam assured the community that there was "zero chance" his family would "move the team out of Cleveland." Within a year of the purchase, the Haslams and the Browns announced a $120 million plan to improve the stadium by reconfiguring seats to improve fan sightlines, modernizing the exterior, adding escalators, and upgrading concession offerings. The Haslams agreed to fund upfront the entirety of the expense—$120 million—to allow the upgrades to be made by 2015. The City reimbursed just one-quarter of that cost, over fifteen years.

43. The Haslams have exhibited the same civic commitment in serving other great Cleveland institutions. They have committed funding to install synthetic turf fields at sixteen public schools in the metropolitan Cleveland area. They have been significant supporters of Cleveland's healthcare institutions—donating $20 million to University Hospitals to create the Haslam Sports Innovation Center, and $30 million to the Cleveland Clinic in the last two years alone. Led by Dee Haslam, the Cleveland Browns Foundation was a founding member of the Stay in the Game! Attendance Network, a public/private partnership combatting chronic absenteeism of schoolchildren throughout Ohio and now supporting nearly 380,000 students. Dee has also been an enthusiastic supporter of the City and its most important business and cultural organizations, serving as a director of the Greater Cleveland Partnership, the United Way of Greater Cleveland (Executive Council), University Hospitals Systems, the Cleveland Orchestra, and the Rock & Roll Hall of Fame. In all, the Haslams and the Browns have contributed more than $150 million to worthy causes in Northeast Ohio since the family purchased the team.

**F.      The Haslam family expands its commitment to professional sports in Ohio**

44. In 2017, the private operator of the Columbus Crew, a Major League Soccer team, announced that it planned to move the team to Austin, Texas—even though the team had more than five years left on its stadium lease with the State of Ohio. Faced with a professional sports

-10-

team threatening to move to another state in the middle of its lease, the State of Ohio sued—invoking the Modell Law to argue that the team was required to stay in Columbus or face a forced sale process.

47.    The Haslams stepped in, recognizing that the Crew "belong[ed] in Columbus."  In December 2018, the Haslams reached an agreement to become co-investors in the team and keep it in Columbus.  And Haslam Sports Group promptly contributed more than $220 million toward the construction of a new state-of-the-art stadium and training facility for the team.  Lower.com Field and the OhioHealth Performance Center opened in 2021.

46.    Haslam Sports Group has not stopped at improving the facilities of the Crew.  It has committed $10 million to fund a public sports park in Northeast Columbus.  And it has supported Columbus City Schools and other neighboring school districts through soccer pitch projects as well as its Stay in the Game! and Soccer in Schools programs.  In 2024, the Haslams continued their commitment to healthcare initiatives, donating $2 million to Pelotonia, a Columbus organization devoted to raising funds for cancer research.

**G.    The City asks the Browns to develop a plan to create a vibrant lakefront economic development integrated with the downtown business district**

47.    Under its terms, the Browns' Lease of their current stadium, Huntington Bank Field, ends in February 2029.  The stadium—hastily constructed in two years after Modell's flight to Baltimore—will by then be thirty years old.  As both the Browns and the City have long understood, that stadium will be incapable of serving as an adequate—let alone first-rate—home for the Browns without an extensive and costly renovation and surrounding infrastructure improvements.

48.    As an open-air facility, the current stadium is used only for eight to ten Browns games and a handful of non-Browns events per year.  All in all, Huntington Bank Field is typically

used for no more than a dozen events a year.  The stadium, like the rest of the lakefront, is separated from the downtown business district by the Shoreway—a 50 mile-per-hour highway—and rail lines.  Those site limitations have long made it impossible for the stadium or other lakefront attractions to anchor a revitalized downtown, by blocking easy pedestrian and transit access that could connect the central business district with the lakefront.

49.     A comprehensive project to develop and integrate the lakefront with the downtown business district has long been on the wish list of the City and its administrators.  So in 2017, knowing that the Browns would need to plan for a home that served their needs in 2029 and beyond, Mayor Frank Jackson asked the Browns to present a vision to connect the lakefront to downtown and transform it into an area of economic vitality.

50.     Working with the City, Dee and Jimmy Haslam led that project.  They spent years generating a plan that would serve the public's interest in economic renewal and create a lakefront neighborhood that could support a home for the Browns in the decades following the Lease expiration.  The Browns commissioned and funded a planning study by Nelson Byrd Woltz, a renowned landscape architecture firm known for ambitious public development projects across the country.

51.     The Browns unveiled the plan in May 2021.  It contemplated transforming the Shoreway into a wide, attractive boulevard and building a wide landscaped land bridge over the boulevard as well as a new transit hub, which would link the downtown business district to a lakefront revitalized by new mixed-use development.

**H.     Encouraged by the City, the Browns present a plan for a renovated stadium in a redeveloped lakefront newly connected to downtown**

52.     In November 2021, the Browns met with Mayor-elect Justin Bibb to discuss his priorities and plans for the lakefront.  Encouraged by his stated support for a redeveloped lakefront

with new infrastructure links to downtown, the Browns began investigating a potential renovation of the existing stadium for use after the Lease ended in 2029.  The Browns assembled and funded a team of experts—real estate developers, financial advisors, architects, designers, engineering firms, construction companies, and consultants—to create detailed renovation plans and cost estimates.

53.     After more than a year of work, in early 2023, the Browns presented a renovation plan to the City and County.  The more modest version of that plan would adequately renovate the aging stadium to extend its life by about twenty years.   But even that plan would cost approximately $1 billion in upfront funding.  That renovation plan depended on substantial infrastructure improvements, such as the land bridge over the Shoreway and new transit hub, that would not only link the renovated stadium and surrounding development to the central business district, but also drive economic activity in the lakefront that would help fund the renovation costs, either through taxes on increased revenues or private financing.   Those infrastructure improvements would cost hundreds of millions of dollars—in addition to the $1 billion cost of renovating the stadium.

**I.     After the City repeatedly fails to step up with a viable funding plan for a renovated stadium in a lakefront linked to downtown, the Browns begin exploring a new domed stadium alternative that can generate greater revenue**

54.     Serious engagement on the renovation plan thus required the City and the County to present a clear path to obtaining the necessary public funding on the necessary timeline—that is, in time to complete renovations by the 2029 NFL season.  Although the Browns engaged in months of back-and-forth with the City and the County, neither offered a viable proposal to provide the public funding on which the renovation plan depends.

-13-

55.     If renovation of the lakefront stadium were indeed the priority the City claims it is, the City would have responded to the funding challenge with creativity and urgency.  But as months passed, it became clear to the Browns that it was imperative to develop a plan for a new home for the Browns that did not depend on significant public funding from the City—public funding that the City appeared to have neither the will nor the ability to offer.

56.     The Browns therefore took a hard look at other sites for a new stadium in Cleveland and its immediate vicinity, ultimately focusing on the possibility of constructing a new domed stadium.  A dome is an economic game-changer for the increasingly forbidding math required to justify the massive private and public investment of a major stadium renovation or construction— especially for an NFL stadium, which hosts only eight to ten team home games a year.  A dome makes a stadium an all-weather, all-season facility—one that can be used year-round for dozens of major events.  The revenue generated by a regular schedule of events—summer and winter, rain or shine—and the related boost to restaurants, shops, and hotels makes private financing cheaper and easier to attract.  And more important, because a dome multiplies by several times the economic impact and tax revenues a stadium can generate, it significantly relieves the burden of public funding that a new stadium or stadium renovation would otherwise impose on local taxpayers.  Among the multiple positive follow-on effects of this economic development: more jobs for City and area residents.

57.     None of this is possible at the lakefront, because putting a dome on Huntington Bank Stadium is not feasible.  Because the stadium sits close to Burke Lakefront Airport, building height restrictions imposed by the Federal Aviation Authority foreclose a renovation that would add a dome.  There are no plans to close that airport.  And even if it is possible to secure the necessary regulatory and other approvals to shut it down (an open question), the timeline for doing

so is highly speculative.  What's more, adding a dome to an existing facility is an expensive and structurally complicated undertaking.  It's doubtful that the returns would justify the massive investment when the facility is already thirty years old.

58.    In October 2023, the Browns informed the City that they were considering other sites—in or near Cleveland—that could support a domed stadium.

**J.    The Browns propose a new domed stadium a few miles southwest of Cleveland that will cost the City and its taxpayers nothing**

59.    A vacant site in Brook Park, a suburb bordering Cleveland to the southwest, looked especially promising.  The site lies less than a mile from the City limits, near Hopkins International Airport, and close to the Browns' training facility in Berea.  And it has ample space for mixed-use development that would benefit from a year-round calendar of events, as well as substantial room for parking—a perennial challenge at the existing stadium site.  And its proximity to two major highways makes it easily accessible not only to fans throughout the Cleveland area, but also to those in Central Ohio and the rest of the state.  In March 2024, the Browns acquired an option to purchase the Brook Park site to ensure its availability for future stadium development.

60.    In April 2024, the Browns presented the County with a detailed proposal for a new stadium on the Brook Park site—along with a plan for funding it.  Construction of a new domed stadium that will last at least fifty years with proper capital maintenance was projected to take approximately three and a half years and cost $2.4 billion.  In recent years, new NFL stadiums have been financed with a majority of public investment.  But the Haslams proposed that private funding contribute at least half the construction cost—$1.2 billion, plus any cost overruns.  As for the other half to come from public funding, the Haslams proposed that it be divided among the State, the County, and Brook Park—with the vast majority supported by incremental taxes and fees on revenues generated by the new stadium development, and the remainder supported by

-15-

modest new taxes that would be paid by visitors.  That fiscally disciplined allocation is possible only because of the dome and the adjacent mixed-use development it will anchor.  The state and local revenues from additional year-round use of the stadium beyond Browns games—projected to be more than $6.3 billion over a thirty-year lease term—will enable construction of a world-class sports and entertainment facility that in time will pay for itself.

61.  A new stadium development in Brook Park would give the City and its residents the benefits of one of the most ambitious and spectacular NFL stadium projects less than a mile from City limits at *zero* cost to the City and its taxpayers.  The Browns appreciate that even today, the City is struggling to satisfy its obligations to fund capital repairs to the existing stadium, as well as to the facilities of other professional sports teams in Northeast Ohio.  The Brook Park proposal frees the City and its taxpayers from any stadium funding obligations, as well as the substantial expenses the City incurs as a result of operations on Browns game days.  A new stadium in Brook Park would also expand the City's options for redeveloping the lakefront—by freeing up prime lakefront real estate currently occupied by the stadium for other public and commercial uses.

62.  Careful attention to Cleveland's fiscal resources and how they can best be deployed counsels in favor of City and County officials giving the Brook Park proposal fair consideration.  Certainly, the City's taxpayers and residents deserve that.

63.  Yet the City responded with knee-jerk hostility to the Brook Park plan—though it still had not presented a viable funding plan of its own for a stadium renovation or new lakefront development.  On May 6, the City passed Emergency Ordinance 391-2024, "direct[ing]" its lawyers to "fully enforce" the Modell Law "to keep the Cleveland Browns in the City of Cleveland and to protect the interests of the taxpayers of the City with regard to their investment in the lakefront stadium."

-16-

64. The City did not explain how the Browns could possibly violate the Modell Law by looking for a new stadium home in the Cleveland area *after* their Lease of the current stadium expires. Or how the City's refusal to consider a plan to build a world-class stadium less than a mile from City lines, at no expense to City taxpayers, could possibly be in taxpayers' interests.

### K. The City presents a proposal for funding a stadium renovation that would cost Cleveland taxpayers hundreds of millions of dollars and do nothing to make the stadium a magnet for economic development

65. In August 2024—more than a year after the Browns had presented a stadium renovation plan and its costs to the City—the City publicly released its funding proposal. That proposal confirmed what the Browns already suspected—that the City does not have a realistic or fiscally sensible solution to the massive public and private investment required to fund a stadium renovation.

66. The City's funding proposal acknowledged that a stadium renovation would cost at least approximately $1 billion. But the City proposed to contribute just $20 million—less than 2%—in upfront construction costs, then dribble out $347 million over the thirty-year term of a new lease. And the City offered only the speculative hope, not a clear plan or commitment, that the State and County would help shoulder the City's public funding contribution. The City's proposal thus left to the Haslams and the Browns the responsibility of generating a plan to fund virtually the entire upfront cost of renovating the City-owned stadium. None of the public-private partnerships that have funded NFL stadium projects in recent history have forced the team to bear such heavy costs at the outset of the project.

67. The City's proposal also capped its responsibility to pay for capital repairs, at $94 million. But it has long been standard for NFL stadium leases to divide the burden of repair and maintenance costs between team owners and the government lessors—with no cap. The existing

Lease, for example, requires the Browns' owner to pay for all routine maintenance and any alterations or improvements, while the City is responsible for all capital repairs.

68.     And the City's proposal came with no plan for funding all of the hundreds of millions of dollars in infrastructure improvements necessary to connect the lakefront and a renovated stadium to downtown—or even a date for delivering that plan.  An open-air stadium cut off from downtown is what the City has now.  And such a stadium cannot generate the revenue needed to fund a massive private or public investment in a stadium renovation.  The City's proposal is based on the unrealistic idea that the Browns will nonetheless pay the majority of the more than $1 billion necessary to fund a renovation of a stadium in an isolated lakefront.

69.     Recognizing that a domed stadium offers substantial economic benefits that an open-air stadium never can, the City asked the Browns in September 2024 to evaluate the feasibility of building a domed stadium adjacent to the current stadium, on the site of Burke Lakefront Airport.  But the City has no authority to shut down Burke Lakefront Airport to replace it with a stadium.  Nor does the City have any way to ensure that it will ever obtain the regulatory approvals required to do so, let alone soon enough to make Burke Lakefront Airport an alternative stadium site.

70.     The Haslams and the Browns, however, remain committed to working with the City and County to find the best new home for the Browns in the Cleveland area—not just the best home for the team and their fans, but the most fiscally responsible solution for local residents and taxpayers.  So they spent hundreds of thousands of dollars working with engineering firms and consultants to determine if a domed stadium at Burke Lakefront Airport is a realistic alternative to one in Brook Park.

71.     It isn't.  Because of ground characterizations and other site disadvantages, building a domed stadium at Burke Lakefront Airport would cost $3.3 billion—far more than the $2.4 billion cost of a domed stadium in Brook Park.  And even that figure assumes construction begins in 2026—unrealistic given the regulatory approvals necessary to shut down and potentially relocate the airport—again, approvals that might never be obtained.  With each year of delay, that $3.3 billion estimate, already prohibitively high, rises substantially.  And, like a renovation of the current stadium, a new stadium at Burke Lakefront Airport would require hundreds of millions of dollars in associated infrastructure investment—in highway connections, transit access, and parking facilities.  A stadium in Brook Park, situated just off the highway, would require less than $100 million in infrastructure investment.

72.     After the impracticality of replacing Burke Lakefront Airport with a new stadium became clear, the Haslams issued a public statement explaining their decision to focus their planning efforts on a new stadium in Brook Park.  As they explained, they had worked since 2017 with the City and Mayor "to find the optimal long-term solution for our stadium."  And they had "learned through our exhaustive work that renovating our current stadium will simply not solve many operational issues and would be a short-term approach."

73.     "With more time to reflect," they explained, "we have also realized that without a dome, we will not attract the type of large-scale events and year-round activity to justify the magnitude of this public-private partnership."  Ultimately, the Haslams explained, "[t]he transformational economic opportunities created by a dome far outweigh what a renovated stadium could produce with around ten events per year."  And, the Haslams added, whether the Browns' home is inside City lines or just beyond them, "Cleveland and Northeast Ohio are the fabric of the Browns and that will always be the case."

-19-

**L.      The City tries to invoke the Modell Law—against owners nothing like Modell**

74.     Days after the Haslams' statement, Cleveland Law Director Mark Griffin said the City would "move forward" with enforcing the Modell Law against the Browns and the Haslams. Again, the City did not explain how the Modell Law could possibly apply to them—a team and owner who are facing a lease expiration on an aging stadium and doing nothing more than prudently searching for the best long-term stadium home in the Cleveland area, well within the team's NFL-defined home territory.

75.     Planning a new stadium in Brook Park, less than a mile from Cleveland's southwestern border, for use after the Browns' current stadium lease expires, bears no resemblance to Modell's attempt to remove the Browns to another state, years before their stadium lease expired.  The City may seek to score cheap points by implausibly casting the Haslams as today's Modell, abandoning Cleveland.  But the City should know better—especially since it is now represented by the very same firm that represented Modell when the City sued to enforce the Browns' stadium lease in 1995.  No one thinks an NFL team leaves its city by building a stadium within a metropolitan area, rather than within city lines.  The NFL's rules, in place long before the Browns signed their current stadium Lease, make this clear: they define a team's home territory as encompassing a 75-mile radius beyond the franchise city.  Brook Park is less than a mile from Cleveland.  Plenty of NFL teams have their home stadium in suburbs of their home city.  The Dallas Cowboys play in Arlington. The San Francisco 49ers play in Santa Clara.  The Los Angeles Rams and Chargers play in Inglewood.  The Buffalo Bills play in Orchard Park.  The Washington Commanders play in Summerfield, Maryland. And the New York Giants and Jets don't even play in New York State, but in Rutherford, New Jersey.  But no one is confused about which city any of these teams calls home.

76.     The City's threats prompted the Brown to seek to protect their right to find the best new home for their franchise after the expiration of the Lease, whether within Cleveland or in the broader metropolitan area that has always claimed the City and the Browns as its own.  They therefore brought this suit in October, seeking to stop the enforcement of the Modell Law against them as unconstitutional and plainly contrary to the Modell Law's plain words and intended application.

77.     The Haslams and the Browns, however, have been and remain committed to working together with the City and County "to find the optimal long-term solution for our stadium."  Even as the City has threatened them with the Modell Law, they have continued to seek a dialogue with the Mayor and County officials.  They have not simply urged the City and County to fairly consider the Brook Park proposal.  They have for their part also continued to engage with the City on its preferred proposal—a stadium renovation—by seeking answers from the City about their concerns so they can be sure to accurately assess each proposal's costs and benefits.

78.     The Browns have also sought to collaborate with the City to objectively evaluate both the renovation proposal and the Brook Park proposal, offering detailed answers—in writing— to the City's questions and urging continued engagement to find a solution satisfactory to all.  The City reciprocated with its own lawsuit.  In mid-January, making good on its threat, the City sued the Haslams and the Browns in state court, claiming that they violated the Modell Law.

79.     Even now, the City has not explained how the Modell Law could apply to a team that has complied and will comply with each of its contractual commitments to the City, that has played and will play its home games in its stadium until the expiration of its lease, and whose owners have committed to keeping the team in the Cleveland area long after the lease expires.  The City appears to believe that a law passed after the Browns signed a contract with the City can

somehow render the contract's terms meaningless, and require the Browns to play all their home games, forever, in a stadium of the City's choosing, without regard to fiscal responsibility, the needs of the team and its fans, or the condition of the facility.

80.     The City's threatened application of the Modell Law is unreasonable on its face—as well as unconstitutional.  The City's suit is a legally meritless and fiscally irresponsible attempt to handcuff the Browns to an aging stadium long after their contractual obligations end.  Its strategy is apparently to run out the clock so the Browns are unable to bring the Brook Park stadium to fruition by 2029, and so hold the team, its fans, and the community hostage to an inferior alternative and the political whims of city managers.  The City's obstinance is hurting the very people it is claiming to help—not just the Browns and their fans in the City, its suburbs, and beyond—but also Cleveland residents and taxpayers.

81.     The Browns thus require prompt relief from the City's unlawful campaign to enforce the Modell Law.  Because the current stadium lease expires after the 2028 season, the new stadium must be completed by mid-2029 for the Browns to be able to use it in time for the 2029 season.  Because a new stadium in Brook Park is expected to take at least forty months to construct, the Browns will need to break ground by early 2026 to meet that deadline.  Absent prompt relief, the uncertainty created by the City's attempt to enforce the Modell Law against them will unlawfully impair their ability to exercise their contractual and legal rights to call a new stadium home in 2029.

## CAUSES OF ACTION

### FIRST CLAIM
### Violation of Art. 1, § 8 and § 10, and the Fourteenth Amendment of the U.S. Constitution
### (Against the City of Cleveland)

82.     Plaintiffs re-allege each of the preceding paragraphs as if set forth again in full.

83.     The Browns' Lease of the stadium, now called Huntington Bank Field, from the City became effective on April 26, 1996 and expires on February 1, 2029.

84.     The Lease does not impose any obligation on the Browns to play games in, or otherwise use, the stadium after its term ends.

85.     The City has no right to unilaterally extend the Lease for any period, and the parties have not agreed to any extension or renewal of the Lease.

86.     On May 6, 2024, the City passed Emergency Ordinance 391-2024, through which "the Director of Law," Mark D. Griffin, was "authorized and directed to fully enforce the provisions of" the Modell Law against Plaintiffs.

87.     The City contends that the Modell Law may be enforced to either prevent the Browns from exercising their rights to move to a new home stadium or to force their sale to a new owner, in direct contravention of the terms of the Lease and related agreements, including among others the Franchise Commitment Agreement.

88.     The City's attempt to enforce the Modell Law against Plaintiffs violates their bargained-for rights under the Lease and related agreements, in violation of the Contracts Clause of Article I, Section 10 of the U.S. Constitution, which states, in relevant part, "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts."

89.     The City contends that the Modell Law may be enforced to discriminate between in-state and out-of-state economic interests by, among other things, giving Ohio political

subdivisions and residents preferential treatment and special rights with respect to the purchase of professional sports organizations.

90. The Modell Law also interferes with the financial relationships within the NFL, including between and among NFL franchises and their owners.

91. The Modell Law places excessive burdens on interstate commerce without advancing any legitimate local interest.

92. The Modell Law, and the City's attempted enforcement thereof, violates both facially and as applied to Plaintiffs here, the Commerce Clause of Article 1, Section 8 of the U.S. Constitution, which grants Congress the power to "regulate Commerce . . . among the several States."

93. The Modell Law is so vague and indefinite that it fails to provide the Browns and their owner fair notice whether their contemplated conduct is forbidden by the statute and thus encourages arbitrary and erratic enforcement in violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

94. The statute is impermissibly vague and indefinite because, among other things, it fails to provide adequate notice as to whether its requirements are triggered when the Browns have complied and will comply with all game usage obligations of the lease agreement for the facility in which they are currently playing most of their home games; what agreements can satisfy its requirement of "an agreement with the political subdivision permitting the team to play most of its home games elsewhere"; the nature, including the timing, of any financial assistance the Browns must receive for their owner to be presently subject to the Modell Law; any discernible or consistent standard for determining the time of "the owner's intention to cease playing most of its home games at the facility"; the nature of the required "six months' advance notice" and the

manner in which it can be adequately provided; any definition of the "area" in which a "group of individuals" must reside in order to be entitled to an "opportunity to purchase the team"; and the nature of the "opportunity to purchase the team" that must be given by the owner, including any actions the owners must affirmatively undertake, in order to satisfy the statute.

95.     The City's attempt to enforce the Modell Law against Plaintiffs violates the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

96.     The City is also liable to Plaintiffs for redress under 42 U.S.C. § 1983 because the City's attempt to enforce the Modell Law deprives Plaintiffs of rights, privileges, or immunities secured by the Constitution and laws of the United States.

97.     The City's attempt to enforce the Modell Law against Plaintiffs is causing and will cause Plaintiffs to suffer damages, including costs incurred as a result of any delays in obtaining approvals and financing for, or in commencing the construction of, a new stadium at Brook Park.

98.     Plaintiffs seek a declaration that the City's attempt to enforce the Modell Law against them violates the U.S. Constitution.

99.     Plaintiffs seek injunctive relief to enjoin the City from enforcing the Modell Law against them, including by bringing or prosecuting suit, in violation of the U.S. Constitution.

100.     Absent declaratory and injunctive relief, Plaintiffs will suffer irreparable harm.

**SECOND CLAIM**
**Violation of Art. 1, § 8 and § 10, and the Fourteenth Amendment of the U.S. Constitution**
**(Against Mark D. Griffin, in his official capacity as Law Director of the City of Cleveland)**

101.     Plaintiffs re-allege each of the preceding paragraphs as if set forth again in full.

102.     The Browns' Lease of the stadium, now called Huntington Bank Field, from the City became effective on April 26, 1996 and expires on February 1, 2029.

103.    The Lease does not impose any obligation on the Browns to play games in, or otherwise use, the stadium after its term ends.

104.    The City has no right to unilaterally extend the Lease for any period, and the parties have not agreed to any extension or renewal of the Lease.

105.    On May 6, 2024, the City passed Emergency Ordinance 391-2024, through which "the Director of Law," Mark D. Griffin, was "authorized and directed to fully enforce the provisions of" the Modell Law against Plaintiffs.

106.    The City, by and through its Director of Law, contends that the Modell Law may be enforced to either prevent the Browns from exercising their rights to move to a new home stadium or to force their sale to a new owner, in direct contravention of the terms of the Lease and related agreements, including among others the Franchise Commitment Agreement.

107.    The City's attempt to enforce the Modell Law, by and through its Director of Law, against Plaintiffs violates their bargained-for rights under the Lease and related agreements, in violation of the Contracts Clause of Article I, Section 10 of the U.S. Constitution, which states, in relevant part, "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts."

108.    The City, by and through its Director of Law, contends that the Modell Law may be enforced to discriminate between in-state and out-of-state economic interests by, among other things, giving Ohio political subdivisions and residents preferential treatment and special rights with respect to the purchase of professional sports organizations.

109.    The Modell Law also interferes with the financial relationships within the NFL, including between and among NFL franchises and their owners.

110.    The Modell Law places excessive burdens on interstate commerce without advancing any legitimate local interest.

111. The Modell Law, and the City's attempted enforcement thereof, by and through its Director of Law, violates both facially and as applied to Plaintiffs here, the Commerce Clause of Article 1, Section 8 of the U.S. Constitution, which grants Congress the power to "regulate Commerce . . . among the several States."

112. The Modell Law is so vague and indefinite that it fails to provide the Browns and their owner fair notice whether their contemplated conduct is forbidden by the statute and thus encourages arbitrary and erratic enforcement in violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

113. The statute is impermissibly vague and indefinite because, among other things, it fails to provide adequate notice as to whether its requirements are triggered when the Browns have complied and will comply with all game usage obligations of the lease agreement for the facility in which they are currently playing most of their home games; what agreements can satisfy its requirement of "an agreement with the political subdivision permitting the team to play most of its home games elsewhere"; the nature, including the timing, of any financial assistance the Browns must receive for their owner to be presently subject to the Modell Law; any discernible or consistent standard for determining the time of "the owner's intention to cease playing most of its home games at the facility"; the nature of the required "six months' advance notice" and the manner in which it can be adequately provided; any definition of the "area" in which a "group of individuals" must reside in order to be entitled to an "opportunity to purchase the team"; and the nature of the "opportunity to purchase the team" that must be given by the owner, including any actions the owners must affirmatively undertake, in order to satisfy the statute.

114.    The City's attempt to enforce the Modell Law, by and through its Director of Law, against Plaintiffs violates the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

115.    The City, by and through its Director of Law, is also liable to Plaintiffs for redress under 42 U.S.C. § 1983 because the City's enforcement of the Modell Law, by and through its Director of Law, deprives Plaintiffs of rights, privileges, or immunities secured by the Constitution and laws of the United States.

116.    Plaintiffs seek a declaration that the City's attempt to enforce the Modell Law, by and through its Director of Law, against them violates the U.S. Constitution.

117.    Plaintiffs seek injunctive relief to enjoin the City's Director of Law from enforcing the Modell Law against them, including by bringing or prosecuting suit, in violation of the U.S. Constitution.

118.    Absent declaratory and injunctive relief, Plaintiffs will suffer irreparable harm.

### THIRD CLAIM
**In the alternative to the First and Second Claims**
**(Against the City of Cleveland and Mark D. Griffin, in his official capacity as Law Director of the City of Cleveland)**

119.    The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

120.    The requirements of the Modell Law have no application to any action the Browns or their owner take to cease the playing of their home games at Huntington Bank Field after the Browns' lease of that facility from the City of Cleveland expires by its terms.

121.    The Modell Law does not require a professional sports team or its owner to play in a facility without a lease agreement or to enter into a new lease agreement for a facility.  As confirmed by the circumstances of its enactment, the Modell Law is plainly intended to prevent

a team that is playing in a tax-supported facility from abandoning that facility during the term of the applicable lease.  The Browns have no intention of playing, and will not play, most of their home games at another facility during the term of their lease of Huntington Bank Field.

122.    Plaintiffs are therefore entitled to a declaration that any action by the Browns to cease playing most of their home games at Huntington Bank Field after their lease of that facility expires does not trigger or violate the Modell Law.

**WHEREFORE**, the Browns pray for an order and judgment:

A.    Declaring, pursuant to 28 U.S.C. § 2201, that the Modell Law violates the U.S. Constitution and is unenforceable;

B.    Declaring, pursuant to 28 U.S.C. § 2201, that any action by the Browns to cease playing most of their home games at Huntington Bank Field after their existing lease of that facility expires does not trigger or violate the Modell Law;

C.    Granting permanent injunctive relief prohibiting the Defendants and their officers and agents from attempting to enforce the Modell Law against Plaintiffs on the basis of any action by the Browns to cease playing most of their home games at Huntington Bank Field after their existing lease of that facility expires;

D.    Awarding Plaintiffs damages for the costs incurred as a result of the City's attempted enforcement of the Modell Law;

E.    Awarding Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and any other applicable statute or regulation;

F.    Granting such further relief as the Court may deem proper.

Dated:  May 26, 2025

<div style="margin-left:45%">

*/s/ Anthony C. White*
_____

Anthony C. White (0062146)
Robert F. Ware (0055515)
Kip T. Bollin (0065275)
Thomas M. Ritzert (0085370)
Kyle A. Hutnick (0095673)
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114
Phone: (216) 566-5500
Fax: (216) 566-5800
Tony.White@ThompsonHine.com
Rob.Ware@ThompsonHine.com
Kip.Bollin@ThompsonHine.com
Thomas.Ritzert@ThompsonHine.com
Kyle.Hutnick@ThompsonHine.com

William Savitt (*pro hac vice forthcoming*)
Bradley R. Wilson (*pro hac vice forthcoming*)
Anitha Reddy (*pro hac vice forthcoming*)
Adam M. Gogolak (*pro hac vice forthcoming*)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
Phone: (212) 403-1000
Fax: (212) 403-2000
wdsavitt@wlrk.com
brwilson@wlrk.com
areddy@wlrk.com
amgogolak@wlrk.com

*Attorneys for Plaintiffs*

</div>