# EXHIBIT A

# LEASE BY WAY OF CONCESSION

between

## CITY OF CLEVELAND

and

## NATIONAL FOOTBALL LEAGUE,
individually as to Section 3, and as nominee for the New Owner

as of

April 26, 1996

# TABLE OF CONTENTS

| Section Number | Descriptive Heading | Page Number |
|---|---|---|
| 1 | Public Purpose | 3 |
| 2 | Definitions | 4 |
| 3 | Assignment and Assumption of Lease by New Owner | 10 |
| 4 | Construction of New Stadium | 10 |
| 5 | Leased Premises | 11 |
| 5(a) | Real Estate and Improvements | 11 |
| 5(b) | Air Rights | 12 |
| 5(c) | Parking | 12 |
| 5(d) | Amendment of Legal Descriptions | 13 |
| 6 | Lease Term | 13 |
| 6(a) | Commencement of Term | 13 |
| 6(b) | Term | 14 |
| 6(c) | Lease Commencement Certificate | 14 |
| 7 | Rental | 14 |
| 8 | Lessee's Representations | 15 |
| 9 | Lessee's Covenants | 15 |
| 9(a) | Play of Games | 15 |
| 9(b) | Obligation to Maintain Franchise | 16 |
| 9(c) | Number of Games | 17 |
| 9(d) | Compliance with Community Development Plan | 17 |
| 9(e) | Nondiscrimination | 17 |
| 9(f) | Signage Plan | 17 |
| 9(g) | Right of Specific Performance | 18 |
| 10 | Taxes and Assessments | 18 |

D04:[01034.DOCS.CLE01165]LEASE 6 12 96.

| Section Number | Descriptive Heading | Page Number |
|---|---|---|
| 10(a) | Taxes Paid by City | 18 |
| 10(b) | City's Expenses Prior to the Commencemen Date | 18 |
| 11 | Costs of Operations and Maintenance of the Leased Premises | 18 |
| 11(a) | Costs of Operations and Maintenance | 18 |
| 11(b) | Services | 20 |
| 11(c) | Payment by Lessee | 25 |
| 11(d) | Maintenance and Repairs | 26 |
| 11(e) | Permits and Authorizations | 27 |
| 11(f) | Alterations | 28 |
| 11(g) | Maintenance Audit | 31 |
| 12 | Revenues from Operations of Leased Premises | 31 |
| 12(a) | Ticket Sales | 31 |
| 12(b) | Licensing and Broadcasting | 33 |
| 12(c) | Advertising; Scoreboard(s) and Signage | 33 |
| 12(d) | Food, Drink and Other Concessions | 34 |
| 12(e) | Novelty Sales | 34 |
| 12(f) | Premium Seating Payments | 34 |
| 12(g) | Naming Rights for the New Stadium | 35 |
| 12(h) | Promotions | 36 |
| 12(i) | Other Events | 36 |
| 13 | Existing Pedestrian Walkway | 36 |
| 14 | Capital Repairs | 36 |
| 14(a) | Definition of Capital Repairs | 36 |
| 14(b) | Proposal of Capital Repairs | 40 |

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

D04:[01034.DOCS.CLE01165]LEASE_6_12_96.

| Section Number | Descriptive Heading | Page Number |
|---|---|---|
| 14(c) | Preparation of Capital Repair Plans | 41 |
| 14(d) | Construction of Capital Repairs | 42 |
| 14(e) | Resolution of Disputes | 43 |
| 14(f) | Capital Repair Fund | 44 |
| 14(g) | Capital Repair Audit | 47 |
| 14(h) | Emergency Repairs | 48 |
| 14(i) | Lessee's Capital Improvements | 49 |
| 15 | Title to Alterations and Capital Repairs | 49 |
| 16 | Use of Premises | 50 |
| 16(a) | Permitted Use | 50 |
| 16(b) | Unlawful Use | 50 |
| 17 | Compliance with Laws | 51 |
| 18 | Indemnification | 51 |
| 19 | Insurance | 52 |
| 19(a) | Lessee Insurance Requirements | 52 |
| 19(b) | City Insurance Requirements | 54 |
| 19(c) | Waiver of Subrogation | 54 |
| 20 | Damage or Destruction | 55 |
| 20(a) | Repair of Damage | 55 |
| 20(b) | Reduced Seating Capacity | 57 |
| 20(c) | Extension of Term | 58 |
| 21 | Condemnation | 58 |
| 22 | Default | 60 |
| 22(a) | Remedies of City | 60 |
| 22(b) | City's Right of Re-Entry | 62 |

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

D04:[01034.DOCS.CLE01165]LEASE_6_12_96.

| Section<br>Number | Descriptive Heading | Page<br>Number |
|---|---|---|
| 22(c) | Lessee's Liability to Date of Termination | 62 |
| 22(d) | Lessee's Subleases and Agreements | 63 |
| 22(e) | Right of Specific Performance | 63 |
| 22(f) | The City's Remedies are Cumulative | 63 |
| 22(g) | Interest On Arrearages | 64 |
| 22(h) | Special Remedy of Lessee | 64 |
| 23 | Permitted Encumbrances | 65 |
| 23(a) | Subletting Allowed | 65 |
| 23(b) | Pledge of Revenues | 66 |
| 23(c) | No Other Liens | 67 |
| 23(d) | Prohibition | 68 |
| 24 | Scheduling the City's Rights of Use | 69 |
| 25 | Successors and Assigns | 70 |
| 26 | Leased Premises Condition | 70 |
| 27 | The City's Right to Inspect | 71 |
| 28 | Surrender | 71 |
| 28(a) | Surrender and Delivery | 71 |
| 28(b) | Removal of Personal Property | 72 |
| 28(c) | Abandonment | 72 |
| 28(d) | Holdover | 72 |
| 28(e) | Delay in Surrender | 73 |
| 29 | Recordation | 73 |
| 30 | Waiver | 73 |
| 31 | Estoppel Certificates | 74 |
| 32 | Approvals and Consents | 74 |

DOC:[01004.DOCS.CLE01165]LEASE_6_12_96.

| Section Number | Descriptive Heading | Page Number |
|---|---|---|
| 33 | Lessee's Equal Employment Opportunity and Affirmative Action Policies; Minority Participation | 75 |
| 33(a) | Compliance with Laws | 75 |
| 33(b) | Lessee's Equal Employment Opportunity and Affirmative Action Policies | 75 |
| 33(c) | MBE/FBE Participation | 75 |
| 33(d) | Quarterly Report | 76 |
| 34 | Equal Employment Opportunity | 76 |
| 35 | Notice | 77 |
| 36 | Electrical Supply | 78 |
| 37 | Landlord's Lien | 78 |
| 38 | Quiet Enjoyment | 79 |
| 39 | Provisions Binding | 79 |
| 40 | Entire Agreement | 79 |
| 41 | Severability | 80 |
| 42 | No Partnership | 80 |
| 43 | Effectiveness of Lease | 80 |
| 44 | Schedules and Exhibits | 80 |
| 45 | Broker's Commission | 81 |
| 46 | Gender and Number | 81 |
| 47 | Headings and Captions | 81 |
| 48 | Governing Law | 81 |
| 49 | Time is of the Essence | 81 |
| 50 | Survival | 81 |
| 51 | Counterparts | 81 |

DO4:[01034.DOCS.CLE01165]LEASE_6_12_96.

| Section Number | Descriptive Heading | Page Number |
|---|---|---|
| 52 | Third-Party Beneficiaries | 82 |
| 53 | Requirements of Law | 82 |
| 54 | Lessee as Manager | 82 |
| 55 | Court Costs and Attorneys' Fees and Expenses | 82 |
| | Signatures | 83 |
| | Acknowledgments | 85 |
| | Fiscal Officer's Certificate | 88 |
| | Exhibit A - Assignment and Assumption of Lease | 89 |
| | Exhibit B - Description of Leased Premises | 92 |
| | Exhibit C - Signage Standards | 93 |
| | Exhibit D - Common Area Maintenance Criteria | |
| | Schedule 14(f) Capital Repair Fund Budget] | 94 |
| | Schedule 19 - Insurance | 95 |

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

D04:[01004.DOCS.CLE01165]LEASE_6_12 96.

## LEASE BY WAY OF CONCESSION

This Lease by Way of Concession ("Lease") is made and entered into at Cleveland, Ohio as of the 26th day of April, 1996 by and between the CITY OF CLEVELAND, a municipal corporation and political subdivision of the State of Ohio (the "City"), through its Mayor and Director of Parks, Recreation and Properties pursuant to the authority of Ordinance No. 303-96, passed by the Council of the City on March 8, 1996, and the NATIONAL FOOTBALL LEAGUE, an unincorporated, non-profit association organized in accordance with the NFL Constitution, individually as to Section 3, and as nominee for the New Owner, with its principal office located in New York, New York, through its Commissioner pursuant to the authority of 1996 Resolution G-1 (such New Owner as the assignee of as this Lease is referred to as the "Lessee").

## RECITALS

A.     The City has provided and wishes to continue to provide a source of public relaxation and entertainment through the construction, ownership and leasing of a sports facility as that term is defined in Sec. 307.673 of the Revised Code (the "Act") for the play of professional football games and the presentation of other entertainment and public attractions.

B.     The maintenance of public safety and order during the operation of a sports facility will require policing and regulation by the City which can best be achieved by the City's acquisition and construction of that sports facility.

C.     The City has reviewed various economic feasibility reports which conclude that the acquisition and construction of a sports facility and the leasing of it for the play of professional football games will result in the creation of jobs and employment opportunities and

that a professional football team will improve the economic welfare of the City and its people through increased spending of individuals residing both inside and outside the City.

D.    The attraction of a professional football team to the City will not only enrich the City and serve as a catalyst for development, but also will project an image of civic pride and commitment.

E.    The City has entered into the Franchise Commitment Agreement dated as of April 26, 1996 ("NFL Agreement") with the National Football League (the "NFL") under the terms of which the NFL has agreed, among other things, to provide an NFL franchise in Cleveland in consideration of the City's agreement to construct a new stadium as described in Section 4 (the "New Stadium"), to enter into this Lease with the City pending the identification of the owner of the Cleveland NFL franchise, and to assign this Lease to such new owner ("New Owner").

F.    The New Stadium to be acquired and constructed by the City will be a sports facility within the meaning of the Act, and the NFL and the New Owner each is an owner within the meaning of the Act.

G.    The New Stadium will be located in an urban renewal area of the City known as the North Coast Harbor Community Development Plan Area and the City's development of the New Stadium in that area and the lease of the New Stadium to the NFL and the New Owner pursuant to this Lease will be undertaken for the foregoing purposes and for the elimination of conditions of blight determined to exist in that Plan Area and to prevent the reoccurrence of such conditions of blight.

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

H.     The New Stadium will create activity centers around the downtown office and retail core, enhance the visual quality of downtown of the City, and enhance the downtown tourism market.

I.     It will be necessary for the City to enter into certain financing arrangements and other agreements all in accordance with the Charter of the City and the Constitution and laws of the State, including the Act, in order to finance the cost of the New Stadium.

J.     The Lessee will undertake to operate and maintain the Leased Premises (hereinafter defined) and to promote its use by the general public for the above described purposes.

K.     The City wishes to lease the Leased Premises to the Lessee and the Lessee wishes to lease the Leased Premises from the City on the terms and conditions contained herein.

L.     It is the intention of the Lessee and City that the improvements to the Leased Premises be exempt from taxation under Ohio Revised Code Section 5709.081 and this Lease has been structured to qualify for that exemption.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the parties hereby agree as follows:

1.     Public Purpose. The City is entering into this Lease in furtherance of the public purposes stated in the recitals, and including, without limitation, the public purposes of (a) providing to the citizens of the City and the State public attractions for their relaxation, entertainment and recreation, (b) the creation of jobs and employment opportunities that will improve the economic welfare of the City and the State, (c) the elimination of the conditions of

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

blight determined to exist in the Plan Area and the prevention of the reoccurrence of such conditions of blight, (d) stimulating further economic development in the City through, among other benefits resulting from having an NFL franchise in the City, the free advertising of the City as a tourism and business location in the media coverage of NFL games played in the New Stadium, the community pride and solidarity engendered by retaining the Cleveland Browns football team in the City, and the enhancement of community relations through the association of persons of differing racial, religious, and ethnic backgrounds in the New Stadium for a common cause.

2.     Definitions. The following defined terms will have the meanings ascribed to them in this Section 2 unless the context clearly indicates otherwise.

"Best efforts" as applied to the City does not require the City to undertake fruitless acts or to undertake commercially unreasonable expenditures considering the aggregate benefit to both parties or to exercise its power of eminent domain.

"Browns" means the Franchise (currently held in trust for the benefit of the people of the City under the Browns Holding Trust and to be assigned to the New Owner), its players, coaches, trainers, office and related personnel.

"Browns Holding Trust" has the meaning set forth in the Trust Agreement by and between the Baltimore Ravens, Inc. (formerly known as the Cleveland Browns, Inc.), as Settlor, and Paul J. Tagliabue, as Trustee, dated as of April 26, 1996.

"Capital Repair Fund" has the meaning set forth in Section 14.

"Capital Repairs" has the meaning set forth in Section 14.

"Capital Repairs Standard" has the meaning set forth in Section 14(c).

"City Events" has the meaning set forth in Section 24.

"Commencement Date" has the meaning set forth in Section 6(a).

"Common Area Maintenance Agreement" means the agreement relating to maintenance of certain property in the Plan Area, to be entered into by the City and the Lessee and to address the matters set forth in Exhibit D.

"Community Development Plan" means the North Coast Harbor Community Development Plan, approved by the Council of the City by and through Ord. No. 1346-91 passed June 17, 1991.

"Construction Contract Documents" means the "Contract Documents" as defined in Condition B-1 of the City of Cleveland General Conditions For a Public Improvement.

"Environmental Law(s)" means each and every law, statute, ordinance, regulation, rule, judicial or administrative order or decree, permit, license, approval, authorization or similar requirement of each and every federal, state and local governmental agency or other governmental authority relating to any Hazardous Substances, and including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Hazardous Materials Transportation Act, the Resource Conservation and Recovery Act, the Hazardous Substances Account Act, the Hazardous Substances Act, and the Underground Storage Tank Act of 1984.

"Final Acceptance Date" has the meaning set forth in the definition of "Substantially Completed."

"Financing Agreements" means the agreements to be entered into by the City to provide for the financing of the New Stadium.

"Franchise" means the Cleveland NFL franchise called the Cleveland Browns as described in the NFL Agreement.

"Hazardous Substance(s)" means any substance, material, condition, mixture or waste which is now or hereafter (a) defined as a "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," or "restricted hazardous waste" under any provision of the State, federal or other applicable law; (b) classified as radioactive materials; (c) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act, 33 U.S.C. Section 1251 et seq. (33 U.S.C. Section 1321) or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. Section 1317); (d) defined as a "hazardous waste" pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq. (42 U.S.C. Section 6903); (e) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq. (42 U.S.C. Section 9601); (f) determined to be a "hazardous chemical substance or mixture" pursuant to the Toxic Substances Control Act, 15 U.S.C. Section 2601 et seq. (15 U.S.C. Section 2605); (g) identified for remediation, storage, containment, removal, disposal or treatment in any City plan for the Plan Area; or (h) determined by the State, federal or local governmental authorities to pose or be capable of posing a risk of injury to human health, safety or property (including but not limited to petroleum and petroleum byproducts; asbestos; polychlorinated biphenyls; polynuclear aromatic hydrocarbons; cyanide; lead; mercury; acetone, styrene; and "hazardous air pollutants" listed pursuant to the Clean Air Act, 42 U.S.C. Section

"HOK" means Hellmuth, Obata & Kassabaum, Inc., Sports Facilities Group.

"Lease Commencement Certificate" has the meaning set forth in Section 6(c).

"Leased Premises" has the meaning set forth in Section 5(a).

"Lessee" means the New Owner.

"Material Capital Repairs" shall mean those Capital Repairs (excluding, for purposes of this definition, Capital Improvements) necessary, in the City's reasonable and prudent judgment as the owner of the New Stadium, (i) to protect the health and safety of the people working or attending events in the New Stadium; (ii) to prevent permanent damage to the roof, foundation, or structure of the New Stadium; or (iii) to assure basic building systems and utilities necessary for the use of the New Stadium.

"NFL" refers to the National Football League as presently constituted and to any successor entity or entities.

"NFL Agreement" means the Franchise Commitment Agreement dated as of April 26, 1996 between the City and the NFL.

"Net Proceeds" means, with respect to PSLs, all proceeds received in connection with the sale or marketing of PSLs net of any direct or indirect expenses incurred in connection with such sales or marketing including, but not limited to, expenses of marketing, legal expenses in connection with marketing and, if required, securities registration of PSLs, escrow fees in respect of the PSL Trust (as defined in the Stadium Financing Agreement), and taxes payable in respect of PSL proceeds.

"New Owner" means the Lessee as the owner or owners of the Franchise as described in the NFL Agreement.

"New Stadium" has the meaning set forth in Section 4.

"PSL" has the meaning set forth in Section 12(f).

"Plan Area" means the urban renewal area described in the Community Development Plan.

"Regular season" means the number of football games counting in the standings for the purpose of determining the NFL teams that will participate in NFL post-season play.

"Regular season home game" means any football game scheduled to be played by the Browns following the Final Acceptance Date during the regular season as a part of the competition for the NFL Championship, which is designated by the NFL in the official NFL schedule to be a home game and, subject to Section 2.7 of the NFL Agreement with respect to the first season of play in the New Stadium, shall not be less than one-half the number of regular season games; provided that notwithstanding the foregoing, once every two (2) calendar years, the NFL may schedule one game less than one-half the number of regular season games to be played at a location other than the New Stadium.

"Rules of the NFL" means those rules and regulations established and promulgated from time to time that are applicable to the ownership and operation of a Franchise, including any collective bargaining agreement, the NFL Constitution and By-laws, the Standard Player Contract, the NFL Player Contract and the Bert Bell NFL Player Retirement Plan and Trust Agreement.

"Stadium Financing Agreement" means the Stadium Financing Agreement dated as of April 26, 1996 between NFL Enterprises, L.P. and the City of Cleveland.

"Stadium Standards" has the meaning set forth in Section 11(f)(ii).

"State of Ohio Lake Erie Submerged Land Lease" means the Lease of Lake Erie Submerged Lands entered into by the State of Ohio and others which grant leasehold interests in submerged lands that are a part of and adjacent to Lake Erie.

"Substantially completed" means, with respect to the construction of the New Stadium, that all final use and occupancy permits have been obtained by the City and delivered to Lessee, and the work on the New Stadium has been finally accepted by the Director of Parks, Recreation and Properties, as evidenced by his signature upon his Certificate of Completion and Acceptance filed in the Office of Commissioner of Accounts of the City, a copy of which shall be sent to the City's contractor, less only minor punch list items which do not materially interfere with Lessee's use and occupancy of the New Stadium for its intended purposes (including, without limitation, use of all Club Seats, private suites and other seating, and the use and function of all restrooms, concessions, entrances, passageways and parking lots) and which do not materially adversely affect the New Stadium's appearance as a complete and fully operational stadium, and which may be completed within sixty (60) days following the date of such certificate. Such acceptance shall be deemed to have taken place as of the date so stated in such certificate (the "Final Acceptance Date").

"Term" shall have the meaning set forth in Section 6(b).

"Work" shall mean, with respect to construction, alterations, or Capital Repairs, the furnishing of all labor, materials, tools, equipment, incidentals and any other thing necessary

or required for the full performance of the Construction Contract Documents by the contractor, including all such required or necessary as called for in any proper subsidiary agreement.

3. Assignment and Assumption of Lease by New Owner. Other than the obligations of the NFL described in this Section 3, it is understood and agreed that the NFL is executing this Lease as a nominee for the New Owner and, as such, shall have no liability under this Lease. Pursuant to the provisions of the NFL Agreement, the NFL agrees to assign all of its interest in and to this Lease to the New Owner, after the New Owner is identified by the NFL, and to cause the New Owner promptly to sign and deliver to the City such written instruments as are necessary and appropriate to evidence the assumption by the New Owner of all of the terms of this Lease and all of the obligations and liabilities of Lessee hereunder which arise after the date of assignment, such written instruments to include, without limitation, an Assignment and Assumption of Lease in the form of Exhibit A attached hereto and made a part hereof. Any provision hereof or of law to the contrary notwithstanding, the NFL acknowledges that the City has the right to specific performance of the NFL's obligations under this Section 3 as provided in Section 22(e) of this Lease. In connection with such assignment, the City shall be under no obligation to make any payment or provide any consideration to the New Owner or the NFL other than as provided in this Lease.

4. Construction of New Stadium. As additional consideration for the NFL's willingness to execute and deliver this Lease, the City is willing to construct buildings and other improvements on the Leased Premises (sometimes hereinafter collectively referred to as the "New Stadium") subject to the consummation of the Financing Arrangements as defined in the Stadium Financing Agreement. The New Stadium is to be constructed by the City in accordance with the NFL Agreement, the Stadium Financing Agreement and the Construction Contract Documents. Any failure by the City to perform such obligations shall be governed by the provisions of the NFL Agreement and the Stadium Financing Agreement, and the Lessee

specifically consents and acknowledges that it is a third-party beneficiary only of the liquidated damages provision contained in Construction Contract Documents.

The provisions of this Section 4 shall not in any manner be deemed or construed to grant the Lessee any independent claim against the City.

5.      Leased Premises.

(a)      Real Estate and Improvements.  The City does hereby demise and lease unto the Lessee, and the Lessee does hereby take and lease from the City the real property described in Exhibit B attached hereto and made a part hereof, together with the buildings, structures and improvements that may be constructed thereon and any replacements, alterations and additions thereto, and, all rights, privileges and easements now or hereafter appurtenant to the premises described in Exhibit B hereto, the said premises, buildings, structures and improvements being sometimes hereinafter collectively referred to as the "Leased Premises"), subject to the Financing Agreements, all liens, encumbrances, easements, and clouds of title, covenants, conditions and restrictions, zoning ordinances, current taxes and assessments not yet due and payable, the terms and provisions of the Community Development Plan, and the rights of others under any State of Ohio Lake Erie Submerged Land Leases, none of which shall materially impair the Lessee's use or quiet enjoyment of the Leased Premises.  Within twenty (20) days of the execution of this Lease, the City shall provide to the NFL a title report relating to the Leased Premises, together with copies of all title documents referenced therein.  Within thirty (30) days following receipt of such title report and documents, the NFL shall identify any items which, if not cured by the City, would, in its reasonable judgment, interfere with the Lessee's use of the Leased Premises for the play of professional football, and would, therefore, constitute a breach of quiet enjoyment pursuant to Section 38 of this Lease.  The NFL shall identify any such items in writing, together with a detailed explanation of reasons why such

Electronically Filed 04/04/2025 15:55:44 / CV 25 11018 / Confirmation Nbr. 3577194 / CLFRSZ

items would so interfere.  Any items not identified by the NFL as a breach of quiet enjoyment

hereunder shall be deemed to have been accepted by the NFL. The City shall present such detailed explanation to the City architect, who shall determine whether such items will interfere with the Lessee's use of the Leased Premises for the play of professional football. The City shall promptly remove all monetary liens or encumbrances therefrom, and shall remedy all other matters that the City's architect determines will interfere with the Lessee's use of the Leased Premises for the play of professional football.

In the event that the City enters into a ground lease of the Leased Premises, the ground lessor and the NFL or the Lessee, as the case may be, shall execute a non-disturbance and attornment agreement in a form reasonably acceptable to the parties.

(b)      Air Rights. The City hereby reserves all air rights over the Leased Premises. The City is reserving the air rights described above in connection with the needs and requirements related to the operation of Burke Lakefront Airport. The City covenants that it will not construct any structures or improvements within the area of such air rights other than facilities in aid of arrival and departure of aircraft at Burke Lakefront Airport required by the Federal Aviation Administration.

(c)      Parking. The City shall make available to the Lessee, free of charge, for home game days plus nine (9) additional days per year, parking spaces for four hundred fifty (450) passenger vehicles, which spaces shall be located north of Erieside Boulevard. The City agrees to cooperate in accordance with law with the Cleveland-Cuyahoga County Port Authority (the "Port Authority") to cause the Port Authority to enter into long-term parking agreements with the Lessee, at Lessee's expense, at reasonable rates (for leasing of entire lots), for an additional twenty-two hundred (2200) parking spaces for passenger vehicles. The City shall use its best efforts to help the Lessee obtain parking spaces for five hundred fifty (550) additional passenger vehicles to be located within reasonable proximity to the passageways

and walkways to the New Stadium for private suite and club seat ticket holders. In no event

shall the Lessee take any action that would restrict Willard Park Garage for the use by the general public. The City shall also use its best efforts to help the Lessee obtain such additional parking spaces for passenger vehicles as may be necessary to comply with laws, rules and regulations relating to the required number of handicapped parking spaces.

(d) <u>Amendment of Legal Descriptions</u>. After construction of the New Stadium is completed and a new legal description for the parcel on which the New Stadium is located is available, the parties agree to amend this Lease to revise the legal descriptions of such parcel.

6. <u>Lease Term</u>.

(a) <u>Commencement of Term</u>. The term of this Lease shall commence (hereinafter referred to as the "<u>Commencement Date</u>") on the later of (i) the Final Acceptance Date, or (ii) the date the City of Cleveland has issued a temporary, partial or permanent certificate of occupancy or (iii) the date of official acknowledgment by the NFL of its approval of the granting of an NFL franchise for the location of a professional football team whose regular season home games are to be played in the New Stadium. Prior to the Commencement Date, the City acknowledges and agrees, subject to prior notice from Lessee to the City, that it shall permit Lessee to occupy and use the Leased Premises prior to substantial completion of the New Stadium construction in order to begin its operations in preparation for its first NFL pre-season and regular season games, provided that such use and occupancy does not interfere with the completion of construction of the New Stadium and provided further that the Lessee shall have obtained all insurance coverage as required pursuant to Section 19 hereunder. No later than the Commencement Date, the City shall provide to the Lessee an updated title report relating to the Leased Premises, which report shall be dated within sixty (60) days prior to the Commencement Date and shall show all matters of record. No later than the Commencement

Date, the City shall have removed, released or otherwise terminated all monetary liens or

monetary encumbrances therefrom except those in connection with the Financing Agreements and taxes and assessments not yet due and payable.

(b) <u>Term</u>. The term of this Lease shall commence on the Commencement Date and continue thereafter to a date thirty (30) years (each full year and the period prior to the February 1st following the Commencement Date, a "<u>Lease Year</u>") from and after the February 1st prior to the first season in which the Browns commence participation in the NFL regular season games ("<u>Term</u>"), subject to extension pursuant to Sections 20 and 21 hereof.

(c) <u>Lease Commencement Certificate</u>. Within ninety (90) days following the Commencement Date, the parties shall enter into a Lease Commencement Certificate confirming the Term of this Lease, the monetary contribution of the NFL or the Lessee to the cost of the Leased Premises, the net proceeds, as of such date, from the sale of permanent seat licenses in the Premium Seating Campaign (as defined in the Stadium Financing Agreement), whether any club seat revenues are the subject of a waiver of Lessee's gate-sharing obligations under the NFL Constitution and, if so, the projected amount of the waiver, identification of any fixtures or personal property included within the Project Budget (as defined in the Stadium Financing Agreement) and such other informational matters as either party may reasonably request.

7. <u>Rental</u>. The rent to be paid by Lessee during the term of this Lease shall be an amount equal to (a) Two Hundred Fifty Thousand Dollars ($250,000.00) per year during the Term of this Lease, which shall be payable on or before February 1 of each Lease Year except for the first Lease Year, for which such rent shall be prorated based on the number of days comprising the first Lease Year and shall be payable no later than thirty (30) days following the Commencement Date; plus (b) the amount of the expenses of operation and maintenance of

Electronically Filed New 18/20 dauts to be paid directly by Lessee, which operation and maintenance obligations are

further described in Section 11. The City and the Lessee intend that all costs, charges, expenses, impositions and obligations of every kind and nature whatsoever relating to the use, occupancy, repair and maintenance of the Leased Premises, including but not limited to, taxes (other than real property taxes), assessments, utility charges and expenses, insurance, operation, maintenance and repairs (other than those items which are defined as "Capital Repairs"), which may arise or become due during the term of this Lease shall be paid by Lessee, and Lessee hereby agrees to indemnify and save harmless the City from and against the same.

8. <u>Lessee's Representations</u>. Lessee represents and warrants that (a) the execution, delivery and performance by Lessee of this Lease are within the power of Lessee, and have been authorized by all necessary action; (b) this Lease has been duly executed and delivered by Lessee; and (c) this Lease and the documents referred to herein constitute valid and binding obligations of Lessee. The Lessee acknowledges and agrees that except as expressly set forth in this Lease, there have been no representations or warranties made by or on behalf of the City with respect to the Leased Premises or with respect to the suitability of the Leased Premises for the conduct of the Lessee's business.

9. <u>Lessee's Covenants</u>. Lessee hereby covenants that it shall comply with the following:

(a) <u>Play of Games</u>. As additional consideration for the City's willingness to execute and deliver this Lease, the Lessee specifically agrees that the Browns will play, in the New Stadium, for not less than thirty (30) years, all regular season home games. Lessee also specifically agrees that the Browns will play in the New Stadium, for not less than thirty (30) years, all post-season, exhibition, all-star, wild-card, divisional playoff, conference championship, NFL Championship or other professional football games as may be scheduled, required, or authorized to be played in the New Stadium by the rules of the NFL, which are

Electronically applicable, generally to all NFL franchises and teams (the "Rules of the NFL"). During each

consecutive four (4) year-period during the Term of this Lease, the Lessee specifically agrees that the Browns will play, in the New Stadium, no less than one-half of the number of all pre-season games which are played at a participating team's home stadium.

(b)     Obligation to Maintain Franchise.  Lessee represents that it shall be, as of the Commencement Date, a member in good standing of the NFL and agrees that, throughout the Term of this Lease, it shall:

(1)     maintain its membership and franchise in the NFL in good standing;

(2)     (i) hold, maintain and defend its rights to play professional football in the City of Cleveland, Ohio, in accordance with the Rules of the NFL, be obligated to play home games of the Franchise at the New Stadium in Cleveland, Ohio, as provided in this Lease, (ii) not negotiate with any person or do or suffer to be done anything which will cause such rights to be lost or impaired or diminished in any respect, or transferred, relocated or otherwise moved or (iii) not sell the Franchise to another person or entity which has the then present intent to relocate, transfer or otherwise move the Franchise to any other city or location, and (iv) not modify the Franchise to permit the Browns to play regular season home games or post-season home games (other than as required by the Rules of the NFL) in any such other city or location; and

(3)     not assign or otherwise transfer its membership and franchise in the NFL unless the assignee or transferee assumes the obligations without modification of Lessee under this Lease arising or accruing from and after the effective date of such assignment or transfer.

(c)     Number of Games.  To the extent within the control of the Lessee, the Lessee covenants that during the Term of this Lease, the number of regular season home games during any NFL season shall not be less than eight (8).

(d)     Compliance with Community Development Plan.  Lessee hereby agrees on behalf of itself, its successors and assigns that it shall, for the duration of the Community Development Plan, devote the Leased Premises to, and only to and in accordance with, the uses specified in the Community Development Plan, as the same may be amended from time to time.  All additions, modifications and replacements made to the Leases Premises during the duration of the Community Development Plan shall conform thereto.  Without limitation of Lessee's other remedies hereunder, the City's modification of or amendment to the Community Development Plan in a way that materially adversely affects Lessee's use of the facility as the venue for professional football games shall constitute a breach of Lessee's quiet enjoyment pursuant to Section 38.

(e)     Nondiscrimination.  Lessee agrees on behalf of itself, its successors and assigns not to discriminate against any person or group of persons on account of race, religion, color, sex, sexual orientation, national origin, age, disability, ethnic group or Vietnam-era or disabled veteran status in the sublease, use, occupancy, maintenance, improvement, tenure or enjoyment of the Leased Premises.

(f)     Signage Plan.  A complete signage plan for the Leased Premises shall be submitted to and approved by the City Planning Commission.  That plan shall be site specific but shall be generally consistent with and encompass the matters addressed in the signage plan standards for the Gateway Sports Complex, which standards are attached as Exhibit C hereto.

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

(g)     Right of Specific Performance.     Any provision of law to the contrary notwithstanding, Lessee acknowledges that the City has the right to specific performance of the Lessee's obligations under paragraphs (a), (b)(2), and (b)(3) and (c) of this Section 9 as provided in Section 22(e) of this Lease.

10.     Taxes and Assessments.

(a)     Taxes Paid by City.     The City shall be responsible for the payment of all real property taxes and assessments, general or special, and all impositions by any governmental entity or authority in the nature of or as a replacement for real property taxes relating to the Leased Premises. The Lessee shall cooperate with the City (but shall not be required to incur out-of-pocket expenses) in any application or application process relating to the exemption of the Leased Premises from taxation; provided that the Lessee shall not thereby be required to increase its obligations or reduce its rights under this Lease.

(b)     City's Expenses Prior to the Commencement Date.     The City, and not the Lessee, shall be responsible for unpaid bills or payroll of the City for work done or services performed at the Leased Premises prior to the Commencement Date.

11.     Costs of Operations and Maintenance of the Leased Premises.     All costs, expenses and obligations of any kind relating to the operation or maintenance of the Leased Premises which may arise or become due and payable during the Term of this Lease shall be paid by the Lessee.

(a)     Costs of Operations and Maintenance.     Such costs, expenses and obligations shall include, without limitation:

(1)     An amount equal to the admissions tax, if any, paid or payable by Lessee to the City pursuant to "Chapter 195 of the Codified Ordinances of Cleveland, Ohio 1976," as amended from time to time;

(2)     The amount of any similar tax which is imposed directly on the sale of tickets, and which is paid or payable by Lessee, whether city, county, state or federal, and whether in the nature of an admissions tax, sales tax or otherwise (other than federal, state or local income taxes, or other taxes measured by income or imposed upon the privilege of carrying on or conducting business in general);

(3)     The amount of any other taxes or governmental impositions and charges of every kind and nature whatsoever, whether or not now customary or within the contemplation of the parties, (including, without limitation, any parking tax) other than the taxes that the City has agreed to pay pursuant to Section 10.

(4)     Any commissions or fees paid or payable or any rebates or donations given to any sponsor, promoter, charity or other person or entity for or in connection with the sale or other distribution of tickets or other rights for the admission of spectators to the New Stadium;

(5)     The cost of footballs, helmets or any other items distributed, or any fees or charges paid or payable to any promoter, for or in connection with any promotions related to admissions to the New Stadium; and

(6)     Any other costs or expenses incurred in connection with the
sale or distribution of tickets or other rights for admission to the New Stadium.

Without limitation of the Lessee's other remedies hereunder, the City's amendment or modification of the existing admissions tax ordinance or enactment of a new admissions tax ordinance such that taxes are imposed in whole or in part on admissions to the New Stadium that are not imposed on admissions to other entertainment venues that are subject to the admissions tax generally and, in particular, that are not imposed on admissions to all professional sports events generally shall constitute a breach of Lessee's quiet enjoyment pursuant to Section 38.

(b) <u>Services</u>. All New Stadium services shall be operated, managed, supervised and paid for by Lessee. Such services shall include, without limitation:

(i) <u>Services for Games</u>. Lessee shall provide, at its own cost and expense, the services for all professional football games and other events to be played in, held at, or to take place in, and to be exhibited to the public in, the New Stadium, including, without limitation:

(A) The sale and taking of tickets for admission to each such game or event;

(B) Customary precautions for crowd control within the New Stadium by means of providing such ushers, doormen, security personnel, emergency personnel, and special police as reasonably may be appropriate for projected attendance at each such game or event, and the City and the Lessee agree that police protection outside of the New Stadium (both on and off the Leased Premises) shall be provided at the City's sole cost and expense and that police protection at the gates to the New Stadium shall be deemed to be within the New Stadium and therefore shall be provided at the cost and expense of the Lessee; <u>provided</u>, that the

City shall bear the cost of any extraordinary level of police protection within the New Stadium over and above normal levels of security, which is necessitated by events outside of Lessee's control, as the City may, in its sole discretion, deem appropriate;

(C)     First-aid service for spectators at each such game or event;

(D)     Technical personnel for the operation of New Stadium systems, including public address, sound, video replay and electronic scoreboard systems for each such game or event;

(E)     Services for the use of public toilets and washrooms, and similar facilities for the media and press, and for the use of the team rooms and officials' room and adjoining showers, bathrooms and toilets, by means of providing such attendants, together with towels, soap, toilet paper and other supplies, therefor as reasonably may be necessary or appropriate;

(F)     Such other customary services pertaining to the admission of spectators to, and the use by spectators of, the premises of the New Stadium for each such game or event, as may be deemed necessary or appropriate by Lessee; and

(G)     Subject to the provisions of Section 11(b)(i)(B), coordinating, supervising, implementing and enforcing vehicular and pedestrian traffic flow into and out of the New Stadium;

(ii)    <u>Groundskeeping</u>.  Lessee shall provide all groundskeeping services with respect to the playing area of the New Stadium and appurtenant facilities.  Lessee shall, at its own cost and expense, obtain and provide staff, equipment and supplies as are necessary or appropriate to the provision of groundskeeping services, which shall include specifically, but without limitation:

(A)    The entire cost of maintaining the surface of the playing area in a condition satisfactory for playing professional football, and all overhead costs of maintaining a groundskeeping crew and equipment.

(B)    The entire cost of preparing the surface of, and marking lines on, the playing area, and of installing and removing goal posts, team benches and otherwise.

(C)    The cost of leasing or otherwise obtaining special equipment and supplies, including field covers, for use in connection with preparing or maintaining the surface of the playing area.

(D)    The entire cost of preparation, conversion and/or restoration of the surface of the playing area with respect to any related event or activity scheduled or arranged by Lessee to be held at, or to take place in the New Stadium.

(E)    After initial construction of the New Stadium and the original placement of the surface of the playing field, the entire cost of preparing the surface of the playing area for the playing of professional football.

-22-

(F) The cost of repairing any damage to or destruction of the surface of the playing area.

(G) The cost of providing, repairing, maintaining and replacing all lawn mowing equipment, snow removal equipment, material handling equipment and other similar equipment necessary or advisable, in the Lessee's reasonable discretion, for the proper operation and maintenance of a football stadium.

(iii) <u>Cleaning and Janitorial</u>. Lessee, at its own cost and expense, shall provide such cleaning, janitorial and ordinary maintenance services as may be necessary or appropriate to keep the Leased Premises clean and in good order for the purposes for which Lessee has been granted the right to use and occupy the same.

(iv) <u>Utilities</u>.

(A) The City shall cause to be supplied such water and electric utility services, sewer, drainage or other utility services as may be necessary or appropriate for the operation of the Leased Premises. The City shall supply such utility services as are necessary for the operation by the Lessee, at Lessee's expense, of lighting and operating spectator facilities, for television and radio broadcasting for cable television and telephone and for the operation of all other New Stadium services, premises and facilities, including without limitation, ordinary heating and air conditioning, ventilating, hot water, water, plumbing and drainage services and facilities for the home and visiting team rooms and officials room, and field lighting for the playing area satisfactory for the playing of night football. Lessee shall pay for the use and consumption of all

utility services at its own cost and expense. The City shall cause the services for utilities at the New Stadium to be separately metered, and shall cause the same to be billed directly to Lessee. Lessee shall obtain and maintain at its sole cost and expense such telephone service, including field telephones, as it may deem appropriate, provided that it shall be entitled to use, at its own cost and expense, all appliances included in the construction of the New Stadium. Lessee shall also be solely responsible for obtaining, and for the payment of all charges (including deposits), programming fees and service charges for the use of, cable television incurred by Lessee or its sublessees.

(B)     The City shall use its best efforts to assure that such services are provided or supplied pursuant to the foregoing provisions of this Section 11, free from any interruption or suspension. In the event of the failure or inability of the City to obtain, procure, supply or provide any such service for a period of ten (10) consecutive days or less, or in the event of any interruption or suspension in the provision or supply thereof for a period of ten (10) consecutive days or less, due to the making of the improvements and repairs described in Section 14 below, or due to any necessary repairs, renewals, extensions or improvements to the facilities required to be made by the City hereunder which are used in providing any such service, or any shortage of fuels or supplies, or any strike, lockout, act of God or war, governmental rules, regulations, decrees or statutes, or any other cause or causes reasonably beyond the control of the City, the City shall not thereby be deemed or considered to have incurred any liability to Lessee for damages whatsoever, so long as it has complied with the provisions of this Section 11(b)(iv)(B), nor shall

Lessee be deemed to have been evicted or unreasonably disturbed in its

use and occupancy of the Leased Premises, or be entitled to any deduction or setoff against the charges to be paid to the City hereunder, or, except as hereinafter provided, otherwise relieved from the performance of its covenants, duties and responsibilities hereunder. Notwithstanding the foregoing, the City shall undertake and diligently pursue all reasonable steps to minimize the effect of any such failure, interruption or suspension of service and to restore the same. In the event that any interruption or suspension in the provisions or supply of services for utilities at the New Stadium renders the New Stadium unusable for the playing of regular season home games, Lessee's covenant under Section 9(a) of this Lease shall be suspended commencing on the date of such interruption or suspension and continuing, based on the nature and severity of the interruption, but in no event beyond the date that is fourteen (14) calendar days after the date the provision or supply of services is fully restored. Moreover, in the event of such an interruption or suspension, the City shall work cooperatively with the Lessee to identify substitute facilities reasonably acceptable to the Lessee for the playing of Lessee's regular season home games and shall facilitate the arrangements between the Lessee and the owner of such site.

(v) <u>Services to Suites and Club Seats</u>. Lessee, at its own cost and expense, shall provide all guest services to the suites and club seats.

(c) <u>Payment by Lessee</u>. The Lessee covenants and agrees from and after the Commencement Date, at its own cost and expense, to pay to the utility company or companies supplying the same, as the same become due and payable and before any fine, penalty, interest or other charge may be added thereto for the nonpayment thereof, all water, gas, electric and sewer rents, rates and charges, charges for utilities, becoming due and payable

Electronically Filed 01/14/2025 15:55 / / CV 25 1107887 / Confirmation Nbr. 3379947 / CLSZ2

out of, or in respect of, or becoming a lien on the Lease or Leased Premises, payable as a result of Lessee's use or occupancy of the Leased Premises.

The Lessee may, if it disputes the amount or validity of any charges, penalties or claims, described in Section 11(c), contest and defend against the same at its cost, and in good faith diligently conduct any necessary proceedings to contest, prevent, and avoid the same, and to withhold the payment thereof pending final determination and shall immediately discharge and remove any lien arising or attaching. On final determination of any claims, the Lessee shall immediately pay any judgment rendered with all proper costs and charges and at the Lessee's sole expense.

(d)    Maintenance and Repairs. The maintenance and repair obligations of the Lessee pursuant to this Section 11(d) shall include all Work not defined as a Capital Repair pursuant to Section 14(a).

(i)    The Lessee shall, at its own cost and expense, provide all routine maintenance to ensure compliance with the terms of this Lease and in order to maintain the Leased Premises. Such routine maintenance shall comprise and include, without limitation, providing routine maintenance to the Leased Premises, and all alleyways, passageways, walkways, promenades, parking areas, plazas, sidewalks, curbs and vaults contained on the Leased Premises, and Lessee shall keep the same in good order and clean, sanitary and safe condition, except for reasonable wear and tear. All repairs, maintenance, replacements, restorations or renovations made by Lessee shall be at least equivalent in quality, workmanship and class to the original work.

(ii)    Lessee shall put, keep and maintain all portions of the

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ
Leased Premises, and the sidewalks, walkways, promenades, parking areas,

D04:[01034.DOCS.CLED1165]LEASE_6_12_96.                -26-

plazas, curbs, alleyways, vaults and passageways adjoining the same in a clean, safe and orderly condition, free of accumulations of dirt, rubbish, snow, ice and unlawful obstructions. Maintenance shall be performed in a nonintrusive and noncorrosive manner.

(iii)    The Lessee shall, at its own cost and expense, keep, replace and maintain in good and safe repair, order and condition all present and future improvements on the Leased Premises including, but not by way of limitation, the playing surface of the New Stadium, building, fixtures, windows, doors, parts and equipment, electrical systems, plumbing, ventilation, heating and air conditioning, sprinkler systems, lighting and seating, scoreboard and signage, irrigation and sewage system, parking areas, landscaping on the Leased Premises, driveways and access roadways on the Leased Premises, and utility lines and connections, both inside and outside, extraordinary and ordinary.

(iv)    The Lessee shall not suffer or permit wasting, damages or injury and shall, at its own cost and expense, use all reasonable precautions to prevent waste, damage or injury.

(v)    The Lessee shall, at its own cost and expense, operate the illumination systems for parking or pedestrian areas situated on the Leased Premises during and for a reasonable time before and after events at the New Stadium.

(e)    <u>Permits and Authorizations</u>. The Lessee shall, at its own cost and expense, make all required applications, petitions and other filings as necessary and shall obtain and maintain all permits, licenses and other authorizations necessary fully to enjoy the uses and benefits of the Leased Premises other than the permits and authorizations for the initial

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

construction of the New Stadium or otherwise relating to periods prior to the Commencement Date, which shall be the obligation of the City.

        (f)     Alterations.

            (i)     The Lessee shall, at its sole cost and expense, be permitted to make changes to or alterations in, or additions or improvements to, the Leased Premises as provided in this subsection. Alterations, additions or improvements affecting the structure of the New Stadium shall not be made without the prior written consent of the City. The Lessee shall deliver to the City, with a copy to the President of the Council of the City, written notice of any such other change, alteration, addition or improvement in excess of $100,000. Lessee shall make no structural changes or alterations in, or additions or improvements to, all or any part of the New Stadium or the Leased Premises without, in each such instance, first making a written proposal to the City specifying the proposed work. The City shall review such request, through its Director of Parks, Recreation and Properties, and determine, in its reasonable judgment, whether to permit such alteration to be made. The City agrees that it will not unreasonably withhold, delay or condition its review and determination. The City shall make such determination within thirty (30) days of its receipt of the written request from the Lessee. If the City determines that such structural alteration may be made, the City shall so notify the Lessee, within such thirty-day period. If the City determines that such alteration may not be made, the City shall deliver, within such thirty-day period, a written determination to that effect to the Lessee including its reasons for such determination. The Lessee may, but shall not be required to, make any modifications or revisions to its request and resubmit such request to the City for determination in the same manner provided above.

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

(ii)     The Lessee shall work with the City's architect to prepare construction drawings and specifications for making all alterations requiring the City's consent (the "<u>Alteration Plans</u>").  The Lessee shall be responsible for paying the architect's fees and expenses and all other costs associated with making the alterations.  The Lessee agrees that such Alteration Plans shall conform to the minimum standards at such time for then-existing NFL stadia generally (the "<u>Stadium Standards</u>").  The Lessee shall cause the Alteration Plans to be prepared and delivered to the City within thirty (30) days after the City's determination pursuant to Section 11(f)(i) above.  The City shall have the right to review the Alteration Plans to assure compliance with the Stadium Standards. In the event the City reasonably believes that the Alteration Plans do not conform to the Stadium Standards, the City shall so notify the Lessee of its determination within thirty (30) days after the Alteration Plans are delivered to the City.  The City agrees that it will not unreasonably withhold, delay or condition its review and approval.  In the event that the City and the Lessee disagree concerning any portion of the Alteration Plans, such dispute shall be settled in accordance with Section 14(e).  The Lessee shall not have the right to proceed with the construction of the alterations as proposed in the Alteration Plans until it has obtained all necessary consents and approvals from the City and its various departments, commissions, agencies, boards and officers in accordance with the terms of this Lease.

(iii)     After the Alteration Plans have been reviewed and approved, the Lessee agrees to cause the alterations to be made and carried out in accordance with such Alteration Plans.  The Lessee shall have the right to select and enter into contracts with any and all contractors, subcontractors, suppliers, vendors, architects, engineers, construction manager, project managers, consultants or other entities or individuals with respect to the completion of the

alterations, all with the prior reasonable approval of the City. The Lessee shall require and obtain from its contractor(s) engaged to construct the alterations performance and payments bonds (or insurance or other security), in an amount equal to one hundred percent (100%) of the amount of the contracts if reasonably available or otherwise in an amount that is reasonably available, for recovery of actual and liquidated damages, including but not limited to damages for delay that may be claimed by the Lessee or the City. In addition, the Lessee shall require and obtain from its contractor(s) and subcontractor(s) engaged to construct the alterations insurance with the same types of coverages, terms and conditions as provided in Section 19, with the City as an additional insured, except that the limits of coverage may be adjusted and the types of coverage may be increased, as reasonably acceptable to both the City and the Lessee, in accordance with the cost and nature of the work to be performed by the contractor(s) or subcontractor(s) in order to protect the interests of the Lessee and the City, respectively. The Lessee shall use its best efforts to obtain for the benefit of the City and the Lessee from each contractor and subcontractor standard commercial warranties for all work performed by such contractor or subcontractor.

(iv)    Any such change, alteration, addition or improvement so permitted shall be made in good and workmanlike manner and in compliance with all applicable permits, authorizations, building and zoning laws or ordinances and with all other laws, ordinances, orders, rules, regulations and requirements of all federal, state, municipal or other local governments, and their duly constituted departments, commissions, agencies, boards and officers. The Lessee agrees to permit the City to observe all such work, but the City shall have no obligation to do so.

(g)  Maintenance Audit.  Commencing on the January 1 after the Commencement Date and on each anniversary of the Commencement Date thereafter during the term of this Lease, the Lessee shall, at its own cost and expense, provide the City, and the President of the Council of the City, with a maintenance inspection report on the New Stadium from a licensed engineer, reasonably acceptable to the City, having at least ten (10) years of experience in performing maintenance inspections of commercial buildings, including stadia, and otherwise qualified to provide the information required hereunder (the "Maintenance Engineer"). The Maintenance Engineer shall report on the condition of the structure and each capital component of the Leased Premises, which report shall include suggestions for any current maintenance work that is necessary to the Leased Premises (such report, the "Maintenance Audit").  The Lessee shall maintain a log for the Leased Premises, which log shall include a copy of all Maintenance Audits as well as a record in reasonable detail of all maintenance work undertaken by the Lessee or the Lessee's agents or representatives.

(h)  New Owner as Lessee shall sign and deliver the then existing Common Area Maintenance Agreement simultaneously with the signing of written instruments evidencing the assumption of this Lease by the New Owner.

12.  Revenues from Operations of Leased Premises.  As between the City and the Lessee, the Lessee shall receive one hundred percent (100%) of all revenues from New Stadium operations, whether direct or indirect (through sublessees or otherwise) excluding, however, any revenues from City Events.  Revenues to be received by Lessee shall include, without limitation:

(a)  Ticket Sales.  "Gross revenues", as hereinafter defined, paid or payable to Lessee, or to any other person or entity entitled or authorized to receive the same by, through or on behalf of Lessee, for or with respect to the admission of spectators to any professional football game  played or scheduled to be played in the Stadium, whether regular

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

season, pre-season, post-season, exhibition, all-star, divisional playoff, conference championship, NFL Championship or otherwise, or to any related event authorized or permitted to be conducted or scheduled to be held by Lessee in the New Stadium and for which a separate charge or fee for admissions is received or receivable by Lessee.

As used in this Section 12(a), the term "gross revenues" shall be defined and construed to mean gross receipts, specifically including, without limitation:

(1)     All sums of money, after the payment of admissions taxes, received or receivable from the sale of tickets or other rights for admission to the New Stadium, regardless of whether such tickets or rights have been presold and donated or returned or otherwise transferred prior to such sale, but excluding any sums refunded to purchasers of tickets for tickets returned prior to the exhibition of the game or event to which the same pertain, all subject to the Lessee's commitment to make certain tickets available to the community free of charge as described below;

(2)     All fees or royalties paid or payable by any sponsor or promoter for or in connection with the right or privilege of selling or distributing tickets or other rights for admission to the New Stadium;

(3)     All service charges or other fees charged by Lessee for passes for admission or ticket exchanges;

(4)     Any and all other amounts received or receivable for or with respect to the admission of spectators to the New Stadium; and

(5)    The value of all credits, tradeoffs, setoffs, and other economic
benefits received in lieu of cash.

It is Lessee's intention to make available free of charge a "reasonable number" of tickets for
each game played at the New Stadium to a nonprofit or civic organization for distribution to
low-income or disadvantaged persons. Such "reasonable number" shall be determined by Lessee
in light of NFL policies limiting the number of complimentary tickets and competing needs for
complimentary tickets, but shall in no event be less than two hundred and fifty (250) tickets per
game.

Lessee shall have full charge, authority and responsibility for the printing,
wording, custody, sale and distribution of tickets for admission to all professional football games
played by the Browns, and to all events or activities scheduled or arranged by Lessee to be held
at or to take place in the New Stadium. Subject to the free tickets described above, Lessee shall
have full discretion and authority with respect to establishing the prices to be charged for tickets
for admission, including promotional and charitable sales and distributions. Subject to
provisions in the Stadium Financing Agreement regarding the sale of PSLs, Lessee shall have
full discretion and authority with respect to establishing the time, place, manner of ticket sales
and eligibility to purchase tickets.

(b)    Licensing and Broadcasting.  All fees and revenues from all radio
and television licensing and broadcasting and other forms of telecommunications activities.

(c)    Advertising; Scoreboard(s) and Signage.  All  fees and revenues
from advertising, signage (permanent or temporary) in or on the New Stadium or the Leased
Premises, including without limitation, scoreboard, screens, banners or displays, time clocks,
Electronically Filed messages, or other signage or other signage or any publications necessary for NFL games or
from which Lessee produces any advertising revenues throughout the entire year.

(d) <u>Food, Drink and Other Concessions</u>. All revenues from and charges for food and beverages, including alcoholic beverages (subject to all applicable licensing requirements), all game programs, yearbooks, and similar publications relating to the Browns, the NFL or otherwise.

(e) <u>Novelty Sales</u>. The proceeds of the sale of products including, without limitation, NFL novelties and licensed products, to the general public.

(f) <u>Premium Seating Payments</u>. Revenues from all suite or club seats located, or to be located, in the New Stadium; provided, that with respect to the suites and club seats to be part of the New Stadium, the initial licensing and/or leasing shall be undertaken as described in the Stadium Financing Agreement. Lessee acknowledges that its rights to the Leased Premises are subject to the rights of the lessees or licensees under those premium seating leases or licenses and the Lessee will by assignment accept and assume all the obligations and liabilities of the lessor or licensor under those leases or licenses. Except with respect to the initial term of any leases or licenses assumed pursuant to the previous sentence, Lessee shall have full charge, authority and responsibility to lease, rent, license, sell or otherwise grant the right to use the suites and club seats and to establish the price or prices to be charged therefor, and Lessee shall be entitled to lease, rent, license, sell or otherwise grant the right to use each suite and club seat to such persons or entities, for such term or period of time, and upon such terms and conditions as it, in its sole discretion, deems desirable.

Net Proceeds from the sale at any time of permanent seat licenses ("PSLs") in excess of $35 million shall be (i) paid to the City and applied by the City first to reimburse any draws from the Capital Repair Fund made for the purpose of obtaining funds to pay the initial costs of construction of the New Stadium and (ii) then shall be paid to the City and applied by the City to reduce its contribution to the initial costs of construction of the New Stadium (by

Electronically Filed 01/12/2016 13:03 / / CONFIRMATION NUMBER 337784 / CV 95 297837

redemption (in whole or in part) of the principal amount then outstanding under those Financing Agreements, or as a credit toward future payments under those Financing Agreements). "PSLs" shall refer only to the purchase for monetary consideration of a right or license that entitles the owner thereof to purchase specific seating tickets for some or all New Stadium events operated by the Lessee, its affiliates or licensees, for a period of years. Lessee acknowledges that its rights to the Leased Premises are subject to the rights of licensees under the PSLs, and the Lessee will by assignment accept and assume all the obligations and liabilities of the licensor under the PSLs.

(g)    Naming Rights for the New Stadium. All revenues received from marketing the name of the New Stadium. The Lessee has the right to market the name of the New Stadium as the venue for the Browns' NFL games. Any name chosen by Lessee shall be consistent with the NFL's then current policy with respect to the promotion and image of professional football taking due account of the fact that the game has substantial interest and appeal to youth. The Lessee shall use commercially reasonable efforts to sell naming rights to a telecommunications company, financial institution, technology company, airline or other transportation company or major Cleveland-area employer. The Lessee shall not permit any name to be given to the New Stadium without prior approval of the City Council, which approval shall not be withheld unless the proposed name (i) violates applicable law or (ii) would reasonably cause embarrassment to the City (such as names containing slang, barbarisms or profanity, that could be construed to encourage the use of tobacco or alcohol by minors, that relate to any illicit drugs or any sexually oriented business or enterprise, or that contain an overt political reference). The City shall be deemed to have given its approval to any name requested by the Lessee unless, within thirty (30) days following the Lessee's request for such approval, the City notifies the Lessee of its disapproval and furnishes a written explanation, in reasonable detail, of the reasons why such name violates applicable law or would reasonably cause embarrassment to the City. Without limiting the foregoing, the City may not condition its

approval upon receipt of any consideration from either the Lessee or the party acquiring the naming rights.

(h)  Promotions.  All revenues, fees and charges from promotional activities relating to Browns and non-Browns activities.

(i)  Other Events.  Except for City Events, all revenues, fees and charges from all sporting, entertainment and other events held in the New Stadium including, without limitation, New Stadium rent, tickets, ticket surcharges, concessions, programs, novelties, and advertising.

13.  Existing Pedestrian Walkway.  The City shall undertake to maintain in a safe and prudent manner that certain existing pedestrian walkway extending from the Mall "C" ("Walkway") over certain railroad rights and under the Cleveland Memorial Shoreway to the Leased Premises.

14.  Capital Repairs.

(a)  Definition of Capital Repairs.  Subject to the provisions of this Lease, including without limitation Sections 14(f) and 22(h), all Capital Repairs and, to the extent provided in Section 14(h), Emergency Repairs, shall be made by the City at the times and subject to the procedures and limitations specified in this Section 14, including without limitation Section 14(f).  The principal source of funds for Capital Repairs shall be the Capital Repair Fund.  The Capital Repair Fund shall be established and funded by the City as provided herein and (except as provided in Section 19(b)) shall be available only to make Capital Repairs.  The Capital Repair Fund shall not be used for ordinary maintenance and repair obligations or for

Electronically Filed 01/06/2025 10:26 . . . / CONFIRMATION Nbr. 3337184 / CL REF

alterations which are the responsibility of Lessee and are described in Section 11 of this Lease.

"Capital Repairs" shall be defined as all Work for:

(i)     prudent and extraordinary repairs;

(ii)    repairs that have a useful life of greater than seven (7) years;

(iii)   repairs that are necessary, in the Lessee's reasonable judgment, to maintain the roof, foundation and the structural integrity of the New Stadium and preserve its usefulness for the purposes for which it is being leased hereunder;

(iv)    all "Capital Improvements," which are defined as all capital modifications or additions to the existing facilities in the New Stadium that maintain both the economic competitiveness of the New Stadium and its revenue potential as compared to other NFL stadia generally and create new revenue enhancing opportunities consistent with those provided in the top one-half of NFL stadia generally, and including modifications and additions that are intended to reduce the cost of the operation and maintenance of the New Stadium; and

(v)     such modifications or additions required by applicable City of Cleveland, County of Cuyahoga, State of Ohio or federal laws, rules, regulations, or building codes, including accommodations required to be made under the Americans with Disabilities Act of 1990, as amended.

Capital Repairs shall also include:

(A)     painting or application of protective coatings no more often than once every five (5) years;

(B)     after exhaustion of claims against any third parties, items covered under warranty and items that are the result of unsatisfactory work on the initial construction of the New Stadium and replacements caused by settling (i.e., broken glass, cracked windows, concrete);

(C)     replacement of carpeting no more than once every five (5) years;

(D)     repairs to or replacement of the playing surface of the New Stadium but only if such repair or replacement is required as a result of the City's construction of other Capital Repairs;

(E)     upgrades of components to field lighting and the scoreboard (including message board, bulbs and circuit breaker panels) no more often than once every ten (10) years; and

(F)     cleaning of the exterior facade of the New Stadium no more often than once every ten (10) years.

Notwithstanding the foregoing, for the first ten (10) years following the Commencement Date, no Capital Improvements shall be deemed to be Capital Repairs; provided, however, that modifications or additions to existing television or cable broadcasting infrastructure and field lighting systems may be deemed to be Capital Repairs during such ten-year period if such modifications or improvements are required by NFL standards that apply generally to all stadia in which NFL football games are played.

Capital Repairs shall not include:

(H)     items that would otherwise be Capital Repairs but that are necessitated by the actions of the Lessee and are not attributable to ordinary wear and tear;

(I)     periodic painting or the application of protective coatings more frequently than once every five (5) years;

(J)     repairs to carpeting or replacement of carpeting more frequently than once every five (5) years;

(K)     repairs to or replacement of the playing surface within the New Stadium (unless such repair or replacement is required as a result of City's construction of other Capital Repairs);

(L)     upgrades to components of the scoreboard more frequently than once every ten (10) years;

(M)     upkeep of the exterior facade of the New Stadium, or cleaning the exterior facade of the New Stadium more frequently than once every ten (10) years;

(N)     routine maintenance of plumbing systems, electrical systems, mechanical systems or heating, ventilation or air conditioning systems; or

(O)     tenant fixtures, finishes, build-out materials and supplementary equipment in any public restaurants in the New Stadium.

(b)  Proposal of Capital Repairs.  Either the City or the Lessee may propose that Capital Repairs be made to the Leased Premises.  If either the City or the Lessee knows of or discovers any legal requirements necessitating a Capital Repair, or any condition or defect in, damage to, or alteration of the physical structure, fixtures, appurtenances, machinery, equipment, furniture, systems, surfaces or any other component of the Leased Premises necessitating a Capital Repair, such party shall promptly notify the other of such legal requirement or condition.  If the Lessee proposes the Capital Repair, it shall submit its request in writing to the City specifying the proposed work and representing that such work falls within the definition of Capital Repairs set forth in Section 14(a).  Proposals for Capital Repairs must include cost estimates, preliminary design work (to be followed by more detailed plans) and proposed timetables.  The cost for the preliminary design work is reimbursable from the Capital Repair Fund if the Work qualifies as a Capital Repair.  The City shall review such request and determine, in its reasonable judgment, whether such proposed work is a Capital Repair.  The City agrees that it will not unreasonably withhold, delay or condition its review and determination.  The City shall make such determination within thirty (30) days following its receipt of the written request from the Lessee.  If the City agrees that such proposed work is a Capital Repair, the City shall notify the Lessee, within such thirty-day period, and proceed with such work as described in Section 14(c).  If the City does not agree that such proposed work is a Capital Repair, the City shall deliver, within such thirty-day period, a written determination to that effect to the Lessee including its reasons for such determination.  Failure by the City to respond shall be deemed to be a denial of the proposal.  The Lessee may, but shall not be required to, make any modifications or revisions to its request and resubmit such request to the City for determination in the same manner provided above; provided that the City's time for making its determination on such resubmission shall be fifteen (15) days rather than thirty (30) days following receipt of request.  Any change to the Capital Repair requested by the Lessee during the process of proposal of the Capital Repair shall be submitted and considered in the same manner provided above.  If the City proposes the Capital Repair, it shall submit its

Electronically Filed proposal in writing to the Lessee specifying the proposed work and stating that the City deems

such work to be a Capital Repair as defined in Section 14(a). The proposal shall include cost estimates, preliminary design work and proposed timetables. The City agrees to cause Capital Repairs to be made in such a way so as to minimize interference with Lessee's use of the Leased Premises. The City shall use reasonable efforts (except in case of an emergency) to make all Capital Repairs other than during the NFL regular season. The Lessee shall be prohibited from pursuing any cause of action against the City for failure to make Capital Repairs, unless the Lessee has complied with the procedures set forth in this Section 14.

        (c)     Preparation of Capital Repair Plans. The City shall work with its architect, which may be either an employee of the City or an outside consultant, to prepare construction drawings and specifications for making all Capital Repairs (the "Capital Repair Plans"). The City, through the Capital Repair Fund, shall be responsible for paying the architect's fees and expenses and all other costs associated with making the Capital Repair Plans. The City and Lessee agree that such Capital Repair Plans for Capital Repairs other than Capital Improvements shall propose commercially reasonable repairs viewed in light of the then-expected remaining useful life of the Stadium (the "Capital Repairs Standard"). The Capital Repair Plans for Capital Improvements shall conform to the standards described in Section 14(a)(iv). The City shall cause the Capital Repair Plans to be prepared and delivered to the Lessee within one hundred twenty (120) days after the City's determination pursuant to Section 14(b) above. The Lessee shall have the right to review the Capital Repair Plans to assure compliance with the Capital Repairs Standard, that the Capital Repair Plans will not materially adversely affect Lessee's use of the New Stadium for its intended purposes, and, with respect to a Capital Improvement, that such Capital Repair is otherwise reasonably acceptable and in accordance with Section 14(a)(iv). The Lessee agrees that it will not unreasonably withhold, delay or condition its review and approval of such Capital Repair Plans. In the event the Lessee reasonably believes that the Capital Repair Plans do not conform to the Capital Repairs Standard or with respect to Capital Improvements, to the standards described in Section 14(a)(iv), or that the Capital Repair Plans will materially adversely affect the Lessee's use of the New Stadium for

44

its intended purposes, the Lessee shall so notify the City of such determination within thirty (30) days after the Capital Repair Plans are delivered to the Lessee. In the event that the City and the Lessee disagree concerning any portion of the Capital Repair Plans, such dispute shall be settled in accordance with Section 14(e); provided that while the dispute is pending, the City shall not have the right to proceed with the construction of the Capital Repairs as proposed in the Capital Repair Plans (other than in an emergency).

(d)     Construction of Capital Repairs. After the Capital Repair Plans have been reviewed and approved or otherwise established, the City agrees to cause the Capital Repairs to be made and carried out in accordance with such Capital Repair Plans. The City shall have the exclusive and unconditional right to control the site on which the Capital Repairs will be made; provided, however, the City shall conduct such Capital Repairs so as to prevent or at least minimize as much as practicable (a) inconvenience to patrons of NFL games and other events at the New Stadium; (b) any reduction in seating capacity and parking spaces at the New Stadium and (c) interference with Lessee's (or event patron's) use or enjoyment of the New Stadium. The City shall have the exclusive right to select and enter into contracts with any and all contractors, subcontractors, suppliers, vendors, architects, engineers, construction manager, project managers, consultants or other entities or individuals with respect to the completion of the Capital Repairs. The City shall use its best efforts to obtain for the benefit of the City and the Lessee from each contractor and subcontractor commercial warranties for all work performed by such contractor or subcontractor. Capital Repairs must be completed to a standard of quality which is the same as that of the original component in the case of Capital Repairs other than Capital Improvements or of the same condition as the other capital components of the Leased Premises in the case of Capital Improvements. In the event that the work completed is unsatisfactory then all  reasonable remedies must be sought against the contractor or subcontractor. The City shall use its best efforts to ensure the work performed by each contractor and subcontractor is performed in a good and workmanlike manner and in accordance with the Capital Repair Plans. All Capital Repairs must be completed in accordance with all

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

applicable zoning, health, environmental and all other governmental regulations, ordinances or statutes.

After the proposal of the Capital Repairs by the Lessee, the Lessee shall have the right to request only such changes in the Capital Repair Plans as are required by unforeseeable circumstances by submitting to the City a written request for a change order. If the proposed change is acceptable to the City, in its sole and absolute discretion, the City shall prepare a change order and cause the Capital Repair Plans to be revised accordingly.

(e)    Resolution of Disputes.  The City and the Lessee agree to attempt in good faith to resolve any disagreement with respect to alterations referred to in Section 11(f) and with respect to Capital Repairs referred to in this Section 14 promptly by negotiations between the City's representative and the Lessee's representative who each has been designated to settle the disagreement. Within ten (10) business days after receipt by one party of the determination or notice from the other referred to in Section 11(f), Section 14(b) or Section 14(c), respectively, the party receiving the determination or notice shall deliver to the other the required written response. The determination or notice and the response shall include (i) a statement of such party's position and a summary of the evidence and arguments supporting its position, and (ii) the name(s) and title(s) of the authorized representatives who will represent that party. The authorized representatives shall meet at a mutually acceptable time and place within five (5) business days of the date of the response and thereafter as often as they reasonably deem necessary to exchange relevant information and to attempt to resolve the disagreement. If the disagreement has not been resolved within thirty (30) calendar days of the first meeting of the authorized representatives on the disagreement, then the disagreement shall be settled by arbitration conducted before three (3) arbitrators in accordance with the then existing rules of the American Arbitration Association.  Such arbitrators shall be required to review such disagreement against the Capital Repairs Standard or, with respect to Capital Improvements,

Electronically filed. Sections 14(a)(iv) and, with respect to the restoration of the City's obligations under this

Section 14, including Section 14(f). In any arbitration, the parties shall be entitled to conduct discovery in accordance with the applicable rules of the Federal Rules of Civil Procedure, with such modifications thereto as may be mutually agreeable to the parties. In the event the parties are unable to agree on the three arbitrators, the parties shall select the three arbitrators by striking alternatively (the first to strike being chosen by lot) from a list of thirteen arbitrators designated by the American Arbitration Association. Each of the parties to the arbitration shall bear the cost of the arbitration on such equitable basis as the arbitrators of the matter shall determine. Notwithstanding the foregoing, nothing in this Agreement shall preclude any party from filing any action in a court of competent jurisdiction seeking any temporary restraining order or preliminary injunction.

(f)     Capital Repair Fund.

(i)     The City shall establish a Capital Repair Fund as a segregated fund of the City, separate and apart from other funds of the City. The City shall annually deposit in the Capital Repair Fund the amounts shown on Schedule 14(f) (as such Schedule may be modified by the City to account for advance contributions in accordance with this subsection (f)), less amounts redirected from the Capital Repair Fund to the costs of constructing the New Stadium as described in Section 3.6 of the Stadium Financing Agreement.

(1)     The funds in the Capital Repair Fund shall be invested by the City in the same manner as other City funds. Investment income earned on the amounts in the Capital Repair Fund shall remain in the Capital Repair Fund and shall not be used as a credit against future contributions. The City and the Lessee shall, prior to the Commencement Date, jointly develop an initial Capital Repair Fund Budget, which shall include, to the extent reasonably practicable, a percentage allocation of the

aggregate Capital Repair Fund as between Capital Improvement items and other Capital Repair items, schedules showing the various components of the improvements for which reserves should be established, appropriate reserves over the Term of the Lease for certain Capital Repairs that are not Capital Improvements (the "Reserves"), and any portions of the Reserves that the City believes will or may need to be used for Capital Repairs during any particular calendar year. Each year, after reviewing the then current Capital Repair Audit (as defined in Section 14(g)) and written requests by the Lessee for Capital Repairs, the City shall propose revisions to the Capital Repair Fund Budget. The Lessee shall have the opportunity to review and approve such proposed revisions to such percentages, schedules and Reserves, which approval shall not be unreasonably withheld, delayed or conditioned. The City and the Lessee agree to work together in good faith to agree on such percentages, schedules and Reserves. As provided in the NFL Agreement, in the event that any amount of the Capital Repair Fund is used for the initial construction of the New Stadium, a minimum amount of $500,000.00 should remain available for Capital Repairs upon completion of the New Stadium.

(2)    The City shall proceed with reasonable diligence to make all Material Capital Repairs.

(3)    If the Capital Repair is a Capital Improvement, the City shall be obligated to make such Capital Improvement only if funds other than Reserves and other than those previously allocated for Capital Repairs are available in the Capital Repair Fund. If sufficient funds are not then available in the Capital Repair Fund, the Lessee shall have the

right, but not the obligation, to fund the shortfall for such Capital Improvement as provided in Section 14(i). In no event shall the City be required to make Capital Improvements to the Leased Premises in excess of the amounts allocated to Capital Improvements in the Capital Repair Fund Budget.

(4) If there are not adequate funds available in the Capital Repair Fund (net of amounts committed for use) to cover the cost of a Capital Repair that is not a Capital Improvement or a Material Capital Repair, the City shall make the repair as soon as it is practical and prudent to do so, in the City's reasonable discretion, taking into account the City's responsibility as owner of the Stadium facility, the fiscal constraints of the City and the amount of Reserves then available and the amount of Reserves projected to be needed for other Capital Repairs pursuant to the Capital Repair Plans. To the extent that the City makes any Capital Repairs costing more than the amounts then available in the Capital Repair Fund to pay for such repairs, the City may pay for such Capital Repairs with advances of deposits scheduled to be made in future years, whereupon the City shall be permitted to revise the Capital Repair Fund amounts set forth on Schedule 14(f) and reduce dollar for dollar such deposits scheduled to be made in the future.

(ii) Any amounts from the Capital Repair Fund applied toward the construction of any Capital Repair may be distributed to the Lessee, to third parties or to the City as provided in this Section 14(f). The amounts payable shall be reimbursed, to the extent available from the Capital Repair Fund, following the Lessee's or the City's submission in writing to the City (or the Lessee) of a pay request which shall include:

(1)     a summary of bills aggregating the total for which a reimbursement is being requested;

(2)     a copy of each individual invoice from any architect, contractor or engineer or any other person charging a fee for work performed pursuant to Section 14;

(3)     lien releases in a form reasonably satisfactory to the City, executed by such architect, contractor or engineer relating to invoices previously paid pursuant to a pay request; and

(4)     requisitions for work completed which have been agreed to by the Lessee's contractor, the Lessee, the Lessee's architect and the Lessee's construction manager, if any.

(iii)     All withdrawals from the Capital Repair Fund for the purpose of making Capital Repairs shall be countersigned by both parties. Any party refusing to sign such withdrawal request shall deliver to the other party a statement of the basis (with reasonable detail) for such recipient's objection thereto.

(g)     Capital Repair Audit. Commencing on the fifth (5th) January 1 after the Commencement Date, and on each fifth (5th) January 1 thereafter during the term of this Lease, the City shall, as an expense of the Capital Repair Fund, provide the Lessee with a structural and capital component inspection report from a licensed engineer, reasonably acceptable to the Lessee, having at least ten (10) years of experience in performing structural and capital component inspections of commercial buildings, including stadia, and otherwise qualified to provide the information required hereunder (the "Capital Repair Engineer"). The

Electronically Filed 4/30/2020 5:05

Capital Repair Engineer shall report on the condition of the structure and each capital component of the Leased Premises, which report shall include suggestions for any current Capital Repairs that are necessary to the Leased Premises and suggestions for revisions to the allocations in the Capital Repair Fund Budget (such report, the "Capital Repair Audit"). The City shall maintain a log for the Leased Premises, which log shall include a copy of all Capital Repair Audits as well as a record in reasonable detail of all Capital Repairs undertaken by the City or the City's agents or representatives.

(h)    Emergency Repairs.  Emergency Repairs shall be made by the City in accordance with law.  However, in the event that the City does not timely make such Emergency Repairs, then the Lessee shall have the right to make such repairs, so long as the Lessee undertakes best efforts to notify the City of the need for such repairs before commencing to undertake the same.  "Emergency Repairs" are those Capital Repairs which, if not immediately made, would endanger the health and safety of the people working in or attending an event in the New Stadium, would cause imminent damage to any significant component of the New Stadium, or would render the New Stadium, or any material mechanical, electrical or plumbing system or other significant component thereof, unusable for previously scheduled events.  Notwithstanding the other provisions of Section 14, the Lessee may submit a request to the Lessor for payment of the cost of the repairs made by the Lessee for approval by the Lessor in accordance with the procedures and requirements set forth in Section 14(f).  In the event that such repair qualifies as an Emergency Repair, then the Capital Repair Fund may be an eligible funding source for such repair.  In making such Emergency Repairs, the Lessee shall comply with all the requirements of Section 14(f)(ii), and the costs of such Emergency Repairs shall be eligible for reimbursement to the Lessee from the Capital Repair Fund by the City only if the Lessee has complied with all of such requirements.  The Emergency Repairs shall be the only exception to the normal pre-approval procedures established in this Section 14.

(i)    Lessee's Capital Improvements. If Lessee shall choose to make any Capital Improvement, approved in accordance with the procedures specified in Sections 14(a) through 14(e) above, for which sufficient funds are not then on deposit in the Capital Repair Fund (net of then existing Reserves and money allocated for Capital Repairs previously agreed upon pursuant to this Section 14), the City shall apply any funds then on deposit in the Capital Repair Fund (net of then existing Reserves and money allocated for Capital Repairs previously agreed upon pursuant to this Section 14) toward the cost of such Capital Improvement provided the Lessee shall: (i) fully fund the difference between the cost of such Capital Improvement and the portion of such cost that can be funded from funds on deposit in the Capital Repair Fund (net of then existing Reserves and money allocated for Capital Repairs previously agreed upon pursuant to this Section 14) (such amount, the "Overage"); and (ii) agree in writing to indemnify and hold the City harmless from and against the Overage.

15.    Title to Alterations and Capital Repairs. Title to all alterations and Capital Repairs made to the Leased Premises hereof shall become a part of the Leased Premises and shall remain upon and be surrendered with the Leased Premises at the end of the term of this Lease; provided, that if prior to the termination of this Lease by expiration or otherwise, or within thirty (30) days thereafter, the City so directs by written notice to the Lessee, the Lessee shall remove any specified improvements or alterations made to the Leased Premises by the Lessee; provided that if the City had the opportunity to consent to the construction or completion of such improvements or alterations, then it shall have designated at the time of such consent whether such improvements or alterations were to be removed. Notwithstanding the foregoing, any fixtures or personal property which were installed in the New Stadium by and at the expense of Lessee and were not provided as part of the Project Budget (as defined in the Stadium Financing Agreement) (and, therefore, not identified in the Lease Commencement Certificate) may be removed by the Lessee at or prior to expiration or termination of the Lease. The Lessee shall pay or cause to be paid promptly to the City the cost of repairing any damage arising from such removal and restoration of the Leased Premises to its condition prior to such removal.

16.    Use of Premises.

(a)    Permitted Use. The Lessee may use the Leased Premises for (i) hosting NFL sanctioned football games in the New Stadium, (ii) for the conducting of practices or workouts by professional football teams, whether or not for exhibition to the public, (iii) selling or granting to third parties the right to the sell tickets or seats and for the conducting and exhibiting by the Lessee to the public other events or activities directly related to, held in connection with, or involving the playing or exhibition of, professional football games, (iv) for administrative office use; (v) for restaurants or food or beverage service facilities by Lessee or by Lessee's designee(s); (vi) for other sporting events, musical concerts and other events and activities that lawfully may be conducted on the Leased Premises; provided, however, that the Lessee shall give thirty (30) days' prior written notice to the Director of Parks, Recreation and Properties and to the Director of Public Safety before allowing use of the Leased Premises for any events or activities not customarily held in or about municipal football stadiums or for any purpose contrary to public policy and unprotected by the First Amendment of the United States Constitution. Lessee shall use and occupy the Leased Premises in a careful, safe, prudent and proper manner, and shall not permit or commit any waste of or to the Leased Premises or to the New Stadium, the structures and improvements thereon, or the fixtures and articles of personal property attached or appurtenant thereto or used in connection therewith, normal wear and tear excepted.

(b)    Unlawful Use. The Lessee will not use or allow the Leased Premises or any part thereof to be used or occupied for any purpose inconsistent with or contrary to the Ordinances of the City or the laws of the State of Ohio, and will not suffer any act to be done or any condition to exist on the Leased Premises or any part thereof which constitutes a nuisance, public or private. The Lessee shall not commit, or knowingly allow to be committed, any act or acts in or upon the Leased Premises which shall be unreasonably injurious, offensive or annoying to adjoining property owners or to the general public.

Electronically Filed 01/14/2025 15:55 / CV 25 1101897 Confirmation Nbr. 3377194 / CLJSZ

17. <u>Compliance with Laws</u>. The City covenants and agrees to deliver, on the Commencement Date, the Leased Premises, which shall be in compliance with all then existing laws, statutes, ordinances, orders, rules, and regulations of every duly constituted governmental authority or agency having jurisdiction over the Leased Premises and the construction, use and occupancy thereof, including, without limitation, Environmental Laws and the Americans with Disabilities Act of 1990, as amended. Throughout the term of this Lease, the Lessee, at its sole cost and expense, will or will cause others within its reasonable control to comply promptly with all present and future laws, statutes, ordinances, orders, rules, and regulations of every duly constituted governmental authority or agency relating to the Leased Premises or the use and occupancy thereof, including, without limitation, Environmental Laws, and will not suffer or permit to remain any use or manner of use of or any condition upon the Leased Premises in violation of any such laws, ordinances, orders, rules, and regulations relating to the use and occupancy of the Leased Premises. If the City's failure to make a Capital Repair results in the failure by the Lessee to be in compliance with any laws, ordinances, orders, rules, and regulations relating to the use and occupancy of the Leased Premises, such failure by the Lessee shall not constitute a breach of this covenant.

18. <u>Indemnification</u>. Lessee shall, and does hereby agree to, indemnify, defend and hold the City harmless from and against any and all liabilities, obligations, claims, demands, penalties and other costs, charges and expenses, including reasonable architects' and attorneys' fees, that may be imposed upon or incurred by the City, or to which the City may become subject resulting, directly or indirectly, (a) by reason of the Lessee's use, possession, occupation, operation, repair, maintenance or management of or condition suffered or permitted to remain upon the Leased Premises by Lessee (ordinary wear and tear excepted) or by reason of alterations carried out by Lessee; (b) resulting by reason of any act or omission, negligence or wrongdoing by or on behalf of Lessee or its officers, agents, representatives, employees, servants, licensees or invitees (other than those acts or omissions, negligence or wrongdoing that

are insurable at commercially reasonable rates, provided that if Lessee fails to obtain and

maintain such insurance against such liabilities and expenses, then such exclusion shall not apply); (c) by reason of any accident, injury, or damage to any person or property occurring in, on or about the Leased Premises or the Walkway; (d) or resulting by reason of any breach or failure on the part of Lessee to pay, perform, observe or otherwise comply with any of the covenants, terms, conditions and provisions on its part to be paid, performed, observed or otherwise complied with under the terms of this Lease. None of the foregoing are intended to limit or affect in any way the City's obligation to provide Capital Repairs pursuant to Section 14 or to deliver, on the Commencement Date, the Leased Premises in compliance with laws pursuant to Section 17.

In case any action or proceeding is brought against the City by reason of any such claim, the Lessee, upon written notice from the City will, at the Lessee's expense, resist or defend such action or proceeding by counsel selected by the Lessee and approved by the Director of Law.

19. Insurance.

(a) Lessee Insurance Requirements. From and after the Commencement Date, Lessee, at its sole expense, shall maintain the types and kinds of insurance described in (a) and (b) below. The amount or amounts of the insurance in (a) below shall initially be as set forth on Schedule 19 attached hereto. The amounts of coverage may, however, be changed by the City once every three (3) calendar years commencing on the January 1 immediately following the Commencement Date based upon the results of a review by Lessee's insurance consultant who shall consult with Lessee and the City. Such review by the Lessee's insurance consultant shall be at the Lessee's sole cost and expense, may be completed no earlier than the September 30th immediately prior to the proposed date of change, and shall report on the types and amounts of insurance as are then customarily available for

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

facilities and activities held in NFL stadia generally.

(1)    Comprehensive general public liability insurance of the type generally carried by owners and operators of a stadium similar to the New Stadium, and consistent with the usage thereof, which shall include coverage for personal liability, liquor liability, contractual liability (including all liabilities of Lessee pursuant to Section 18 if and to the extent such insurance is available at commercially reasonable rates), Lessees' legal liability, bodily injury (including death) and property damage, all on an occurrence basis with respect to the business carried on, in and from the Leased Premises and Lessee's use and occupancy of the Leased Premises with coverage for any one occurrence or claim of not less than the amounts set forth on Schedule 19 and with deductibles not in excess of the amounts set forth on Schedule 19.

(2)    Worker's compensation insurance.

(3)    Business interruption insurance.

(4)    Vehicle insurance.

(5)    All insurance described in (1) and (4) above shall be in place prior to any entry by Lessee onto the Leased Premises prior to the Commencement Date as permitted by Section 6(a).

All insurance provided for in this Section 19(a) (other than worker's compensation insurance) shall be effected under valid and enforceable policies in form and shall be written by companies licensed to transact business in Ohio and shall be reasonably satisfactory to the City. The liability, business interruption and vehicle insurance policies shall include the City as an additional insured under such policies. Upon or prior to the effective date of insurance policies

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

required under this Lease and thereafter not less than thirty (30) days prior to the expiration

dates of policies theretofore furnished pursuant to this Section, originals of the policies or certificates or memoranda thereof shall be furnished to the City, and the Lessee shall furnish to the City evidence of payment of premiums in accordance with the Lessee's regular course of business, but in any event in time to prevent cancellation for nonpayment.

(b) <u>City Insurance Requirements</u>. The City shall obtain and maintain fire and extended property insurance which shall cover all improvements to the Leased Premises (but not the personal property of the Lessee), which insurance shall be in an amount not less than eighty percent (80%) of the replacement cost of such improvements, as such may increase from time to time, without deduction for depreciation, and shall name the City as loss payee. The City may make advances from the Capital Repair Fund to pay the premium for such fire and extended property insurance, provided that any such advances from the Capital Repair Fund shall be reimbursed by the City on or before the March 1 immediately following the date on which the premium is so paid.

(c) <u>Waiver of Subrogation</u>. Lessee hereby waives and releases all causes and rights of recovery against the City for any loss or damage to property arising by reason of any peril insured against under the policies of insurance described in Section 19(a) or otherwise, regardless of cause or origin, including any act of neglect or omission by the City or its respective officers, agents, representatives, employees, servants, licensees or invitees, but only to the extent that any right to recovery by such releasing party under said policy or policies of insurance is not thereby impaired or adversely affected in whole or in part. Each such policy of insurance shall contain an endorsement recognizing the foregoing waiver and release and waiving all rights of subrogation by the insurer against either party hereto. The foregoing waiver and release by Lessee of the City with respect to the policies of insurance described in Section 19(a) shall not apply to any deductibles assumed by the Lessee or to any loss or damage in excess of the maximum coverages required thereunder. To the extent the City carries any insurance relating to the Leased Premises, the City hereby waives and releases all causes of

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

action and rights of recovery against Lessee for any loss or damage to property arising by reason of any peril insured against under such policies of insurance, regardless of cause or origin, including any act of neglect or omission by Lessee or its respective officers, agents, representatives, employees, servants, licensees, or invitees, but only to the extent that any right to recovery by the City under said policy or policies of insurance is not thereby impaired or adversely affected in whole or in part. Such policy of insurance shall contain an endorsement recognizing the foregoing waiver and release and waiving all rights of subrogation by the insurer against either party hereto.

### 20. Damage or Destruction.

(a) Repair of Damage. If at any time during the term of this Lease, the improvements on the Leased Premises or any part thereof shall be damaged or destroyed by fire or other cause of loss (including any cause of loss for which insurance coverage was not obtained) of any kind or nature, ordinary or extraordinary, foreseen or unforeseen, or if the City fails to make a Capital Repair which renders the New Stadium unusable for a scheduled event in Lessee's reasonable judgment, or if Lessee shall experience any interruption or suspension in the provision or supply of utility service for more than ten (10) consecutive days, Lessee shall not thereby be, or be deemed to be, relieved of its obligations hereunder to perform and observe the covenants, duties and responsibilities on its part to be performed or observed, except as otherwise provided in this Section 20 and in Section 22(h). In such event, the proceeds of insurance maintained by the City pursuant to Section 19 upon receipt by the City plus the amount of the deductible, if any, shall be deposited by the City in escrow with a third-party to be used and distributed in accordance with this Section 20. The City shall proceed with reasonable diligence (subject to a reasonable time allowance for the purpose of adjusting such loss) to repair, alter, restore, replace, rebuild or supply the same as nearly as possible to a condition reasonably satisfactory for the purposes to which the Lessee has been granted the right

of use and occupancy of the Leased Premises; provided, however, that the City shall not be

required to expend from the Capital Repair Fund for such repair, alteration, restoration, replacement, or rebuilding any amount that would reduce the Capital Repair Fund below the Reserve amount other than to make the specific Capital Repair for which the Reserve exists.

If the estimated cost of repairing the damage to the Leased Premises exceeds the available Capital Repair Fund balance plus the insurance proceeds, if any, plus the amount of the deductible, if any, the City shall have three (3) months from the date of such damage or destruction within which to determine, in the City's sole discretion, whether the repair in excess of such amount shall be made at the City's sole expense. Should the City determine that such repair of the Leased Premises shall not be made at the City's expense, the Lessee shall have sixty (60) days from the date of the City's determination within which to determine in Lessee's sole discretion whether the repair in excess of such amount shall be made at Lessee's sole expense. If the City determines to proceed and subject to additional requirements imposed by weather conditions, permitting and authorization requirements, restrictions contained in this Lease, receipt of commercially reasonable bids, and other matters outside of the control of the City, the City shall proceed with reasonable diligence to commence the repair, alteration, restoration, replacement, rebuilding or resupply within nine (9) months after the occurrence of the damage or destruction and shall cause the repair, alteration, restoration, replacement or rebuilding to be completed no later than twenty-four (24) months following the commencement thereof, unless the parties agree to a longer period. If, following a determination by the City not to make such repair, the Lessee also determines not to make such repair, the Lessee shall have the right, after thirty (30) days prior written notice to the City, to terminate this Lease; provided, however, that if by reason of the parties' failure to make such repair, the Leased Premises will remain unusable permanently, then, without further action by the Lessee, this Lease shall terminate.

In the event that this Lease terminates following damage or destruction to the Leased Premises, all proceeds of insurance shall be shared by the City and the Lessee in

proportion to their respective original contributions to the cost of improvements on the Leased Premises. For such purposes, Lessee's contribution shall be reduced by (i) one hundred percent (100%) of the amount of net proceeds received by the Lessee (or by the NFL on behalf of the Lessee) from the sale of PSLs and (ii) forty percent (40%) of club seat revenues subject to a waiver of Lessee's gate-sharing obligations under the NFL Constitution. Upon termination of this Lease, neither party shall have any further obligation under this Lease except as provided in Section 50. If the Lease is terminated pursuant to this section, then the City shall work cooperatively with the Lessee to identify an alternate stadium site for a minimum of thirty (30) months following termination.

In the event that damage or destruction renders the Leased Premises unusable as described in Section 20(b), then for and during the period of time that the Leased Premises remain so unusable temporarily (plus up to fourteen (14) days thereafter), the City shall work cooperatively with the Lessee to identify an alternate stadium site acceptable to Lessee and facilitate the arrangements between the Lessee and the owner of such site at comparable cost to the Lessee for use during the period that the Leased Premises are unusable. In such event, the Lessee covenants to recommence the play of games at the New Stadium as soon as practicable, but in no event later than fourteen (14) days, after the Leased Premises become usable.

(b) Reduced Seating Capacity. In the event of any such damage or destruction, as a result of which the New Stadium cannot lawfully be used for a scheduled event or if the spectator seating capacity of the New Stadium is diminished to less than eighty percent (80%) of the general seating or seventy percent (70%) of the premium seating (i.e., club seats and private suites) of that existing immediately prior to such damage or destruction or if access to the New Stadium is prevented, or if the City fails to make a Capital Repair which renders the New Stadium unusable, in Lessee's reasonable judgment, for a scheduled event, or if Lessee shall experience any interruption or suspension in the provision or supply of utility service for

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

more than ten (10) consecutive days, Lessee shall be relieved of its covenant to play all of its

regular season home games and other games in the New Stadium as required by Section 9(a) for and during the period of time that the Leased Premises remain so unusable (plus up to fourteen (14) days thereafter). In such event, the Lessee covenants to recommence the play of games at the New Stadium as soon as practicable, but in no event later than fourteen (14) days, after the Leased Premises become usable. If, as a result of any such damage or destruction, or any other reason not within the control or not the fault of the Lessee, the number of parking spaces available to the Lessee from the City free of charge is diminished, the City shall use its best efforts to provide to the Lessee alternative parking arrangements within reasonable proximity to the New Stadium.

(c)     Extension of Term.  If, as a result of the events described in Section 20(b), for each season that the Lessee is relieved of its obligation to play fifty percent (50%) or more of its regular season home games in the New Stadium, the Lessee shall have the right to extend the Term of this Lease for one (1) additional Lease Year.

21.     Condemnation.   To the extent permitted by law, the City shall not condemn the Leased Premises or support a condemnation thereof by any other governmental or quasi-governmental authority, except as may be required by the Federal Aviation Administration.  Any condemnation of all or a substantial portion of the Leased Premises by the City or support by the City of a condemnation thereof by any other governmental or quasi-governmental authority, except for the Federal Aviation Administration, shall constitute a breach of Lessee's quiet enjoyment pursuant to Section 38.

In the event that all of the Leased Premises, or a substantial portion thereof, shall be acquired permanently by authority of any governmental entity in the exercise of its power of eminent domain, and as a result of which the Leased Premises are made unusable for purposes of playing professional football therein, or if access to the New Stadium is prevented, or if either spectator general seating or premium seating capacity is diminished to less than ninety-five

percent (95%) of that existing immediately prior to the condemnation, and it is not commercially reasonable in the City's reasonable determination for the City to restore the same, the City may, at its election, apply the proceeds of the condemnation award to provide facilities reasonably acceptable to the Lessee in substitution for those taken by eminent domain, in which case this Lease shall remain in force and effect with respect to the substituted facilities reasonably acceptable to the Lessee, including the Lessee's covenant that the Browns will play their home games in the substitute facilities as required in Section 9 above. In the event that the City elects not to so apply the proceeds of the condemnation award or the parties cannot agree on substitute facilities, this Lease shall terminate upon the taking of physical possession by condemnor or proposed condemnor. If the Lease is terminated pursuant to this Section, then the City shall use its best efforts to provide the Lessee at Lessee's expense with such alternative stadium site for a minimum of thirty (30) months following termination.

In the event of any temporary or partial condemnation of the New Stadium, which affects the Lessee's use and occupancy of the Leased Premises as provided in this Lease, then the proceeds of any award for or on account of said condemnation shall be used to enclose and restore the remaining usable part of the New Stadium, if the same is, in the City's reasonable determination, commercially reasonable. If such event renders the New Stadium unusable for purposes of playing professional football therein, the City shall work cooperatively with the Lessee to identify substitute facilities for Lessee's use and facilitate the arrangements between the Lessee and the owner of such site at comparable cost to the Lessee during the period of time that the Leased Premises remain so unusable (plus up to fourteen (14) days thereafter). In such event, the Lessee covenants to recommence the play of games at the New Stadium as soon as practicable, but in no event later than fourteen (14) days, after the Leased Premises become usable. If as a result of a partial or temporary condemnation, for each season that the Lessee is relieved of its obligation to play fifty percent (50%) or more of its regular season home games in the New Stadium, the Lessee shall have the right to extend the Term of this Lease for one (1) additional Lease Year.

In any condemnation proceeding, each party shall have the right to claim and receive from the condemning authority compensation for its losses, including, without limitation, its respective interest in the Leased Premises, and its (or in the case of the Lessee, the NFL's) original contribution to the cost of improvements on the Leased Premises; provided, however, the Lessee's contribution shall be reduced by (i) one hundred percent (100%) of the amount of net proceeds received by the Lessee (or by the NFL on behalf of the Lessee) from the sale of PSLs and (ii) forty percent (40%) of club seat revenues subject to a waiver of Lessee's gate-sharing obligations under the NFL Constitution.

22. <u>Default</u>.

(a) <u>Remedies of City</u>. If any one or more of the following events (each of which is herein sometimes called "<u>Event of Default</u>") shall happen:

(1) If default shall be made in the due and punctual payment of any sums required to be paid by the Lessee to the City under the provisions of this Lease when and as the same shall become due and payable and such default shall continue for a period of thirty (30) days after notice in writing thereof by the City to the Lessee; or

(2) If the Lessee shall be in default in the due and punctual payment of any sums required to be paid by the Lessee to parties other than the City or if the Lessee shall be in default of, or violate any covenant, agreement, term or condition, and if any such failure, violation, or default shall continue without cure for a period of ninety (90) days after notice in writing thereof by the City to the Lessee, or if such default cannot, with due diligence, be cured within ninety (90) days and Lessee shall not have commenced the cure thereof within

such period and shall not be diligently proceeding to cure such default; or

(3)     If the Lessee shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall take the benefit of any relevant legislation that may be in force for bankrupt or insolvent debtors or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation, or if any proceedings shall be taken by the Lessee under any relevant bankruptcy law in force in any jurisdiction available to the Lessee, or if the Lessee shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of the Lessee or of the Leased Premises, or shall make any general assignment for the benefit of creditors; or

(4)     If a petition shall be filed against the Lessee seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal, state, or other statute, law or regulation, and shall remain undismissed for an aggregate of one hundred twenty (120) days, or if a trustee, receiver or liquidator of the Lessee or of all of its properties or of the Leased Premises shall be appointed without the consent or acquiescence of the Lessee and such appointment shall remain unvacated for an aggregate of one hundred twenty (120) days,

the City may, at its option, at any time while such Event of Default continues, give written notice to the Lessee specifying one or more such Events of Default and either require the Lessee to perform its obligations as provided in Section 22(e) below, or state that this Lease and the Term hereby demised shall expire and terminate on the date specified in such notice, and upon the date specified in such notice, subject to the provisions of subsection (c) in this Section, this Lease and the term hereof and all rights of the Lessee under this Lease shall expire and terminate.  In the event of any such termination, the City may, without further notice, enter

69

upon and re-enter the premises and facilities of the Leased Premises, and by summary proceedings, ejectment or otherwise, may dispossess Lessee therefrom, and thereupon shall be entitled to have, hold and enjoy the Leased Premises and the right to receive all rental of and from the same. It is agreed and understood that, in the event of any such termination of this Lease by the City, the Lessee shall not thereby be relieved of its duties, responsibilities and obligations hereunder accruing prior to the date of such termination, or accruing thereafter.

In the event that the termination of this Lease is a result of a breach not within the Lessee's control, the City shall pay to the Lessee the amount of the Lessee's contribution to the costs of the improvements on the Leased Premises which remains unamortized and unrecovered from the sum of (i) one hundred percent (100%) of the amount of net proceeds received by the Lessee (or by the NFL on behalf of the Lessee) from the sale of PSLs and (ii) forty percent (40%) of club seat revenues subject to a waiver of Lessee's gate-sharing obligations under the NFL Constitution, and termination of the Lease shall be specifically subject to and conditional upon appropriation of such amounts. Such amounts may be payable over no more than five (5) years with interest thereon at the rate paid on United States treasury bills having a maturity closest to the term of such payments.

(b)    City's Right of Re-Entry.  Upon any such expiration or termination of this Lease, the Lessee shall quit and peacefully surrender the Leased Premises to the City, and the City, upon or at any time after any such expiration or termination, may without further notice, enter upon and re-enter the Leased Premises and possess and repossess itself thereof, by summary proceedings, ejectment or otherwise, and may dispossess the Lessee and remove the Lessee and may have, hold and enjoy the Leased Premises and the right to receive all rental income of and from the same.

(c)    Lessee's Liability to Date of Termination.  No such expiration or

Electronically... termination of this Lease shall relieve the Lessee of its liability and obligations under this Lease

accrued to the date of such expiration and termination. In the event of any such expiration or termination, whether or not the Leased Premises or any part thereof shall have been relet, the Lessee shall pay to the City all charges required to be paid by the Lessee up to the time of such expiration or termination of this Lease.

(d) <u>Lessee's Subleases and Agreements</u>. At the City's option, upon any such expiration or termination of this Lease, all the Lessee's subleases, concession agreements and similar agreements for use of the Leased Premises then in effect shall be deemed assigned to the City by the Lessee, and the Lessee shall, upon notice from the City, execute and deliver to the City instruments, in proper form, assigning to the City the Lessee's interest in and to each such sublease and agreement, the Lessee hereby irrevocably appointing the City, in the event of the Lessee's failure or refusal to comply with any such notice, as its attorney-in-fact to execute any and all such assignments.

(e) <u>Right of Specific Performance</u>. The parties to this Lease hereby acknowledge and agree that the subject matter of this Lease is unique, that the damages at law for the breach of the NFL's obligations under Section 3 or of any of Lessee's obligations under Section 9(a), 9(b)(2), 9(b)(3) and 9(c) of this Lease create irreparable harm and are not ascertainable and that money damages or other legal relief cannot adequately compensate the City for any such breach. Therefore, the parties have agreed and consented to, as evidenced by their execution of this Lease, the City's right to specific performance of the Lessee's obligations under those Sections of this Lease and to have, receive and hold an injunction from a court of competent jurisdiction in the State of Ohio which enjoins the breaching of the provision of those Sections of this Lease by Lessee.

(f) <u>The City's Remedies are Cumulative</u>. In the event of any breach by the Lessee of any of the covenants, agreements, terms or conditions contained in this Lease, the City, in addition to any and all other rights provided herein, shall be entitled to invoke any

right and remedy allowed at law or in equity or by statute or otherwise for such breach as though re-entry (only after termination or expiration of the Lease), summary proceedings, and other remedies were not provided for in this Lease.

(g) <u>Interest on Arrearages</u>. All charges more than ten (10) days in arrears and all other amounts collectible hereunder by the City shall bear interest at the rate of eight percent (8%) per annum from their respective due dates until paid, provided that this shall in no way limit, lessen, offset or affect any claim for damages by the City for any breach or default by the Lessee.

(h) <u>Special Remedy of Lessee</u>. In the event that the Mayor of the City fails to include in the Mayor's Estimate required to be prepared pursuant to Section 38 of the Charter of the City a proposed appropriation of, or following such inclusion the Council of the City fails to appropriate, funds adequate to meet "City Obligations" (as hereafter described) or (in the case of unbudgeted City Obligations), the Mayor fails to seek ordinance authority or the Council of the City fails to pass such ordinance(s) making appropriations for such City Obligations, the Lessee shall have, in addition to all other rights and remedies provided in this Lease, the following special remedy as described in this Section 22(h). <u>First</u>, the Lessee shall notify the City that the Lessee believes in good faith that the City has failed to satisfy a City Obligation. The Lessee's notice shall describe the City Obligation and shall state the amount of funds that the Lessee alleges have not been so included or appropriated by the City. <u>Second</u>, within ten (10) days following receipt by the City of the Lessee's notice, the City shall deliver to the Lessee a written response. The parties hereby agree that the failure by the City to fulfill any City Obligation shall constitute a breach and that the Lessee shall have a cause of action against the City for money damages as a result of such breach. In the event that a court enters a judgment for money damages against the City and such judgment remains unsatisfied for one hundred eighty (180) days, then the Lessee shall have the right to terminate this Lease, upon thirty (30) days notice to the City.

Electronically Filed 01/14/2025 15:59 / CVSE / CV 89 / Confirmation Nbr. 3377194 / CLJSZ

Notwithstanding the foregoing, nothing in this Lease shall preclude any party from filing any action in a court of competent jurisdiction seeking any temporary restraining order or preliminary injunction or other remedy at law or equity, except for the right of termination which is available only as specifically provided herein. A "City Obligation" shall be any one of the three (3) obligations specifically set forth as follows:

(i) To make a contribution to the Capital Repair Fund required by Section 14 of this Lease, as shown on Schedule 14(f);

(ii) To make any Material Capital Repair; and

(iii) To bear responsibility for costs associated with the condition of the Leased Premises required by Section 26 of this Lease.

Notwithstanding any other remedy of the Lessee provided in this Lease or pursuant to applicable law, the Lessee shall have the right to offset against any rental due hereunder from the Lessee to the City any and all amounts which a court of proper jurisdiction determines by final judgment, or which the arbitrators acting pursuant to Section 14(e) so determine, is under applicable law due and owing from the City to the Lessee. For purposes of this determination only, failure by the Council of the City to appropriate funds to satisfy such obligation of the City shall not affect the City's obligation to the Lessee.

23. Permitted Encumbrances.

(a) Subletting Allowed. The City hereby expressly consents to the subletting by the Lessee of any space available in the Leased Premises for food service,

65

concessions, retail, service or entertainment operations of a type customarily found in similar stadium facilities and consistent with the intended usage of the New Stadium, including, without limitation, professional football games. All such subleases must terminate or be terminable upon the expiration or earlier termination of this Lease unless otherwise expressly consented to by the City, which consent shall not be unreasonably withheld. By way of illustration, the City's consent shall not be deemed to be unreasonably withheld if the sublease to be considered does not contain market rate provisions, is not in a form acceptable to the City, or is not customary in NFL football stadia generally.

(b)     Pledge of Revenues. The Lessee may assign, pledge or otherwise encumber (i) its interest in this Lease in conjunction with the encumbrance of its Franchise, provided that any encumbrances of the Lessee's interest in this Lease shall not permit any foreclosure by the secured party of the Lessee's leasehold interests hereunder separate and apart from foreclosure on the Franchise and shall restrict the sale of the Lessee's leasehold interest to the same person as is acquiring the Franchise, or (ii) its interest in the revenues derived from the operation of the Leased Premises, as security for interim or permanent financing or refinancing, obtained and used by the Lessee solely for the purposes of: (1) acquiring the Franchise or refinancing the then current Franchise indebtedness; or (2) reimbursing the NFL for its contribution to the costs of construction of the New Stadium; or (3) fulfilling its obligations under this Lease; or (4) paying any other costs and expenses relating to the maintenance and operation of the New Stadium, the NFL Franchise and the Browns. Such financing shall be subject to compliance with the NFL debt ceiling as may be in effect from time to time.

The City will provide written notice to the Lessee's lender (of which the City has been notified by Lessee as to its name and address) of any default of Lessee under this Lease. In the event of Lessee's default, the City specifically agrees that the City's lender shall have the right to cure Lessee's default(s) within the same cure periods given to the Lessee. During the

Electronically Filed 01/14/2022 15:35

periods set forth above, so long as the Lessee's lender is proceeding with due diligence to cure Lessee's default, the City shall not terminate this Lease.

(c)     No Other Liens.  Other than as permitted by this Section 23, Lessee shall not suffer or permit to remain upon all or any part of the Leased Premises, or Lessee's leasehold interest therein, any lien for work performed or materials supplied to or for Lessee and/or to or for the Leased Premises by or on behalf of Lessee, or any other lien or encumbrance thereon arising by reason of Lessee's use and occupancy thereof.  Lessee shall, and does hereby agree, at its own cost and expense, to defend the New Stadium, the Leased Premises and the City against any and all suits, actions or other proceedings that may be instituted for the enforcement of any such lien or encumbrance.

If any mechanics', laborers' or materialmen's liens shall at any time be filed against the Leased Premises or any part thereof, Lessee, within thirty (30) days after the date of Lessee's receipt of notice of the filing, shall cause the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise; provided, however, that Lessee shall have the right to contest the validity of any such lien in any manner permitted by law.  In the event of any such contest, Lessee shall provide to the City title insurance, an indemnity, bond or other assurance or security satisfactory to the City, and Lessee shall thereafter diligently proceed to cause such lien to be removed and discharged.  If Lessee shall fail to discharge or to contest any such lien then, in addition to any other right or remedy, the City may, after thirty (30) days notice to Lessee, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring the discharge of such lien by deposit or bonding proceedings.  In any such event, the City shall be entitled, if the City so elects, to compel the prosecution of an action for the foreclosure of such lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest, costs and allowances.  Any amount so paid by the City and all costs and expenses, including attorneys' fees, incurred

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ
by the City in connection therewith, together with interest thereon at ten percent (10%) per

annum, from the respective dates of the City's payment or incurrence of the cost and expense, and shall be paid by Lessee to the City upon demand.

Notwithstanding any other provision in this Section 23, no assignment by Lessee of its interest under this Lease as security for any loan shall prevent the City, upon any default by the Lessee under any such loan, at the City's sole option, from curing any default under such loan and entering upon and operating the Leased Premises. Any such assignment shall expressly provide that the interest of the assignee is subject to the terms and provisions of this Lease and that the assignee shall give notice to the City of any default by the Lessee under any loan agreement no later than ten (10) days after the occurrence thereof. If so requested by the Lessee in writing, the City shall give notice to any such assignee of any default by the Lessee under the terms of this Lease no later than ten (10) days after the occurrence thereof.

The City shall not suffer or permit to remain upon all or any part of the Leased Premises any lien for work performed or materials supplied to or for the City and/or to or for the Leased Premises by or on behalf of the City, or any other lien or encumbrance thereon arising by reason of the City's ownership thereof. The City shall, and does hereby agree, at its own cost and expense, to defend the Leased Premises and the Lessee against any and all suits, actions or other proceedings that may be instituted for the enforcement of any such lien or encumbrance, and the City agrees promptly to have any such liens and encumbrances removed or discharged.

(d)     Prohibition. Except as otherwise expressly provided in this Lease, the Lessee shall not (1) assign, mortgage, pledge, encumber or in any manner transfer this Lease, or any part thereof, or (2) sublease the Leased Premises, or any part thereof, or (3) sell, transfer, mortgage, pledge, lease, license or encumber the improvements on the Leased Premises, without the prior written consent of the City, expressed through the Director of Parks,

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ
Recreation and Properties with the concurrence of the Board of Control, in each instance, and

any attempt to do any of such acts without such consent shall be null and void and of no effect and may, in the City's sole discretion, be deemed to be a breach of this Lease. No assignment or mortgage by the Lessee shall in any way affect the terms, conditions, covenants, agreements and provisions herein set forth, and any and all such assignments or subleases shall be at all times subject to this Lease and to the prior right, title and interest of the City in and to the Leased Premises.

24.    Scheduling the City's Rights of Use. The City intends, from time to time, but no more than eight (8) times in any calendar year during the term of this Lease to use the Leased Premises to hold certain civic, cultural or community events and activities as it deems appropriate, as proposed by the Director of Parks, Recreation and Properties with approval of the Council of the City, including, without limitation, events such as Special Olympics, youth athletic events and civic celebrations ("City Events"). It is acknowledged and understood by the parties that in order to accommodate such additional uses of the Leased Premises, Lessee will require that a time and date be scheduled and/or reserved for all such games, events and activities, and that the same be played, held, or take place, at the times and on the dates so scheduled and/or reserved therefor no less than thirty (30) and no greater than one hundred eighty (180) days in advance. Lessee agrees to cooperate with the City to schedule such events and activities and the City agrees that it will not request such events or activities of the type or on dates that would interfere with previously scheduled uses of the Leased Premises by the Lessee. The City acknowledges that the Leased Premises will not be available for City Events for forty-eight (48) hours prior to or twenty-four (24) hours after any other previously scheduled event at the Leased Premises. The City agrees that all reasonable maintenance and operating expenses and staff time associated with or reasonably allocated to such events and activities, in each case, as agreed upon by the parties in advance and appropriately documented, shall be paid for by the City and, notwithstanding the provisions of Section 12, all revenues generated by such events and activities from all sources whatsoever shall belong to the City.

25.     Successors and Assigns.  This Lease shall be binding upon and shall inure to the benefit of the parties hereto and, to the extent this Lease expressly permits assignment, to their respective permitted successors and assigns.

26.     Leased Premises Condition.  As between the City and the Lessee, to the extent permitted by law, the City hereby agrees to bear any and all responsibility with respect to, and to pay on behalf of the Lessee, any and all foreseeable or unforeseeable damage, losses, costs, claim, liabilities or expenses, directly or indirectly (including legal and other professional fees) arising from any condition existing or events occurring on or about the Leased Premises prior to the date on which Lessee first takes possession of the Leased Premises or the Commencement Date, which ever is earlier.  Without limiting the foregoing, the City shall enforce the terms of its construction contracts with respect to the New Stadium, including all related improvements, including without limitation enforcement of warranty, completion of "start-up" functions, delivery of equipment operation and maintenance manuals to Lessee, provide for training of Lessee's employees in the operation of plumbing, electrical, HVAC/mechanical and other systems and take such other actions necessary to correct construction defects and to educate Lessee with respect to the operation of the improvements constituting the New Stadium.

From and after the date on which Lessee first takes possession of the Leased Premises or the Commencement Date,   whichever is earlier, Lessee's compliance with Environmental Laws shall be at Lessee's sole cost and expense to the extent such compliance is required by reason of Lessee's use and occupancy of the Leased Premises.  As between the City and Lessee, to the extent permitted by law, the City shall bear all responsibility, costs and expenses (including legal and other professional fees) attributable to and  pay on behalf of the Lessee, all damages, losses, costs, claims, liabilities or expenses resulting from acts or omissions of the City, its agents, employees, or invitees, with respect to (i) conditions of the Leased Premises existing prior to the date the Lessee takes possession thereof and (ii) events occurring on or

about the Leased Premises prior to the date the Lessee takes possession, or attributable to conditions existing or events occurring on property adjacent to the Leased Premises, in which cases compliance with Environmental Laws shall be at the City's sole cost and expense. Lessee (the permitted assignee of the NFL as original Lessee hereunder, and not the NFL) agrees to take responsibility for and to pay, on behalf of the City, any damages, losses, costs, claims, liabilities or expenses (including legal and other professional fees in connection therewith), for any environmental conditions that were caused by Lessee, its employees, invitees or its assignees or sublessees, and for any damage, loss, cost, liability or expense directly or indirectly arising from any condition existing or events occurring on or about the Leased Premises from and after the date on which Lessee first takes possession of the Leased Premises or the Commencement Date, whichever is earlier, and for any claims, liabilities, costs and expenses (including legal and other professional fees) in connection therewith. These indemnifications and allocations of obligations shall survive the termination of this Lease.

27. <u>The City's Right to Inspect</u>. Upon twenty-four (24) hours notice, the City, its agents and representatives shall have access to the Leased Premises and improvements thereon at any and all times reasonable for the purpose of inspecting the Leased Premises. The Lessee shall have the right to accompany the City on such inspection.

28. <u>Surrender</u>.

(a) <u>Surrender and Delivery</u>. The Lessee shall, on the expiration of the term hereby granted, or upon the earlier termination of this Lease, peaceably and quietly leave, surrender or yield up unto the City the Leased Premises together with all improvements then located thereon, clean and in good order and condition except for reasonable wear and tear thereof and insured loss or damage by fire or other casualty, all of which shall become property of the City free and clear of all liens, encumbrances and subtenancies whatsoever, except those

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

existing on the date of execution of this Lease and taxes and assessments not then due and payable.

(b)     Removal of Personal Property.  Personal property purchased and installed by Lessee at Lessee's sole expense may be removed by Lessee at or prior to the expiration or earlier termination of this Lease or within thirty (30) days thereafter or by  the Lessee's sublessee at or prior to the expiration or earlier termination of its sublease, provided that the removal thereof will not injure the Leased Premises or the structural integrity of the improvements or the New Stadium or necessitate changes in or repairs to the same.  Lessee shall pay or cause to be paid promptly to the City the cost of repairing any damage arising from such removal and restoration of the Leased Premises to its condition prior to such removal.

(c)     Abandonment.  Any personal property of Lessee or any  sublessee which shall remain on the Leased Premises for more than thirty (30) days after the expiration or earlier termination of this Lease  may, at the option of the City, be deemed to have been abandoned by Lessee or such sublessee.   The abandoned personal property may either be retained by the City as its property, be disposed of, without accountability, in such manner as the City may see fit, or if the City shall give written notice to Lessee to such effect, such personal property shall be removed by Lessee at Lessee's sole cost and expense.  During this period, the City shall not be responsible for any loss or damage occurring to any such personal property owned by Lessee or any sublessee.

(d)     Holdover.  It is understood and agreed that should Lessee hold over the Leased Premises beyond the Term, without first having extended this Lease by written agreement of both the City and Lessee, such holding over shall not be considered as a renewal or extension of this Lease and shall be a tenancy from calendar month to calendar month and for no longer period.

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

(e)    Delay in Surrender.  If the Leased Premises are not surrendered at the end of the term, then Lessee shall hold harmless, indemnify and defend the City against loss or liability resulting from delay by Lessee or its assignees and sublessees in so surrendering the Leased Premises, including but not limited to any claims founded on such delay made by any succeeding occupant of the Leased Premises or any part thereof, and notwithstanding the provisions elsewhere in this Lease, Lessee shall be liable to the City for any and all legal expenses, costs, and fees incurred by the City in obtaining the possession of the Leased Premises.

29.    Recordation.  The City shall cause this Lease to be properly recorded in the Cuyahoga County Recorder's office.

30.    Waiver.  No waiver by either party at any time, express or implied, of any breach of any provisions of this Lease shall be deemed a waiver or a breach of any other provision of this Lease or a consent to any subsequent breach of the same or any other provision.  If any action by either party shall require the consent or approval of the other party, the other party's consent to or approval of such action on any one occasion shall not be deemed to consent to or approve of said action on any subsequent occasion or a consent to or approval of any action on the same or any subsequent occasion.  Any and all rights and remedies which either party may have under this Lease or by operation of law, either at law or in equity, upon any breach, shall be distinct, separate and cumulative and shall not be deemed inconsistent with each other; and no one of them, whether exercised by said party or not, shall be deemed to be in exclusion of any other; and any two or more or all of such rights and remedies may be exercised at the same time.  No covenant, agreement, term or condition of this Lease to be performed or complied with by the Lessee, and no breach thereof, shall be waived, altered, modified or terminated except by a written instrument executed by the City.

31.   <u>Estoppel Certificates</u>.  Either the City or Lessee, without charge, at any time and from time to time, upon ten (10) days written request by the other, shall certify, by written instrument, duly executed and acknowledged in recordable form, to the other party or any other person:

(a)   that this Lease is unmodified and in full force and effect, or, if there has been a modification, that the same is in full force and effect as modified, and stating the date and nature of such modification;

(b)   the dates, if any, to which sums due hereunder have been paid in advance;

(c)   whether the other party is or is not in default in the performance of any covenant, condition or agreement on its part to be performed, and the nature of such default, if any; and

(d)   such other reasonable and appropriate information as the other party may request.

32.   <u>Approvals and Consents</u>.  Whenever the approval or consent of either party to this Lease is required or requested, such consent or approval shall not be unreasonably withheld.  Unless otherwise specified herein, any such consent or approval shall be given or denied within thirty (30) days after request in writing therefor, and any failure to give or deny any such consent or approval within such thirty (30) day period shall be deemed to constitute the denial thereof.

33.    Lessee's Equal Employment Opportunity and Affirmative Action Policies; Minority Participation.

(a)    Compliance with Laws.  Lessee hereby agrees to comply with all applicable affirmative action laws, including without limitation Chapter 187 (to the extent applicable) and any other laws and regulations administered by the City's Office of Equal Opportunity.

(b)    Lessee's Equal Employment Opportunity and Affirmative Action Policies.  Lessee hereby agrees to use best efforts to employ qualified minorities for forty percent (40%) and females for twenty percent (20%) of the new, project related, full-time equivalent jobs and positions created at the Leased Premises (other than the jobs and positions related to the Team's players, coaches and trainers).  Minorities shall have the meaning set forth in Chapter 187 of the Codified Ordinances of Cleveland, Ohio, 1976, as said ordinances may be amended from time to time ("Chapter 187").

Lessee further agrees to use best efforts to employ qualified persons who at the date of hire are residents of the City of Cleveland for seventy-five percent (75%) of the new, project related, full-time equivalent jobs and positions created at the Leased Premises (other than jobs and positions related to the Team's players, coaches and trainers).

(c)    MBE/FBE Participation.  Lessee agrees to use best efforts to award or cause to be awarded at least forty percent (40%) of all contracts for operation of the Stadium (including those described in Section 23(a)) to minority and/or female owned business enterprises ("MBE/FBES") that are certified by the City's Office of Equal Opportunity.  MBE/FBES shall have the meaning set forth in Chapter 187.

To verify the award of MBE/FBE contracts, Lessee shall submit copies of all contracts, subcontracts, purchase orders, cancelled checks and other information as may be required by the City's Director of Equal Opportunity, with a copy to the Director of Parks, Recreation and Properties at the notice address set forth in Section 35.

(d) <u>Quarterly Report</u>. Lessee agrees to submit or cause to be submitted to the City's Director of Equal Opportunity, with a copy to the Director of Parks Recreation and Properties and a copy to the President of the City's City Council at the notice addresses set forth in Section 35 a quarterly report, setting forth information necessary to determine the attainment of the goals set forth in this Section 33. This information shall include, but not be limited to, the number and types of jobs created and contracts awarded, to whom the jobs were filled by and contracts awarded to, and any and all other information required by the City.

34. <u>Equal Employment Opportunity</u>. During the performance of this Lessee, the Lease agrees as follows:

(a) The Lessee shall not discriminate against any employee or applicant for employment because of race, religion, color, sex, sexual orientation, national origin, age, disability, ethnic group or Vietnam-era or disabled veteran status. The Lessee shall take affirmative action to insure that applicants are employed and that employees are treated during employment without regard to race, religion color, sex, sexual orientation, disabled veteran status. As used herein, "treated" means and includes without limitation the following: recruited, whether by advertising or other means; compensated, whether in the form of rates of pay or other forms of compensation; selected for training, including apprenticeship, promoted, upgraded, demoted, downgraded, transferred, laid off and terminated. The Lessee agrees to and shall post in conspicuous places, available to employees and applicants for employment, notices to be provided by the hiring representatives of the Lessee setting forth the provisions of this nondiscrimination clause.

(b)     The Lessee will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that the Lessee is an equal opportunity employer.

(c)     The Lessee shall send to each labor union or representative of workers with which it has a collective bargaining agreement or other contract, or understanding, a notice advising the labor union or worker's representative of the Lessee's commitments under the equal opportunity clause, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(d)     It is the policy of the City that business concerns owned and operated by minority persons and/or women shall have every practicable opportunity to participate in the performance of contracts awarded by the City.

35.     Notice.  Any notice which is required or proper under the terms of this Lease to be given by the City or the Lessee shall be in writing and shall be deemed sufficient if such notice is delivered in person, sent by nationally recognized overnight courier, delivery fees prepaid, or sent by certified mail, postage prepaid, with return receipt requested, to each of the parties entitled to receive such notice at the delivery or Post Office address respectfully furnished to the City or the Lessee by each of such parties, unless otherwise expressly provided in this Lease.  Any such notice shall be deemed delivered upon hand delivery, the day after depositing with a reputable overnight courier, or three (3) days after depositing such notice in a postal receptacle, return receipt requested.  The addresses originally specified for the City and the Lessee and to serve until notice otherwise shall be given are:

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

City:   The Director of Law
      City Hall
      601 Lakeside Avenue, N.E.
      Cleveland, Ohio 44114

       and

      The Director of Parks, Recreation and Properties
      City Hall
      601 Lakeside Avenue, N.E.
      Cleveland, Ohio 44114

      with a copy to:

      President
      Cleveland City Council
      City Hall
      601 Lakeside Avenue, N.E.
      Cleveland, Ohio 44114

Lessee:  Commissioner
      National Football League
      410 Park Avenue
      New York, New York 10022

      with a copy to:

      Gregg H. Levy, Esq.
      Covington & Burling
      1201 Pennsylvania Avenue, N.W.
      Washington, D.C. 20004

36. Electrical Supply. So long as the City operates Cleveland Public Power, the City agrees to supply, through Cleveland Public Power, and the Lessee agrees to accept and pay for at customary commercial rates, electrical power to the exterior surface of the New Stadium, or such other parts of the Leased Premises, in such amounts and in such a manner as is reasonably necessary or appropriate to maintain and operate the Leased Premises.

37. Landlord's Lien. The City shall have a lien on all personal property of Lessee located on the Leased Premises. The City agrees that it shall subordinate its landlord's lien to any lender permitted by the terms of this Lease acquiring a lien on such personal property which lender has (i) provided purchase money financing for such personal property or (ii)

provided working capital financing for Lessee, or to any other lender holding a loan permitted pursuant to Section 23(b).

38. Quiet Enjoyment. The City warrants that the Lessee, subject to the terms and provisions of this Lease and upon payment of the charges required hereunder and observing and performing all of the terms, provisions and conditions hereof, shall lawfully, peaceably and quietly have and enjoy the use of the Leased Premises and all appurtenances thereto during the term hereof. Any provision of law to the contrary notwithstanding, the City acknowledges that breach of this provision creates irreparable harm not ascertainable or compensable in money damages, and consents hereby to any injunctive action filed by the Lessee in any competent court in the State of Ohio to enjoin or remedy such breach. Lessee agrees that in case of a breach of this provision, it may be entitled to money damages or appropriate equitable remedies, it being understood by the parties that the remedy of termination of this Lease shall only be available (a) in the event of a title problem which materially adversely affects the Lessee's full use and enjoyment of the Leased Premises for the purposes for which it is leased hereby and (b) as specifically provided herein. The parties acknowledge that the remedy of termination for breach of quiet enjoyment is not a favored remedy of the parties and should only be awarded by a court in the event that no other remedy at law or in equity would be adequate.

39. Provisions Binding. The parties agree that they have had meaningful discussion and/or negotiation of the provisions, terms and conditions contained in this Lease. Therefore, doubtful or ambiguous provisions, if any, contained in this Lease shall not be construed against the party who physically prepared this Lease. The rule commonly referred to as "Fortius Contra Proferentum" shall not be applied to this Lease or any interpretation thereof.

40. Entire Agreement. This instrument contains all the agreements and conditions made between the parties hereto and all the financial obligations of the parties hereto,

and may not be modified orally or in any other manner other than by an agreement in writing, signed by all the parties hereto or their respective successors in interest.

41. <u>Severability</u>. In the event that any provision of this Lease, or the application thereof to any person or circumstances, shall, for any reason and to any extent, be determined or declared by any court of law or other binding authority to be invalid or unenforceable, the remainder of this Lease, and the application of such provision to any other person or circumstance, shall not be affected thereby, but rather shall be construed and enforced as if the invalid or unenforceable provision were not contained herein.

42. <u>No Partnership</u>. Nothing contained in this Lease shall, or shall be deemed or construed so as to create the relationship of principal-agent, joint venturers, co-adventurers, partners or co-tenants between the City and Lessee; it being the express intention of the parties that they are and shall remain independent contractors one as to the other.

43. <u>Effectiveness of Lease</u>. Before this Lease may become effective, it must be executed by the Commissioner of the NFL pursuant to 1996 Resolution G-1 duly adopted by the NFL Executive Committee on February 10, 1996 and by the Mayor and the Director of Parks, Recreation and Properties of the City pursuant to Ordinance No. 303-96 duly adopted by the Council of the City on March 8, 1996, and this Lease shall be effective upon the last of such executions. Notwithstanding the foregoing, this Lease shall become null and void and of no further force or effect if the NFL's obligations to locate a professional football franchise in Cleveland, Ohio is terminated pursuant to the NFL Agreement.

44. <u>Schedules and Exhibits</u>. All schedules and exhibits attached hereto shall be deemed to be and are incorporated herein by reference and made a part of this Lease. Each schedule and exhibit referred to in this Lease forms an essential part of the document.

45. <u>Broker's Commission</u>. Each of the parties represents and warrants that there are no claims for brokerage commissions or finder's fees in connection with the execution of this Lease, and agrees to indemnify the other against, and hold it harmless from, all liability arising from any such claim including, without limitation, the cost of counsel fees in connection therewith.

46. <u>Gender and Number</u>. Words of any gender used in this Lease shall be held to include any other gender, and words in the singular number shall be held to include the plural (and vice-versa), when the sense requires.

47. <u>Headings and Captions</u>. The captions and section or paragraph headings are inserted only for convenience, and are in no way to be construed as a part of this Lease or as a limitation on the scope of the particular provisions to which they refer.

48. <u>Governing Law</u>. This Lease shall be governed by the laws of the State of Ohio.

49. <u>Time is of the Essence</u>. Time is of the essence in the Lease.

50. <u>Survival</u>. The liabilities and obligations of the NFL under Section 3, the provisions of Sections 18, 26 and 28, the first sentence of the third paragraph of Section 20(a), the last sentence of the third paragraph of Section 20(a), the last sentence of the second paragraph of Section 21, the last sentence of Section 22(a), and any liabilities or obligations of the Lessee or the City arising or relating to periods prior to the termination of this Lease, shall survive any expiration or earlier termination of this Lease.

51. <u>Counterparts</u>. This Lease may be signed in counterparts, each of which

52.     Third-Party Beneficiaries.  There shall be no third-party beneficiaries of this Lease.

53.     Requirements of Law.  The performance by the City under this Lease is subject to the Charter of the City and all applicable laws of the State, including that the obligations of the City under this Lease to perform any covenants that require the expenditure of City funds in subsequent fiscal years are subject to and conditioned upon the appropriation of funds therefor.

54.     Lessee as Manager.  The City hereby designates the Lessee as manager of the Leased Premises for purposes of Ohio Revised Code Section 5709.081(B) and this Lease shall constitute a management or similar agreement for purposes of Section 5709.081(B).

55.     Court Costs and Attorneys' Fees and Expenses.  In the event that in connection with any dispute arising under the terms of this Lease either party hereto should initiate suit or other judicial proceeding against the other party hereto to enforce its rights hereunder, to the extent permitted by law, the prevailing party in any such suit or proceeding shall be entitled to receive from the non-prevailing party to the suit or proceeding, in addition to any other amounts to which the prevailing party may be entitled, the amount of all court costs and reasonable attorneys' fees and expenses incurred by such prevailing party in connection with the suit or proceeding.

IN WITNESS WHEREOF, the City of Cleveland has caused its name and corporate seal to be affixed to duplicate copies of this Lease by its Mayor, and its Director of Parks, Recreation and Properties, thereunto duly authorized, and the National Football League has caused its corporate name to be affixed to duplicate copies hereof by its Commissioner and _____, all as of the 26th day of April, 1996.

Signed and Acknowledged in
the Presence of:
(witnesses

_____
Printed Name: FREDERICK R. NANCE

_____
Printed Name: SHARON SOBOL JORDAN

THE CITY OF CLEVELAND

By _____
                    Mayor

By _____
              Director of Parks,
           Recreation and Properties

(witnesses

_____
Printed Name: FRANK HAWKINS

NATIONAL FOOTBALL LEAGUE,
individually as to Section 3, and
as nominee for the New Owner

By _____
                 Commissioner

The within instrument is hereby approved as to legal form and correctness *June 12*, 1996.

_____
Director of Law

(To be executed upon assignment)

_____, Lessee

(witnesses as to both)

_____        By_____

Printed Name:_____

_____        By_____

Printed Name:_____

STATE OF OHIO        )
                           )   SS.
COUNTY OF CUYAHOGA   )

      BEFORE ME, a Notary Public in and for said County and State, personally appeared Michael R. White, Mayor, and Oliver B. Spellman, Director of Parks, Recreation and Properties, of the CITY OF CLEVELAND, the municipal corporation on whose behalf the foregoing Lease was executed, who acknowledged, that they did sign the same for and on behalf of said City of Cleveland, being thereunto duly authorized and that the same is their free act and deed individually and as such officers and the free and corporate act and deed of said City of Cleveland.

      IN WITNESS WHEREOF, I have hereunto set my hand and official seal at Cleveland, Ohio, this 12 day of June, 1996.

                                   _____
                                        Notary Public

                                 KENNETH E. BANKS, JR. Attorney at Law
                                 Notary Public - State of Ohio
                                 My commission has no expiration date
                                 Sec. 147.03 R.C.

STATE OF *District of Columbia*
COUNTY OF *City of Washington* } SS.

BEFORE ME, a Notary Public in and for said County and State, personally appeared Paul Tagliabue, Commissioner, and _____, _____, of the NATIONAL FOOTBALL LEAGUE, an unincorporated, non-profit association, on whose behalf the foregoing Lease was executed, who acknowledged that they did sign the same for and on behalf of said association, being thereunto duly authorized and that the same is their free act and deed individually and as such officers and the free and corporate act and deed of said association.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal at *Washington*, *DC*, this *10th* day of *June*, 1996.

_Karla Balourdos_
Notary Public

My Commission Expires July 14, 2000

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

STATE OF _____   )
                      )    SS.
COUNTY OF _____  )

       BEFORE ME, a Notary Public in and for said County and State, personally appeared

_____ and _____, as _____ and

_____ of the _____, a _____, on

whose behalf the foregoing Lease was executed, who acknowledged that they did sign the same

for and on behalf of said association, being thereunto duly authorized and that the same is their

free act and deed individually and as such officers and the free and corporate act and deed of

said association.

       IN WITNESS WHEREOF, I have hereunto set my hand and official seal at

_____, _____, this ___ day of _____, ____.


                                    _____
                                       Notary Public

This instrument prepared by:

Squire, Sanders & Dempsey
4900 Society Center
127 Public Square
Cleveland, Ohio 44114

## FISCAL OFFICER'S CERTIFICATE

The undersigned, being the fiscal officer of the City of Cleveland, Ohio, certifies that the moneys required to meet the obligations of the City during the year 1996 under the foregoing Lease by Way of Concession between the City and the National Football League have been appropriated lawfully by the Council of the City for that purpose and are in the treasury or in the process of collection to the credit of an appropriate fund, free from any previous encumbrance. This Certificate is given in compliance with Sections 5705.41 and 5705.44 of the Revised Code.

Dated: _June 12_, 1996

_____
Director of Finance

## EXHIBIT A

## ASSIGNMENT AND ASSUMPTION OF LEASE

This Assignment and Assumption of Lease is made and entered into at _____, this _____ day of _____, 199__ by and between the National Football League, an unincorporated, non-profit association ("Assignor") and _____, the owner of the National Football League franchise ("NFL Franchise"), whose home territory is Cleveland, Ohio ("Assignee").

## RECITALS

A.    Assignor and Assignee have entered into a Franchise Commitment Agreement, dated as of April 26, 1996 ("Franchise Commitment Agreement"), providing for, among other things, the acquisition by Assignee of the NFL Franchise; and

B.    The Franchise Commitment Agreement requires the Assignor to assign, and the Assignee to assume, all of Assignor's right, title and interest in and to the Lease by Way of Concession (defined below).

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledge, the parties agree as follows:

1.    Assignment.

Assignor hereby assigns to Assignee (i) all of Assignor's right, title, interest and obligations as Lessee under that certain Lease by Way of Concession dated as of April 26, 1996 by and between the City of Cleveland and the Assignor and (ii) Assignor's entire leasehold estate thereunder (collectively, the "Lease").

2.    Assumption.

In consideration of the foregoing assignment, Assignee hereby expressly agrees to be bound by and perform all of the obligations and liabilities of the New Owner and Lessee relating to periods of time or events occurring subsequent to the Commencement Date (as defined in the Lease) or, in the event of the occupancy and use of the Leased Premises prior to the Commencement Date, occurring subsequent to such occupancy and use.

IN WITNESS WHEREOF, the parties have duly executed this Assignment and Assumption of Lease as of the date first above written and shall be effective as of _____, _____.

NATIONAL FOOTBALL LEAGUE

By:_____
Its:_____

By:_____
Its:_____

_____, ASSIGNEE

By:_____
Its:_____

ACKNOWLEDGED this ____ day of _____, 199__.

THE CITY OF CLEVELAND

By: _____

The within instrument is hereby approved as to legal form and correctness _____, 199____.

_____
Director of Law

STATE OF _____ )
                        )    SS.
COUNTY OF _____ )

     BEFORE ME, a Notary Public in and for said County and State, personally appeared Paul Tagliabue, Commissioner, and _____, _____, of the NATIONAL FOOTBALL LEAGUE, an unincorporated, non-profit association, on whose behalf the foregoing Assignment and Assumption of Lease was executed, who acknowledged that they did sign the same for and on behalf of said association, being thereunto duly authorized and that the same is their free act and deed individually and as such officers and the free and corporate act and deed of said association.

     IN WITNESS WHEREOF, I have hereunto set my hand and official seal at _____, _____, this ___ day of _____, 1996.

_____
                  Notary Public

STATE OF                )
                        )    SS.
COUNTY OF               )

     BEFORE ME, a Notary Public in and for said County and State, personally appeared _____, Assignee, who acknowledged that he/she did sign the foregoing Assignment and Assumption of Lease, and that same is his/her free act and deed.

     IN WITNESS WHEREOF, I have hereunto set my hand and official seal at _____, _____, this ___ day of _____, 1996.

_____
                  Notary Public

This instrument prepared by:

Squire, Sanders & Dempsey
Electronically Filed 05/22/2015 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ
127 Public Square
Cleveland, Ohio 44114

# EXHIBIT B

## Description of Leased Premises

[Description of Stadium Parcel to come]

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio and known as being part of extended Original Two Acre Lot Numbers 9 through 17 (both inclusive), and together forming a parcel of land bounded and described as follows:

Beginning in the centerline of West 3rd Street (99 feet wide), at its point of intersection with the centerline of Erieside Avenue, N.W. (70 feet wide) as shown by the Dedication Plat of Erieside Avenue, N.E. and N.W. and West 3rd Street, recorded in Volume 204 of Maps, Page 69 of Cuyahoga County Records;

Thence South 33° 56' 46" East, along the centerline of West 3rd Street, 346.23 feet to a point;

Thence North 56° 03' 14" East, along a line drawn perpendicular to said centerline of West 3rd Street, 72.74 feet to its point of intersection with the Northeasterly curved line of said West 3rd Street, said point also being the Southwesterly corner of the Donald Gray Gardens and the principle place of beginning of the parcel of land herein intended to be described;

Thence Northeasterly, along the curved Southeasterly line of Erieside Avenue N.E., being the arc of a circle deflecting to the right, having a radius of 457.01 feet and a chord that bears North 34° 09' 36" West, 533.59 feet, an arc distance of 569.79 feet to a point of tangency therein;

Thence North 55° 50' 24" East, continuing along the Southerly line of Erieside Avenue N.E., 445.39 feet to a point of curvature therein;

Thence along the arc of a circle deflecting to the right, having a radius of 515.00 feet, a chord that bears South 57° 29' 05" East, 29.56 feet, an arc distance of 29.57 feet to a point of compound curvature;

Thence Southeasterly, along the Westerly line of Erieside Avenue (70 feet wide) as relocated, along an arc of a circle deflecting to the right, having a radius of 30.00 feet, a chord that bears South 87° 28' 59" East, 33.03 feet, an arc distance of 34.98 feet to a point of compound curvature;

Thence continuing Southeasterly along the Westerly line of Erieside Avenue, as relocated, along the arc of a circle deflecting to the right, having a radius of 190.00 feet, a chord that bears South 44° 06' 13" East, 65.69 feet, an arc distance of 66.03 feet to a point of tangency;

Thence South 34° 08' 55" East along the said line of relocated Erieside Avenue, 462.69 feet to a point of curvature therein;

Thence Southeasterly along said line of relocated Erieside Avenue and the arc of a circle deflecting to the left, having a radius of 335.00 feet and a chord that bears South 72° 20' 27" East, 414.26 feet, an arc distance of 446.61 feet to a point;

Thence South 20° 31' 59" East, 25.00 feet to a point on the Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W.;

Thence South 56° 01' 58" West, along said Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., 117.38 feet to an angle point therein;

Thence South 54° 27' 44" West, continuing along said Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., 64.87 feet to a point of curvature therein;

Thence Southwesterly, along the curved Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., being the arc of a circle deflecting to the left, having a radius of 980.00 feet and a chord that bears South 47° 12' 58" West, 247.22 feet, an arc distance of 247.88 feet to a point of reverse curvature therein;

Thence Southwesterly, continuing along the curved Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., being the arc of a circle deflecting to the right, having a radius of 1480.00 feet and a chord bearing South 49° 45' 29" West, 503.20 feet, an arc distance of 505.66 feet to a point of curvature therein;

Thence South 59° 32' 45" West, along said Northwesterly line of the West 3rd exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., 201.27 feet to the Southeasterly end of a curved turnout between said Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway, N.E. and N.W. and West 3rd Street;

Thence Northwesterly, along said turnout, being an arc of a circle deflecting to the right, having a radius of 100.00 feet, an arc distance of 150.99 feet to a point of tangency in said Northeasterly line of West 3rd Street;

Thence North 33° 56' 46" West, continuing along the Northwesterly line of West 3d Street, 421.07 feet to a point of curvature therein;

Thence Northeasterly, along the Northeasterly curved line of West 3 rd Street, being the arc of a circle deflecting to the right, having a radius of 457.01 feet and a chord that bears North 24° 46' 13" West, 145.75 feet an arc distance of 146.38 feet to the principle place of beginning according to a survey dated May, 1986 by the City of Cleveland, Department of Public Service, Division of Engineering and Construction, Plats and Surveys. This legal description was prepared by Jomarie Wasik, Ohio Professional Surveyor Number 7027. Bearings are to an assumed meridian and are used to denote angles only.

# EXHIBIT C

## Signage Standards

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

## Schedule 14(f)

## Capital Repair Fund Budget

| Year | Contribution | Reserve Amount | Amount Allocated to Capital Improvements |
|------|-------------|----------------|------------------------------------------|
| 1996 | $      0 | $      0 | $0 |
| 1997 | 2,000,000 | 2,000,000 | 0 |
| 1998 | 0 | 0 | 0 |
| 1999 | 500,000 | 500,000 | 0 |
| 2000 | 500,000 | 500,000 | 0 |
| 2001 | 650,000 | 650,000 | 0 |
| 2002 | 650,000 | 650,000 | 0 |
| 2003 | 650,000 | 650,000 | 0 |
| 2004 | 650,000 | 650,000 | 0 |
| 2005 | 650,000 | 650,000 | 0 |
| 2006 | 850,000 | 850,000 | 0 |
| 2007 | 850,000 | 850,000 | 0 |
| 2008 | 850,000 | 850,000 | 0 |
| 2009 | 850,000 | 850,000 | 0 |
| 2010 | 850,000 | (To be | (To be |
| 2011 | 850,000 | established per | established per |
| 2012 | 850,000 | Section 14) | Section 14) |
| 2013 | 850,000 | | |
| 2014 | 850,000 | | |
| 2015 | 850,000 | | |
| 2016 | 850,000 | | |
| 2017 | 850,000 | | |
| 2018 | 850,000 | | |
| 2019 | 850,000 | | |
| 2020 | 850,000 | | |
| 2021 | 5,900,000 | | |
| 2022 | 6,300,000 | | |
| 2023 | 6,700,000 | | |
| 2024 | 7,100,000 | | |
| 2025 | 7,500,000 | | |
| 2026 | -0- | | |
| 2027 | -0- | | |
| 2028 | -0- | | |

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

Signage requirements for Gateway Sports Complex from the *Central Market community Development Plan* accepted by the Cleveland City Planning Commission September 26, 1986 and last amended August 11, 1993.

8.    Signage

A complete signage plan for the site shall be submitted to and approved by the City Planning Commission. Signs which shall be visible from public rights-of-way and public open spaces shall be limited to signs identifying the sports facility district, the stadium, the arena, and associated parking facilities. Such signs may identify primary tenants and events occurring in the sports facility district, at the stadium and at the arena, but shall not display advertising for products, services, businesses, corporations, or other organizations. Permitted sign types shall be limited to the following:

District Identification Signs: Signs identifying or naming the sports facility district may be placed along Ontario Street, Carnegie Avenue, and East 9th Street.

Event Identification Signs: Signs identifying the events occurring at the sports facility may be placed along Ontario Street, Carnegie Avenue, and East 9th Street.

Building Identification Signs: Signs identifying or naming the stadium and arena may be placed on the buildings or on the site in the vicinity of the buildings.

Tenant Identification Signs: Signs identifying the major tenants of the stadium and arena may be placed on the buildings or on the site in the vicinity of the buildings. Signs identifying other tenants of space on the site may be placed on the building for those tenants occupying a portion of the ground floor of the building, containing an entrance from the building exterior, and separated from other such spaces by a party wall or walls.

Parking Identification Signs: Signs identifying on-site parking facilities may be placed on the buildings or on the site in the

vicinity of surface parking.

Directional Signs: Signs indicating a direction or a location to which pedestrian or vehicular traffic is requested to move shall be placed as appropriate.

Informational Signs: Signs which present miscellaneous information or instructions intended to serve the public, product or issue and not containing information included in the definition of any other sign shall be placed as appropriate.

Banner Signs: Signs which may be mounted on light poles in public rights-of-way and public open space shall be placed as appropriate presenting information included in the definitions of the signs identified above.

Scoreboard: A variable message scoreboard which may be visible from one or more public rights-of-way may be placed within the stadium and may be used for the display of advertising for products, services, businesses, corporations, or other organizations.

Electronic Changeable Copy Signs: Variable message signs which may be visible from one or more public rights-of-way or public open spaces may be placed on or adjacent to the arena, stadium, or parking garage. All net revenues generated from information displayed on such signs shall be used for the maintenance of public open spaces and streetscape associated with the sports facility complex. Information displayed on these signs shall be limited to the following:

     a.   Identification of the sports facility complex, the arena, or the stadium.

     b.   Identification of events held at the sports facility complex, the arena, or the stadium.

     c.   Identification of events held at other local public assembly facilities.

     d.   Acknowledgement of organizations or individuals sponsoring events held at the facility or contributing to the construction or operation of the facility as sponsors or patrons.

     e.   Identification of products or services offered for sale on the premises of the facility.

     f.   Public service messages such as time, temperature, and information of a civic nature. These public service messages shall be displayed at least twenty (20) percent of the time during which electronic changeable copy signs are operating between the hours of 7:00 A.M. and 12 Midnight.

     The signage plan shall present the minimum amount of signage required to provide necessary information to the public and to reflect a degree of order and uniformity through the elements of scale, placement, type, format, and graphics. The signage plan shall identify the design and location of each sign including size, color, materials, and means of illumination which shall be in conformance with Sign Regulations, Chapter 350 of the Codified Ordinances and in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

Mr. Morrison said that the staff had drafted a resolution for the Planning Commission to weigh regarding the gate signs such that if the Planning Commission approved them it would be delimiting the scope of its approval. The resolution sets forth the appropriateness of the gate signs as designed and contrasted off-premises advertising, such signage with which is deemed unacceptable. He said that the meeting minutes required a clear rationale stating why the gate signs as presented are acceptable and needed and do not constitute off-premises advertising. He then read aloud a draft resolution. He said that the gate signs were consistent with City policy in naming buildings.

Commissioner Robinson concurred with the resolution and said that the gate signs would not, because of their location, be read in any way as building naming signs.

Mr. Morrison said that the gate signs will be unified by their height, construction, and depth, and all rendered in brush aluminum. He said that design details will be refined by the staff in working with the project architect and the sign designer. He said that architects were to be commended for not hindering the openness of the stadium notches. He said that the design for the signs of the two suite gates on the north side of the building will be presented later.

Acting Chairman Coyne commended the design team for the excellence of the stadium's design.

In response, Ms. Downing said that the building is going to be a tribute to the City.

Mr. Morrison put forth the proposed resolution for Planning Commission action.

## CPC Resolution No. 319-99

Whereas, the sale of naming rights to private corporations for publicly owned arenas and stadia has become standard practice in cities throughout the United States;

Whereas, the owners of the Cleveland Browns have the right in their lease with the City of Cleveland as it was negotiated with the National Football League in 1996 to market to private corporations the name of the new football stadium at North coast Harbor;

Whereas, the owners of the Cleveland Browns have proposed to name the new stadium "Cleveland Browns Stadium" if allowed to sell naming rights for six entrance gates providing patron access to the new stadium;

**16**

SECRETARY.

Whereas, the name "Cleveland Browns Stadium" recognizes the strong support of Clevelanders for this franchise and assures, that in broadcasting and promoting events at the new stadium, the name "Cleveland: shall be at the forefront;

Whereas, the owners of the Cleveland Browns are committed to marketing the naming rights to Cleveland-area corporations, thus furthering the public-private partnership that has been vital to Cleveland's renaissance and the financing of the city's new sports facilities;

Whereas, the owners of the Cleveland Browns intend to sell discrete gate names to corporations for a period of no less than 10 years with the intention that patrons associate the gate name with its location and are directed to specific entrances around the new stadium;

Whereas, the design of the new stadium is unique insofar as the upper deck level is discontinuous between the sidelines, thus requiring that patrons utilize specific gates to access the appropriate ramps and elevators to reach their seats.

Whereas, the owners of the Cleveland Browns are committed to utilizing the gate names as part of its formal wayfinding system , and will feature the gate names in printed and broadcast materials including tickets, brochures and public information which shall assist the public in finding the appropriate gate entrance to reach their seats;

**Therefore, be it resolved that:**

1. The City Planning Commission accepts the proposal made by the Cleveland Browns to designate the new football stadium, the "Cleveland Browns Stadium" and, in foregoing its right to market the name of the new stadium to a private corporation, shall substitute in lieu thereof the marketing of naming rights to private corporations for four primary entrance gates.

2. The City Planning Commission determines that the proposed sponsored gate names for the four primary entrances and the two north suite entrances on the exterior of the stadium shall identify discrete building entrances in a large and unique public assembly facility.

3. The identification of discrete building entrances is an essential component of the building wayfinding system and shall be reinforced by the use of the discrete sponsored gate names on tickets, stadium directional signage, public information and other media communications for the purposes of directing patrons to their seats.

4. The proposed gate signage identifies specific building elements of a uniquely designed public assembly facility and does not constitute off-premises advertising signage within the meaning of the City's Codified ordinances.

17

SECRETARY

5.    These primary gate and suite entrance signs are hereby approved as presented with the understanding that the project sponsors for the stadium shall present the design details to the staff for review and approval.

ACTION #2:  Motion to Adopt Resolution No. CPC 0319-99.

BOWEN Y  BURKE 2  COYNE  Y LUMPKIN Y  PINKNEY 1  ROBINSON Y  SMALL Y

APPROVED  X   APPROVED SUBJECT TO STATED AMENDMENT ___
DISAPPROVED  __   DISAPPROVED UNLESS AMENDED ____ TABLED__

> MOTION #2:  The Design Review Committee recommends approval as presented of the proposed entry gate signs for the Cleveland Browns Stadium with the understanding that the City Planning Commission will rule on the appropriateness of the proposed naming or sponsorship approach to these locations. It is understood that the staff will review the designs of these signs as they are submitted.

ACTION #3:  Motion to Adopt Motion #2 of the Design Review Committee.

BOWEN Y  BURKE 2  COYNE  Y  LUMPKIN Y  PINKNEY 1  ROBINSON  Y  SMALL  Y

APPROVED  X   APPROVED SUBJECT TO STATED AMENDMENT ___
DISAPPROVED  __   DISAPPROVED UNLESS AMENDED ____ TABLED__

> Mr. Morrison said that two issues needed clarification for the record. The first, he said, had to do with the scoreboards that had been approved in principle. He said that any modifications to it were going to be reviewed by the staff. He said that, from certain vantage points, advertising on the scoreboard will be visible from the public right-of-way. He said that the staff has taken the position that this situation is an accident of the design. He said that he understood the Browns took the same view, but that it was their intent that the scoreboard panels are illuminated only for stadium events.

> Ms. Henrichsen said that Jacobs Field is lighted on non-game nights about thirty times a year.

18

SECRETARY

CENTRAL MARKET

COMMUNITY DEVELOPMENT PLAN

Cleveland City Planning Commission
Hunter Morrison, Director

Accepted: September 29, 1986
Amended: November 5, 1990
June 17, 1991
February 24, 1992
August 11, 1993

CENTRAL MARKET
COMMUNITY DEVELOPMENT PLAN

## Table of Contents

|  |  | Page |
|---|---|---|
| I. | CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN............. | 1 |
| | A. Boundaries...................................... | 1 |
| | B. Definitions..................................... | 2 |
| | C. Description of the Plan Area..................... | 2 |
| | D. Plan Area in Context............................ | 3 |
| | E. Objectives of the Plan.......................... | 4 |
| II. | ACTION AREA REDEVELOPMENT PLAN....................... | 4 |
| | A. Objectives of the Action Area................... | 4 |
| | B. Redevelopment Proposal.......................... | 5 |
| | C. Permitted Land Uses............................. | 5 |
| | D. Parcel Size..................................... | 6 |
| | E. Site and Building Requirements.................. | 6 |
| III. | ADDITIONAL POLICIES AND PROCEDURES APPLICABLE TO THE PLAN AREA.................................... | 11 |
| | A. Public Improvements............................. | 11 |
| | B. Redevelopment Plan Review....................... | 11 |
| | C. Duration of Land Use Controls................... | 11 |
| | D. Procedure for Amendment......................... | 11 |
| IV. | PROVISION TO PREVENT RECURRENCE OF BLIGHTED OR SUBSTANDARD AREA AND DISCRIMINATION.................. | 12 |
| V. | RELOCATION PLAN...................................... | 13 |
| | Exhibit I: Central Market Community Development Plan Area... | 14 |
| | Exhibit II: Central Market Area Permitted Land Uses........ | 15 |
| | Exhibit III: Central Market Area Public Rights-of-Way........ | 16 |

I. CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN

A. BOUNDARIES

1. THE CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA

After review of the blighted conditions found in the blight survey for the Central Market Survey Area, the City Planning Commission has, pursuant to local ordinances, designated a portion of the Blight Survey Area as a Community Development Plan Area in order to prescribe treatments that will eliminate the blight and prevent the recurrence of blight.

The boundary of the designated Community Development Plan Area, entitled the "CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA", is delineated in Exhibit I and generally includes the area bounded by Ontario Avenue on the west, Carnegie Avenue on the south, E. 9th Street (between Carnegie Avenue and Bolivar Road) and E. 7th Street (between Huron Road and Bolivar Road) on the east and Huron Road (between Ontario Avenue and E. 7th Street) and Bolivar Road (between E. 7th Street and E. 9th Street) on the north. Pursuant to provisions of the City Charter and Codified Ordinances the prescribed treatment to eliminate and prevent the recurrence of blight in a designated Community Development Plan Area may include clearance and redevelopment, rehabilitation or conservation, or any combination or part thereof.

2. ACTION AREAS

Specific "Action Areas", with defined boundaries, shall be established by the City when the City has determined that a suitable and satisfactory redevelopment, or rehabilitation proposal is presented that offers a satisfactory contractual commitment from a Redeveloper. All such "Action Areas" will have boundaries based upon sound planning principles for the elimination of blight and prevention of its recurrence. Rehabilitation and/or redevelopment in a specific Action Area must relate appropriately to adjacent and surrounding land uses, eliminate blighting influences in the surrounding areas, spur the elimination of blight, and prevent the recurrence of blight.

The City shall acquire property for redevelopment in an Action Area when there is a satisfactory commitment from a Redeveloper to acquire such property from the City and to redevelop it in accordance with the Community Development Plan and when the City is satisfied that the proposed commitment provides the best means of eliminating blight and preventing the recurrence of blight. Alternatively, the City shall acquire property for rehabilitation in an Action Area when there is a satisfactory commitment from a Redeveloper to acquire such property and when the City is satisfied that the proposed commitment provides the best means of eliminating blight and preventing the recurrence of blight.

One specific geographic area, with defined boundaries comprising the entire CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA, has been established as the "Action Area" appropriate for the Plan Area by the City. This "Action Area" is comprised of a majority of structures which are substandard by reason of age, obsolescence, dilapidation, overcrowding, faulty arrangement, mixtures of incompatible land uses, a lack of ventilation or sanitary facilities or any combination of these factors, and therefore, has been identified, based upon sound planning principles, as the treatment area where blight is to be eliminated. The boundary of the Action Area (hereinafter referred to as the "Action Area") is shown on Exhibit I and is equal to and the same

1

as the boundary above described for the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA.

### B.   DEFINITIONS

As used in this document, the terms listed below shall be interpreted according to the following definitions:

1.   Blight Survey Area:  An area designated by the City Planning Commission in which buildings and lots are surveyed to determine conditions of blight.

2.   Community Development Plan:  A plan adopted by the City Planning Commission and the City Council which, pursuant to provisions of the City Charter and Codified Ordinances, prescribe treatment to eliminate blight and prevent the recurrence of blight in a designated portion of a Blight Survey Area.

3.   Action Area: A designated area of a Blight Survey Area for which the City has determined that a satisfactory contractual commitment from a Redeveloper has been presented for the area's suitable redevelopment or rehabilitation based upon sound planning principles for the elimination of blight and the prevention of its recurrence.

4.   Urban Design Guidelines:  Recommendations adopted by the City Planning Commission in accordance with the Community Development Plan to provide specific guidance to a Redeveloper for the redevelopment of an Action Area relative to the physical design of improvements to property, structures, or public infrastructure to eliminate blight and prevent its recurrence.

5.   Redevelopment Plan:  A plan presented by a Redeveloper identifying specific improvements to property, structures, or public infrastructure in an Action Area consistent with the goals and objectives of a Community Development Plan and Urban Design Guidelines to eliminate blight and prevent its recurrence.  This Redevelopment Plan may include the following components:

Site Plan.

Building Plan, including floor plans, elevations, and sections.

Signage Plan.

Landscape Plan.

Streetscape Plan.

Lighting Plan.

### C.   DESCRIPTION OF THE PLAN AREA

The CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA encompasses approximately twenty-eight (28) acres of land area the majority of which is underutilized as surface parking lots.  Public street rights-of-way  include parts of E. 4th, E. 6th and E. 7th Streets and Bolivar Avenue, Woodland Road, and Eagle Avenue in the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA.  None of these streets have significant vehicular traffic volumes, nor are they critical links in the downtown street network.

2

There was a total of forty-four (44) commercial/ industrial buildings in the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA. Forty-two (42) of those buildings were found to be in substandard condition. The majority of buildings in the Plan Area were built around the turn of the century and are multi-story loft type structures. Most of these structures have been demolished.

The uses which occupied the buildings that existed in the Plan Area included the produce vendors at the Central Market, wholesale outlets, offices, adult entertainment establishments, warehousing and storage operations.

D.   PLAN AREA IN CONTEXT

The CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA is a major entry point to downtown Cleveland. The Plan Area is a highly visible location particularly from the Innerbelt and the Hope Memorial (Lorain-Carnegie) bridges. The redevelopment of the Plan Area must relate to the following activity and development centers in downtown Cleveland:

Euclid/Prospect Retail District

Euclid Avenue, the primary retail street, provides main entrances to the Higbee Company and May Company department stores as well as many other retail outlets. Prospect Avenue offers a "people street" of bargain stores as well as secondary entrances to the department stores. The streets are connected via the Euclid and Colonial shopping arcades and the two department stores.

Tower City

Located to the northwest of the Plan Area, this building complex is undergoing an ambitious revitalization and expansion program to be realized over a number of years. Tower City's concourse has been renovated and additional parking has been provided. Also, the City, State, and Federal governments have made major financial commitments to repair the structural bridges supporting Tower City and the State Office building.

Playhouse Square

Located along Euclid Avenue northeast of the Plan Area, between East 13th and East 18th Streets, this area serves as downtown's theater and entertainment district. It acts as the second of two major downtown activity hubs that generate considerable traffic on Euclid Avenue.

Public Square

Located two blocks northeast of the Plan Area, Public Square is a busy transportation node and pedestrian area, and has recently undergone major renovation. Its four quadrants offer a relaxing environment for pedestrians featuring plazas, walkways, trees, bus stops, fountains, statues, and other public amenities.

E. 9th Street Corridor

Downtown's primary business street runs along East 9th, from Lakeside Avenue on the north, to Prospect Avenue on the south. This corridor formed part of the Erieview I Urban Renewal Plan Area. Specific concepts of the plan were essentially completed with

3

construction of the Ohio Bell Building, the One Cleveland Center, and Eaton Center.

E.   OBJECTIVES OF THE PLAN

Pursuant to local ordinances, the City Planning Commission has reviewed the CENTRAL MARKET BLIGHT SURVEY which encompasses the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA, to determine the existing nature and extent of urban blight in that part of downtown. This Survey is one of several similar surveys, such as the Euclid-Prospect, Playhouse Square, Erieview I, and Erieview II surveys, which have been conducted by the City Planning Commission as part of the City's continuing planning process for downtown Cleveland.   In accordance with such ordinances and City policy related to sound planning principles, the City intends to authorize treatment measures that will eliminate the blighted conditions found to exist in the Plan Area.   The two central criteria for renewal activities are the elimination of blight and the prevention of its recurrence, consistent with applicable local and state laws, public policy and sound planning principles.  The following aims shall guide the redevelopment activities in the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA:

1.   To make provision for the acquisition and demolition of those buildings or structures in the Action Area which have been identified as being of substandard condition in the CENTRAL MARKET BLIGHT SURVEY, and which are obstructive to undertaking a sound redevelopment plan, to enable the elimination of blight and the prevention of the recurrence of blight in the Plan Area.

2.   To eliminate incompatible land uses and prevent the future inclusion of any incompatible land use activities that will hamper the efficient economic functioning of the redevelopment for the Plan Area and/or cause the recurrence of blight.

3.   To redevelop the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA and to require that all future development in the Plan Area be consistent with and adhere to the restrictions described in this plan.

II.   ACTION AREA REDEVELOPMENT PLAN

A.   OBJECTIVES OF THE ACTION AREA

The action area shall be developed in accordance with the City's policy of acquisition by the City for redevelopment only where:

1.   The City determines that redevelopment offers the best means for elimination of blight and prevention of its recurrence;

2.   There exists a suitable commitment from a Redeveloper to redevelop the property to eliminate blight and prevent the recurrence of blight.

A number of planning considerations and objectives are relevant to the kind of development which will best prevent the recurrence of blight within the Action Area:

1.   Create activity centers around the downtown office and retail core.  The Central Market area has been designated in the Downtown Plan as the most appropriate location for a new sports complex in Cleveland.  Its close proximity to the interstate highway network and public transportation provides convenient access for residents of the city and region.

4

2.    Enhance the visual quality of downtown.  Ontario and East 9th Streets which bound the Central Market area are major traffic corridors for Cleveland's central business district.  Thoughtful design and placement of the sports facilities in a park like setting can create grand urban entrances for downtown Cleveland.

3.    Support surrounding economic development.  The sports facilities should be designed to relate to adjacent districts and should enhance pedestrian activity to support their economic viability and generate new development.

4.    Enhance Cleveland's architectural heritage.  New development should be designed to respect the historic architectural context surrounding the Central Market area in terms of physical massing, construction materials, and the design treatment of facades and public open spaces.

5.    Strategically locate new parking facilities.  New parking should be built to address the daily demand of downtown office workers and visitors as well as provide parking for events at the sports facilities.

6.    Extend downtown Cleveland's public open space and park system.  The development of public open space is essential to address the needs of the large number of people attending events at the proposed sports facility.  It also affords the opportunity to extend the network of public open space in Cleveland's central business district, which currently stretches from North Coast Harbor through the Mall to Public Square, southward to the Innerbelt.  The design of public open spaces around the sports facility should provide an appropriate setting for the stadium and the arena, and should be sufficiently flexible to accommodate public gatherings during times when events are not scheduled in the sports facilities.

B.    REDEVELOPMENT PROPOSAL

The City has been presented with a satisfactory contractual commitment from a Redeveloper to redevelop the Action Area with a sports facility that is intended to house major league professional athletic teams and lighting, landscaping, and pedestrian walkway amenities.

C.    PERMITTED LAND USES

In the Action Area the primary use shall be an integrated multi-use sports facility, consisting of an open air stadium and enclosed arena, open to the public, together with related uses which support the sports facility.  Additional permitted uses ancillary to said sports facility may include pedestrian concourse areas, public spaces, concession areas, meeting areas, offices, retail, restaurants, cafes and other uses of the same general character, interior and exterior pedestrian walkways, and off-street parking.  The stadium shall be located in a subarea of the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA as shown in Exhibit II and, in general, bounded by Ontario Street, a relocated Eagle Avenue, East 9th Street, and Carnegie Avenue.  The arena shall be located in a subarea of the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA as shown in Exhibit II and, in general, bounded by Ontario Street, Huron Road, an extension of East 6th Street to be constructed, and a relocated Eagle Avenue.

Mixed use development may occur within a subarea of the CENTRAL MARKET AREA as shown in Exhibit II and, in general bounded by an extension of East 6th Street to be constructed, Huron Road, East 7th

5

Street, Bolivar Road, East 9th Street, and a relocated Eagle Avenue. Permitted land uses within this subarea may include the following primary uses:

    1.   General office space;

    2.   Retail shopping space;

    3.   Hotel and residential development; and

    4.   Public open space.

Off-street parking ancillary to said primary uses may be constructed in structured garages.

In the event that the Redeveloper determines that it is unable to redevelop the property with a multi-use sports facility, or either component thereof, mixed use development may also occur within those subareas of the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA that are not otherwise developed.

    D.   PARCEL SIZE

When contiguous developable land assembly has been accomplished under common ownership, any development of such assembled land must occur on such consolidated parcel pursuant to a site development plan for the redevelopment of the entire consolidated parcel, which site development plan shall be submitted for approval to the City Planning Commission. The subdivision of any such consolidated parcel shall require prior City Planning Commission approval. As to any parcel which is not included in any such contiguous developable land assembly, the Redeveloper shall submit to the City Planning Commission for its approval a separate site development plan. If parking is approved by the City, such parking must be approved for compliance with the standards of Section 349.07 of the Codified Ordinances of Cleveland, Ohio, 1976, regarding paving, drainage, bumper guards, landscaping, and screening.

    E.   SITE AND BUILDING REQUIREMENTS

    1.   Maximum Building Height

Any building or structure hereafter erected shall not exceed two hundred fifty (250) feet in height and shall be built to heights in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

    2.   On-Site Vehicular/Pedestrian Separation

The design of any sports facilities on the site shall minimize pedestrian and vehicular traffic conflicts and shall be in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

    3.   Off-Site Vehicular/Pedestrian Separation

The Redeveloper may construct one or more pedestrian walkways connecting the sports facility to development occurring in the Tower City and Euclid/Prospect Districts. Prior to constructing any pedestrian walkway, the Redeveloper shall demonstrate to the satisfaction of the City Planning Commission that the proposed pedestrian walkways are of sufficient size and capacity to accommodate

6

pedestrian traffic generated by the sports facility when it is used to its maximum design capacity and provide convenient access to off-site parking garages and public transit facilities. The City Planning Commission shall approve the location, size, and design of all pedestrian walkways constructed in conjunction with the development of the sports facility which shall be in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

### 4. Parking and Circulation Requirements

The proposed sports facility shall require the vacation of portions of East 4th Street, Bolivar Road, Eagle Avenue, and Woodland Avenue through the site, and portions of traffic lanes on Ontario Street and Carnegie Avenue along the perimeter of the site. In order to accommodate vehicular access in this area of downtown Cleveland, Eagle Avenue shall be relocated northward and an extension of East 6th Street shall be constructed between Huron Road and the relocated Eagle Avenue as shown in Exhibit III. These roadways shall function as public rights-of-way even though they may be closed to vehicular traffic during events at the stadium or the arena to accommodate safe, unobstructed movement of people through the site.

The proposed sports facility shall be designed to avoid or minimize the need to undertake additional major off-site capital infrastructure changes.

Automobile and bus parking and circulation areas for the sports facility shall minimize pedestrian and vehicular conflicts and shall be in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

The redevelopment shall be planned to accommodate and facilitate measures to encourage the use of public rail and bus transit for the sports facility events. Pedestrian walkways shall be designed so as to tie into the existing and proposed downtown pedestrian network and provide safe and convenient pedestrian access to and from the sports facility.

A maximum of 2,350 new off-street parking spaces may be provided as part of the redevelopment of which no more than 2,250 spaces may be located in a parking garage and no more than 100 surface parking spaces may be provided. These spaces shall be designed and constructed so as to be available for new and existing development in the Euclid/Prospect District to the extent not inconsistent with the sports facility use. The location and configuration of all off-street parking and vehicular circulation areas shall be in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan and shall be subject to review and approval by the Downtown Off-Street Parking Committee and the City Planning Commission in accordance with Section 349.11 of the Zoning Code.

Unused portions of the Action Area may be used for temporary, interim surface parking until June 30, 1992. Thereafter, such use shall be subject to prior approval by the Downtown Off-Street Parking Committee and the City Planning Commission.

### 5. Setbacks

Any new improvements, including all buildings, parking areas, walls, fences, or other structures, shall be setback in

7

conformance with all urban design guidelines adopted by the City
Planning Commission in accordance with Section III.B. of this Plan.

### 6. Parking Entrances and Exits

Entrances and exits to ancillary off-street parking not
constituting a part of the sports facility structure may be located only
on the East 6th Street extension, East 9th Street, Ontario Street,
Carnegie Avenue, Bolivar Road, Huron Road, and East 7th Street to the
extent such streets have not been vacated and the relocated Eagle Avenue
and shall be in conformance with all urban design guidelines adopted by
the City Planning Commission in accordance with Section III.B.

### 7. Public Open Space

Public open space shall be of sufficient size to allow
for safe movement of people through the site and to the sports facility.
The design of this public open space shall be sufficiently flexible to
accommodate public gatherings during times when events are not scheduled
in the sports facilities and shall be in conformance with all urban
design guidelines adopted by the City Planning Commission in accordance
with Section III.B.

After June 30, 1992, unused portions of the Action Area
shall be designed as interim public open space until such time as other
permitted uses may be developed in accordance with Section II.C. of this
Plan.

### 8. Signage

A complete signage plan for the site shall be submitted
to and approved by the City Planning Commission. Signs which shall be
visible from public rights-of-way and public open spaces shall be
limited to signs identifying the sports facility district, the stadium,
the arena, and associated parking facilities. Such signs may identify
primary tenants and events occurring in the sports facility district, at
the stadium and at the arena, but shall not display advertising for
products, services, businesses, corporations, or other organizations.
Permitted sign types shall be limited to the following:

District Identification Signs: Signs identifying or
naming the sports facility district may be placed along Ontario Street,
Carnegie Avenue, and East 9th Street.

Event Identification Signs: Signs identifying the
events occurring at the sports facility may be placed along Ontario
Street, Carnegie Avenue, and East 9th Street.

Building Identification Signs: Signs identifying or
naming the stadium and arena may be placed on the buildings or on the
site in the vicinity of the buildings.

Tenant Identification Signs: Signs identifying the
major tenants of the stadium and arena may be placed on the buildings or
on the site in the vicinity of the buildings. Signs identifying other
tenants of space on the site may be placed on the building for those
tenants occupying a portion of the ground floor of the building,
containing an entrance from the building exterior, and separated from
other such spaces by a party wall or walls.

Parking Identification Signs: Signs identifying on-site
parking facilities may be placed on the buildings or on the site in the

8

vicinity of surface parking.

Directional Signs: Signs indicating a direction or a location to which pedestrian or vehicular traffic is requested to move shall be placed as appropriate.

Informational Signs: Signs which present miscellaneous information or instructions intended to serve the public, product or issue and not containing information included in the definition of any other sign shall be placed as appropriate.

Banner Signs: Signs which may be mounted on light poles in public rights-of-way and public open space shall be placed as appropriate presenting information included in the definitions of the signs identified above.

Scoreboard: A variable message scoreboard which may be visible from one or more public rights-of-way may be placed within the stadium and may be used for the display of advertising for products, services, businesses, corporations, or other organizations.

Electronic Changeable Copy Signs: Variable message signs which may be visible from one or more public rights-of-way or public open spaces may be placed on or adjacent to the arena, stadium, or parking garage. All net revenues generated from information displayed on such signs shall be used for the maintenance of public open spaces and streetscape associated with the sports facility complex. Information displayed on these signs shall be limited to the following:

a. Identification of the sports facility complex, the arena, or the stadium.

b. Identification of events held at the sports facility complex, the arena, or the stadium.

c. Identification of events held at other local public assembly facilities.

d. Acknowledgement of organizations or individuals sponsoring events held at the facility or contributing to the construction or operation of the facility as sponsors or patrons.

e. Identification of products or services offered for sale on the premises of the facility.

f. Public service messages such as time, temperature, and information of a civic nature. These public service messages shall be displayed at least twenty (20) percent of the time during which electronic changeable copy signs are operating between the hours of 7:00 A.M. and 12 Midnight.

The signage plan shall present the minimum amount of signage required to provide necessary information to the public and to reflect a degree of order and uniformity through the elements of scale, placement, type, format, and graphics. The signage plan shall identify the design and location of each sign including size, color, materials, and means of illumination which shall be in conformance with Sign Regulations, Chapter 350 of the Codified Ordinances and in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

9. Landscaping and Streetscape

9

Landscape and streetscape plans shall be submitted to the City Planning Commission for approval. A landscaping plan shall describe the design of permanent and interim public open spaces and include the location of areas to be planted or paved, the number and location of shrubs, earth mounds, planting, trees, and other vegetation to be used, the design, location, and materials to be use in paved areas, the location of public art, light poles, waste receptacles, benches or seating areas, fences, water fountains, or other street furniture.

A streetscape plan shall describe the design of public rights-of-way and include the location of and paving materials to be used for sidewalks and amenity strips, the location of handicapped ramps, the location and type of trees, light poles, sign poles, waste receptacles, or other street furniture to be placed in the public rights-of-way. Landscape and streetscape plans shall conform to all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

10. Lighting

A complete lighting plan for the site shall be submitted to and approved by the City Planning Commission. All lighting shall be included in the lighting presentation to the City Planning Commission, including types of light fixtures, color, and level of illumination for facades, major building entrances, parking garages, public rights-of-way, public open spaces, pedestrian pathways, and other areas requiring special illumination. All wiring shall be underground. The lighting plan shall conform to all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

11. Pedestrian Walkway Amenities

Pedestrian walkway amenities shall be provided to stress principal pedestrian pathways in order to minimize pedestrian and vehicular conflicts and to provide shelter from inclement weather. Pedestrian walkway amenities may be in the form of interior climate controlled passageways or exterior open walkways with canopies or arcades. They shall be located and built in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

12. Utility/Systems Installation

All utility and system installations visible from public open spaces or public street rights-of-way shall be screened by vegetation or fencing. All wiring shall be underground. All rooftop utilities shall also be screened with suitable parapet walls or roof forms.

13. Service Access

Entranceways for service vehicles may be located on Huron Road, Bolivar Road, and East 7th Street and shall be in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

10

III.  ADDITIONAL POLICIES AND PROCEDURES APPLICABLE TO THE PLAN AREA

A.  PUBLIC IMPROVEMENTS

Any public improvements installed or constructed in connection with the renewal and development in the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA, shall conform to City standards and specifications for such work and all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

B.  REDEVELOPMENT PLAN REVIEW

No improvements shall be made with respect to any property, structure, or public infrastructure in the Action Area until the applicable plans and specifications have been approved by the appropriate City agencies.  The City Planning Commission shall review and approve the Redevelopment Plan and specifications for improvements to property, structures, and public infrastructure proposed by the Redeveloper for the Action Area.  For the purpose of undertaking said Plan review, the City Planning Commission shall adopt and, from time to time, amend Urban Design Guidelines consistent with the goals and objectives of the Community Development Plan to provide specific guidance to the Redeveloper relative to the physical design of improvements proposed for the Action Area.

C.  DURATION OF LAND USE CONTROLS

The land use restrictions and site and building requirements herein set forth shall be applicable to all properties included in the Plan Area in connection with the renewal, redevelopment and reuse thereof, and shall remain in effect for a period of twenty (20) years from the date of original approval of this Plan by the Council of the City of Cleveland, unless otherwise amended by the said City Council. Said period shall automatically be extended for one additional ten year period unless the City Council determines legislatively that said renewal period shall not occur.

1.  Zoning Change

Under the present Zoning Code, the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA includes General Retail Business and Semi-Industry districts.  To carry out the proposed development, the General Retail Business portion of the Plan Area shall be rezoned to a Semi-Industry district.

D.  PROCEDURE FOR AMENDMENT

This Plan may be amended from time to time in compliance with all requirements of law and the applicable provisions of the Codified Ordinances of the City of Cleveland, provided that with respect to any land in the Plan Area with respect to which the land use restrictions and site and building requirements herein set forth have been imposed, the written consent of the then owner of such land affected by any such amendment shall be obtained.

11

IV. PROVISION TO PREVENT RECURRENCE OF BLIGHTED OR SUBSTANDARD AREAS AND DISCRIMINATION

Every contract for the sale, lease, use, rehabilitation or redevelopment of the property within the Plan Area shall contain such restrictions and conditions as are deemed necessary to prevent a recurrence of blighted or substandard areas, provided that no such restrictions shall be based upon race, creed or color; shall indicate what covenants, restrictions and conditions of such contracts shall be covenants running with the land; shall provide appropriate remedies for any breach of covenants or conditions; shall provide that each redevelopment contract for the sale, lease, use or redevelopment of the property within such area, and convenience of land pursuant thereto shall contain conditions and covenants which shall run with the land which shall provide that there shall be no discrimination against or segregation of any person or group of persons based upon race, color, religion, national origin or ancestry in the sale, lease, sublease, transfer, occupancy, tenure or enjoyment of such land in perpetuity; and that such redevelopment contracts and conveyances of land within the Plan Area shall contain a covenant that no grantee himself, or any person claiming under or through him, shall establish or permit any such practice or discrimination or segregation with reference to the selection, location, number or occupancy of tenants, lessees, sublessees or vendees in any or all of the land within such Plan Area.

12

## V.    RELOCATION PLAN

The Community Development Plan contemplates that acquisition and clearance projects in the Plan will involve commercial relocation activities.

Relocation provisions satisfactory to the Department of Community Development of the City will be provided, where applicable, in connection with each specified proposal for acquisition, clearance and redevelopment property in a designated Action Area, which involves acquisition by the City.  Review and supervision of such specific relocation provisions will be carried out by the Department of Community Development.  Such specific relocation provisions may be tailored to fit the specific facts relating to a particular redevelopment proposal, and may include the provision of technical assistance and information by the Department of Community Development and/or particular Redeveloper in the event a Redeveloper is of a size or otherwise has a staffing capability which would enable technical assistance to be provided.

In nonfederally assisted projects, relocation payments for commercial (non-residential) displacements will include the payment of the reasonable and satisfactorily documented actual costs of moving business furniture, equipment and inventory, if any, and in addition payment of the actual costs of utility hook-up work necessary in connection with moving such business into replacement facilities.  In connection with projects financed in whole or in part with federal funds, involving a loan or grant of federal monies to pay some part of the private costs of redevelopment project, the then applicable federal relocation requirements shall be applied.

13



# EXHIBIT 1
## CENTRAL MARKET
## COMMUNITY DEVELOPMENT PLAN AREA

Electronically Filed 01/14/2025 15:55 / / AOV 25-M 01189 / Confirmation Nbr. 3373104 / CLJSZ



EXHIBIT 2
CENTRAL MARKET AREA
PERMITTED LAND USE



HURON RD.

ONTARIO

E. 6TH EXTENSION

BOLIVAR RD.

RELOCATED EAGLE AVE.

CARNEGIE

EXHIBIT 3
CENTRAL MARKET AREA
PUBLIC RIGHT-OF-WAY

TO BE VACATEO
TO BE CONSTRUCTED

## Schedule 19

### Insurance

|  | Minimum Limits of Liability |
|---|---|
| Comprehensive General<br>Liability Insurance | **Personal Injury**<br>$3,000,000 for injury to one person<br><br>$5,000,000 for injury to more than one person<br><br>Deductibles not to exceed $250,000 |
| Business Interruption Insurance | Not less than annual rent |
| Vehicle Insurance | As determined by Lessee |

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio and known as being part of extended Original Two Acre Lot Numbers 9 through 17 (both inclusive), and together forming a parcel of land bounded and described as follows:

Beginning in the centerline of West 3rd Street (99 feet wide), at its point of intersection with the centerline of Erieside Avenue, N.W. (70 feet wide) as shown by the Dedication Plat of Erieside Avenue, N.E. and N.W. and West 3rd Street, recorded in Volume 204 of Maps, Page 69 of Cuyahoga County Records;

Thence South 33° 56' 46" East, along the centerline of West 3rd Street, 346.23 feet to a point;

Thence North 56° 03' 14" East, along a line drawn perpendicular to said centerline of West 3rd Street, 72.74 feet to its point of intersection with the Northeasterly curved line of said West 3rd Street, said point also being the Southwesterly corner of the Donald Gray Gardens and the principle place of beginning of the parcel of land herein intended to be described;

Thence Northeasterly, along the curved Southeasterly line of Erieside Avenue N.E., being the arc of a circle deflecting to the right, having a radius of 457.01 feet and a chord that bears North 34° 09' 36" West, 533.59 feet, an arc distance of 569.79 feet to a point of tangency therein;

Thence North 55° 50' 24" East, continuing along the Southerly line of Erieside Avenue N.E., 445.39 feet to a point of curvature therein;

Thence along the arc of a circle deflecting to the right, having a radius of 515.00 feet, a chord that bears South 57° 29' 05" East, 29.56 feet, an arc distance of 29.57 feet to a point of compound curvature;

Thence Southeasterly, along the Westerly line of Erieside Avenue (70 feet wide) as relocated, along an arc of a circle deflecting to the right, having a radius of 30.00 feet, a chord that bears South 87° 28' 59" East, 33.03 feet, an arc distance of 34.98 feet to a point of compound curvature;

Thence continuing Southeasterly along the Westerly line of Erieside Avenue, as relocated, along the arc of a circle deflecting to the right, having a radius of 190.00 feet, a chord that bears South 44° 06' 13" East, 65.69 feet, an arc distance of 66.03 feet to a point of tangency;

Thence South 34° 08' 55" East along the said line of relocated Erieside Avenue, 462.69 feet to a point of curvature therein;

Thence Southeasterly along said line of relocated Erieside Avenue and the arc of a circle deflecting to the left, having a radius of 335.00 feet and a chord that bears South 72° 20' 27" East, 414.26 feet, an arc distance of 446.61 feet to a point;

Thence South 20° 31' 59" East, 25.00 feet to a point on the Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W.;

Thence South 56° 01' 58" West, along said Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., 117.38 feet to an angle point therein;

Thence South 54° 27' 44" West, continuing along said Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., 64.87 feet to a point of curvature therein;

Thence Southwesterly, along the curved Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., being the arc of a circle deflecting to the left, having a radius of 980.00 feet and a chord that bears South 47° 12' 58" West, 247.22 feet, an arc distance of 247.88 feet to a point of reverse curvature therein;

Thence Southwesterly, continuing along the curved Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., being the arc of a circle deflecting to the right, having a radius of 1480.00 feet and a chord bearing South 49° 45' 29" West, 503.20 feet, an arc distance of 505.66 feet to a point of curvature therein;

Thence South 59° 32' 45" West, along said Northwesterly line of the West 3rd exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., 201.27 feet to the Southeasterly end of a curved turnout between said Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway, N.E. and N.W. and West 3rd Street;

Thence Northwesterly, along said turnout, being an arc of a circle deflecting to the right, having a radius of 100.00 feet, an arc distance of 150.99 feet to a point of tangency in said Northeasterly line of West 3rd Street;

Thence North 33° 56' 46" West, continuing along the Northwesterly line of West 3d Street, 421.07 feet to a point of curvature therein;

Thence Northeasterly, along the Northeasterly curved line of West 3 rd Street, being the arc of a circle deflecting to the right, having a radius of 457.01 feet and a chord that bears North 24° 46' 13" West, 145.75 feet an arc distance of 146.38 feet to the principle place of beginning according to a survey dated May, 1986 by the City of Cleveland, Department of Public Service, Division of Engineering and Construction, Plats and Surveys. This legal description was prepared by Jomarie Wasik, Ohio Professional Surveyor Number 7027. Bearings are to an assumed meridian and are used to denote angles only.