# EXHIBIT B

# FRANCHISE COMMITMENT AGREEMENT

between

## CITY OF CLEVELAND, OHIO

and the

## NATIONAL FOOTBALL LEAGUE

# TABLE OF CONTENTS

FRANCHISE COMMITMENT AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE I - DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARTICLE II - FRANCHISE COMMITMENT OF NFL . . . . . . . . . . . . . . . . . . . . . 4

    Section 2.1. Agreement to Provide Franchise . . . . . . . . . . . . . . . . . . . 4
    Section 2.2. Expansion Franchise . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 2.3. NFL Division . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 2.4. Expansion Franchise . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 2.5. Relocated Franchise . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 2.6. Specific Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 2.7. Determination of Commencement Date of the Cleveland
               NFL Franchise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 2.8. Conditions to NFL Obligation . . . . . . . . . . . . . . . . . . . . . 7
    Section 2.9. Notice of New Ownership . . . . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE III - TEAM NAME, COLORS, RECORDS AND HERITAGE . . . . . . . . . 7

    Section 3.1. Browns Heritage Property to be Held in Trust . . . . . . . . . . 7
    Section 3.2. Stadium Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 3.3. Specific Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE IV - CONSTRUCTION, FINANCING AND LEASE OF NEW STADIUM . . 8

    Section 4.1. Agreement to Construct . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 4.2. Stadium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 4.3. Design and Construction of Stadium . . . . . . . . . . . . . . . . 8
    Section 4.4. Sources of Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 4.5. NFL Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 4.6. Lease of Stadium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 4.7. 30-Year Commitment . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE V - SETTLEMENT OF LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . 9

    Section 5.1. Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 5.2. Releases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Section 5.3. NFL Guaranty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARTICLE VI - ADDITIONAL AGREEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Section 6.1.  NFL to Direct Negotiations with Owners . . . . . . . . . . . . . . . . . 10
    Section 6.2.  Super Bowl . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Section 6.3.  NFL Experience . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Section 6.4.  Municipal Football . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Section 6.5.  Construction Monitoring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE VII - REPRESENTATIONS AND AGREEMENTS . . . . . . . . . . . . . . . . 11

    Section 7.1.  Representations of the City . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Section 7.2.  Obligation of City to Deliver Documents . . . . . . . . . . . . . . . . . 12
    Section 7.3.  Representations and Warranties of NFL . . . . . . . . . . . . . . 12
    Section 7.4.  Obligation of NFL to Deliver Documents . . . . . . . . . . . . . . 14
    Section 7.5.  Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE VIII- REMEDIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    Section 8.1.  Specific Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    Section 8.2.  Other Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Section 8.3.  Governing Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Section 8.4.  Agreement to Pay Attorneys' Fees and Expenses . . . . . . . . 15
    Section 8.5.  No Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Section 8.6.  Notice of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

EXHIBIT A - Browns Holding Trust

EXHIBIT B - Stadium Financing Agreement

EXHIBIT C - Lease

EXHIBIT D - Cooperative Agreement

EXHIBIT E - Releases

EXHIBIT F - Termination of Lease

# FRANCHISE COMMITMENT AGREEMENT

This Franchise Commitment Agreement ("Agreement") is entered into as of April 26, 1996 by and between the City of Cleveland, Ohio ("the City"), a municipal corporation and political subdivision of the State of Ohio, and the National Football League ("the NFL" or the "League"), an unincorporated, nonprofit association organized under its Constitution and By-laws, with its principal office in New York, New York.

## Background

The Cleveland Browns football team has played professional football at Cleveland Stadium in Cleveland since 1946, pursuant to a franchise from the NFL owned by Cleveland Browns, Inc. ("CBI") and certain leases between the City and CBI and Cleveland Stadium Corp. ("CSC").

On October 27, 1995 CBI entered into an agreement with the Maryland Stadium Authority, an instrumentality of the State of Maryland ("MSA"), pursuant to which CBI would relocate the NFL franchise to Baltimore, Maryland.

On November 6, 1995, the City filed an action, Case No. 297833, in the Court of Common Pleas, Cuyahoga County, Ohio, seeking injunctive relief against CBI and CSC alleging breaches of the lease agreements between the City and those corporations that would occur upon relocation of the Cleveland Browns franchise to Baltimore.

On November 16, 1995, the City filed an action, Case No. 95CV2428, in the United States District Court for the Northern District of Ohio, Eastern Division, to obtain certain injunctive and declaratory relief for the benefit of the City and its people with respect to the names "The Cleveland Browns" and "The Browns", together with certain other names and marks.

Pursuant to Section 4.3 of the NFL Constitution, relocation of any NFL franchise outside of its home territory requires the prior approval by affirmative vote of three-fourths of the existing member clubs of the League, and on November 4, 1995, CBI requested that the NFL member clubs approve relocation of its franchise from Cleveland, Ohio to Baltimore, Maryland.

On January 4, 1996 and January 17, 1996 representatives of the City appeared before representatives of the NFL and its members and presented the City's case in opposition to the relocation of the Cleveland Browns, and on January 18, 1996, at the NFL's annual meeting, the member clubs postponed the vote on CBI's request for approval for relocation.

On January 18, 1995, MSA filed an action, Case No. L96-155, in the United States District Court, District of Maryland, Northern Maryland, seeking damages and injunctive relief against the League and all of its member clubs, except CBI, due to alleged violations of federal and Maryland state antitrust laws.

On February 8, 1996, the City, the League, CBI, CSC, Arthur B. Modell and MSA concluded certain agreements in principle (the "Interim Agreement") contemplating definitive agreements that would, among other things and under certain conditions: (i) require CBI to relinquish all right, title and interest in the Cleveland Browns team name, colors, history and heritage and transfer them in trust to the Commissioner of the NFL for the benefit of the City pending transfer to the new owner of the Cleveland NFL franchise, (ii) require the League to locate an NFL franchise in Cleveland upon completion by Cleveland of construction of a new stadium, (iii) require the League to provide certain funds to assist the City in paying costs of constructing a new stadium, (iv) require the League to enter into a lease with the City and to cause the new owner of the Cleveland franchise to accept the lease, (v) require CBI and CSC to pay damages to the City in settlement of the above-referenced litigation filed by the City and in consideration of early termination of their leases with the City.

The NFL and the City by this Agreement and the related documents and agreements incorporated herein by reference seek to reflect the definitive agreements contemplated by, and thereby supersede, the Interim Agreement.

## ARTICLE I

## DEFINITIONS

"Browns Agreements" means the Releases to which Modell is a party, the Franchise Exchange Agreement by and among National Football League, the Baltimore Ravens Football Company Inc. (formerly known as Cleveland Browns Football Company, Inc.), Baltimore Ravens, Inc. (formerly known as Cleveland Browns Inc.), and Cleveland Stadium Corp., the Termination of Lease, and the Browns Holding Trust.

"Browns Holding Trust" means the Trust Agreement dated as of April 26, 1996 between the Baltimore Ravens, Inc. (formerly known as the Cleveland Browns, Inc.), as Settlor, and Paul J. Tagliabue, as Trustee, the form of which is attached to this Agreement as Exhibit A.

"Browns Heritage Property" means the Browns Heritage, as defined in the Browns Holding Trust.

"Cleveland NFL Franchise" means the franchise with its home territory in Cleveland, Ohio to be provided by the NFL pursuant to this Agreement.

"Cooperative Agreement" means the Cooperative Agreement among the County of Cuyahoga, City of Cleveland, the Cleveland-Cuyahoga County Port Authority and the NFL, the form of which is attached to this Agreement as Exhibit D.

"Financing Arrangements" means the issuance and sale by the City of Cleveland of its "obligations" as defined in Section 307.673 of the Ohio Revised Code and its receipt of the other funds necessary to pay the costs of the Stadium as described in the Stadium Financing Agreement.

"Implementing Agreements" means (a), with respect to the City, the Stadium Financing Agreement, the Lease, the Releases to which the City is a party and the Termination of Lease, and (b) with respect to the NFL, the Stadium Financing Agreement, the Lease, the Browns Holding Trust, and the Releases to which it is a party.

"Lease" means the Lease By Way of Concession dated as of April 26, 1996, between the City of Cleveland and the NFL and to be assigned by the NFL to the New Owner, the form of which is attached to this Agreement as Exhibit C.

"Modell" means Cleveland Stadium Corp., the Baltimore Ravens, Inc. (formerly known as The Cleveland Browns, Inc., aka, Cleveland Browns, Inc. and The Cleveland Browns), the Baltimore Ravens Football Company, Inc. (formerly known as the Cleveland Browns Football Company, Inc.), Arthur B. Modell, Pauline Wells, Alfred E. Lerner, Broshaw & Co. and BSC, LLC.

"New Owner" means the persons who become the owners of the Cleveland NFL Franchise.

"Notice Address" means

(a)     as to the City:            Office of the Mayor
                                   City of Cleveland
                                   601 Lakeside Avenue
                                   Cleveland, Ohio 44114

                                   With copies to the following
                                   City officials at the same address:

                                        Cleveland City Council President
                                        Director of Law of the City
                                        Director of Finance of the City

(b)     as to the NFL:            National Football League
                                   410 Park Avenue
                                   New York, New York 10022
                                   Attention: Commissioner

                                   With copies to:

                                   Covington & Burling
                                   1201 Pennsylvania Avenue, N.W.
                                   Washington, D.C. 20004-7566
                                   Attention: Gregg H. Levy, Esq.

(c)    as to Modell:                Arthur B. Modell
                                    250 West Pratt Street
                                    Suite 1800
                                    Baltimore, Maryland  21201

"Premium Seating Condition" shall have the meaning set forth in the Stadium Financing Agreement.

"Releases" means the General Waivers and Releases of Claims and Covenants Not to Sue by the Releasing Parties attached to this Agreement as Exhibit E.

"Releasing Parties" means the persons and entities executing the Releases.

"Stadium" means the new football stadium to be constructed in the City, as more particularly described in Article IV, together with related site improvements.

"Stadium Financing Agreement" means the Stadium Financing Agreement dated as of April 26, 1996 between the City of Cleveland and NFL Enterprises, L.P.

"Team Commitment Condition" shall mean satisfaction of the numerical targets of the Premium Seating Conditions (as defined in the Stadium Financing Agreement) on or before November 15, 1997.

"Termination of Lease" means the Termination of Lease dated as of April 26, 1996 between the City of Cleveland, as lessor, and Cleveland Stadium Corp. and the Baltimore Ravens, Inc. (formerly known as the Cleveland Browns, Inc.), as sublessor and sublessee, and the Baltimore Ravens Football Company, Inc. (formerly known as Cleveland Browns Football Company, Inc.) and BSC, LLC, a form of which is attached to this Agreement as Exhibit F.

"Trust Property" means the Trust Property as defined in the Browns Holding Trust.

## ARTICLE II

## FRANCHISE COMMITMENT OF NFL

**Section 2.1.  Agreement to Provide Franchise.**  Subject to the terms and conditions of this Agreement, the NFL shall approve an NFL franchise with a home territory of Cleveland, Ohio to play home games in Cleveland, Ohio (the "Cleveland NFL Franchise") commencing no later than commencement of the first season of NFL play occurring after the Stadium has been completed.  If the Cleveland NFL Franchise is an expansion franchise, Cleveland will be deemed a qualified NFL territory with no application process being necessary to establish the Cleveland NFL Franchise.  In the event that the NFL expands its League before 1999, the Cleveland NFL Franchise will be  part of that expansion; provided, that at the time of such expansion the NFL has determined in its sole discretion that the Stadium will be completed in time to commence

play during the 1999 football season; and provided, further, that the Cleveland NFL Franchise will not commence play until that season. The parties currently contemplate that the Stadium will be an open air facility (as described in Section 4.2 of this Agreement) that will be completed in time for team play in the League's 1999 season.

Section 2.2. **Expansion Franchise.** The NFL will notify Cleveland on or before November 15, 1997, if practicable, but in all events prior to November 15, 1998, if it determines that the Cleveland NFL Franchise will be an expansion franchise. If the Cleveland NFL Franchise is an expansion franchise, the NFL will undertake reasonable efforts to provide an opportunity to qualified ownership groups whose majority holders are residents of Northeastern Ohio to make application to the NFL to acquire the Cleveland NFL Franchise. Consideration will also be given to selecting an ownership group in Cleveland that includes females and minorities.

Section 2.3. **NFL Division.** The Cleveland NFL Franchise will be in a division of the NFL which includes the Pittsburgh Steelers and the Cincinnati Bengals. If necessary, the NFL will realign the divisions to accomplish that.

Section 2.4. **Expansion Franchise.** If the Cleveland NFL Franchise is an expansion franchise that is awarded in connection with a broader expansion of the League, the criteria governing player selection and revenue sharing shall be applied equally among all franchises admitted to the League as part of such expansion.

Section 2.5. **Relocated Franchise.** If the Cleveland NFL Franchise is to be a relocated team, (a) the NFL will notify the City of the identity of the relocated team not later than March 15 of the year in which the relocated team is to play its first season in Cleveland. If an existing team is to be relocated to Cleveland, the NFL must determine in its sole discretion that the relocation is justified based on application of the NFL relocation criteria. The City is opposed to relocation of a team that is supported by its home city through fan loyalty and competitive economic support. Moreover, in no event will the City accept, nor will the NFL permit, the relocation of an existing team in breach of that team's extant lease obligations without the consent of the host city.

Section 2.6. **Specific Performance.** The City is entitled to specific performance of the obligations of the NFL to deliver the Cleveland NFL Franchise to Cleveland as provided in 2.1 of this Article II. The specific performance rights and remedies of the City are more fully described in Article VIII of this Agreement.

Section 2.7. **Determination of Commencement Date of the Cleveland NFL Franchise.**

(a) If the Team Commitment Condition shall have been satisfied, then the NFL shall place an NFL franchise in Cleveland to commence play in either the 1999 or the 2000 NFL season, as determined in section (b) below. If the Team Commitment Condition shall not have been satisfied, the NFL shall have no obligation to place an NFL franchise in Cleveland and this Agreement shall without further action by any party be null, void, and of no force and effect, except as to the obligations of the NFL under

Section 3.3 and Section 5.1, which obligations shall survive termination of this Agreement.

(b) <u>1999 Commencement Date.</u> The Cleveland NFL Franchise will commence play in the 1999 NFL season if the condition specified in (a) is satisfied, and either:

(i)     On June 1, 1998, the respective construction management consultants of the City and the NFL shall have mutually confirmed that the critical path of Stadium construction should result in Stadium completion no later than July 31, 1999 (or if the NFL or, if designated, the Cleveland NFL Franchise, and the City shall have agreed to schedule all of the Franchise's pre-season games on the road, September 1, 1999); <u>or</u>

(ii)    If the June 1, 1998 condition is not satisfied, the parties' respective construction management consultants and a third construction management consultant chosen by the parties' respective consultants shall have mutually confirmed no later than October 1, 1998 that the critical path of Stadium construction should result in Stadium completion by July 31, 1999 (or if the NFL or, if designated, the Cleveland NFL Franchise, and the City shall have agreed to schedule all of the Franchise's pre-season games on the road, September 1, 1999); <u>or</u>

(iii)   If the Team Commitment Condition is satisfied but neither the condition specified in (i) nor the condition specified in (ii) is satisfied, then the NFL shall place an NFL franchise in Cleveland to commence play in the 2000 season or, upon the mutual agreement of the parties, thereafter.

(c) If the determination made pursuant to section (b) is that the Stadium is likely to be completed by July 31, 1999 (or September 1, 1999) and the Stadium is not Completed (as defined in the Stadium Financing Agreement) on or before such date, then:

(i)     The City shall cause its general contractors to pay the NFL liquidated damages for each day after the applicable Stadium completion date (which liquidated damages shall not be considered a penalty) in the following amounts:

| | | |
|---|---|---|
| August 1, 1999 | - | $ 8,000 a day (If the applicable completion date is July 31, 1999) |
| September 1999 | - | $10,000 a day |
| October 1999 | - | $20,000 a day |
| November 1-20, 1999 | - | $40,000 a day; and |

(ii)     The City shall cause an alternate site to be available for play of NFL games in the 1999 season at a cost to the new franchise no greater than the per-game cost of the Stadium under the Lease; provided that such alternate playing site shall be subject to NFL approval (Ohio Stadium in Columbus is pre-approved by the NFL for the purposes of this section); and

(iii)    The City shall exert reasonable efforts to assist the new franchise in marketing ticket sales at the alternate playing site.

Section 2.8.  **Conditions to NFL Obligation.**  The NFL's obligations under this Article II are subject to (i)  the City having entered into, and not being in material breach of, any of its obligations under its  Implementing Agreements, and (ii)  the City's having completed the Financing Arrangements,  and  (iii)  the Team Commitment Condition having been satisfied.

Section 2.9.  **Notice of New Ownership.**  Notwithstanding anything aforesaid to the contrary, the NFL shall disclose the identities of the proposed New Owner of the Cleveland franchise to the City, in writing, promptly after the determinative vote by the NFL owners.  If the City objects to the proposed New Owner, the City shall have the right to file a written objection with the Commissioner stating the reasons for the objection; provided that any such objection shall not have a binding effect on the NFL.


**ARTICLE III**

**TEAM NAME, COLORS, RECORDS AND HERITAGE**

Section 3.1.  **Browns Heritage Property to be Held in Trust.**  The NFL will cause Modell and the Trustee to enter into the Browns Holding Trust in accordance with the terms of which the Trustee shall assign certain Trust Property, including the Browns Heritage Property, to the New Owner.  The Browns Holding Trust is attached to this Agreement as Exhibit A.

Section 3.2.  **Stadium Records.**  The NFL will obtain from Modell any and all records held by Modell relating to the operations and activities conducted at Cleveland Stadium.  The NFL will provide to the City any and all information relating to the land on which the existing Cleveland Stadium is sited and the condition of the foundation, structures and fixtures constituting Cleveland Stadium.

Section 3.3.  **Specific Performance.**  In accordance with the terms of the Browns Heritage Trust, the City is entitled to specific performance of the obligations of the Trustee to obtain from Modell the Browns Heritage Property and to deliver the Browns Heritage Property to the New Owner of the Cleveland NFL Franchise or to the Pro Football Hall of Fame.

## ARTICLE IV

## CONSTRUCTION, FINANCING AND LEASE OF NEW STADIUM

Section 4.1. Agreement to Construct. In consideration of the performance by the NFL of its obligations under this Agreement, the Stadium Financing Agreement, the Browns Holding Trust, the Lease and the Cooperative Agreement , the City will acquire and construct a new Stadium in the City in accordance with the terms of the Stadium Financing Agreement, subject to the consummation of the Financing Arrangements to pay the costs thereof, to be owned by the people of the City.

Section 4.2. Stadium. The design of the new Stadium as provided for in the Stadium Financing Agreement will include (i) a masonry facade acceptable to the City and the NFL, (ii) a bleacher area of approximately 10,000 seats that substantially replicates the area in Cleveland Stadium known as the "Dawg Pound", (iii) approximately 72,000 seats, of which approximately 8,000 will be club seats and 94 will be in suites that in the aggregate accommodate approximately 1,084 persons (with suites varying in size to hold from 10 persons to 20 persons in a single suite), and will substantially meet the program requirements for construction set forth as generic stadium guidelines by Hellmuth, Obata & Kassabaum, Inc., Sports Facilities Group in its "NFL Stadium Facility Program" dated December 15, 1994. If an open air facility, the Stadium will have a natural grass playing field. At its option, the City may elect to construct a domed Stadium or a domed multiple function Stadium in lieu of an open air Stadium. The City will notify the NFL of that election on or before March 26, 1996.

Section 4.3. Design and Construction of Stadium. The City will carry out the design and construction of the Stadium consistent with the terms of the Stadium Financing Agreement attached as Exhibit B.

Section 4.4. Sources of Funds. Costs of constructing the Stadium will be paid from public and private funds as described in the Stadium Financing Agreement. The City has agreed to provide certain public funds to construct and finance the Stadium and lease it to the NFL/New Owner. Such financing consists of a trustee issuing and selling Certificates of Participation, in rental payments to be made by the City under the lease of the Stadium, as authorized in Ordinance No. 305-96, passed by the Council of the City on March 8, 1996, an interim borrowing as authorized by Ordinance No. 306-96, passed by the Council of the City on March 8, 1996, to pay costs of the Stadium pending issuance of the Certificates of Participation, the City borrowing $10 million from the Cleveland Development Partnership I, the City allocating utilities funds to this project and advances made in anticipation of those transactions (collectively, the "City Financial Obligation"). It is expressly understood and agreed that (i) the City's obligation to provide financing for the Stadium is limited to its obligations to create and service the City Financial Obligation and (ii) the City shall not be deemed or obligated to incur any cost or expense with respect to the construction, maintenance or operation of the Stadium except as expressly provided in this Agreement, the Stadium Financing Agreement and the Lease. In addition, the City and the NFL expressly agree and

understand that the City shall not be called upon to pay any portion or advance any funds toward, without limitation, relocation expenses, funds advanced by the NFL (except upon abandonment of the project as provided in the Stadium Financing Agreement), training facilities, the purchase or subsidy of loges, tickets, seat licenses or any other expense not specifically agreed to therein.

Section 4.5. **NFL Assessments.** Notwithstanding the funding arrangements described in the Stadium Financing Agreement, if for any reason the contributions to be made by NFL Enterprises, L.P. for Stadium construction are not made by NFL Enterprises, L.P. in immediately available funds on or before the dates provided in the Stadium Financing Agreement, the NFL shall make such contributions by means of a League assessment to the full extent necessary to satisfy the obligations of NFL Enterprises, L.P. under the Stadium Financing Agreement.

Section 4.6. **Lease of Stadium.** Simultaneously with the execution and delivery of this Agreement, the NFL and the City will enter into the form of lease and management agreement ("Lease") attached to this Agreement as Exhibit C. In accordance with Section 3 of the Lease, the NFL will assign the Lease to the New Owner of the Cleveland NFL Franchise, and cause the New Owner to sign and deliver such written instruments as are necessary and appropriate to evidence (a) the assumption by the New Owner of all of the terms of the Lease and all of the obligations and liabilities of lessee under the Lease, and (b) the agreement by the New Owner to perform each and all of the obligations and liabilities of lessee under the Lease.

In the event the City determines to construct a domed Stadium or a domed multiple purpose Stadium facility, the NFL and the City shall negotiate in good faith appropriate modifications to the Lease that reflect the different available uses, revenue potential and expenses of a domed facility.

Section 4.7. **30-Year Commitment.** Whether the Stadium is open-air or domed, the NFL will sign and deliver a lease and will cause the New Owner of the Cleveland NFL franchise to accept assignment of such lease which shall contain covenants equivalent to Sections 9(a), 9(b) and 22(e) of the Lease.

## ARTICLE V

## SETTLEMENT OF LITIGATION

Section 5.1. **Damages.** The NFL will cause Modell to enter into the Termination of Lease which provides for Modell (i) to pay in a timely manner, damages to the City in the amount of $9.3 million in four equal annual installments of $2,325,000 on December 30 in each of the years 1996, 1997, 1998 and 1999 by wire transfer to the following account: City of Cleveland active account at Society Bank (KeyCorp), Cleveland, Ohio, ABA #041001039, Account #8000068 (or such other account that the City may designate in written notice to the NFL and to Modell at their respective Notice Addresses), (ii) to pay to the City by wire transfer to the following account: City of

Cleveland active account at Society Bank (KeyCorp), Cleveland, Ohio, ABA #041001039, Account #8000068 (or such other account the City may designate in written notice to the NFL and to Modell at their respective Notice Addresses), within 30 days following receipt by the NFL of documentation providing evidence reasonably satisfactory to the NFL of the actual City administrative costs and expenses (in an amount not to exceed $500,000) and the actual legal and other professional fees and expenses (in an amount not to exceed $1,750,000), respectively incurred in connection with the effort to retain the Cleveland Browns in Cleveland.

Section 5.2. **Releases.** On the date of signing of this Agreement the NFL will cause the Releasing Parties to execute the Releases in the forms attached as Exhibit E.

Section 5.3. **NFL Guaranty.** If for any reason the payments to be made by Modell to the City pursuant to paragraphs (b) and (c) of Section 4 of the Termination of Lease (as described in clause (ii) of Section 5.1 hereof) are not timely made, the NFL shall pay to the City upon demand such amount owed to the City. If necessary, the NFL shall make such payment to the City by means of a League assessment to the full extent necessary to enable the NFL to pay such amount owed to the City. In addition, in the event that the payments to be made by Modell to the City pursuant to paragraph (a) of Section 4 of the Termination of Lease (as described in clause (i) of Section 5.1 hereof) are not timely made, the NFL shall cooperate with the City in causing, and shall use its best efforts to cause, Modell to make such payments. Without limitation of the foregoing, in appropriate circumstances (as determined by the NFL), the NFL shall withhold funds sufficient to discharge Modell's obligations to the City under paragraph (a) of Section 4 of the Termination Lease from any payments due to Modell from funds in the NFL's possession and shall pay such funds to the City in discharge of Modell's obligations.

## ARTICLE VI

## ADDITIONAL AGREEMENTS

Section 6.1. **NFL to Direct Negotiations with Owners.** Upon execution of this Agreement, the City will not solicit, negotiate or enter into agreements with other owners of NFL franchises to relocate their franchises to Cleveland.

Section 6.2. **Super Bowl.** In the event the City constructs a domed Stadium and meets the NFL's other site selection criteria for hosting a Super Bowl, the Commissioner will recommend Cleveland as a site for a Super Bowl within the first three years after the domed Stadium is constructed.

Section 6.3. **NFL Experience.** The NFL will use its best efforts to locate in Cleveland as a permanent installation the NFL theme park known as the "NFL Experience" that has been staged in the past as a temporary installation at Super Bowl events.

**Section 6.4. Municipal Football.** The NFL shall contribute, or cause NFL Charities to contribute, $100,000 each year in the years 1996, 1997 and 1998 to the City in cash or, if agreed to by the City, in equipment, for use in the Cleveland Muny Football Association programs. The contribution for 1996 shall be made within thirty (30) days following the signing and delivery of this Agreement, and the contributions for 1997 and 1998 shall be made on or before the first day of February in each of those years. Upon granting of the Cleveland NFL Franchise, the NFL will use good faith efforts to cause the New Owner of the Cleveland NFL Franchise to support Cleveland municipal youth football programs at levels mutually agreeable to the City and the New Owner.

**Section 6.5. Construction Monitoring.** The NFL shall contribute to the City $30,000 annually for three years to fund the cost of monitoring compliance during construction of the Stadium by contractors working on the Stadium Project with equal employment opportunity, affirmative action and minority and female business enterprise participation requirements applicable to City of Cleveland public improvement projects.


## ARTICLE VII

## REPRESENTATIONS AND AGREEMENTS

### 7.1. Representations of the City.

(a)  <u>Organization and Standing.</u>  The City is a municipal corporation duly organized, validly existing and in good standing under the laws of the State of Ohio and has full power and authority to own, lease, and operate its properties and to carry on its operations as now being conducted and to carry out the transactions contemplated by this Agreement.

(b)  <u>Power and Authority; Binding Obligations.</u>  The execution, delivery and performance of this Agreement by the City has been duly and validly authorized and approved by all necessary action of the City. The City has full power and authority to execute and deliver and perform its obligations under this Agreement and to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by the City and the terms hereof constitute valid and binding obligations of the City, enforceable against the City in accordance with its terms except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws relating to or affecting generally the enforcement of creditors' rights and the application of general principles of equity.

(c)  <u>No Conflict.</u>  Neither the execution and delivery of this Agreement by the City nor the performance by the City of the specific transactions contemplated hereby to be performed by the City (i) will violate any provision of the City's Charter or other constituent documents; (ii) violate any provisions of law or any judgment, order, injunction, decree, rule, regulation or ruling of any governmental authority, which is applicable to the City or its assets or properties; (iii) will, with or without the giving of notice or the passage of time, or both, conflict with or result in any breach of any of the

terms or conditions of, or constitute a default under any agreement to which the City is a party or by which the City or its assets are bound.

(d) Consents. No consent, approval, permit or authorization of, or declaration to or filing with any governmental or regulatory authority, or other third party is required for the execution and delivery by the City of this Agreement.

(e) Compliance with Law. The City has complied and is complying in all respects with, and is not in default under or in violation of, the terms of all licenses and all applicable statutes, laws, rules, regulations, and ordinances of any governmental body, whether federal, state or local, other than any noncompliance, violation or default which would not have material adverse effect on the City's ability to consummate the transactions contemplated by this Agreement.

(f) Compliance with Agreement. The City has complied with, and is not in default under, or in violation of, the terms of this Agreement.

(g) Litigation. Except for the pending actions described in the Releases, the City is not subject to any judgment, award, order, writ, injunction, arbitration decision or decree affecting the City's ability to consummate the transactions contemplated by this Agreement, and there is no litigation, action, suit, claim, proceeding or investigation pending or, to the City's knowledge, threatened against the City in any federal, state or local court, or before any administrative agency or arbitrator or before any other tribunal duly authorized to resolve disputes, which would affect the City's ability to consummate the transactions contemplated by this Agreement.

(h) Bankruptcy. No insolvency proceedings of any character, including without limitation, bankruptcy, receivership, reorganization, composition or arrangement with creditors, voluntary or involuntary, affecting the City are pending or, to the knowledge of the City, threatened, and the City has not made any assignment for the benefit of creditors or taken any action in contemplation of, or which would constitute the basis for, the institution of which insolvency proceedings.

Section 7.2. Obligation of City to Deliver Documents. The City will execute and deliver simultaneously with the execution and delivery of this Agreement, its Implementing Agreements. The obligation of the City to sign and deliver its Implementing Agreements and instruments is subject to: (i) the NFL having executed and delivered this Agreement and its Implementing Agreements, (ii) Modell having signed and delivered the Browns' Agreements, and (iii) Covington & Burling, counsel to the NFL and to NFL Enterprises, L.P., having delivered to the City its opinion, in form and substance satisfactory to the City, as to the due authorization and execution by the NFL of this Agreement and the Lease, the due authorization and execution by Enterprises of the Stadium Financing Agreement and the enforceability of this Agreement, the Lease and the Stadium Financing Agreement in accordance with their terms.

## Section 7.3. Representations and Warranties of NFL.

(a)   Organization and Standing. The NFL is an unincorporated not-for-profit association and has full power and authority to own, lease, and operate its properties and to carry on its business as now being conducted and to carry out the transactions contemplated by this Agreement.

(b)   Power and Authority; Binding Obligations. The execution, delivery and performance of this Agreement by the NFL have been duly and validly authorized and approved by all necessary action of the NFL. The NFL has full power and authority to execute and deliver and perform its obligations under this Agreement and to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by the NFL and the terms thereof constitute valid and binding obligations of the NFL, enforceable against the NFL in accordance with its terms except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws relating to or affecting generally the enforcement of creditor's rights and the application of general principles of equity.

(c)   No Conflict. Neither the execution and delivery of this Agreement by the NFL nor the consummation of the specific transactions contemplated hereby (i) will violate any provision of the NFL Constitution and Bylaws or other constituent documents, (ii) violate any provisions of law or any judgment, order, injunction, decree, rule, regulation or ruling of any governmental authority, which is applicable to the NFL or its assets or properties, (iii) will, with or without the giving of notice or the passage of time, or both, conflict with or result in any breach of any of the terms or conditions of, or constitute a default under any mortgage, agreement or other instrument to which the NFL is a party or by which the NFL or its assets are bound, or (iv) except as provided in Section 4.5, will result in the creation of any liens upon the NFL's assets.

(d)   Consents. No consent, approval, permit or authorization of, or declaring to or filing with any governmental or regulatory authority, or other third party is required for the execution and delivery by the NFL of this Agreement or for the consummation of the specific transactions contemplated hereby.

(e)   Compliance with Law. The NFL has complied and is complying in all respects with, and is not in default under or in violation of, the terms of all licenses and all applicable statutes, laws, rules, regulations, and ordinances of any governmental body, whether federal, state or local, other than any noncompliance, violation or default which would not have a material adverse effect on the NFL's ability to consummate the transactions contemplated by this Agreement.

(f)   Compliance with Agreement. The NFL has complied with, and is not in default under, or in violation of, the terms of this Agreement.

(g)   Litigation. The NFL is not subject to any judgment, award, order, writ, injunction, arbitration decision or decree that would preclude the performance of its obligations under this Agreement, and there is no litigation, action, suit, claim,

proceeding or investigation pending or, to the NFL's knowledge, threatened against the NFL or the NFL's assets in any federal, state or local court, or before any administrative agency or arbitrator or before any other tribunal duly authorized to resolve disputes, which would preclude the NFL from consummating the transactions contemplated by this Agreement.

(h)     Bankruptcy.  No insolvency proceedings of any character, including without limitation, bankruptcy, receivership, reorganization, composition or arrangement with creditors, voluntary or involuntary, affecting the NFL are pending or, to the knowledge of the NFL, threatened, and the NFL has not made any assignment for the benefit of creditors or taken any action in contemplation of, or which would constitute the basis for, the institution of such insolvency proceedings.

### Section 7.4.  Obligation of NFL to Deliver Documents.

(a)     The NFL shall execute and deliver,  simultaneously with the execution and delivery of this Agreement, its Implementing Agreements; provided that the fully executed Lease shall be delivered in escrow pending satisfaction of the condition in Section 3.4(k) of the Stadium Financing Agreement.  The NFL will cause NFL Enterprises, L.P. to execute and deliver, simultaneously with the execution and delivery of this Agreement,  the Stadium Financing Agreement.  The obligations of the NFL to sign and deliver its Implementing Agreements and to cause Enterprises  to execute and deliver the Stadium Financing Agreement is subject to: (i) the City having signed and delivered its Implementing Agreements, (ii) Modell having signed and delivered the Browns Agreements, and (iii) Cleveland Tomorrow having evidenced its agreement to lead the campaign for the marketing of premium seating at the New Stadium and caused Cleveland Development Partnership I to deliver its commitment to loan the City $10,000,000 to pay costs of construction of the New Stadium.

(b)     Upon the request of the City, to be made on or before the date the City consummates the Financing Arrangements, the NFL will sign and deliver the Cooperative Agreement.

### Section 7.5.   Entire Agreement.   This Agreement and the Implementing Agreements contain all the agreements between the City and the NFL and may not be modified orally or in any other manner other than by an agreement in writing signed by the NFL and the City, respectively, or their respective successors in interest or, in the case of a waiver or other forbearance by one party of its rights under this Agreement, by an instrument in writing signed by the forbearing party.


### ARTICLE VIII

### REMEDIES

Section 8.1.  Specific Performance.  The NFL acknowledges and agrees that the damages incurred by the City as a result of any breach of the obligations of the NFL

under Sections 2.1, 3.1, 4.6 and 4.7 of this Agreement are not readily ascertainable, that money damages or other legal relief will not adequately compensate the City for any such breach, and that the City is entitled to injunctive relief compelling the specific performance of those obligations under this Agreement.

Section 8.2. <u>Other Remedies.</u> The NFL or the City, as the case may be, may pursue all remedies now or hereafter existing at law or in equity to collect all amounts due or to become due under this Agreement and to enforce the performance and observance of any obligation of either party under this Agreement. No remedy conferred upon or reserved to the City by this Agreement is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law, in equity or by statute. No delay or omission to exercise any right or power accruing upon any default shall impair that right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. In order to entitle the City to exercise any remedy reserved to it, it shall not be necessary to give any notice, other than any notice required by law or for which express provision is made herein.

Section 8.3. <u>Governing Law.</u> This Agreement shall be construed under and in accordance with the laws of the State of New York (without regard to the conflict of laws principles thereof, except to the extent that the laws of the State of New York impose obligations on or create liability of the City that are not consistent with its powers under its Charter and the laws of the State of Ohio.

Section 8.4. <u>Agreement to Pay Attorneys' Fees and Expenses.</u> In the event that in connection with any dispute arising under the terms of this Agreement either party hereto should initiate suit or other judicial proceeding against the other party hereto to enforce its rights hereunder, to the extent permitted by law, the prevailing party in any such suit or proceeding shall be entitled to receive from the non-prevailing party to the suit or proceeding, in addition to any other amounts to which the prevailing party may be entitled, the amount of all court costs and reasonable attorneys' fees and expenses incurred by such prevailing party in connection with the suit or proceeding.

Section 8.5. <u>No Waiver.</u> No failure by either party to this Agreement to insist upon the strict performance by the other of any provision of this Agreement shall constitute a waiver of its right to strict performance and no express waiver by one party shall be deemed to apply to any other existing or subsequent right to remedy the failure by the other party to observe or comply with any provision hereof.

**Section 8.6. Notice of Default.** Each party shall notify the other if it becomes aware of the occurrence of any default under this Agreement or of any fact, condition or event which, with the giving of notice or passage of time or both, would become a default.

CITY OF CLEVELAND, OHIO

By _____
            Mayor

And By _____
            Director of Parks,
            Recreation and Properties

NATIONAL FOOTBALL LEAGUE

By _____
            Commissioner

The within instrument is hereby approved
as to legal form and correctness
June 12, 1996.

_____
Director of Law, City of Cleveland

## FISCAL OFFICER'S CERTIFICATE

The undersigned, being the fiscal officer of the City of Cleveland, Ohio, certifies that the moneys required to meet the obligations of the City during the year 1996 under the foregoing Franchise Commitment Agreement have been appropriated lawfully by the Council of the City for that purpose and are in the treasury or in the process of collection to the credit of an appropriate fund, free from any previous encumbrance. This Certificate is given in compliance with Sections 5705.41 and 5705.44 of the Revised Code.

Dated: _____June 12_____, 1996            _____
                                                     Director of Finance