# EXHIBIT A



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed: COMPLAINT**
**January 14, 2025 15:55**

By: JUSTIN E. HERDMAN 0080418

Confirmation Nbr. 3377194

CITY OF CLEVELAND

    vs.

HASLAM SPORTS GROUP, LLC, ET AL.

CV 25 110189

**Judge:** LAUREN C. MOORE

**Pages Filed:** 264

**IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO
GENERAL DIVISION**

| | |
|---|---|
| **THE CITY OF CLEVELAND,**<br>C/O Law Department<br>601 Lakeside Avenue East, Rm. 106<br>Cleveland, OH 44114 | **CASE NO.** |
| **Plaintiff,** | |
| **v.** | **JUDGE** |
| **HASLAM SPORTS GROUP, LLC**<br>C/O Corporation Service Company<br>251 Little Falls Drive<br>Wilmington, DE 19808 | **CIVIL COMPLAINT FOR STATUTORY VIOLATION OF R.C. 9.67, BREACH OF CONTRACT, AND DECLARATORY AND INJUNCTIVE RELIEF** |
| **CLEVELAND BROWNS FOOTBALL COMPANY LLC**<br>CT Corporation System<br>4400 Easton Commons Way, Ste. 125<br>Columbus, OH 43219 | |
| **CLEVELAND BROWNS STADIUM COMPANY LLC**<br>CT Corporation System<br>4400 Easton Commons Way, Ste. 125<br>Columbus, OH 43219 | |
| **Defendants.** | **JURY DEMAND ENDORSED HEREON** |

---

## COMPLAINT OF THE CITY OF CLEVELAND

---

## Introduction

1.     For decades, the City of Cleveland and the taxpaying public have supported the Cleveland Browns—financially and otherwise—at the team's lakefront stadium.  Through thick and thin, rain and snow, good seasons and bad, Clevelanders have stood by their football team.

2.     That community support carries tangible costs:  The City and taxpaying public have poured hundreds of millions of dollars into building and maintaining the Browns' stadium (now called Huntington Bank Field) as well as the area surrounding it.  And the City has long provided those funds against the backdrop that, in return for that exhaustive taxpayer support, the Browns and their owners would uphold their end of the bargain under the law—and uphold their role as stewards of the Downtown Cleveland community that has experienced exciting and significant growth over the years.

3.     After accepting community support, spending Cleveland taxpayer funds, and promising to comply with the law, the Browns now argue that the laws don't apply to them.  They seek to abandon the lakefront stadium in Downtown Cleveland that they asked the public to build and maintain for them, hoping that another set of taxpayers will pay for them to move to a new city with a new set of promises.

4.     Just two years ago, Jimmy Haslam committed to redoing the stadium and helping develop the Cleveland lakefront:  "Cleveland would benefit tremendously from the development of the waterfront. . . .  Having the stadium down there seems to be in everybody's best interest, so ***we're committed to redoing the stadium***.  In all likelihood, it's not going to have a dome, but it'll be a substantial remodel of the existing facility, and we're probably three, four, five years away from that happening. . . .  We're loving working with [the Mayor] and his team to put forth the best plan for Cleveland.  And we want to be part of the story and help out any way we can.  We

believe it's critically important for the development of downtown to be an attractive city." (Emphasis added.)[1]

5.      The City agrees that it's critically important for the Browns to be located in Cleveland.

6.      Ohio law agrees as well. After one of the Browns' previous owners, Art Modell, moved the team to Baltimore before the 1996 NFL season (in a controversy infamously dubbed "The Move"), two important things happened that remain relevant today. First, the City sued the Browns and ultimately reached a compromise: Modell would take the team to Baltimore but return the Browns' intellectual property, history, and records; the NFL would grant new owners a new Cleveland Browns team; and the City would construct a new lakefront stadium for that team. And second, Modell's move prompted congressional hearings and nationwide debate surrounding the use of taxpayer funds to build and upgrade stadium facilities for wealthy owners of professional sports teams. The Ohio General Assembly weighed in on this debate by enacting a law conditioning when Ohio teams can leave their publicly financed facilities in the future. *See* R.C. 9.67. That law is colloquially referred to as the "Modell Law"—an acknowledgement of the circumstances making the law necessary.

7.      The Modell Law's requirements are straightforward. It provides that if a team takes taxpayer money and plays in a tax-supported facility, then the owner must either obtain the City's authorization or give the City and others the opportunity to purchase the team before moving the team away from that facility. This common-sense response prevents owners from accepting

---

[1] Anthony Polsal, *Dee and Jimmy Haslam Remain 'Committed to Redoing' FirstEnergy Stadium, Upgrading City of Cleveland Waterfront Property* (Mar. 28, 2023), https://www.clevelandbrowns.com/news/dee-and-jimmy-haslam-remain-committed-to-redoing-firstenergy-stadium-upgrading-c (accessed Jan. 12, 2025)

taxpayer funding for a stadium only to turn around and unilaterally abandon those taxpayers and the stadium. In short, if you take more than $350 million dollars of the public's money, you can't take the money and run.

8.      The Haslams are well aware of the Modell Law and its requirements. After all, the Modell Law led directly to the Haslams' acquisition of their interest in the Columbus Crew—after an Ohio court rejected an attempt by former owners of that team to declare the law unconstitutional. There can be no question, then, that the Haslams understand that their ownership of the Browns—and their receipt of millions in municipal support for their enterprise—means that they must abide by the modest legal requirements in the Modell Law.

9.      But the Haslams no longer want to abide by duly enacted Ohio law when it hampers their desired ends—that is, pursuing a new domed stadium away from the Downtown Cleveland community that has long supported the team both financially and communally. In connection with their desire to abandon their current stadium, the Browns preemptively filed a lawsuit asking a federal court to invalidate the Modell Law entirely (or to at least declare the Browns immune from it), and have intimated, via this lawsuit and by letter, that they have no intention to follow state law or their obligations under a long-held lease contract with the City.

10.     The Browns' and their owners' new-found (and opportunistic) disagreement with state law is not a license to defy it. Nor, for that matter, is it license for the Browns to breach their contractual obligations to the City, which include the requirement to follow duly enacted laws.

11.     For its part, the City has upheld, and continues to uphold, its end of the bargain—investing hundreds of millions of taxpayer dollars into the stadium from which Browns' owners now seek to turn their backs.

12. The City of Cleveland thus brings this suit to prevent the Browns from abandoning the City and public that provided the Browns with a stadium and maintained that stadium through thick and thin—and to ultimately protect the City's and taxpayers' past, present, and future investments in the Downtown Cleveland lakefront stadium.

### The Parties

13. The City of Cleveland is an Ohio charter municipal corporation. The City is organized and exists as a political subdivision of the State of Ohio, with its principal place of business in Cuyahoga County, Ohio.

14. Defendant Haslam Sports Group, LLC, is a Delaware limited liability company that has ownership interests in professional sports teams located in Cleveland, Columbus, and Milwaukee, Wisconsin. Haslam Sports Group regularly makes requests of the City under the Lease by Way of Concession dated April 26, 1996, conducting business in Cuyahoga County, Ohio. Haslam Sports Group's statutory agent for service is Corporation Service Company, located at 251 Little Falls Drive, Wilmington, Delaware 19808. Jimmy Haslam is a managing member of Haslam Sports Group and has represented himself to the public as an owner of the Cleveland Browns. Dee Haslam is the CEO of Haslam Sports Group and has represented herself to the public as an owner of the Cleveland Browns.

15. Defendant Cleveland Browns Football Company LLC, is a Delaware limited liability company that operates the "Cleveland Browns" NFL franchise, as well as its marketing, branding, product placement, and team operations.

16. Defendant Cleveland Browns Stadium Company LLC, is a Delaware limited liability company.

17.     Upon information and belief, Haslam Sports Group owns the majority or all of the ownership interest in Cleveland Browns Football Company LLC and Cleveland Browns Stadium Company LLC.

18.     All Defendants solicited business and conducted commercial activity in Cuyahoga County.

### Jurisdiction and Venue

19.     This Court has personal jurisdiction over Defendants under R.C. 2307.382(A)(1), 2307.382(A)(2), 2307.382(A)(8), and 2307.382(C).

20.     Venue is proper under Civ. R. 3(C)(2), 3(C)(3), and 3(C)(5).

### Background

**A.     The Modell Law.**

21.     In the aftermath of the controversy surrounding Art Modell's intended relocation of the Browns to Baltimore, the Ohio General Assembly enacted R.C. 9.67.

22.     Commonly known as the "Modell Law," the statute's requirements are simple: An owner must either obtain the City's express authorization or provide notice and an opportunity for the City or individuals in the area to purchase the team before the team can stop using a tax-supported facility (like Huntington Bank Field) for most of the team's home games.

**B.     The Browns accept taxpayer funding for the new stadium and agree to comply with Ohio law.**

23.     The City and the Browns, via Cleveland Browns Stadium Company, LLC, are parties to a Lease by Way of Concession dated April 26, 1996 ("Lease"), under which the City agreed to construct a new stadium for the team. That stadium is now called Huntington Bank Field, and is located at 100 Alfred Lerner Way, Cleveland, Ohio 44114. The Lease is attached as Exhibit A to this Complaint.

24. The City upheld, and continues to uphold, its end of that bargain, at considerable expense to the City and taxpayers.

25. To start, the City and taxpayers contributed about $290 million to build Huntington Bank Field on City-owned property—costs for which taxpayers continue to foot the bill over 25 years after the Browns first snapped a football at the stadium.

26. Investment in the Browns and Huntington Bank Field did not end once the stadium was built and the Browns began playing. Consistent with its desire to protect investments in the stadium and the surrounding area, as well as with its contractual obligations, the City has continued to lay out taxpayer funds for repairs, maintenance, and other support ever since.

27. The City funds a "Capital Repair Fund" to cover, among other things, prudent and extraordinary repairs; repairs necessary to maintain the stadium's roof, foundation, or structural integrity; and replacing carpeting and painting once every five years. *See* Ex. A § 14.

28. The City is also financially responsible for emergency repairs to the stadium. If the City does not timely make emergency repairs, the Browns enjoy the right to make the repairs directly and seek reimbursement from the City. Ex. A § 14(h).

29. The City's responsibilities are not abstract. From 2003 until 2024, the City spent over $78 million dollars on stadium repairs. And the Browns have sought $8 million over the next four years for improvements to the stadium that they now want to abandon.

30. Just last month, the Browns notified the City that they are proceeding with nearly $3.2 million dollars in emergency repairs for which the Browns demanded reimbursement from the City. *See* Ex. B (Letter from David A. Jenkins, Chief Operating Officer of Haslam Sports Group, to James DeRosa, Director of Mayor's Off. of Capital Projects, Off. of the Mayor (Dec.

17, 2024)); Ex. C (Letter from David A. Jenkins, Chief Operating Officer of Haslam Sports Group, to James DeRosa, Director of Mayor's Off. of Capital Projects, Off. of the Mayor (Dec. 17, 2024)).

31.     Ongoing support for the Browns and Huntington Bank Field also includes over $4 million annually in county sin taxes as well as the City's annual payment of around $1.3 million in property taxes and insurance payments.

32.     In exchange for this taxpayer support and assistance, the Browns specifically agreed to comply "with all present and future laws, statutes, [and] ordinances," Ex. A § 17— including, of course, Ohio's Modell Law.

33.     Of course, the Browns and their owners are also required to follow Ohio law independent of their contractual obligations to the City.

### C.     The Haslams acquire the Browns and seek to move them out of Cleveland.

34.     Jimmy and Dee Haslam took over the Browns in 2012, many years after both the Modell Law and the Lease became effective.  They and the corporate entities that they control assumed the obligations in the Lease, including the obligation to comply with Ohio law.

35.     Upon taking over the Browns, the Haslams went out of their way to assure the City and its citizens that the Browns would not abandon the public's investment.

36.     Their assurances could not have been more clear.  "We're not moving the Cleveland Browns," Jimmy Haslam reported to the press.  Mary Kay Cabot, *Jimmy Haslam Promises He's in for the 'Long Haul' and Wouldn't Dream of Moving Tradition-Rich Browns out of Cleveland* (Aug. 3, 2012), https://www.cleveland.com/browns/2012/08/jimmy_haslam_putting_on_my_ora. html (accessed Jan. 12, 2025).  "That thought never, ever entered our minds." *Id.*

37.     The Haslams kept their word—for a time—and the Browns continued to play at Huntington Bank Field.  Beginning in 2017, though, the City and the Haslams, via Haslam Sports Group, engaged in a series of discussions about the Browns' future playing location once the

current Lease ends.  During those discussions, the Haslams advocated for a domed stadium for the Browns.

38.     The City, for its part, relentlessly tried to craft solutions that would advance both the Browns' objectives as well as the long-term interests of Cleveland residents and the community.  The City presented a fiscally responsible, yet aggressive, $461 million proposal to renovate Huntington Bank Field.  It also presented an alternative proposal to make a portion of the Burke Lakefront Airport available for the construction of a new stadium and adjacent development, including the possibility of a domed stadium.

39.     Despite the City's efforts toward a shared path forward, the Haslams were unsatisfied.  Rather than continuing to play at the taxpayer-funded facility as the Modell Law and the Browns' contractual obligations would require, they began to plan a move to Brook Park.

40.     Further to those plans, in early 2024, Haslam Sports Group reached a purchase agreement to acquire 176 acres of land in Brook Park.  Troy Smith, *Browns Owners Purchasing New Land Outside of Cleveland* (Feb. 8, 2024), https://www.axios.com/local/cleveland/2024/02/08/browns-new-stadium-dome-haslams (accessed Jan. 12, 2025).  Around the same time, a "Cleveland Browns/Haslam Sports Group" spokesperson explained that the team was "studying other potential stadium options in Northeast Ohio at various additional sites."  Cleveland Browns, *Cleveland Browns and Haslam Sports Group Provide Statement on Future Stadium Planning* (Feb. 8, 2024), https://www.clevelandbrowns.com/news/cleveland-browns-and-haslam-sports-group-provide-statement-on-future-stadium-planning (accessed Jan. 12, 2025).

41.     Cleveland City Council passed Emergency Ordinance 391-2024 on May 6, 2024.  The ordinance authorized and directed the City's Director of Law to enforce the Modell Law to

protect the City and its citizens from the detrimental effects of the Browns abandoning Huntington Bank Field.

42.     The City will lose at least $30 million in economic output every year should the Browns abandon their stadium. And the City stands to lose about $11 million in annual tax revenue. Ex. D at 2 (Memorandum from Econsult Solutions, Inc. to Squire Patton Boggs (Nov. 11, 2024)).

43.     In October of 2024, the Haslams met with Mayor Bibb and told him they intend to move the Browns from Cleveland to Brook Park, halting negotiations. The Haslams did not enter into an agreement with the City that permitted the Browns to move. Nor did the Haslams offer the team for sale or otherwise comply with the Modell Law.

**D.     The Browns sue the City and continue planning to leave Cleveland.**

44.     About a week later, the Browns filed a preemptive federal lawsuit. *See Cleveland Browns Football Company LLC v. The City of Cleveland*, No. 24-cv-1857 (N.D. Ohio Oct. 24, 2024). They improperly asked a federal court to invalidate Ohio's Modell Law—or at least to permit the Browns to ignore it.

45.     Despite the pendency of the litigation they initiated—and with knowledge that the Modell Law remains on the books and applicable to them—the Browns and their owners continued preparing to move to Brook Park. The Haslams began meeting with Brook Park's mayor weekly to discuss plans for a new stadium. And the Browns announced a partnership with Lincoln Property Company, a real-estate developer that participated in constructing the stadium for the Dallas Cowboys. Most recently, Haslam Sports Group announced it had "taken the necessary steps" to "solidify our future purchase" of the land in Brook Park. Michelle Jarboe, *Cleveland Browns Firm Up Deal to Buy Brook Park Land for Domed Stadium Project* (Jan. 2, 2025),

https://www.news5cleveland.com/news/local-news/cleveland-browns-firm-up-deal-to-buy-brook-park-land-for-domed-stadium-project (accessed Jan. 12, 2025).

46.     On December 30, 2024, Mayor Bibb sent a letter to the Browns, seeking clarification on their intentions and to remind them of their state-law and contractual obligations to the City.  Ex. E (Letter from Justin M. Bibb, Mayor, City of Cleveland, to Cleveland Browns Football Company LLC, c/o Jimmy and Dee Haslam (Dec. 30, 2024)).

47.     In the December 30 letter, Mayor Bibb asked for assurances that the Browns would comply with the Modell Law and the Lease.

48.     The Browns responded to Mayor Bibb's letter on January 9, 2025.  Ex. F (Letter from Tony White, Thompson Hine, to Justin E. Herdman, Jones Day (Jan. 9, 2025)).  The Browns refused to substantively respond to the request for assurances that they would comply with the law and the Lease, instead directing the City to their federal complaint. *See id.*

49.     The City responded to the Browns' letter, explaining that it had "no choice but to read the Browns' letter as a direct refusal to comply with their lease and Ohio law's requirement to provide the City and local individuals with an opportunity to purchase the team." Ex. G (Letter from Justin Herdman, Jones Day, to Anthony C. White, Thompson Hine (Jan. 9, 2025)).

50.     The City now brings this lawsuit to enforce its state-law and contractual rights and to prevent the Browns from taking advantage of the public.

### COUNT I.
### Violation of the Modell Law

51.     The City incorporates by reference the preceding paragraphs as if set forth here in full.

52.     Ohio Revised Code 9.67 provides:

No owner of a professional sports team that uses a tax-supported facility for most of its home games and receives financial assistance from the state or a political

subdivision thereof shall cease playing most of its home games at the facility and begin playing most of its home games elsewhere unless the owner either:

> (A) Enters into an agreement with the political subdivision permitting the team to play most of its home games elsewhere;

> (B) Gives the political subdivision in which the facility is located not less than six months' advance notice of the owner's intention to cease playing most of its home games at the facility and, during the six months after such notice, gives the political subdivision or any individual or group of individuals who reside in the area the opportunity to purchase the team.

53. One or more Defendants are "owner[s]" of the Cleveland Browns under R.C. 9.67.

54. The Cleveland Browns are a professional sports team.

55. Huntington Bank Field is a tax-supported facility.

56. Huntington Bank Field was constructed on property the City owns.

57. The City and taxpayers contributed about $290 million to build the stadium.

58. The City and taxpayers spent over $78 million on stadium repairs from 2003 until 2024.

59. Cuyahoga County residents, which necessarily includes residents of the City, contribute more than $4 million annually to the stadium's needs via sin taxes.

60. The City pays around $1.3 million annually in property taxes and insurance payments on Huntington Bank Field.

61. The Browns benefit from these and other forms of public financial assistance from Ohio and political subdivisions thereof.

62. The City is a political subdivision of Ohio and is an intended beneficiary of the Modell Law.

63. Huntington Bank Field is located in the City of Cleveland.

64. The Browns play most of their home games at Huntington Bank Field.

65.     There is no agreement under which the City has agreed to permit the Browns to begin playing most of their home games elsewhere.  To the contrary, the City very much objects to any such move.

66.     The owners of the Browns have publicly declared that the team will cease playing their home games at Huntington Bank Field in Cleveland and begin playing most of their home games in Brook Park.

67.     The owners of the Browns have manifested their intentions to move the team via, at least, securing options to purchase land in Brook Park, engaging a partner to develop the Brook Park land, their public statements, and their federal lawsuit against the City.

68.     The owners of the Browns have not given the City or any interested group of individuals who reside in the area the opportunity to purchase the team, as required under the Modell Law.  In fact, when requested to do so by the City, they refused.

69.     The owners of the Browns have disclaimed any intention to comply with the Modell Law, as is apparent from their federal lawsuit, public statements, and actions.

70.     The owners of the Browns are presently violating the Modell Law or have unambiguously expressed concrete intentions to violate the Modell Law.

71.     The owners of the Browns' violation of the Modell Law, and intended violation of the Modell Law, injures the City.

72.     Due to the owners of the Browns' violation of the Modell Law, the City and its residents will lose at least $30 million in economic output every year.

73.     Due to the owners of the Browns' violation of the Modell Law the City will lose at least $11 million in annual tax revenue.

74.     Due to the owners of the Browns' violation of the Modell Law, and intended continuing violation of the Modell Law, the City and its residents are injured in their loss of the opportunity to buy the Browns that is afforded by state law.

75.     Injunctive relief is necessary and proper to compel team owners to comply with state law.

## COUNT II.
## Breach of Contract

76.     The City incorporates by reference the preceding paragraphs as if set forth here in full.

77.     The City of Cleveland and the National Football League, as nominee for a new owner of the Cleveland Browns, entered into the Lease on April 26, 1996. *See* Ex. A.

78.     The NFL as nominee assigned rights and obligations under the Lease to Cleveland Browns Stadium Company LLC on October 23, 1998.  Ex. H (Assignment and Assumption of Lease).

79.     The City has performed, and continues to perform, all of its obligations under the Lease.

80.     Section 17 of the Lease provides that the Lessee agrees to "comply promptly with all present and future laws, statutes, ordinances, orders, rules, and regulations of every duly constituted governmental authority or agency relating to the Leased Premises or the use and occupancy thereof."  Ex. A § 17.

81.     The Modell Law is a duly enacted law relating to the leased premises.

82.     The Defendants are violating the Modell Law as set forth above, and, therefore, are in breach of their contractual obligations under the Lease.

83.     The City is damaged by Defendants' breach of the Lease, as set forth above.

84.    All of the Defendants are subject to the terms of the Lease.

85.    The Lease and subsequent Assignment and Assumption of Lease specifically contemplate that the future owners of the Cleveland Browns will be subject to the rights and obligations that the contracts confer.

86.    The Lease, throughout, sets forth the rights and obligations of the "Lessee."

87.    The Lease defines "Lessee" as the "New Owner." Ex. A at 7.

88.    The Lease defines "New Owner" as "the Lessee as the owner or owners of the Franchise as described in the NFL Agreement." Ex. A at 8.

89.    The Lease sets forth the Lessee's representation that it is "a member in good standing of the NFL." Ex. A § 9(b).

90.    The Lease requires the Lessee to "hold, maintain and defend its rights to play professional football in the City of Cleveland, Ohio." Ex. A § 9(b)(2)(i).

91.    The Lease requires the Lessee to "not sell the Franchise to another person or entity which has the then present intent to relocate, transfer or otherwise move the Franchise to any other city or location." Ex. A § 9(b)(2)(iii).

92.    The Lease requires the Lessee to "not modify the Franchise to permit the Browns to play regular season home games or post-season home games . . . in any such other city or location." Ex. A § 9(b)(2)(iv).

93.    The Lease prohibits the Lessee from assigning or otherwise transferring "its membership and franchise in the NFL unless the assignee or transferee assumes the obligations without modification of Lessee under this Lease." Ex. A § 9(b)(3).

94.     The Assignment and Assumption of Lease provides that the Assignee "hereby expressly agrees to be bound by and perform all of the obligations and liabilities of the New Owner (as defined in the Lease) and Lessee (as defined in the Lease)." Ex. H § 2.

95.     The NFL as nominee entered the Lease with actual, apparent, or implied authority to bind the Browns' new owners as its principals.

96.     Cleveland Browns Stadium Company LLC entered the Assignment and Assumption of Lease with actual, apparent, or implied authority to bind the Browns' new owners as its principals.

97.     Defendants acquired their ownership of the Cleveland Browns with full knowledge of these contractual and agency relationships.

98.     By accepting the many benefits that come from the City's payments and obligations under the Lease, all of the Defendants have assumed the attendant obligations that come with those benefits.

99.     Defendants have acted as agents of one another under the terms of the Lease.

100.    Haslam Sports Group has specifically invoked the Lease to demand reimbursements from the City to Cleveland Browns Stadium Company LLC. *See, e.g.*, Ex. B; Ex. C.

101.    Defendants have been held out as owners of the Browns.

102.    Haslam Sports Group holds "Dee, Jimmy and the Haslam family" out as having purchased the Browns.

103.    Haslam Sports Group holds itself out as owners of the Browns.

104.    Jimmy Haslam holds himself out as an owner of the Browns.

105.    Dee Haslam holds herself out as an owner of the Browns.

106.   Haslam Sports Group holds Dee and Jimmy Haslam out as "CEO and Chairman, Managing Partners" of Haslam Sports Group.

107.   The Browns hold Jimmy and Dee Haslam out as Managing And Principal Partners of the Browns.

108.   The Browns hold Haslam Sports Group out as having ownership of the Cleveland Browns.

109.   Cleveland Browns Football Company LLC holds itself out as the entity that "own[s] and operate[s] the Team," defined as the "Cleveland Browns football franchise." Ex. I (Am. Compl. ¶¶ 2, 16, *Cleveland Browns Football Company LLC v. The City of Cleveland*, No. 24-cv-1857 (N.D. Ohio Nov. 15, 2024)).

110.   Defendants further blur any distinction between them in their statements to the public.

111.   Press accounts reported that the "Haslam Sports Group says it has reviewed and will respond to Mayor Justin Bibb's letter," which was sent to Cleveland Browns Football Company LLC, c/o Jimmy and Dee Haslam.   Cleveland Magazine, *Haslam Sports Group Responds to Mayor Bibb's Intent to Invoke the Art Modell Law* (Dec. 31, 2024), https://clevelandmagazine.com/in-the-cle/development/articles/haslam-sports-group-responds-to-mayor-bibb's-intent-to-invoke-the-art-modell-law (accessed Jan. 12, 2025).

112.   Peter John-Baptiste, described as "chief communications officer of the Haslam Sports Group, owner of the Browns," was quoted as saying: "As we stated months ago when we filed our lawsuit . . . ." Cleveland Magazine, *Haslam Sports Group Responds to Mayor Bibb's Intent to Invoke the Art Modell Law* (Dec. 31, 2024), https://clevelandmagazine.com/in-the-

cle/development/articles/haslam-sports-group-responds-to-mayor-bibb's-intent-to-invoke-the-art-modell-law (accessed Jan. 12, 2025).

113. The Browns' federal lawsuit was filed by Cleveland Browns Football Company LLC. Ex. J (Compl., *Cleveland Browns Football Company LLC v. The City of Cleveland*, No. 24-cv-1857 (N.D. Ohio Oct. 24, 2024)).

114. Defendants make no effort to clarify distinctions between them in their press releases issued by a "Cleveland Browns/Haslam Sports Group Spokesperson." *E.g.*, Cleveland Browns, *Cleveland Browns and Haslam Sports Group Provide Statement on Future Stadium Planning* (Feb. 8, 2024), https://www.clevelandbrowns.com/news/cleveland-browns-and-haslam-sports-group-provide-statement-on-future-stadium-planning (accessed Jan. 12, 2025).

115. Defendants have held themselves out as subject to the terms of the Lease.

116. Cleveland Browns Football Company LLC directly acknowledged that it is subject to the terms of the Lease in its federal complaint. Ex. I (Am. Compl. ¶¶ 42, 59, *Cleveland Browns Football Company LLC v. The City of Cleveland*, No. 24-cv-1857 (N.D. Ohio Nov. 15, 2024)).

117. Cleveland Browns Football Company LLC misleadingly represented that it "fully intend[s] to perform under the terms of the" Lease, further acknowledging that it is subject to the Lease. Ex. I (Am. Compl. ¶ 62, *Cleveland Browns Football Company LLC v. The City of Cleveland*, No. 24-cv-1857 (N.D. Ohio Nov. 15, 2024)).

118. The City has relied on Defendants' having held themselves out as subject to the terms of the Lease.

119. All Defendants acted in a concerted and interdependent fashion with regard to the facts forming the basis of their breach of contract.

120.    Due to all Defendants' conduct, the terms of the Lease, and the manner in which Defendants operate and hold themselves out to the City and public, all Defendants are subject to the Lease directly via black-letter contract and agency principles as well as other doctrines such as equitable estoppel, judicial estoppel, quasi-estoppel, assumption, and veil-piercing/alter ego.

121.    In the alternative, Defendants have anticipatorily breached their contractual obligations.  The City asked for assurance that Defendants would comply with their contractual obligations (including compliance with the Modell Law).  Defendants did not meaningfully respond.  And Defendants' conduct reinforces that they unequivocally intend to breach or repudiate their contractual obligations.

## COUNT III.
### Declaratory Judgment and Injunctive Relief

122.    The City incorporates by reference the preceding paragraphs as if set forth here in full.

123.    R.C. 2721.03 provides:

> [A]ny person interested under a deed, will, written contract, or other writing constituting a contract or any person whose rights, status, or other legal relations are affected by a constitutional provision, statute, rule as defined in section 119.01 of the Revised Code, municipal ordinance, township resolution, contract, or franchise may have determined any question of construction or validity arising under the instrument, constitutional provision, statute, rule, ordinance, resolution, contract, or franchise and obtain a declaration of rights, status, or other legal relations under it.

124.    The City is a municipal corporation organized under the laws of Ohio.

125.    The City is a person for purposes of R.C. 2721.03.

126.    The City is party to the Lease, a written contract.

127.    The Modell Law grants the City certain rights in the event that a professional sports team intends to cease playing most of its home games at a tax-supported facility in the City and begin playing most of its home games elsewhere.

128.    Those rights include either the right to negotiate an agreement permitting the team to relocate or the opportunity to purchase the team. *See* R.C. 9.67(A), (B).

129.    The City is a person whose rights or other legal relations are affected by the Modell Law.

130.    As explained above, real controversy exists between the Defendants and the City.

131.    Defendants have willingly sought and accepted taxpayer support and the use of a tax-supported stadium for the Cleveland Browns.

132.    Because Defendants have accepted these benefits to support the lakefront stadium in Downtown Cleveland, Defendants have reciprocal obligations under the Modell Law and the Lease to the City and its residents.

133.    Defendants have expressed clear intentions to cause the Browns to begin playing most of their home games at a location other than Huntington Bank Field.

134.    The Modell Law gives the City and its residents a statutory right to the opportunity to buy the Browns.

135.    The Lease gives the City a contractual right to the opportunity, on behalf of itself and individuals residing in the area, to buy the Browns.

136.    Defendants have not afforded the City or individuals residing in the area the opportunity to buy the Browns.

137.    The Browns have no intention of affording the City or individuals residing in the area the opportunity to buy the Browns.

138.    There is a genuine, concrete dispute between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

139.    The City faces significant and imminent harms from Defendants' actions that are actually present or significantly likely to occur.

140.    The issues in this case are appropriate for judicial resolution and will terminate the uncertainty and controversy discussed herein.

141.    Absent speedy relief, the City will not receive statutory and contractual benefits to which it is entitled.

142.    The City recognizes the requirement that "all persons who have or claim any interest that would be affected by the declaration[s]" it seeks "shall be made parties to the action or proceeding."  R.C. 2721.12.  The subject matter of this controversy is vitally important to the public, including any potential interested purchasers of the Browns.  The City presently is unaware of any additional persons who need to be made parties to this action, but it reserves the right to amend its pleadings to add necessary parties should they become apparent.

143.    The City is also entitled to all necessary and proper injunctive relief to protect against the irreparable harm that it faces.

WHEREFORE, the City asks for the following relief:

A.  A declaratory judgment that the Modell Law applies to the Defendants and their planned move to Brook Park.

B.  A declaratory judgment that the Defendants cannot, consistent with their obligations under Ohio law and the Lease, cause the Browns to begin playing home games at another facility without giving the City notice of at least six months and, during those six months, offering the City and any individual or group of individuals residing in the area a reasonable opportunity to buy the

Browns and prevent their move or negotiate an agreement under which the Browns would be permitted to move.

C. A declaratory judgment that the Browns must comply with Ohio law, including the Modell Law.

D. Injunctive relief preventing the Browns from accepting or receiving funding or proceeding with construction of a stadium for the Browns' home games in Brook Park absent Defendants' compliance with R.C. 9.67.

E. Injunctive relief barring Defendants from relocating the Browns from Cleveland to Brook Park, or any other location, absent Defendants' compliance with R.C. 9.67, including but not limited to:

    a. Defendants providing the City and any individuals or groups of individuals with a good-faith opportunity to purchase the team.

    b. Defendants providing the full time period required under R.C. 9.67 for individuals or groups of individuals to purchase the team.

F. Requiring Defendants to provide specific performance under the Lease, including by complying with the Modell Law.

G. Money damages in an amount exceeding $25,000 and to be determined at trial.

H. Continuing oversight by the Court to ensure that Defendants negotiate in good faith with the City and any individual or group of individuals, and provide a reasonable opportunity to purchase the Browns.

I. Any other legal or equitable relief that the Court deems just and proper, including attorneys' fees and other costs.

Respectfully Submitted,

/s/ *Justin E. Herdman*

Justin E. Herdman, Bar No. 0080418
jherdman@jonesday.com
Tracy K. Stratford, Bar No. 0069457
tkstratford@jonesday.com
James R. Saywell, Bar No. 0092174
jsaywell@jonesday.com
Samuel V. Lioi, Bar No. 0100464
slioi@jonesday.com
Gregory E. Hilbert, Bar No. 0101242
ghilbert@jonesday.com
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114.1190
Tel: (216) 586-3939
Facsimile: (216) 579-0212

Mark D. Griffin, Bar No. 0064141
MGriffin@clevelandohio.gov
Director of Law
City of Cleveland, Department of Law
601 Lakeside Avenue, Room 106
Cleveland, Ohio 44114-1077
Tel: (216) 664-2800

*Attorneys for Plaintiff*
*The City of Cleveland*

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all of the issues so triable herein, pursuant to the Ohio Rules of Civil Procedure.

Respectfully submitted,

/s/ *Justin E. Herdman*

Justin E. Herdman
*One of the Attorneys for Plaintiff*
*The City of Cleveland*

# EXHIBIT A

## LEASE BY WAY OF CONCESSION

between

## CITY OF CLEVELAND

and

## NATIONAL FOOTBALL LEAGUE,
individually as to Section 3, and as nominee for the New Owner

as of

April 26, 1996

# TABLE OF CONTENTS

| Section Number | Descriptive Heading | Page Number |
|---|---|---|
| 1 | Public Purpose | 3 |
| 2 | Definitions | 4 |
| 3 | Assignment and Assumption of Lease by New Owner | 10 |
| 4 | Construction of New Stadium | 10 |
| 5 | Leased Premises | 11 |
| 5(a) | Real Estate and Improvements | 11 |
| 5(b) | Air Rights | 12 |
| 5(c) | Parking | 12 |
| 5(d) | Amendment of Legal Descriptions | 13 |
| 6 | Lease Term | 13 |
| 6(a) | Commencement of Term | 13 |
| 6(b) | Term | 14 |
| 6(c) | Lease Commencement Certificate | 14 |
| 7 | Rental | 14 |
| 8 | Lessee's Representations | 15 |
| 9 | Lessee's Covenants | 15 |
| 9(a) | Play of Games | 15 |
| 9(b) | Obligation to Maintain Franchise | 16 |
| 9(c) | Number of Games | 17 |
| 9(d) | Compliance with Community Development Plan | 17 |
| 9(e) | Nondiscrimination | 17 |
| 9(f) | Signage Plan | 17 |
| 9(g) | Right of Specific Performance | 18 |
| 10 | Taxes and Assessments | 18 |

| Section Number | Descriptive Heading | Page Number |
|---|---|---|
| 10(a) | Taxes Paid by City | 18 |
| 10(b) | City's Expenses Prior to the Commencemen Date | 18 |
| 11 | Costs of Operations and Maintenance of the Leased Premises | 18 |
| 11(a) | Costs of Operations and Maintenance | 18 |
| 11(b) | Services | 20 |
| 11(c) | Payment by Lessee | 25 |
| 11(d) | Maintenance and Repairs | 26 |
| 11(e) | Permits and Authorizations | 27 |
| 11(f) | Alterations | 28 |
| 11(g) | Maintenance Audit | 31 |
| 12 | Revenues from Operations of Leased Premises | 31 |
| 12(a) | Ticket Sales | 31 |
| 12(b) | Licensing and Broadcasting | 33 |
| 12(c) | Advertising; Scoreboard(s) and Signage | 33 |
| 12(d) | Food, Drink and Other Concessions | 34 |
| 12(e) | Novelty Sales | 34 |
| 12(f) | Premium Seating Payments | 34 |
| 12(g) | Naming Rights for the New Stadium | 35 |
| 12(h) | Promotions | 36 |
| 12(i) | Other Events | 36 |
| 13 | Existing Pedestrian Walkway | 36 |
| 14 | Capital Repairs | 36 |
| 14(a) | Definition of Capital Repairs | 36 |
| 14(b) | Proposal of Capital Repairs | 40 |

D04:[01034.DOCS.CLE01165]LEASE_6_12_96.

| Section Number | Descriptive Heading | Page Number |
|---|---|---|
| 14(c) | Preparation of Capital Repair Plans | 41 |
| 14(d) | Construction of Capital Repairs | 42 |
| 14(e) | Resolution of Disputes | 43 |
| 14(f) | Capital Repair Fund | 44 |
| 14(g) | Capital Repair Audit | 47 |
| 14(h) | Emergency Repairs | 48 |
| 14(i) | Lessee's Capital Improvements | 49 |
| 15 | Title to Alterations and Capital Repairs | 49 |
| 16 | Use of Premises | 50 |
| 16(a) | Permitted Use | 50 |
| 16(b) | Unlawful Use | 50 |
| 17 | Compliance with Laws | 51 |
| 18 | Indemnification | 51 |
| 19 | Insurance | 52 |
| 19(a) | Lessee Insurance Requirements | 52 |
| 19(b) | City Insurance Requirements | 54 |
| 19(c) | Waiver of Subrogation | 54 |
| 20 | Damage or Destruction | 55 |
| 20(a) | Repair of Damage | 55 |
| 20(b) | Reduced Seating Capacity | 57 |
| 20(c) | Extension of Term | 58 |
| 21 | Condemnation | 58 |
| 22 | Default | 60 |
| 22(a) | Remedies of City | 60 |
| 22(b) | City's Right of Re-Entry | 62 |

| Section Number | Descriptive Heading | Page Number |
|---|---|---|
| 22(c) | Lessee's Liability to Date of Termination | 62 |
| 22(d) | Lessee's Subleases and Agreements | 63 |
| 22(e) | Right of Specific Performance | 63 |
| 22(f) | The City's Remedies are Cumulative | 63 |
| 22(g) | Interest On Arrearages | 64 |
| 22(h) | Special Remedy of Lessee | 64 |
| 23 | Permitted Encumbrances | 65 |
| 23(a) | Subletting Allowed | 65 |
| 23(b) | Pledge of Revenues | 66 |
| 23(c) | No Other Liens | 67 |
| 23(d) | Prohibition | 68 |
| 24 | Scheduling the City's Rights of Use | 69 |
| 25 | Successors and Assigns | 70 |
| 26 | Leased Premises Condition | 70 |
| 27 | The City's Right to Inspect | 71 |
| 28 | Surrender | 71 |
| 28(a) | Surrender and Delivery | 71 |
| 28(b) | Removal of Personal Property | 72 |
| 28(c) | Abandonment | 72 |
| 28(d) | Holdover | 72 |
| 28(e) | Delay in Surrender | 73 |
| 29 | Recordation | 73 |
| 30 | Waiver | 73 |
| 31 | Estoppel Certificates | 74 |
| 32 | Approvals and Consents | 74 |

| Section Number | Descriptive Heading | Page Number |
|---|---|---|
| 33 | Lessee's Equal Employment Opportunity and Affirmative Action Policies; Minority Participation | 75 |
| 33(a) | Compliance with Laws | 75 |
| 33(b) | Lessee's Equal Employment Opportunity and Affirmative Action Policies | 75 |
| 33(c) | MBE/FBE Participation | 75 |
| 33(d) | Quarterly Report | 76 |
| 34 | Equal Employment Opportunity | 76 |
| 35 | Notice | 77 |
| 36 | Electrical Supply | 78 |
| 37 | Landlord's Lien | 78 |
| 38 | Quiet Enjoyment | 79 |
| 39 | Provisions Binding | 79 |
| 40 | Entire Agreement | 79 |
| 41 | Severability | 80 |
| 42 | No Partnership | 80 |
| 43 | Effectiveness of Lease | 80 |
| 44 | Schedules and Exhibits | 80 |
| 45 | Broker's Commission | 81 |
| 46 | Gender and Number | 81 |
| 47 | Headings and Captions | 81 |
| 48 | Governing Law | 81 |
| 49 | Time is of the Essence | 81 |
| 50 | Survival | 81 |
| 51 | Counterparts | 81 |

| Section Number | Descriptive Heading | Page Number |
|---|---|---|
| 52 | Third-Party Beneficiaries | 82 |
| 53 | Requirements of Law | 82 |
| 54 | Lessee as Manager | 82 |
| 55 | Court Costs and Attorneys' Fees and Expenses | 82 |
| Signatures | | 83 |
| Acknowledgments | | 85 |
| Fiscal Officer's Certificate | | 88 |
| Exhibit A - Assignment and Assumption of Lease | | 89 |
| Exhibit B - Description of Leased Premises | | 92 |
| Exhibit C - Signage Standards | | 93 |
| Exhibit D - Common Area Maintenance Criteria | | |
| Schedule 14(f) Capital Repair Fund Budget] | | 94 |
| Schedule 19 - Insurance | | 95 |

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

D04:[01004.DOCS.CLE01165]LEASE_6_12 96.

## LEASE BY WAY OF CONCESSION

This Lease by Way of Concession ("Lease") is made and entered into at Cleveland, Ohio as of the 26th day of April, 1996 by and between the CITY OF CLEVELAND, a municipal corporation and political subdivision of the State of Ohio (the "City"), through its Mayor and Director of Parks, Recreation and Properties pursuant to the authority of Ordinance No. 303-96, passed by the Council of the City on March 8, 1996, and the NATIONAL FOOTBALL LEAGUE, an unincorporated, non-profit association organized in accordance with the NFL Constitution, individually as to Section 3, and as nominee for the New Owner, with its principal office located in New York, New York, through its Commissioner pursuant to the authority of 1996 Resolution G-1 (such New Owner as the assignee of as this Lease is referred to as the "Lessee").

## RECITALS

A.    The City has provided and wishes to continue to provide a source of public relaxation and entertainment through the construction, ownership and leasing of a sports facility as that term is defined in Sec. 307.673 of the Revised Code (the "Act") for the play of professional football games and the presentation of other entertainment and public attractions.

B.    The maintenance of public safety and order during the operation of a sports facility will require policing and regulation by the City which can best be achieved by the City's acquisition and construction of that sports facility.

C.    The City has reviewed various economic feasibility reports which conclude that the acquisition and construction of a sports facility and the leasing of it for the play of professional football games will result in the creation of jobs and employment opportunities and

that a professional football team will improve the economic welfare of the City and its people through increased spending of individuals residing both inside and outside the City.

D. The attraction of a professional football team to the City will not only enrich the City and serve as a catalyst for development, but also will project an image of civic pride and commitment.

E. The City has entered into the Franchise Commitment Agreement dated as of April 26, 1996 ("NFL Agreement") with the National Football League (the "NFL") under the terms of which the NFL has agreed, among other things, to provide an NFL franchise in Cleveland in consideration of the City's agreement to construct a new stadium as described in Section 4 (the "New Stadium"), to enter into this Lease with the City pending the identification of the owner of the Cleveland NFL franchise, and to assign this Lease to such new owner ("New Owner").

F. The New Stadium to be acquired and constructed by the City will be a sports facility within the meaning of the Act, and the NFL and the New Owner each is an owner within the meaning of the Act.

G. The New Stadium will be located in an urban renewal area of the City known as the North Coast Harbor Community Development Plan Area and the City's development of the New Stadium in that area and the lease of the New Stadium to the NFL and the New Owner pursuant to this Lease will be undertaken for the foregoing purposes and for the elimination of conditions of blight determined to exist in that Plan Area and to prevent the reoccurrence of such conditions of blight.

H.     The New Stadium will create activity centers around the downtown office and retail core, enhance the visual quality of downtown of the City, and enhance the downtown tourism market.

I.     It will be necessary for the City to enter into certain financing arrangements and other agreements all in accordance with the Charter of the City and the Constitution and laws of the State, including the Act, in order to finance the cost of the New Stadium.

J.     The Lessee will undertake to operate and maintain the Leased Premises (hereinafter defined) and to promote its use by the general public for the above described purposes.

K.     The City wishes to lease the Leased Premises to the Lessee and the Lessee wishes to lease the Leased Premises from the City on the terms and conditions contained herein.

L.     It is the intention of the Lessee and City that the improvements to the Leased Premises be exempt from taxation under Ohio Revised Code Section 5709.081 and this Lease has been structured to qualify for that exemption.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the parties hereby agree as follows:

1.     Public Purpose. The City is entering into this Lease in furtherance of the public purposes stated in the recitals, and including, without limitation, the public purposes of (a) providing to the citizens of the City and the State public attractions for their relaxation, entertainment and recreation, (b) the creation of jobs and employment opportunities that will improve the economic welfare of the City and the State, (c) the elimination of the conditions of

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

blight determined to exist in the Plan Area and the prevention of the reoccurrence of such conditions of blight, (d) stimulating further economic development in the City through, among other benefits resulting from having an NFL franchise in the City, the free advertising of the City as a tourism and business location in the media coverage of NFL games played in the New Stadium, the community pride and solidarity engendered by retaining the Cleveland Browns football team in the City, and the enhancement of community relations through the association of persons of differing racial, religious, and ethnic backgrounds in the New Stadium for a common cause.

2.    Definitions. The following defined terms will have the meanings ascribed to them in this Section 2 unless the context clearly indicates otherwise.

"Best efforts" as applied to the City does not require the City to undertake fruitless acts or to undertake commercially unreasonable expenditures considering the aggregate benefit to both parties or to exercise its power of eminent domain.

"Browns" means the Franchise (currently held in trust for the benefit of the people of the City under the Browns Holding Trust and to be assigned to the New Owner), its players, coaches, trainers, office and related personnel.

"Browns Holding Trust" has the meaning set forth in the Trust Agreement by and between the Baltimore Ravens, Inc. (formerly known as the Cleveland Browns, Inc.), as Settlor, and Paul J. Tagliabue, as Trustee, dated as of April 26, 1996.

"Capital Repair Fund" has the meaning set forth in Section 14.

"Capital Repairs" has the meaning set forth in Section 14.

"Capital Repairs Standard" has the meaning set forth in Section 14(c).

"City Events" has the meaning set forth in Section 24.

"Commencement Date" has the meaning set forth in Section 6(a).

"Common Area Maintenance Agreement" means the agreement relating to maintenance of certain property in the Plan Area, to be entered into by the City and the Lessee and to address the matters set forth in Exhibit D.

"Community Development Plan" means the North Coast Harbor Community Development Plan, approved by the Council of the City by and through Ord. No. 1346-91 passed June 17, 1991.

"Construction Contract Documents" means the "Contract Documents" as defined in Condition B-1 of the City of Cleveland General Conditions For a Public Improvement.

"Environmental Law(s)" means each and every law, statute, ordinance, regulation, rule, judicial or administrative order or decree, permit, license, approval, authorization or similar requirement of each and every federal, state and local governmental agency or other governmental authority relating to any Hazardous Substances, and including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Hazardous Materials Transportation Act, the Resource Conservation and Recovery Act, the Hazardous Substances Account Act, the Hazardous Substances Act, and the Underground Storage Tank Act of 1984.

"Final Acceptance Date" has the meaning set forth in the definition of "Substantially Completed."

"Financing Agreements" means the agreements to be entered into by the City to provide for the financing of the New Stadium.

"Franchise" means the Cleveland NFL franchise called the Cleveland Browns as described in the NFL Agreement.

"Hazardous Substance(s)" means any substance, material, condition, mixture or waste which is now or hereafter (a) defined as a "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," or "restricted hazardous waste" under any provision of the State, federal or other applicable law; (b) classified as radioactive materials; (c) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act, 33 U.S.C. Section 1251 et seq. (33 U.S.C. Section 1321) or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. Section 1317); (d) defined as a "hazardous waste" pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq. (42 U.S.C. Section 6903); (e) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq. (42 U.S.C. Section 9601); (f) determined to be a "hazardous chemical substance or mixture" pursuant to the Toxic Substances Control Act, 15 U.S.C. Section 2601 et seq. (15 U.S.C. Section 2605); (g) identified for remediation, storage, containment, removal, disposal or treatment in any City plan for the Plan Area; or (h) determined by the State, federal or local governmental authorities to pose or be capable of posing a risk of injury to human health, safety or property (including but not limited to petroleum and petroleum byproducts; asbestos; polychlorinated biphenyls; polynuclear aromatic hydrocarbons; cyanide; lead; mercury; acetone; styrene; and "hazardous air pollutants" listed pursuant to the Clean Air Act, 42 U.S.C. Section

"HOK" means Hellmuth, Obata & Kassabaum, Inc., Sports Facilities Group.

"Lease Commencement Certificate" has the meaning set forth in Section 6(c).

"Leased Premises" has the meaning set forth in Section 5(a).

"Lessee" means the New Owner.

"Material Capital Repairs" shall mean those Capital Repairs (excluding, for purposes of this definition, Capital Improvements) necessary, in the City's reasonable and prudent judgment as the owner of the New Stadium, (i) to protect the health and safety of the people working or attending events in the New Stadium; (ii) to prevent permanent damage to the roof, foundation, or structure of the New Stadium; or (iii) to assure basic building systems and utilities necessary for the use of the New Stadium.

"NFL" refers to the National Football League as presently constituted and to any successor entity or entities.

"NFL Agreement" means the Franchise Commitment Agreement dated as of April 26, 1996 between the City and the NFL.

"Net Proceeds" means, with respect to PSLs, all proceeds received in connection with the sale or marketing of PSLs net of any direct or indirect expenses incurred in connection with such sales or marketing including, but not limited to, expenses of marketing, legal expenses in connection with marketing and, if required, securities registration of PSLs, escrow fees in respect of the PSL Trust (as defined in the Stadium Financing Agreement), and taxes payable in respect of PSL proceeds.

"New Owner" means the Lessee as the owner or owners of the Franchise as described in the NFL Agreement.

"New Stadium" has the meaning set forth in Section 4.

"PSL" has the meaning set forth in Section 12(f).

"Plan Area" means the urban renewal area described in the Community Development Plan.

"Regular season" means the number of football games counting in the standings for the purpose of determining the NFL teams that will participate in NFL post-season play.

"Regular season home game" means any football game scheduled to be played by the Browns following the Final Acceptance Date during the regular season as a part of the competition for the NFL Championship, which is designated by the NFL in the official NFL schedule to be a home game and, subject to Section 2.7 of the NFL Agreement with respect to the first season of play in the New Stadium, shall not be less than one-half the number of regular season games; provided that notwithstanding the foregoing, once every two (2) calendar years, the NFL may schedule one game less than one-half the number of regular season games to be played at a location other than the New Stadium.

"Rules of the NFL" means those rules and regulations established and promulgated from time to time that are applicable to the ownership and operation of a Franchise, including any collective bargaining agreement, the NFL Constitution and By-laws, the Standard Player Contract, the NFL Player Contract and the Bert Bell NFL Player Retirement Plan and Trust Agreement.

"Stadium Financing Agreement" means the Stadium Financing Agreement dated as of April 26, 1996 between NFL Enterprises, L.P. and the City of Cleveland.

"Stadium Standards" has the meaning set forth in Section 11(f)(ii).

"State of Ohio Lake Erie Submerged Land Lease" means the Lease of Lake Erie Submerged Lands entered into by the State of Ohio and others which grant leasehold interests in submerged lands that are a part of and adjacent to Lake Erie.

"Substantially completed" means, with respect to the construction of the New Stadium, that all final use and occupancy permits have been obtained by the City and delivered to Lessee, and the work on the New Stadium has been finally accepted by the Director of Parks, Recreation and Properties, as evidenced by his signature upon his Certificate of Completion and Acceptance filed in the Office of Commissioner of Accounts of the City, a copy of which shall be sent to the City's contractor, less only minor punch list items which do not materially interfere with Lessee's use and occupancy of the New Stadium for its intended purposes (including, without limitation, use of all Club Seats, private suites and other seating, and the use and function of all restrooms, concessions, entrances, passageways and parking lots) and which do not materially adversely affect the New Stadium's appearance as a complete and fully operational stadium, and which may be completed within sixty (60) days following the date of such certificate. Such acceptance shall be deemed to have taken place as of the date so stated in such certificate (the "Final Acceptance Date").

"Term" shall have the meaning set forth in Section 6(b).

"Work" shall mean, with respect to construction, alterations, or Capital Repairs, the furnishing of all labor, materials, tools, equipment, incidentals and any other thing necessary

or required for the full performance of the Construction Contract Documents by the contractor, including all such required or necessary as called for in any proper subsidiary agreement.

3.    Assignment and Assumption of Lease by New Owner.  Other than the obligations of the NFL described in this Section 3, it is understood and agreed that the NFL is executing this Lease as a nominee for the New Owner and, as such, shall have no liability under this Lease.  Pursuant to the provisions of the NFL Agreement, the NFL agrees to assign all of its interest in and to this Lease to the New Owner, after the New Owner is identified by the NFL, and to cause the New Owner promptly to sign and deliver to the City such written instruments as are necessary and appropriate to evidence the assumption by the New Owner of all of the terms of this Lease and all of the obligations and liabilities of Lessee hereunder which arise after the date of assignment, such written instruments to include, without limitation, an Assignment and Assumption of Lease in the form of Exhibit A attached hereto and made a part hereof.  Any provision hereof or of law to the contrary notwithstanding, the NFL acknowledges that the City has the right to specific performance of the NFL's obligations under this Section 3 as provided in Section 22(e) of this Lease.  In connection with such assignment, the City shall be under no obligation to make any payment or provide any consideration to the New Owner or the NFL other than as provided in this Lease.

4.    Construction of New Stadium.  As additional consideration for the NFL's willingness to execute and deliver this Lease, the City is willing to construct buildings and other improvements on the Leased Premises (sometimes hereinafter collectively referred to as the "New Stadium") subject to the consummation of the Financing Arrangements as defined in the Stadium Financing Agreement.  The New Stadium is to be constructed by the City in accordance with the NFL Agreement, the Stadium Financing Agreement and the Construction Contract Documents.  Any failure by the City to perform such obligations shall be governed by the provisions of the NFL Agreement and the Stadium Financing Agreement, and the Lessee

specifically consents and acknowledges that it is a third-party beneficiary only of the liquidated damages provision contained in Construction Contract Documents.

The provisions of this Section 4 shall not in any manner be deemed or construed to grant the Lessee any independent claim against the City.

5.    Leased Premises.

(a)    Real Estate and Improvements.  The City does hereby demise and lease unto the Lessee, and the Lessee does hereby take and lease from the City the real property described in Exhibit B attached hereto and made a part hereof, together with the buildings, structures and improvements that may be constructed thereon and any replacements, alterations and additions thereto, and, all rights, privileges and easements now or hereafter appurtenant to the premises described in Exhibit B hereto, the said premises, buildings, structures and improvements being sometimes hereinafter collectively referred to as the "Leased Premises"), subject to the Financing Agreements, all liens, encumbrances, easements, and clouds of title, covenants, conditions and restrictions, zoning ordinances, current taxes and assessments not yet due and payable, the terms and provisions of the Community Development Plan, and the rights of others under any State of Ohio Lake Erie Submerged Land Leases, none of which shall materially impair the Lessee's use or quiet enjoyment of the Leased Premises.  Within twenty (20) days of the execution of this Lease, the City shall provide to the NFL a title report relating to the Leased Premises, together with copies of all title documents referenced therein.  Within thirty (30) days following receipt of such title report and documents, the NFL shall identify any items which, if not cured by the City, would, in its reasonable judgment, interfere with the Lessee's use of the Leased Premises for the play of professional football, and would, therefore, constitute a breach of quiet enjoyment pursuant to Section 38 of this Lease.  The NFL shall identify any such items in writing, together with a detailed explanation of reasons why such items would interfere.  Any items not identified by the NFL as a breach of quiet enjoyment

hereunder shall be deemed to have been accepted by the NFL. The City shall present such detailed explanation to the City architect, who shall determine whether such items will interfere with the Lessee's use of the Leased Premises for the play of professional football. The City shall promptly remove all monetary liens or encumbrances therefrom, and shall remedy all other matters that the City's architect determines will interfere with the Lessee's use of the Leased Premises for the play of professional football.

In the event that the City enters into a ground lease of the Leased Premises, the ground lessor and the NFL or the Lessee, as the case may be, shall execute a non-disturbance and attornment agreement in a form reasonably acceptable to the parties.

(b) <u>Air Rights</u>. The City hereby reserves all air rights over the Leased Premises. The City is reserving the air rights described above in connection with the needs and requirements related to the operation of Burke Lakefront Airport. The City covenants that it will not construct any structures or improvements within the area of such air rights other than facilities in aid of arrival and departure of aircraft at Burke Lakefront Airport required by the Federal Aviation Administration.

(c) <u>Parking</u>. The City shall make available to the Lessee, free of charge, for home game days plus nine (9) additional days per year, parking spaces for four hundred fifty (450) passenger vehicles, which spaces shall be located north of Erieside Boulevard. The City agrees to cooperate in accordance with law with the Cleveland-Cuyahoga County Port Authority (the "Port Authority") to cause the Port Authority to enter into long-term parking agreements with the Lessee, at Lessee's expense, at reasonable rates (for leasing of entire lots), for an additional twenty-two hundred (2200) parking spaces for passenger vehicles. The City shall use its best efforts to help the Lessee obtain parking spaces for five hundred fifty (550) additional passenger vehicles to be located within reasonable proximity to the passageways and walkways to the New Stadium for private suite and club seat ticket holders. In no event

shall the Lessee take any action that would restrict Willard Park Garage for the use by the general public. The City shall also use its best efforts to help the Lessee obtain such additional parking spaces for passenger vehicles as may be necessary to comply with laws, rules and regulations relating to the required number of handicapped parking spaces.

      (d)    <u>Amendment of Legal Descriptions</u>. After construction of the New Stadium is completed and a new legal description for the parcel on which the New Stadium is located is available, the parties agree to amend this Lease to revise the legal descriptions of such parcel.

6.    <u>Lease Term</u>.

      (a)    <u>Commencement of Term</u>. The term of this Lease shall commence (hereinafter referred to as the "<u>Commencement Date</u>") on the later of (i) the Final Acceptance Date, or (ii) the date the City of Cleveland has issued a temporary, partial or permanent certificate of occupancy or (iii) the date of official acknowledgment by the NFL of its approval of the granting of an NFL franchise for the location of a professional football team whose regular season home games are to be played in the New Stadium. Prior to the Commencement Date, the City acknowledges and agrees, subject to prior notice from Lessee to the City, that it shall permit Lessee to occupy and use the Leased Premises prior to substantial completion of the New Stadium construction in order to begin its operations in preparation for its first NFL pre-season and regular season games, provided that such use and occupancy does not interfere with the completion of construction of the New Stadium and provided further that the Lessee shall have obtained all insurance coverage as required pursuant to Section 19 hereunder. No later than the Commencement Date, the City shall provide to the Lessee an updated title report relating to the Leased Premises, which report shall be dated within sixty (60) days prior to the Commencement Date and shall show all matters of record. No later than the Commencement

Date, the City shall have removed, released or otherwise terminated all monetary liens or

monetary encumbrances therefrom except those in connection with the Financing Agreements and taxes and assessments not yet due and payable.

(b)  Term.  The term of this Lease shall commence on the Commencement Date and continue thereafter to a date thirty (30) years (each full year and the period prior to the February 1st following the Commencement Date, a "Lease Year") from and after the February 1st prior to the first season in which the Browns commence participation in the NFL regular season games ("Term"), subject to extension pursuant to Sections 20 and 21 hereof.

(c)  Lease Commencement Certificate.  Within ninety (90) days following the Commencement Date, the parties shall enter into a Lease Commencement Certificate confirming the Term of this Lease, the monetary contribution of the NFL or the Lessee to the cost of the Leased Premises, the net proceeds, as of such date, from the sale of permanent seat licenses in the Premium Seating Campaign (as defined in the Stadium Financing Agreement), whether any club seat revenues are the subject of a waiver of Lessee's gate-sharing obligations under the NFL Constitution and, if so, the projected amount of the waiver, identification of any fixtures or personal property included within the Project Budget (as defined in the Stadium Financing Agreement) and such other informational matters as either party may reasonably request.

7.  Rental.  The rent to be paid by Lessee during the term of this Lease shall be an amount equal to (a) Two Hundred Fifty Thousand Dollars ($250,000.00) per year during the Term of this Lease, which shall be payable on or before February 1 of each Lease Year except for the first Lease Year, for which such rent shall be prorated based on the number of days comprising the first Lease Year and shall be payable no later than thirty (30) days following the Commencement Date; plus (b) the amount of the expenses of operation and maintenance of

Electronically Filed New 18/2021 05:53 PM / CONFIRMATION NUMBER 207384 / CV 21 947717 the Stadium to be paid directly by Lessee, which operation and maintenance obligations are

further described in Section 11.  The City and the Lessee intend that all costs, charges, expenses, impositions and obligations of every kind and nature whatsoever relating to the use, occupancy, repair and maintenance of the Leased Premises, including but not limited to, taxes (other than real property taxes), assessments, utility charges and expenses, insurance, operation, maintenance and repairs (other than those items which are defined as "Capital Repairs"), which may arise or become due during the term of this Lease shall be paid by Lessee, and Lessee hereby agrees to indemnify and save harmless the City from and against the same.

8.    Lessee's Representations.  Lessee represents and warrants that (a) the execution, delivery and performance by Lessee of this Lease are within the power of Lessee, and have been authorized by all necessary action; (b) this Lease has been duly executed and delivered by Lessee; and (c) this Lease and the documents referred to herein constitute valid and binding obligations of Lessee.  The Lessee acknowledges and agrees that except as expressly set forth in this Lease, there have been no representations or warranties made by or on behalf of the City with respect to the Leased Premises or with respect to the suitability of the Leased Premises for the conduct of the Lessee's business.

9.    Lessee's Covenants.  Lessee hereby covenants that it shall comply with the following:

(a)    Play of Games.  As additional consideration for the City's willingness to execute and deliver this Lease, the Lessee specifically agrees that the Browns will play, in the New Stadium, for not less than thirty (30) years, all regular season home games. Lessee also specifically agrees that the Browns will play in the New Stadium, for not less than thirty (30) years, all post-season, exhibition, all-star, wild-card, divisional playoff, conference championship, NFL Championship or other professional football games as may be scheduled, required, or authorized to be played in the New Stadium by the rules of the NFL, which are applicable generally to all NFL franchises and teams (the "Rules of the NFL").  During each

consecutive four (4) year-period during the Term of this Lease, the Lessee specifically agrees that the Browns will play, in the New Stadium, no less than one-half of the number of all pre-season games which are played at a participating team's home stadium.

      (b)    <u>Obligation to Maintain Franchise</u>. Lessee represents that it shall be, as of the Commencement Date, a member in good standing of the NFL and agrees that, throughout the Term of this Lease, it shall:

      (1)    maintain its membership and franchise in the NFL in good standing;

      (2)    (i) hold, maintain and defend its rights to play professional football in the City of Cleveland, Ohio, in accordance with the Rules of the NFL, be obligated to play home games of the Franchise at the New Stadium in Cleveland, Ohio, as provided in this Lease, (ii) not negotiate with any person or do or suffer to be done anything which will cause such rights to be lost or impaired or diminished in any respect, or transferred, relocated or otherwise moved or (iii) not sell the Franchise to another person or entity which has the then present intent to relocate, transfer or otherwise move the Franchise to any other city or location, and (iv) not modify the Franchise to permit the Browns to play regular season home games or post-season home games (other than as required by the Rules of the NFL) in any such other city or location; and

      (3)    not assign or otherwise transfer its membership and franchise in the NFL unless the assignee or transferee assumes the obligations without modification of Lessee under this Lease arising or accruing from and after the effective date of such assignment or transfer.

(c)     Number of Games.  To the extent within the control of the Lessee, the Lessee covenants that during the Term of this Lease, the number of regular season home games during any NFL season shall not be less than eight (8).

(d)     Compliance with Community Development Plan.  Lessee hereby agrees on behalf of itself, its successors and assigns that it shall, for the duration of the Community Development Plan, devote the Leased Premises to, and only to and in accordance with, the uses specified in the Community Development Plan, as the same may be amended from time to time.  All additions, modifications and replacements made to the Leases Premises during the duration of the Community Development Plan shall conform thereto.  Without limitation of Lessee's other remedies hereunder, the City's modification of or amendment to the Community Development Plan in a way that materially adversely affects Lessee's use of the facility as the venue for professional football games shall constitute a breach of Lessee's quiet enjoyment pursuant to Section 38.

(e)     Nondiscrimination.  Lessee agrees on behalf of itself, its successors and assigns not to discriminate against any person or group of persons on account of race, religion, color, sex, sexual orientation, national origin, age, disability, ethnic group or Vietnam-era or disabled veteran status in the sublease, use, occupancy, maintenance, improvement, tenure or enjoyment of the Leased Premises.

(f)     Signage Plan.  A complete signage plan for the Leased Premises shall be submitted to and approved by the City Planning Commission.  That plan shall be site specific but shall be generally consistent with and encompass the matters addressed in the signage plan standards for the Gateway Sports Complex, which standards are attached as Exhibit C hereto.

(g)     Right of Specific Performance.   Any provision of law to the contrary notwithstanding, Lessee acknowledges that the City has the right to specific performance of the Lessee's obligations under paragraphs (a), (b)(2), and (b)(3) and (c) of this Section 9 as provided in Section 22(e) of this Lease.

10.     Taxes and Assessments.

(a)     Taxes Paid by City.  The City shall be responsible for the payment of all real property taxes and assessments, general or special, and all impositions by any governmental entity or authority in the nature of or as a replacement for real property taxes relating to the Leased Premises.  The Lessee shall cooperate with the City (but shall not be required to incur out-of-pocket expenses) in any application or application process relating to the exemption of the Leased Premises from taxation; provided that the Lessee shall not thereby be required to increase its obligations or reduce its rights under this Lease.

(b)     City's Expenses Prior to the Commencement Date.  The City, and not the Lessee, shall be responsible for unpaid bills or payroll of the City for work done or services performed at the Leased Premises prior to the Commencement Date.

11.     Costs of Operations and Maintenance of the Leased Premises.  All costs, expenses and obligations of any kind relating to the operation or maintenance of the Leased Premises which may arise or become due and payable during the Term of this Lease shall be paid by the Lessee.

(a)     Costs of Operations and Maintenance.  Such costs, expenses and obligations shall include, without limitation:

(1)    An amount equal to the admissions tax, if any, paid or payable by Lessee to the City pursuant to "Chapter 195 of the Codified Ordinances of Cleveland, Ohio 1976," as amended from time to time;

(2)    The amount of any similar tax which is imposed directly on the sale of tickets, and which is paid or payable by Lessee, whether city, county, state or federal, and whether in the nature of an admissions tax, sales tax or otherwise (other than federal, state or local income taxes, or other taxes measured by income or imposed upon the privilege of carrying on or conducting business in general);

(3)    The amount of any other taxes or governmental impositions and charges of every kind and nature whatsoever, whether or not now customary or within the contemplation of the parties, (including, without limitation, any parking tax) other than the taxes that the City has agreed to pay pursuant to Section 10.

(4)    Any commissions or fees paid or payable or any rebates or donations given to any sponsor, promoter, charity or other person or entity for or in connection with the sale or other distribution of tickets or other rights for the admission of spectators to the New Stadium;

(5)    The cost of footballs, helmets or any other items distributed, or any fees or charges paid or payable to any promoter, for or in connection with any promotions related to admissions to the New Stadium; and

(6)    Any other costs or expenses incurred in connection with the sale or distribution of tickets or other rights for admission to the New Stadium.

Without limitation of the Lessee's other remedies hereunder, the City's amendment or modification of the existing admissions tax ordinance or enactment of a new admissions tax ordinance such that taxes are imposed in whole or in part on admissions to the New Stadium that are not imposed on admissions to other entertainment venues that are subject to the admissions tax generally and, in particular, that are not imposed on admissions to all professional sports events generally shall constitute a breach of Lessee's quiet enjoyment pursuant to Section 38.

(b)    Services.  All New Stadium services shall be operated, managed, supervised and paid for by Lessee.  Such services shall include, without limitation:

(i)    Services for Games.  Lessee shall provide, at its own cost and expense, the services for all professional football games and other events to be played in, held at, or to take place in, and to be exhibited to the public in, the New Stadium, including, without limitation:

(A)    The sale and taking of tickets for admission to each such game or event;

(B)    Customary precautions for crowd control within the New Stadium by means of providing such ushers, doormen, security personnel, emergency personnel, and special police as reasonably may be appropriate for projected attendance at each such game or event, and the City and the Lessee agree that police protection outside of the New Stadium (both on and off the Leased Premises) shall be provided at the City's sole cost and expense and that police protection at the gates to the New Stadium shall be deemed to be within the New Stadium and therefore shall be provided at the cost and expense of the Lessee; provided, that the

City shall bear the cost of any extraordinary level of police protection within the New Stadium over and above normal levels of security, which is necessitated by events outside of Lessee's control, as the City may, in its sole discretion, deem appropriate;

(C)     First-aid service for spectators at each such game or event;

(D)     Technical personnel for the operation of New Stadium systems, including public address, sound, video replay and electronic scoreboard systems for each such game or event;

(E)     Services for the use of public toilets and washrooms, and similar facilities for the media and press, and for the use of the team rooms and officials' room and adjoining showers, bathrooms and toilets, by means of providing such attendants, together with towels, soap, toilet paper and other supplies, therefor as reasonably may be necessary or appropriate;

(F)     Such other customary services pertaining to the admission of spectators to, and the use by spectators of, the premises of the New Stadium for each such game or event, as may be deemed necessary or appropriate by Lessee; and

(G)     Subject to the provisions of Section 11(b)(i)(B), coordinating, supervising, implementing and enforcing vehicular and pedestrian traffic flow into and out of the New Stadium;

(ii)    Groundskeeping.  Lessee shall provide all groundskeeping services with respect to the playing area of the New Stadium and appurtenant facilities.  Lessee shall, at its own cost and expense, obtain and provide staff, equipment and supplies as are necessary or appropriate to the provision of groundskeeping services, which shall include specifically, but without limitation:

(A)    The entire cost of maintaining the surface of the playing area in a condition satisfactory for playing professional football, and all overhead costs of maintaining a groundskeeping crew and equipment.

(B)    The entire cost of preparing the surface of, and marking lines on, the playing area, and of installing and removing goal posts, team benches and otherwise.

(C)    The cost of leasing or otherwise obtaining special equipment and supplies, including field covers, for use in connection with preparing or maintaining the surface of the playing area.

(D)    The entire cost of preparation, conversion and/or restoration of the surface of the playing area with respect to any related event or activity scheduled or arranged by Lessee to be held at, or to take place in the New Stadium.

(E)    After initial construction of the New Stadium and the original placement of the surface of the playing field, the entire cost of preparing the surface of the playing area for the playing of professional football.

(F)    The cost of repairing any damage to or destruction of the surface of the playing area.

(G)    The cost of providing, repairing, maintaining and replacing all lawn mowing equipment, snow removal equipment, material handling equipment and other similar equipment necessary or advisable, in the Lessee's reasonable discretion, for the proper operation and maintenance of a football stadium.

(iii)    <u>Cleaning and Janitorial</u>.    Lessee, at its own cost and expense, shall provide such cleaning, janitorial and ordinary maintenance services as may be necessary or appropriate to keep the Leased Premises clean and in good order for the purposes for which Lessee has been granted the right to use and occupy the same.

(iv)    <u>Utilities</u>.

(A)  The City shall cause to be supplied such water and electric utility services, sewer, drainage or other utility services as may be necessary or appropriate for the operation of the Leased Premises. The City shall supply such utility services as are necessary for the operation by the Lessee, at Lessee's expense, of lighting and operating spectator facilities, for television and radio broadcasting for cable television and telephone and for the operation of all other New Stadium services, premises and facilities, including without limitation, ordinary heating and air conditioning, ventilating, hot water, water, plumbing and drainage services and facilities for the home and visiting team rooms and officials room, and field lighting for the playing area satisfactory for the playing of night football. Lessee shall pay for the use and consumption of all

utility services at its own cost and expense. The City shall cause the services for utilities at the New Stadium to be separately metered, and shall cause the same to be billed directly to Lessee. Lessee shall obtain and maintain at its sole cost and expense such telephone service, including field telephones, as it may deem appropriate, provided that it shall be entitled to use, at its own cost and expense, all appliances included in the construction of the New Stadium. Lessee shall also be solely responsible for obtaining, and for the payment of all charges (including deposits), programming fees and service charges for the use of, cable television incurred by Lessee or its sublessees.

(B) The City shall use its best efforts to assure that such services are provided or supplied pursuant to the foregoing provisions of this Section 11, free from any interruption or suspension. In the event of the failure or inability of the City to obtain, procure, supply or provide any such service for a period of ten (10) consecutive days or less, or in the event of any interruption or suspension in the provision or supply thereof for a period of ten (10) consecutive days or less, due to the making of the improvements and repairs described in Section 14 below, or due to any necessary repairs, renewals, extensions or improvements to the facilities required to be made by the City hereunder which are used in providing any such service, or any shortage of fuels or supplies, or any strike, lockout, act of God or war, governmental rules, regulations, decrees or statutes, or any other cause or causes reasonably beyond the control of the City, the City shall not thereby be deemed or considered to have incurred any liability to Lessee for damages whatsoever, so long as it has complied with the provisions of this Section 11(b)(iv)(B), nor shall Lessee be deemed to have been evicted or unreasonably disturbed in its

use and occupancy of the Leased Premises, or be entitled to any deduction or setoff against the charges to be paid to the City hereunder, or, except as hereinafter provided, otherwise relieved from the performance of its covenants, duties and responsibilities hereunder.  Notwithstanding the foregoing, the City shall undertake and diligently pursue all reasonable steps to minimize the effect of any such failure, interruption or suspension of service and to restore the same.  In the event that any interruption or suspension in the provisions or supply of services for utilities at the New Stadium renders the New Stadium unusable for the playing of regular season home games, Lessee's covenant under Section 9(a) of this Lease shall be suspended commencing on the date of such interruption or suspension and continuing, based on the nature and severity of the interruption, but in no event beyond the date that is fourteen (14) calendar days after the date the provision or supply of services is fully restored. Moreover, in the event of such an interruption or suspension, the City shall work cooperatively with the Lessee to identify substitute facilities reasonably acceptable to the Lessee for the playing of Lessee's regular season home games and shall facilitate the arrangements between the Lessee and the owner of such site.

(v)     Services to Suites and Club Seats.  Lessee, at its own cost and expense, shall provide all guest services to the suites and club seats.

(c)     Payment by Lessee.  The Lessee covenants and agrees from and after the Commencement Date, at its own cost and expense, to pay to the utility company or companies supplying the same, as the same become due and payable and before any fine, penalty, interest or other charge may be added thereto for the nonpayment thereof, all water, gas, electric and sewer rents, rates and charges, charges for utilities, becoming due and payable

out of, or in respect of, or becoming a lien on the Lease or Leased Premises, payable as a result of Lessee's use or occupancy of the Leased Premises.

The Lessee may, if it disputes the amount or validity of any charges, penalties or claims, described in Section 11(c), contest and defend against the same at its cost, and in good faith diligently conduct any necessary proceedings to contest, prevent, and avoid the same, and to withhold the payment thereof pending final determination and shall immediately discharge and remove any lien arising or attaching. On final determination of any claims, the Lessee shall immediately pay any judgment rendered with all proper costs and charges and at the Lessee's sole expense.

(d)     Maintenance and Repairs. The maintenance and repair obligations of the Lessee pursuant to this Section 11(d) shall include all Work not defined as a Capital Repair pursuant to Section 14(a).

(i)     The Lessee shall, at its own cost and expense, provide all routine maintenance to ensure compliance with the terms of this Lease and in order to maintain the Leased Premises. Such routine maintenance shall comprise and include, without limitation, providing routine maintenance to the Leased Premises, and all alleyways, passageways, walkways, promenades, parking areas, plazas, sidewalks, curbs and vaults contained on the Leased Premises, and Lessee shall keep the same in good order and clean, sanitary and safe condition, except for reasonable wear and tear. All repairs, maintenance, replacements, restorations or renovations made by Lessee shall be at least equivalent in quality, workmanship and class to the original work.

(ii)     Lessee shall put, keep and maintain all portions of the Leased Premises, and the sidewalks, walkways, promenades, parking areas,

plazas, curbs, alleyways, vaults and passageways adjoining the same in a clean, safe and orderly condition, free of accumulations of dirt, rubbish, snow, ice and unlawful obstructions. Maintenance shall be performed in a nonintrusive and noncorrosive manner.

(iii) The Lessee shall, at its own cost and expense, keep, replace and maintain in good and safe repair, order and condition all present and future improvements on the Leased Premises including, but not by way of limitation, the playing surface of the New Stadium, building, fixtures, windows, doors, parts and equipment, electrical systems, plumbing, ventilation, heating and air conditioning, sprinkler systems, lighting and seating, scoreboard and signage, irrigation and sewage system, parking areas, landscaping on the Leased Premises, driveways and access roadways on the Leased Premises, and utility lines and connections, both inside and outside, extraordinary and ordinary.

(iv) The Lessee shall not suffer or permit wasting, damages or injury and shall, at its own cost and expense, use all reasonable precautions to prevent waste, damage or injury.

(v) The Lessee shall, at its own cost and expense, operate the illumination systems for parking or pedestrian areas situated on the Leased Premises during and for a reasonable time before and after events at the New Stadium.

(e) Permits and Authorizations. The Lessee shall, at its own cost and expense, make all required applications, petitions and other filings as necessary and shall obtain and maintain all permits, licenses and other authorizations necessary fully to enjoy the uses and benefits of the Leased Premises other than the permits and authorizations for the initial

construction of the New Stadium or otherwise relating to periods prior to the Commencement Date, which shall be the obligation of the City.

        (f)    <u>Alterations</u>.

        (i)    The Lessee shall, at its sole cost and expense, be permitted to make changes to or alterations in, or additions or improvements to, the Leased Premises as provided in this subsection. Alterations, additions or improvements affecting the structure of the New Stadium shall not be made without the prior written consent of the City. The Lessee shall deliver to the City, with a copy to the President of the Council of the City, written notice of any such other change, alteration, addition or improvement in excess of $100,000. Lessee shall make no structural changes or alterations in, or additions or improvements to, all or any part of the New Stadium or the Leased Premises without, in each such instance, first making a written proposal to the City specifying the proposed work. The City shall review such request, through its Director of Parks, Recreation and Properties, and determine, in its reasonable judgment, whether to permit such alteration to be made. The City agrees that it will not unreasonably withhold, delay or condition its review and determination. The City shall make such determination within thirty (30) days of its receipt of the written request from the Lessee. If the City determines that such structural alteration may be made, the City shall so notify the Lessee, within such thirty-day period. If the City determines that such alteration may not be made, the City shall deliver, within such thirty-day period, a written determination to that effect to the Lessee including its reasons for such determination. The Lessee may, but shall not be required to, make any modifications or revisions to its request and resubmit such request to the City for determination in the same manner provided above.

(ii)     The Lessee shall work with the City's architect to prepare construction drawings and specifications for making all alterations requiring the City's consent (the "Alteration Plans").  The Lessee shall be responsible for paying the architect's fees and expenses and all other costs associated with making the alterations.  The Lessee agrees that such Alteration Plans shall conform to the minimum standards at such time for then-existing NFL stadia generally (the "Stadium Standards").  The Lessee shall cause the Alteration Plans to be prepared and delivered to the City within thirty (30) days after the City's determination pursuant to Section 11(f)(i) above.  The City shall have the right to review the Alteration Plans to assure compliance with the Stadium Standards. In the event the City reasonably believes that the Alteration Plans do not conform to the Stadium Standards, the City shall so notify the Lessee of its determination within thirty (30) days after the Alteration Plans are delivered to the City.  The City agrees that it will not unreasonably withhold, delay or condition its review and approval.  In the event that the City and the Lessee disagree concerning any portion of the Alteration Plans, such dispute shall be settled in accordance with Section 14(e).  The Lessee shall not have the right to proceed with the construction of the alterations as proposed in the Alteration Plans until it has obtained all necessary consents and approvals from the City and its various departments, commissions, agencies, boards and officers in accordance with the terms of this Lease.

(iii)     After the Alteration Plans have been reviewed and approved, the Lessee agrees to cause the alterations to be made and carried out in accordance with such Alteration Plans.  The Lessee shall have the right to select and enter into contracts with any and all contractors, subcontractors, suppliers, vendors, architects, engineers, construction manager, project managers,

consultants or other entities or individuals with respect to the completion of the

alterations, all with the prior reasonable approval of the City. The Lessee shall require and obtain from its contractor(s) engaged to construct the alterations performance and payments bonds (or insurance or other security), in an amount equal to one hundred percent (100%) of the amount of the contracts if reasonably available or otherwise in an amount that is reasonably available, for recovery of actual and liquidated damages, including but not limited to damages for delay that may be claimed by the Lessee or the City. In addition, the Lessee shall require and obtain from its contractor(s) and subcontractor(s) engaged to construct the alterations insurance with the same types of coverages, terms and conditions as provided in Section 19, with the City as an additional insured, except that the limits of coverage may be adjusted and the types of coverage may be increased, as reasonably acceptable to both the City and the Lessee, in accordance with the cost and nature of the work to be performed by the contractor(s) or subcontractor(s) in order to protect the interests of the Lessee and the City, respectively. The Lessee shall use its best efforts to obtain for the benefit of the City and the Lessee from each contractor and subcontractor standard commercial warranties for all work performed by such contractor or subcontractor.

(iv)     Any such change, alteration, addition or improvement so permitted shall be made in good and workmanlike manner and in compliance with all applicable permits, authorizations, building and zoning laws or ordinances and with all other laws, ordinances, orders, rules, regulations and requirements of all federal, state, municipal or other local governments, and their duly constituted departments, commissions, agencies, boards and officers. The Lessee agrees to permit the City to observe all such work, but the City shall have no obligation to do so.

(g) Maintenance Audit. Commencing on the January 1 after the Commencement Date and on each anniversary of the Commencement Date thereafter during the term of this Lease, the Lessee shall, at its own cost and expense, provide the City, and the President of the Council of the City, with a maintenance inspection report on the New Stadium from a licensed engineer, reasonably acceptable to the City, having at least ten (10) years of experience in performing maintenance inspections of commercial buildings, including stadia, and otherwise qualified to provide the information required hereunder (the "Maintenance Engineer"). The Maintenance Engineer shall report on the condition of the structure and each capital component of the Leased Premises, which report shall include suggestions for any current maintenance work that is necessary to the Leased Premises (such report, the "Maintenance Audit"). The Lessee shall maintain a log for the Leased Premises, which log shall include a copy of all Maintenance Audits as well as a record in reasonable detail of all maintenance work undertaken by the Lessee or the Lessee's agents or representatives.

(h) New Owner as Lessee shall sign and deliver the then existing Common Area Maintenance Agreement simultaneously with the signing of written instruments evidencing the assumption of this Lease by the New Owner.

12. Revenues from Operations of Leased Premises. As between the City and the Lessee, the Lessee shall receive one hundred percent (100%) of all revenues from New Stadium operations, whether direct or indirect (through sublessees or otherwise) excluding, however, any revenues from City Events. Revenues to be received by Lessee shall include, without limitation:

(a) Ticket Sales. "Gross revenues", as hereinafter defined, paid or payable to Lessee, or to any other person or entity entitled or authorized to receive the same by, through or on behalf of Lessee, for or with respect to the admission of spectators to any

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

professional football game played or scheduled to be played in the Stadium, whether regular

season, pre-season, post-season, exhibition, all-star, divisional playoff, conference championship, NFL Championship or otherwise, or to any related event authorized or permitted to be conducted or scheduled to be held by Lessee in the New Stadium and for which a separate charge or fee for admissions is received or receivable by Lessee.

As used in this Section 12(a), the term "gross revenues" shall be defined and construed to mean gross receipts, specifically including, without limitation:

(1)     All sums of money, after the payment of admissions taxes, received or receivable from the sale of tickets or other rights for admission to the New Stadium, regardless of whether such tickets or rights have been presold and donated or returned or otherwise transferred prior to such sale, but excluding any sums refunded to purchasers of tickets for tickets returned prior to the exhibition of the game or event to which the same pertain, all subject to the Lessee's commitment to make certain tickets available to the community free of charge as described below;

(2)     All fees or royalties paid or payable by any sponsor or promoter for or in connection with the right or privilege of selling or distributing tickets or other rights for admission to the New Stadium;

(3)     All service charges or other fees charged by Lessee for passes for admission or ticket exchanges;

(4)     Any and all other amounts received or receivable for or with respect to the admission of spectators to the New Stadium; and

(5)    The value of all credits, tradeoffs, setoffs, and other economic benefits received in lieu of cash.

It is Lessee's intention to make available free of charge a "reasonable number" of tickets for each game played at the New Stadium to a nonprofit or civic organization for distribution to low-income or disadvantaged persons. Such "reasonable number" shall be determined by Lessee in light of NFL policies limiting the number of complimentary tickets and competing needs for complimentary tickets, but shall in no event be less than two hundred and fifty (250) tickets per game.

Lessee shall have full charge, authority and responsibility for the printing, wording, custody, sale and distribution of tickets for admission to all professional football games played by the Browns, and to all events or activities scheduled or arranged by Lessee to be held at or to take place in the New Stadium. Subject to the free tickets described above, Lessee shall have full discretion and authority with respect to establishing the prices to be charged for tickets for admission, including promotional and charitable sales and distributions. Subject to provisions in the Stadium Financing Agreement regarding the sale of PSLs, Lessee shall have full discretion and authority with respect to establishing the time, place, manner of ticket sales and eligibility to purchase tickets.

(b)    Licensing and Broadcasting. All fees and revenues from all radio and television licensing and broadcasting and other forms of telecommunications activities.

(c)    Advertising; Scoreboard(s) and Signage. All fees and revenues from advertising, signage (permanent or temporary) in or on the New Stadium or the Leased Premises, including without limitation, scoreboard, screens, banners or displays, time clocks,

Electronically Filed messages, posters, marquees, signs or other signage or any publications necessary for NFL games or
from which Lessee produces any advertising revenues throughout the entire year.

(d)     Food, Drink and Other Concessions.     All revenues from and charges for food and beverages, including alcoholic beverages (subject to all applicable licensing requirements), all game programs, yearbooks, and similar publications relating to the Browns, the NFL or otherwise.

(e)     Novelty Sales.  The proceeds of the sale of products including, without limitation, NFL novelties and licensed products, to the general public.

(f)     Premium Seating Payments.  Revenues from all suite or club seats located, or to be located, in the New Stadium; provided, that with respect to the suites and club seats to be part of the New Stadium, the initial licensing and/or leasing shall be undertaken as described in the Stadium Financing Agreement.  Lessee acknowledges that its rights to the Leased Premises are subject to the rights of the lessees or licensees under those premium seating leases or licenses and the Lessee will by assignment accept and assume all the obligations and liabilities of the lessor or licensor under those leases or licenses.  Except with respect to the initial term of any leases or licenses assumed pursuant to the previous sentence, Lessee shall have full charge, authority and responsibility to lease, rent, license, sell or otherwise grant the right to use the suites and club seats and to establish the price or prices to be charged therefor, and Lessee shall be entitled to lease, rent, license, sell or otherwise grant the right to use each suite and club seat to such persons or entities, for such term or period of time, and upon such terms and conditions as it, in its sole discretion, deems desirable.

Net Proceeds from the sale at any time of permanent seat licenses ("PSLs") in excess of $35 million shall be (i) paid to the City and applied by the City first to reimburse any draws from the Capital Repair Fund made for the purpose of obtaining funds to pay the initial costs of construction of the New Stadium and (ii) then shall be paid to the City and applied by the City to reduce its contribution to the initial costs of construction of the New Stadium (by

Electronically Filed during the original principal amount of the City's Financing Agreements, or subsequently by

redemption (in whole or in part) of the principal amount then outstanding under those Financing Agreements, or as a credit toward future payments under those Financing Agreements). "PSLs" shall refer only to the purchase for monetary consideration of a right or license that entitles the owner thereof to purchase specific seating tickets for some or all New Stadium events operated by the Lessee, its affiliates or licensees, for a period of years. Lessee acknowledges that its rights to the Leased Premises are subject to the rights of licensees under the PSLs, and the Lessee will by assignment accept and assume all the obligations and liabilities of the licensor under the PSLs.

   (g)    Naming Rights for the New Stadium.  All revenues received from marketing the name of the New Stadium.  The Lessee has the right to market the name of the New Stadium as the venue for the Browns' NFL games.  Any name chosen by Lessee shall be consistent with the NFL's then current policy with respect to the promotion and image of professional football taking due account of the fact that the game has substantial interest and appeal to youth.  The Lessee shall use commercially reasonable efforts to sell naming rights to a telecommunications company, financial institution, technology company, airline or other transportation company or major Cleveland-area employer.  The Lessee shall not permit any name to be given to the New Stadium without prior approval of the City Council, which approval shall not be withheld unless the proposed name (i) violates applicable law or (ii) would reasonably cause embarrassment to the City (such as names containing slang, barbarisms or profanity, that could be construed to encourage the use of tobacco or alcohol by minors, that relate to any illicit drugs or any sexually oriented business or enterprise, or that contain an overt political reference).  The City shall be deemed to have given its approval to any name requested by the Lessee unless, within thirty (30) days following the Lessee's request for such approval, the City notifies the Lessee of its disapproval and furnishes a written explanation, in reasonable detail, of the reasons why such name violates applicable law or would reasonably cause embarrassment to the City.  Without limiting the foregoing, the City may not condition its

approval upon receipt of any consideration from either the Lessee or the party acquiring the naming rights.

(h)  Promotions.  All revenues, fees and charges from promotional activities relating to Browns and non-Browns activities.

(i)  Other Events.  Except for City Events, all revenues, fees and charges from all sporting, entertainment and other events held in the New Stadium including, without limitation, New Stadium rent, tickets, ticket surcharges, concessions, programs, novelties, and advertising.

13.  Existing Pedestrian Walkway.  The City shall undertake to maintain in a safe and prudent manner that certain existing pedestrian walkway extending from the Mall "C" ("Walkway") over certain railroad rights and under the Cleveland Memorial Shoreway to the Leased Premises.

14.  Capital Repairs.

(a)  Definition of Capital Repairs.  Subject to the provisions of this Lease, including without limitation Sections 14(f) and 22(h), all Capital Repairs and, to the extent provided in Section 14(h), Emergency Repairs, shall be made by the City at the times and subject to the procedures and limitations specified in this Section 14, including without limitation Section 14(f).  The principal source of funds for Capital Repairs shall be the Capital Repair Fund.  The Capital Repair Fund shall be established and funded by the City as provided herein and (except as provided in Section 19(b)) shall be available only to make Capital Repairs.  The Capital Repair Fund shall not be used for ordinary maintenance and repair obligations or for

Electronically filed 01/05/2025 16:15 / / CV 25 1085618 / Confirmation Nbr. 3337124 / CLJSB

alterations which are the responsibility of Lessee and are described in Section 11 of this Lease.

"Capital Repairs" shall be defined as all Work for:

(i)     prudent and extraordinary repairs;

(ii)    repairs that have a useful life of greater than seven (7) years;

(iii)   repairs that are necessary, in the Lessee's reasonable judgment, to maintain the roof, foundation and the structural integrity of the New Stadium and preserve its usefulness for the purposes for which it is being leased hereunder;

(iv)    all "Capital Improvements," which are defined as all capital modifications or additions to the existing facilities in the New Stadium that maintain both the economic competitiveness of the New Stadium and its revenue potential as compared to other NFL stadia generally and create new revenue enhancing opportunities consistent with those provided in the top one-half of NFL stadia generally, and including modifications and additions that are intended to reduce the cost of the operation and maintenance of the New Stadium; and

(v)     such modifications or additions required by applicable City of Cleveland, County of Cuyahoga, State of Ohio or federal laws, rules, regulations, or building codes, including accommodations required to be made under the Americans with Disabilities Act of 1990, as amended.

Capital Repairs shall also include:

(A)  painting or application of protective coatings no more often than once every five (5) years;

(B)  after exhaustion of claims against any third parties, items covered under warranty and items that are the result of unsatisfactory work on the initial construction of the New Stadium and replacements caused by settling (i.e., broken glass, cracked windows, concrete);

(C)  replacement of carpeting no more than once every five (5) years;

(D)  repairs to or replacement of the playing surface of the New Stadium but only if such repair or replacement is required as a result of the City's construction of other Capital Repairs;

(E)  upgrades of components to field lighting and the scoreboard (including message board, bulbs and circuit breaker panels) no more often than once every ten (10) years; and

(F)  cleaning of the exterior facade of the New Stadium no more often than once every ten (10) years.

Notwithstanding the foregoing, for the first ten (10) years following the Commencement Date, no Capital Improvements shall be deemed to be Capital Repairs; provided, however, that modifications or additions to existing television or cable broadcasting infrastructure and field lighting systems may be deemed to be Capital Repairs during such ten-year period if such modifications or improvements are required by NFL standards that apply generally to all stadia in which NFL football games are played.

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

-38-

Capital Repairs shall not include:

(H)     items that would otherwise be Capital Repairs but that are necessitated by the actions of the Lessee and are not attributable to ordinary wear and tear;

(I)     periodic painting or the application of protective coatings more frequently than once every five (5) years;

(J)     repairs to carpeting or replacement of carpeting more frequently than once every five (5) years;

(K)     repairs to or replacement of the playing surface within the New Stadium (unless such repair or replacement is required as a result of City's construction of other Capital Repairs);

(L)     upgrades to components of the scoreboard more frequently than once every ten (10) years;

(M)     upkeep of the exterior facade of the New Stadium, or cleaning the exterior facade of the New Stadium more frequently than once every ten (10) years;

(N)     routine maintenance of plumbing systems, electrical systems, mechanical systems or heating, ventilation or air conditioning systems; or

(O)     tenant fixtures, finishes, build-out materials and supplementary equipment in any public restaurants in the New Stadium.

(b)    Proposal of Capital Repairs.  Either the City or the Lessee may propose that Capital Repairs be made to the Leased Premises.  If either the City or the Lessee knows of or discovers any legal requirements necessitating a Capital Repair, or any condition or defect in, damage to, or alteration of the physical structure, fixtures, appurtenances, machinery, equipment, furniture, systems, surfaces or any other component of the Leased Premises necessitating a Capital Repair, such party shall promptly notify the other of such legal requirement or condition.  If the Lessee proposes the Capital Repair, it shall submit its request in writing to the City specifying the proposed work and representing that such work falls within the definition of Capital Repairs set forth in Section 14(a).  Proposals for Capital Repairs must include cost estimates, preliminary design work (to be followed by more detailed plans) and proposed timetables.  The cost for the preliminary design work is reimbursable from the Capital Repair Fund if the Work qualifies as a Capital Repair.  The City shall review such request and determine, in its reasonable judgment, whether such proposed work is a Capital Repair.  The City agrees that it will not unreasonably withhold, delay or condition its review and determination.  The City shall make such determination within thirty (30) days following its receipt of the written request from the Lessee.  If the City agrees that such proposed work is a Capital Repair, the City shall notify the Lessee, within such thirty-day period, and proceed with such work as described in Section 14(c).  If the City does not agree that such proposed work is a Capital Repair, the City shall deliver, within such thirty-day period, a written determination to that effect to the Lessee including its reasons for such determination.  Failure by the City to respond shall be deemed to be a denial of the proposal.  The Lessee may, but shall not be required to, make any modifications or revisions to its request and resubmit such request to the City for determination in the same manner provided above; provided that the City's time for making its determination on such resubmission shall be fifteen (15) days rather than thirty (30) days following receipt of request.  Any change to the Capital Repair requested by the Lessee during the process of proposal of the Capital Repair shall be submitted and considered in the same manner provided above.  If the City proposes the Capital Repair, it shall submit its proposal in writing to the Lessee specifying the proposed work and stating that the City deems

such work to be a Capital Repair as defined in Section 14(a). The proposal shall include cost estimates, preliminary design work and proposed timetables. The City agrees to cause Capital Repairs to be made in such a way so as to minimize interference with Lessee's use of the Leased Premises. The City shall use reasonable efforts (except in case of an emergency) to make all Capital Repairs other than during the NFL regular season. The Lessee shall be prohibited from pursuing any cause of action against the City for failure to make Capital Repairs, unless the Lessee has complied with the procedures set forth in this Section 14.

(c)     Preparation of Capital Repair Plans. The City shall work with its architect, which may be either an employee of the City or an outside consultant, to prepare construction drawings and specifications for making all Capital Repairs (the "Capital Repair Plans"). The City, through the Capital Repair Fund, shall be responsible for paying the architect's fees and expenses and all other costs associated with making the Capital Repair Plans. The City and Lessee agree that such Capital Repair Plans for Capital Repairs other than Capital Improvements shall propose commercially reasonable repairs viewed in light of the then-expected remaining useful life of the Stadium (the "Capital Repairs Standard"). The Capital Repair Plans for Capital Improvements shall conform to the standards described in Section 14(a)(iv). The City shall cause the Capital Repair Plans to be prepared and delivered to the Lessee within one hundred twenty (120) days after the City's determination pursuant to Section 14(b) above. The Lessee shall have the right to review the Capital Repair Plans to assure compliance with the Capital Repairs Standard, that the Capital Repair Plans will not materially adversely affect Lessee's use of the New Stadium for its intended purposes, and, with respect to a Capital Improvement, that such Capital Repair is otherwise reasonably acceptable and in accordance with Section 14(a)(iv). The Lessee agrees that it will not unreasonably withhold, delay or condition its review and approval of such Capital Repair Plans. In the event the Lessee reasonably believes that the Capital Repair Plans do not conform to the Capital Repairs Standard or with

respect to Capital Improvements, to the standards described in Section 14(a)(iv), or that the Capital Repair Plans will materially adversely affect the Lessee's use of the New Stadium for

its intended purposes, the Lessee shall so notify the City of such determination within thirty (30) days after the Capital Repair Plans are delivered to the Lessee.  In the event that the City and the Lessee disagree concerning any portion of the Capital Repair Plans, such dispute shall be settled in accordance with Section 14(e); provided that while the dispute is pending, the City shall not have the right to proceed with the construction of the Capital Repairs as proposed in the Capital Repair Plans (other than in an emergency).

       (d)     <u>Construction of Capital Repairs</u>.  After the Capital Repair Plans have been reviewed and approved or otherwise established, the City agrees to cause the Capital Repairs to be made and carried out in accordance with such Capital Repair Plans.  The City shall have the exclusive and unconditional right to control the site on which the Capital Repairs will be made; provided, however, the City shall conduct such Capital Repairs so as to prevent or at least minimize as much as practicable (a) inconvenience to patrons of NFL games and other events at the New Stadium; (b) any reduction in seating capacity and parking spaces at the New Stadium and (c) interference with Lessee's (or event patron's) use or enjoyment of the New Stadium.  The City shall have the exclusive right to select and enter into contracts with any and all contractors, subcontractors, suppliers, vendors, architects, engineers, construction manager, project managers, consultants or other entities or individuals with respect to the completion of the Capital Repairs.  The City shall use its best efforts to obtain for the benefit of the City and the Lessee from each contractor and subcontractor commercial warranties for all work performed by such contractor or subcontractor.  Capital Repairs must be completed to a standard of quality which is the same as that of the original component in the case of Capital Repairs other than Capital Improvements or of the same condition as the other capital components of the Leased Premises in the case of Capital Improvements.  In the event that the work completed is unsatisfactory then all  reasonable remedies must be sought against the contractor or subcontractor.  The City shall use its best efforts to ensure the work performed by each contractor and subcontractor is performed in a good and workmanlike manner and in accordance with the Capital Repair Plans.  All Capital Repairs must be completed in accordance with all

applicable zoning, health, environmental and all other governmental regulations, ordinances or statutes.

After the proposal of the Capital Repairs by the Lessee, the Lessee shall have the right to request only such changes in the Capital Repair Plans as are required by unforeseeable circumstances by submitting to the City a written request for a change order. If the proposed change is acceptable to the City, in its sole and absolute discretion, the City shall prepare a change order and cause the Capital Repair Plans to be revised accordingly.

(e)     Resolution of Disputes.  The City and the Lessee agree to attempt in good faith to resolve any disagreement with respect to alterations referred to in Section 11(f) and with respect to Capital Repairs referred to in this Section 14 promptly by negotiations between the City's representative and the Lessee's representative who each has been designated to settle the disagreement. Within ten (10) business days after receipt by one party of the determination or notice from the other referred to in Section 11(f), Section 14(b) or Section 14(c), respectively, the party receiving the determination or notice shall deliver to the other the required written response. The determination or notice and the response shall include (i) a statement of such party's position and a summary of the evidence and arguments supporting its position, and (ii) the name(s) and title(s) of the authorized representatives who will represent that party. The authorized representatives shall meet at a mutually acceptable time and place within five (5) business days of the date of the response and thereafter as often as they reasonably deem necessary to exchange relevant information and to attempt to resolve the disagreement. If the disagreement has not been resolved within thirty (30) calendar days of the first meeting of the authorized representatives on the disagreement, then the disagreement shall be settled by arbitration conducted before three (3) arbitrators in accordance with the then existing rules of the American Arbitration Association. Such arbitrators shall be required to review such disagreement against the Capital Repairs Standard or, with respect to Capital Improvements, against Section 14(e)(iv) and, in either case, in light of the terms of the City's obligations under this

Section 14, including Section 14(f).  In any arbitration, the parties shall be entitled to conduct discovery in accordance with the applicable rules of the Federal Rules of Civil Procedure, with such modifications thereto as may be mutually agreeable to the parties.  In the event the parties are unable to agree on the three arbitrators, the parties shall select the three arbitrators by striking alternatively (the first to strike being chosen by lot) from a list of thirteen arbitrators designated by the American Arbitration Association.  Each of the parties to the arbitration shall bear the cost of the arbitration on such equitable basis as the arbitrators of the matter shall determine.  Notwithstanding the foregoing, nothing in this Agreement shall preclude any party from filing any action in a court of competent jurisdiction seeking any temporary restraining order or preliminary injunction.

(f)     Capital Repair Fund.

(i)     The City shall establish a Capital Repair Fund as a segregated fund of the City, separate and apart from other funds of the City.  The City shall annually deposit in the Capital Repair Fund the amounts shown on Schedule 14(f) (as such Schedule may be modified by the City to account for advance contributions in accordance with this subsection (f)), less amounts redirected from the Capital Repair Fund to the costs of constructing the New Stadium as described in Section 3.6 of the Stadium Financing Agreement.

(1)     The funds in the Capital Repair Fund shall be invested by the City in the same manner as other City funds.  Investment income earned on the amounts in the Capital Repair Fund shall remain in the Capital Repair Fund and shall not be used as a credit against future contributions.  The City and the Lessee shall, prior to the Commencement Date, jointly develop an initial Capital Repair Fund Budget, which shall include, to the extent reasonably practicable, a percentage allocation of the

aggregate Capital Repair Fund as between Capital Improvement items and other Capital Repair items, schedules showing the various components of the improvements for which reserves should be established, appropriate reserves over the Term of the Lease for certain Capital Repairs that are not Capital Improvements (the "Reserves"), and any portions of the Reserves that the City believes will or may need to be used for Capital Repairs during any particular calendar year.  Each year, after reviewing the then current Capital Repair Audit (as defined in Section 14(g)) and written requests by the Lessee for Capital Repairs, the City shall propose revisions to the Capital Repair Fund Budget.  The Lessee shall have the opportunity to review and approve such proposed revisions to such percentages, schedules and Reserves, which approval shall not be unreasonably withheld, delayed or conditioned.  The City and the Lessee agree to work together in good faith to agree on such percentages, schedules and Reserves.  As provided in the NFL Agreement, in the event that any amount of the Capital Repair Fund is used for the initial construction of the New Stadium, a minimum amount of $500,000.00 should remain available for Capital Repairs upon completion of the New Stadium.

(2)  The City shall proceed with reasonable diligence to make all Material Capital Repairs.

(3)  If the Capital Repair is a Capital Improvement, the City shall be obligated to make such Capital Improvement only if funds other than Reserves and other than those previously allocated for Capital Repairs are available in the Capital Repair Fund.  If sufficient funds are not then available in the Capital Repair Fund, the Lessee shall have the

right, but not the obligation, to fund the shortfall for such Capital Improvement as provided in Section 14(i).  In no event shall the City be required to make Capital Improvements to the Leased Premises in excess of the amounts allocated to Capital Improvements in the Capital Repair Fund Budget.

(4)	If there are not adequate funds available in the Capital Repair Fund (net of amounts committed for use) to cover the cost of a Capital Repair that is not a Capital Improvement or a Material Capital Repair, the City shall make the repair as soon as it is practical and prudent to do so, in the City's  reasonable discretion, taking into account the City's responsibility as owner of the Stadium facility, the fiscal constraints of the City and the amount of Reserves then available and the amount of Reserves projected to be needed for other Capital Repairs pursuant to the Capital Repair Plans.  To the extent that the City makes any Capital Repairs costing more than the amounts then available in the Capital Repair Fund to pay for such repairs, the City may pay for such Capital Repairs with advances of deposits scheduled to be made in future years, whereupon the City shall be permitted to revise the Capital Repair Fund amounts set forth on Schedule 14(f) and reduce dollar for dollar such deposits scheduled to be made in the future.

(ii)	Any amounts from the Capital Repair Fund applied toward the construction of any Capital Repair may be distributed to the Lessee, to third parties or to the City as provided in this Section 14(f).  The amounts payable shall be reimbursed, to the extent available from the Capital Repair Fund, following the Lessee's or the City's submission in writing to the City (or the Lessee) of a pay request which shall include:

(1)     a summary of bills aggregating the total for which a reimbursement is being requested;

(2)     a copy of each individual invoice from any architect, contractor or engineer or any other person charging a fee for work performed pursuant to Section 14;

(3)     lien releases in a form reasonably satisfactory to the City, executed by such architect, contractor or engineer relating to invoices previously paid pursuant to a pay request; and

(4)     requisitions for work completed which have been agreed to by the Lessee's contractor, the Lessee, the Lessee's architect and the Lessee's construction manager, if any.

(iii)     All withdrawals from the Capital Repair Fund for the purpose of making Capital Repairs shall be countersigned by both parties.  Any party refusing to sign such withdrawal request shall deliver to the other party a statement of the basis (with reasonable detail) for such recipient's objection thereto.

(g)     <u>Capital Repair Audit</u>.  Commencing on the fifth (5th) January 1 after the Commencement Date, and on each fifth (5th) January 1 thereafter during the term of this Lease, the City shall, as an expense of the Capital Repair Fund, provide the Lessee with a structural and capital component inspection report from a licensed engineer, reasonably acceptable to the Lessee, having at least ten (10) years of experience in performing structural and capital component inspections of commercial buildings, including stadia, and otherwise qualified to provide the information required hereunder (the "<u>Capital Repair Engineer</u>").  The

Electronically Filed 4/30/2024 16:06 / / CV 24 996566 / Confirmation Nbr. 3176911 / CLCTS

Capital Repair Engineer shall report on the condition of the structure and each capital component of the Leased Premises, which report shall include suggestions for any current Capital Repairs that are necessary to the Leased Premises and suggestions for revisions to the allocations in the Capital Repair Fund Budget (such report, the "Capital Repair Audit"). The City shall maintain a log for the Leased Premises, which log shall include a copy of all Capital Repair Audits as well as a record in reasonable detail of all Capital Repairs undertaken by the City or the City's agents or representatives.

          (h)     Emergency Repairs. Emergency Repairs shall be made by the City in accordance with law. However, in the event that the City does not timely make such Emergency Repairs, then the Lessee shall have the right to make such repairs, so long as the Lessee undertakes best efforts to notify the City of the need for such repairs before commencing to undertake the same. "Emergency Repairs" are those Capital Repairs which, if not immediately made, would endanger the health and safety of the people working in or attending an event in the New Stadium, would cause imminent damage to any significant component of the New Stadium, or would render the New Stadium, or any material mechanical, electrical or plumbing system or other significant component thereof, unusable for previously scheduled events. Notwithstanding the other provisions of Section 14, the Lessee may submit a request to the Lessor for payment of the cost of the repairs made by the Lessee for approval by the Lessor in accordance with the procedures and requirements set forth in Section 14(f). In the event that such repair qualifies as an Emergency Repair, then the Capital Repair Fund may be an eligible funding source for such repair. In making such Emergency Repairs, the Lessee shall comply with all the requirements of Section 14(f)(ii), and the costs of such Emergency Repairs shall be eligible for reimbursement to the Lessee from the Capital Repair Fund by the City only if the Lessee has complied with all of such requirements. The Emergency Repairs shall be the only exception to the normal pre-approval procedures established in this Section 14.

(i)    Lessee's Capital Improvements.  If Lessee shall choose to make any Capital Improvement, approved in accordance with the procedures specified in Sections 14(a) through 14(e) above, for which sufficient funds are not then on deposit in the Capital Repair Fund (net of then existing Reserves and money allocated for Capital Repairs previously agreed upon pursuant to this Section 14), the City shall apply any funds then on deposit in the Capital Repair Fund (net of then existing Reserves and money allocated for Capital Repairs previously agreed upon pursuant to this Section 14) toward the cost of such Capital Improvement provided the Lessee shall:  (i) fully fund the difference between the cost of such Capital Improvement and the portion of such cost that can be funded from funds on deposit in the Capital Repair Fund (net of then existing Reserves and money allocated for Capital Repairs previously agreed upon pursuant to this Section 14) (such amount, the "Overage"); and (ii) agree in writing to indemnify and hold the City harmless from and against the Overage.

15.    Title to Alterations and Capital Repairs.  Title to all alterations and Capital Repairs made to the Leased Premises hereof shall become a part of the Leased Premises and shall remain upon and be surrendered with the Leased Premises at the end of the term of this Lease; provided, that if prior to the termination of this Lease by expiration or otherwise, or within thirty (30) days thereafter, the City so directs by written notice to the Lessee, the Lessee shall remove any specified improvements or alterations made to the Leased Premises by the Lessee; provided that if the City had the opportunity to consent to the construction or completion of such improvements or alterations, then it shall have designated at the time of such consent whether such improvements or alterations were to be removed.  Notwithstanding the foregoing, any fixtures or personal property which were installed in the New Stadium by and at the expense of Lessee and were not provided as part of the Project Budget (as defined in the Stadium Financing Agreement) (and, therefore, not identified in the Lease Commencement Certificate) may be removed by the Lessee at or prior to expiration or termination of the Lease.  The Lessee shall pay or cause to be paid promptly to the City the cost of repairing any damage arising from such removal and restoration of the leased Premises to its condition prior to such removal.

Electronically Filed 04/14/2023 15:55:09 / / 07/14/2023 15:53:39 / its condition prior to such removal.

DO4:[01034.DOCS.CLE01165]LEASE_6_12_96.          -49-

16.  Use of Premises.

(a)  Permitted Use.  The Lessee may use the Leased Premises for (i) hosting NFL sanctioned football games in the New Stadium, (ii) for the conducting of practices or workouts by professional football teams, whether or not for exhibition to the public, (iii) selling or granting to third parties the right to the sell tickets or seats and for the conducting and exhibiting by the Lessee to the public other events or activities directly related to, held in connection with, or involving the playing or exhibition of, professional football games, (iv) for administrative office use; (v) for restaurants or food or beverage service facilities by Lessee or by Lessee's designee(s); (vi) for other sporting events, musical concerts and other events and activities that lawfully may be conducted on the Leased Premises; provided, however, that the Lessee shall give thirty (30) days' prior written notice to the Director of Parks, Recreation and Properties and to the Director of Public Safety before allowing use of the Leased Premises for any events or activities not customarily held in or about municipal football stadiums or for any purpose contrary to public policy and unprotected by the First Amendment of the United States Constitution.  Lessee shall use and occupy the Leased Premises in a careful, safe, prudent and proper manner, and shall not permit or commit any waste of or to the Leased Premises or to the New Stadium, the structures and improvements thereon, or the fixtures and articles of personal property attached or appurtenant thereto or used in connection therewith, normal wear and tear excepted.

(b)  Unlawful Use.  The Lessee will not use or allow the Leased Premises or any part thereof to be used or occupied for any purpose inconsistent with or contrary to the Ordinances of the City or the laws of the State of Ohio, and will not suffer any act to be done or any condition to exist on the Leased Premises or any part thereof which constitutes a nuisance, public or private.  The Lessee shall not commit, or knowingly allow to be committed, any act or acts in or upon the Leased Premises which shall be unreasonably injurious, offensive or annoying to adjoining property owners or to the general public.

DO4:[01034.DOCS.CLE01165]LEASE_6_12_96.                -50-

17. <u>Compliance with Laws</u>. The City covenants and agrees to deliver, on the Commencement Date, the Leased Premises, which shall be in compliance with all then existing laws, statutes, ordinances, orders, rules, and regulations of every duly constituted governmental authority or agency having jurisdiction over the Leased Premises and the construction, use and occupancy thereof, including, without limitation, Environmental Laws and the Americans with Disabilities Act of 1990, as amended. Throughout the term of this Lease, the Lessee, at its sole cost and expense, will or will cause others within its reasonable control to comply promptly with all present and future laws, statutes, ordinances, orders, rules, and regulations of every duly constituted governmental authority or agency relating to the Leased Premises or the use and occupancy thereof, including, without limitation, Environmental Laws, and will not suffer or permit to remain any use or manner of use of or any condition upon the Leased Premises in violation of any such laws, ordinances, orders, rules, and regulations relating to the use and occupancy of the Leased Premises. If the City's failure to make a Capital Repair results in the failure by the Lessee to be in compliance with any laws, ordinances, orders, rules, and regulations relating to the use and occupancy of the Leased Premises, such failure by the Lessee shall not constitute a breach of this covenant.

18. <u>Indemnification</u>. Lessee shall, and does hereby agree to, indemnify, defend and hold the City harmless from and against any and all liabilities, obligations, claims, demands, penalties and other costs, charges and expenses, including reasonable architects' and attorneys' fees, that may be imposed upon or incurred by the City, or to which the City may become subject resulting, directly or indirectly, (a) by reason of the Lessee's use, possession, occupation, operation, repair, maintenance or management of or condition suffered or permitted to remain upon the Leased Premises by Lessee (ordinary wear and tear excepted) or by reason of alterations carried out by Lessee; (b) resulting by reason of any act or omission, negligence or wrongdoing by or on behalf of Lessee or its officers, agents, representatives, employees, servants, licensees or invitees (other than those acts or omissions, negligence or wrongdoing that are insurable at commercially reasonable rates, provided that if Lessee fails to obtain and

maintain such insurance against such liabilities and expenses, then such exclusion shall not apply); (c) by reason of any accident, injury, or damage to any person or property occurring in, on or about the Leased Premises or the Walkway; (d) or resulting by reason of any breach or failure on the part of Lessee to pay, perform, observe or otherwise comply with any of the covenants, terms, conditions and provisions on its part to be paid, performed, observed or otherwise complied with under the terms of this Lease. None of the foregoing are intended to limit or affect in any way the City's obligation to provide Capital Repairs pursuant to Section 14 or to deliver, on the Commencement Date, the Leased Premises in compliance with laws pursuant to Section 17.

In case any action or proceeding is brought against the City by reason of any such claim, the Lessee, upon written notice from the City will, at the Lessee's expense, resist or defend such action or proceeding by counsel selected by the Lessee and approved by the Director of Law.

19. Insurance.

(a) Lessee Insurance Requirements. From and after the Commencement Date, Lessee, at its sole expense, shall maintain the types and kinds of insurance described in (a) and (b) below. The amount or amounts of the insurance in (a) below shall initially be as set forth on Schedule 19 attached hereto. The amounts of coverage may, however, be changed by the City once every three (3) calendar years commencing on the January 1 immediately following the Commencement Date based upon the results of a review by Lessee's insurance consultant who shall consult with Lessee and the City. Such review by the Lessee's insurance consultant shall be at the Lessee's sole cost and expense, may be completed no earlier than the September 30th immediately prior to the proposed date of change, and shall report on the types and amounts of insurance as are then customarily available for

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

facilities and activities held in NFL stadia generally.

DOC-101074.DOCS.CLEQU65LEASE 6.12.96                                    -52-

(1)     Comprehensive general public liability insurance of the type generally carried by owners and operators of a stadium similar to the New Stadium, and consistent with the usage thereof, which shall include coverage for personal liability, liquor liability, contractual liability (including all liabilities of Lessee pursuant to Section 18 if and to the extent such insurance is available at commercially reasonable rates), Lessees' legal liability, bodily injury (including death) and property damage, all on an occurrence basis with respect to the business carried on, in and from the Leased Premises and Lessee's use and occupancy of the Leased Premises with coverage for any one occurrence or claim of not less than the amounts set forth on Schedule 19 and with deductibles not in excess of the amounts set forth on Schedule 19.

(2)     Worker's compensation insurance.

(3)     Business interruption insurance.

(4)     Vehicle insurance.

(5)     All insurance described in (1) and (4) above shall be in place prior to any entry by Lessee onto the Leased Premises prior to the Commencement Date as permitted by Section 6(a).

All insurance provided for in this Section 19(a) (other than worker's compensation insurance) shall be effected under valid and enforceable policies in form and shall be written by companies licensed to transact business in Ohio and shall be reasonably satisfactory to the City. The liability, business interruption and vehicle insurance policies shall include the City as an additional insured under such policies. Upon or prior to the effective date of insurance policies

required under this Lease and thereafter not less than thirty (30) days prior to the expiration

dates of policies theretofore furnished pursuant to this Section, originals of the policies or certificates or memoranda thereof shall be furnished to the City, and the Lessee shall furnish to the City evidence of payment of premiums in accordance with the Lessee's regular course of business, but in any event in time to prevent cancellation for nonpayment.

(b)     City Insurance Requirements.  The City shall obtain and maintain fire and extended property insurance which shall cover all improvements to the Leased Premises (but not the personal property of the Lessee), which insurance shall be in an amount not less than eighty percent (80%) of the replacement cost of such improvements, as such may increase from time to time, without deduction for depreciation, and shall name the City as loss payee. The City may make advances from the Capital Repair Fund to pay the premium for such fire and extended property insurance, provided that any such advances from the Capital Repair Fund shall be reimbursed by the City on or before the March 1 immediately following the date on which the premium is so paid.

(c)     Waiver of Subrogation.  Lessee hereby waives and releases all causes and rights of recovery against the City for any loss or damage to property arising by reason of any peril insured against under the policies of insurance described in Section 19(a) or otherwise, regardless of cause or origin, including any act of neglect or omission by the City or its respective officers, agents, representatives, employees, servants, licensees or invitees, but only to the extent that any right to recovery by such releasing party under said policy or policies of insurance is not thereby impaired or adversely affected in whole or in part.  Each such policy of insurance shall contain an endorsement recognizing the foregoing waiver and release and waiving all rights of subrogation by the insurer against either party hereto.  The foregoing waiver and release by Lessee of the City with respect to the policies of insurance described in Section 19(a) shall not apply to any deductibles assumed by the Lessee or to any loss or damage in excess of the maximum coverages required thereunder.  To the extent the City carries any insurance relating to the Leased Premises, the City hereby waives and releases all causes of

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

action and rights of recovery against Lessee for any loss or damage to property arising by reason of any peril insured against under such policies of insurance, regardless of cause or origin, including any act of neglect or omission by Lessee or its respective officers, agents, representatives, employees, servants, licensees, or invitees, but only to the extent that any right to recovery by the City under said policy or policies of insurance is not thereby impaired or adversely affected in whole or in part.  Such policy of insurance shall contain an endorsement recognizing the foregoing waiver and release and waiving all rights of subrogation by the insurer against either party hereto.

### 20.  Damage or Destruction.

(a)  Repair of Damage.  If at any time during the term of this Lease, the improvements on the Leased Premises or any part thereof shall be damaged or destroyed by fire or other cause of loss (including any cause of loss for which insurance coverage was not obtained) of any kind or nature, ordinary or extraordinary, foreseen or unforeseen, or if the City fails to make a Capital Repair which renders the New Stadium unusable for a scheduled event in Lessee's reasonable judgment, or if Lessee shall experience any interruption or suspension in the provision or supply of utility service for more than ten (10) consecutive days, Lessee shall not thereby be, or be deemed to be, relieved of its obligations hereunder to perform and observe the covenants, duties and responsibilities on its part to be performed or observed, except as otherwise provided in this Section 20 and in Section 22(h).  In such event, the proceeds of insurance maintained by the City pursuant to Section 19 upon receipt by the City plus the amount of the deductible, if any, shall be deposited by the City in escrow with a third-party to be used and distributed in accordance with this Section 20.  The City shall proceed with reasonable diligence (subject to a reasonable time allowance for the purpose of adjusting such loss) to repair, alter, restore, replace, rebuild or supply the same as nearly as possible to a condition reasonably satisfactory for the purposes to which the Lessee has been granted the right

of use and occupancy of the Leased Premises; provided, however, that the City shall not be

required to expend from the Capital Repair Fund for such repair, alteration, restoration, replacement, or rebuilding any amount that would reduce the Capital Repair Fund below the Reserve amount other than to make the specific Capital Repair for which the Reserve exists.

If the estimated cost of repairing the damage to the Leased Premises exceeds the available Capital Repair Fund balance plus the insurance proceeds, if any, plus the amount of the deductible, if any, the City shall have three (3) months from the date of such damage or destruction within which to determine, in the City's sole discretion, whether the repair in excess of such amount shall be made at the City's sole expense. Should the City determine that such repair of the Leased Premises shall not be made at the City's expense, the Lessee shall have sixty (60) days from the date of the City's determination within which to determine in Lessee's sole discretion whether the repair in excess of such amount shall be made at Lessee's sole expense. If the City determines to proceed and subject to additional requirements imposed by weather conditions, permitting and authorization requirements, restrictions contained in this Lease, receipt of commercially reasonable bids, and other matters outside of the control of the City, the City shall proceed with reasonable diligence to commence the repair, alteration, restoration, replacement, rebuilding or resupply within nine (9) months after the occurrence of the damage or destruction and shall cause the repair, alteration, restoration, replacement or rebuilding to be completed no later than twenty-four (24) months following the commencement thereof, unless the parties agree to a longer period. If, following a determination by the City not to make such repair, the Lessee also determines not to make such repair, the Lessee shall have the right, after thirty (30) days prior written notice to the City, to terminate this Lease; provided, however, that if by reason of the parties' failure to make such repair, the Leased Premises will remain unusable permanently, then, without further action by the Lessee, this Lease shall terminate.

In the event that this Lease terminates following damage or destruction to the Leased Premises, all proceeds of insurance shall be shared by the City and the Lessee in

proportion to their respective original contributions to the cost of improvements on the Leased Premises. For such purposes, Lessee's contribution shall be reduced by (i) one hundred percent (100%) of the amount of net proceeds received by the Lessee (or by the NFL on behalf of the Lessee) from the sale of PSLs and (ii) forty percent (40%) of club seat revenues  subject to a waiver of Lessee's gate-sharing obligations under the NFL Constitution. Upon termination of this Lease, neither party shall have any further obligation under this Lease except as provided in Section 50. If the Lease is terminated pursuant to this section, then the City shall work cooperatively with the Lessee to identify an alternate stadium site for a minimum of thirty (30) months following termination.

In the event that damage or destruction renders the Leased Premises unusable as described in Section 20(b), then for and during the period of time that the Leased Premises remain so unusable temporarily (plus up to fourteen (14) days thereafter), the City shall work cooperatively with the Lessee to identify an alternate stadium site acceptable to Lessee and facilitate the arrangements between the Lessee and the owner of such site at comparable cost to the Lessee for use during the period that the Leased Premises are unusable. In such event, the Lessee covenants to recommence the play of games at the New Stadium as soon as practicable, but in no event later than fourteen (14) days, after the Leased Premises become usable.

(b)  Reduced Seating Capacity. In the event of any such damage or destruction, as a result of which the New Stadium cannot lawfully be used for a scheduled event or if the spectator seating capacity of the New Stadium is diminished to less than eighty percent (80%) of the general seating or seventy percent (70%) of the premium seating (i.e., club seats and private suites) of that existing immediately prior to such damage or destruction or if access to the New Stadium is prevented, or if the City fails to make a Capital Repair which renders the New Stadium unusable, in Lessee's reasonable judgment, for a scheduled event, or if Lessee shall experience any interruption or suspension in the provision or supply of utility service for

more than ten (10) consecutive days, Lessee shall be relieved of its covenant to play all of its

regular season home games and other games in the New Stadium as required by Section 9(a) for and during the period of time that the Leased Premises remain so unusable (plus up to fourteen (14) days thereafter). In such event, the Lessee covenants to recommence the play of games at the New Stadium as soon as practicable, but in no event later than fourteen (14) days, after the Leased Premises become usable. If, as a result of any such damage or destruction, or any other reason not within the control or not the fault of the Lessee, the number of parking spaces available to the Lessee from the City free of charge is diminished, the City shall use its best efforts to provide to the Lessee alternative parking arrangements within reasonable proximity to the New Stadium.

(c)     Extension of Term.  If, as a result of the events described in Section 20(b), for each season that the Lessee is relieved of its obligation to play fifty percent (50%) or more of its regular season home games in the New Stadium, the Lessee shall have the right to extend the Term of this Lease for one (1) additional Lease Year.

21.     Condemnation.  To the extent permitted by law, the City shall not condemn the Leased Premises or  support a condemnation thereof by any other governmental or quasi-governmental authority, except as may be required by the Federal Aviation Administration.  Any condemnation of all or a substantial portion of the Leased Premises by the City or support by the City· of a condemnation thereof by any other governmental or quasi-governmental authority, except for the Federal Aviation Administration, shall constitute a breach of Lessee's quiet enjoyment pursuant to Section 38.

In the event that all of the Leased Premises, or a substantial portion thereof, shall be acquired permanently by authority of any governmental entity in the exercise of its power of eminent domain, and as a result of which the Leased Premises are made unusable for purposes of playing professional football therein, or if access to the New Stadium is prevented, or if either
spectator general seating or premium seating capacity is diminished to less than ninety-five

percent (95%) of that existing immediately prior to the condemnation, and it is not commercially reasonable in the City's reasonable determination for the City to restore the same, the City may, at its election, apply the proceeds of the condemnation award to provide facilities reasonably acceptable to the Lessee in substitution for those taken by eminent domain, in which case this Lease shall remain in force and effect with respect to the substituted facilities reasonably acceptable to the Lessee, including the Lessee's covenant that the Browns will play their home games in the substitute facilities as required in Section 9 above. In the event that the City elects not to so apply the proceeds of the condemnation award or the parties cannot agree on substitute facilities, this Lease shall terminate upon the taking of physical possession by condemnor or proposed condemnor. If the Lease is terminated pursuant to this Section, then the City shall use its best efforts to provide the Lessee at Lessee's expense with such alternative stadium site for a minimum of thirty (30) months following termination.

In the event of any temporary or partial condemnation of the New Stadium, which affects the Lessee's use and occupancy of the Leased Premises as provided in this Lease, then the proceeds of any award for or on account of said condemnation shall be used to enclose and restore the remaining usable part of the New Stadium, if the same is, in the City's reasonable determination, commercially reasonable. If such event renders the New Stadium unusable for purposes of playing professional football therein, the City shall work cooperatively with the Lessee to identify substitute facilities for Lessee's use and facilitate the arrangements between the Lessee and the owner of such site at comparable cost to the Lessee during the period of time that the Leased Premises remain so unusable (plus up to fourteen (14) days thereafter). In such event, the Lessee covenants to recommence the play of games at the New Stadium as soon as practicable, but in no event later than fourteen (14) days, after the Leased Premises become usable. If as a result of a partial or temporary condemnation, for each season that the Lessee is relieved of its obligation to play fifty percent (50%) or more of its regular season home games in the New Stadium, the Lessee shall have the right to extend the Term of this Lease for one (1) additional Lease Year.

DOM:00094 DOCS CLEO11650LEASE 6.17.96          -59-

In any condemnation proceeding, each party shall have the right to claim and receive from the condemning authority compensation for its losses, including, without limitation, its respective interest in the Leased Premises, and its (or in the case of the Lessee, the NFL's) original contribution to the cost of improvements on the Leased Premises; provided, however, the Lessee's contribution shall be reduced by (i) one hundred percent (100%) of the amount of net proceeds received by the Lessee (or by the NFL on behalf of the Lessee) from the sale of PSLs and (ii) forty percent (40%) of club seat revenues  subject to a waiver of Lessee's gate-sharing obligations under the NFL Constitution.

22.    Default.

(a)    Remedies of City.  If any one or more of the  following events (each of which is herein sometimes called "Event of Default") shall happen:

(1)    If default shall be made in the due and punctual payment of any sums required to be paid by the Lessee to the City under the provisions of this Lease when and as the same shall become due and payable and such default shall continue for a period of thirty (30) days after notice in writing thereof by the City to the Lessee; or

(2)    If the Lessee shall be in default in the due and punctual payment of any sums required to be paid by the Lessee to parties other than the City or if the Lessee shall be in default of, or violate any covenant, agreement, term or condition, and if any such failure, violation, or default shall continue without cure for a period of ninety (90) days after notice in writing thereof by the City to the Lessee, or if such default cannot, with due diligence, be cured within ninety (90) days and Lessee shall not have commenced the cure thereof within

such period and shall not be diligently proceeding to cure such default; or

(3)     If the Lessee shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall take the benefit of any relevant legislation that may be in force for bankrupt or insolvent debtors or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation, or if any proceedings shall be taken by the Lessee under any relevant bankruptcy law in force in any jurisdiction available to the Lessee, or if the Lessee shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of the Lessee or of the Leased Premises, or shall make any general assignment for the benefit of creditors; or

(4)     If a petition shall be filed against the Lessee seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal, state, or other statute, law or regulation, and shall remain undismissed for an aggregate of one hundred twenty (120) days, or if a trustee, receiver or liquidator of the Lessee or of all of its properties or of the Leased Premises shall be appointed without the consent or acquiescence of the Lessee and such appointment shall remain unvacated for an aggregate of one hundred twenty (120) days,

the City may, at its option, at any time while such Event of Default continues, give written notice to the Lessee specifying one or more such Events of Default and either require the Lessee to perform its obligations as provided in Section 22(e) below, or state that this Lease and the Term hereby demised shall expire and terminate on the date specified in such notice, and upon the date specified in such notice, subject to the provisions of subsection (c) in this Section, this Lease and the term hereof and all rights of the Lessee under this Lease shall expire and terminate. In the event of any such termination, the City may, without further notice, enter

upon and re-enter the premises and facilities of the Leased Premises, and by summary proceedings, ejectment or otherwise, may dispossess Lessee therefrom, and thereupon shall be entitled to have, hold and enjoy the Leased Premises and the right to receive all rental of and from the same. It is agreed and understood that, in the event of any such termination of this Lease by the City, the Lessee shall not thereby be relieved of its duties, responsibilities and obligations hereunder accruing prior to the date of such termination, or accruing thereafter.

In the event that the termination of this Lease is a result of a breach not within the Lessee's control, the City shall pay to the Lessee the amount of the Lessee's contribution to the costs of the improvements on the Leased Premises which remains unamortized and unrecovered from the sum of (i) one hundred percent (100%) of the amount of net proceeds received by the Lessee (or by the NFL on behalf of the Lessee) from the sale of PSLs and (ii) forty percent (40%) of club seat revenues subject to a waiver of Lessee's gate-sharing obligations under the NFL Constitution, and termination of the Lease shall be specifically subject to and conditional upon appropriation of such amounts. Such amounts may be payable over no more than five (5) years with interest thereon at the rate paid on United States treasury bills having a maturity closest to the term of such payments.

(b) City's Right of Re-Entry. Upon any such expiration or termination of this Lease, the Lessee shall quit and peacefully surrender the Leased Premises to the City, and the City, upon or at any time after any such expiration or termination, may without further notice, enter upon and re-enter the Leased Premises and possess and repossess itself thereof, by summary proceedings, ejectment or otherwise, and may dispossess the Lessee and remove the Lessee and may have, hold and enjoy the Leased Premises and the right to receive all rental income of and from the same.

(c) Lessee's Liability to Date of Termination. No such expiration or termination of this Lease shall relieve the Lessee of its liability and obligations under this Lease

accrued to the date of such expiration and termination. In the event of any such expiration or termination, whether or not the Leased Premises or any part thereof shall have been relet, the Lessee shall pay to the City all charges required to be paid by the Lessee up to the time of such expiration or termination of this Lease.

(d) <u>Lessee's Subleases and Agreements</u>. At the City's option, upon any such expiration or termination of this Lease, all the Lessee's subleases, concession agreements and similar agreements for use of the Leased Premises then in effect shall be deemed assigned to the City by the Lessee, and the Lessee shall, upon notice from the City, execute and deliver to the City instruments, in proper form, assigning to the City the Lessee's interest in and to each such sublease and agreement, the Lessee hereby irrevocably appointing the City, in the event of the Lessee's failure or refusal to comply with any such notice, as its attorney-in-fact to execute any and all such assignments.

(e) <u>Right of Specific Performance</u>. The parties to this Lease hereby acknowledge and agree that the subject matter of this Lease is unique, that the damages at law for the breach of the NFL's obligations under Section 3 or of any of Lessee's obligations under Section 9(a), 9(b)(2), 9(b)(3) and 9(c) of this Lease create irreparable harm and are not ascertainable and that money damages or other legal relief cannot adequately compensate the City for any such breach. Therefore, the parties have agreed and consented to, as evidenced by their execution of this Lease, the City's right to specific performance of the Lessee's obligations under those Sections of this Lease and to have, receive and hold an injunction from a court of competent jurisdiction in the State of Ohio which enjoins the breaching of the provision of those Sections of this Lease by Lessee.

(f) <u>The City's Remedies are Cumulative</u>. In the event of any breach by the Lessee of any of the covenants, agreements, terms or conditions contained in this Lease, the City, in addition to any and all other rights provided herein, shall be entitled to invoke any

right and remedy allowed at law or in equity or by statute or otherwise for such breach as though re-entry (only after termination or expiration of the Lease), summary proceedings, and other remedies were not provided for in this Lease.

(g)   Interest on Arrearages.  All charges more than ten (10) days in arrears and all other amounts collectible hereunder by the City shall bear interest at the rate of eight percent (8%) per annum from their respective due dates until paid, provided that this shall in no way limit, lessen, offset or affect any claim for damages by the City for any breach or default by the Lessee.

(h)   Special Remedy of Lessee.  In the event that the Mayor of the City fails to include in the Mayor's Estimate required to be prepared pursuant to Section 38 of the Charter of the City a proposed appropriation of, or following such inclusion the Council of the City fails to appropriate, funds adequate to meet "City Obligations" (as hereafter described) or (in the case of unbudgeted City Obligations), the Mayor fails to seek ordinance authority or the Council of the City fails to pass such ordinance(s) making appropriations for such City Obligations, the Lessee shall have, in addition to all other rights and remedies provided in this Lease, the following special remedy as described in this Section 22(h).  First, the Lessee shall notify the City that the Lessee believes in good faith that the City has failed to satisfy a City Obligation.  The Lessee's notice shall describe the City Obligation and shall state the amount of funds that the Lessee alleges have not been so included or appropriated by the City.  Second, within ten (10) days following receipt by the City of the Lessee's notice, the City shall deliver to the Lessee a written response.  The parties hereby agree that the failure by the City to fulfill any City Obligation shall constitute a breach and that the Lessee shall have a cause of action against the City for money damages as a result of such breach.  In the event that a court enters a judgment for money damages against the City and such judgment remains unsatisfied for one hundred eighty (180) days, then the Lessee shall have the right to terminate this Lease, upon thirty (30) days' notice to the City.

Notwithstanding the foregoing, nothing in this Lease shall preclude any party from filing any action in a court of competent jurisdiction seeking any temporary restraining order or preliminary injunction or other remedy at law or equity, except for the right of termination which is available only as specifically provided herein. A "City Obligation" shall be any one of the three (3) obligations specifically set forth as follows:

(i)     To make a contribution to the Capital Repair Fund required by Section 14 of this Lease, as shown on Schedule 14(f);

(ii)    To make any Material Capital Repair; and

(iii)   To bear responsibility for costs associated with the condition of the Leased Premises required by Section 26 of this Lease.

Notwithstanding any other remedy of the Lessee provided in this Lease or pursuant to applicable law, the Lessee shall have the right to offset against any rental due hereunder from the Lessee to the City any and all amounts which a court of proper jurisdiction determines by final judgment, or which the arbitrators acting pursuant to Section 14(e) so determine, is under applicable law due and owing from the City to the Lessee. For purposes of this determination only, failure by the Council of the City to appropriate funds to satisfy such obligation of the City shall not affect the City's obligation to the Lessee.

23.   Permitted Encumbrances.

(a)     Subletting Allowed.  The City hereby expressly consents to the subletting by the Lessee of any space available in the Leased Premises for food service,

concessions, retail, service or entertainment operations of a type customarily found in similar stadium facilities and consistent with the intended usage of the New Stadium, including, without limitation, professional football games. All such subleases must terminate or be terminable upon the expiration or earlier termination of this Lease unless otherwise expressly consented to by the City, which consent shall not be unreasonably withheld. By way of illustration, the City's consent shall not be deemed to be unreasonably withheld if the sublease to be considered does not contain market rate provisions, is not in a form acceptable to the City, or is not customary in NFL football stadia generally.

(b)    Pledge of Revenues. The Lessee may assign, pledge or otherwise encumber (i) its interest in this Lease in conjunction with the encumbrance of its Franchise, provided that any encumbrances of the Lessee's interest in this Lease shall not permit any foreclosure by the secured party of the Lessee's leasehold interests hereunder separate and apart from foreclosure on the Franchise and shall restrict the sale of the Lessee's leasehold interest to the same person as is acquiring the Franchise, or (ii) its interest in the revenues derived from the operation of the Leased Premises, as security for interim or permanent financing or refinancing, obtained and used by the Lessee solely for the purposes of: (1) acquiring the Franchise or refinancing the then current Franchise indebtedness; or (2) reimbursing the NFL for its contribution to the costs of construction of the New Stadium; or (3) fulfilling its obligations under this Lease; or (4) paying any other costs and expenses relating to the maintenance and operation of the New Stadium, the NFL Franchise and the Browns. Such financing shall be subject to compliance with the NFL debt ceiling as may be in effect from time to time.

The City will provide written notice to the Lessee's lender (of which the City has been notified by Lessee as to its name and address) of any default of Lessee under this Lease. In the event of Lessee's default, the City specifically agrees that the City's lender shall have the right to cure Lessee's default(s) within the same cure periods given to the Lessee. During the

periods set forth above, so long as the Lessee's lender is proceeding with due diligence to cure Lessee's default, the City shall not terminate this Lease.

(c) <u>No Other Liens</u>. Other than as permitted by this Section 23, Lessee shall not suffer or permit to remain upon all or any part of the Leased Premises, or Lessee's leasehold interest therein, any lien for work performed or materials supplied to or for Lessee and/or to or for the Leased Premises by or on behalf of Lessee, or any other lien or encumbrance thereon arising by reason of Lessee's use and occupancy thereof. Lessee shall, and does hereby agree, at its own cost and expense, to defend the New Stadium, the Leased Premises and the City against any and all suits, actions or other proceedings that may be instituted for the enforcement of any such lien or encumbrance.

If any mechanics', laborers' or materialmen's liens shall at any time be filed against the Leased Premises or any part thereof, Lessee, within thirty (30) days after the date of Lessee's receipt of notice of the filing, shall cause the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise; provided, however, that Lessee shall have the right to contest the validity of any such lien in any manner permitted by law. In the event of any such contest, Lessee shall provide to the City title insurance, an indemnity, bond or other assurance or security satisfactory to the City, and Lessee shall thereafter diligently proceed to cause such lien to be removed and discharged. If Lessee shall fail to discharge or to contest any such lien then, in addition to any other right or remedy, the City may, after thirty (30) days notice to Lessee, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring the discharge of such lien by deposit or bonding proceedings. In any such event, the City shall be entitled, if the City so elects, to compel the prosecution of an action for the foreclosure of such lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest, costs and allowances. Any amount so paid by the City and all costs and expenses, including attorneys' fees, incurred by the City in connection therewith, together with interest thereon at ten percent (10%) per

annum, from the respective dates of the City's payment or incurrence of the cost and expense, and shall be paid by Lessee to the City upon demand.

Notwithstanding any other provision in this Section 23, no assignment by Lessee of its interest under this Lease as security for any loan shall prevent the City, upon any default by the Lessee under any such loan, at the City's sole option, from curing any default under such loan and entering upon and operating the Leased Premises. Any such assignment shall expressly provide that the interest of the assignee is subject to the terms and provisions of this Lease and that the assignee shall give notice to the City of any default by the Lessee under any loan agreement no later than ten (10) days after the occurrence thereof. If so requested by the Lessee in writing, the City shall give notice to any such assignee of any default by the Lessee under the terms of this Lease no later than ten (10) days after the occurrence thereof.

The City shall not suffer or permit to remain upon all or any part of the Leased Premises any lien for work performed or materials supplied to or for the City and/or to or for the Leased Premises by or on behalf of the City, or any other lien or encumbrance thereon arising by reason of the City's ownership thereof. The City shall, and does hereby agree, at its own cost and expense, to defend the Leased Premises and the Lessee against any and all suits, actions or other proceedings that may be instituted for the enforcement of any such lien or encumbrance, and the City agrees promptly to have any such liens and encumbrances removed or discharged.

(d)     Prohibition.  Except as otherwise expressly provided in this Lease, the Lessee shall not (1) assign, mortgage, pledge, encumber or in any manner transfer this Lease, or any part thereof, or (2) sublease the Leased Premises, or any part thereof, or (3) sell, transfer, mortgage, pledge, lease, license or encumber the improvements on the Leased Premises, without the prior written consent of the City, expressed through the Director of Parks,

Recreation and Properties with the concurrence of the Board of Control, in each instance, and

any attempt to do any of such acts without such consent shall be null and void and of no effect and may, in the City's sole discretion, be deemed to be a breach of this Lease. No assignment or mortgage by the Lessee shall in any way affect the terms, conditions, covenants, agreements and provisions herein set forth, and any and all such assignments or subleases shall be at all times subject to this Lease and to the prior right, title and interest of the City in and to the Leased Premises.

24. <u>Scheduling the City's Rights of Use</u>. The City intends, from time to time, but no more than eight (8) times in any calendar year during the term of this Lease to use the Leased Premises to hold certain civic, cultural or community events and activities as it deems appropriate, as proposed by the Director of Parks, Recreation and Properties with approval of the Council of the City, including, without limitation, events such as Special Olympics, youth athletic events and civic celebrations ("City Events"). It is acknowledged and understood by the parties that in order to accommodate such additional uses of the Leased Premises, Lessee will require that a time and date be scheduled and/or reserved for all such games, events and activities, and that the same be played, held, or take place, at the times and on the dates so scheduled and/or reserved therefor no less than thirty (30) and no greater than one hundred eighty (180) days in advance. Lessee agrees to cooperate with the City to schedule such events and activities and the City agrees that it will not request such events or activities of the type or on dates that would interfere with previously scheduled uses of the Leased Premises by the Lessee. The City acknowledges that the Leased Premises will not be available for City Events for forty-eight (48) hours prior to or twenty-four (24) hours after any other previously scheduled event at the Leased Premises. The City agrees that all reasonable maintenance and operating expenses and staff time associated with or reasonably allocated to such events and activities, in each case, as agreed upon by the parties in advance and appropriately documented, shall be paid for by the City and, notwithstanding the provisions of Section 12, all revenues generated by such events and activities from all sources whatsoever shall belong to the City.

25.     Successors and Assigns.  This Lease shall be binding upon and shall inure to the benefit of the parties hereto and, to the extent this Lease expressly permits assignment, to their respective permitted successors and assigns.

26.     Leased Premises Condition.  As between the City and the Lessee, to the extent permitted by law, the City hereby agrees to bear any and all responsibility with respect to, and to pay on behalf of the Lessee, any and all foreseeable or unforeseeable damage, losses, costs, claim, liabilities or expenses, directly or indirectly (including legal and other professional fees) arising from any condition existing or events occurring on or about the Leased Premises prior to the date on which Lessee first takes possession of the Leased Premises or the Commencement Date, which ever is earlier.  Without limiting the foregoing, the City shall enforce the terms of its construction contracts with respect to the New Stadium, including all related improvements, including without limitation enforcement of warranty, completion of "start-up" functions, delivery of equipment operation and maintenance manuals to Lessee, provide for training of Lessee's employees in the operation of plumbing, electrical, HVAC/mechanical and other systems and take such other actions necessary to correct construction defects and to educate Lessee with respect to the operation of the improvements constituting the New Stadium.

From and after the date on which Lessee first takes possession of the Leased Premises or the Commencement Date,  whichever is earlier, Lessee's compliance with Environmental Laws shall be at Lessee's sole cost and expense to the extent such compliance is required by reason of Lessee's use and occupancy of the Leased Premises.  As between the City and Lessee, to the extent permitted by law, the City shall bear all responsibility, costs and expenses (including legal and other professional fees) attributable to and  pay on behalf of the Lessee, all damages, losses, costs, claims, liabilities or expenses resulting from acts or omissions of the City, its agents, employees, or invitees, with respect to (i) conditions of the Leased Premises existing prior to the date the Lessee takes possession and (ii) events occurring on or

about the Leased Premises prior to the date the Lessee takes possession, or attributable to conditions existing or events occurring on property adjacent to the Leased Premises, in which cases compliance with Environmental Laws shall be at the City's sole cost and expense.  Lessee (the permitted assignee of the NFL as original Lessee hereunder, and not the NFL) agrees to take responsibility for and to pay, on behalf of the City, any damages, losses, costs, claims, liabilities or expenses (including legal and other professional fees in connection therewith), for any environmental conditions that were caused by Lessee, its employees, invitees or its assignees or sublessees, and for any damage, loss, cost, liability or expense directly or indirectly arising from any condition existing or events occurring on or about the Leased Premises from and after the date on which Lessee first takes possession of the Leased Premises or the Commencement Date, whichever is earlier, and for any claims, liabilities, costs and expenses (including legal and other professional fees) in connection therewith.  These indemnifications and allocations of obligations shall survive the termination of this Lease.

27.  The City's Right to Inspect.  Upon twenty-four (24) hours notice, the City, its agents and representatives shall have access to the Leased Premises and improvements thereon at any and all times reasonable for the purpose of inspecting the Leased Premises.  The Lessee shall have the right to accompany the City on such inspection.

28.  Surrender.

(a)  Surrender and Delivery.  The Lessee shall, on the expiration of the term hereby granted, or upon the earlier termination of this Lease, peaceably and quietly leave, surrender or yield up unto the City the Leased Premises together with all improvements then located thereon, clean and in good order and condition except for reasonable wear and tear thereof and insured loss or damage by fire or other casualty, all of which shall become property of the City free and clear of all liens, encumbrances and subtenancies whatsoever, except those

existing on the date of execution of this Lease and taxes and assessments not then due and payable.

(b)   <u>Removal of Personal Property</u>.  Personal property purchased and installed by Lessee at Lessee's sole expense may be removed by Lessee at or prior to the expiration or earlier termination of this Lease or within thirty (30) days thereafter or by the Lessee's sublessee at or prior to the expiration or earlier termination of its sublease, provided that the removal thereof will not injure the Leased Premises or the structural integrity of the improvements or the New Stadium or necessitate changes in or repairs to the same.  Lessee shall pay or cause to be paid promptly to the City the cost of repairing any damage arising from such removal and restoration of the Leased Premises to its condition prior to such removal.

(c)   <u>Abandonment</u>.  Any personal property of Lessee or any sublessee which shall remain on the Leased Premises for more than thirty (30) days after the expiration or earlier termination of this Lease may, at the option of the City, be deemed to have been abandoned by Lessee or such sublessee.  The abandoned personal property may either be retained by the City as its property, be disposed of, without accountability, in such manner as the City may see fit, or if the City shall give written notice to Lessee to such effect, such personal property shall be removed by Lessee at Lessee's sole cost and expense.  During this period, the City shall not be responsible for any loss or damage occurring to any such personal property owned by Lessee or any sublessee.

(d)   <u>Holdover</u>.  It is understood and agreed that should Lessee hold over the Leased Premises beyond the Term, without first having extended this Lease by written agreement of both the City and Lessee, such holding over shall not be considered as a renewal or extension of this Lease and shall be a tenancy from calendar month to calendar month and for no longer period.

(e)    Delay in Surrender.  If the Leased Premises are not surrendered at the end of the term, then Lessee shall hold harmless, indemnify and defend the City against loss or liability resulting from delay by Lessee or its assignees and sublessees in so surrendering the Leased Premises, including but not limited to any claims founded on such delay made by any succeeding occupant of the Leased Premises or any part thereof, and notwithstanding the provisions elsewhere in this Lease, Lessee shall be liable to the City for any and all legal expenses, costs, and fees incurred by the City in obtaining the possession of the Leased Premises.

29.    Recordation.  The City shall cause this Lease to be properly recorded in the Cuyahoga County Recorder's office.

30.    Waiver.  No waiver by either party at any time, express or implied, of any breach of any provisions of this Lease shall be deemed a waiver or a breach of any other provision of this Lease or a consent to any subsequent breach of the same or any other provision.  If any action by either party shall require the consent or approval of the other party, the other party's consent to or approval of such action on any one occasion shall not be deemed to consent to or approve of said action on any subsequent occasion or a consent to or approval of any action on the same or any subsequent occasion.  Any and all rights and remedies which either party may have under this Lease or by operation of law, either at law or in equity, upon any breach, shall be distinct, separate and cumulative and shall not be deemed inconsistent with each other; and no one of them, whether exercised by said party or not, shall be deemed to be in exclusion of any other; and any two or more or all of such rights and remedies may be exercised at the same time.  No covenant, agreement, term or condition of this Lease to be performed or complied with by the Lessee, and no breach thereof, shall be waived, altered, modified or terminated except by a written instrument executed by the City.

31.    Estoppel Certificates.  Either the City or Lessee, without charge, at any time and from time to time, upon ten (10) days written request by the other, shall certify, by written instrument, duly executed and acknowledged in recordable form, to the other party or any other person:

(a)    that this Lease is unmodified and in full force and effect, or, if there has been a modification, that the same is in full force and effect as modified, and stating the date and nature of such modification;

(b)    the dates, if any, to which sums due hereunder have been paid in advance;

(c)    whether the other party is or is not in default in the performance of any covenant, condition or agreement on its part to be performed, and the nature of such default, if any; and

(d)    such other reasonable and appropriate information as the other party may request.

32.    Approvals and Consents.  Whenever the approval or consent of either party to this Lease is required or requested, such consent or approval shall not be unreasonably withheld.  Unless otherwise specified herein, any such consent or approval shall be given or denied within thirty (30) days after request in writing therefor, and any failure to give or deny any such consent or approval within such thirty (30) day period shall be deemed to constitute the denial thereof.

33. <u>Lessee's Equal Employment Opportunity and Affirmative Action Policies;</u> <u>Minority Participation.</u>

(a) <u>Compliance with Laws.</u> Lessee hereby agrees to comply with all applicable affirmative action laws, including without limitation Chapter 187 (to the extent applicable) and any other laws and regulations administered by the City's Office of Equal Opportunity.

(b) <u>Lessee's Equal Employment Opportunity and Affirmative Action</u> <u>Policies.</u> Lessee hereby agrees to use best efforts to employ qualified minorities for forty percent (40%) and females for twenty percent (20%) of the new, project related, full-time equivalent jobs and positions created at the Leased Premises (other than the jobs and positions related to the Team's players, coaches and trainers). Minorities shall have the meaning set forth in Chapter 187 of the Codified Ordinances of Cleveland, Ohio, 1976, as said ordinances may be amended from time to time ("<u>Chapter 187</u>").

Lessee further agrees to use best efforts to employ qualified persons who at the date of hire are residents of the City of Cleveland for seventy-five percent (75%) of the new, project related, full-time equivalent jobs and positions created at the Leased Premises (other than jobs and positions related to the Team's players, coaches and trainers).

(c) <u>MBE/FBE Participation.</u> Lessee agrees to use best efforts to award or cause to be awarded at least forty percent (40%) of all contracts for operation of the Stadium (including those described in Section 23(a)) to minority and/or female owned business enterprises ("<u>MBE/FBES</u>") that are certified by the City's Office of Equal Opportunity. MBE/FBES shall have the meaning set forth in Chapter 187.

To verify the award of MBE/FBE contracts, Lessee shall submit copies of all contracts, subcontracts, purchase orders, cancelled checks and other information as may be required by the City's Director of Equal Opportunity, with a copy to the Director of Parks, Recreation and Properties at the notice address set forth in Section 35.

(d)  Quarterly Report.  Lessee agrees to submit or cause to be submitted to the City's Director of Equal Opportunity, with a copy to the Director of Parks Recreation and Properties and a copy to the President of the City's City Council at the notice addresses set forth in Section 35 a quarterly report, setting forth information necessary to determine the attainment of the goals set forth in this Section 33. This information shall include, but not be limited to, the number and types of jobs created and contracts awarded, to whom the jobs were filled by and contracts awarded to, and any and all other information required by the City.

34.  Equal Employment Opportunity.  During the performance of this Lessee, the Lease agrees as follows:

(a)  The Lessee shall not discriminate against any employee or applicant for employment because of race, religion, color, sex, sexual orientation, national origin, age, disability, ethnic group or Vietnam-era or disabled veteran status. The Lessee shall take affirmative action to insure that applicants are employed and that employees are treated during employment without regard to race, religion color, sex, sexual orientation, disabled veteran status. As used herein, "treated" means and includes without limitation the following: recruited, whether by advertising or other means; compensated, whether in the form of rates of pay or other forms of compensation; selected for training, including apprenticeship, promoted, upgraded, demoted, downgraded, transferred, laid off and terminated. The Lessee agrees to and shall post in conspicuous places, available to employees and applicants for employment, notices to be provided by the hiring representatives of the Lessee setting forth the provisions of this nondiscrimination clause.

(b)     The Lessee will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that the Lessee is an equal opportunity employer.

(c)     The Lessee shall send to each labor union or representative of workers with which it has a collective bargaining agreement or other contract, or understanding, a notice advising the labor union or worker's representative of the Lessee's commitments under the equal opportunity clause, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(d)     It is the policy of the City that business concerns owned and operated by minority persons and/or women shall have every practicable opportunity to participate in the performance of contracts awarded by the City.

35.     Notice.  Any notice which is required or proper under the terms of this Lease to be given by the City or the Lessee shall be in writing and shall be deemed sufficient if such notice is delivered in person, sent by nationally recognized overnight courier, delivery fees prepaid, or sent by certified mail, postage prepaid, with return receipt requested, to each of the parties entitled to receive such notice at the delivery or Post Office address respectfully furnished to the City or the Lessee by each of such parties, unless otherwise expressly provided in this Lease.  Any such notice shall be deemed delivered upon hand delivery, the day after depositing with a reputable overnight courier, or three (3) days after depositing such notice in a postal receptacle, return receipt requested.  The addresses originally specified for the City and the Lessee and to serve until notice otherwise shall be given are:

City:          The Director of Law
City Hall
601 Lakeside Avenue, N.E.
Cleveland, Ohio  44114

             and

The Director of Parks, Recreation and Properties
City Hall
601 Lakeside Avenue, N.E.
Cleveland, Ohio  44114

with a copy to:

President
Cleveland City Council
City Hall
601 Lakeside Avenue, N.E.
Cleveland, Ohio  44114

Lessee:     Commissioner
National Football League
410 Park Avenue
New York, New York  10022

with a copy to:

Gregg H. Levy, Esq.
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004

36.    Electrical Supply.  So long as the City operates Cleveland Public Power, the City agrees to supply, through Cleveland Public Power, and the Lessee agrees to accept and pay for at customary commercial rates, electrical power to the exterior surface of the New Stadium, or such other parts of the Leased Premises, in such amounts and in such a manner as is reasonably necessary or appropriate to maintain and operate the Leased Premises.

37.    Landlord's Lien.  The City shall have a lien on all personal property of Lessee located on the Leased Premises.  The City agrees that it shall subordinate its landlord's lien to any lender permitted by the terms of this Lease acquiring a lien on such personal property which lender has (i) provided purchase money financing for such personal property or (ii)

provided working capital financing for Lessee, or to any other lender holding a loan permitted pursuant to Section 23(b).

38. Quiet Enjoyment. The City warrants that the Lessee, subject to the terms and provisions of this Lease and upon payment of the charges required hereunder and observing and performing all of the terms, provisions and conditions hereof, shall lawfully, peaceably and quietly have and enjoy the use of the Leased Premises and all appurtenances thereto during the term hereof. Any provision of law to the contrary notwithstanding, the City acknowledges that breach of this provision creates irreparable harm not ascertainable or compensable in money damages, and consents hereby to any injunctive action filed by the Lessee in any competent court in the State of Ohio to enjoin or remedy such breach. Lessee agrees that in case of a breach of this provision, it may be entitled to money damages or appropriate equitable remedies, it being understood by the parties that the remedy of termination of this Lease shall only be available (a) in the event of a title problem which materially adversely affects the Lessee's full use and enjoyment of the Leased Premises for the purposes for which it is leased hereby and (b) as specifically provided herein. The parties acknowledge that the remedy of termination for breach of quiet enjoyment is not a favored remedy of the parties and should only be awarded by a court in the event that no other remedy at law or in equity would be adequate.

39. Provisions Binding. The parties agree that they have had meaningful discussion and/or negotiation of the provisions, terms and conditions contained in this Lease. Therefore, doubtful or ambiguous provisions, if any, contained in this Lease shall not be construed against the party who physically prepared this Lease. The rule commonly referred to as "Fortius Contra Proferentum" shall not be applied to this Lease or any interpretation thereof.

40. Entire Agreement. This instrument contains all the agreements and conditions made between the parties hereto and all the financial obligations of the parties hereto,

and may not be modified orally or in any other manner other than by an agreement in writing, signed by all the parties hereto or their respective successors in interest.

41. <u>Severability</u>. In the event that any provision of this Lease, or the application thereof to any person or circumstances, shall, for any reason and to any extent, be determined or declared by any court of law or other binding authority to be invalid or unenforceable, the remainder of this Lease, and the application of such provision to any other person or circumstance, shall not be affected thereby, but rather shall be construed and enforced as if the invalid or unenforceable provision were not contained herein.

42. <u>No Partnership</u>. Nothing contained in this Lease shall, or shall be deemed or construed so as to create the relationship of principal-agent, joint venturers, co-adventurers, partners or co-tenants between the City and Lessee; it being the express intention of the parties that they are and shall remain independent contractors one as to the other.

43. <u>Effectiveness of Lease</u>. Before this Lease may become effective, it must be executed by the Commissioner of the NFL pursuant to 1996 Resolution G-1 duly adopted by the NFL Executive Committee on February 10, 1996 and by the Mayor and the Director of Parks, Recreation and Properties of the City pursuant to Ordinance No. 303-96 duly adopted by the Council of the City on March 8, 1996, and this Lease shall be effective upon the last of such executions. Notwithstanding the foregoing, this Lease shall become null and void and of no further force or effect if the NFL's obligations to locate a professional football franchise in Cleveland, Ohio is terminated pursuant to the NFL Agreement.

44. <u>Schedules and Exhibits</u>. All schedules and exhibits attached hereto shall be deemed to be and are incorporated herein by reference and made a part of this Lease. Each schedule and exhibit referred to in this Lease forms an essential part of the document.

45. Broker's Commission. Each of the parties represents and warrants that there are no claims for brokerage commissions or finder's fees in connection with the execution of this Lease, and agrees to indemnify the other against, and hold it harmless from, all liability arising from any such claim including, without limitation, the cost of counsel fees in connection therewith.

46. Gender and Number. Words of any gender used in this Lease shall be held to include any other gender, and words in the singular number shall be held to include the plural (and vice-versa), when the sense requires.

47. Headings and Captions. The captions and section or paragraph headings are inserted only for convenience, and are in no way to be construed as a part of this Lease or as a limitation on the scope of the particular provisions to which they refer.

48. Governing Law. This Lease shall be governed by the laws of the State of Ohio.

49. Time is of the Essence. Time is of the essence in the Lease.

50. Survival. The liabilities and obligations of the NFL under Section 3, the provisions of Sections 18, 26 and 28, the first sentence of the third paragraph of Section 20(a), the last sentence of the third paragraph of Section 20(a), the last sentence of the second paragraph of Section 21, the last sentence of Section 22(a), and any liabilities or obligations of the Lessee or the City arising or relating to periods prior to the termination of this Lease, shall survive any expiration or earlier termination of this Lease.

51. Counterparts. This Lease may be signed in counterparts, each of which

52.   <u>Third-Party Beneficiaries</u>.  There shall be no third-party beneficiaries of this Lease.

53.   <u>Requirements of Law.</u>  The performance by the City under this Lease is subject to the Charter of the City and all applicable laws of the State, including that the obligations of the City under this Lease to perform any covenants that require the expenditure of City funds in subsequent fiscal years are subject to and conditioned upon the appropriation of funds therefor.

54.   <u>Lessee as Manager</u>.  The City hereby designates the Lessee as manager of the Leased Premises for purposes of Ohio Revised Code Section 5709.081(B) and this Lease shall constitute a management or similar agreement for purposes of Section 5709.081(B).

55.   <u>Court Costs and Attorneys' Fees and Expenses</u>.  In the event that in connection with any dispute arising under the terms of this Lease either party hereto should initiate suit or other judicial proceeding against the other party hereto to enforce its rights hereunder, to the extent permitted by law, the prevailing party in any such suit or proceeding shall be entitled to receive from the non-prevailing party to the suit or proceeding, in addition to any other amounts to which the prevailing party may be entitled, the amount of all court costs and reasonable attorneys' fees and expenses incurred by such prevailing party in connection with the suit or proceeding.

IN WITNESS WHEREOF, the City of Cleveland has caused its name and corporate seal to be affixed to duplicate copies of this Lease by its Mayor, and its Director of Parks, Recreation and Properties, thereunto duly authorized, and the National Football League has caused its corporate name to be affixed to duplicate copies hereof by its Commissioner and _____, all as of the 26th day of April, 1996.

Signed and Acknowledged in
the Presence of:
(witnesses)

_____
Printed Name: _FREDERICK R. NANCE_

_____
Printed Name: _SHARON SOBOL JORDAN_

THE CITY OF CLEVELAND

By _____
                        Mayor

By _____
          Director of Parks,
          Recreation and Properties

(witnesses

_____
Printed Name: _FRANK HAWKINS_

NATIONAL FOOTBALL LEAGUE,
individually as to Section 3, and
as nominee for the New Owner

By _____
                    Commissioner

The within instrument is hereby approved as
to legal form and correctness *June 12*,
1996.

_____
Director of Law

(To be executed upon assignment)

_____, Lessee

(witnesses as to both)

_____          By_____

Printed Name:_____

_____          By_____

Printed Name:_____

STATE OF OHIO           )
                               )    SS.
COUNTY OF CUYAHOGA   )

BEFORE ME, a Notary Public in and for said County and State, personally appeared Michael R. White, Mayor, and Oliver B. Spellman, Director of Parks, Recreation and Properties, of the CITY OF CLEVELAND, the municipal corporation on whose behalf the foregoing Lease was executed, who acknowledged, that they did sign the same for and on behalf of said City of Cleveland, being thereunto duly authorized and that the same is their free act and deed individually and as such officers and the free and corporate act and deed of said City of Cleveland.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal at Cleveland, Ohio, this 12 day of _June_, 1996.

_____
Notary Public

KENNETH E. BANKS, JR. Attorney at Law
Notary Public · State of Ohio
My commission has no expiration date
Sec. 147.03 R.C.

STATE OF *District of Columbia*
COUNTY OF *City of Washington* } SS.

BEFORE ME, a Notary Public in and for said County and State, personally appeared Paul Tagliabue, Commissioner, and _____, _____ of the NATIONAL FOOTBALL LEAGUE, an unincorporated, non-profit association, on whose behalf the foregoing Lease was executed, who acknowledged that they did sign the same for and on behalf of said association, being thereunto duly authorized and that the same is their free act and deed individually and as such officers and the free and corporate act and deed of said association.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal at *Washington* , *DC* , this *10th* day of *June* , 1996.

_____
Notary Public

My Commission Expires July 14, 2000

STATE OF _____ )
                    )   SS.
COUNTY OF _____ )

BEFORE ME, a Notary Public in and for said County and State, personally appeared _____ and _____, as _____ and _____ of the _____, a _____, on whose behalf the foregoing Lease was executed, who acknowledged that they did sign the same for and on behalf of said association, being thereunto duly authorized and that the same is their free act and deed individually and as such officers and the free and corporate act and deed of said association.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal at _____, _____, this ___ day of _____, ____.

_____
Notary Public

This instrument prepared by:

Squire, Sanders & Dempsey
4900 Society Center
127 Public Square
Cleveland, Ohio 44114

## FISCAL OFFICER'S CERTIFICATE

The undersigned, being the fiscal officer of the City of Cleveland, Ohio, certifies that the moneys required to meet the obligations of the City during the year 1996 under the foregoing Lease by Way of Concession between the City and the National Football League have been appropriated lawfully by the Council of the City for that purpose and are in the treasury or in the process of collection to the credit of an appropriate fund, free from any previous encumbrance. This Certificate is given in compliance with Sections 5705.41 and 5705.44 of the Revised Code.

Dated: June 12, 1996

_____
Director of Finance

## EXHIBIT A

## ASSIGNMENT AND ASSUMPTION OF LEASE

This Assignment and Assumption of Lease is made and entered into at _____, this _____ day of _____, 199__ by and between the National Football League, an unincorporated, non-profit association ("Assignor") and _____, the owner of the National Football League franchise ("NFL Franchise"), whose home territory is Cleveland, Ohio ("Assignee").

## RECITALS

A. Assignor and Assignee have entered into a Franchise Commitment Agreement, dated as of April 26, 1996 ("Franchise Commitment Agreement"), providing for, among other things, the acquisition by Assignee of the NFL Franchise; and

B. The Franchise Commitment Agreement requires the Assignor to assign, and the Assignee to assume, all of Assignor's right, title and interest in and to the Lease by Way of Concession (defined below).

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledge, the parties agree as follows:

1. Assignment.

Assignor hereby assigns to Assignee (i) all of Assignor's right, title, interest and obligations as Lessee under that certain Lease by Way of Concession dated as of April 26, 1996 by and between the City of Cleveland and the Assignor and (ii) Assignor's entire leasehold estate thereunder (collectively, the "Lease").

2. Assumption.

In consideration of the foregoing assignment, Assignee hereby expressly agrees to be bound by and perform all of the obligations and liabilities of the New Owner and Lessee relating to periods of time or events occurring subsequent to the Commencement Date (as defined in the Lease) or, in the event of the occupancy and use of the Leased Premises prior to the Commencement Date, occurring subsequent to such occupancy and use.

IN WITNESS WHEREOF, the parties have duly executed this Assignment and Assumption of Lease as of the date first above written and shall be effective as of _____, _____.

NATIONAL FOOTBALL LEAGUE

By:_____
Its:_____

By:_____
Its:_____

_____, ASSIGNEE

By:_____
Its:_____

ACKNOWLEDGED this ___ day of _____, 199__.

THE CITY OF CLEVELAND

By: _____

The within instrument is hereby approved as to legal form and correctness _____, 199____.

_____
Director of Law

STATE OF _____ )
                          )   SS.
COUNTY OF _____ )

      BEFORE ME, a Notary Public in and for said County and State, personally appeared Paul Tagliabue, Commissioner, and _____, _____, of the NATIONAL FOOTBALL LEAGUE, an unincorporated, non-profit association, on whose behalf the foregoing Assignment and Assumption of Lease was executed, who acknowledged that they did sign the same for and on behalf of said association, being thereunto duly authorized and that the same is their free act and deed individually and as such officers and the free and corporate act and deed of said association.

      IN WITNESS WHEREOF, I have hereunto set my hand and official seal at _____, _____, this ___ day of _____, 1996.

                                    _____
                                       Notary Public

STATE OF )
                    )   SS.
COUNTY OF )

      BEFORE ME, a Notary Public in and for said County and State, personally appeared _____, Assignee, who acknowledged that he/she did sign the foregoing Assignment and Assumption of Lease, and that same is his/her free act and deed.

      IN WITNESS WHEREOF, I have hereunto set my hand and official seal at _____, _____, this ___ day of _____, 1996.

                                      _____
                                       Notary Public

This instrument prepared by:

Squire, Sanders & Dempsey
4900 Society Center
127 Public Square
Cleveland, Ohio 44114

Electronically Filed 05/20/2025 16:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

**EXHIBIT B**

Description of Leased Premises

[Description of Stadium Parcel to come]

EXHIBIT A

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio and known as being part of extended Original Two Acre Lot Numbers 9 through 17 (both inclusive), and together forming a parcel of land bounded and described as follows:

Beginning in the centerline of West 3rd Street (99 feet wide), at its point of intersection with the centerline of Erieside Avenue, N.W. (70 feet wide) as shown by the Dedication Plat of Erieside Avenue, N.E. and N.W. and West 3rd Street, recorded in Volume 204 of Maps, Page 69 of Cuyahoga County Records;

Thence South 33° 56' 46" East, along the centerline of West 3rd Street, 346.23 feet to a point;

Thence North 56° 03' 14" East, along a line drawn perpendicular to said centerline of West 3rd Street, 72.74 feet to its point of intersection with the Northeasterly curved line of said West 3rd Street, said point also being the Southwesterly corner of the Donald Gray Gardens and the principle place of beginning of the parcel of land herein intended to be described;

Thence Northeasterly, along the curved Southeasterly line of Erieside Avenue N.E., being the arc of a circle deflecting to the right, having a radius of 457.01 feet and a chord that bears North 34° 09' 36" West, 533.59 feet, an arc distance of 569.79 feet to a point of tangency therein;

Thence North 55° 50' 24" East, continuing along the Southerly line of Erieside Avenue N.E., 445.39 feet to a point of curvature therein;

Thence along the arc of a circle deflecting to the right, having a radius of 515.00 feet, a chord that bears South 57° 29' 05" East, 29.56 feet, an arc distance of 29.57 feet to a point of compound curvature;

Thence Southeasterly, along the Westerly line of Erieside Avenue (70 feet wide) as relocated, along an arc of a circle deflecting to the right, having a radius of 30.00 feet, a chord that bears South 87° 28' 59" East, 33.03 feet, an arc distance of 34.98 feet to a point of compound curvature;

Thence continuing Southeasterly along the Westerly line of Erieside Avenue, as relocated, along the arc of a circle deflecting to the right, having a radius of 190.00 feet, a chord that bears South 44° 06' 13" East, 65.69 feet, an arc distance of 66.03 feet to a point of tangency;

Thence South 34° 08' 55" East along the said line of relocated Erieside Avenue, 462.69 feet to a point of curvature therein;

Thence Southeasterly along said line of relocated Erieside Avenue and the arc of a circle deflecting to the left, having a radius of 335.00 feet and a chord that bears South 72° 20' 27" East, 414.26 feet, an arc distance of 446.61 feet to a point;

Thence South 20° 31' 59" East, 25.00 feet to a point on the Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W.;

Thence South 56° 01' 58" West, along said Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., 117.38 feet to an angle point therein;

Thence South 54° 27' 44" West, continuing along said Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., 64.87 feet to a point of curvature therein;

Thence Southwesterly, along the curved Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., being the arc of a circle deflecting to the left, having a radius of 980.00 feet and a chord that bears South 47° 12' 58" West, 247.22 feet, an arc distance of 247.88 feet to a point of reverse curvature therein;

Thence Southwesterly, continuing along the curved Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., being the arc of a circle deflecting to the right, having a radius of 1480.00 feet and a chord bearing South 49° 45' 29" West, 503.20 feet, an arc distance of 505.66 feet to a point of curvature therein;

Thence South 59° 32' 45" West, along said Northwesterly line of the West 3rd exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., 201.27 feet to the Southeasterly end of a curved turnout between said Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway, N.E. and N.W. and West 3rd Street;

Thence Northwesterly, along said turnout, being an arc of a circle deflecting to the right, having a radius of 100.00 feet, an arc distance of 150.99 feet to a point of tangency in said Northeasterly line of West 3rd Street;

Thence North 33° 56' 46" West, continuing along the Northwesterly line of West 3d Street, 421.07 feet to a point of curvature therein;

Thence Northeasterly, along the Northeasterly curved line of West 3 rd Street, being the arc of a circle deflecting to the right, having a radius of 457.01 feet and a chord that bears North 24° 46' 13" West, 145.75 feet an arc distance of 146.38 feet to the principle place of beginning according to a survey dated May, 1986 by the City of Cleveland, Department of Public Service, Division of Engineering and Construction, Plats and Surveys. This legal description was prepared by Jomarie Wasik, Ohio Professional Surveyor Number 7027. Bearings are to an assumed meridian and are used to denote angles only.

# EXHIBIT C

## Signage Standards

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

## Schedule 14(f)

## Capital Repair Fund Budget

| Year | Contribution | Reserve Amount | Amount Allocated to Capital Improvements |
|------|--------------|----------------|------------------------------------------|
| 1996 | $ 0 | $ 0 | $0 |
| 1997 | 2,000,000 | 2,000,000 | 0 |
| 1998 | 0 | 0 | 0 |
| 1999 | 500,000 | 500,000 | 0 |
| 2000 | 500,000 | 500,000 | 0 |
| 2001 | 650,000 | 650,000 | 0 |
| 2002 | 650,000 | 650,000 | 0 |
| 2003 | 650,000 | 650,000 | 0 |
| 2004 | 650,000 | 650,000 | 0 |
| 2005 | 650,000 | 650,000 | 0 |
| 2006 | 850,000 | 850,000 | 0 |
| 2007 | 850,000 | 850,000 | 0 |
| 2008 | 850,000 | 850,000 | 0 |
| 2009 | 850,000 | 850,000 | 0 |
| 2010 | 850,000 | (To be established per Section 14) | (To be established per Section 14) |
| 2011 | 850,000 | | |
| 2012 | 850,000 | | |
| 2013 | 850,000 | | |
| 2014 | 850,000 | | |
| 2015 | 850,000 | | |
| 2016 | 850,000 | | |
| 2017 | 850,000 | | |
| 2018 | 850,000 | | |
| 2019 | 850,000 | | |
| 2020 | 850,000 | | |
| 2021 | 5,900,000 | | |
| 2022 | 6,300,000 | | |
| 2023 | 6,700,000 | | |
| 2024 | 7,100,000 | | |
| 2025 | 7,500,000 | | |
| 2026 | -0- | | |
| 2027 | -0- | | |
| 2028 | -0- | | |

Signage requirements for Gateway Sports Complex from the *Central Market community Development Plan* accepted by the Cleveland City Planning Commission September 26, 1986 and last amended August 11, 1993.

8.   Signage

A complete signage plan for the site shall be submitted to and approved by the City Planning Commission.  Signs which shall be visible from public rights-of-way and public open spaces shall be limited to signs identifying the sports facility district, the stadium, the arena, and associated parking facilities.  Such signs may identify primary tenants and events occurring in the sports facility district, at the stadium and at the arena, but shall not display advertising for products, services, businesses, corporations, or other organizations. Permitted sign types shall be limited to the following:

District Identification Signs:  Signs identifying or naming the sports facility district may be placed along Ontario Street, Carnegie Avenue, and East 9th Street.

Event Identification Signs:  Signs identifying the events occurring at the sports facility may be placed along Ontario Street, Carnegie Avenue, and East 9th Street.

Building Identification Signs:  Signs identifying or naming the stadium and arena may be placed on the buildings or on the site in the vicinity of the buildings.

Tenant Identification Signs:  Signs identifying the major tenants of the stadium and arena may be placed on the buildings or on the site in the vicinity of the buildings.  Signs identifying other tenants of space on the site may be placed on the building for those tenants occupying a portion of the ground floor of the building, containing an entrance from the building exterior, and separated from other such spaces by a party wall or walls.

Parking Identification Signs:  Signs identifying on-site parking facilities may be placed on the buildings or on the site in the vicinity of surface parking.

Directional Signs:  Signs indicating a direction or a location to which pedestrian or vehicular traffic is requested to move shall be placed as appropriate.

Informational Signs:  Signs which present miscellaneous information or instructions intended to serve the public, product or issue and not containing information included in the definition of any other sign shall be placed as appropriate.

Banner Signs:  Signs which may be mounted on light poles in public rights-of-way and public open space shall be placed as appropriate presenting information included in the definitions of the signs identified above.

Scoreboard:  A variable message scoreboard which may be visible from one or more public rights-of-way may be placed within the stadium and may be used for the display of advertising for products, services, businesses, corporations, or other organizations.

Electronic Changeable Copy Signs:  Variable message signs which may be visible from one or more public rights-of-way or public open spaces may be placed on or adjacent to the arena, stadium, or parking garage.  All net revenues generated from information displayed on such signs shall be used for the maintenance of public open spaces and streetscape associated with the sports facility complex. Information displayed on these signs shall be limited to the following:

      a.   Identification of the sports facility complex, the arena, or the stadium.

      b.   Identification of events held at the sports facility complex, the arena, or the stadium.

      c.   Identification of events held at other local public assembly facilities.

      d.   Acknowledgement of organizations or individuals sponsoring events held at the facility or contributing to the construction or operation of the facility as sponsors or patrons.

      e.   Identification of products or services offered for sale on the premises of the facility.

      f.   Public service messages such as time, temperature, and information of a civic nature.  These public service messages shall be displayed at least twenty (20) percent of the time during which electronic changeable copy signs are operating between the hours of 7:00 A.M. and 12 Midnight.

The signage plan shall present the minimum amount of signage required to provide necessary information to the public and to reflect a degree of order and uniformity through the elements of scale, placement, type, format, and graphics.  The signage plan shall identify the design and location of each sign including size, color, materials, and means of illumination which shall be in conformance with Sign Regulations, Chapter 350 of the Codified Ordinances and in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

City Planning Commission
Regular Meeting – March 19, 1999

---

Mr. Morrison said that the staff had drafted a resolution for the Planning Commission to weigh regarding the gate signs such that if the Planning Commission approved them it would be delimiting the scope of its approval. The resolution sets forth the appropriateness of the gate signs as designed and contrasted off-premises advertising, such signage with which is deemed unacceptable. He said that the meeting minutes required a clear rationale stating why the gate signs as presented are acceptable and needed and do not constitute off-premises advertising. He then read aloud a draft resolution. He said that the gate signs were consistent with City policy in naming buildings.

Commissioner Robinson concurred with the resolution and said that the gate signs would not, because of their location, be read in any way as building naming signs.

Mr. Morrison said that the gate signs will be unified by their height, construction, and depth, and all rendered in brush aluminum. He said that design details will be refined by the staff in working with the project architect and the sign designer. He said that architects were to be commended for not hindering the openness of the stadium notches. He said that the design for the signs of the two suite gates on the north side of the building will be presented later.

Acting Chairman Coyne commended the design team for the excellence of the stadium's design.

In response, Ms. Downing said that the building is going to be a tribute to the City.

Mr. Morrison put forth the proposed resolution for Planning Commission action.


### CPC Resolution No. 319-99

Whereas, the sale of naming rights to private corporations for publicly owned arenas and stadia has become standard practice in cities throughout the United States;

Whereas, the owners of the Cleveland Browns have the right in their lease with the City of Cleveland as it was negotiated with the National Football League in 1996 to market to private corporations the name of the new football stadium at North coast Harbor;

Whereas, the owners of the Cleveland Browns have proposed to name the new stadium "Cleveland Browns Stadium" if allowed to sell naming rights for six entrance gates providing patron access to the new stadium;

16

City Planning Commission
Regular Meeting – March 19, 1999

Whereas, the name "Cleveland Browns Stadium" recognizes the strong support of Clevelanders for this franchise and assures, that in broadcasting and promoting events at the new stadium, the name "Cleveland: shall be at the forefront;

Whereas, the owners of the Cleveland Browns are committed to marketing the naming rights to Cleveland-area corporations, thus furthering the public-private partnership that has been vital to Cleveland's renaissance and the financing of the city's new sports facilities;

Whereas, the owners of the Cleveland Browns intend to sell discrete gate names to corporations for a period of no less than 10 years with the intention that patrons associate the gate name with its location and are directed to specific entrances around the new stadium;

Whereas, the design of the new stadium is unique insofar as the upper deck level is discontinuous between the sidelines, thus requiring that patrons utilize specific gates to access the appropriate ramps and elevators to reach their seats.

Whereas, the owners of the Cleveland Browns are committed to utilizing the gate names as part of its formal wayfinding system , and will feature the gate names in printed and broadcast materials including tickets, brochures and public information which shall assist the public in finding the appropriate gate entrance to reach their seats;

Therefore, be it resolved that:

1.  The City Planning Commission accepts the proposal made by the Cleveland Browns to designate the new football stadium, the "Cleveland Browns Stadium" and, in foregoing its right to market the name of the new stadium to a private corporation, shall substitute in lieu thereof the marketing of naming rights to private corporations for four primary entrance gates.

2.  The City Planning Commission determines that the proposed sponsored gate names for the four primary entrances and the two north suite entrances on the exterior of the stadium shall identify discrete building entrances in a large and unique public assembly facility.

3.  The identification of discrete building entrances is an essential component of the building wayfinding system and shall be reinforced by the use of the discrete sponsored gate names on tickets, stadium directional signage, public information and other media communications for the purposes of directing patrons to their seats.

4.  The proposed gate signage identifies specific building elements of a uniquely designed public assembly facility and does not constitute off-premises advertising signage within the meaning of the City's Codified ordinances.

17

SECRETARY

City Planning Commission
Regular Meeting – March 19, 1999

5.  These primary gate and suite entrance signs are hereby approved as presented with the understanding that the project sponsors for the stadium shall present the design details to the staff for review and approval.

ACTION #2:  Motion to Adopt Resolution No. CPC 0319-99.

BOWEN Y  BURKE 2  COYNE Y  LUMPKIN Y  PINKNEY 1  ROBINSON Y  SMALL Y

APPROVED X  APPROVED SUBJECT TO STATED AMENDMENT ___
DISAPPROVED ___  DISAPPROVED UNLESS AMENDED ___  TABLED __

> MOTION #2:  The Design Review Committee recommends approval as presented of the proposed entry gate signs for the Cleveland Browns Stadium with the understanding that the City Planning Commission will rule on the appropriateness of the proposed naming or sponsorship approach to these locations.  It is understood that the staff will review the designs of these signs as they are submitted.

ACTION #3:  Motion to Adopt Motion #2 of the Design Review Committee.

BOWEN Y  BURKE 2  COYNE Y  LUMPKIN Y  PINKNEY 1  ROBINSON Y  SMALL Y

APPROVED X  APPROVED SUBJECT TO STATED AMENDMENT ___
DISAPPROVED ___  DISAPPROVED UNLESS AMENDED ___  TABLED __

> Mr. Morrison said that two issues needed clarification for the record.  The first, he said, had to do with the scoreboards that had been approved in principle.  He said that any modifications to it were going to be reviewed by the staff.  He said that, from certain vantage points, advertising on the scoreboard will be visible from the public right-of-way.  He said that the staff has taken the position that this situation is an accident of the design.  He said that he understood the Browns took the same view, but that it was their intent that the scoreboard panels are illuminated only for stadium events.

> Ms. Henrichsen said that Jacobs Field is lighted on non-game nights about thirty times a year.

18

SECRETARY

CENTRAL MARKET

COMMUNITY DEVELOPMENT PLAN

Cleveland City Planning Commission    Accepted: September 29, 1986
Hunter Morrison, Director           Amended: November 5, 1990
                                                  June 17, 1991
                                                  February 24, 1992
                                                  August 11, 1993

CENTRAL MARKET
COMMUNITY DEVELOPMENT PLAN

### Table of Contents

|  |  | Page |
|---|---|---|
| I. | CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN.............. | 1 |
|  | A. Boundaries......................................... | 1 |
|  | B. Definitions........................................ | 2 |
|  | C. Description of the Plan Area....................... | 2 |
|  | D. Plan Area in Context.............................. | 3 |
|  | E. Objectives of the Plan............................ | 4 |
| II. | ACTION AREA REDEVELOPMENT PLAN....................... | 4 |
|  | A. Objectives of the Action Area..................... | 4 |
|  | B. Redevelopment Proposal............................ | 5 |
|  | C. Permitted Land Uses............................... | 5 |
|  | D. Parcel Size....................................... | 6 |
|  | E. Site and Building Requirements.................... | 6 |
| III. | ADDITIONAL POLICIES AND PROCEDURES APPLICABLE TO THE PLAN AREA..................................... | 11 |
|  | A. Public Improvements............................... | 11 |
|  | B. Redevelopment Plan Review......................... | 11 |
|  | C. Duration of Land Use Controls..................... | 11 |
|  | D. Procedure for Amendment........................... | 11 |
| IV. | PROVISION TO PREVENT RECURRENCE OF BLIGHTED OR SUBSTANDARD AREA AND DISCRIMINATION................... | 12 |
| V. | RELOCATION PLAN...................................... | 13 |
| Exhibit I: | Central Market Community Development Plan Area... | 14 |
| Exhibit II: | Central Market Area Permitted Land Uses........ | 15 |
| Exhibit III: | Central Market Area Public Rights-of-Way........ | 16 |

I.    CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN

    A.    BOUNDARIES

        1.    THE CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA

After review of the blighted conditions found in the blight survey for the Central Market Survey Area, the City Planning Commission has, pursuant to local ordinances, designated a portion of the Blight Survey Area as a Community Development Plan Area in order to prescribe treatments that will eliminate the blight and prevent the recurrence of blight.

The boundary of the designated Community Development Plan Area, entitled the "CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA", is delineated in Exhibit I and generally includes the area bounded by Ontario Avenue on the west, Carnegie Avenue on the south, E. 9th Street (between Carnegie Avenue and Bolivar Road) and E. 7th Street (between Huron Road and Bolivar Road) on the east and Huron Road (between Ontario Avenue and E. 7th Street) and Bolivar Road (between E. 7th Street and E. 9th Street) on the north. Pursuant to provisions of the City Charter and Codified Ordinances the prescribed treatment to eliminate and prevent the recurrence of blight in a designated Community Development Plan Area may include clearance and redevelopment, rehabilitation or conservation, or any combination or part thereof.

        2.    ACTION AREAS

Specific "Action Areas", with defined boundaries, shall be established by the City when the City has determined that a suitable and satisfactory redevelopment, or rehabilitation proposal is presented that offers a satisfactory contractual commitment from a Redeveloper.    All such "Action Areas" will have boundaries based upon sound planning principles for the elimination of blight and prevention of its recurrence.    Rehabilitation and/or redevelopment in a specific Action Area must relate appropriately to adjacent and surrounding land uses, eliminate blighting influences in the surrounding areas, spur the elimination of blight, and prevent the recurrence of blight.

The City shall acquire property for redevelopment in an Action Area when there is a satisfactory commitment from a Redeveloper to acquire such property from the City and to redevelop it in accordance with the Community Development Plan and when the City is satisfied that the proposed commitment provides the best means of eliminating blight and preventing the recurrence of blight.    Alternatively, the City shall acquire property for rehabilitation in an Action Area when there is a satisfactory commitment from a Redeveloper to acquire such property and when the City is satisfied that the proposed commitment provides the best means of eliminating blight and preventing the recurrence of blight.

One specific geographic area, with defined boundaries comprising the entire CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA, has been established as the "Action Area" appropriate for the Plan Area by the City.    This "Action Area" is comprised of a majority of structures which are substandard by reason of age, obsolescence, dilapidation, overcrowding, faulty arrangement, mixtures of incompatible land uses, a lack of ventilation or sanitary facilities or any combination of these factors, and therefore, has been identified, based upon sound planning principles, as the treatment area where blight is to be eliminated.    The boundary of the Action Area (hereinafter referred to as the "Action Area") is shown on Exhibit I and is equal to and the same

1

as the boundary above described for the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA.

B.   DEFINITIONS

As used in this document, the terms listed below shall be interpreted according to the following definitions:

1.   Blight Survey Area:  An area designated by the City Planning Commission in which buildings and lots are surveyed to determine conditions of blight.

2.   Community Development Plan:  A plan adopted by the City Planning Commission and the City Council which, pursuant to provisions of the City Charter and Codified Ordinances, prescribe treatment to eliminate blight and prevent the recurrence of blight in a designated portion of a Blight Survey Area.

3.   Action Area: A designated area of a Blight Survey Area for which the City has determined that a satisfactory contractual commitment from a Redeveloper has been presented for the area's suitable redevelopment or rehabilitation based upon sound planning principles for the elimination of blight and the prevention of its recurrence.

4.   Urban Design Guidelines:  Recommendations adopted by the City Planning Commission in accordance with the Community Development Plan to provide specific guidance to a Redeveloper for the redevelopment of an Action Area relative to the physical design of improvements to property, structures, or public infrastructure to eliminate blight and prevent its recurrence.

5.   Redevelopment Plan:  A plan presented by a Redeveloper identifying specific improvements to property, structures, or public infrastructure in an Action Area consistent with the goals and objectives of a Community Development Plan and Urban Design Guidelines to eliminate blight and prevent its recurrence.  This Redevelopment Plan may include the following components:

Site Plan.

Building Plan, including floor plans, elevations, and sections.

Signage Plan.

Landscape Plan.

Streetscape Plan.

Lighting Plan.

C.   DESCRIPTION OF THE PLAN AREA

The CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA encompasses approximately twenty-eight (28) acres of land area the majority of which is underutilized as surface parking lots.  Public street rights-of-way  include parts of E. 4th, E. 6th and E. 7th Streets and Bolivar Avenue, Woodland Road, and Eagle Avenue in the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA.  None of these streets have significant vehicular traffic volumes, nor are they critical links in the downtown street network.

2

There was a total of forty-four (44) commercial/ industrial buildings in the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA. Forty-two (42) of those buildings were found to be in substandard condition. The majority of buildings in the Plan Area were built around the turn of the century and are multi-story loft type structures. Most of these structures have been demolished.

The uses which occupied the buildings that existed in the Plan Area included the produce vendors at the Central Market, wholesale outlets, offices, adult entertainment establishments, warehousing and storage operations.

D.   PLAN AREA IN CONTEXT

The CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA is a major entry point to downtown Cleveland. The Plan Area is a highly visible location particularly from the Innerbelt and the Hope Memorial (Lorain-Carnegie) bridges. The redevelopment of the Plan Area must relate to the following activity and development centers in downtown Cleveland:

Euclid/Prospect Retail District

Euclid Avenue, the primary retail street, provides main entrances to the Higbee Company and May Company department stores as well as many other retail outlets. Prospect Avenue offers a "people street" of bargain stores as well as secondary entrances to the department stores. The streets are connected via the Euclid and Colonial shopping arcades and the two department stores.

Tower City

Located to the northwest of the Plan Area, this building complex is undergoing an ambitious revitalization and expansion program to be realized over a number of years. Tower City's concourse has been renovated and additional parking has been provided. Also, the City, State, and Federal governments have made major financial commitments to repair the structural bridges supporting Tower City and the State Office building.

Playhouse Square

Located along Euclid Avenue northeast of the Plan Area, between East 13th and East 18th Streets, this area serves as downtown's theater and entertainment district. It acts as the second of two major downtown activity hubs that generate considerable traffic on Euclid Avenue.

Public Square

Located two blocks northeast of the Plan Area, Public Square is a busy transportation node and pedestrian area, and has recently undergone major renovation. Its four quadrants offer a relaxing environment for pedestrians featuring plazas, walkways, trees, bus stops, fountains, statues, and other public amenities.

E. 9th Street Corridor

Downtown's primary business street runs along East 9th, from Lakeside Avenue on the north, to Prospect Avenue on the south. This corridor formed part of the Erieview I Urban Renewal Plan Area. Specific concepts of the plan were essentially completed with

3

construction of the Ohio Bell Building, the One Cleveland Center, and Eaton Center.

### E.    OBJECTIVES OF THE PLAN

Pursuant to local ordinances, the City Planning Commission has reviewed the CENTRAL MARKET BLIGHT SURVEY which encompasses the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA, to determine the existing nature and extent of urban blight in that part of downtown. This Survey is one of several similar surveys, such as the Euclid-Prospect, Playhouse Square, Erieview I, and Erieview II surveys, which have been conducted by the City Planning Commission as part of the City's continuing planning process for downtown Cleveland.    In accordance with such ordinances and City policy related to sound planning principles, the City intends to authorize treatment measures that will eliminate the blighted conditions found to exist in the Plan Area.    The two central criteria for renewal activities are the elimination of blight and the prevention of its recurrence, consistent with applicable local and state laws, public policy and sound planning principles.    The following aims shall guide the redevelopment activities in the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA:

1.    To make provision for the acquisition and demolition of those buildings or structures in the Action Area which have been identified as being of substandard condition in the CENTRAL MARKET BLIGHT SURVEY, and which are obstructive to undertaking a sound redevelopment plan, to enable the elimination of blight and the prevention of the recurrence of blight in the Plan Area.

2.    To eliminate incompatible land uses and prevent the future inclusion of any incompatible land use activities that will hamper the efficient economic functioning of the redevelopment for the Plan Area and/or cause the recurrence of blight.

3.    To redevelop the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA and to require that all future development in the Plan Area be consistent with and adhere to the restrictions described in this plan.

## II.    ACTION AREA REDEVELOPMENT PLAN

### A.    OBJECTIVES OF THE ACTION AREA

The action area shall be developed in accordance with the City's policy of acquisition by the City for redevelopment only where:

1.    The City determines that redevelopment offers the best means for elimination of blight and prevention of its recurrence;

2.    There exists a suitable commitment from a Redeveloper to redevelop the property to eliminate blight and prevent the recurrence of blight.

A number of planning considerations and objectives are relevant to the kind of development which will best prevent the recurrence of blight within the Action Area:

1.    Create activity centers around the downtown office and retail core.  The Central Market area has been designated in the Downtown Plan as the most appropriate location for a new sports complex in Cleveland.  Its close proximity to the interstate highway network and public transportation provides convenient access for residents of the city and region.

4

2. Enhance the visual quality of downtown. Ontario and East 9th Streets which bound the Central Market area are major traffic corridors for Cleveland's central business district. Thoughtful design and placement of the sports facilities in a park like setting can create grand urban entrances for downtown Cleveland.

3. Support surrounding economic development. The sports facilities should be designed to relate to adjacent districts and should enhance pedestrian activity to support their economic viability and generate new development.

4. Enhance Cleveland's architectural heritage. New development should be designed to respect the historic architectural context surrounding the Central Market area in terms of physical massing, construction materials, and the design treatment of facades and public open spaces.

5. Strategically locate new parking facilities. New parking should be built to address the daily demand of downtown office workers and visitors as well as provide parking for events at the sports facilities.

6. Extend downtown Cleveland's public open space and park system. The development of public open space is essential to address the needs of the large number of people attending events at the proposed sports facility. It also affords the opportunity to extend the network of public open space in Cleveland's central business district, which currently stretches from North Coast Harbor through the Mall to Public Square, southward to the Innerbelt. The design of public open spaces around the sports facility should provide an appropriate setting for the stadium and the arena, and should be sufficiently flexible to accommodate public gatherings during times when events are not scheduled in the sports facilities.

B. REDEVELOPMENT PROPOSAL

The City has been presented with a satisfactory contractual commitment from a Redeveloper to redevelop the Action Area with a sports facility that is intended to house major league professional athletic teams and lighting, landscaping, and pedestrian walkway amenities.

C. PERMITTED LAND USES

In the Action Area the primary use shall be an integrated multi-use sports facility, consisting of an open air stadium and enclosed arena, open to the public, together with related uses which support the sports facility. Additional permitted uses ancillary to said sports facility may include pedestrian concourse areas, public spaces, concession areas, meeting areas, offices, retail, restaurants, cafes and other uses of the same general character, interior and exterior pedestrian walkways, and off-street parking. The stadium shall be located in a subarea of the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA as shown in Exhibit II and, in general, bounded by Ontario Street, a relocated Eagle Avenue, East 9th Street, and Carnegie Avenue. The arena shall be located in a subarea of the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA as shown in Exhibit II and, in general, bounded by Ontario Street, Huron Road, an extension of East 6th Street to be constructed, and a relocated Eagle Avenue.

Mixed use development may occur within a subarea of the CENTRAL MARKET AREA as shown in Exhibit II and, in general bounded by an extension of East 6th Street to be constructed, Huron Road, East 7th

5

Street, Bolivar Road, East 9th Street, and a relocated Eagle Avenue. Permitted land uses within this subarea may include the following primary uses:

     1.   General office space;

     2.   Retail shopping space;

     3.   Hotel and residential development; and

     4.   Public open space.

Off-street parking ancillary to said primary uses may be constructed in structured garages.

In the event that the Redeveloper determines that it is unable to redevelop the property with a multi-use sports facility, or either component thereof, mixed use development may also occur within those subareas of the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA that are not otherwise developed.

D.   PARCEL SIZE

When contiguous developable land assembly has been accomplished under common ownership, any development of such assembled land must occur on such consolidated parcel pursuant to a site development plan for the redevelopment of the entire consolidated parcel, which site development plan shall be submitted for approval to the City Planning Commission.  The subdivision of any such consolidated parcel shall require prior City Planning Commission approval.  As to any parcel which is not included in any such contiguous developable land assembly, the Redeveloper shall submit to the City Planning Commission for its approval a separate site development plan.  If parking is approved by the City, such parking must be approved for compliance with the standards of Section 349.07 of the Codified Ordinances of Cleveland, Ohio, 1976, regarding paving, drainage, bumper guards, landscaping, and screening.

E.   SITE AND BUILDING REQUIREMENTS

1.   Maximum Building Height

Any building or structure hereafter erected shall not exceed two hundred fifty (250) feet in height and shall be built to heights in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

2.   On-Site Vehicular/Pedestrian Separation

The design of any sports facilities on the site shall minimize pedestrian and vehicular traffic conflicts and shall be in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

3.   Off-Site Vehicular/Pedestrian Separation

The Redeveloper may construct one or more pedestrian walkways connecting the sports facility to development occurring in the Tower City and Euclid/Prospect Districts.  Prior to constructing any pedestrian walkway, the Redeveloper shall demonstrate to the satisfaction of the City Planning Commission that the proposed pedestrian walkways are of sufficient size and capacity to accommodate

6

pedestrian traffic generated by the sports facility when it is used to its maximum design capacity and provide convenient access to off-site parking garages and public transit facilities.  The City Planning Commission shall approve the location, size, and design of all pedestrian walkways constructed in conjunction with the development of the sports facility which shall be in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

### 4.  Parking and Circulation Requirements

The proposed sports facility shall require the vacation of portions of East 4th Street, Bolivar Road, Eagle Avenue, and Woodland Avenue through the site, and portions of traffic lanes on Ontario Street and Carnegie Avenue along the perimeter of the site.  In order to accommodate vehicular access in this area of downtown Cleveland, Eagle Avenue shall be relocated northward and an extension of East 6th Street shall be constructed between Huron Road and the relocated Eagle Avenue as shown in Exhibit III.  These roadways shall function as public rights-of-way even though they may be closed to vehicular traffic during events at the stadium or the arena to accommodate safe, unobstructed movement of people through the site.

The proposed sports facility shall be designed to avoid or minimize the need to undertake additional major off-site capital infrastructure changes.

Automobile and bus parking and circulation areas for the sports facility shall minimize pedestrian and vehicular conflicts and shall be in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

The redevelopment shall be planned to accommodate and facilitate measures to encourage the use of public rail and bus transit for the sports facility events.  Pedestrian walkways shall be designed so as to tie into the existing and proposed downtown pedestrian network and provide safe and convenient pedestrian access to and from the sports facility.

A maximum of 2,350 new off-street parking spaces may be provided as part of the redevelopment of which no more than 2,250 spaces may be located in a parking garage and no more than 100 surface parking spaces may be provided.  These spaces shall be designed and constructed so as to be available for new and existing development in the Euclid/Prospect District to the extent not inconsistent with the sports facility use.  The location and configuration of all off-street parking and vehicular circulation areas shall be in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan and shall be subject to review and approval by the Downtown Off-Street Parking Committee and the City Planning Commission in accordance with Section 349.11 of the Zoning Code.

Unused portions of the Action Area may be used for temporary, interim surface parking until June 30, 1992.  Thereafter, such use shall be subject to prior approval by the Downtown Off-Street Parking Committee and the City Planning Commission.

### 5.  Setbacks

Any new improvements, including all buildings, parking areas, walls, fences, or other structures, shall be setback in

7

conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

### 6. Parking Entrances and Exits

Entrances and exits to ancillary off-street parking not constituting a part of the sports facility structure may be located only on the East 6th Street extension, East 9th Street, Ontario Street, Carnegie Avenue, Bolivar Road, Huron Road, and East 7th Street to the extent such streets have not been vacated and the relocated Eagle Avenue and shall be in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B.

### 7. Public Open Space

Public open space shall be of sufficient size to allow for safe movement of people through the site and to the sports facility. The design of this public open space shall be sufficiently flexible to accommodate public gatherings during times when events are not scheduled in the sports facilities and shall be in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B.

After June 30, 1992, unused portions of the Action Area shall be designed as interim public open space until such time as other permitted uses may be developed in accordance with Section II.C. of this Plan.

### 8. Signage

A complete signage plan for the site shall be submitted to and approved by the City Planning Commission. Signs which shall be visible from public rights-of-way and public open spaces shall be limited to signs identifying the sports facility district, the stadium, the arena, and associated parking facilities. Such signs may identify primary tenants and events occurring in the sports facility district, at the stadium and at the arena, but shall not display advertising for products, services, businesses, corporations, or other organizations. Permitted sign types shall be limited to the following:

District Identification Signs:  Signs identifying or naming the sports facility district may be placed along Ontario Street, Carnegie Avenue, and East 9th Street.

Event Identification Signs:  Signs identifying the events occurring at the sports facility may be placed along Ontario Street, Carnegie Avenue, and East 9th Street.

Building Identification Signs:  Signs identifying or naming the stadium and arena may be placed on the buildings or on the site in the vicinity of the buildings.

Tenant Identification Signs:  Signs identifying the major tenants of the stadium and arena may be placed on the buildings or on the site in the vicinity of the buildings.  Signs identifying other tenants of space on the site may be placed on the building for those tenants occupying a portion of the ground floor of the building, containing an entrance from the building exterior, and separated from other such spaces by a party wall or walls.

Parking Identification Signs:  Signs identifying on-site parking facilities may be placed on the buildings or on the site in the

8

vicinity of surface parking.

Directional Signs: Signs indicating a direction or a location to which pedestrian or vehicular traffic is requested to move shall be placed as appropriate.

Informational Signs: Signs which present miscellaneous information or instructions intended to serve the public, product or issue and not containing information included in the definition of any other sign shall be placed as appropriate.

Banner Signs: Signs which may be mounted on light poles in public rights-of-way and public open space shall be placed as appropriate presenting information included in the definitions of the signs identified above.

Scoreboard: A variable message scoreboard which may be visible from one or more public rights-of-way may be placed within the stadium and may be used for the display of advertising for products, services, businesses, corporations, or other organizations.

Electronic Changeable Copy Signs: Variable message signs which may be visible from one or more public rights-of-way or public open spaces may be placed on or adjacent to the arena, stadium, or parking garage. All net revenues generated from information displayed on such signs shall be used for the maintenance of public open spaces and streetscape associated with the sports facility complex. Information displayed on these signs shall be limited to the following:

a. Identification of the sports facility complex, the arena, or the stadium.

b. Identification of events held at the sports facility complex, the arena, or the stadium.

c. Identification of events held at other local public assembly facilities.

d. Acknowledgement of organizations or individuals sponsoring events held at the facility or contributing to the construction or operation of the facility as sponsors or patrons.

e. Identification of products or services offered for sale on the premises of the facility.

f. Public service messages such as time, temperature, and information of a civic nature. These public service messages shall be displayed at least twenty (20) percent of the time during which electronic changeable copy signs are operating between the hours of 7:00 A.M. and 12 Midnight.

The signage plan shall present the minimum amount of signage required to provide necessary information to the public and to reflect a degree of order and uniformity through the elements of scale, placement, type, format, and graphics. The signage plan shall identify the design and location of each sign including size, color, materials, and means of illumination which shall be in conformance with Sign Regulations, Chapter 350 of the Codified Ordinances and in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

9. Landscaping and Streetscape

9

Landscape and streetscape plans shall be submitted to the City Planning Commission for approval. A landscaping plan shall describe the design of permanent and interim public open spaces and include the location of areas to be planted or paved, the number and location of shrubs, earth mounds, planting, trees, and other vegetation to be used, the design, location, and materials to be use in paved areas, the location of public art, light poles, waste receptacles, benches or seating areas, fences, water fountains, or other street furniture.

A streetscape plan shall describe the design of public rights-of-way and include the location of and paving materials to be used for sidewalks and amenity strips, the location of handicapped ramps, the location and type of trees, light poles, sign poles, waste receptacles, or other street furniture to be placed in the public rights-of-way. Landscape and streetscape plans shall conform to all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

10. Lighting

A complete lighting plan for the site shall be submitted to and approved by the City Planning Commission. All lighting shall be included in the lighting presentation to the City Planning Commission, including types of light fixtures, color, and level of illumination for facades, major building entrances, parking garages, public rights-of-way, public open spaces, pedestrian pathways, and other areas requiring special illumination. All wiring shall be underground. The lighting plan shall conform to all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

11. Pedestrian Walkway Amenities

Pedestrian walkway amenities shall be provided to stress principal pedestrian pathways in order to minimize pedestrian and vehicular conflicts and to provide shelter from inclement weather. Pedestrian walkway amenities may be in the form of interior climate controlled passageways or exterior open walkways with canopies or arcades. They shall be located and built in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

12. Utility/Systems Installation

All utility and system installations visible from public open spaces or public street rights-of-way shall be screened by vegetation or fencing. All wiring shall be underground. All rooftop utilities shall also be screened with suitable parapet walls or roof forms.

13. Service Access

Entranceways for service vehicles may be located on Huron Road, Bolivar Road, and East 7th Street and shall be in conformance with all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

10

III.  ADDITIONAL POLICIES AND PROCEDURES APPLICABLE TO THE PLAN AREA

A.  PUBLIC IMPROVEMENTS

Any public improvements installed or constructed in connection with the renewal and development in the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA, shall conform to City standards and specifications for such work and all urban design guidelines adopted by the City Planning Commission in accordance with Section III.B. of this Plan.

B.  REDEVELOPMENT PLAN REVIEW

No improvements shall be made with respect to any property, structure, or public infrastructure in the Action Area until the applicable plans and specifications have been approved by the appropriate City agencies.  The City Planning Commission shall review and approve the Redevelopment Plan and specifications for improvements to property, structures, and public infrastructure proposed by the Redeveloper for the Action Area.  For the purpose of undertaking said Plan review, the City Planning Commission shall adopt and, from time to time, amend Urban Design Guidelines consistent with the goals and objectives of the Community Development Plan to provide specific guidance to the Redeveloper relative to the physical design of improvements proposed for the Action Area.

C.  DURATION OF LAND USE CONTROLS

The land use restrictions and site and building requirements herein set forth shall be applicable to all properties included in the Plan Area in connection with the renewal, redevelopment and reuse thereof, and shall remain in effect for a period of twenty (20) years from the date of original approval of this Plan by the Council of the City of Cleveland, unless otherwise amended by the said City Council. Said period shall automatically be extended for one additional ten year period unless the City Council determines legislatively that said renewal period shall not occur.

1.  Zoning Change

Under the present Zoning Code, the CENTRAL MARKET COMMUNITY DEVELOPMENT PLAN AREA includes General Retail Business and Semi-Industry districts.  To carry out the proposed development, the General Retail Business portion of the Plan Area shall be rezoned to a Semi-Industry district.

D.  PROCEDURE FOR AMENDMENT

This Plan may be amended from time to time in compliance with all requirements of law and the applicable provisions of the Codified Ordinances of the City of Cleveland, provided that with respect to any land in the Plan Area with respect to which the land use restrictions and site and building requirements herein set forth have been imposed, the written consent of the then owner of such land affected by any such amendment shall be obtained.

11

IV.   PROVISION TO PREVENT RECURRENCE OF BLIGHTED OR SUBSTANDARD AREAS
AND DISCRIMINATION

Every contract for the sale, lease, use, rehabilitation or
redevelopment of the property within the Plan Area shall contain such
restrictions and conditions as are deemed necessary to prevent a
recurrence of blighted or substandard areas, provided that no such
restrictions shall be based upon race, creed or color; shall indicate
what covenants, restrictions and conditions of such contracts shall be
covenants running with the land; shall provide appropriate remedies for
any breach of covenants or conditions; shall provide that each
redevelopment contract for the sale, lease, use or redevelopment of the
property within such area, and convenience of land pursuant thereto
shall contain conditions and covenants which shall run with the land
which shall provide that there shall be no discrimination against or
segregation of any person or group of persons based upon race, color,
religion, national origin or ancestry in the sale, lease, sublease,
transfer, occupancy, tenure or enjoyment of such land in perpetuity; and
that such redevelopment contracts and conveyances of land within the
Plan Area shall contain a covenant that no grantee himself, or any
person claiming under or through him, shall establish or permit any such
practice or discrimination or segregation with reference to the
selection, location, number or occupancy of tenants, lessees, sublessees
or vendees in any or all of the land within such Plan Area.

Electronically Filed 01/14/2025 15:55 /  / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

V.    RELOCATION PLAN

The Community Development Plan contemplates that acquisition and clearance projects in the Plan will involve commercial relocation activities.

Relocation provisions satisfactory to the Department of Community Development of the City will be provided, where applicable, in connection with each specified proposal for acquisition, clearance and redevelopment property in a designated Action Area, which involves acquisition by the City.  Review and supervision of such specific relocation provisions will be carried out by the Department of Community Development.  Such specific relocation provisions may be tailored to fit the specific facts relating to a particular redevelopment proposal, and may include the provision of technical assistance and information by the Department of Community Development and/or particular Redeveloper in the event a Redeveloper is of a size or otherwise has a staffing capability which would enable technical assistance to be provided.

In nonfederally assisted projects, relocation payments for commercial (non-residential) displacements will include the payment of the reasonable and satisfactorily documented actual costs of moving business furniture, equipment and inventory, if any, and in addition payment of the actual costs of utility hook-up work necessary in connection with moving such business into replacement facilities.  In connection with projects financed in whole or in part with federal funds, involving a loan or grant of federal monies to pay some part of the private costs of redevelopment project, the then applicable federal relocation requirements shall be applied.

13



# EXHIBIT 1
# CENTRAL MARKET
# COMMUNITY DEVELOPMENT PLAN AREA



# EXHIBIT 2
# CENTRAL MARKET AREA
# PERMITTED LAND USE



EXHIBIT 3
CENTRAL MARKET AREA
PUBLIC RIGHT-OF-WAY

TO BE VACATED
TO BE CONSTRUCTED

## Schedule 19

### Insurance

|  | Minimum Limits of Liability |
|---|---|
| Comprehensive General<br>Liability Insurance | Personal Injury<br>$3,000,000 for injury to one person |
|  | $5,000,000 for injury to more than one person |
|  | Deductibles  not to exceed $250,000 |
| Business Interruption Insurance | Not less than annual rent |
| Vehicle Insurance | As determined by Lessee |

EXHIBIT A

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio and known as being part of extended Original Two Acre Lot Numbers 9 through 17 (both inclusive), and together forming a parcel of land bounded and described as follows:

Beginning in the centerline of West 3rd Street (99 feet wide), at its point of intersection with the centerline of Erieside Avenue, N.W. (70 feet wide) as shown by the Dedication Plat of Erieside Avenue, N.E. and N.W. and West 3rd Street, recorded in Volume 204 of Maps, Page 69 of Cuyahoga County Records;

Thence South 33° 56' 46" East, along the centerline of West 3rd Street, 346.23 feet to a point;

Thence North 56° 03' 14" East, along a line drawn perpendicular to said centerline of West 3rd Street, 72.74 feet to its point of intersection with the Northeasterly curved line of said West 3rd Street, said point also being the Southwesterly corner of the Donald Gray Gardens and the principle place of beginning of the parcel of land herein intended to be described;

Thence Northeasterly, along the curved Southeasterly line of Erieside Avenue N.E., being the arc of a circle deflecting to the right, having a radius of 457.01 feet and a chord that bears North 34° 09' 36" West, 533.59 feet, an arc distance of 569.79 feet to a point of tangency therein;

Thence North 55° 50' 24" East, continuing along the Southerly line of Erieside Avenue N.E., 445.39 feet to a point of curvature therein;

Thence along the arc of a circle deflecting to the right, having a radius of 515.00 feet, a chord that bears South 57° 29' 05" East, 29.56 feet, an arc distance of 29.57 feet to a point of compound curvature;

Thence Southeasterly, along the Westerly line of Erieside Avenue (70 feet wide) as relocated, along an arc of a circle deflecting to the right, having a radius of 30.00 feet, a chord that bears South 87° 28' 59" East, 33.03 feet, an arc distance of 34.98 feet to a point of compound curvature;

Thence continuing Southeasterly along the Westerly line of Erieside Avenue, as relocated, along the arc of a circle deflecting to the right, having a radius of 190.00 feet, a chord that bears South 44° 06' 13" East, 65.69 feet, an arc distance of 66.03 feet to a point of tangency;

Thence South 34° 08' 55" East along the said line of relocated Erieside Avenue, 462.69 feet to a point of curvature therein;

Thence Southeasterly along said line of relocated Erieside Avenue and the arc of a circle deflecting to the left, having a radius of 335.00 feet and a chord that bears South 72° 20' 27" East, 414.26 feet, an arc distance of 446.61 feet to a point;

Thence South 20° 31' 59" East, 25.00 feet to a point on the Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W.;

Thence South 56° 01' 58" West, along said Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., 117.38 feet to an angle point therein;

Thence South 54° 27' 44" West, continuing along said Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., 64.87 feet to a point of curvature therein;

Thence Southwesterly, along the curved Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., being the arc of a circle deflecting to the left, having a radius of 980.00 feet and a chord that bears South 47° 12' 58" West, 247.22 feet, an arc distance of 247.88 feet to a point of reverse curvature therein;

Thence Southwesterly, continuing along the curved Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., being the arc of a circle deflecting to the right, having a radius of 1480.00 feet and a chord bearing South 49° 45' 29" West, 503.20 feet, an arc distance of 505.66 feet to a point of curvature therein;

Thence South 59° 32' 45" West, along said Northwesterly line of the West 3rd exit ramp of the Cleveland Memorial Shoreway N.E. and N.W., 201.27 feet to the Southeasterly end of a curved turnout between said Northwesterly line of the West 3rd Street exit ramp of the Cleveland Memorial Shoreway, N.E. and N.W. and West 3rd Street;

Thence Northwesterly, along said turnout, being an arc of a circle deflecting to the right, having a radius of 100.00 feet, an arc distance of 150.99 feet to a point of tangency in said Northeasterly line of West 3rd Street;

Thence North 33° 56' 46" West, continuing along the Northwesterly line of West 3d Street, 421.07 feet to a point of curvature therein;

Thence Northeasterly, along the Northeasterly curved line of West 3 rd Street, being the arc of a circle deflecting to the right, having a radius of 457.01 feet and a chord that bears North 24° 46' 13" West, 145.75 feet an arc distance of 146.38 feet to the principle place of beginning according to a survey dated May, 1986 by the City of Cleveland, Department of Public Service, Division of Engineering and Construction, Plats and Surveys. This legal description was prepared by Jomarie Wasik, Ohio Professional Surveyor Number 7027. Bearings are to an assumed meridian and are used to denote angles only.

# EXHIBIT B

Docusign Envelope ID: C1BB762D-CFAB-47CA-8107-D4E80D868BE8

December 17, 2024

VIA ELECTRONIC MAIL

Office of the Mayor
601 Lakeside Ave.
Cleveland, Ohio 44114
Attn:   James DeRosa
        Director of Mayor's Office of Capital Projects
        jderosa@clevelandohio.gov

Re: Notice of Huntington Bank Field Emergency Repairs

Dear Director DeRosa:

Thank you for your continued collaboration with Cleveland Browns Stadium Company LLC (the "Browns") regarding Capital Repairs at Huntington Bank Field (the "Stadium"). As our teams have recently discussed, I am writing to follow up with respect to certain Capital Repairs, specifically certain Capital Repairs that Osborn Engineering ("Osborn") has classified as "Emergency" for safety reasons and thus need to be completed as soon as possible. Each of the below listed Capital Repairs, including their status as Emergency Repairs, are further detailed in the letter from Osborn attached as Exhibit A.

Because the Capital Repairs referenced above qualify as Emergency Repairs under Section 14(h) of the Lease by Way of Concession between the City and the National Football League dated April 26, 1996 (as subsequently assigned to the Browns and amended, the "Lease"), as we have discussed, the Browns will perform these Emergency Repairs as expeditiously as possible (with the City to subsequently reimburse the Browns for the cost of such Capital Repairs) pursuant to and in accordance with the Lease. Doing so will ensure remediation of critical safety issues at the Stadium in a timely and efficient fashion. The work, with approximate budget numbers and timelines, is listed below:

| Description of Capital Repair | Cost Estimate | Duration | Anticipated Start Date | Anticipated Construction Completion |
|---|---|---|---|---|
| Repair of Non-Structural Concrete | $44,000 | 16 Weeks | 2/3/2025 | 5/30/2025 |
| Replacement of A/C Units in Allied Office and Three (3) First Aid Rooms | $66,000 | 16 Weeks | 2/3/2025 | 5/30/2025 |
| Replacement of Chilled Water Pump Seals | $22,000 | 4 Weeks | 2/3/2025 | 3/7/2025 |
| Replacement of Failed Gutter Systems | $110,000 | 20 Weeks | 2/3/2025 | 6/27/2025 |
| Overhead/Vertical Concrete Repairs | $880,000 | 24 Weeks | 2/3/2025 | 7/25/2025 |
| Repair of Joints in Seating Bowl and Concourses | $1,100,000 | 24 Weeks | 2/3/2025 | 7/25/2025 |
| Replacement of Hot Water Heater | $110,000 | 12 Weeks | 2/3/2025 | 5/2/2025 |
| Reconfigure and Recommission of the 8" Chilled Water Pipe Automation | $12,000 | 4 Weeks | 2/3/2025 | 3/7/2025 |
| Implementation of Arc Flash Study with Placards | $166,000 | 24 Weeks | 2/3/2025 | 7/25/2025 |

We look forward to continued collaboration between the Browns and the City regarding Capital Repairs at the Stadium. As always, please do not hesitate to contact us with any questions, and we look forward to continuing to work with you.

Sincerely,

David A. Jenkins
David A. Jenkins
Executive Vice President, Chief Operating Officer, Haslam Sports Group

**CLEVELAND BROWNS**

cc:   Mark Duluk, Manager, Division of Architecture and Site Development
      Greg Rush, Senior Vice President, Chief Financial Officer (Haslam Sports Group)
      Ted Tywang, Chief Administrative Officer & General Counsel (Haslam Sports Group)
      Michele Powell, Vice President, Stadium Operations & Event Development (Haslam Sports Group)
      Sean Barrett, Director, Stadium Maintenance (Cleveland Browns)

**Exhibit A**

**Osborn Letter re Emergency Capital Repairs**

*[Attached]*

Docusign Envelope ID: C1BB762D-CFAB-47CA-8107-D4E80D868BE8



**OSBORN**
ENGINEERING

December 3, 2024

Mr. Sean Barrett
Cleveland Browns
100 Alfred Lerner Way
Cleveland, Ohio 44114

Re:     Huntington Bank Field
        Emergency Repairs – 2025 Scope Items (Rev #1)

Dear Mr. Barrett,

Upon our review of the various conditions within the stadium, we have identified the follow capital repair scope items to be 'emergency repairs' as defined in the Lease (page 48) between the City of Cleveland and the Cleveland Browns. This letter is intended to accompany your office's letter to the City notifying them of the Cleveland Browns intent to make such repairs upon approval by the City. The following are the scope items seeking approval at this time:

- Repair of non-structural concrete
- Replace A/C split units in Allied office and three (3) first aid rooms
- Replace chilled water pump seals
- Replace failed gutter systems
- Overhead / vertical concrete repairs
- Repair joints in seating bowl and concourses
- Replace hot water heater
- Reconfigure and recommission the 8" chilled water pipe automation
- Implementation of arc flash study with placards

The above work items are further described below and includes the estimated cost to implement such work:

1. **Repair of non-structural concrete –** The repair of non-structural concrete includes such things as tripping hazards on walking surfaces, heavily spalled curbs, appreciable settlement of concrete slabs, etc. These conditions endanger the health and safety of the people working in or attending an event at the stadium. The estimated cost to implement repairs is $44,000.

2. **Replace A/C split units in Allied office and three (3) first aid rooms –** The environmental conditions within these four (4) spaces are unsuitable during periods of stadium usage during summer. The elevated interior temperatures and inadequate air flow endanger the health and safety of the people working in and attending an event at the stadium. The estimated cost to implement this work is $66,000.

3. **Replace chilled water pump seals –** The seals on the existing chilled water pumps are original to the stadium construction in 1999. These seals are beyond their expected useful service life. Failure of the seals will significantly impact the ability to provide conditioned air to many interior spaces



within the stadium. The resulting conditions endanger the health and safety of the people working in and attending an event at the stadium. The estimated cost to implement this work is $22,000.

4. **Replace failed gutter systems** – Many of the original galvanized gutters that prevent water intrusion into finished spaces have been replaced over the past few years. However, there are many deteriorated gutters still to be replaced. Failed gutters allow water to infiltrate interior spaces causing damages to finished surfaces and provide for an opportunity for mold growth. Such conditions endanger the health and safety of people working in or attending an event at the stadium. In addition, water infiltration would cause imminent damage to significant components of the stadium. The estimated cost to implement gutter replacement is $110,000.

5. **Overhead / vertical concrete repairs** – Deterioration of exposed concrete in this stadium is an on-going issue. Therefore, it becomes necessary to undergo a concrete repair program annually. Concrete repairs include loose and spalled overhead and vertical concrete that should it dislodge from the concrete substrate it potentially could injure someone. As a result, we consider such repair necessary so as not to endanger the health and safety of the people working in or attending an event at the stadium. The estimate cost to implement these repairs is $880,000.

6. **Repair joints in seating bowl and concourses** – Exterior joint sealants in northern climates such as Cleveland have a useful life span of 5 to 7 years. As a result, a continual replacement program is necessary to maintain watertight integrity in a large venue such as the stadium. It is necessary to maintain these joints that otherwise would allow water infiltration and cause imminent damage to significant components of the stadium. The estimated cost to replace failing joints is $1,100,000.

7. **Replace hot water heater** – The existing hot water heaters in the stadium are 25 years old and well beyond their useful service life. Failure of the water heater would significantly diminish the ability to provide hot water to all areas of the stadium. Such a failure would render the stadium unusable for previously schedule events. The estimated cost to replace a water heater is $110,000.

8. **Reconfigure and recommission the 8" chilled water pipe automation** – The existing chilled water pipe system is not properly constructed. As a result, the system is incapable of providing enough cool air to the south side of the stadium. The resulting elevated temperatures within these interior spaces endanger the health and safety of the people working in or attending an event at the stadium. The estimated cost to implement the repairs is $12,000.

9. **Implementation of arc flash study with placards** – A regularly scheduled arc flash study is required by the electrical code. Such studies identify potential safety hazards within electrical panels and related components. The existence of an electrical safety hazard endangers the health and safety of people working with and around electrical panels and related components. The cost to implement the arc flash study and subsequently install safety placards is $166,000.

The total cost to implement the above ten emergency work items is approximately $2,500,000. We recommend that the above scope items be addressed immediately or as soon as practical.

Please let me know if you have any questions.



Sincerely,

**Osborn Engineering**
Aaron Lobas, PE SE

By  Jack Krebs, PE
        Director of Sports Engineering

# EXHIBIT C

December 17, 2024

VIA ELECTRONIC MAIL

Office of the Mayor
601 Lakeside Ave.
Cleveland, Ohio 44114
Attn:  James DeRosa
        Director of Mayor's Office of Capital Projects
        jderosa@clevelandohio.gov

Re: Notice of Huntington Bank Field Emergency Repairs

Dear Director DeRosa:

Thank you for your continued collaboration with Cleveland Browns Stadium Company LLC (the "Browns") regarding Capital Repairs at Huntington Bank Field (the "Stadium"). As our teams have recently discussed, I am writing to follow up with respect to certain Capital Repairs, specifically regarding the replacement of certain hot water expansion tanks in the Stadium, that Osborn Engineering ("Osborn") has classified as "Emergency" for safety reasons and thus have been completed expeditiously by the Browns. These Capital Repairs, including their status as Emergency Repairs, are further detailed in the letter from Osborn attached as Exhibit A.

Because the Capital Repairs referenced above qualify as Emergency Repairs under Section 14(h) of the Lease by Way of Concession between the City and the National Football League dated April 26, 1996 (as subsequently assigned to the Browns and amended, the "Lease"), as we have discussed, the Browns have performed these Emergency Repairs (with the City to subsequently reimburse the Browns for the cost of such Capital Repairs) pursuant to and in accordance with the Lease. Doing so has ensured the remediation of critical safety issues at the Stadium in a timely and efficient fashion. The work, with a final budget number of approximately $20.5K took seven days to complete.

We look forward to continued collaboration between the Browns and the City regarding Capital Repairs at the Stadium. As always, please do not hesitate to contact us with any questions, and we look forward to continuing to work with you.

Sincerely,

David A. Jenkins
David A. Jenkins
Executive Vice President, Chief Operating Officer, Haslam Sports Group


cc:    Mark Duluk, Manager, Division of Architecture and Site Development
       Greg Rush, Senior Vice President, Chief Financial Officer (Haslam Sports Group)
       Ted Tywang, Chief Administrative Officer & General Counsel (Haslam Sports Group)
       Michele Powell, Vice President, Stadium Operations & Event Development (Haslam Sports Group)
       Sean Barrett, Director, Stadium Maintenance (Cleveland Browns)

## Exhibit A

Osborn Letter re Emergency Capital Repairs

*[Attached]*



**OSBORN**
ENGINEERING

December 2, 2024

Mr. Sean Barrett
Cleveland Browns
100 Alfred Lerner Way
Cleveland, Ohio 44114

Re:     Huntington Bank Field
        Emergency Repairs – Expansion Tank Replacement

Dear Mr. Barrett,

As discussed, we understand the two existing domestic hot water expansion tanks are in a failed condition.
The tanks are necessary to properly control the water pressure for the downstream hot water tanks. Excess
pressure within the hot water tanks would cause the pressure relief valves at the heaters to empty the hot
water from the heaters to the mechanical room floor and potentially cause imminent damage to the
stadium's hot water system. The resulting condition would result in failure of the water heater(s) thus
significantly diminish the ability to provide hot water to all areas of the stadium. Such a failure would render
the stadium unusable for previously schedule events.

Due to equipment lead time constraints, we recommend that three readily available smaller expansion tanks
be installed to replace the two failed  tanks. As a result, it will be necessary to modify the piping to
accommodate the additional tank.

The total cost to implement the above work item is approximately $20,375.00. We recommend that the
expansion tanks be replaced immediately or as soon as practical.

Please let me know if you have any questions.

Sincerely,

**Osborn Engineering**
Aaron Lobas, PE SE

*Jack Krebs*

By  Jack Krebs, PE
     Director of Sports Engineering

# EXHIBIT D



ECONSULT
SOLUTIONS INC.

economics | strategy | insight

1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

# Memorandum

| | |
|---|---|
| To: | Squire Patton Boggs |
| From: | Econsult Solutions, Inc. |
| Date: | November 11, 2024 |
| RE: | Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development |

## 1  Purpose

Econsult Solutions, Inc. (ESI) was engaged by Squire Patton Boggs to evaluate the economic and fiscal impacts of the Cleveland Browns (Browns) developing a new stadium (Brook Park Stadium) on a site just east of Cleveland Hopkins International Airport in Brook Park, Ohio in Cuyahoga County (County). The Browns are also proposing substantial mixed-use development at the site, including hotel, office, retail, event space, and apartments.

The purpose of this analysis is to:

> 1) quantify the potential net losses of economic impacts (including output, earnings, and jobs supported) and tax revenue from the City of Cleveland (City) with the relocation of NFL games and other stadium events to Brook Park Stadium[1] and,

> 2) evaluate the market potential for the proposed uses for the Brook Park Stadium site through analyzing site conditions and land use compatibility, market area demographics and economics, market trends and conditions of proposed property use types, and the landscape of competitive districts within the County. This analysis also considers the potential adverse impacts of this development on Downtown Cleveland.

Econsult Solutions, Inc. (ESI), a nationally recognized firm based in Philadelphia. ESI brings extensive expertise in economic development, land use, and public policy, with a team of seasoned economists, planners, and policy experts. The firm has successfully contributed to high-profile development projects and strategic planning initiatives in Cleveland, Pittsburgh, Philadelphia and numerous other communities nationally.

---

[1] Economic output is a measure direct spending and re-spending within a select geography, similar to GDP, but is a more robust measure of economic activity. This economic activity supports earnings and jobs, which in turn, supports tax revenue for local jurisdictions.

Memorandum                                                                 P a g e | 2

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

## 2  Conclusions

### 2.1  Economic Losses to the City

The relocation of the Browns to Brook Park Stadium will result in the City losing at least $30 million in direct, indirect, and induced economic output annually, including $14 million in employee compensation that supports approximately 360 jobs. A large portion of this lost economic activity will likely impact Downtown Cleveland. The City will also lose approximately $11 million in direct, indirect, and induced tax revenue annually from team and stadium operations and visitor spending.[2][3]

The projected programming of more than 50 non-NFL events at Brook Park Stadium and environs would draw activities from existing sports, entertainment, and convention venues in the City that could more than double these economic losses from the City.

### 2.2  Market Evaluation

The development site, immediately east of Cleveland Hopkins International Airport, is surrounded by industrial uses, which substantially limits its marketability for mixed-use development. Market conditions in the areas surrounding the development site are weak compared to other parts of the County, especially those with recently built mixed-use development. The amount of proposed development for the site would be unprecedented in this part of the County and there is limited demand for the proposed uses.

Given slow regional economic growth and the County's declining population, the success of the proposed development would be dependent on drawing market demand from other parts of the City and County, which would have an adverse impact on Downtown Cleveland.[4] Given market conditions, the development would shift economic activity outside of Cleveland and would not generate net new economic and fiscal impacts to the County or State of Ohio.

---

[2] Tax revenue is generated from economic activity; therefore, with the relocation of the Browns, the City would lose $30 million in economic output and $11 million in tax revenue annually.

[3] The data supporting the economic and fiscal impact analysis were provided by the City of Cleveland, including direct admissions, income, and property tax payments from the Browns as well as from publicly available sources, including stadium attendance and average per capita visitor spending. ESI did not receive any data or information directly from the Browns. In some cases, reasonable assumptions were made based on industry standards and ESI's experience conducting similar analyses.

[4] Throughout this memorandum, "the region" or "regional" activity refers to the Cleveland Metropolitan Statistical Area (MSA).

**ESI** ECONSULT SOLUTIONS INC.                    1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                 P a g e | 3

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

## 3    Summary of Key Findings

### 3.1    Attendance and Patron Spending at Huntington Bank Field (Current Stadium)[5]

- **With an average annual attendance of 642,200, stadium patrons generate an estimated $59 million in annual offsite spending** on hotels, retail, food and beverage, transportation, and other activities attributable to games and events, including approximately 28,900 hotel room nights in the City, or around 3,000 room nights per event. This level is more than one third of the City's total supply of 8,225 rooms.

- There are approximately 4,800 hotel rooms in the core parts of Downtown, more than half of the City's supply; therefore, **Downtown's hotel supply has the capacity to satisfy all of the room nights generated by overnight patrons of the Current Stadium,** which creates an opportunity to capture a greater share of their spending within the City.

- **Patrons of the Current Stadium spend approximately $20.5 million on retail and food and beverage offsite in the County.** While retail sales vary depending on the type of retailer or restaurant, using an industry standard of $350 in average sales per square foot, **this spending supports just over 58,000 square feet of retail space throughout the County.**

### 3.2    Economic Impacts of Current Stadium Patrons

- **Within the County, Current Stadium patron spending generates approximately $100 million in total direct, indirect, and induced economic output,** of which, $48 million is employee compensation supporting 1,230 jobs.

- **With the relocation of the Browns to Brook Park Stadium, the City would lose at least $30 million in total direct, indirect, and induced economic output,** including $14 million in employee compensation that supports 360 jobs. A large proportion of these losses would impact Downtown Cleveland.

### 3.3    Fiscal Impacts of Current Stadium Patrons

- **In total, with the Browns relocating to Brook Park Stadium, the City would lose approximately $11 million in annual tax revenue.**

  - **The City currently captures approximately $10 million in direct taxes annually from the Browns,** including income, admissions, and property taxes as well as from contractor spending for stadium operations and maintenance.

---

[5] Since the Brook Park Stadium site is only 10 miles southeast of Downtown in Cuyahoga County and three miles from the team headquarters and practice facility, it is assumed that the relocation would not significantly impact housing or operational spending decisions by the organization or players, coaches, and staff (although further study would be needed to understand if this would result in significant changes to the Browns' contracting activities with City-based vendors). The lost tax revenue and economic activity would primarily come from the lack of games and events at the Current Stadium, including direct taxes paid by the Browns and taxes generated from offsite patron spending.

**ESI** ECONSULT
SOLUTIONS INC.

1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum

P a g e | 4

RE: Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

- o **The City also collects approximately $1 million in taxes annually generated from offsite patron spending**, including hotel and parking tax as well as taxes from indirect and induced economic activity. Since the City does not have a sales tax, the loss of patron spending activities would have a relatively small impact on the City's tax base.

### 3.4   Impacts on Other Venues in City

- In addition to NFL games, **the Browns have indicated that the Brook Park Stadium would also host more than 50 concerts, special events, and collegiate sports annually, while domes in comparable Midwestern markets host substantially fewer events each year (less than 15).**

- **In 2023, dome stadiums in comparable markets**, including Ford Field (Detroit), Lucas Oil Stadium (Indianapolis), and U.S. Bank Stadium (Minneapolis), **hosted four to twelve major events (with attendance of approximately 50,000 or more) for a ratio of 1.6 to 2.8 events per 1 million residents in the MSA.** Each dome also hosted four to ten smaller events such as high school tournaments or conventions. Based on the size of the Cleveland MSA, the Brook Park Stadium could expect to host around four major events and four or five smaller events.

- **The only way to achieve the goal of 50 annual events is to draw patronage from Rocket Mortgage FieldHouse, Progressive Field, Huntington Convention Center of Cleveland, I-X Center, and other major venues, including conference hotels.** Therefore, the combined losses in economic activity to the City from losing Current Stadium and major venue patronage would more than double.

### 3.5   Real Estate Development Program and Site Evaluation

- **The Browns have proposed a new stadium with a seating capacity of approximately 70,000 and several additional structures containing a mix of uses totaling more than 2.6 million square feet on a site in Brook Park**. The proposed mixed-use development includes 645 apartments, 495,700 square feet of office space, 299,000 square feet of retail, 405 hotel rooms, an 85,000 square foot event venue, 30,700 square foot team store, 102,000 square foot operations facility, and surface and structured parking. The estimated cost for the stadium itself is $2.4 billion with no available cost estimate for the proposed mixed-use development.

- **The approximately 190-acre site is bordered by industrial uses and transportation infrastructure**. The site is bordered by the Ford Motor Company Cleveland Engine Plant No. 1 (with a workforce of around 1,600 to the north), logistics and warehousing space to the west and south, rail tracks and Berea Freeway followed by Cleveland Hopkins International Airport to the west, and Interstate 71 followed by a neighborhood of modest single-family homes to the east (with recent sales of $150,000 to $200,000).

ESI ECONSULT SOLUTIONS INC.

1435 Walnut Street, 4ᵗʰ Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                                      P a g e | 5

RE: Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

- **The broader area is primarily industrial.** Not including the airport, more than 91 percent of commercial real estate within a mile of the Brook Park site comprises of industrial uses (5.84 of 6.37 million total square feet). The site is also zoned industrial and does not permit any of the Browns' proposed uses.

- **Pedestrian accessibility and connectivity are limited** – Given the surrounding industrial uses, walkability is very limited to and from the site. There is not a direct pedestrian route from Brook Park Station with walk-times of 15 to 20 minutes along Engle Road that has poor sidewalk conditions and has limited curb appeal for pedestrians.

- **The proposed mixed-use development is incompatible with adjacent land uses and the site has very limited marketability for these types of uses due to nuisances (e.g., noise, truck traffic, and air pollution) and lack of nearby open space and recreational amenities.** The site is substantially less competitive than other suburban mixed-use developments built in the last 10 years, including Westlake (Crocker Park), Beachwood (Pinecrest), and Brecksville (Valor Acres).

- **Given surrounding uses, the proposed development would have limited catalytic potential to attract more mixed-use investment in the area** – The surrounding area is primarily industrial with very few developable parcels; therefore, there is very limited opportunity for the proposed redevelopment to spur additional investment in housing or commercial uses.

- **The site is most appropriate for industrial uses and growing the Cuyahoga County's industrial employment base.** According to CoStar, there is 3.3 million square feet of industrial space proposed for the site, and given moderate socioeconomic conditions in the market area, the creation of industrial jobs would provide economic opportunities for the workforce living in surrounding communities.

### 3.6    Market Area Demographics and Economics

- **Socioeconomic conditions in the market area (within three miles of the site) are stable and moderate.** Since 2010, the population in the market area has declined, although this is consistent with countywide trends and trends throughout the Cleveland Metropolitan Statistical Area (MSA). The median household income in the market area is just under $63,500, which is consistent with the county and MSA medians. However, compared to three-mile areas around Crocker Park, Pinecrest, and Valor Acres in other suburban communities in the County, the socioeconomic conditions in the Brook Park market area are substantially weaker.

- **More than a third of jobs in the market area are in industrial sectors.** There are just under 24,000 jobs in Manufacturing, Wholesale Trade, Transportation & Warehousing, and Other Services (except Public Administration) representing 35 percent of the market area's employment base, compared to only 15 percent in Cleveland and 21 percent in the County. Conversely, only 13 percent of the market area's jobs are in professional sectors, including

**ESI** ECONSULT SOLUTIONS INC.                    1435 Walnut Street, 4ᵗʰ Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                          P a g e | 6

RE: Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

Information, Finance & Insurance, Professional, Scientific & Technical Services, and Management of Companies & Enterprises, compared to 22 percent in Cleveland and 18 percent countywide. The market area has a substantial industrial economic base, which would provide less demand for quality office space and higher-end apartments compared to other parts of the County.

### 3.7    Real Estate Development Analysis

- **There has been limited multifamily development in the market area over the last decade. Of the apartments that have been built, the majority consists of affordable and/or senior-oriented apartments indicating limited market potential for the proposed higher-end market rate apartments.** According to CoStar, around 70 percent of the market area's supply of just over 6,000 units was built before 1970. Since 2015, 532 units have been built across four properties, three of which are senior properties, including a Section 8 property.

- **There is a limited pool of higher-income renters in the market area to support the proposed 645 units.** For the property to be successful, it would need to attract tenants from a much broader area, including from areas with stronger economic conditions and better access to retail, amenities, and open space, including Downtown Cleveland.

- **Given the MSA's weak office market post-pandemic, the Brook Park site's office space will likely struggle to compete with already established commercial districts unless it can find an anchor tenant to lease a large share of the nearly 500,000 square feet of proposed space.** While Downtown has the County's largest concentration of office space, Westlake has captured the largest share of new office deliveries over the last decade, adding more than 1.0 million square feet. The County's speculative (spec) office market is weak post-pandemic with net negative absorption of space every year since 2019. Prospective tenants are being very selective of space based on quality and location and the Brook Park location would be substantially less competitive than Downtown Cleveland or established suburban commercial areas like Westlake or Beachwood.

- **Given proximity to the airport, the market area has a large supply of hotel rooms, although the supply is lower quality and less competitive.** The Average Daily Rate (ADR) of $104 in the market area is significantly lower than ADR in Cleveland ($160) and the other parts of the county ($122). Additionally, occupancy of the market area hotel supply (60.8 percent) is lower than Cleveland (64.0 percent) and parts of Cuyahoga County outside of Cleveland (63.4 percent).

- **Hotel demand in the County has not recovered from the pandemic and there is a risk that increasing supply would pull demand from other established submarkets like Downtown Cleveland.** The total number of room nights in the County over a 12-month period from August 2019 to August 2024 is seven percent lower. The recovery in the City has been slightly stronger

**ESI** ECONSULT SOLUTIONS INC.

1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                                   P a g e | 7

RE: Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

with only a five percent decline. In the market area, the decline was substantially higher at 15 percent.

- **The market area has a relatively large supply of retail space with 4.8 million square feet, although new development has been limited**. Less than 200,000 square feet of new space has been added in the market area since 2015 and there is no other proposed space. Most of this new retail space includes gas stations, auto dealerships, fast food restaurants, and a smaller strip center with Aldi grocery store at 6820 Pearl Road in Middleburg Heights. The proposed retail space on the Brook Park site exceeds total retail space delivered in the Brook Park market area for over a decade, and creating an entertainment focused retail destination would be unprecedented in this part of the County.

- **While the proposed amount of retail space for the site only represents about 10 percent of the amount of retail space delivered in the suburban portions of the County since 2015**, given the poor marketability of the site for retail uses, socioeconomic conditions in the market area, and competition from more attractive retail districts, **there would not be a sustaining local customer base for non-event days.**

### 3.8    Competitive Districts Analysis

- **Three competitive suburban mixed-use districts in Cuyahoga County were identified for evaluating market conditions**. These districts include Crocker Park in Westlake, Pinecrest in Beachwood, and Valor Acres in Brecksville (which is still under development).

- **While the total population within the Brook Park market area is larger than the competitive districts, median household income and median housing values are substantially lower compared to the other districts.** In fact, median housing values in the competitive market areas are approximately twice as high as within the Brook Park market area. Levels of educational attainment – which are often a site selection criterion for higher-end national retailers – are also substantially lower for the Brook Park market area.

- **Average office and retail rents are much lower in the Brook Park market area compared to the competitive districts.**  Average office rents in the Brook Park market area of $16.30 per square foot are lower than the competitive districts of $19.14 to $22.52 per square foot. Average rents for newer construction are much higher ranging from $21.48 to $29.99 per square foot. Average rents for retail space in the Brook Park market area of $13.84 per square foot are also much lower than the competitive areas of $17.31 to $21.08 per square foot.

- **Given the Brook Park site's limited marketability for mixed-use development and relatively weak socioeconomic conditions with the market area, the proposed development may struggle to attract national retailers, office tenants, and residents without offering discounted rents or other concessions compared to these other competitive and more attractive districts.**

**ESI** ECONSULT
SOLUTIONS INC.

1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                                    P a g e | 8

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed
Development

### 3.9   Impacts to Downtown Cleveland

- Given weak market conditions and slow regional economic growth, **the success of the proposed development will depend on its ability to draw demand from other parts of the County and region, putting Downtown Cleveland especially at risk. In other words, the proposed development will effectively shift economic activity within the County and will not generate net new impacts.**

- **As the Cleveland region's hub of employment, arts, culture, entertainment, and tourism activities, the success of Downtown directly impacts the region's competitiveness and economic trajectory.** As Downtown continues to recover in the post pandemic era, its economic future also impacts neighborhoods throughout the urban core. Without a strong Downtown, the economic viability of the entire region will be threatened.

- **Conversely, new mixed-use investment activity Downtown at the scale of what is proposed for the Brook Park site, could have a substantial catalytic impact on the City's economy.** This type of investment would further bolster Downtown's growing residential community and leverage recent investments in its hospitality ecosystem, including the $49 million expansion of the Huntington Convention Center. This type of investment would also create synergies with Downtown's sports and entertainment anchors, including Rocket Mortgage FieldHouse and Progressive Field.

ESI ECONSULT SOLUTIONS INC.

1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                                              Page | 9

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

## 4   Economic and Fiscal Impact Analysis

### 4.1   Overview of Economic Impact and Methodology

Economic impact estimates are generated by utilizing input-output models to translate an initial amount of direct economic activity into the total amount of activity that it supports, which includes multiple waves of spillover impacts generated by the spending on goods and services by the Browns, labor income by coaches, players, and staff as well as spending from patrons of Huntington Bank Field at area hotels, restaurants, retailors, and other service providers. The economic impacts from these expenditures are modeled using IMPLAN, an industry standard input-output model software program. Such models are designed to estimate two sets of spillover impacts from direct expenditures:

- The **indirect effect**, which measures the multiplier effect from the purchase of goods and services from local vendors (i.e., supply chain impacts); and

- The **induced effect**, which measures the multiplier effect from the spending of labor income by employees within a geography (i.e., labor income impacts).

IMPLAN models these impacts at the county level; therefore, in order to demonstrate the impacts of the Browns relocating to the Brook Park Stadium (that is in a different part of Cuyahoga County), a "sharedown" assumption is used to determine the proportion of impacts that occur in the City based on the distribution of population and employment.

### 4.2   Identification of Impacts

The Browns organization, their home games at Huntington Bank Field, and special events such as concerts and other spectator entertainment at the stadium generate economic activity in the City, including economic output and earnings and supporting jobs. These activities also generate direct revenue for the City through admissions tax from ticket sales, property tax from the stadium, and income tax from players, coaches, and staff.

Economic Impacts

- **Team and Stadium Operations:** When the Browns pay for contractors to support the team and operate events at Huntington Bank Field, and when the Browns pay their players, coaches, and staff who then spend their wages on housing, groceries, and other household needs, this spending generates economic and fiscal impacts. The Browns' practice facility and corporate headquarters (CrossCountry Mortgage Campus of the Cleveland Browns) are also in Cuyahoga County in Berea; therefore, the move would have very little influence on the home locations of players, coaches and staff. It is assumed that the move would not substantially impact contracting decision making for team and stadium operations. In other words, contractors for the Browns today, whether the company and are located in the City or outside the City, would likely not change (although further evaluation would be needed to understand the Browns' future business relationships with City-based vendors). However, wages paid to on-site

**ESI** **ECONSULT**
**SOLUTIONS INC.**
1435 Walnut Street, 4ᵗʰ Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                                  P a g e | 10

RE: Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

contractors for the operations and maintenance of the stadium for games and events are subject to City income tax and would adversely impact the City's tax base (explained below).

- **Browns and Other Event Ancillary Visitor Spending:** The Browns relocation to Brook Park Stadium would have a substantial adverse impact to ancillary patron spending activity – or spending that occurs outside of the stadium supporting local businesses, hotel room nights, jobs, and tax revenue. While patron spending at the Current Stadium on food, beverage, and concessions directly supports the Browns, the relocation to Brook Park Stadium would have an impact on where patrons spend money before and after games and events, since a substantial share of this spending activity would then occur outside of the City. The inclusion of a hotel, retail, and entertainment space at the Brook Park Stadium site would further exacerbate this trend leaving patrons with much less propensity to spend money in the City, if at all.

Tax Revenue Impacts

- **Direct Taxes from the Browns:** The operations of the Current Stadium and team during home games directly generate municipal income tax, property tax, and admissions tax for the City. However, since the Browns' practice facility and headquarters are located in Berea, income tax revenue is shared between the City and the City of Berea. If the Browns relocate to Brook Park, the City will lose all direct tax revenue associated with the team.

- **Taxes from Contractor Wages for Stadium Operations:** While it is assumed a move to Brook Park would not have substantial impact on contracting activities, wages paid by contractors for operations and maintenance activities at the Current Stadium are subject to City income tax that would be effectively lost with a move to Brook Park.

- **Taxes from Visitor Spending:** Beyond direct taxes, ancillary spending by stadium patrons contributes to parking tax, hotel tax, and income tax from businesses such as retailers and restaurants.

### 4.3  Visitation and Spending

Huntington Bank Field, with a seating capacity of 67,400, serves as the home venue for Browns games and hosts various events and festivals. Over the past three years, annual stadium attendance has averaged approximately 642,200, with over 90 percent attending Browns home games (585,500 patrons). Since zip code or survey data for stadium patrons was unavailable, for the purposes of this study, it is estimated that 80 percent of visitors are daytrippers (or those not supporting hotel room nights), with the remaining 20 percent as overnight visitors supporting hotel room nights in the Cleveland region.

Memorandum                                                                                    P a g e | 11

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

Figure 4.1: Average Annual Attendance by Event Type and Visitor Origin, 2022 to 2024

| Attendance | Daytrip | Overnight | Total |
|---|---|---|---|
| Football | 468,400 | 117,100 | 585,500 |
| Events | 45,300 | 11,300 | 56,700 |
| Total | 513,800 | 128,400 | 642,200 |

*Source: ESPN (2024), City of Cleveland (2024), Econsult Solutions, Inc. (2024)*

Ancillary visitor spending refers to expenditures made outside of the stadium. In-stadium purchases, such as concessions and team merchandise, directly support the Browns, and are thus excluded. Recreational spending is excluded from the visitor spending profile, as spending on game and event tickets falls within this category.

Based on the average daily visitor spending profile, this study assumes that 50 percent of average daily retail and food and beverage expenditures by daytrippers occur outside the stadium, while 100 percent of average daily transportation spending can be attributed to a stadium visit (e.g., rideshare, parking, gasoline, public transportation). For overnight visitors, it is assumed that one day of average daily lodging expenses can be attributed to stadium events, while 30 percent of transportation costs can be attributed to a stadium visit (e.g., flight to Cleveland, long-distance drive).

This study assumes that the vast majority of overnight visitors (90 percent) would stay within Cuyahoga County due to its proximity to the Current Stadium, with the remainder staying in other parts of the region. According to CoStar, over the past 12 months, the City accounted for approximately 50 percent of the total hotel room nights in Cuyahoga County. As a result, this study assumes that 50 percent of the Current Stadium's overnights visitors stay within the City, with the remainder in other parts of the County.

Figure 4.2: Average Visitor Spending Profile and Assumptions, Per Person Per Day[6]

| Category | Daytrip | % Offsite Spending Attributed to Stadium Visit | Overnight | % Offsite Spending Attributed to Stadium Visit |
|---|---|---|---|---|
| Lodging | $0 | 0% | $76 | 100% |
| Retail | $20 | 50% | $30 | 50% |
| Food/Beverage | $35 | 50% | $69 | 50% |
| Recreation/Sightseeing/Entertainment | $21 | 0% | $32 | 0% |
| Transportation to Destination | $49 | 100% | $97 | 30% |
| Total | $125 | | $303 | |

*Source: OhioTourism (2023), CoStar (2024), Econsult Solutions, Inc. (2024)*

---

[6] OhioTourism provides a daily visitor spending profile but does not consider higher spending estimates for overnight visitors (e.g., multiple meals, higher transportation costs, etc.). This study assumes a multiplier of 1.5 to 2.0 for select line items to account for these differences.

**ESI ECONSULT SOLUTIONS INC.**

1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                   P a g e | 12

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

Figure 4.3: Estimated Hotel Room Nights and Revenue Supported by Huntington Bank Field Patrons

|  | Cleveland | Rest of Cuyahoga County | Total |
|---|---|---|---|
| Hotel Room Nights | 28,900 | 28,900 | 57,800 |
| ADR | $181 | $134 | |
| Revenue ($M) | $5.2 | $3.9 | $9.1 |

*Source: City of Cleveland (2024), CoStar (2024), Econsult Solutions, Inc. (2024)*

On average, patrons of Huntington Bank Field spend around $58.6 million annually outside of the stadium on lodging, retail, food and beverage, and transportation.

Figure 4.4: Total Annual Visitor Spending Attributable to Huntington Bank Field (in $M)

| Category | Daytrip | Overnight | Total |
|---|---|---|---|
| Lodging | - | $9.1 | $9.1 |
| Retail | $5.1 | $1.9 | $7.0 |
| Food/Beverage | $9.0 | $4.4 | $13.5 |
| Transportation to Destination | $25.3 | $3.7 | $29.0 |
| Total | $39.4 | $19.2 | $58.6 |

*Source: TourismOhio (2023), CoStar (2024), Econsult Solutions, Inc. (2024)*

## 4.4   Economic Impacts

While a large portion of ancillary spending from Current Stadium patron occurs in the City, patrons also spend money on meals or retail in other parts of the County or elsewhere in the region. With the Browns relocating to Brook Park Stadium, the City would lose a very large share of current spending activity. This analysis assumes that the City would lose 29 percent of the current economic impacts generated within Cuyahoga County, based on a proportionate share of the City's population to the County.[7]

Direct visitor spending in these sectors generates indirect and induced impacts as dollars circulate through the local economy. The estimated $58.6 million in ancillary spending by stadium patrons results in:

- A total annual economic impact of $29.5 million in Cleveland, supporting approximately 360 jobs and generating approximately $14.0 million in employee compensation;

---

[7] As explained previously, a sharedown method is typically used to proportionally allocate economic impacts within a county to a particular municipality based on distribution of employment and/or population (in this case, 29 percent). Currently, the City likely captures much more than 29 percent of economic activity given the Current Stadium's location Downtown. With the relocation to Brook Park Stadium, this analysis assumes that the City would lose 29 percent of current economic activity in the County with a portion of impacts still occurring in the City. For example, a small proportion of Brook Park Stadium patrons will likely stay Downtown.

**ESI  ECONSULT SOLUTIONS INC.**                                   1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                                           P a g e | 13

RE: Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed
Development

- A total annual economic impact of $100.3 million within Cuyahoga County, supporting 1,230 jobs with over $47.6 million in earnings; and,

- Approximately $126.9 million total annual economic impact in Ohio, supporting 1,320 jobs and around $53.0 million in employee compensation.

Figure 4.5: Estimated Annual Economic Impact of Ancillary Visitor Spending Attributable to Huntington Bank Field by Geography

| Economic Impact | Cleveland | Cuyahoga | Ohio |
|---|---|---|---|
| Direct Output ($M) | $15.5 | $52.7 | $58.6 |
| Indirect and Induced Output ($M) | $14.0 | $47.6 | $74.1 |
| Total Output ($M) | $29.5 | $100.3 | $126.9 |
| Total Employment (FTE) | 360 | 1,230 | 1,320 |
| Employee Compensation ($M) | $14.0 | $47.6 | $53.0 |

*Source: IMPLAN (2022), Econsult Solutions, Inc. (2024)*

## 4.5   Fiscal Impacts

The City benefits from direct taxes generated by the Browns' operations and stadium activities, as well as from taxes on businesses supported by visitor spending from football patrons and event attendees. If the Browns relocate to Brook Park Stadium, the City stands to lose approximately $11 million in annual tax revenue.

- **Income Tax (Brown's Operation):** Since the Browns' practice facility and headquarters are located in Berea, the City only captures the portion of the team's payroll attributable to home games. According to the City, it collected approximately $900,000 in income tax from the Browns in 2023. The City would no longer collect this revenue if the Browns relocated to Brook Park Stadium.

- **Income Tax (Stadium Operations and Maintenance):** Wages for on-site contractors at the Current Stadium for operations and maintenance are subject to City income tax. Desk research and review of the Green Bay Packers' annual financial report for 2023 (since the team is publicly owned and publishes its financial records), a reasonable estimate for NFL stadium operations and maintenance is around $30 million annually. Based on IMPLAN modeling, this spending generates just under $300,000 in annual income tax for the City.

- **Property Tax:** While Huntington Bank Field is owned by the City, as the stadium's operator, the Browns are not exempt from property tax. According to the City, in 2023, the stadium generated $787,287 in property tax (to be collected in 2024).

- **Admissions Tax:** Browns home games, concerts, and other events generated just over $7.3 million in admissions tax revenue in 2023, up from just under $6.0 million in 2022. From January

**ESI** ECONSULT SOLUTIONS INC.                                                                     1435 Walnut Street, 4ᵗʰ Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                                              P a g e | 14

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

to August 2024, the city has already collected $7.4 million. Therefore, it is assumed that in a typical year moving forward, the City would collect an average of $8.0 million annually.

- **Parking Occupancy Tax:** The City collects an eight percent tax on parking fees. Data on parking revenue from stadium events is unavailable, but assuming an average parking cost of $25 per vehicle, 2.5 persons per vehicle, and 75 percent of patrons arriving by personal vehicle, this equates to approximately $4.8 million in parking revenue [642,210 patrons * 75 percent arriving by personal vehicle / 2.5 persons per vehicle * $25 average parking fee] and approximately $385,000 in parking tax [$4.8 million * 8.0 percent parking tax], rounded to $400,000.

- **Hotel Tax (Transient Occupancy Tax):** Out of town stadium patrons, including those who live in the region but choose to stay in a Downtown hotel as part of the experience, support the city's hotel tax base. As outlined in Figure 4.3, overnight visitors on average contribute approximately $9.1 million in hotel revenue. As the City of Cleveland collects a three (3.0) percent Transient Occupancy Tax on hotel revenue, it is estimated that these lodging expenditures contribute around $273,000 in tax revenue to the City, rounded to $300,000.

- **Income Tax (from Visitor Spending):** Employment wages are directly, indirectly supported, and induced by visitor spending also contribute to the City's income tax revenue. On an annual basis, visitor spending supports around $11 million in wages paid by businesses within the City. At a 2.5% income tax rate, this generates an additional $275,000 in income tax revenue for the City.

Figure 4.6: Summary of City Tax Revenue Generated from Cleveland Browns and Ancillary Visitor Spending

| Tax Category | Average Annual Revenue (in $M) |
|---|---|
| **Direct Taxes from Browns** | |
| Income Tax (Team) | $0.8 |
| Income Tax (Stadium O&M) | $0.2 |
| Admissions Tax | $8.0 |
| Property Tax | $0.8 |
| **Taxes from Visitor Spending** | |
| Hotel Tax | $0.3 |
| Parking Occupancy Tax | $0.4 |
| Income Tax | $0.3 |
| **Total** | $10.8 |

*Source: City of Cleveland (2024), Cleveland CCA (2024), IMPLAN (2022), Econsult Solutions, Inc. (2024)*

**ESI** ECONSULT SOLUTIONS INC.                    1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                     P a g e | 15

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

## 5   Broader Impacts to Cleveland and Downtown

### 5.1   Impacts to Downtown's Economic Trajectory

As the Cleveland region's hub of employment, arts, culture, entertainment, and tourism activities, the success of Downtown directly impacts the region's competitiveness and economic trajectory. As Downtown continues to recover in the post pandemic era, its economic future also impacts neighborhoods throughout the urban core. As regions throughout the country compete for talent, investment, and economic development opportunities, promoting access to vibrant, walkable, and amenitized commercial districts is essential. Therefore, without a strong Downtown Cleveland, the economic viability of the entire region will be threatened.

Given weak market conditions and slow economic growth in the MSA, the success of the proposed development will be dependent on its ability to draw demand from other parts of the County and region. According to the Ohio Department of Development, from 2020 to 2050, the County's population is projected to decline by more than 18 percent for a net population loss of more than 230,000. While slow or no growth regions still need to replace aging or obsolete real estate, in this case, given the amount and expected quality of the proposed development, future demand would have to come from other parts of the County, putting Downtown Cleveland especially at risk.

Downtown Cleveland has been resilient over the last decade. It has been one of the fastest growing neighborhoods in Cleveland with its total population growing by 55 percent from 2010 to 2024, compared to the City losing eight percent and the County losing three percent of their populations during this time period. Downtown Cleveland has also accounted for around a third of the City's new multifamily development since 2015.

Figure 5.1: Population and Multifamily Development Trends

| Use Type | Downtown Cleveland | City of Cleveland | Cuyahoga County |
|---|---|---|---|
| Total Population, 2010 | 9,470 | 397,111 | 1,280,122 |
| Total Population, 2024 | 14,700 | 365,993 | 1,236,639 |
| Change, 2010-2024 | 55% | -8% | -3% |
| Multifamily Units Built Since 2015 | 3,911 | 11,699 | 15,991 |
| Share of Total Units | 40% | 19% | 11% |

*Source: CoStar (2024), Esri Business Analyst (2024)*

Given that the Brook Park market area does not have adequate demand to support the 645 proposed multifamily units (analysis provided in following section), the absorption of these units would require capturing net new demand from higher-income renters entering the market and from attracting existing renters from the City and Downtown. This, coupled with continued decline of the office market post-pandemic, would adversely impact Downtown's retail market and overall vibrancy leading to further economic and fiscal decline.

ESI ECONSULT SOLUTIONS INC.                     1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                                   P a g e | 16

RE: Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

Conversely, new mixed-use investment activity Downtown at the scale of what is proposed for the Brook Park site, could have a substantial catalytic impact on the City's economy by further bolstering Downtown's growing residential community and leveraging recent investments in its hospitality ecosystem, including the $49 million expansion of the Huntington Convention Center. This level of investment would also create synergies with Downtown's sports and entertainment anchors, including Rocket Mortgage FieldHouse and Progressive Field.

## 5.2   Added Losses from Additional Events at Brook Park Stadium

Events at Dome Stadiums in Comparable Midwestern Markets

In addition to NFL games, the Browns have indicated that the Brook Park Stadium would also host more than 50 concerts, special events, collegiate sports, and conferences. Dome stadiums in comparable Midwestern markets, including Ford Field (Detroit), U.S. Bank Stadium (Minneapolis), and Lucas Oil Stadium (Indianapolis), also host NFL home games, major concerts and events, and smaller events. In this context, major concerts and events typically have an attendance of 50,000 or more for national artists such as Taylor Swift, Garth Brooks, and Metallica as well as professional wrestling (WWE) and major collegiate sporting events such as Bowl games. In 2023, Ford Field had the most major event days with 12, while U.S. Bank Stadium and Lucas Oil Stadium had six and four event days, respectively. Based on regional (MSA) population, these domes hosted between 1.6 and 2.8 major events per one million residents. These domes also hosted five to ten smaller events such as high school tournaments, conventions, and motorcross. Based on the Cleveland MSA population of just under 2.1 million, the Brook Park Stadium would expect to host around four major events and four or five smaller events.

Figure 5.2: Non-NFL Events at Dome Stadiums in Comparable Markets, 2023

| Stadium | City | NFL Team | MSA Population | Major Concerts and Events | Major Events per 1 million residents |
|---------|------|----------|----------------|---------------------------|--------------------------------------|
| Ford Field | Detroit | Lions | 4.3M | 12 | 2.8 |
| U.S. Bank Stadium | Minneapolis | Vikings | 3.7M | 6 | 1.6 |
| Lucas Oil Stadium | Indianapolis | Colts | 2.1M | 4 | 1.9 |

Source: U.S. Census (2024), Ford Field (2024), U.S. Bank Stadium (2024), Lucas Oil Stadium (2024)

Impacts of Drawing Activities from Existing City Sports, Convention, and Entertainment Venues

Based on activities at comparable dome stadiums, achieving a goal of 50 events annually would draw events and activities from other venues in the City, including Rocket Mortgage FieldHouse, Progressive Field, Huntington Convention Center of Cleveland, and I-X Center. For example, Monster Jam, currently hosted at Rocket Mortgage FieldHouse, attracts approximately 15,000 to 18,000 patrons per event over a three-day period. Moving this event to Brook Park Stadium would pull approximately 50,000 patrons out of the City and Downtown. Attracting conferences from the convention center would also lead to substantial losses in economic activity and room nights from the City. Since the details on the projected 50 events at Brook Park Stadium are unknown, Figure 5.3 shows order-of-magnitude hypothetical

**ESI** ECONSULT SOLUTIONS INC.                    1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                                  P a g e | 17

RE: Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

scenarios of lost economic activity from the City. For example, assuming 50 annual events averaging 10,000 patrons, the City would lose $23 million in economic output, including $11 million in employee compensation supporting 300 jobs. If average attendance for these events is higher, the City stands to lose an even greater amount of economic and fiscal activity.

Figure 5.3: Lost Impacts of Cleveland-Based Events Relocating to Brook Park Stadium and Environs

| Economic Impact | Hypothetical Attendance Scenarios | | | |
| --- | --- | --- | --- | --- |
| | 50,000 | 100,000 | 500,000 | 1,000,000 |
| Direct Output ($M) | $1.2 | $2.4 | $12.1 | $24.2 |
| Indirect and Induced Output ($M) | $1.1 | $2.2 | $10.9 | $21.8 |
| Total Output ($M) | $2.3 | $4.6 | $23.0 | $46.0 |
| Total Employment (FTE) | 30 | 60 | 300 | 600 |
| Employee Compensation ($M) | $1.1 | $2.2 | $10.9 | $21.8 |
| Tax Revenue ($M) | $0.1 | $0.1 | $0.6 | $1.2 |
| Hotel Room Nights | 2,300 | 4,600 | 23,000 | 46,000 |

*Source: IMPLAN (2022), Econsult Solutions, Inc. (2024)*

## 5.3  Conclusions

With the continued uncertainty of the office market in the post-pandemic era, downtown areas nationally continue to recover and redefine their economic purpose. The continued loss of market support for retail and storefronts would have adverse spillover impacts leading to declining conditions, increasing storefront vacancies, and negative perceptions from visitors. Many downtowns have focused on tourism, hospitality, and entertainment as part of their recovery strategy to compensate for the decline in purchasing power from the daily office workforce. The Brook Park Stadium plans would be contrary to these types of efforts and momentum.

In addition to lost economic and fiscal activity, the construction of Brook Park Stadium would create substantial costs for the City and other jurisdictions through needed infrastructure investments, including upgrades to roadways, utilities, and public transportation serving the site, in addition to added costs for event circulation planning and public safety enhancements. Conversely, Downtown's infrastructure and service providers are already in place to serve not just Huntington Bank Field, but the City's other prominent sports, entertainment, and hospitality venues and complementary commercial uses.

ESI ECONSULT SOLUTIONS INC.                    1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                                          P a g e | 18

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed
Development

## 6   Stadium Development Market Analysis

The following analysis evaluates the marketability of the proposed mixed-use development, including
the site and each of the proposed asset classes, including multifamily, office, retail, and hotel.

### 6.1   Proposed Development

Development Program

The Browns have proposed a new dome stadium with a seating capacity of approximately 70,000 and a
mix of uses containing more than 2.6 million square feet, including apartments, office, retail, event
venue, team store, operations facility, and surface and structured parking for a site in Brook Park, Ohio.
The estimated cost for the stadium itself is $2.4 billion with no available cost estimate for the proposed
mixed-use development.

Figure 6.1: Renderings of Proposed Brook Park Stadium and Mixed-Use Development

 

*Source: Cleveland Browns (2024)*

Figure 6.2: Proposed Brook Park Site Development Program

| Proposed Use | Total Square Feet (SF) / Units / Rooms |
|---|---|
| Multifamily | 645 units, 1,358,000 SF |
| Office | 495,700 SF |
| Retail | 299,000 SF |
| Hotel | 405 rooms, 233,000 SF |
| Stadium Operations Facility | 102,000 SF |
| Event Venue | 85,000 SF |
| Team Store | 30,700 SF |
| **Total** | **2,603,400 SF** |

*Source: City of Cleveland (2024)*

ESI ECO SOLUTIONS INC.                              1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                                     P a g e | 19

RE: Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

## Future Events and Programming

In addition to NFL games, the Browns have indicated that the Brook Park Stadium would also host concerts, special events, and collegiate sports. Dome stadiums in comparable Midwestern markets, including Ford Field (Detroit), U.S. Bank Stadium (Minneapolis), and Lucas Oil Stadium (Indianapolis), also host NFL home games, major concerts and events, and smaller events. In this context, major concerts and events typically have an attendance of 50,000 or more for major national artists such as Taylor Swift, Garth Brooks, and Metallica as well as professional wrestling (WWE) and major collegiate sporting events such as Bowl games. In 2023, Ford Field had the most major event days with 12, while U.S. Bank Stadium and Lucas Oil Stadium had six and four event days, respectively. Based on MSA population, these domes hosted between 1.6 and 2.8 major events per one million residents. These domes also hosted five to ten smaller events such as high school tournaments, conventions, and motorcross. Based on the Cleveland MSA population of just under 2.1 million, the Brook Park Stadium would expect to host around four major events and four or five smaller events.

Figure 6.3: Non-NFL Events at Dome Stadiums in Comparable Markets, 2023

| Stadium | City | NFL Team | MSA Population | Major Concerts and Events | Major Events per 1 million residents |
|---|---|---|---|---|---|
| Ford Field | Detroit | Lions | 4.3M | 12 | 2.8 |
| U.S. Bank Stadium | Minneapolis | Vikings | 3.7M | 6 | 1.6 |
| Lucas Oil Stadium | Indianapolis | Colts | 2.1M | 4 | 1.9 |

*Source: U.S. Census (2024), Ford Field (2024), U.S. Bank Stadium (2024), Lucas Oil Stadium (2024)*

## Site Location

The proposed site (Brook Park site) is in Brook Park containing approximately 190 acres bordered by Ford Motor Company Cleveland Engine Plant No. 1 to the north (with a workforce of around 1,600), logistics and warehousing space to the west and south, rail tracks and Berea Freeway followed by Cleveland Hopkins International Airport further west, and Interstate 71 followed by a neighborhood of modest single-family homes to the east. The site is approximately 10 miles southwest of Huntington Bank Field, generally within a 20-minute drive.

ESI ECONSULT SOLUTIONS INC.                          1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                              P a g e | 20

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed
Development

Figure 6.4: Site Location



*Source: Google Map (2024), Econsult Solutions, Inc. (2024)*

Figure 6.5: Proposed Brook Park Stadium Site Aerial



*Source: Google Earth Pro (2024), ESI (2024)*

1435 Walnut Street, 4ᵗʰ  Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

ESI ECONSULT
SOLUTIONS INC.

Memorandum                                                                                      P a g e | 21

RE: Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

Land Use and Compatibility

The areas surrounding the Brook Park site are primarily industrial with airport-serving uses throughout, including long-term parking lots. Based on data from CoStar, within a mile of the site, not including the airport, there is just under 6.4 million square feet of commercial real estate, of which, 5.8 million square feet, or just over 91 percent is light industrial, warehousing, flex, or manufacturing space, including the 1.7 million square foot Ford facility immediately north. There is one multifamily property, Glenbrook Townhomes, which was built in 1960 and is in average condition.

According to CoStar, the only proposed development within this area includes more than 3.3 million square feet of industrial space proposed for the Brook Park site (CoStar does not list the Browns Stadium redevelopment as a proposed development).

Figure 6.6: Existing Commercial Real Estate within One Mile of Brook Park Site

| Proposed Use | Area (million SF) | Share |
|---|---|---|
| Industrial/Flex | 5.84 | 91.6% |
| Multi-Family | 0.13 | 2.0% |
| Hospitality | 0.13 | 2.0% |
| Office | 0.13 | 2.0% |
| Specialty (airport hangar) | 0.06 | 1.4% |
| Retail | 0.09 | 0.9% |
| Total | 6.37 | |

*Source: CoStar (2024)*

According to the Zone Map of City of Brook Park, the Brook Park site is zoned U-5A Industrial District and according to the Brook Park Zoning Ordinance 1121.321 the district is "to provide, in appropriate and convenient districts, areas for industrial uses in order to promote employment and strengthen the economy of the community." Permitted uses include veterinary hospitals and industrial or manufacturing uses. The proposed uses of office, hotel, retail, residential or entertainment uses are not permitted in this district and a variance and/or zoning change would be required prior to development.

Therefore, the most compatible uses for the Brook Park site are industrial (warehousing, logistics, or manufacturing) or other complementary uses serving the airport.

## 6.2    Site Marketability Analysis

The adjacent industrial uses as well as the proximity of Cleveland Hopkins International Airport severely limit the marketability for mixed-use development.

- **Incompatibility with adjacent land uses** – Mixed-use development, including multifamily, office, retail, and entertainment uses would be incompatible with adjacent land uses that include the Ford plant to the north, logistics and warehousing space to the west and south, airport further west, and industrial uses followed by Interstate 71 to the east. The areas further east include single-family residential neighborhoods consisting of very modest

ESI ECONSULT SOLUTIONS INC.                    1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                              P a g e | 22

RE: Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed
Development

homes in average condition. According to Zillow, home sales over the last two years in these areas have generally ranged between $150,000 and $200,000.

- **Pedestrian connectivity is limited** – Given the surrounding industrial uses, walkability is very limited to and from the site. There is not a direct pedestrian route from Brook Park Station with walk-times of 15 to 20 minutes along Engle Road that has poor sidewalk conditions and has limited curb appeal for pedestrians.

- **Poor environmental conditions for mixed-use development** – Given the proximity of the airport, the area has significant noise and poor air quality. There is limited nearby greenery, open space, or recreational uses limiting the competitiveness of the site for office and residential uses. The area's industrial character and nearby uses would also create a nuisance for residents, office workers, and retail customers with emissions and truck traffic.

- **Hotels development would be a complementary use for the airport** – The existing hotel supply is below average, and a new hotel would improve the quality and condition of the supply. However, beyond event days and hotel demand from the airport, the hotel would have limited marketability without active retail or better accessibility.

- **Given surrounding uses, the proposed development would have limited catalytic potential to attract more mixed-use investment in the area** – The surrounding area is primarily industrial with very few developable parcels; therefore, there is very limited opportunity for the proposed redevelopment to spur additional investment in housing or commercial uses.

## 6.3   Market Area

This study defines a three-mile radius around the proposed stadium site as the market area. The market area includes portions of Cleveland, Brook Park and Berea. Most of the western portions of the market area include Cleveland Hopkins International Airport.

**ESI** ECONSULT
SOLUTIONS INC.                                    1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
                                                  215-717-2777 | econsultsolutions.com

Memorandum                                                                                    P a g e | 23

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

Figure 6.7: 3-Mile Radius Market Area of Proposed Stadium Development



*Source: Google Map (2024), Econsult Solutions, Inc. (2024)*

**ESI** ECONSULT SOLUTIONS INC.                    1435 Walnut Street, 4ᵗʰ Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                    P a g e | 24

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed
Development

## 6.4    Demographic Conditions

Socioeconomic conditions in the market are generally consistent with countywide conditions and trends.
The population within the market area has been declining, although this is consistent with trends in
Cleveland and the County. The median household income in the market area is just under $63,500,
which is consistent with the county and MSA medians.

As a primarily working-class neighborhood, the market area has a median home value just under
$178,000 – higher than the City of Cleveland but lower than both the county and MSA medians of
$214,289 and $234,675, respectively. Levels of educational attainment in the market area and Brook
Park are also relatively low. In Brook Park, only 18 percent of the population aged 25 and older have at
least a bachelor's degree, compared to 24 percent in Cleveland, 38 percent in Cuyahoga County, and 36
percent in the MSA.

Figure 6.8: Demographic Profile and Trends

|  | Market Area | Brook Park | City of Cleveland | Cuyahoga County | Cleveland MSA |
|---|---|---|---|---|---|
| Population - 2010 | 72,410 | 19,201 | 397,111 | 1,280,122 | 2,178,763 |
| Population - 2024 | 69,218 | 17,906 | 365,993 | 1,236,639 | 2,165,812 |
| Population Change | -4% | -7% | -8% | -3% | -1% |
| Median Household Income | $61,453 | $65,257 | $39,220 | $62,403 | $68,279 |
| Median Housing Value | $177,696 | $166,196 | $115,237 | $214,289 | $234,675 |
| % Pop. with bachelor's degree+ | 26% | 18% | 24% | 38% | 36% |

*Source: Esri Business Analyst (2024)*

## 6.5    Employment Analysis

There are just under 70,000 jobs in the market area, representing about seven percent of the total
employment in Cuyahoga County. The largest share of these jobs is in manufacturing (18.7 percent) and
when aggregating Wholesale Trade, Transportation and Warehousing, and Other Services employment,
more than a third (35 percent) are industrial and related jobs, compared to 15 percent in Cleveland and
21 percent throughout the county. The market area has just under 9,000 professional sector jobs,
(including Information, Finance & Insurance, Professional, Scientific & Technical Services, and
Management of Companies & Enterprises) representing 13 percent of the workforce, compared to 22
percent in Cleveland and 18 percent countryside. This further demonstrates that the area is a major hub
for industrial jobs in the county and is less competitive for professional sector jobs and higher quality
office space. This also informs the types of housing that would be in demand from the market area's
workforce – a large share of the workforce is seeking quality affordable or workforce housing as
opposed to higher-end apartments.

ESI ECONSULT SOLUTIONS INC.    1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                                      P a g e | 25

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed
Development

Figure 6.9: Employment by Sector, 2024

| Industry Sector | Market area | | Cleveland | | Cuyahoga County | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Agriculture, Forestry, Fishing & Hunting | 6 | 0.0% | 181 | 0.0% | 364 | 0.0% |
| Mining | 0 | 0.0% | 818 | 0.2% | 1,441 | 0.2% |
| Utilities | 19 | 0.0% | 3,000 | 0.7% | 3,535 | 0.4% |
| Construction | 2,307 | 3.4% | 7,938 | 2.0% | 26,740 | 2.8% |
| Manufacturing | 12,848 | 18.7% | 24,143 | 6.0% | 91,774 | 9.7% |
| Wholesale Trade | 3,750 | 5.5% | 8,859 | 2.2% | 30,790 | 3.3% |
| Retail Trade | 6,223 | 9.1% | 16,977 | 4.2% | 77,038 | 8.2% |
| Transportation & Warehousing | 4,494 | 6.5% | 6,210 | 1.5% | 15,452 | 1.6% |
| Information | 524 | 0.8% | 6,753 | 1.7% | 19,722 | 2.1% |
| Finance & Insurance | 1,017 | 1.5% | 10,103 | 2.5% | 35,605 | 3.8% |
| Real Estate, Rental & Leasing | 1,735 | 2.5% | 5,934 | 1.5% | 23,306 | 2.5% |
| Professional, Scientific & Tech Services | 7,315 | 10.6% | 70,617 | 17.4% | 116,565 | 12.4% |
| Management of Companies & Enterprises | 20 | 0.0% | 1,994 | 0.5% | 2,228 | 0.2% |
| Admin, Support & Waste Management Services | 1,368 | 2.0% | 6,313 | 1.6% | 21,166 | 2.2% |
| Educational Services | 2,738 | 4.0% | 17,589 | 4.3% | 50,813 | 5.4% |
| Health Care & Social Assistance | 8,981 | 13.1% | 149,973 | 37.0% | 243,175 | 25.8% |
| Arts, Entertainment & Recreation | 996 | 1.4% | 10,664 | 2.6% | 20,590 | 2.2% |
| Accommodation & Food Services | 4,822 | 7.0% | 18,664 | 4.6% | 60,508 | 6.4% |
| Other Services (except Public Administration) | 2,759 | 4.0% | 19,941 | 4.9% | 56,125 | 5.9% |
| Public Administration | 6,552 | 9.5% | 17,087 | 4.2% | 41,962 | 4.4% |
| Total | 68,732 | 100.0% | 405,170 | 100.0% | 943,493 | 100.0% |

*Source: Esri Business Analyst (2024)*

## 6.6   Residential Analysis

Multifamily

There are 645 apartments proposed for the Brook Park site totaling just under 1.4 million gross square
feet. This would represent the largest number of multifamily units built within the market area for more
than a decade.

According to CoStar, around 4,250 of the market area's total supply of 6,077 multifamily units (around
70 percent) was built before 1970, and since 2015, only 532 units across four properties have been
delivered. Of this newer supply, three of the properties (448 of the 532 units, or 94 percent) are senior-
oriented properties, including the 203-unit Riverside Park Phase II, which is a Section 8 property. The
only non-senior market rate property is The Centaur, which is an adaptive reuse of a former office
building containing 84 units. Given its location bordering the airport, average rents of are $1,661, or
$1.90 per square foot, well-below average rents for new construction in Cuyahoga County outside of
Cleveland, which averaged around $2,294 for units built after 2015.

ESi ECONSULT SOLUTIONS INC.                1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                                    P a g e | 26

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

There is one market rate property under construction, The Villas at Brookview at 14105 Snow Road, which will include 89 duplex rental units with attached garages. While this property has posted asking rents at the very high end of the market ($2.19 per square foot), since the units have yet to be absorbed, market rents at these levels are still untested. Additionally, this type of product is not indicative of market demand for the proposed higher-end, higher-density apartments at the Brook Park site. The proposed development will also offer more than seven times the number of units as The Villas at Brookview.

Figure 6.10: Multifamily Development in Market Area since 2015

| Property | Address | City | Total Units | Year Built | Description |
|---|---|---|---|---|---|
| The Centaur | 21200 Brookpark Road | Fairview Park | 84 | 2022 | Adaptive Reuse |
| Riverside Park Phase II | 17800 Parkmount Ave | Cleveland | 203 | 2022 | Section 8 Senior |
| Sheldon Square | 125 Sheldon Rd | Berea | 120 | 2022 | Senior Apartments |
| Parma Village | 11500 Huffman Rd | Parma | 125 | 2016 | Senior Apartments |

*Source: CoStar (2024)*

Average rents in the market area ($1,085) are slightly lower than Cleveland and the county average. Of new supply built since 2015, the average rents in the market area are also lower.

Cuyahoga County has had significantly less multifamily development outside of Cleveland. Since 2015, the county added around 16,000 new units, of which, 11,700 were built in Cleveland (73 percent). Outside of Cleveland, the only communities delivering more than 500 units over the last 10 years were Westlake (717 units) and Beachwood (787 units), both with much stronger socioeconomic and market conditions compared to Brook Park and the Brook Park market area.

ESI ECONSULT
SOLUTIONS INC.

1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                     P a g e | 27

RE: Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

Figure 6.11: Multifamily Housing Market Profile, YTD 2024

|  | Market Area | City of Cleveland | Rest of Cuyahoga County | Total Cuyahoga County |
|---|---|---|---|---|
| Total Units | 5,688 | 60,142 | 81,933 | 142,075 |
| Total Built Since 2015 | 532 | 11,699 | 4,292 | 15,991 |
| % Units Built Since 2015 | 9% | 19% | 5% | 11% |
| Proposed Units | 0 | 2,856 | 1,006 | 3,871 |
| Average Rent – Total Supply | $1,085 | $1,214 | $1,146 | $1,175 |
| Average Rent –Supply Since 2015 | $1,810 | $1,855 | $2,294 | $1,973 |

*Source: CoStar (2024)*

There are around 34,000 households earning more than $75,000 in the market area who could likely afford units at the Brook Park site.[8] Based on the distribution of renter-occupied households by income in Cuyahoga County, there are around 7,300 renter-occupied households who could afford units at the Brook Park site. Based on conventional housing demand modeling, this returns a capture rate of 8.6 percent. Lenders typically seek a capture rate of less than five percent. This indicates that the proposed apartments would have to attract households from a much broader area, although it may struggle to attract tenants from more competitive and amenitized neighborhoods in suburban areas or Cleveland. While the adjacent airport and Ford plant would offer some demand for the proposed apartments, given assumed rent levels, they would be unaffordable to a sizable proportion of this workforce.

Figure 6.12: Housing Demand Model for Market Area

| Income Range | Households in Market Area | Assumed Minimum Rent Affordability | Assumer Renter Household | Eligible Households |
|---|---|---|---|---|
| $75,000 - $99,999 | 12,088 | $1,563 | 26% | 3,143 |
| $100,000 - $149,999 | 13,791 | $1,667 | 20% | 2,801 |
| $150,000 - $199,999 | 5,354 | $2,500 | 20% | 1,071 |
| $200,000+ | 2,758 | >$3,333 | 10% | 276 |
| Total Households | 33,992 |  | Total Eligible | 7,290 |
| **Capture Rate for 645 units** |  |  |  | **8.8%** |

*Source: ACS (2023), Esri (2024), Esri Business Analyst (2024)*

---

[8] While conventional affordability standards are around 30 to 35 percent of income toward rent, higher-income households typically allocate less income towards rent. This model assumes affordability of 20 to 25 percent of income towards rent.

**ESI** ECONSULT
SOLUTIONS INC.

1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                    P a g e | 28

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed
Development

Single-Family

According to the Zillow Housing Value Index (ZHVI), the average home value in Brook Park is just over
$198,000 ranking it among the lowest municipalities in Cuyahoga County and just below the county
average of $205,000. Property value appreciation in Brook Park has generally followed countywide and
MSA trends. According to Zillow, in the last 36 months, there have only been seven sales of single-family
homes built since 2010 in the market area indicating very little new construction for more than a
decade.

Figure 6.13: Zillow Housing Value Index (ZHVI), August 2015 to August 2024

|                 | Brook Park | Cuyahoga County | Cleveland MSA |
|-----------------|-----------:|----------------:|--------------:|
| ZHVI 2015       | $103,854   | $105,893        | $126,150      |
| ZHVI 2024       | $198,292   | $205,186        | $231,550      |
| Change in Value | +91%       | +94%            | +84%          |

*Source: Zillow (2024)*

## 6.7    Office Analysis

There are 495,700 square feet of office space proposed for the site. Within the market area, there are
3.5 million square feet of office space, of which, around 500,000 square feet are vacant (around 15
percent). This vacancy rate is consistent with the parts of Cuyahoga County outside of Cleveland (14
percent). The vacancy rate is not as high in Cleveland at around nine percent.

There has only been 43,000 square feet of office space built in the market area since 2015 (20600
Emerald Parkway) and this space has a marketable location adjacent to the Rocky River and Bridle Trail
and within easy access from Interstate 480. Most of the office space within a mile of the Brook Park site
is older and less competitive, primary built in the 1960s and 1970s, which is why the average rent of
$16.30 per square foot is lower than in Cleveland ($20.40 per square foot) and other parts of the County
($19.79 per square foot).

There has very little new office development in the County since 2015 with only 2.6 million square feet
of space delivered, of which, 1.9 million square feet, or 73 percent was built in Cleveland. Overall, given
the impacts of the COVID-19 pandemic, vacancies continue to increase with negative net absorption in
the County of 331,500 square feet over the last 12 months. While leasing trends indicate that newer and
higher quality office space can be competitive (aka "flight-to-quality"), most newer office space in the
suburban portions of the County is in areas with stronger socioeconomic conditions, including Westlake
that has delivered more than a million square feet of space since 2015. While a recent JLL office market
report for Q2 2024 indicates that the market has stabilized,[9] the proposed office space would have to
compete with already established commercial districts in the County and could only be successful if an
anchor tenant leasing a large proportion of the nearly 500,000 square feet of proposed space could be

[9] https://www.us.jll.com/content/dam/jll-com/documents/pdf/research/americas/us/q2-2024-office-market-dynamics/jll-us-office-market-dynamics-q2-2024-cleveland.pdf

**ESI** ECONSULT SOLUTIONS INC.

1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                P a g e | 29

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

identified. At the same time, this is a large amount of space for a single tenant. For comparison, the Sherwin-Williams Research & Development Center that is under development in Brecksville will contain approximately 600,000 square feet.

Figure 6.14: Office Supply Profile, 2024 YTD

|  | Market Area | Cleveland | Cuyahoga County (excl. Cleveland) | Total Cuyahoga County |
|---|---|---|---|---|
| Total Supply (MSF) | 3.5 | 53.2 | 41.9 | 95.1 |
| Vacancy Rate | 15% | 9% | 14% | 11% |
| Total Vacant Space (MSF) | 0.5 | 4.8 | 5.7 | 10.5 |
| Average Rent | $16.30 | $20.40 | $19.70 | $20.10 |
| 12-Month Net Absorption | 12,300 | (207,000) | (124,500) | (331,500) |
| Built since 2015 (MSF) | 0.4 | 0.7 | 1.9 | 2.6 |
| Average Rent | N/A | $23.40 | $23.720 | $23.60 |

*Source: CoStar (2024)*

Figure 6.15: Annual Net Office Absorption, Cuyahoga County, 2015 through 2024 YTD



*Source: CoStar (2024)*

## 6.8  Retail Analysis

There ais just under 300,000 square feet of retail space proposed for the site, not including the more than 30,000 square foot team store and 85,000 square foot event venue. The market area has a relatively large supply of retail space with 4.8 million square feet, although new development has been limited with less than 200,000 square feet of new space added since 2015 and there is no other proposed space. Most of this retail space includes gas stations, auto dealerships, out lot fast food restaurants, and a smaller strip center with Aldi grocery store at 6820 Pearl Road in Middleburg Heights. The proposed retail space on the Brook Park site would represent the most retail space delivered in the

ESI ECONSULT SOLUTIONS INC.

1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum

Page | 30

RE: Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

market area for over a decade and creating an entertainment focused retail destination would be unprecedented in this part of the County.

Average retail rents are relatively low in the market area – $13.84 per square foot compared to $17.35 per square foot in the suburban parts of the County – which can be attributed to market conditions, quality of the existing supply, and lack of new development.

While the proposed amount of retail space for the site only represents about 10 percent of the amount of retail space delivered in the suburban portions of the County since 2015, given the poor marketability of the site for retail uses, socioeconomic conditions in the market area, and competition from more attractive retail districts, there would not be a sustaining local customer base for non-event days.

Figure 6.16: Retail Supply Overview

| | Market Area | Cleveland | Cuyahoga County (excl. Cleveland) | Total Cuyahoga County |
|---|---|---|---|---|
| Inventory MSF | 4.8 | 33.2 | 56.0 | 89.2 |
| Vacancy Rate | 3.6% | 2.6% | 3.7% | 5.0% |
| Average Rent | $13.84 | $14.61 | $20.07 | $16.33 |
| Built since 2015 MSF | 0.2 | 0.8 | 2.8 | 3.6 |
| Average Rent | $13.45 | $15.08 | $19.08 | $18.19 |

*Source: CoStar (2024)*

## 6.9 Hotel Analysis

Given the presence of the airport, there is a sizable supply of hotel rooms within the market area with 2,643 rooms representing 28 percent of the hotel supply in Cuyahoga County outside of Cleveland; however, most of the supply is lower quality and less competitive as reflected by the Average Daily Rate (ADR) of $104, significantly lower than the ADR in Cleveland ($160) and the other parts of the County ($122). Additionally, occupancy of the hotel supply within three miles of the site (60.8 percent) is lower than the City (64.0 percent) and parts of the County outside of the City (63.4 percent). New development has been very limited within three miles of the site with only 170 rooms delivered since 2015 compared to 1,758 rooms in the City and 1,635 rooms in the areas of the County outside of City. The proposed hotel development of 404 rooms on the Brook Park site would represent more than double the number of rooms added to the market area since 2015.

ESI ECONSULT SOLUTIONS INC.

1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                                          P a g e | 31

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed
Development

Figure 6.17: Hotel Supply Overview

|  | Market Area | Cleveland | Cuyahoga County (excl. Cleveland) | Total Cuyahoga County |
|---|---|---|---|---|
| Total Rooms | 2,643 | 8,225 | 9,336 | 17,561 |
| 12-Month Occupancy | 60.8% | 64.0% | 63.4% | 63.7% |
| 12-Month ADR | $104 | $160 | $122 | $140 |
| Rooms Built since 2015 | 170 | 1,758 | 1,635 | 3,393 |
| 12-Month Occupancy | 60.2% | 67.5% | 63.4% | 65.7% |
| 12-Month ADR | $126 | $164 | $135 | $150 |
| Total Proposed Rooms | 0 | 345 | 244 | 589 |

*Source: CoStar (2024)*

Hotel demand in the county has not recovered from the pandemic – the total number of room nights in
Cuyahoga County over a 12-month period from August 2019 to August 2024 is seven percent lower. The
recovery in Cleveland has been slightly stronger with only a five percent decline. In the market area, the
decline was 15 percent.

While new hotel development would vastly improve the market area's hotel supply, it is a less
competitive area for higher-quality hotels. Given that Cuyahoga County's room night demand is still
below pre-pandemic levels, the success of a new hotel would require capturing demand from other
parts of the County. This would especially impact Downtown Cleveland, which has also not recovered
from the pandemic with total 12-month room nights of 1,068,000 as of August 2024 (235,239)
compared to 1,150,000 in as of August 2019, for a seven percent decline.

Figure 6.18: Hotel Demand Overview, 12-Month Room Nights, August 2019 vs. August 2024

|  | Market Area | Cleveland | Cuyahoga County (excl. Cleveland) | Total Cuyahoga County |
|---|---|---|---|---|
| 12-Month Room Nights, Aug. 2019 | 710,000 | 1,960,000 | 2,420,000 | 4,390,000 |
| 12-Month Room Nights, Aug. 2024 | 600,000 | 1,860,000 | 2,200,000 | 4,060,000 |
| Net Change | (110,000) | (100,000) | (220,000) | (330,000) |
| % Change | -15% | -5% | -9% | -7% |

*Source: CoStar (2024)*

ESI ECONSULT SOLUTIONS INC.

1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed
Development

## 6.10  Competitive Districts Analysis

Competitive Suburban Mixed-Use Districts

Three competitive suburban mixed-use districts in Cuyahoga County were identified for evaluating
market conditions, including Crocker Park in Westlake, Pinecrest in Beachwood, and Valor Acres in
Brecksville (which is still under development).

In terms of size, scale, and uses, Crocker Park in Westlake is the most comparable to the Brook Park
development program, including 534 multifamily units, around 900,000 square feet of office space, 1.1
million square feet of retail space, and 110 hotel rooms (although the influence of Crocker Park is more
substantial given adjacent development in Westlake).

While the population within the Brook Park market area is larger than the competitive districts, median
household income and median housing values are substantially lower for the Brook Park site compared
to the other districts. In fact, median housing values in the competitive market areas are effectively
twice as high as within the Brook Park market area. Levels of educational attainment – which are often a
site selection criterion for higher-end national retailers – are also substantially lower for the Brook Park
market area.

The description of each district, aerial impage, and demographic profile for each district within a three-
mile radius is presented on the following pages.

**ESI** ECONSULT
SOLUTIONS INC.

1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

## Figure 6.19: Profiles of Competitive Mixed-Used Districts

**Crocker Park**





**Pinecrest**




**Valor Acres**




**ESI** ECO SOLUTIONS INC.

1435 Walnut Street, 4ᵗʰ Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                     P a g e | 34

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed
Development

Figure 6.20: 3-Mile Radius of Competitive Mixed-Use Districts



*Source: Google Map (2024, ArcGIS Pro (2024), Econsult Solutions, Inc. (2024)*

Figure 6.21: Demographic Profile Within 3-Mile Radius of Competitive Mixed-Use Districts

| 3-Mile Radius | Proposed Site (Brook Park) | Croker Park (Westlake) | Pinecrest (Beachwood) | Valor Acres (Brecksville) |
|---|---|---|---|---|
| Population (2010) | 72,410 | 54,920 | 42,737 | 16,815 |
| Population (2024) | 69,218 | 56,698 | 44,054 | 16,383 |
| Population Change (2010-2024) | -4% | 3% | 3% | -3% |
| Median Household Income | $61,453 | $118,663 | $92,857 | $127,976 |
| Median Housing Value | $177,696 | $346,608 | $366,516 | $363,659 |
| % with Bachelor's Degree+ | 26% | 62% | 58% | 63% |

*Source: Esri Business Analyst (2024)*

A review of newly built apartments in or near these districts indicates that with the exception of Crocker
Park in Westlake, average rents per square foot are above $2.00, and in some cases above $2.50 per
square foot. Crocker Park has 534 units, making it substantially larger than the other properties and is

**ESI** ECONSULT
SOLUTIONS INC.

1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                    P a g e | 35

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed Development

now around 10 years old. The proposed development program includes 645 units and would represent the most units built within a single development in the suburban parts of Cuyahoga County for several decades. Given its location, it would not be able to achieve rents at the same levels as this competition in areas with stronger market conditions.

Figure 6.22: Competitive Suburban Commercial District Apartments

| | Crocker Park Living (Westlake) | 4th and Pinecrest (Beachwood) | The Hiatus (Beachwood) | The Aster (Beachwood) | Canvas at Valor Acres (Brecksville) |
|---|---|---|---|---|---|
| Total Units | 534 | 87 | 146 | 206 | 168 |
| Year Built | 2015 | 2018 | 2022 | 2018 | 2023 |
| Occupancy | 97% | 96.5% | 93.8% | 94.4% | 73.6% |
| Average Studio Rent | $1,380 | - | $1,410 | - | - |
| Rent PSF | $1.74 | - | $3.10 | - | - |
| Average One-Bedroom Rent | $1,715 | $2,701 | $1,882 | $1,784 | $1,932 |
| Rent PSF | $1.99 | $2.81 | $3.02 | $2.24 | $2.56 |
| Average Two-Bedroom Ret | $2,493 | $3,557 | $2,853 | $2,175 | $3,643 |
| Rent PSF | $1.94 | $2.80 | $2.77 | $1.87 | $2.59 |
| Average Three-Bedroom Rent | $2,679 | $4,298 | - | $3,421 | $4,242 |
| Rent PSF | $1.90 | $2.54 | - | $2.27 | $2.78 |
| **Total Average Rent** | **$2,023** | **$3,199** | **$1,888** | **$2,007** | **$2,422** |
| **Rent PSF** | **$1.96** | **$2.79** | **$2.99** | **$2.06** | **$2.58** |

*Source: CoStar (2024)*

Office development built since 2015 in each of the competitive market areas has average rents ranging from $21.48 to $29.99 per square foot with retail space building since 2015 ranging from $14.27 to $22.43 per square foot. Among the competitive districts, Beachwood has the highest average rents. Average retail rents for the Brook Park site are lower for newer supply and total supply. Average office rents are also lower than the competitive areas.

ESI ECONSULT SOLUTIONS INC.                1435 Walnut Street, 4th Floor | Philadelphia, PA 19102
215-717-2777 | econsultsolutions.com

Memorandum                                                                                            P a g e | 36

RE:  Economic and Fiscal Impacts of Cleveland Browns Relocation to Brook Park and Market Evaluation of Proposed
Development

Figure 6.23: Office and Retail Development Within 3-Mile Radius of Competitive Mixed-Use Districts

| 3-Mile Radius | Proposed Site (Brook Park) | Croker Park (Westlake) | Pinecrest (Beachwood) | Valor Acres (Brecksville) |
|---|---|---|---|---|
| Total Office Supply (SF) | 3.5M | 4.1M | 8.4M | 2.1M |
| Average Rent (PSF) | $16.30 | $20.64 | $22.52 | $19.14 |
| Total Office Built since 2015 (SF) | .04M | 1.1M | 0.43M | .05M |
| Average Rent (PSF) | N/A | $21.48 | $29.99 | $23.93 |
| Total Retail Supply (SF) | 4.8M | 3.6M | 5.0M | .83M |
| Average Rent (PSF) | $13.84 | $17.31 | $21.08 | $18.58 |
| Total Retail Built since 2015 (SF) | .2M | .75M | 1.0M | .05M |
| Average Rent (PSF) | $13.45 | $14.27 | $22.43 | $17.89 |

Source: CoStar (2024)

ESI ECONSULT SOLUTIONS INC.                                1435 Walnut Street, 4th Floor  | Philadelphia, PA 19102
215-717-2777  | econsultsolutions.com

# EXHIBIT E

Electronically Filed 01/14/2025 15:55 /  / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ



**City of Cleveland**
Justin M. Bibb, Mayor

Office of the Mayor
Cleveland City Hall
601 Lakeside Avenue, Room 202
Cleveland, Ohio 44114
216/664-3990 · Fax 216/420-8766
www.cleveland-oh.gov

December 30, 2024

<u>Sent Via E-Mail</u>

Cleveland Browns Football Company LLC
c/o Jimmy and Dee Haslam
76 Lou Groza Blvd.
Berea, OH 44017

    *Re:  Ohio Revised Code § 9.67*

Dear Mr. and Mrs. Haslam:

I am writing this letter on behalf of the City of Cleveland (the "City") to the Cleveland Browns Football Company LLC (the "Browns"), as owner of the professional sports team known as the Cleveland Browns.

As you are well aware, in 1996, following the relocation of the Browns to Baltimore, the Ohio General Assembly enacted, and the Governor signed, Ohio Revised Code § 9.67.  Known as the Modell Law, the statute provides in full:

> No owner of a professional sports team that uses a tax-supported facility for most of its home games and receives financial assistance from the state or a political subdivision thereof shall cease playing most of its home games at the facility and begin playing most of its home games elsewhere unless the owner either:
>
> > (A) Enters into an agreement with the political subdivision permitting the team to play most of its home games elsewhere;
> >
> > (B) Gives the political subdivision in which the facility is located not less than six months' advance notice of the owner's intention to cease playing most of its home games at the facility and, during the six months after such notice, gives the political subdivision or any individual or group of individuals who reside in the area the opportunity to purchase the team.

R.C. § 9.67.

The Browns play home games in Cleveland at "a tax-supported facility" now known as Huntington Bank Field ("HBF").  Indeed, during roughly the last 20 years, the City has spent over $350 million for the construction, repair, and maintenance of HBF. Nevertheless, the Browns have also expressed publicly a desire to move.

Yet, to date, the Browns have not provided the City or others with the opportunity to purchase the team, as required by law. And if that opportunity were provided, the City intends to take a leadership role in assembling an "individual or group of individuals who reside in the area" in purchasing the team.

If the Browns intend to begin the six-month window during which the team must be offered for purchase, please identify (1) the date on which the team will be offered for purchase and (2) a date and time at which we can send our representatives to begin inspection and evaluation of the Browns' records, as defined in R.C. § 1706.01.

***

Please respond to this letter by January 9, 2025. If you do not formally respond to this letter by that date—or if you inform the City that you do not intend to comply with R.C. § 9.67 or the terms of the Browns' contractual obligations—the City intends to take appropriate legal action.

Respectfully,

Justin M. Bibb
Mayor | City of Cleveland

cc: David A. Yost, Ohio Attorney General
    Kip T. Bollin, Thompson Hine LLP
    Justin E. Herdman, Jones Day

An Equal Opportunity Employer

# EXHIBIT F

# THOMPSON HINE

ATLANTA    CINCINNATI    COLUMBUS    LOS ANGELES    WASHINGTON, D.C.
CHICAGO        CLEVELAND        DAYTON        NEW YORK

January 9, 2025

*Via Email and Regular U.S. Mail*

Justin E. Herdman, Esq.
Jones Day
901 Lakeside Ave.
Cleveland, OH 44114-1190
jherdman@jonesday.com

**Re:  *Cleveland Browns Football Company LLC v. The City of Cleveland*, N.D. Ohio Case No. 1:24-cv-01857**

Dear Justin:

I write in response to the letter from the City of Cleveland to the Cleveland Browns Football Company LLC (the "Browns"), which was delivered through the parties' counsel in the above-captioned litigation on December 30, 2024. The answers to the City's questions regarding the Browns' positions on the Modell Law are clearly set forth in the Browns' November 15, 2024 Amended Complaint. The Browns understand that the City intends to assert legal claims in connection with those matters, as it has made clear in earlier public statements, and the Browns look forward to expeditiously resolving all of the parties' claims in the litigation pending before the Honorable David Ruiz in the Northern District of Ohio.

Very truly yours,

Anthony C. White

cc:    Tracy K. Stratford, Esq.
       James R. Saywell, Esq.
       Robert F. Ware, Esq.
       Kip T. Bollin, Esq.
       Thomas M. Ritzert, Esq.

Tony.White@ThompsonHine.com  Fax: 216.566.5800  Phone: 216.566.5734

| THOMPSON HINE LLP | 3900 Key Center | www.ThompsonHine.com |
|---|---|---|
| | 127 Public Square | |
| | Cleveland, Ohio 44114-1291 | F: 216.566.5800 |

# EXHIBIT G

# JONES DAY

NORTH POINT • 901 LAKESIDE AVENUE • CLEVELAND, OHIO 44114.1190

TELEPHONE: +1.216.586.3939 • JONESDAY.COM

DIRECT NUMBER: 2165867113
JHERDMAN@JONESDAY.COM

January 9, 2025

<u>Sent Via E-Mail</u>

Anthony C. White
Thompson Hine, LLC
3900 Key Center
127 Public Square
Cleveland, Ohio 44114-1291

*Re:  Legal Obligations of Cleveland Browns Football Company LLC and Its Owners*

Dear Mr. White:

I am writing this letter on behalf of the City of Cleveland (the "City") in reply to your January 9, 2025 Letter (the "Response Letter") on behalf of Cleveland Browns Football Company LLC (the "Browns").

As you know, the City sent a letter to the Browns (and its owners) on December 30, 2024 (the "Letter"). The Letter made clear that the Browns are subject to the requirements of Ohio Revised Code § 9.67, which is known as the Modell Law, and asked for confirmation about whether that the Browns intended to comply with that law.

In addition, as a part of the Browns' contractual obligations for the heavily tax-supported facility now called Huntington Bank Stadium, the Browns agreed to, among other things, "comply promptly with all present and future laws, statutes, ordinances, orders, rules, and regulations of every duly constituted governmental authority or agency relating to the Leased Premises or the use and occupancy thereof." Agreement § 17. Likewise, the Browns agreed to, upon request, provide adequate assurance of the company's compliance with the contract. *See id.* § 31. The City is entitled to assurance that the Browns intend to uphold their contractual obligations, including complying with Ohio law.

Rather than assure the City that the Browns intend to comply with their legal obligations, the Browns provided no meaningful response. The City has no choice but to read the Browns' letter as a direct refusal to comply with their lease and Ohio law's requirement to provide the City and local individuals with an opportunity to purchase the team. *See* Ohio Rev. Code § 9.67. This confirms for the City that the Browns (and its owners) are directly flouting duly-enacted Ohio law as well as the Browns' contractual obligations to the City.

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

**JONES DAY**

Mr. White
January 9, 2025
Page 2

 This all is deeply unfortunate.  Cleveland taxpayers have invested over $350 million in Huntington Bank Stadium and the City has been actively working to develop the City's lakefront. The Browns (via the Haslam Sports Group) are abandoning the City just as the lakefront is experiencing unprecedented levels of new growth, violating their legal obligations in the process.

Best regards,

*/s/ Justin E. Herdman*

Justin E. Herdman

cc: Mark D. Griffin
 Tracy K. Stratford
 James R. Saywell
 Robert F. Ware
 Kip T. Bollin
 Thomas M. Ritzert

# EXHIBIT H

## ASSIGNMENT AND ASSUMPTION OF LEASE

This Assignment and Assumption of Lease is made and entered into at Cleveland, Ohio this 23rd day of October, 1998 by and between the NATIONAL FOOTBALL LEAGUE, an unincorporated not-for-profit association ("Assignor"), and CLEVELAND BROWNS STADIUM COMPANY LLC ("Assignee"), an affiliate of the owner of the National Football League franchise ("NFL Franchise"), whose home territory is Cleveland, Ohio.

### RECITALS

A. Assignor and Cleveland Browns Football Company LLC, an affiliate of Assignee, have entered into an Expansion Franchise Agreement, dated as of September 7, 1998, as amended (the "Expansion Franchise Agreement"), providing for, among other things, the acquisition by Cleveland Browns Football Company LLC of the NFL Franchise; and

B. The Expansion Franchise Agreement provides that Assignor will assign, and the Assignee will assume, all of Assignor's right, title and interest in and to the Lease (defined below).

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. Assignment.

Assignor hereby assigns to Assignee (i) all of Assignor's right, title, interest and obligations as Lessee under that certain Lease by Way of Concession dated as of April 26, 1996, by and between the City of Cleveland and the Assignor and (ii) Assignor's entire leasehold estate thereunder (collectively, the "Lease") which Lease granted to Assignor certain rights in and to the real property described in Exhibit A attached hereto and the improvements thereon.

2. Assumption.

In consideration of the foregoing assignment, Assignee hereby expressly agrees to be bound by and perform all of the obligations and liabilities of the New Owner (as defined in the Lease) and Lessee (as defined in the Lease) relating to periods of time or events occurring subsequent to the Commencement Date (as defined in the Lease) or, in the event of the occupancy and use of the Leased Premises (as defined in the Lease) prior to the Commencement Date, occurring subsequent to such occupancy and use.

IN WITNESS WHEREOF, the parties have duly executed this Assignment and Assumption of Lease as of the date first above written to be effective as of October 23, 1998.

WITNESSES:                           NATIONAL FOOTBALL LEAGUE

_____            By: _____

Print Name  *James Ryan*             Its  _____VP-CA._____

_____

Print Name  *W. Andrew Jack*

                                     CLEVELAND BROWNS STADIUM
_____            COMPANY LLC, ASSIGNEE

Print Name  *Paul Singerman*         By _____

_____            Its:  _____PRESIDENT_____

Print Name  *Daniel G. Berick*

ACKNOWLEDGED this 23rd day of October, 1998.

THE CITY OF CLEVELAND

By: _____

The within instrument is hereby approved as to legal form and correctness October 23, 1998.

_____
Director of Law (acting)

This instrument prepared by:

Paul J. Singerman
Berick, Pearlman & Mills
1350 Eaton Center
1111 Superior Avenue
Cleveland, Ohio  44144-2596

STATE OF OHIO
~~CITY OF WASHINGTON~~                    )

                                         )        SS.

COUNTY OF CUYAHOGA.
~~DISTRICT OF COLUMBIA~~                  )

       BEFORE ME, a Notary Public in and for said County and State, personally

appeared Frank Hawkins , V.P. Law    of the NATIONAL FOOTBALL

LEAGUE, an unincorporated not-for-profit association, on whose behalf the foregoing

Assignment and Assumption of Lease was executed, who acknowledged that he did sign the

same for and on behalf of said association, being thereunto duly authorized and that the same is

his free act and deed as an officer and the free and corporate act and deed of said association.

       IN WITNESS WHEREOF, I have hereunto set my hand and official seal at

Washington, DC, this 23rd day of October, 1998.

                             Notary Public

                         PAUL J. SINGERMAN, Attorney At Law
                          Notary Public - State of Ohio
                      My commission has no expiration date.
                           Section 147.03 R. C.

- 3 -

STATE OF Ohio         )

                          )    SS.

COUNTY OF Cuyahoga  )

        BEFORE ME, a Notary Public in and for said County and State, personally appeared Carmen A. Policy, President of Cleveland Browns Stadium Company LLC, Assignee, who acknowledged that he/she did sign the foregoing Assignment and Assumption of Lease, and that same is his/her free act and deed and the free and corporate act and deed of Assignee.

        IN WITNESS WHEREOF, I have hereunto set my hand and official seal at

_____Berea_____, _____Ohio_____, this 23rd day of October, 1998.

                                      Notary Public

                                  PAUL J. SINGERMAN, Attorney At Law
                                  Notary Public - State of Ohio
                                My commission has no expiration date.
                                  Section 147.03 R. C.

# EXHIBIT I

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| **CLEVELAND BROWNS FOOTBALL COMPANY LLC,**<br>76 Lou Groza Boulevard<br>Berea, Ohio 44017, | ) ) ) ) ) | **Case No. 1:24-CV-01857-DAR**<br><br>**Judge David A. Ruiz** |
| **Plaintiff,** | ) ) ) | |
| vs. | ) ) | |
| **THE CITY OF CLEVELAND,**<br>601 Lakeside Avenue<br>Room 227<br>c/o Mark D. Griffin, Chief Law Officer<br>Cleveland, Ohio 44114, | ) ) ) ) ) ) ) | |
| **Defendant.** | ) ) | |
| **Please also serve:** | ) ) | |
| **OHIO ATTORNEY GENERAL**<br>Dave Yost,<br>30 East Broad Street, 14th Floor<br>Columbus, Ohio 43215. | ) ) ) ) | |

**AMENDED COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff Cleveland Browns Football Company LLC (the "Browns") for its Amended Complaint against Defendant the City of Cleveland ("City") alleges as follows:

**I.      INTRODUCTION**

1.      The Browns bring this action seeking a declaratory judgment finding that Ohio Rev. Code § 9.67 is unconstitutional on its face and as applied to the Browns, or in the alternative, finding that the Browns' intention to develop a domed stadium in the City of Brook Park, Ohio, and, after the expiration of its current lease obligations, play its home games at that site, does not trigger or violate the requirements of R.C. 9.67.

2. The Browns own the rights to the Cleveland Browns football franchise (the "Team"), a franchise within the National Football League ("NFL"). The Team currently plays home games at Huntington Bank Field located on Cleveland's lakefront ("HBF"), which is leased by an affiliate of the Browns, Cleveland Browns Stadium Company LLC ("StadCo"), pursuant to the terms of an April 26, 1996, lease agreement with the City that expires in 2029 (the "HBF Lease").

3. Upon expiration of the HBF Lease, the Team will have no right or obligation to continue to play at HBF, nor will there be any obligation for there to be taxpayer funds used to support HBF, the Browns, or the Team's use of HBF.

4. Neither the City, nor StadCo, is under any obligation to renew the HBF Lease, and the HBF Lease requires StadCo to surrender the premises to the City upon expiration. In fact, the HBF Lease has specifically negotiated provisions restricting relocation of the Team, all of which expire at the end of the term.

5. HBF is an open-air stadium facility located on the shores of Lake Erie in downtown Cleveland, Ohio. Given the limitations of an open-air facility at this location, HBF is currently only used for major events 10 to 12 times per year. Yet, HBF occupies a significant footprint on Cleveland's downtown lakefront.

6. Since 2017, well over a decade prior to the expiration date for the HBF Lease, the Browns have planned for such expiration and worked in a good-faith, open, and transparent manner with the City to develop a long-term, sustainable stadium solution that would benefit the Team's loyal fans, the Cleveland lakefront, the region, and the people of Northeast Ohio.

7. Over the course of several years, with the City at the table and by their side, the Browns painstakingly and thoroughly investigated the costs and benefits of renovating HBF. They

also explored other sites in Cleveland, and at the City's request, recently conducted a detailed analysis of the feasibility of building a new stadium and mixed-use development at the Burke Lakefront Airport site in downtown Cleveland. The City was supportive of a potential Browns move to a new stadium on the Burke Lakefront site and made a financial offer in support of such move. Unfortunately, such financial offer was insufficient to absorb the vastly increased costs of developing on the Burke Lakefront Airport site, and, in light of the uncertainty and risks involved in closing of the airport, the City could not provide a definitive timeline for site availability which is a critical element of planning for a project of this scale.

8.     As a result of this exhaustive years-long work, conducted in cooperation and in a spirit of transparency with the City, the Browns concluded that investing billions of private and public dollars in a stadium on the lakefront does not result in the greatest benefit for the Team's fans or positive impact for the City or Northeast Ohio. Instead, the Browns recently indicated to the City that they intend to focus on a domed stadium option in the City of Brook Park, Ohio, which is adjacent to the City. In connection with such communication, the Browns also publicly and privately reiterated their commitment to continue their significant philanthropic efforts in the City after the potential move to Brook Park, which include supporting education, youth sports, volunteerism, economic mobility, reentry, and many other community and charitable causes.

9.     The Brook Park option would support an estimated 50 to 70 event days per year, including at least an additional 6 to 10 major concerts and events (i.e., 50,000 people per event), would drive significant economic activity in the City, County, Northeast Ohio region, and State, would open up the HBF lakefront location for improved development and year-round activity, and would make it feasible for the Team to remain in the Greater Cleveland area for generations to come.

10.     However, despite: (a) the Browns' transparency with the City; (b) the fact that the City will have received the full value of its bargain under the HBF Lease; and (c) the fact that the Browns have repeatedly confirmed that the HBF Lease will be performed in full prior to expiration, the City seeks to use extracontractual measures that were not a part of the Parties' business relationship or negotiations to thwart the Browns' ability to exercise its bargained-for contractual rights (after performing its bargained-for obligations).

11.     Indeed, the City has stated its opposition to the Browns' efforts to make the dome stadium in Brook Park a reality, and has inaccurately likened the construction of a stadium in Brook Park, on land that borders the City, to the decision made by a previous owner of the Browns, Art Modell, to move the franchise over 400 miles away to Baltimore, Maryland in 1995.

12.     In early 1996, in the aftermath of Art Modell's actions, the NFL and the City announced that the NFL would bring a new NFL team to Cleveland to play in a to-be-constructed stadium, which today is HBF. On April 26, 1996, the City and the NFL entered into the HBF Lease and a Franchise Commitment Agreement (the "FCA") pursuant to which the new team and stadium could be built.

13.     After the City's agreements with the NFL were already in effect, Ohio enacted Revised Code Section 9.67, known informally as the "Modell Law," effective June 20, 1996. The Modell Law imposes certain vague, unconstitutional restrictions on the owner of a professional sports team playing most of its home games at a tax-supported facility.

14.     On May 6, 2024, the Cleveland City Council passed Emergency Ordinance 391-2024, authorizing and directing the City's Director of Law to enforce the provisions of the Modell Law against the Browns. City Law Director Mark Griffin also has made it clear that the City plans to take legal action against the Browns in connection with the Brook Park stadium option. Indeed,

on October 22, 2024, Mr. Griffin told local reporters that the City is compiling information, researching law, and evaluating its next steps "before moving forward with formal litigation action – which will likely occur in the coming weeks" to enforce the Modell Law, noting that the City will do "everything we can" to keep the Team in downtown Cleveland, including filing a lawsuit under the Modell Law to "require the Browns to make their team available for local purchasers who will keep the team in the City of Cleveland."[1] These and other similar statements and threats of litigation have caused uncertainty regarding the Browns' legal rights and obligations in connection with the domed stadium project and the Team's potential options after the 2028 season. The Browns do not desire conflict with the City but have been compelled to bring this action to resolve this uncertainty and obtain clarity regarding their rights and obligations, and to enable the Browns to move forward for the benefit of the Team's fans and the region.

15.  The Browns dispute that the Modell Law is constitutional or enforceable, and, in any event, deny any violation of the Modell Law. Given the City's Emergency Ordinance and repeated comments to news media of its intentions to sue the Browns under the Modell Law or otherwise enforce that statute, the Browns are left with no choice but to come to this Court for relief, and seek a declaration that the Modell Law is unconstitutional, both *per se* and as-applied, and in the alternative, that even if enforceable, the Browns have not taken any action that would trigger or violate that law.

---

[1]  http://www.news5cleveland.com/sports/browns/battle-over-new-browns-stadium-could-play-out-in-court  (last accessed Oct. 23, 2024).

## II.     PARTIES, JURISDICTION, AND VENUE

16.     The Browns are a Delaware limited liability company with their principal place of business at 76 Lou Groza Boulevard, Berea, Ohio 44017. The Browns are the business entity that own and operate the Team.

17.     The City is a municipal corporation organized under the laws of the State of Ohio and is located at 601 Lakeside Avenue, Cleveland, Ohio 44114.

18.     This Court has subject matter jurisdiction over the Browns' federal declaratory judgment claims pursuant to 28 U.S.C. §§ 1331 and 2201.

19.     This Court has supplemental jurisdiction over the Browns' state-law claim for declaratory relief that they are not in violation of Ohio Rev. Code § 9.67 pursuant to 28 U.S.C. §§ 1367(a) and 2201 because this state law claim and the Browns' federal claims arise from a common nucleus of operative fact and because the Browns' state law claim is so related to their federal claims that they form part of the same case or controversy.

20.     This Court may exercise personal jurisdiction over the City because the City is located within this forum and because this forum has an interest in adjudicating this dispute.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the City is located in the Northern District of Ohio and because a substantial part of the property that is the subject of this action is situated in the Northern District of Ohio.

### III.     BACKGROUND

**A.     The NFL's Teams are Financially Interdependent and Subject to NFL Rules.**

22.     The NFL is comprised of 32 member teams. Each team operates as a franchise and agrees to be subject to the NFL's oversight and to abide by the NFL's bylaws and other rules.

23.     Due to the large number of member teams in a variety of different jurisdictions, the NFL's success depends on its ability to oversee and coordinate with each of its member teams nationwide.

24.     The NFL's member teams have a symbiotic relationship where each member team's success or drawing power financially affects other teams nationwide.

25.     For example, the NFL contracts with television networks to air games for each of the member teams nationwide. The revenues from those television network contracts are divided equally among member teams.

26.     NFL member teams also share revenue from ticket sales. The capacity and quality of a team's stadium impacts ticket sales and prices, and thus these factors for one team's playing venue impact revenue for the other 31 NFL member franchises.

27.     Accordingly, decisions about whether to renovate or build a new stadium have economic impact well beyond the city and state in which that stadium is located.

28.     This level of interdependence is why, among other reasons, adding and removing member teams from the league, and other significant operational changes by member teams such as changing the location and venue for home games, must be approved by the NFL and its members.

29.     Interfering with the symbiotic relationship among NFL member teams inflicts substantial harm on interstate commerce.

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

**B.** **The City Entered Into the HBF Lease and FCA to Bring the Browns Back to Cleveland.**

30. In November 1995, then-owner of the Browns, Art Modell, announced that he was moving the Team from Cleveland, Ohio to Baltimore, Maryland, in part due to the aging conditions of Cleveland's Municipal Stadium, where the Team was playing home games.

31. In the midst of intense public outcry following the announced move and following discussions with the City, in February 1996 the NFL announced that it would approve a new NFL team to play home games in Cleveland.

32. On April 26, 1996, the City and the NFL entered into two agreements necessary to create a new team and stadium: the HBF Lease and the FCA.

33. In the FCA, the NFL agreed to approve a new Cleveland NFL Franchise that would participate in the NFL's league structure and be subject to all of the NFL's bylaws and other rules.

34. The City and the NFL (standing in the shoes of a future owner), entered into the 30-year HBF Lease where the City agreed to build a new stadium for the expansion team.

35. All NFL franchises, including the team contemplated by the FCA, must be bound by the NFL's franchise agreement (the "NFL Franchise Agreement").

36. The NFL Franchise Agreement sets forth the terms pursuant to which the Team is permitted to play as an NFL team.

37. Under the NFL Franchise Agreement, the Browns became subject to certain contractual obligations with the NFL concerning the ability to sell the Team at a later date, including but not limited to, ultimate approval by other NFL team owners of such a potential sale.

38. The Franchise Agreement also allows the Browns to relocate the Team and play games outside of HBF only if the NFL agrees.

39.     Under Section 4.3 of the NFL Constitution, relocation of any NFL franchise outside of its home territory requires the prior approval by affirmative vote of three-fourths of the existing member clubs of the league.

40.     In or about September 1998, the Browns entered into an Expansion Franchise Agreement where the Browns acquired the rights to own and operate the Team as a new member of the NFL.

41.     In connection with the Browns' acquisition of the Team, the Browns affiliate, StadCo, was assigned certain rights and obligations under a lease for HBF, where the Team plays most of its home games. The HBF Lease expires in 2029. The HBF Lease does not automatically renew, StadCo is under no obligation to renew the HBF Lease, and neither is the City. In other words, in accordance with the terms the City originally negotiated with the NFL, the time for which the Team is to play at HBF is set to naturally expire under the operation of the HBF Lease in 2029, and the Team has no right, or obligation, to play at HBF after expiration of the HBF Lease. Rather, the Team has the obligation to surrender the HBF premises to the City upon expiration of the HBF Lease.

42.     The Browns and StadCo have complied with the terms of the HBF Lease, and as required by the HBF Lease the Team will continue to play most of its home games at HBF through the remainder of the HBF Lease term, i.e., through the 2028 NFL season.

**C.     Ohio Passed the Modell Law in Response to the Abrupt Relocation of the Browns to Another State.**

43.     Effective June 20, 1996, Ohio enacted R.C. 9.67, known informally as the Modell Law, imposing certain limitations on owners of professional sports teams utilizing tax supported facilities within the state.

44.     R.C. 9.67 states as follows:

9

No owner of a professional sports team that uses a tax-supported facility for most of its home games and receives financial assistance from the state or a political subdivision thereof shall cease playing most of its home games at the facility and begin playing most of its home games elsewhere unless the owner either:

(A) Enters into an agreement with the political subdivision permitting the team to play most of its home games elsewhere;

(B) Gives the political subdivision in which the facility is located not less than six months' advance notice of the owner's intention to cease playing most of its home games at the facility and, during the six months after such notice, gives the political subdivision or any individual or group of individuals who reside in the area the opportunity to purchase the team.

45.     The Modell Law does not contain or incorporate any supporting definitions of its operative terms, and it includes many vague and undefined terms.

46.     For example, the Modell Law does not specify what is meant by "financial assistance," and there are no analogous statutes or rules from which a definition can be ascertained.

47.     Nor does the statute indicate what is meant by "political subdivision," or if a facility can be supported by more than one "political subdivision." If there can be more than one political subdivision, then which political subdivision would have priority or apply? In this case, the Brook Park site is located within Cuyahoga County, which is the same county within which the existing lakefront stadium is located.

48.     The statute also does not state whether the term "elsewhere," refers to any location different than the tax-supported facility, or instead a location outside of a relevant "political subdivision," which is itself an undefined term.

49.     Nor does the statute provide any guidance to owners about how to send advance "notice," to whom "notice" should be sent, or what the "notice" must contain.

50.     The statute does not provide any guidance to owners about what constitutes the "opportunity" that must be afforded to potential buyers hoping to purchase the team, or how much a potential purchaser must be able to bring to the table in order to be a truly bona fide potential

purchaser. For example – does anyone who offers $25 for the team get treated as a potential buyer under the Modell Law? Does the buyer have to keep the team within the existing stadium or political subdivision? The statute does not require the team to remain within the political subdivision. The statute does not provide that the City gets to approve a successful buyer.

51. Nor is the statute clear on what "area" individuals must reside in to be eligible for an opportunity to purchase the team.

52. Moreover, the Modell Law does not contain any exceptions or carve-outs for circumstances in which the statute would interfere with the terms of any contract applicable to the professional sports team in question, or the owner, such as: (a) a negotiated lease for the facility in question with specific non-relocation provisions and, critically, a defined term after which such provisions expire; or (b) contractual provisions with a national sports league governing or restricting the terms on which a particular sports franchise may be sold or relocated.

53. On its face, the Modell Law also discriminates against interstate commerce by providing "individuals who reside in the area" (i.e., in Ohio) with an opportunity to purchase the Team, to the exclusion of individuals outside Ohio.

**D. The City Has Threatened to Prematurely Enforce the Modell Law.**

54. In August 2012, the current owners of the Browns acquired the Team, and consistent with NFL rules, NFL team owners unanimously approved that purchase in October 2012.

55. In 2017, over a decade before the HBF Lease was set to expire, the Browns began working in cooperation with the City on options for potential renovation of HBF and other future stadium options.

56.     Following many years of cost benefit analysis and consideration of multiple stadium options conducted in cooperation with the City, the Browns recently indicated to the City that they would be focusing on a domed stadium option in the city of Brook Park, Ohio, which neighbors the City. The Browns would not begin playing any games in the potential Brook Park domed stadium until after the expiration of the HBF Lease.

57.     In May 2024, the City passed Emergency Ordinance 391-2024, authorizing and directing the City Law Director to enforce the Modell Law against the Browns.

58.     In October 2024, the City Law Director, certain City Council members, and other City officials, made numerous statements to the effect that the City intended to take action against the Browns and would seek to enforce the Modell Law to prevent the Team from playing at a stadium in Brook Park, or outside the City. As reported by one Cleveland news outlet, Cleveland Law Director Mark Griffin stated: "We're gonna move forward because that's the law. We're gonna move forward because that is what the Cleveland city ordinances require us to do."[2]

59.     The City has made it clear it will attempt to arbitrarily enforce the Modell Law now, years before the HBF Lease will expire in 2029, and despite the Browns' compliance with the terms of the HBF Lease.

60.     In comments to local media, the City Law Director conceded that the Modell Law interferes with the Browns' contractual arrangements with the NFL and the NFL rules, noting that the City itself would not purchase the Team because "[m]y understanding of the NFL is they prohibit cities from doing that."[3]

---

[2] https://www.wkyc.com/article/sports/nfl/browns/cleveland-browns-art-modell-law-haslam-sports-group-domed-stadium-brook-park-city-council-bibb-administration/95-55370573-81c9-4a29-af21-fe3bebcdfe9f (last accessed 11/15/2024).

[3] https://www.news5cleveland.com/sports/browns/battle-over-new-browns-stadium-could-play-out-in-court.

12

61.     Moreover, the City Law Director admitted that the purpose of the City's enforcement of the Modell Law is to give local purchasers a preference over other individuals who may be located in states other than Ohio, stating that the City is prepared to "file a lawsuit to require the Browns to make their team available for local purchasers who will keep the team in the City of Cleveland."[4]

62.     Plainly, based on the City's emergency ordinance and recent statements of City officials, the City takes the position that the Modell Law is constitutional and enforceable and that the Browns' indication that they are pursuing the option of a stadium in Brook Park violates that statute.

63.     The City will have received the full benefit of its bargain with the Browns at the conclusion of the HBF Lease, as the Browns have repeatedly reiterated that they fully intend to perform under the terms of the HBF Lease through its expiration in 2029.

64.     The Browns specifically negotiated terms in the HBF Lease that provide the Browns with certain express and implied rights when the HBF Lease expires in 2029, including terms concerning relocation, wind-up, and surrender of the premises. The City now seeks to use the Modell Law to impose extracontractual terms on the Browns that would ultimately prevent the Browns from exercising those bargained-for contractual rights at the end of the HBF Lease term and would cause the Browns to violate the terms of other agreements like the NFL Franchise Agreement.

65.     R.C. 9.67, even if found to be constitutional, which the Browns dispute, is simply inapplicable where, as here, the HBF Lease does not expire until 2029 and the Browns have made

_____

[4] *Id.*

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

it clear to the City that the Team will continue to play most of its home games at HBF until that agreement expires.

66.     Based on the City's position, the Browns had no choice but to seek a ruling from this Court as to the enforceability and current inapplicability of the Modell Law.

67.     The Browns deny that the Modell Law is constitutional and deny any violation of that statute.

**COUNT I**
**Declaratory Judgment – Violation of Due Process – Void for Vagueness**
**Unconstitutional As Applied**

68.     The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

69.     Pursuant to 28 U.S.C. § 2201, there is a real and justiciable controversy between the Browns and the City concerning whether R.C. 9.67 is a valid and enforceable statute.

70.     The City takes the position that R.C. 9.67 prevents the Browns from building a new stadium in Brook Park, Ohio, which the Browns deny.

71.     The statute is so vague and ambiguous that no owner of a professional sports franchise in Ohio has fair notice about what conduct the statute contemplates or forbids.

72.     It is a basic principle of due process that a statute is void for vagueness if its prohibitions are not clearly defined. *Memphis Ctr. For Reprod. Health v. Slatery*, No. 20-5969, 2020 U.S. App. LEXIS 36780, at *4-5 (6th Cir. Nov. 20, 2020) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

73.     To survive a void for vagueness challenge, a statute must "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. . ." *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 341-42 (6th Cir. 2007) (quoting *Colautti v. Franklin*, 439 U.S. 379, 390, 99 S. Ct. 675, 58 L. Ed. 2d 596 (1979)).

74.     R.C. 9.67 vaguely requires the owner of a professional sports team who relocates the team "elsewhere," to either: (i) enter into an agreement with the local political subdivision; or (ii) give "six months' advance notice of the owner's intention to cease playing most of its home games at the facility" and give individuals "who reside in the area" the "opportunity" to purchase the team. R.C. 9.67(B).

75.     However, the statute does not include any definitions for its terms, nor does it provide any guidance for giving notice under the statute or what kind of opportunity to purchase the team is sufficient to satisfy the statute.

76.     The statute's terms do not provide a person of ordinary intelligence with any notice whatsoever as to what conduct is covered by the statute or what is required to comply.

77.     For example, how far must a team move to be located "elsewhere"? Is a new stadium across the street "elsewhere"? A different location within the same city? Outside the City but within the same county? Outside the region? Outside the State of Ohio?

78.     Similarly, what constitutes "an agreement … permitting the team to play …elsewhere"? And when must that "agreement" be entered into? Does a lease containing relocation restrictions during the lease term that expire with the lease term suffice to satisfy R.C. 9.67(A)? Or must an owner enter into a new agreement with a political subdivision after giving "advance notice" of an "intention to cease playing" at the current facility?

79.     R.C. 9.67(B) requires an owner to give "six months' advance notice of the owner's intention" to move the team. But when does an owner manifest the "intention" to move the team? At the beginning of the planning stage? When renderings are unveiled publicly? When land for the new stadium is under contract? When construction begins? When the new stadium is ready for

use? When written notice of a date certain for the move is provided? The statute gives no guidance when an owner attempting to comply with the statute must send this notice.

80. The statute is also unclear what "area" is covered when it requires that "individuals who reside in the area" must have the opportunity to purchase the team. *Id.* As applied to the Browns, does the statute's requirements include all residents in the City of Cleveland? Cuyahoga County? Northeast Ohio? The State of Ohio? Again, the statute fails to specify which individuals have an opportunity to purchase the team and which offers an owner must consider. The statute is also silent on the role of the applicable professional sports league, despite each professional league playing a dispositive role in the transfer of team ownership rights.

81. The statute also does not specify what kind of "opportunity" must be given to those individuals who want to purchase the team. What time frame constitutes a sufficient "opportunity"? Days? Weeks? Months? Must all offers be considered? May individuals located outside of the "area" bid at the same time individuals located within the "area"? How much consideration should each offer receive? How much due diligence are prospective buyers entitled to? Must the prospective buyer agree to keep the team at the current facility? Again the statute is silent where it must be precise.

82. Rather than meet their obligation to draft laws that are "clearly defined" and provide "fair notice" to the public, Ohio lawmakers, influenced by the understandable emotion of the beloved Browns leaving Ohio, swayed to the political pressures of the day by enacting a symbolic yet incomprehensible statute that is impermissibly vague and unconstitutional.

83. Indeed, as currently constructed, even if R.C. 9.67 were triggered and applied to the facts of the case, the Browns could not be sure of their obligations under the statute and would have to expend a significant amount of time, money, and resources in attempting to fulfill the

requirements of the statute. What is more, without any way of knowing when it has fully complied, the City could continue to "move the goalposts," and ask more and more from the Browns all under the guise of requiring full compliance with R.C. 9.67.

84. In addition, the Browns would have no way to dispute such requirements under the statute as currently written because there is no process to appeal any assertion by the City that the Browns have acted in contravention of R.C. 9.67 and no guidelines for what evidence would be needed to support such an assertion.

85. In these ways, and more, the vagueness and ambiguity in the Modell Law authorizes or even encourages arbitrary and discriminatory enforcement.

86. Therefore, R.C. 9.67 is void for vagueness, is unconstitutional, and cannot be enforced as to the Browns or any other Ohio professional sports team.

87. As a result, the rights, status, or other legal obligations of the Browns and the City are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 is unconstitutional will terminate the uncertainty and controversy which has given rise to this proceeding.

## COUNT II
### Declaratory Judgment – Violation of Contract Clause
### Unconstitutional As Applied

88. The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

89. Pursuant to 28 U.S.C. § 2201, there is a real and justiciable controversy between the Browns and the City concerning whether R.C. 9.67 is a valid and enforceable statute.

90. The HBF Lease and the FCA were effective as of April 26, 1996, and predate the effective date of the Modell Law on June 20, 1996.

91. The HBF Lease and the FCA made the Browns subject to the NFL Franchise Agreement, which provides the terms pursuant to which the Team is permitted to play as an NFL franchise.

92. The Franchise Agreement prohibits the Browns from selling the Team without the express written consent of the NFL.

93. Relocation of any NFL franchise outside of its home territory requires the prior approval by affirmative vote of three-fourths of the existing member clubs of the league.

94. The Franchise Agreement also allows the Browns to relocate the Team and play games outside of HBF Stadium where the NFL agrees.

95. The City takes the position that R.C. 9.67 may be enforced as to the Browns to either prevent the Browns from exercising their rights pursuant to the NFL Franchise Agreement to move the Stadium or to force a sale of the Team, all in direct contravention of the terms of the NFL franchise agreement.

96. The Browns maintain that they: (i) may exercise their rights pursuant to the NFL Franchise Agreement to move the Stadium; and (ii) cannot give others an opportunity to purchase the Team in compliance with R.C. 9.67 without breaching the Franchise Agreement.

97. Article I, Section 10 of the United States Constitution states, in relevant part, "No state shall . . . pass any . . . Law impairing the Obligation of Contracts."

98. This clause is generally referred to as the "Contract Clause."

99. In analyzing whether or not a statute violates the federal Contract Clause, courts have imposed a two-part test: (1) did the state law operate as a substantial impairment of a contractual relationship; and (2) is the state law appropriately and reasonably drawn in a way that advances a significant and legitimate public purpose.

100. R.C. 9.67 substantially impairs the Browns' NFL Franchise Agreement and purports to void fundamental terms of the NFL Franchise Agreement by: (1) depriving the Browns of a critical bargained-for value in the form of the option to move the Stadium; or (2) forcing the Browns to offer the Team for purchase in direct contravention of the terms of the NFL Franchise Agreement.

101. If the Browns were to comply with the statute and provide an opportunity to purchase the Team through a sale not approved by the NFL, they would be in breach of the NFL Franchise Agreement. Accordingly, complying with R.C. 9.67 would require the Browns to breach the NFL Franchise Agreement and, therefore, the statute violates the Contract Clause.

102. R.C. 9.67 was not appropriately and reasonably drawn in a way that advances a significant and legitimate public purpose.

103. Therefore, R.C. 9.67 violates the Contract Clause and is unconstitutional and cannot be enforced as to the Browns.

104. As a result, the rights, status, or other legal obligations of the Browns and the City are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 is unconstitutional will terminate the uncertainty and controversy which has given rise to this proceeding.

## COUNT III
### Declaratory Judgment – Violation of Dormant Commerce Clause
### Facially Unconstitutional and Unconstitutional As Applied

105. The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

19

106.     Pursuant to 28 U.S.C. § 2201, there is a real and justiciable controversy between the Browns and the City concerning whether the Art Modell Law, R.C. 9.67, which is currently the only law of its kind in the nation, is a valid and enforceable statute.

107.     The City takes the position that the Browns must comply with R.C. 9.67 and that the statute is constitutional, which the Browns deny.

108.     The Commerce Clause of the United States Constitution affirmatively grants Congress the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8.

109.     The dormant Commerce Clause, in consequence, restricts states from enacting laws that discriminate against interstate commerce by advantaging in-state firms or disadvantaging out-of-state rivals. *See, e.g., Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 370-7 (2023); *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-338 (2008).

110.     The dormant Commerce Clause further restricts states from placing burdens on interstate commerce that are clearly excessive when compared with putative local benefits. *Nat'l Pork Producers Council*, 598 U.S. at 377 (2023); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

111.     R.C. 9.67 violates the dormant Commerce Clause on its face.

112.     Specifically, the text of R.C. 9.67 violates the dormant Commerce Clause by advantaging in-state economic actors and disadvantaging out-of-state rivals by, among other things, giving Ohio political subdivisions and Ohio residents preferential treatment and special rights with respect to purchase of professional sports organizations that is not afforded to residents of states other than Ohio.

113.     R.C. 9.67 also violates the dormant Commerce Clause on its face by placing excessive burdens on interstate commerce without advancing any legitimate local interest.

114.    R.C. 9.67 also violates the dormant Commerce Clause as-applied to the Browns.

115.    For example, each of the NFL member teams are financially interdependent such that each member team's success or drawing power financially affects other teams nationwide.

116.    NFL member teams divide proceeds from television contracts equally and share revenue from ticket sales.

117.    Decisions about relocating the stadium in which the Team plays have nationwide economic impact.

118.    This type of revenue sharing, financial interdependence, and top-down League governance is true of all major American professional sports leagues.

119.    As applied, R.C. 9.67 violates the dormant Commerce Clause by interfering with the symbiotic relationship among NFL member teams nationwide, which inflicts substantial harm on interstate commerce.

120.    R.C. 9.67 has no connection to public safety, health, or well-being.

121.    As a result, the rights, status, or other legal obligations of the Browns and the City are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 is unconstitutional will terminate the uncertainty and controversy which has given rise to this proceeding.

### COUNT IV – In The Alternative to COUNTS I-III
### Declaratory Judgment – R.C. 9.67 Does Not Apply

122.    The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

123.    R.C. 9.67 requires that the owner of a professional sports team that uses a tax-supported facility for most of its home games and receives financial assistance from the state or a political subdivision thereof shall not cease playing most of its home games at that facility unless

it (i) enters into an agreement with the political subdivision; or (ii) gives "six months' advance notice of the owner's intention to cease playing most of its home games at the facility . . . ."

124. The requirements of R.C. 9.67 have no application in the case of the Browns, as the duration for which the Team is set to play at HBF is spelled out in the HBF Lease between the City and StadCo, and all parties know already that the HBF Lease is set to expire in 2029.

125. When the HBF Lease expires in 2029, the Team will no longer be obligated to play most of its home games at a facility supported by tax-payer funds as contemplated by R.C. 9.67.

126. The Browns have not yet broken ground on or even finalized a deal for any new stadium and have repeatedly stated their intention for the Team to continue to play most of its home games at HBF through the remainder of the HBF Lease term.

127. The Browns have no right or obligation for the Team to continue to play at HBF beyond the expiration of the HBF Lease in 2029, and, in fact, must surrender the HBF premises to the City upon expiration of the HBF Lease. The HBF Lease is therefore an agreement permitting the Team to play most of its home games elsewhere as contemplated by R.C. 9.67(A).

128. Like the Browns, the City also has no obligation to renew the term of the HBF Lease beyond 2029.

129. R.C. 9.67 does not require the Browns or the City to sign a new lease and is plainly intended to prevent a team that is playing in a tax-supported facility from moving from that location during the term of the applicable lease. The Browns have not, and do not intend, to move while they are obligated to play at HBF. In short, R.C. 9.67 simply does not apply to the matter of where the Team will play its home games after the expiration of the HBF Lease, and the City already has full knowledge of, and indeed, specifically negotiated the duration of that lease.

130.     What is more, R.C. 9.67 was enacted to address concerns raised in response to the Browns previously being moved out of the state of Ohio – which facts do not exist here.

131.     Therefore, the Browns are entitled to a declaration from this Court that the Browns' actions do not trigger or violate R.C. 9.67.

**WHEREFORE**, the Browns respectfully request that this Court:

A.     Enter a declaratory judgment finding that R.C. 9.67 is unconstitutional *per se* because it violates the dormant Commerce Clause of the United States Constitution;

B.     Enter a declaratory judgment finding that R.C. 9.67 is unconstitutional as applied to the Browns because it violates:

     i.     the Due Process Clause of the United States Constitution;

     ii.     the Contract Clause of the United States Constitution; and

     iii.     the dormant Commerce Clause of the United States Constitution;

C.     In the alternative, if this Court finds that R.C. 9.67 is constitutional, a judgment finding that the Browns' actions do not trigger or violate R.C. 9.67;

D.     An award of Plaintiff's reasonable attorney's fees and costs; and

E.     Such other necessary and proper relief, both legal and equitable, including attorney's fees and other costs, as this Court deems just and proper.

DATED:     November 15, 2024

Respectfully submitted,

*/s/ Anthony C. White*
Anthony C. White (0062146)
Robert F. Ware (0055515)
Kip T. Bollin (0065275)
Thomas M. Ritzert (0085370)
Kyle A. Hutnick (0095673)
THOMPSON HINE LLP
3900 Key Center

23

127 Public Square
Cleveland, OH 44114
Phone: (216) 566-5500
Fax: (216) 566-5800
Tony.White@ThompsonHine.com
Rob.Ware@ThompsonHine.com
Kip.Bollin@ThompsonHine.com
Thomas.Ritzert@ThompsonHine.com
Kyle.Hutnick@ThompsonHine.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically on November 15, 2024

and counsel of record will receive a notice of filing through the Court's electronic filing system in

accordance with Fed. R. Civ. P. 5(b)(2)(E) and this Court's Local Rules.

*/s/ Anthony C. White*
Anthony C. White (0062146)

# EXHIBIT J

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **CLEVELAND BROWNS FOOTBALL COMPANY LLC**<br>76 Lou Groza Boulevard<br>Berea, Ohio 44017 | ) Case No. _____<br>)<br>) Judge _____<br>)<br>) |
| **Plaintiff,** | )<br>) |
| **vs.** | ) **COMPLAINT FOR DECLARATORY**<br>) **JUDGMENT**<br>) |
| **THE CITY OF CLEVELAND**<br>601 Lakeside Avenue<br>Room 227<br>c/o Mark D. Griffin, Chief Law Officer<br>Cleveland, Ohio 44114 | )<br>)<br>)<br>)<br>)<br>) |
| **Defendant.** | )<br>)<br>) |
| **Please also serve:** | )<br>) |
| **OHIO ATTORNEY GENERAL**<br>Dave Yost<br>30 East Broad Street, 14th Floor<br>Columbus, Ohio 43215 | )<br>)<br>)<br>)<br>) |

Plaintiff Cleveland Browns Football Company, LLC (the "Browns") for its Complaint against Defendant the City of Cleveland ("City") alleges as follows:

## I.     INTRODUCTION

1.     The Browns bring this action seeking a declaratory judgment finding that Ohio Rev. Code § 9.67 is unconstitutional on its face and as applied to the Browns, or in the alternative finding that the Browns' intention to develop a domed stadium in the City of Brook Park, Ohio, and, after the expiration of its current lease obligations, play its home games at that site, does not trigger or violate the requirements of R.C. 9.67.

2.       The Browns own the rights to the Cleveland Browns football franchise (the "Team"), a franchise within the National Football League. The Team currently plays home games at Huntington Bank Field ("HBF"), which is leased by an affiliate of the Browns, Cleveland Browns Stadium Company LLC ("StadCo") pursuant to the terms of a lease agreement with the City that expires in 2029 (the "HBF Lease").

3.       Upon expiration of the HBF Lease, the Team will have no right or obligation to continue to play at HBF, nor will there be any obligation for there to be taxpayer funds used to support HBF or the Browns or the Team's use of HBF. Neither the City, nor StadCo, is any under obligation to renew the HBF Lease, and the HBF Lease requires StadCo to surrender the premises to the City upon expiration.  In fact, the HBF Lease has specifically negotiated provisions restricting relocation of the Team, all of which expire at the end of the term.

4.       HBF is an open-air stadium facility located on the shores of Lake Erie in downtown Cleveland, Ohio. Given the limitations of an open-air facility at this location, HBF is currently only used for major events 10 to 12 times per year. Yet, HBF occupies a significant footprint on Cleveland's downtown lakefront.

5.       Since 2017, well over a decade prior to the expiration date for the HBF Lease, the Browns have planned for such expiration and worked in a good-faith, open, and transparent manner with the City to develop a long-term, sustainable stadium solution that would benefit the Team's loyal fans, the Cleveland lakefront, the region, and the people of Northeast Ohio.

6.       With the City at the table and by their side, the Browns painstakingly and thoroughly investigated the costs and benefits for renovation of HBF over the course of several years.  They also explored other sites in Cleveland, and at the City's request recently conducted a detailed analysis of the feasibility of building a new stadium and mixed-use development at the

Burke Lakefront Airport site in downtown Cleveland. The City was supportive of a potential Browns' move to a new stadium on the Burke Lakefront site, and made a financial offer in support of such move.

7.     As a result of this exhaustive, years-long work, conducted in cooperation and in a spirit of transparency with the City, the Browns concluded that investing billions of private and public dollars in a stadium on the lakefront, does not result in the greatest benefit for the Team's fans or impact for the City or Northeast Ohio. Instead, the Browns recently indicated to the City that they intend to focus on a domed stadium option in the City of Brook Park, Ohio, which is adjacent to the City. In connection with such communication, the Browns also publicly and privately reiterated their commitment to continue their significant philanthropic efforts in the City of Cleveland after the potential move to Brook Park, which include supporting education, youth sports, volunteerism, economic mobility, reentry, and many other community and charitable causes.

8.     The Brook Park option would support an estimated 50 to 70 event days per year, will drive significant economic activity in the City, County, Northeast Ohio region and State, will open up the HBF lakefront location for improved development and year-round activity, will make it feasible for the Team to remain in the Greater Cleveland Area for generations to come.

9.     However, the City has stated its opposition to the Browns' efforts to make the dome stadium in Brook Park a reality, and has likened the construction of a stadium in Brook Park, which borders the City, to the decision made by a previous owner of the Browns, Art Modell, to move the franchise over 400 miles away to Baltimore, Maryland in 1995.

10.     In the aftermath of Art Modell's actions in 1995, Ohio enacted Revised Code Section 9.67, known informally as the "Modell Law", which imposes certain vague,

unconstitutional restrictions on the owner of a professional sports team playing most of its home games at a tax-supported facility.

11.     On May 6, 2024, the Cleveland City Council passed Emergency Ordinance 391-2024, authorizing and directing the City's Director of Law to enforce the provisions of the Modell Law against the Browns.  In recent days, City Law Director Mark Griffin has made it clear that the City plans to take legal action against the Browns in connection with the Brook Park stadium option.  Indeed, on October 22, 2024, Mr. Griffin told local reporters that the City is compiling information, researching law, and evaluating its next steps "before moving forward with formal litigation action – which will likely occur in the coming weeks" to enforce the Modell Law, noting that the City will do "everything we can" to keep the Team in downtown Cleveland, including filing a lawsuit under the Modell Law to "require the Browns to make their team available for local purchasers who will keep the team in the City of Cleveland."[1]  These and other similar statements and threats of litigation have caused uncertainty regarding the Browns' legal rights and obligations in connection with the domed stadium project and the Team's potential options after the 2028 season.  The Browns do not desire conflict with the City, but have brought this action to resolve their uncertainty and obtain clarity regarding their rights and obligations, and to enable them to move forward for the benefit of the Team's fans and the region.

12.     The Browns dispute that the Modell Law is constitutional or enforceable, and in any event, deny any violation of the Modell Law.  Given the City's Emergency Ordinance and repeated comments to news media of its intentions to sue the Browns under the Modell Law or otherwise enforce that statute, the Browns are left with no choice but to come to this Court for relief, and seek a declaration that the Modell Law is unconstitutional, both *per se* and as-applied,

---

[1] http://www.news5cleveland.com/sports/browns/battle-over-new-browns-stadium-could-play-out-in-court (last accessed Oct. 23, 2024)

and in the alternative, that even if enforceable, the Browns have not taken any action that would trigger or violate that law.

## II.     PARTIES, JURISDICTION, AND VENUE

13.     The Browns are a Delaware limited liability company with their principal place of business at 76 Lou Groza Boulevard, Berea, Ohio 44017. The Browns are the business entity that own and operate the Team.

14.     The City is a municipal corporation organized under the laws of the State of Ohio and is located at 601 Lakeside Avenue, Cleveland, Ohio 44114.

15.     This Court has subject matter jurisdiction over the Browns' federal declaratory judgment claims pursuant to 28 U.S.C. §§ 1331 and 2201.

16.     This Court has supplemental jurisdiction over the Browns' state-law claim for declaratory relief that they are not in violation of Ohio Rev. Code § 9.67 pursuant to 28 U.S.C. §§ 1367(a) and 2201 because this state-law claim and the Browns' federal claims arise from a common nucleus of operative fact and because the Browns' state-law claim is so related to their federal claims that they form part of the same case or controversy.

17.     This Court may exercise personal jurisdiction over the City because the City is located within this forum and because this forum has an interest in adjudicating this dispute.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the City is located in the Northern District of Ohio and because a substantial part of the property that is the subject of this action is situated in the Northern District of Ohio.

## III.     BACKGROUND

19.     In 1996, in the aftermath of the Browns NFL franchise move from Cleveland, Ohio to Baltimore, Maryland, Ohio enacted R.C. 9.67, known informally as the Modell Law, imposing

certain limitations on owners of professional sports teams utilizing tax supported facilities within the state.

20. R.C. Section 9.67 states as follows.

No owner of a professional sports team that uses a tax-supported facility for most of its home games and receives financial assistance from the state or a political subdivision thereof shall cease playing most of its home games at the facility and begin playing most of its home games elsewhere unless the owner either:

(A) Enters into an agreement with the political subdivision permitting the team to play most of its home games elsewhere;

(B) Gives the political subdivision in which the facility is located not less than six months' advance notice of the owner's intention to cease playing most of its home games at the facility and, during the six months after such notice, gives the political subdivision or any individual or group of individuals who reside in the area the opportunity to purchase the team.

21. The Modell Law does not contain or incorporate any supporting definitions of its operative terms, and it includes many vague terms. For example, "opportunity to purchase," "elsewhere," "area" and "notice" are not defined or explained in the statute.

22. Moreover, the Modell Law does not contain any exceptions or carve-outs for circumstances in which the statute would interfere with the terms of any contract applicable to the professional sports team in question, or the owner, such as (a) a negotiated lease for the facility in question with specific non-relocation provisions and, critically, a defined term after which such provisions expire, or (b) contractual provisions with a national sports league governing or restricting the terms on which a particular sports franchise may be sold or relocated.

23. In August 2012, the current owners of the Browns acquired the Team, and consistent with NFL rules, NFL team owners unanimously approved that purchase in October 2012.

6

24.     As part of the acquisition of the Team, the Browns took ownership subject to the existing franchise agreement (the "NFL Franchise Agreement"), which provides the terms pursuant to which the Team is permitted to play as an NFL team.

25.     Under the NFL Franchise Agreement, the Browns became subject to certain contractual obligations with the NFL concerning the ability to sell the Team at a later date, including but not limited to, ultimate approval of other NFL team owners of such a potential sale.

26.     The Franchise Agreement also allows the Browns to relocate the Team and play games outside of HBF only if the NFL agrees.

27.     In connection with its acquisition of the Team, the Browns affiliate, StadCo, was assigned certain rights and obligations under a lease for HBF, where the Team plays most of its home games.  The HBF Lease expires in 2029. The HBF Lease does not automatically renew, StadCo is under no obligation to renew the HBF Lease, and neither is the City. In other words, the time for which the Team is to play at HBF is set to naturally expire under the operation of the HBF Lease in 2029, and the Team has no right, or obligation, to play at HBF after expiration of the HBF Lease.

28.     The Browns and StadCo have at all times complied with the terms of the HBF Lease, and the Team will continue to play most of its home games at HBF through the remainder of that HBF Lease term, *i.e.*, through the 2028 NFL season.

29.     In 2017, over a decade before the HBF Lease for HBF was set to expire, the Browns began working in cooperation with the City on options for potential renovation of HBF and other future stadium options.

30.     Following many years of cost benefit analysis and consideration of multiple stadium options conducted in cooperation with the City, the Browns recently indicated to the City

that they would be focusing on a domed stadium option in the City of Brook Park, which neighbors the City. The Browns would not begin playing any games in the potential Brook Park domed stadium until after the expiration of the HBF Lease.

31.    In May of 2024, the City passed Emergency Ordinance 391-2024, authorizing and directing the City Law Director to enforce the Modell Law against the Browns.

32.    In October of 2024, the City Law Director, and certain City Council members and other City officials, made numerous statements to the effect that the City intended to take action against the Browns and would seek to enforce the Modell Law to prevent the Team from playing at a stadium in Brook Park, or outside the City.

33.    In comments to local media, the City Law Director conceded that the Modell Law interferes with the Browns' contractual arrangements with the NFL and NFL rules, noting that the City itself would not purchase the Team because "[m]y understanding of the NFL is they prohibit cities from doing that."[2]

34.    Moreover, the City Law Director admitted that the purpose of the City's enforcement of the Modell Law is to give local purchasers a preference over other individuals who may be located in states other than Ohio, stating that the City is prepared to "file a lawsuit to require the Browns to make their team available for local purchasers who will keep the team in the City of Cleveland."[3]

35.    Plainly, based on the City's emergency ordinance and recent statements of City officials, the City takes the position that the Modell Law is constitutional and enforceable and that

---

[2] https://www.news5cleveland.com/sports/browns/battle-over-new-browns-stadium-could-play-out-in-court

[3] *Id.*

the Browns' indication that they are pursuing the option of a stadium in Brook Park violates that statute.

36.     The Browns deny that the Modell Law is constitutional and deny any violation of that statute.

## COUNT I
### Declaratory Judgment – Violation of Due Process – Void for Vagueness

37.     The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

38.     Pursuant to 28 U.S.C. § 2201, there is a real and justiciable controversy between the Browns and the City concerning whether R.C. 9.67 is a valid and enforceable statute.

39.     The City takes the position that the Browns must comply with R.C. 9.67, which the Browns deny.

40.     The statute is so vague and ambiguous that neither the Browns nor any other owner of a professional sports franchise in Ohio has fair notice about what conduct the statute contemplates or forbids.

41.     It is a basic principle of due process that a statute is void for vagueness if its prohibitions are not clearly defined. *Memphis Ctr. For Reprod. Health v. Slatery*, No. 20-5969, 2020 U.S. App. LEXIS 36780, at \*4-5 (6th Cir. Nov. 20, 2020) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

42.     To survive a void for vagueness challenge, a statute must "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. . ." *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 341-42 (6th Cir. 2007) (quoting *Colautti v. Franklin*, 439 U.S. 379, 390, 99 S. Ct. 675, 58 L. Ed. 2d 596 (1979)).

9

43. R.C. 9.67 vaguely requires the owner of a professional sports team who relocates the team "elsewhere," to either: (i) enter into an agreement with the local political subdivision; or (ii) give "six months' advance notice of the owner's intention to cease playing most of its home games at the facility" and give individuals "who reside in the area" the "opportunity" to purchase the team. R.C. 9.67(B).

44. None of these terms provide a person of ordinary intelligence with any notice whatsoever as to what conduct is covered by the statute or what is required to comply.

45. For example, how far must a team move to be located "elsewhere"? Is a new stadium across the street "elsewhere"? A different location within the same city? Outside the City but within the same county? Outside Northeast Ohio? Outside the State of Ohio?

46. Similarly, an owner must give "six months' advance notice of the owner's intention" to move the team. R.C. 9.67(B). But when does an owner manifest the "intention" to move the team? At the beginning of the planning stage? When renderings are unveiled publicly? When land for the new stadium is under contract? When construction begins? When the new stadium is ready for use? The statute gives no guidance when an owner attempting to comply with the statute must send this notice.

47. The statute is also unclear what "area" is covered when it requires that "individuals who reside in the area" must have the opportunity to purchase the team. *Id.* Does this include all residents in the City of Cleveland? Cuyahoga County? Northeast Ohio? The State of Ohio? Again, the statute fails to specify which individuals have an opportunity to purchase the team and which offers an owner must consider.

48. The statute also does not specify what kind of "opportunity" must be given to those individuals who want to purchase the team. Must all offers be considered? And how much

consideration should each offer receive? How much due diligence are prospective buyers entitled to? Must a privately owned team open its books and records to the entire public? Must the prospective buyer agree to keep the team at the current facility? Again the statute is silent where it must be precise.

49. Rather than meet their obligation to draft laws that are "clearly defined" and provide "fair notice" to the public, Ohio lawmakers swayed to the political pressures of the day by enacting a symbolic yet incomprehensible statute that is impermissibly vague and unconstitutional.

50. Therefore, R.C. 9.67 is void for vagueness, is unconstitutional, and cannot be enforced as to the Browns.

51. As a result, the rights, status, or other legal obligations of the Browns and the City are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 is unconstitutional will terminate the uncertainty and controversy which has given rise to this proceeding.

## COUNT II
### Declaratory Judgment – Violation of Dormant Commerce Clause

52. The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

53. Pursuant to 28 U.S.C. § 2201, there is a real and justiciable controversy between the Browns and the City concerning whether the Art Modell Law, R.C. 9.67 is a valid and enforceable statute.

54. The City takes the position that the Browns must comply with R.C. 9.67 and that the statute is constitutional, which the Browns deny.

55. The Commerce Clause of the United States Constitution affirmatively grants Congress the power to "regulate Commerce … among the several States." U.S. Const. art. I, § 8.

56.     The dormant Commerce Clause, in consequence, restricts states from enacting laws that discriminate against interstate commerce by advantaging in-state firms or disadvantaging out-of-state rivals.  *See, e.g., Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 370-7 (2023); *Department of Revenue of Ky. v. Davis*, 553 U. S. 328, 337-338 (2008).

57.     The dormant Commerce Clause further restricts states from placing burdens on interstate commerce that are clearly excessive when compared with putative local benefits. *Nat'l Pork Producers Council*, 598 U.S. at 377 (2023); *Pike v. Bruce Church, Inc.*, 397 U. S. 137, 142 (1970).

58.     R.C. 9.67 violates the dormant Commerce Clause by advantaging in-state economic actors and disadvantaging out-of-state rivals by, among other things, giving Ohio political subdivisions and Ohio residents preferential treatment and special rights with respect to purchase of professional sports organizations that is not afforded to residents of states other than Ohio.

59.     R.C. 9.67 violates the dormant Commerce Clause by placing excessive burdens on interstate commerce without advancing any legitimate local interest.

60.     R.C. 9.67 has no connection to public safety, health, or well-being.

61.     As a result, the rights, status, or other legal obligations of the Browns and the City are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 is unconstitutional will terminate the uncertainty and controversy which has given rise to this proceeding.

## COUNT III
### Declaratory Judgment – Violation of Contract Clause

62.    The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

63.    Pursuant to 28 U.S.C. § 2201, there is a real and justiciable controversy between the Browns and the City concerning whether R.C. 9.67 is a valid and enforceable statute.

64.    The Browns and the NFL are parties to the NFL Franchise Agreement, which provides the terms pursuant to which the Team is permitted to play as an NFL franchise.

65.    The Franchise Agreement prohibits the Browns from selling the Team without the express written consent of the NFL.

66.    The Franchise Agreement also allows the Browns to relocate the Team and play games outside of HBF Stadium where the NFL agrees.

67.    The City takes the position that R.C. 9.67 may be enforced as to the Browns to either prevent the Browns from exercising their rights pursuant to the NFL Franchise Agreement to move the Stadium or to force a sale of the Team in direct contravention of the terms of the NFL franchise agreement.

68.    The Browns maintain that they: (i) may exercise their rights pursuant to the NFL Franchise Agreement to move the Stadium; and (ii) cannot give others an opportunity to purchase the Team in compliance with R.C. 9.67 without breaching the Franchise Agreement.

69.    Article I, Section 10 of the United States Constitution states, in relevant part, "No state shall . . . pass any . . . Law impairing the Obligation of Contracts."

70.    This clause is generally referred to as the "Contract Clause."

71.    In analyzing whether or not a statute violates the federal Contract Clause, courts have imposed a two-part test: (1) did the state law operate as a substantial impairment of a

contractual relationship; and (2) is the state law appropriately and reasonably drawn in a way that advances a significant and legitimate public purpose.

72. R.C. 9.67 substantially impairs the Browns' NFL Franchise Agreement and purports to void fundamental terms of the NFL Franchise Agreement by: (1) depriving the Browns of a critical bargained-for value in the form of the option to move the Stadium; or (2) forcing the Browns to offer the Team for purchase in direct contravention of the terms of the NFL Franchise Agreement.

73. If the Browns were to comply with the statute, they would be in breach of the NFL Franchise Agreement.

74. Complying with R.C. 9.67 would require the Browns to breach the NFL Franchise Agreement and, therefore, the statute violates the Contract Clause.

75. R.C. 9.67 was not appropriately and reasonably drawn in a way that advances a significant and legitimate public purpose.

76. Therefore, R.C. 9.67 violates the Contract Clause and is unconstitutional and cannot be enforced as to the Browns.

77. As a result, the rights, status, or other legal obligations of the Browns and the City are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 will terminate the uncertainty and controversy which has given rise to this proceeding.

## COUNT IV
### Declaratory Judgment – Violation of Privileges and Immunities Clause

78. The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

79. Pursuant to 28 U.S.C. § 2201, there is a real and justiciable controversy between the Browns and the City concerning whether R.C. 9.67 is a valid and enforceable statute.

80.     The City takes the position that the Browns must comply with R.C. 9.67, which the Browns deny.

81.     The Privileges and Immunities Clause of the United States Constitution provides that a state may not enact laws that discriminate against citizens of other states.  U.S. Const. art. 4, § 2; *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449 (2019); *Alerding v. Ohio High Sch. Atheltic Ass'n*, 779 F.2d 315, 317 (6th Cir. 1985).

82.     R.C. 9.67 violates the Privileges and Immunities Clause by creating opportunities for Ohio citizens at the expense of similar opportunities for citizens of other states by giving local Ohio residents the opportunity to purchase the Team that is not afforded to residents of states other than Ohio.

83.     As a result, the rights, status, or other legal obligations of the Browns and the City are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 is unconstitutional will terminate the uncertainty and controversy which has given rise to this proceeding.

<u>**COUNT V**</u>
**Declaratory Judgment – Unconstitutional As Applied**

84.     The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

85.     Even if a statute has some permissible use, it may be unconstitutional as applied to a particular party. *See Carroll v. City of Cleveland*, 522 Fed. App'x 299, 306 (6th Cir. 2013).

86.     As described in Counts I through IV above, R.C. 9.67 is unenforceable against the Browns because it violates the: (I) Dormant Commerce Clause; (II) Contract Clause; (III) Privileges and Immunities Clause; and (IV) Due Process Clause, all of the United States Constitution.

87.     Even if there is some permissible use for R.C. 9.67 as applied to others, it is unenforceable as enforced against the Browns. For example, the City Law Director himself concedes that, as applied to the Browns, R.C. 9.67 would violate NFL rules and contractual arrangements with the Browns.

88.     Therefore, R.C. 9.67 is unconstitutional as applied to the Browns.

89.     As a result, the rights, status, or other legal obligations of the Browns and the City are uncertain and insecure, and a declaratory judgment from this Court that R.C. 9.67 is unconstitutional as applied to the Browns will terminate the uncertainty and controversy which has given rise to this proceeding.

<u>**COUNT VI – In The Alternative to COUNTS I-V**</u>
**R.C. 9.67 – Compliance with the Modell Law**

90.     The Browns incorporate the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

91.     R.C. 9.67 requires that the owner of a professional sports team that uses a tax-supported facility for most of its home games and receives financial assistance from the state or a political subdivision thereof shall not cease playing most of its home games at that facility unless it (i) enters into an agreement with the political subdivision; or (ii) give "six months' advance notice of the owner's intention to cease playing most of its home games at the facility. . ."

92.     The requirements of R.C. 9.67 have no application in the case of the Browns, as the duration for which the Team is set to play at HBF is spelled out in the HBF Lease between the City and StadCo, and all parties know already that the HBF Lease is set to expire in 2029.

93.     When the HBF Lease expires in 2029, the Team will no longer be playing at a facility supported by tax-payer funds as contemplated by R.C. 9.67.

16

94. The Browns have not yet broken ground on or even finalized a deal for any new stadium and have repeatedly stated their intention for the Team to continue to play most of its home games at HBF through the remainder of the HBF Lease term, well into 2029.

95. The Browns have no right or obligation for the Team to continue to play at HBF beyond the expiration of the HBF Lease in 2029.

96. Similarly, the City has no obligation to renew the term of the HBF Lease beyond 2029.

97. R.C. 9.67 does not require the Browns or the City to sign a new lease and is plainly intended to prevent a team that is currently playing in a tax-supported facility from moving from that location. The Browns have not, and do not intend, to move while they are obligated to play at HBF. In short, R.C. 9.67 simply does not apply to the matter of where the Team will play its home games after the expiration of the HBF Lease, and the City already has full knowledge of the duration of that lease.

98. Therefore, the Browns are entitled to a declaration from this Court that the Browns' actions do not trigger or violate R.C. 9.67.

**WHEREFORE**, the Browns respectfully request that this Court:

A. Enter a declaratory judgment finding that R.C. 9.67 is unconstitutional *per se* because it violates:

    i.      the Due Process Clause of the United States Constitution

    ii.     the Dormant Commerce Clause of the United States Constitution;

    iii.    the Contract Clause of the United States Constitution; and

    iv.    the Privileges and Immunities Clause of the United States Constitution;

B. A judgment finding that R.C. 9.67 is unconstitutional as applied to the Browns;

   C.     In the alternative, if this Court finds that R.C. 9.67 is constitutional, a judgment finding that the Browns' actions do not trigger or violate R.C. 9.67;

   D.     An award of Plaintiff's reasonable attorney's fees and costs; and

   E.     Such other necessary and proper relief, both legal and equitable, including attorney's fees and other costs, as this Court deems just and proper.

DATED:      October 24, 2024

                                   Respectfully submitted,

                                   /s/ Anthony C. White
                                   Anthony C. White (0062146)
                                   Robert F. Ware (0055515)
                                   Kip T. Bollin (0065275)
                                   Thomas M. Ritzert (0085370)
                                   Kyle A. Hutnick (0095673)
                                   THOMPSON HINE LLP
                                   3900 Key Center
                                   127 Public Square
                                   Cleveland, OH 44114
                                   Phone: (216) 566-5500
                                   Fax: (216) 566-5800
                                   Tony.White@ThompsonHine.com
                                   Rob.Ware@ThompsonHine.com
                                   Kip.Bollin@ThompsonHine.com
                                   Thomas.Ritzert@ThompsonHine.com
                                   Kyle.Hutnick@ThompsonHine.com

                                   *Attorneys for Plaintiff*

Electronically Filed 01/14/2025 15:55 / / CV 25 110189 / Confirmation Nbr. 3377194 / CLJSZ

# UNITED STATES DISTRICT COURT

for the

Northern District of Ohio

| | |
|---|---|
| Cleveland Browns Football Company LLC | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
| The City of Cleveland | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   The City of Cleveland
601 Lakeside Avenue
Room 227
c/o Mark D. Griffin, Chief Law Officer
Cleveland, Ohio 44114

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*SANDY OPACICH, CLERK OF COURT*

Date: _____10/24/2024_____     _____

*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (i))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Cleveland Browns Football Company LLC | The City of Cleveland |

**(b)** County of Residence of First Listed Plaintiff   Cuyahoga
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Thompson Hine LLP, 3900 Key Center, 127 Public Square, Cleveland, Ohio 44114, (216) 566-5500

Attorneys *(if Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | **PERSONAL INJURY** ☐ 365 Personal Injury - Product Liability | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** ☐ 370 Other Fraud | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 751 Family and Medical Leave Act | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | ☐ 791 Employee Retirement Income Security Act | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | **SOCIAL SECURITY** ☐ 861 HIA (1395ff) | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 862 Black Lung (923) | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 863 DIWC/DIWW (405(g)) | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI | |
| | | ☐ 555 Prison Condition | ☐ 865 RSI (405(g)) | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | **FEDERAL TAX SUITS** ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| | | **IMMIGRATION** ☐ 462 Naturalization Application | ☐ 871 IRS—Third Party 26 USC 7609 | |
| | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 2201
Brief description of cause:
Declaratory judgment claim seeking declaration that Ohio statute is unconstitutional on its face and as applied to Plaintiff.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
October 24, 2024

SIGNATURE OF ATTORNEY OF RECORD
/s/ Anthony C. White

**FOR OFFICE USE ONLY**

RECEIPT #   AMOUNT   APPLYING IFP   JUDGE   MAG. JUDGE

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO

**I.**  Civil Categories: (Please check one category only ).

  1. ☑  General Civil
  2. ☐  Administrative Review/Social Security
  3. ☐  Habeas Corpus Death Penalty

  *If under Title 28, §2255, name the SENTENCING JUDGE: _____

  CASE NUMBER: _____

**II.  RELATED OR REFILED CASES** See LR 3.1 which provides in pertinent part: "If an action is filed or removed to this Court and assigned to a District Judge after which it is discontinued, dismissed or remanded to a State court, and subsequently refiled, it shall be assigned to the same Judge who received the initial case assignment without regard for the place of holding court in which the case was refiled. Counsel or a party without counsel shall be responsible for bringing such cases to the attention of the Court by responding to the questions included on the Civil Cover Sheet."

This action: ☐ is **RELATED** to another **PENDING** civil case ☐ is a **REFILED** case ☐ was **PREVIOUSLY REMANDED**

**If applicable, please indicate on page 1 in section VIII, the name of the Judge and case number.**

**III.**  In accordance with Local Civil Rule  **3.8**, actions involving counties in the Eastern Division shall be filed at any of  the divisional offices therein.  Actions involving counties in the Western Division shall be filed at the Toledo office. For the purpose of determining the proper division, and for statistical reasons, the following information is requested.

ANSWER ONE PARAGRAPH ONLY. ANSWER PARAGRAPHS 1 THRU 3 IN ORDER.  UPON FINDING WHICH PARAGRAPH APPLIES TO YOUR CASE, ANSWER IT AND STOP.

(1)  **Resident defendant** If the defendant resides in a county within this district, please set forth the name of such county
**COUNTY**:  Cuyahoga
Corporation **For the purpose of answering the above, a corporation is deemed to be a resident of that county in which it has its principal place of business in that district.**

(2)  **Non-Resident defendant**. If no defendant is a resident of a county in this district, please set forth the county wherein the cause of action arose or the event complained of occurred.
**COUNTY**:

(3)  **Other Cases**. If no defendant is a resident of this district, or if the defendant is a corporation not having a principle place of business within the district, and the cause of action arose or the event complained of occurred outside this district, please set forth the county of the plaintiff's residence.
**COUNTY**:

**IV.**  The Counties in the Northern District of Ohio are divided into divisions as shown below.  After the county is determined in Section  III, please check the appropriate division.

**EASTERN DIVISION**

☐  **AKRON**  .  (Counties: Carroll, Holmes, Portage, Stark, Summit, Tuscarawas and Wayne)
☑  **CLEVELAND**  (Counties: Ashland, Ashtabula, Crawford, Cuyahoga, Geauga, Lake, Lorain, Medina and Richland)
☐  **YOUNGSTOWN**  (Counties: Columbiana, Mahoning and Trumbull)

**WESTERN DIVISION**

☐  **TOLEDO**  (Counties: Allen, Auglaize, Defiance, Erie, Fulton, Hancock, Hardin, Henry, Huron, Lucas, Marion, Mercer, Ottawa, Paulding, Putnam, Sandusky, Seneca VanWert, Williams, Wood and Wyandot)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**  **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**  **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**  **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. **(See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.**  **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**  **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**  **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**  **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.