# Exhibit A

## IN THE FRANKLIN COUNTY COURT OF COMMON PLEAS
### GENERAL DIVISION

**State of Ohio ex rel. Ohio Attorney**
**General Mike DeWine, et al.,**　　　　:

　　　　　　　　　　　　　　　　　　　　　:　　**Case No. 18-CV-001864**

　　　　　　　　　　**Plaintiffs,**

　　　　　　　　　　　　　　　　　　　　　:　　**Judge Jeffrey M. Brown**

　　**vs.**

　　　　　　　　　　　　　　　　　　　　　:

**Precourt Sports Ventures, LLC, et al.,**

　　　　　　　　　　　　　　　　　　　　　:

　　　　　　　　　　**Defendants.**

### DECISION AND ENTRY DENYING DEFENDANTS' MOTION TO DISMISS

**BROWN, J.**

　　　　This matter comes before the Court on the Motion to Dismiss filed by Defendants Precourt Sports Ventures, LLC ("PSV"), Major League Soccer, L.L.C. ("MLS"), Team Columbus Soccer, L.L.C., and Crew Soccer Stadium Limited Liability Company (collectively "Defendants"). Specifically, Defendants move to dismiss the Amended Complaint in this action for failure to state a claim upon which relief may be granted pursuant to Civ.R. 12(B)(6). Plaintiffs City of Columbus and Ohio Attorney General Mike DeWine (collectively "Plaintiffs") jointly filed a Memorandum Contra to Defendants' Motion to Dismiss. After a delay described below, Defendants filed a Reply in Support. The parties then presented their oral arguments on the motion to the Court on September 4, 2018. For the reasons that follow, Defendants' Motion to Dismiss is **DENIED.**

### I.　　INTRODUCTION

　　　　This is a unique case, for two main reasons. First, the Court is faced with the challenge of interpreting a statute never addressed by any court. It's a matter of first impression, so to speak. Second, to borrow words from defense counsel's opening statement at oral argument, "this is an emotionally fraught case." These emotions and the interests at stake in this matter reach well

1

beyond just the parties. The outcome in this case has the potential to either uplift the spirits of, or drive a stake through the devoted heart of a loyal and vocal sector of the local citizenry—the sports fan. "Fans get so much from identifying with a team, in ways even players don't. The athletes can be mercenaries, but the fan is permanent." Stone, *The Psychology of Being a Sports Fan*, Seattle Times (Feb. 15, 2014), available at https://www.seattletimes.com/sports/the-psychology-of-being-a-sports-fan/, quoting Eric Simons, *The Secret Lives of Sports Fans: The Science of Sports Obsession*.

To many, following a sports team extends well beyond cheering one's favorite team to victory on game day. Planting oneself in the seats of the sports team's home venue imbeds a common root that unites and sprouts a forest of fans growing from the same soil—love and devotion to the home team. Sports teams and their fans are an integral part of any community. Teams and their fans are essential threads, and their devotion to each other weaves a fabric of community identity.

Indeed, Defendants' conduct which formed the basis of this action was also the catalytic agent uniting soccer fans locally and around the globe, spawning the #SaveTheCrew movement. The organization fashions itself as more than just a collaboration of broken-hearted soccer fans— it is a community advocacy group. #SaveTheCrew's platform and meteoric rise in membership and influential weight underlines the "communal, social, and civic bond[1]" generated by sports fandom.

The untested statute before the Court is R.C. 9.67. Born out of the relocation of the National Football League's Cleveland Browns to the city of Baltimore by then-owner Art Modell, R.C. 9.67 is commonly coined "the Modell Law." (Am. Compl. at ¶ 5.) Modell's decision to move the

---

[1] https://savethecrew.com/pdfs/Mission%20Statement.pdf.

Browns to Baltimore stemmed from his belief that the City of Cleveland would not support an

upgrade to the aging Cleveland Municipal Stadium—the outdoor sports facility shared with Major

League Baseball's Cleveland Indians until a newly-constructed baseball park opened in 1994—or

support construction of a new facility where the Browns could play its home games. As a result of

Modell's lack of faith in the City of Cleveland's willingness or ability to support a new or upgraded

facility, he announced the team's impending departure on November 6, 1995, just one day before

Cuyahoga County voters approved an extension of a tax on cigarettes and alcohol to fund stadium

renovations. Heider, Diemer, and Theiss, *Browns Bolt: Modell Warned Mayor, Governor a Month

Ago; Deal Announced in Baltimore*, Plain Dealer Extra (Nov. 7, 1995), available at

http://blog.cleveland.com/pdextra/2012/09/nov_7_1995_browns_bolt_modell.html (updated Sept.

14, 2012, last accessed Oct. 11, 2018).

A testament to the substantial importance and emotionally-uniting value, prestige, and

overall psychological well-being sports brings to a city's devoted sports fans, the Browns move

sparked "litigation, Congressional hearings, and a nationwide debate about the use of public funds

to build and upgrade facilities for wealthy owners of professional sports teams." (Am. Compl. at ¶

5.) The General Assembly adopted R.C. 9.67 in June 1996 as part of a compromise to bring

professional football back to Cleveland. *Id.*

The full text of the statute, upon which the ultimate resolution of this case turns, is as

follows:

### Restrictions on owner of professional sports team that uses a tax-supported facility.

No owner of a professional sports team that uses a tax-supported facility for
most of its home games and receives financial assistance from the state or a
political subdivision thereof shall cease playing most of its home games at

3

the facility and begin playing most of its home games elsewhere unless the owner either:

(A) Enters into an agreement with the political subdivision permitting the team to play most of its home games elsewhere;

(B) Gives the political subdivision in which the facility is located not less than six months' advance notice of the owner's intention to cease playing most of its home games at the facility and, during the six months after such notice, gives the political subdivision or any individual or group of individuals who reside in the area the opportunity to purchase the team.

R.C. 9.67.

Plaintiffs' Amended Complaint seeks both declaratory and injunctive relief. Specifically, Plaintiffs request a declaratory judgment finding: (1) that R.C. 9.67 applies to each Defendant separately; (2) that PSV and MLS must provide Plaintiff City of Columbus with at least six-month's notice before effectuating a move of the Crew from Columbus to Austin, Texas, or to any other city; and (3) that during said notice period PSV and MLS must offer the city and any individual or group of individuals residing in the Columbus area a reasonable opportunity to purchase the Crew and prevent the team's move, or negotiate an agreement under which the Crew could permissibly relocate and play most of its home games in a city other than Columbus. (Am. Compl. post ¶ 44, Claim for Relief ¶ 1.) Plaintiffs further seek a preliminary and permanent injunction precluding PSV and MLS from moving the Crew to Austin, Texas, or to any other city, absent compliance with R.C. 9.67. (*Id.*, Claim for Relief ¶ 2.) Lastly, Plaintiffs seek "[c]ontinuing oversight by the Court to ensure that PSV and MLS negotiate in good faith with the City of Columbus and any individual or group of individuals residing in the Columbus area [and provide] a reasonable opportunity to buy the Crew." (*Id.*, Claim for Relief ¶ 3.)

Defendants raise four independent reasons to dismiss Plaintiffs' Amended Complaint. Defendants first contend that R.C. 9.67 by its terms does not apply to them, embracing principles

4

of statutory construction and interpretation. (*See* Mot. to Dismiss at 3.) The remaining three reasons Defendants suggest warrant dismissal of Plaintiffs' Amended Complaint are on constitutional grounds. Defendants maintain that R.C. 9.67 violates the dormant Commerce Clause of the United States Constitution. (*See* Mot. to Dismiss at 4.) They also argue that the statute violates the Privileges and Immunities Clause. *Id.* Finally, Defendants contend that R.C. 9.67 is unconstitutionally vague and therefore void. *Id.*

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Much of the relevant factual background set forth in the Court's May 8, 2018 Entry addressing, among other things, Plaintiffs' Motion to Toll R.C. 9.67 and the parties' motions concerning discovery, also applies to the instant matter. As such, the Court recites for convenience the applicable facts as set forth in said Entry, with the limitation correctly noted by Defendants that the factual allegations set forth in Plaintiffs' Amended Complaint are accepted as true solely for purposes of the instant Motion to Dismiss. *Volbers-Klarich v. Middletown Mgmt., Inc.*, 125 Ohio St.3d 494, 2010-Ohio-2057, 912 N.E.2d 106, ¶ 12. Additionally, because the Court's review of a motion to dismiss under Civ.R. 12(B)(6) is generally confined to the allegations in the complaint and it may not consider other allegations, evidence, or considerations that are outside of the pleading, certain factual background statements recited in the May 8, 2018 Entry which were attributable to other motions are omitted from this Decision and Entry. *State ex rel. Fuqua v. Alexander*, 79 Ohio St.3d 206, 207, 680 N.E.2d 985 (1997). For example, allegations raised in Plaintiffs' Motions to Toll cannot be considered in the Court's review of Defendants' Motion to Dismiss.

### A.     Factual Background

Columbus Crew SC ("the Crew") is one of 23 professional soccer teams owned by MLS. (Am. Compl. at ¶¶ 1, 12.) MLS formed in 1993, and awarded the City of Columbus one of the league's first ten teams in 1994. (*Id.* at ¶¶19-20.) The league's inaugural season was in 1996. (*Id.* at ¶ 21.) Lamar Hunt and family were the first operator/investors of the Crew. (*Id.* at ¶ 20.) The Crew played its home games in The Ohio State University's football stadium from 1996 through the 1998 season. *Id.* Crew Soccer Stadium [LLC] then entered into a twenty-five (25) year lease with the State of Ohio in 1998 for land owned by the Ohio Expo Commission, on which MLS's first soccer-specific stadium would be constructed. (*Id.* at ¶ 22.) The Crew now plays most of its home games in MAPFRE Stadium, which is owned by Team Columbus Soccer, L.L.C. and sits on the aforementioned 15.25-acre state-owned property located within the city's territorial boundaries—Crew Soccer Stadium [LLC] leases the property from the State of Ohio. (*Id.* at ¶¶ 10, 14.)

The Hunt family sold its operator/investor interest in the Crew back to MLS in 2013. (*Id.* at ¶ 25.) PSV purchased said interest in the Crew from MLS that same year and now manages the team. (*Id.* at ¶¶ 11, 25.) Plaintiffs' Amended Complaint states that when PSV purchased the operator/investor interest in the team, it also became the sole member of Team Columbus Soccer, L.L.C. with rights to operate the Crew. (*Id.* at ¶¶ 1, 13, 27.) PSV also, according to the Amended Complaint, became the sole member of Crew Soccer Stadium [LLC], the entity which leases the grounds upon which MAPFRE Stadium is located.

Anthony Precourt ("Mr. Precourt") is the chief executive officer of PSV. (*Id.* at ¶ 1.) In October 2017, Mr. Precourt announced that PSV was seriously considering moving the Crew from Columbus if the city or private investors could not guarantee that a downtown stadium would be

6

built for the team, naming Austin, Texas as the new home city for the relocated team. (*Id.* at ¶¶ 2, 11, 28.) MLS Commissioner Don Garber ("Mr. Garber") allegedly endorsed PSV "explor[ing]" its "options in Austin" during his "State of the League" address in December 2017. (Am. Compl. at ¶ 2.) In fact, Mr. Garber purportedly acknowledged a so-called "Austin Clause" whereby MLS agreed in the 2013 operator/investor agreement with PSV that the team could move there. *Id.* Plaintiffs contend that Mr. Garber also acknowledged that MLS and PSV had intentionally not made the "Austin clause" public. *Id.*

Defendants state that while considering relocation of the Crew, PSV has been open to hearing offers from interested buyers. (Defs.' Mot. to Dismiss at 6.) Moreover, they state that "Mr. Precourt has engaged in discussions with at least one potential local investor regarding keeping Crew SC in Columbus." *Id.* Plaintiffs contend, however, that the city "has had no meaningful indications from Mr. Precourt or Mr. Garber about the Crew remaining in Columbus * * *." (Am. Compl. at ¶ 30.) As discussed below, however, it appears Columbus and Crew fans were recently tossed a life preserver, ironically from a rescue boat with the current owner of the Cleveland Browns at the helm.

As a result of the Columbus-to-Austin relocation developments at the time, Ohio Attorney General Mike DeWine sent Mr. Precourt a letter on December 8, 2017. (Ex. A, March 5, 2018 Compl.) In addition to urging Mr. Precourt "keep the Crew in Columbus," the letter states "in light of continued accounts that you are 'exploring * * * potentially relocating the Club to the city of Austin, Texas,' I write to reiterate your obligations under Ohio law." (*Id.* at first paragraph.)

## B.    Procedural Background

Although not determinative of the instant matter, the Court finds it beneficial to summarize

7

the relevant procedural background in this case. As previously stated, this Court issued a Journal

Entry and Order on May 8, 2018, which accomplished the following:

1. Granted in part Plaintiffs' Motion to Toll R.C. 9.67, thereby instituting a 90-day "pause" on the six-month notice period set forth in the statute;
2. Granted in part Defendants' Motion to Stay Discovery, thereby issuing a general stay of discovery during the 90-day toll of R.C. 9.67's six-month notice period, save for information and materials necessary for potential bone fide purchasers to make a valuation and offer to purchase;
3. Ordered Plaintiff Ohio Attorney General Mike DeWine's Motion to Compel Discovery held in abeyance until further order of the Court;
4. Deferred ruling on the instant Motion to Dismiss until the expiration of the 90-day toll of R.C. 9.67's six-month notice period or until further order of the Court[2]; and
5. Set forth a schedule for the Court to conduct separate meetings with Plaintiffs and Defendants, at which the Court and the parties would
   a. explore the potential for resolution of this matter through a mutually agreed settlement,
   b. determine what constitutes a bona fide purchaser,
   c. discuss the imposition of bona fide purchaser preconditions, if any, and
   d. consider any other matters which might lend to a potential settlement and otherwise facilitate negotiations between the parties for settlement of this case, with the assistance of this Court.

Although the Court conducted meetings with the parties—individually—pursuant to its

May 8, 2018 Order, the schedule and structure of the negotiations and discussions as set forth in

Section IV of said Order was not followed or was otherwise disrupted. This was due to the fact

that, on May 14, 2018, Defendants filed a Notice of Appeal of this Court's May 8, 2018 Order

with the Tenth District Court of Appeals. This Court took the position that the appeal divested the

Court of jurisdiction to proceed with settlement discussions and facilitation of negotiations in

accordance the May 8 Order.

---

[2] As noted below, the toll was ultimately extended for a period of 44 days after remand from the Tenth District Court of Appeals.

The Tenth District dismissed Defendants' appeal for lack of jurisdiction and remanded the matter to this Court on June 21, 2018. Because the appeal precluded action consistent with the May 8, 2018 Order, this Court ordered a 44-day extension of the original 90-day toll to commence on August 6, 2018. Once this Court regained jurisdiction, it continued to monitor settlement negotiations as outlined in the May 8, 2018 Order.

In addition to extending the 90-day toll or "pause," the Court ordered the parties to present oral arguments on Defendants' Motion to Dismiss. On September 4, 2018, the Court allotted each side 45 minutes to present arguments and entertain questions from the Court. Defendants' Motion to Dismiss is now deemed submitted for ruling and ripe for adjudication.

## C.    Post-Oral Argument Developments

Cognizant of the fact that it is generally confined to the allegations contained in the complaint when deciding a Civ.R. 12(B)(6) motion to dismiss for failure to state a claim (discussed infra), *Neinast v. Ohio Expositions Comm'n*, 10th Dist. No. 09AP-349, 2009-Ohio-4850, ¶ 8, the Court would nevertheless be remiss in failing to acknowledge the developments in this matter following oral arguments. To be sure, "[a] trial court may take judicial notice of 'appropriate matters' in considering a Civ.R. 12(B)(6) motion to dismiss for failure to state a claim. *Charles v. Conrad*, 10th Dist. Franklin No. 05AP-410, 2005-Ohio-6106, ¶ 26, citing *State ex rel. Neff v. Corrigan*, 75 Ohio St.3d 12, 16, 1996-Ohio-231, 661 N.E.2d 170. Although "appropriate matters" generally refers to "prior proceedings in the immediate case," *State ex rel. Chafin v. Brown*, 10th Dist. Franklin No. 16AP-572, 2017-Ohio-198, ¶ 16, the Court finds reference to the developments more than appropriate, if not necessary.

On October 12, 2018, MLS issued the following statement:

Major League Soccer and the Columbus Partnership have been working together for several months on a plan to keep Crew SC in Columbus and we have made significant progress.

Recently, the Haslam Family—along with the Columbus-based Edwards Family, have joined the effort to keep Crew SC in Columbus.

MLS, the Columbus Partnership and the investor group all agree that for the club to be successful in Columbus, it requires strong local partners, long-term corporate support, a strong season ticket base and long-term plans for a stadium, practice facilities and associated sites.

MLS is committed to keeping Crew SC in Columbus should we continue to make progress on these critical components and agree to key terms with the investor group.

MLS recognizes the cooperation Precourt Sports Ventures has demonstrated throughout the process to date.

MLS also remains very committed to PSV's plan to launch an MLS club in Austin and is excited for Austin to become a great addition to MLS. We will continue to work with PSV and the City of Austin on the timing around the launch of Austin FC.

MLSsoccer staff, *Cleveland Browns owners emerge as potential buyers of Columbus Crew SC*,

(Oct. 12, 2018), https://www.mlssoccer.com/post/2018/10/12/cleveland-browns-owners-emerge-

potential-buyers-columbus-crew-sc.

The apparent cessation of efforts to move the team to Austin notwithstanding, the parties have not advised the Court of an intent to no longer pursue this action. Therefore, this Court must proceed with ruling on Defendants' Motion to Dismiss.

## III.  STANDARDS OF REVIEW

### A.  Notice Pleading

Ohio is a notice pleading state. Notice pleading in Ohio means that "a plaintiff is not required to prove his or her case at the pleading stage." *York v. Ohio State Highway Patrol*, 60 Ohio St.3d 143, 144-145, 573 N.E.2d 1063 (1991). The policy behind such standard is due to the

fact that "many plaintiffs lack access to relevant evidence, which can be obtained only through discovery from materials in the defendant's possession." *State ex rel. Cincinnati Enquirer v. Ronan*, 124 Ohio St.3d 17, 2009-Ohio-5947, 918 N.E.2d 515, ¶ 7. If courts required a plaintiff to prove a case in the complaint, many valid claims would be dismissed because of the plaintiff's lack of access to relevant evidence. *York* at 145.

Civ.R. 8(A), the civil procedure rule embodying the notice pleading standard, provides in relevant part:

> A pleading that sets forth a claim for relief…shall contain (1) a short and plain statement of the claim showing that the party is entitled to relief, and (2) a demand for judgment for the relief to which the party claims to be entitled.

Complaints must give the defendant(s) fair notice of the nature of the action. *Ford v. Brooks*, 10th Dist. No. 11AP-664, 2012-Ohio-943. Subject to limited exceptions, including those in Civ.R. 9, a plaintiff need not plead operative facts with particularity. *Mills v. Deehr*, 8th Dist. No. 82799, 2004-Ohio-2410, ¶ 9.

### B.     Motions to Dismiss Under Civ.R. 12(B)(6)

A motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Civ.R. 12(B)(6) tests the sufficiency of the pleading. *Harvest Credit Mgmt. VII v. Ryan*, 10th Dist. No. 09AP-1163, 2010-Ohio-5260, ¶ 4. The Court's review is confined to the allegations in the complaint and the Court may not consider other allegations, evidence, or considerations that are outside of the pleading. *State ex rel. Fuqua*, 79 Ohio St.3d at 207. Courts may, however, "consider memoranda, briefs, and oral arguments on legal issues" when deciding a Civ.R. 12(B)(6) motion, "and this material is not considered to constitute matters outside the pleadings that would necessitate a summary-judgment determination." *State ex rel. Scott v. City of Cleveland*, 112 Ohio

11

St.3d 324, 2006-Ohio-6573, 859 N.E.2d 923, ¶ 26, citing 5C Wright and Miller, *Federal Practice and Procedure*, Section 1366, 182-183 (2004) (analyzing similarly worded federal rule); *see, also, State ex rel. Neff*, 75 Ohio St.3d at 16, and cases cited therein (courts may take judicial notice of appropriate matters in determining Civ.R. 12(B)(6) motion without converting it to a motion for summary judgment).

As noted in Section II of this Decision and Entry, in reviewing such a motion, this court must presume that the facts alleged in the complaint are true and all reasonable inferences must be made in favor of the non-moving party. *O'Brien v. Univ. Community Tenants Union, Inc.*, 42 Ohio St.2d 242, 327 N.E.2d 753 (1975); *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 532 N.E.2d 753 (1988). Dismissal under Civ.R. 12(B)(6) is appropriate only when it appears beyond doubt from the face of the complaint that the plaintiff can prove no set of facts warranting relief after all factual allegations are presumed true and all reasonable inferences are made in the plaintiff's favor. *State ex rel. Neff*, 75 Ohio St.3d at 14. "[A]s long as there is a set of facts, consistent with the plaintiff's complaint, which would allow the plaintiff to recover, the court may not grant a defendant's motion to dismiss." *York*, 60 Ohio St.3d at 145.

## C.  Statutory Construction Rules

There is no shortage of rules of statutory construction. When construing a statute, a court's paramount concern is ascertaining the legislative intent in enacting the statute and giving effect to that intent. *State ex rel. Steele v. Morrissey*, 103 Ohio St.3d 355, 2004-Ohio-4960, 815 N.E.2d 1107; *Cochrel v. Robinson*, 113 Ohio St. 526, 149 N.E. 871 (1925). To discern the General Assembly's intent, courts "first consider the statutory language, reading words and phrases in context and construing them in accordance with rules of grammar and common usage." *State ex rel. Stoll v. Logan County Bd. of Elections*, 117 Ohio St.3d 76, 81, 881 N.E.2d 1214 (2008). If the

12

language of the statute conveys a clear, unequivocal, and definite meaning, then the interpretive inquiry is at an end and the statute must be applied as written. *See, e.g., State v. Roberts*, 134 Ohio St.3d 459, 2012-Ohio-5684, 983 N.E.2d 334, ¶ 21; *State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.*, 74 Ohio St.3d 543, 1996-Ohio-291, 660 N.E.2d 463. If, however, the statute is silent or ambiguous, a court is charged with construing the language in a manner that reflects the intent of the General Assembly. *Clark v. Scarpelli*, 91 Ohio St.3d 271, 274, 2001-Ohio-39, 744 N.E.2d 719, citing *Cochrel*, paragraph four of the syllabus. "A statute is ambiguous when its language is subject to more than one reasonable interpretation." *Lang v. Dir., Ohio Dep't of Job & Family Servs.*, 134 Ohio St.3d 296, 299, 2012-Ohio-5366, 982 N.E.2d 636, ¶ 14, quoting *Clark* at 274.

When a court undertakes the task of statutory interpretation, it may consider a host of factors, including the object sought to be attained by the statute, the legislative history, the circumstances under which the statute was enacted, and the consequences of a particular construction. R.C. 1.49; *Family Medicine Found., Inc. v. Bright*, 96 Ohio St.3d 183, 2002-Ohio-4034, 772 N.E.2d 1177, ¶ 9; *Brooks Capital Servs., LLC v. 5151 Trabue Ltd.*, 10th Dist. Franklin No. 12AP-30, 2012 Ohio App. LEXIS 3901 (Sep. 27, 2012), ¶ 19. Just as the General Assembly is presumed not to intend an absurd result in the operation of its statutes, courts have a duty when construing statutes to avoid the same. *State ex rel. Haines v. Rhodes*, 168 Ohio St. 165, 151 N.E.2d 716 (1958), paragraph two of the syllabus. "Rather, courts must seek to construe the statute to operate sensibly." *Brooks Capital Servs., LLC* at ¶ 20, citing *State ex rel. Carna v. Teays Valley Local School Dist. Bd. of Edn.*, 131 Ohio St.3d 478, 2012-Ohio-1484, 967 N.E.2d 193, ¶ 19, quoting *State ex rel. Saltsman v. Burton*, 154 Ohio St. 262, 268, 95 N.E.2d 377 (1950) (noting that " '[s]tatutes must be construed, if possible, to operate sensibly and not to accomplish foolish

13

results' "). The Court must read the words and phrases of R.C. 9.67 "*in context*" and construe them according to their customary usage, and shall endeavor to interpret R.C. 9.67 "in a manner that most readily furthers the legislative purpose as reflected in the wording used in the legislation." R.C. 1.42 (emphasis added); *State ex rel. Toledo Edison Co. v. City of Clyde*, 76 Ohio St.3d 508, 513, 1996-Ohio-376, 668 N.E.2d 498.

### D. Constitutional Presumption

It is a fundamental principle of Ohio law that "a court must 'presume the constitutionality of [the state's] lawfully enacted legislation.' " R.C. 1.47(A); *City of Cleveland v. State*, 128 Ohio St. 3d 135, 2010-Ohio-6318, 942 N.E.2d 370, ¶ 6, quoting *Arnold v. Cleveland*, 67 Ohio St.3d 35, 38, 616 N.E.2d 163 (1993), citing *Univ. Hts. v. O'Leary*, 68 Ohio St.2d 130, 135, 429 N.E.2d 148 (1981). A party challenging the constitutionality of a statute bears the burden of overcoming that presumption. *Id.* "A court's power to invalidate a statute is a power to be exercised only with great caution and in the clearest of cases." *Columbia Gas Transmission Corp. v. Levin,* 117 Ohio St. 3d 122, 2008-Ohio-511, ¶ 41 (quotation omitted). All "doubts regarding the validity of a legislative enactment are to be resolved in favor of the statute." *State v. Smith*, 80 Ohio St. 3d 89, 99-100 (1997) (quotation omitted). In the context of a facial challenge, the heavy burden is on the challenging party to show that a statute is unconstitutional in *all* of its applications. *Harrold v. Collier*, 107 Ohio St. 3d 44, 2005-Oho-5334, ¶ 37 ("A facial challenge to a statute is the most difficult to bring successfully because the challenger must establish that there exists no set of circumstances under which the statute would be valid."). Simply because a statute "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid * * *." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095 (1987).

14

## IV.    DISCUSSION

In short, Defendants argue Plaintiffs' Amended Complaint should be dismissed for four main, independent reasons, each with several sub-bases for dismissal. As stated previously, the first of Defendants' primary justifications for dismissal is that R.C. 9.67 does not, by its terms and in conjunction with the allegations plead in Plaintiffs' Amended Complaint, apply to Defendants. The remaining grounds for dismissal Defendants put forth are constitutional in nature: they argue that the statute violates the Dormant Commerce Clause and the Privileges and Immunities Clause of the United States Constitution, and contend that R.C. 9.67 is unconstitutionally vague and therefore void. Defendants also argue that if the Court were to adopt Plaintiffs' interpretation of R.C. 9.67 it "might yield further unconstitutional actions," namely the impermissible taking of intangible property (PSV's interest in the Crew and its equity interest in MLS), and a violation of the Contracts Clause of the United States Constitution and Ohio Constitution. (Mot. to Dismiss at 18-24.)

### A.    Applicability

Defendants argue that R.C. 9.67 does not apply to them for multiple reasons. To advance this argument Defendants parse the statute into two separate and distinct criterion that must be attributable to the "owner" of a professional sports team in order to trigger R.C. 9.67's application. They contend that two financial preconditions must be established: (1) the use of a tax-supported facility, and (2) receipt of financial assistance from the state or political subdivision.

15

Claiming that MLS is the "true owner[3]" of the Crew, Defendants maintain the Amended Complaint fails to sufficiently allege that MLS either used a tax-supported facility or received the type of financial assistance necessary to trigger the statute. In other words, Defendants claim that the Amended Complaint fails to assign the allegations to the appropriate party—allegations which, if true, would trigger application of R.C. 9.67.

Secondly, Defendants argue that, regardless of the entity on which the focus is directed, the Amended Complaint fails to allege receipt by any party (either the PSV entities or MLS) of the type of financial assistance that would activate R.C. 9.67. While urging the Court to adopt a conjunctive reading of R.C. 9.67's assistance clauses requiring satisfaction of the two independent preconditions mentioned above, Defendants assert that the Amended Complaint only alleges the receipt of benefits that relate to the use of a tax-supported facility. Defendants contend that the Amended Complaint fails to allege facts sufficient to meet the statute's second "financial assistance" requirement.

In sum, Defendants' applicability argument is two-fold. First, R.C. 9.67 does not apply to MLS, the true owner of the Crew. Second, employing the rules of statutory construction, Defendants argue that R.C. 9.67 contains two independent financial preconditions that must be alleged in a complaint in order to survive a motion to dismiss challenge. Thus, even if the Amended Complaint alleged facts sufficient to show that R.C. 9.67 did apply to MLS, Defendants contend

---

[3] Defendants claim Plaintiffs acknowledge that MLS is the owner of the Crew, citing to paragraphs 1 and 12 of the Amended Complaint to support this contention. In paragraph one Plaintiffs state "Mr. Precourt is the chief executive officer of Precourt Sports Ventures LLC ("PSV"), the Crew's 'operator/investor.' " Paragraph 12 of the Amended Complaint states, "MLS is the 'owner' of the Crew, which is a 'professional sports team.' MLS is a limited liability company formed in Delaware." As noted below, however, it cannot be said that Plaintiffs undoubtedly concede this point.

16

Plaintiffs have failed to show that any of the named Defendants received benefits in the form of financial assistance detached from the use of a tax-supported facility.

1.  "Owner of a Professional Sports Team"

Defendants state that R.C. 9.67, by its terms, applies only to the "*owner* of a professional sports team that uses a tax-supported facility for most of its home games and receives financial assistance from the state or a political subdivision thereof." (Mot. to Dismiss at 7 (emphasis sic).) Throughout the course of this case, Defendants have maintained that MLS is the owner of the Crew. To be sure, at oral argument MLS's counsel referred to the Crew as "just an asset. It's not a jural entity. It is an asset owned by someone: MLS." As mentioned above, Defendants claim Plaintiffs acknowledge MLS's status as owner of the Crew. As shown below, however, Plaintiffs do not concede this point.

Defendants contend that Plaintiffs' Amended Complaint fails to allege that MLS—as distinct from PSV and its entities—received any support from the state or the City of Columbus necessary to trigger application of R.C. 9.67. In short, because MLS is undisputedly the owner of the Crew and R.C. 9.67 applies to the owner, Defendants argue that Plaintiffs' failure to make the aforementioned allegations means their Amended Complaint fails to state a claim upon which relief can be granted and should therefore be dismissed under Civ.R. 12(B)(6).

Defendants claim the Amended Complaint contains a mere few dubious instances of allegations of assistance received that focus specifically on MLS, and even then, they are legal conclusions couched as factual allegations. Defendants cite to Paragraph 7 which states, "[t]he Crew plays its home games in 'a tax-supported facility,' and PSV and MLS have accepted 'financial assistance' from Ohio and Columbus." They claim this allegation is insufficient to state

17

a claim against MLS for two reasons. First, Defendants make a temporal argument, maintaining that R.C. 9.67's use of the present-tense ("*receives* financial assistance") makes the allegation that MLS "accepted" financial assistance in the past irrelevant. (R.C. 9.67 (emphasis added).) Second, Defendants argue the Amended Complaint fails to provide facts to support the allegation in Paragraph 7 and is therefore a legal conclusion that the Court is not bound to accept as true. *See, e.g., Carasalina, LLC v. Smith Phillips & Assocs.*, 10th Dist. No. 13AP-1027, 2014-Ohio-2423, ¶ 14, quoting *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986).

Defendants point also to Paragraph 43 which claims, "Mapfre Stadium is a 'tax-supported facility' and Crew owners have received 'financial assistance from the state or a political subdivision.' " They contend, however, that the allegation in Paragraph 43 does not provide any specificity as to the type of financial assistance received and merely restates the language of R.C. 9.67.

Paragraph 44 of the Amended Complaint is the only instance Defendants concede that Plaintiffs set forth the form of benefits received. Defendants contend, however, that Paragraph 44 does not save Plaintiffs' Amended Complaint from dismissal because it fails to expressly direct those allegations at MLS, the Crew's true owner. (Defendants also argue that Paragraph 44 fails to allege the receipt of financial assistance beyond benefits that relate to the use of a tax-supported facility, discussed infra.) Defendants' position on Paragraph 44 is that it "simply lists the same alleged subsidies that Paragraph 10 attributes to the 'Crew and its affiliates' without alleging that any such subsidies were provided to MLS." (Reply at 3, citing Compl. ¶¶ 10, 43-44.)

The last sentence captures the crux of the applicability dispute. Defendants believe that where R.C. 9.67 refers "owner," it must mean the team's true owner—here, MLS. Conversely,

18

Plaintiffs urge that the statute "applies to owners whose *teams* have been given public dollars."

(Memo Contra Mot. to Dismiss at 3 (emphasis sic).)

First, as hinted above, Plaintiffs urge the Court to not rely on Defendants' representations

about who owns the Crew for purposes of deciding the instant motion. Plaintiffs note that the only

litigation tackling the ownership issue found that MLS is not a single entity, holding as follows:

> MLS has, to say the least, a unique structure, even for a sports league. MLS
> retains significant centralized control over both league and individual team
> operations. MLS owns all of the teams that play in the league (a total of 12 prior
> to the start of 2002) [now 23], as well as all intellectual property rights, tickets,
> supplied equipment, and broadcast rights. MLS sets the teams' schedules;
> negotiates all stadium leases and assumes all related liabilities; pays the salaries
> of referees and other league personnel; and supplies certain equipment.
>
> * * *
>
> However, MLS has also relinquished some control over team operations to
> certain investors. * * * These investors are referred to as operator/investors and
> are the co-defendants in this action. Each operator/investor has the "exclusive
> right and obligation to provide Management Services for a Team within its
> Home Territory" and is given some leeway in running the team and reaping the
> potential benefits therefrom.
>
> Specifically, the operator/investors hire, at their own expense and discretion,
> local staff (including the general managers and coaches of their respective
> teams), and are responsible for local office expenses, local promotional costs
> for home games, and one-half the stadium rent (the same portion as MLS). In
> addition, they license local broadcast rights, sell home tickets, and conduct all
> local marketing on behalf of MLS; agreements regarding these matters do not
> require the prior approval of MLS. * * *.

*Fraser v. Major League Soccer*, 284 F.3d 47, 53-54 (1st Cir.2002).

In that case the First Circuit Court of Appeals reviewed a decision from the United States

District Court for the District of Massachusetts, which granted summary judgment on certain

claims to MLS, nine of its operator/investors, and the United States Soccer Federation, Inc., in an

action brought by players alleging antitrust violations. *Id.* at 52. The matter ultimately went to trial

on the remaining claims not dismissed via summary judgment, and the jury returned a special verdict in favor of MLS et al. *Id.*

Although it ultimately affirmed the district court, the First Circuit held "that the case for applying single entity status to MLS and its operator/investors has not been established but that in this case the jury verdict makes a remand on the section 1 [Sherman Act] claim unnecessary." *Id.* at 56. Furthermore, although concluding "that the single entity problem need not be answered definitively in this case[,]" the First Circuit did find "the case for applying the single entity label to MLS" was "debatable." *Id.* at 59.

Secondly, Plaintiffs urge the Court to consider "Defendants' own representations * * * to question their claims" about ownership. (Memo Contra at 4.) This includes the fact that, even after the filing of Defendants' Motion to Dismiss, "Anthony Precourt continued to hold himself out as the 'owner' of the Crew[,]" pointing to Mr. Precourt's Twitter account as of April 19, 2018, at 9:55 p.m. *Id.* Further, Plaintiffs note that, "although [Mr. Precourt] has subsequently altered that description, other so-called 'operator/investors' have continued to refer to themselves as 'owners.' " *Id.*, citing Sounders FC Front Office, Seattle Sounders FC (Apr. 20, 2018) available at https://perma.cc/AUA9-ZR5Q; Ownership, Los Angeles Football Club (Apr. 20, 2018) available at https://perma.cc/X2AK-EX32; Arthur Blank, Atlanta United FC (Apr. 20, 2018) available at https://perma.cc/R8KC-PZX2. As stated above, however, in deciding a motion to dismiss under Civ.R. 12(B)(6) the Court "must limit its consideration to the four corners of the complaint." *Singleton v. Adjutant Gen. of Ohio*, 10th Dist. Franklin No. 02AP-971, 2003-Ohio-1838, ¶ 18. Accordingly, the Court will not give weight to these representations in making the instant ruling.

Defendants argue in their Motion to Dismiss that instead of alleging MLS received the necessary public support to trigger the statute's application, Plaintiffs instead allege that "the Crew

and its affiliates" accepted said support. They point to *Spit Shine A Detailer, L.L.C. v. Rick Case Hyundai*, 2017-Ohio-8888, 100 N.E.3d 1231 (8th Dist.) to support dismissing a complaint naming a defendant but failing to allege facts necessary to explain the basis for suing that defendant. The dismissed claim in *Spit Shine A Detailer, L.L.C.*, however, was a fraud claim which "must be pleaded with particularity under Civ.R. 9(B), a rule that places a higher burden than is normally required upon the person asserting such a claim to support general allegations with specific facts." *Reasoner v. State Farm Mut. Auto Ins. Co.*, 10th Dist. Franklin No. 01AP-490, 2002-Ohio-878, ¶ 35, citing *Carter-Jones Lumber Co. v. Denune*, 132 Ohio App.3d 430, 433, 725 N.E.2d 330 (10th Dist. 1999). Such a heightened pleading standard is not applicable here.

Defendants further argue that the ordinary meaning of the word "affiliates" does not encompass an owner. (Mot. to Dismiss at 8, citing *Bond Safeguard Ins. Co. v. Dixon Builders I, LLC*, 12th Dist. Butler No. CA2011-02-027, 2012-Ohio-3313, ¶ 44 (an "affiliate" is a company "effectively controlled by, associated with, related to, and/or under the common ownership or control of another" company).) Defendants posit that, therefore, the Amended Complaint fails to allege facts sufficient to establish that R.C. 9.67 applies to MLS and because no other Defendant is the team owner, the Amended Complaint fails to state a claim under the statute and should be dismissed. (Reply at 3.)

Defendants claim that Plaintiffs try to solve this problem by rewriting the statute so that both conditions would attach to the term "team"—not to "owner." *Id.* According to Defendants, "[t]hat does not work." *Id.* To demonstrate, Defendants demarcate the statute's clauses as follows:

> No owner of a professional sports team that [1] uses a tax-supported facility for most of its home games and [2] receives financial assistance from the state or a political subdivision thereof [3] shall cease playing most of its home games at the facility and begin playing most of its home games elsewhere unless the owner either * * *.

21

R.C. 9.67 (emphasis and numbering added). Defendants maintain that Plaintiffs' argument is that each of the above-numbered clauses refers to "professional sports team." (*Id.*, citing Pls.' Memo Contra at 3.) Defendants posit that if such reading were correct, "the subject of the overall sentence ('No owner') would have no corresponding predicate and would play no role in the statutory text." *Id.* Defendants argue this reading is ungrammatical and wrong. They also claim

> [i]t would be ungrammatical to read clauses [1] and [2] as applying to the team and clause [3] as applying to the owner, because both [1] and [3] use the same phrase, "most of its home games." Obviously, it makes no sense to think that the sentence was referring both to "most of the *team's* home games" and also to "most of the *owner's* home games." Indeed, subparagraph B of R.C. 9.67 refers expressly to the *"owner's* intention to cease playing most of *its* home games at the facility." *See id.* (emphasis added). All three instances of the same phrasing should be interpreted the same way.

*Id.* at fn. 2.

The correct reading, according to Defendants, is that the subject of each clause is "owner," thus "the *owner* must use a tax-supported facility, the *owner* must receive financial assistance from the state or a political subdivision, and the *owner* is the one that ceases playing most of its home games at the facility." *Id.* at 4. Defendants contend that because "MLS is the undisputed owner, those requirements have not been pleaded." *Id.*

The Court finds that Defendants' reading of R.C. 9.67 does not permit the statute "to operate sensibly," and their construction of its words and phrases would "accomplish foolish results." *State ex rel. Saltsman*, 154 Ohio St. at 268. Taking Defendants' interpretation to its logical conclusion would require the owner (MLS, as a corporate entity) to be the persons actually playing the soccer games in MAPFRE Stadium, as opposed to the team. Simply put, that is "an illogical or absurd result" which the Court must avoid when interpreting statutes. *See Brooks Capital Servs.*, *supra*, at ¶ 20. Nor could such a reading be what the General Assembly imagined when drafting

22

R.C. 9.67. Instead, it is clear from the language and structure of R.C. 9.67 that the statute unequivocally applies to an "owner of a professional sports *team that uses* a tax-supported facility for most of its home games," and *team* that "receives financial assistance from the state or a political subdivision thereof." Plaintiffs are correct in construing the restrictive word "that" to apply to *the team* which both "uses" a tax-supported facility and "receives" financial assistance. To be sure, it is the *professional sports team* satisfying R.C. 9.67's prerequisites that cannot "cease *playing* most of *its* home games at the [tax-supported] facility." It defies logic and common sense to think the General Assembly meant the owner—and not the team—to play those games.

The Court further finds that the General Assembly's use of the word "owner" was in direct response to the conditions which brought about the R.C. 9.67's enactment in the first place. Art Modell surreptitiously took the Browns from Cleveland to Baltimore, while he was the team's *owner*. Furthermore, this Court cannot imagine a better, more common-sense term to describe the person, entity, or capacity having the authority to resolve to relocate a professional sports team than that team's owner.

Defendants' argument turns on the notion that MLS does not derive any benefit from the financial assistance received by the remaining Defendants. But Defendants have failed to show that Plaintiffs cannot establish that MLS does in fact receive some benefit, either directly or indirectly. There simply is not enough evidence before the Court at this time to demonstrate Plaintiffs cannot prove this potential fact. Regarding an "owner of a professional sports team," the Court therefore finds that Plaintiffs' Amended Complaint sufficiently alleges the conditions for R.C. 9.67 to apply to Defendants. Plaintiffs allege at Paragraph 12 that MLS is the owner of the Crew, and list the benefits covered by R.C. 9.67 that are provided to both the Crew and MLS. Those allegations are adequate to defeat Defendants' Motion to Dismiss on

ownership/applicability grounds. Because Ohio is a notice-pleading state, Plaintiffs need not prove these allegations in their Amended Complaint.

2. Financial Preconditions

The second prong of Defendants' applicability argument concerns the financial assistance clauses of R.C. 9.67. Defendants contend that a proper reading of the statute reveals two separate and independent financial preconditions which must be established in order for R.C. 9.67 to apply. Because the statute contains the word "and," not "or," Defendants argue that "Plaintiffs must demonstrate *both* that Crew SC plays in a 'tax-supported facility' *and* that the team owner 'receives financial assistance from the state or a political subdivision.' " (Mot. to Dismiss at 8-9 (emphasis sic).)

Defendants argue that Plaintiffs' Amended Complaint only alleges facts sufficient to establish the "tax-supported facility" requirement. Defendants specifically cite to Plaintiffs' allegations of taxpayer-funded improvements to MAPFRE Stadium's parking facilities, a property tax exemption for the land on which MAPFRE Stadium sits, a below-market lease for the land on which MAPFRE Stadium sits, taxpayer-funded construction on MAPFRE Stadium's water supply, and a taxpayer-funded road that benefits MAPFRE Stadium. (Mot. to Dismiss at 9.) Defendants maintain that each of the above constitute taxpayer support exclusively for MAPFRE Stadium, sufficient only to argue that the stadium is indeed a "tax-supported facility." They cite *Cleveland Elec. Illuminating Co. v. Cleveland,* 37 Ohio St.3d 50, 52-54, 524 N.E.2d 441 (1988) and *State ex rel. Fostoria Daily Review Co. v. Fostoria Hosp. Ass'n,* 40 Ohio St. 3d 10, 12, 531 N.E.2d 313 (1988) for the principle that the term "tax support" has a broad meaning. Defendants contend that Plaintiffs' Amended Complaint fails to allege any financial support unrelated to MAPFRE Stadium and have therefore failed to state a claim under R.C. 9.67.

24

Plaintiffs, citing to ¶¶ 43-44 of their Amended Complaint, counter that these paragraphs expressly allege the tax support *and* financial assistance that the Crew receives and has received from Ohio and the City of Columbus. They maintain that these allegations, which must be accepted as true at the motion to dismiss stage, sufficiently allege the financial preconditions necessary to trigger R.C. 9.67's application to Defendants. Plaintiffs also state that the Amended Complaint alleges, in the present tense: (1) that Defendants lease the land upon which MAPFRE Stadium sits at a below-market value; (2) that in response to Defendants' lobbying the state paid $5 million to improve and pave the parking lot which is presently used by Crew-game attendees; (3) that the city entered into a Tax Increment Financing and Economic Development Agreement to extend Silver Drive, which Crew-game attendees use to access MAPFRE Stadium; and (4) that the land upon which MAPFRE Stadium is located remains tax exempt. (Am. Compl. at ¶¶ 9, 44.) Plaintiffs argue these allegations are more than adequate to state a claim against Defendants under R.C. 9.67 and to defeat Defendants' Motion to Dismiss.

Plaintiffs assert that in order to avoid the consequences of their Amended Complaint's properly-stated allegations, Defendants attempt to create statutory ambiguity by claiming the requirement that a team "receives financial assistance" is satisfied only when the team is receiving a direct subsidy at the very moment of the announced move. Plaintiffs are correct that by using the present tense verb "receive" in R.C. 9.67, the Generally Assembly simply intended for the law to operate prospectively. *See, e.g., State v. Consilio*, 114 Ohio St.3d 295, 2007-Ohio-4163 (statutes possess a general presumption of prospective application). The General Assembly merely intended to indicate that the requirements of R.C. 9.67 are triggered upon receipt of financial assistance after the statute's effective date.

25

Moreover, the Court does not agree that the term "financial assistance" as used in R.C. 9.67 excludes public funds relating to MAPFRE Stadium. Even if it did, Plaintiffs have alleged Defendants received other public benefits making R.C. 9.67 applicable. Such benefits include parking improvements, infrastructure improvements funded through tax increment financing arrangements, and below market land leases. (Am. Compl. at ¶ 44.)

The Court finds that R.C. 9.67 is not as limited as Defendants suggest. The terms "financial" and "assistance" enjoy the usual, ordinary meaning of the words. *See Merriam Webster's Collegiate Dictionary* 436 (10th Ed. 1993) (defining "financial" as "relating to finance" and "finance" as "money or other liquid resources of a government, business, group, or individual"); *Id.* at 70 (defining "assistance" as "the act of assisting or the help supplied" or "aid (financial and technical.)" The Court finds that there is no question that the assistance alleged in ¶ 44 of the Amended Complaint constitutes the type of financial assistance covered by R.C. 9.67. Similarly, the property tax exemption that the Crew receives also qualifies as "financial assistance" under R.C. 9.67. To be eligible for the exemption, a team must show that its stadium was paid for in whole or in part with public funds. R.C. 5709.081(B)(2)(b). Thus, because public financing necessarily must predate an exemption, the exemption itself is an independent form of taxpayer assistance that is unrelated to other tax support for a facility. Accordingly, the Court declines to follow Defendants' interpretation of R.C. 9.67.

B.    **Constitutional Challenges**

Defendants contend that Plaintiffs' reading of R.C. 9.67 erects "numerous substantive barriers to any relocation of Crew SC that appear nowhere in the statutory text." (Mot. to Dismiss at 10.) Defendants maintain that under Plaintiffs' interpretation "R.C. 9.67 requires Defendants to afford interested buyers in Ohio a 'reasonable' opportunity to purchase the team." *Id.* Defendants

26

assert that Plaintiffs also read the statute as authorizing this Court to engage in "continuing oversight" to "ensure that PSV and MLS negotiate in good faith" with potential bona fide purchasers. *Id.*

Defendants argue that the plain text of the statute does not support the above reading. They note that the word "reasonable" does not appear in the statute, "much less next to the description of the 'opportunity' that must be provided." *Id.*, citing R.C. 9.67. Furthermore, Defendants note that R.C. 9.67 "says nothing about 'continuing oversight' or any requirement to negotiate in good faith." *Id.* They contend that such a reading would violate the United States Constitution and Ohio law, and that "principles of Constitutional avoidance would strongly counsel the Court to steer clear of an interpretation that raises so many Constitutional difficulties." *Id.*, citing *In re D.S.*, 2017-Ohio-8289, 93 N.E.3d 937, at ¶ 7 (for the notion that courts should avoid reaching constitutional issues where other courts can resolve the case on other grounds). The Court addresses Defendants' constitutional arguments in turn.

1.  Dormant Commerce Clause

The Commerce Clause of the United States Constitution authorizes Congress "[t]o regulate Commerce * * * among the several States." U.S. Constitution, Article I, Section 8, cl. 3. " 'Though phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce.' " *State v. Eal*, 10th Dist. Franklin No. 11AP-460, 2012-Ohio-1373, ¶ 61, quoting *Oregon Waste Sys. v. Dept. of Environmental Quality*, 511 U.S. 93, 98 (1994). This interpretation has come to be known as the dormant Commerce Clause. *See Dep't of Revenue v. Davis,* 553 U.S. 328, 337-38 (2008). In the "dormant" form, the Commerce Clause " 'denies the States the power unjustifiably to discriminate against or burden the interstate

27

flow of articles of commerce.' " *Am. Bev. Assn. v. Snyder*, 735 F.3d 362, 369 (6th Cir.2013),

quoting *Oregon Waste Sys.* at 98. "[T]he dormant Commerce Clause is driven by concern about

'economic protectionism—that is, regulatory measures designed to benefit in-state economic

interests by burdening out-of-state competitors.' " *Dept. of Revenue v. Davis*, 553 U.S. 328, 337-

338 (2008), quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273-274 (1988). Due to

the fact, however, that "the ability of Congress to regulate every single item of interstate commerce

is impractical, if not impossible, states are free to regulate items of 'local character' so long as the

exercise of this regulatory power is executed within the confines of the Commerce Clause itself.

*Ecological Sys. v. City of Dayton*, 2d Dist. Montgomery Nos. 18950, 18951, 18966, 2002-Ohio-

388, quoting *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623 (1978).

Policies designed to benefit citizens of one state to the detriment of citizens of other states

are paradigmatic violations of the dormant Commerce Clause. Examples of such violations cited

by Defendants include: *W. Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 194-95 (1994) (pricing

order imposing a uniform fee on all milk sold in Massachusetts violated the dormant Commerce

Clause because its "avowed purpose and its undisputed effect are to enable higher cost

Massachusetts dairy farmers to compete with lower cost dairy farmers in other States"); *Beskind

v. Easley,* 325 F.3d 506, 509, 515 (4th Cir. 2003) (statute that prohibited out-of-state wine

manufacturers from shipping directly to North Carolina violated the dormant Commerce Clause

because the statute treated in-state manufacturers differently from out-of-state manufacturers to

the benefit of the former); *Dayton Power & Light Co. v. Lindley,* 58 Ohio St.2d 465, 474, 391

N.E.2d 716 (1979) (Ohio coal consumption tax was invalid where it effectively encouraged the

consumption of Ohio coal and discouraged the consumption of out-of-state coal); *Ecological Sys.,

Inc.,* 2002-Ohio-388 (ordinance violated dormant Commerce Clause where it prohibited the

28

discharge of materials from "another state into the City of Dayton's wastewater facilities"). *See also, e.g., Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 576 (Commerce Clause "precludes a state from mandating that its residents be given a preferred right of access" to benefits "over out-of-state consumers").

An exception to the dormant Commerce Clause is recognized by courts where the state acts as a market participant as opposed to a market regulator. *White v. Mass. Council of Constr. Employers*, 460 U.S. 204, 208 (1983) ("when a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause"). Plaintiffs urge the Court to adopt this market-participant exception, claiming that Ohio and the City of Columbus "acted as market participants when they provided financial assistance to the Columbus Crew." (Memo Contra at 10.) Plaintiffs specifically claim that they participated in the "financial services industry" when they provided financial support to Defendants for the purpose of constructing MAPFRE Stadium "and when they provide on-going taxpayer support to the Crew in the form of a tax-exemption through R.C. 5709.081 (which the General Assembly modified specifically for [Defendants'] benefit)." (Memo Contra at 11.) Plaintiffs contend that Defendants could have avoided the requirements of R.C. 9.67 by "seek[ing] funding from private banks or other financial firms[,]" but instead "Defendants sought—and obtained—taxpayer money." *Id.* Plaintiffs assert that Defendants have benefitted from this choice by receiving public funds bearing no interest and with no repayment obligation, and that R.C. 9.67 (in effect at the time Defendants accepted the funds) secured to Plaintiffs the benefit of this purported "bargain" by imposing "requirements to help protect the public's investment in the Crew should the team seek to relocate." *Id.*

The market-participant doctrine applies "when a sovereign acts as a consumer or vendor in commerce [because] its actions as a market participant are distinct from its actions as a market

regulator." *Shaper v. Tracy*, 97 Ohio App.3d 760, 763, 647 N.E.2d 550 (10th Dist.1994). "[W]hen

a state chooses to sell bonds and enter the securities market, [for example,] it is acting as a market

participant." *Id.* at 763-764. By choosing to tax its own citizens, however, the state "is acting as a

market regulator." *Id.* at 764. Indeed, the United States Supreme Court has said that the market-

participant doctrine has no application where

> [t]he Ohio action ultimately at issue is neither its purchase nor its sale of
> ethanol, but its assessment and computation of taxes—a primeval governmental
> activity. To be sure, the tax credit scheme has the purpose and effect of
> subsidizing a particular industry, as do many dispositions of the tax laws. That
> does not transform it into a form of state participation in the free market.

*Limbach* (1988), 486 U.S. at 277.

Plaintiffs' arguments and the cases cited in support do not convince the Court that the

market-participant exception to the dormant Commerce Clause is applicable here. As noted by

Defendants on page 16 of their Reply, in *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976),

the United States Supreme Court found that Maryland acted as a market participant where it

entered the market for the purchase of automobile hulks and therefore was allowed to control the

disposition and movement of those hulks. *Id.* at 806. In *White,* the high court found that City of

Boston acted as a market participant when it hired contractors to perform City-sponsored

construction projects. 460 U.S. at 214. In *Davis*, the U.S. Supreme Court found that Kentucky

acted as a market participant by issuing bonds, thereby "competing in the market for limited

investment dollars." 553 U.S. at 345. Each of those actions involved the government buying or

selling a good or service. Here, Plaintiffs are not in the market of buying or selling a good or

service. Accordingly, the Court finds the market-participant exception does not apply.

As such, the Court must proceed with an analysis of Defendants' dormant Commerce

Clause challenge. The first step in analyzing a law challenged under the dormant Commerce Clause "is to determine whether it 'regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce.' " *Oregon Waste Sys.* at 99, quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979). Put differently, this Court must determine whether R.C. 9.67 "directly regulates or discriminates against interstate commerce, or [whether] its effect is to favor in-state economic interests over out-of-state interests." *Int'l Dairy Foods Assn. v. Boggs*, 622 F.3d 628, 648 (6th Cir.2010), quoting *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986).

A law discriminates against interstate commerce when it treats in-state and out-of-state economic interests differently, benefitting the former and burdening the latter. *Oregon Waste Sys.* at 99. Such differential treatment "is not limited to attempts to convey advantages on local merchants; it may include attempts to give local consumers an advantage over consumers in other states." *Camps Newfound/Owatonna, Inc*, 520 U.S. at 577-578. A discriminatory restriction on commerce "is virtually *per se* invalid." *Oregon Waste Sys.* at 99.

Where a court finds that a challenged statute is "neither discriminatory nor extraterritorial," the court should apply the balancing test outlined in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), and uphold it "unless the burden it imposes upon interstate commerce is 'clearly excessive in relation to the putative local benefits.' " *Am. Beverage Ass'n*, 735 F.3d at 370 (quoting *Pike*, 397 U.S. at 142). The Court here pauses to note that a statute is extraterritorial if it "directly controls commerce occurring wholly outside the boundaries of a State * * *." *Healy v. Beer Inst. Inc.*, 491 U.S. 324, 336 (1989). R.C. 9.67 does no such thing, and thus an "extraterritorial" analysis is not necessary. The Court further notes Defendants argument that *Pike* does not come into play

31

here because R.C. 9.67 on its face treats in-state residents differently from out-of-state residents and discriminates against interstate commerce. As shown below, the Court disagrees.

a)     *R.C. 9.67 is Not Discriminatory*

"A statute can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect." *E. Kentucky Resources v. Fiscal Court*, 127 F.3d 532, 540 (6th Cir.1997), citing *Wyoming v. Oklahoma*, 502 U.S. 437, 454-455 (1992). "[T]he critical consideration is the overall effect of the statute on both local and interstate activity." *Brown-Forman*, 476 U.S. at 579. The party challenging the statute bears the initial burden of proof to show that the state regulation is discriminatory. *Davis*, 553 U.S. at 338.

### Facial Discrimination

To determine whether R.C. 9.67 violates the dormant Commerce Clause, the Court must "first ask whether it discriminates on its face against interstate commerce." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007), citing *Am. Trucking Ass'ns v. Mich. PSC*, 545 U.S. 429, 433 (2005); *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources*, 504 U.S. 353, 359 (1992). "[D]iscrimination against interstate commerce in favor of local business or investment is *per se* invalid * * *." *C & A Carbone v. Town of Clarkstown*, 511 U.S. 383, 392, citing *Maine v. Taylor*, 477 U.S. 131 (1986). Thus, a state law is *per se* invalid if it provides "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers* at 338, citing *Oregon Waste Sys.*, 511 U.S. at 99; *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988).

Defendants argue that, by its terms, R.C. 9.67 unconstitutionally favors citizens of Ohio over citizens of other states because when a team owner fails to obtain permission to relocate, the

32

statute prohibits relocation unless the owner "gives the political subdivision or any individual or group of individuals *who reside in the area* the opportunity to purchase the team." R.C. 9.67 (emphasis added). They claim that potential purchasers who reside outside Ohio do not receive the same privilege. But that is not what the text of R.C. 9.67 says, and Defendants are injecting words into the statute in order to advance their dormant Commerce Clause argument.

On its face, R.C. 9.67 is neutral in its application. The statute on its face does not show "an 'obvious effort to saddle those outside the State' with the burden of complying with the regulation." *Am. Beverage Ass'n*, 735 F.3d at 371, quoting *Chem. Waste Mgmt. Inc., v. Hunt*, 505 U.S. 334, 346 (1992). Rather, the statute necessarily requires in-state presence to be triggered. While it is true that the statute requires owners playing in a taxpayer-funded stadium and having received public financial assistance to give "the political subdivision or any individual or group of individuals who *reside in the area the opportunity* to purchase the team," nothing in the plain text of R.C. 9.67 excludes those from outside of Ohio to also participate in the same opportunity. The only residency distinction in R.C. 9.67 is to at least give local purchasers an opportunity to buy the team, the same opportunity afforded to out-of-state purchasers. There is no "cognizable form of discrimination if the statute otherwise treats similarly situated in-state and out-of-state entities the same." *Garber v. Menendez*, 888 F.3d 839, 843 (6th Cir.2018), citing *General Motors Corp. v. Tracy*, 519 U.S. 278, 298-99 (1996).

Defendants concede the aforementioned point but claim that the opportunity for non-local residents to submit purchase offers "does not ameliorate the unconstitutionality of the statute [because] [t]he team owner still must wait six months so that local residents will have the 'opportunity to purchase' required by the statute." (Reply at 9.) They also argue that the local benefit offered by R.C. 9.67 burdens interstate commerce by denying the team owner (and

33

operator) the benefit of increased competition for the team's operating rights. (Mot. to Dismiss at 13.) According to Defendants, by limiting prospective offers to local residents, R.C. 9.67 "necessarily eliminates the potential for bids from citizens of the other 49 states, some of which might be higher than those made by Ohio residents, and cuts off the potential for competition from non-Ohio residents that otherwise might drive up the value of the club." *Id.* But once again, that is not what R.C. 9.67 says. It does not prohibit out-of-state purchasers from also attempting to purchase the team during the six-month notice period. On its face, the law does not give local investors any advantage over non-local potential purchasers.

The Court therefore finds that R.C. 9.67 is not facially discriminatory and does not impermissibly favor local interests over out-of-state interests to the detriment of the latter. That finding, however, does not end the Court's dormant Commerce Clause inquiry.

### Purposeful Discrimination

Laws "that appear neutral but have an impermissibly protectionist purpose" can also violate the dormant Commerce Clause. *Garber*, 888 F.3d at 843, citing *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270-271 (1984). To determine whether R.C. 9.67 purposefully discriminates within interstate commerce, the Court must once again turn to the actual language in the statute. *Am. Beverage Ass'n*, 735 F.3d at 371; *see also Int'l Dairy*, 622 F.3d at 648 ("the purpose of a regulation can be ascertained from its language"). This is because the most "persuasive evidence of the purpose of a statute [are] the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases [courts] have followed their plain meaning." *E. Ky. Res.*, 127 F.3d at 542, quoting *Perry v. Commerce Loan Co.*, 383 U.S. 392, 400 (1966).

As shown by the text of R.C. 9.67, the law does not distinguish between interstate and intrastate moves. There is nothing to indicate an attempt by the General Assembly "to benefit local economic actors at the expense of out-of-state actors." *Am. Beverage Ass'n*, 735 F.3d at 372. As put by Plaintiffs, "[a]ttempting to ensure that a team actually uses a facility for which taxpayers expended money hardly reflects an improper attempt to burden interstate commerce." (Memo Contra at 14.)

The Court agrees with Plaintiffs that both the relocation provision and opportunity-to-purchase provision of the law applies to in-state as well as out-of-state entities and relocations the same. The law would apply the same if the Crew were to move to Cleveland just as it would in a move to Austin. It applies even-handedly to any owner deciding to play in a tax-supported stadium and receive financial assistance. Nowhere does R.C. 9.67 preclude owners from entertaining offers from out-of-state purchasers. The Court is not persuaded by Defendants' argument that the law denies "the benefits of increased competition" by limiting "prospective offers to local residents." (Mot. to Dismiss at 13.) "Absent concrete evidence from the statutory language that the * * * requirement[s] [are] purposefully discriminatory," the Court finds R.C. 9.67 lacks a discriminatory purpose. *Am. Beverage Ass'n* at 372.

### Discriminatory Effect

Even though the Court does not find R.C. 9.67 to be either facially or purposefully discriminatory, Defendants could still prevail if the Court finds the law to have a discriminatory effect. *Brown-Forman*, 476 U.S. at 578-579. "[T]here are two complementary components to a claim that a statute has a discriminatory effect on interstate commerce: the claimant must show both how local economic actors are favored by the legislation, and how out-of-state actors are burdened by the legislation." *E. Ky. Res.*, 127 F.3d at 543. The case of *Hunt v. Washington State*

35

*Apple Advertising Comm.*, 432 U.S. 333 (1977), addressed the issue of discriminatory effect. There, North Carolina law prohibited the importation of closed containers of apples bearing a grade "other than the applicable U.S. grade or standard." *Id.* at 335. The statute was challenged by an association composed of apple growers from Washington state whose purpose it was to advertise Washington-produced apples. *Id.* at 336-337.

The association argued the statute was unconstitutional because of its discriminatory impact on Washington State's apple producers. The association maintained that because Washington State-graded apples are recognized by the industry as superior to all other grades, including those of the U.S. Department of Agriculture, Washington State apple growers would lose the competitive edge that a Washington-State grade confers, while at the same time North Carolina's apple growers would be protected from a powerful competitor. It also argued that complying with the North Carolina statute would be extremely costly and inefficient.

The U.S. Supreme Court agreed. The high court first explained how the statute burdened out-of-state economic actors. It stated that the "first, and most obvious [effect] is the statute's consequence of raising the costs of doing business in the North Carolina market for Washington apple growers and dealers, while leaving those of their North Carolina counterparts unaffected." *Id.* at 351. Then the U.S. Supreme Court illustrated how the statute benefitted the local economic actors. It noted also that the statute had the

> effect of stripping away from the Washington apple industry the competitive and economic advantages it has earned for itself through its expensive inspection and grading system [which] * * * has gained nationwide acceptance in the apple trade. * * * By prohibiting Washington growers and dealers from marketing apples under their State's grades, the statute has a leveling effect which insidiously operates to the advantage of local apple producers. * * * Such 'downgrading' offers the North Carolina apple industry the very sort of protection against competing out-of-state products that the Commerce Clause was designed to prohibit.

36

*Id.* at 351-352.

In the instant matter, the Court finds that Defendants have failed to satisfy their burden to demonstrate that R.C. 9.67 favors local potential purchasers over out-of-state purchasers. They have not shown an increased cost to out-of-state purchasers, nor a competitive advantage for in-state purchasers. The statute does not "favor local enterprise by prohibiting patronage of out-of-state competitors or their facilities." *C &A Carbone Inc.*, 511 U.S. at 394. As stated above, the statute simply grants equal treatment to in-state and out-of-state purchasers. "[U]nless there is evidence that a state law treats in-state economic interests differently than out-of-state economic interests, that law is valid under the Commerce Clause." *E. Ky. Res.*, 127 F.3d at 544. Because Defendants failed to make such a showing, the Court cannot find that R.C. 9.67 has a discriminatory effect.

### b)  *Weighing the Burdens and Benefits*

Because the Court finds that R.C. 9.67 is neither discriminatory nor extraterritorial, it must proceed with weighing its burdens and benefits in accordance with the *Pike* balancing test. *Int'l Dairy*, 622 F.3d at 649, citing *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 449 (6th Cir. 2009). As mentioned above, the Court must uphold R.C. 9.67 under Defendants' dormant Commerce Clause challenge "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. The *Pike* balancing test reflects the notion that the Commerce Clause was

> never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the Constitution.

*Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 443-444 (1960) (internal citations omitted).

Under *Pike,* whether a burden on interstate commerce "will be tolerated * * * depend[s] on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike,* 397 U.S. at 142. As set forth recently by the Sixth Circuit,

> *Pike* balancing is already a difficult exercise, [*Davis,* 553 U.S. at 354], often requiring courts to make subjective judgments not unlike "deciding whether three apples are better than six tangerines," *id.* at 360 (Scalia, J., concurring). Difficulty becomes unworkability when courts are forced to speculate about the extent of a hypothetical burden without concrete proof. For that reason, courts have held that <u>the party challenging the law bears the responsibility of proving that the burdens placed on interstate commerce outweigh the law's benefits,</u> *LensCrafters, Inc. v. Robinson,* 403 F.3d 798, 805 (6th Cir. 2005), and have turned away challengers who failed to meet that responsibility, *see Colon Health Ctrs. of Am., LLC v. Hazel,* 813 F.3d 145, 157-59 (4th Cir. 2016); *Baude v. Heath,* 538 F.3d 608, 612-13 (7th Cir. 2008); *Nat'l Paint & Coatings Ass'n v. City of Chicago,* 45 F.3d 1124, 1132 (7th Cir. 1995).

*Garber,* 888 F.3d at 845 (emphasis added.)

Thus, under *Pike,* state laws are "presumed valid." *Byrd v. Tenn. Wine & Spirits Retailers Ass 'n,* 883 F. 3d 608, 624 (6th Cir. 2018). *Pike* established a forgiving standard of review and statutes "frequently survive * * * *Pike* scrutiny." *Davis,* 553 U.S. at 339. Moreover, *Garber* raises the question as to whether a party challenging a law can prove at the motion to dismiss stage, as here, that the burdens placed on interstate commerce outweigh the law's benefits.

> Even if discouraging residents from relocating could be considered a potential cognizable burden on interstate commerce (a doubtful proposition), we have no way of assessing that burden. The case ended at the motion-to-dismiss stage, at Dr. Menendez's request, and thus neither he nor anyone else offered any proof on the point. Nor is it obvious what such evidence would show.

*Garber* at 845.

Defendants did not address the *Pike* analysis until their Reply, and they have failed to carry

the above-referenced burden. The Court finds that the nature of the local interests that R.C. 9.67 is designed to protect are significant and the statute's corresponding burdens are limited. The Court finds persuasive Plaintiffs' argument that R.C. 9.67 was designed to ensure that taxpayer money is not wasted. "By placing conditions on when a sports team may stop using a facility supported in part with public funds, the statute helps see that those funds are not squandered." (Memo Contra at 16.) The Court agrees that there is a compelling governmental interest in ensuring that when public funds *are* provided for such a purpose, the stadium is actually used and is not prematurely abandoned and allowed to stand empty. This is why the General Assembly requires eligibility for a tax exemption to be dependent upon the facility being used for a "significant portion of [a team's] home schedule." *See* R.C. 5709.081(B).

The Court also agrees that the benefits secured by R.C. 9.67 involve more than money. The presence of a sports franchise within a city goes beyond a commercial transaction. The team is of significant value to the public and to the well-being of the community. *See, e.g., New York v. New York Jets Football Club, Inc.*, 394 N.Y.S.2d 799, 803 (N.Y. Sup. Ct. 1977) (failure to enforce a lease would have resulted in "injury to the welfare, recreation, prestige, prosperity and trade and commerce of the people of the City"). "Much more is at stake than merely the loss of direct and indirect revenue to the City * * * Any loss represents a diminution of the quality of life here * * *." *City of New York v. New York Yankees,* 458 N.Y.S. 2d 486, 489-490 (N.Y. Sup. Ct. 1983).

Additionally, the Court finds that the potential burdens of R.C. 9.67 are limited in both scope and effect. The law applies only to those professional sports teams that have accepted public financial assistance and play in a taxpayer-funded facility. Still, R.C. 9.67 does not impose a prohibition on efforts to relocate such teams. A publicly supported team remains free to negotiate with the city in which it is located and obtain a waiver of the law's other requirements. R.C.

39

9.67(A). These minimal burdens simply help ensure that the taxpayers who have supported such a team have the same opportunity to participate in any relocation discussions, just the same as out-of-state purchasers.

Finally, Defendants have failed to show that there are alternatives to the requirements imposed by R.C. 9.67 that would sufficiently advance the public interest and protect the benefits of the bargain made by the state and the City of Columbus. When it comes to public investment in a local sports team, enforcement of the requirements found in R.C. 9.67 is the least burdensome way to protect that interest.

Accordingly, because R.C. 9.67 is not facially or purposefully discriminatory, does not have a discriminatory effect, and any burdens imposed on interstate commerce do not outweigh the local interest, the Court declines to find that R.C. 9.67 violates the dormant Commerce Clause.

### 2. Privileges and Immunities Clause

The Privileges and Immunities Clause states that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Constitution, Article IV, Section 2, cl. 1. It bars "unreasonable discrimination by one state against the citizens of another state in favor of its own." *Alerding v. Ohio High Sch. Athletic Ass'n,* 779 F.2d 315, 317 (6th Cir. 1985); *accord State v. Burnett,* 755 N.E.2d 857, 870 (Ohio 2001) (citing *Toomer v. Witsell,* 334 U.S. 385, 396 (1948)); *Raymond v. O'Connor*, 526 F. App'x 526, 529 (6th Cir. 2013) (same). The clause was "intended to establish a norm of comity among the various states, so as to fuse into one Nation a collection of independent, sovereign states." *Alerding* at 316-317 (internal citations omitted). The Privileges and Immunities Clause "seeks to promote interstate harmony"

40

by preventing discrimination on the basis of state citizenship. *Id.* at 317; *see also Toomer* at 398 (purpose of clause is to "outlaw classifications based on the fact of non-citizenship").

The Privileges and Immunities Clause prohibits states from denying out-of-state residents "fundamental" rights provided to their own residents. *Garber*, 888 F.3d at 845, citing *McBurney v. Young*, 569 U.S. 221, 227-228 (2013). It has been held to protect "the rights of citizens to 'ply their trade, practice their occupation, or pursue a common calling.' " *McBurney* at 227, quoting *Hicklin v. Orbeck*, 437 U.S. 518, 524 (1978); *Supreme Court of N. H. v. Piper*, 470 U.S. 274, 280 (1985) ("[O]ne of the privileges which the Clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State"). The "right to pursue * * * economic opportunities" is among the "privileges and immunities" protected by the Privileges and Immunities Clause. *Alerding* at 317.

Defendants argue that R.C. 9.67 attempts to create economic opportunities for Ohio citizens at the expense of similar opportunities for citizens of other states. They claim that by impermissibly requiring that a team owner seeking to relocate its team must provide a right of first negotiation to local residents and restricting the ability of out-of-state individuals to contract with Defendants in relation to the relocation of the team, the statute violates the Privileges and Immunities Clause. The relevant interest under the Privileges and Immunities Clause, according to Defendants, "is whether citizens of other states have the right to pursue the economic opportunity provided to citizens of Ohio vis-a-vis Crew SC." (Reply at 18.) Defendants argue that R.C. 9.67 substantially burdens the rights of citizens of other states to have access to the same economic opportunities afforded to Ohio citizens. This interest, Defendants argue, is precisely what the Privileges and Immunities Clause protects, and the statute's failure to preserve such an interest is why R.C. 9.67 violates the Privileges and Immunities Clause. *Id.* Moreover, Defendants

assert that Plaintiffs' purported interest in preserving taxpayer dollars and ensuring Ohio citizens have an opportunity to purchase a professional sports team supported by those tax dollars does not justify this substantial burden on the rights of out-of-state citizens.

Plaintiffs contend that Defendants lack standing to raise their Privileges and Immunities claim. Indeed, the United States Supreme Court has held that "the Privileges and Immunities Clause is inapplicable to corporations * * *." *W. & S. Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 656 (1981), citing *Hemphill* v. *Orloff*, 277 U.S. 537, 548-550 (1928). "A corporation is not a mere collection of individuals capable of claiming all benefits assured them by Section 2, Article IV, of the Constitution." *Hemphill* at 548 (internal citations omitted). This Court too questions whether Defendants have standing to bring their Privileges and Immunities claim. "[A] party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.' " *Kowalski v. Tesmer*, 543 U.S. 125, 129, quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975). There are, however, some limited circumstances where courts allow "a third party standing to assert the rights of another." *Id.* at 129-130. Defendants did not make an attempt to establish this standing until their Reply after Plaintiffs noted the failure on page 23 of their Memo Contra.

There, Defendants claim to have third-party standing to assert the claims of those out-of-state citizens who are harmed by R.C. 9.67, and "the fact that corporations lack 'privileges and immunities' under the Constitution is irrelevant." (Reply at 19.) Courts have recognized third-party standing "when a claimant (i) suffers its own injury in fact, (ii) possesses a sufficiently 'close' relationship with the person who possesses the right,' and (iii) shows some 'hindrance' that stands in the way of the claimant seeking relief. *City of E. Liverpool v. Columbiana Cty. Budget Comm.*, 114 Ohio St.3d 133, 2007-Ohio-3759, 870 N.E.2d 705, ¶ 22, quoting *Kowalski* 543 U.S.

42

at 129-130. Defendants maintain that they are directly harmed by their inability to contract with out-of-state citizens for economic opportunities related to a potential relocation of Crew SC. Such harm, according to Defendants, is functionally the same harm as that suffered by the out-of-state citizens who lack a level playing field to negotiate with Defendants for the rights to Crew SC. Defendants also claim they are best situated to raise this issue because they are already involved with this suit, and do not need to hire additional counsel or file a separate lawsuit to vindicate their rights and the rights of any out-of-state investors that are currently being chilled by R.C. 9.67.

The Court finds that Defendants lack standing to bring a Privileges and Immunities claim. In order to satisfy the "close relationship" prong of the third-party standing test set forth in *Kowalski*, the relationship must be "*existing*" rather than one which is "*hypothetical*." *Kowalski* at 131 (emphasis sic). Defendants merely hypothesize a potential out-of-state purchaser with whom, in fact, they have no relationship at all because such a person has not actually been identified. Defendants also fail the "hindrance" prong of the test. Defendants simply assert that the hinderance standing in the way of a claimant seeking relief is the fact that they are already parties to this case and shouldn't be forced to hire additional counsel or file a separate lawsuit to vindicate the rights of any out-of-state investors. That is not the type of "hindrance" the United States Supreme Court had in mind. If that were the case, the third *Kowalski* prong would be pointless because it will always be more convenient for an existing party to litigate a case.

Even if Defendants had standing to bring their Privileges and Immunities claim, it would still fail. That is because they interpret the relevant interest at stake much too broadly. As stated above, the Privileges and Immunities Clause prohibits states from denying out-of-state residents "fundamental" rights provided to their own residents. *Garber*, 888 F.3d at 845, citing *McBurney*, 569 U.S. at 227-228. There is no fundamental right to have preferred access to purchase a sports

43

team. Besides, that is not what R.C. 9.67 does. The statute does not include a restriction on anyone from out-of-state purchasing the team. Accordingly, the Court denies Defendants' motion to invalidate R.C. 9.67 on the grounds that it violates the Privileges and Immunities Clause of the U.S. Constitution.

3.    <u>Vagueness</u>

Defendants also argue that R.C. 9.67 is void for vagueness. Due process requires that states provide "meaningful standards" in their laws. *City of Norwood v. Homey,* 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, ¶ 81; *see also In re Application of Columbus S. Power Co.,* 134 Ohio St.3d 392, 2012-Ohio-5690, 983 N.E.2d 276, ¶ 20 ("The void-for-vagueness doctrine is a component of the right to due process and is rooted in concerns that laws provide fair notice and prevent arbitrary enforcement."). Laws must "give fair notice to the citizenry of the conduct proscribed and the penalty to be affixed" in the event of a breach. *Norwood,* 110 Ohio St. 3d 353, at ¶ 81. "Implicitly, the law must also convey an understandable standard capable of enforcement in the courts." *Id.*

A statute survives a void-for-vagueness challenge if it is written in a manner such that "a person of common intelligence" can understand it, and if it "provides sufficient standards to prevent arbitrary and discriminatory enforcement." *Klein v. Leis,* 99 Ohio St. 3d 537, 2003-Ohio-4779, ¶ 16. The type of law at issue matters as well. " '[L]aws directed to economic matters are subject to a less strict vagueness test than laws interfering with the exercise of constitutionally protected rights.' " *Columbus S. Power Co.* at ¶ 14, quoting *Columbia Gas Transm. Corp. v. Levin,* 117 Ohio St.3d 122, 2008-Ohio-511, 882 N.E.2d 400, ¶ 42. A " 'greater degree of ambiguity will be tolerated * * * when [a] statute regulates the conduct of businesses.' " *Id.,* quoting *Big Bear Super Market No. 3 v. Immigration & Naturalization Serv.,* 913 F.2d 754, 757 (9th Cir.1990). A

44

civil statute (not involving the First Amendment) must be given the greatest leeway and is invalid only if it is "so vague and indefinite that it sets forth no standard or rule or if it is substantially incomprehensible." *Columbia Gas* at ¶ 46.

Defendants note that several terms in R.C. 9.67 are undefined, including "notice," "opportunity to purchase," and "reside in the area." Simply because a statute needs interpretation, however, does not make it impermissibly vague. "Many statutes require administrative and judicial construction to clarify specific language. Such statutes are not unconstitutionally vague." *Columbus S. Power Co.* at ¶ 20 (quoting *Minnesota ex rel. Alexander v. Block*, 660 F.2d 1240, 1255 n.35 (8th Cir. 1981)). Nor is a statute "void for vagueness merely because it could have been more precisely worded." *State ex rel. Rear Door Bookstore v. Tenth Dist. Court of Appeals*, 63 Ohio St.3d 354, 358 (1992); *see also Jordan v. De George,* 341 U.S. 223, 231-32 (1951) ("Impossible standards of specificity are not required").

The Court pauses to note that much of Defendants' void-for-vagueness argument centers around what they believe is Plaintiffs' "interpretation" of R.C. 9.67, similar in respects to their constitutional avoidance arguments, discussed below. Specifically, Defendants claim that Plaintiffs' request for the Court's oversight makes the statute unconstitutionally vague. One party's interpretation of a statute is not the focus when analyzing a vagueness challenge, nor is a merits review of that interpretation ripe at the motion to dismiss stage. Moreover, Plaintiffs maintain that their request "is based in equity—not statute[,]" and that it is Defendants' conduct thus far—not any statutory requirement—that makes Plaintiffs' request necessary. Indeed, "courts have inherent authority—authority that has existed since the very beginning of the common law— to compel obedience of their lawfully issued orders." *Cramer v. Petrie*, 70 Ohio St.3d 131, 133, 1994-Ohio-404, 637 N.E.2d 882.

Keeping the above-referenced standards in mind, the Court will address the purportedly vague words and phrases of R.C. 9.67 in turn, and read the words and phrases in context. Additionally, the Court construes the words and phrases according to their customary usage and in a manner that most readily furthers the legislative intent. R.C. 1.42.

a)      *Notice and Intention*

Defendants argue that there is no way to discern from the statutory term "advance notice" what exactly they must do, and thus the threat of arbitrary and discriminatory enforcement is present. (Mot. to Dismiss at 16.) In support of this contention Defendants note that the Amended Complaint alleges "notice" of the Crew's intent to relocate has not been given, "even though it also alleges Plaintiffs had been aware for months that the team might move." (Reply at 20; Am. Compl. at ¶ 28 ("[i]n October 2017, Mr. Precourt announced his intention to move the Crew if the [c]ity or private investors could not guarantee him that a downtown stadium would be built for the team"); ¶ 29 ("[i]n December 2017, Mr. Garber endorsed PSV's 'explor(ing)' its 'options in Austin.' ") Moreover, Defendants state that throughout the course of these proceedings Plaintiffs' counsel "continue[s] to question whether *even now* Defendants have ever given notice." (Reply at 20.) As a result, Defendants claim to "lack any understanding of how to give notice under the statute, making it impossible for them to comply." *Id.*

Defendants also claim that R.C. 9.67 ties its six-month notice period to some unspecified point in time after a team owner has the "intention to cease playing most of its home games at the facility," a phrase that is also vague. Defendants contend that it could refer to any time after the owner begins to consider relocation, to sometime after the owner believes that relocation is probable, or only to a time after the owner has taken affirmative steps toward relocation. They believe that because R.C. 9.67 does not define what "intention" means, it provides no notice for

46

team owners of how to comply with the statute and leads to the possibility of arbitrary and discriminatory enforcement. Defendants ultimately assert that on its face R.C. 9.67 "simply requires six months' notice before the team leaves once that 'intention' arises." (Mot. to Dismiss at 17.) The Court and Plaintiffs agree. Plaintiffs maintain that the notice provision of R.C. 9.67 satisfies the standard to survive a vagueness challenge—that is, it is easily understood by persons of common intelligence, and that Defendants' interpretation proves this point.

The terms "notice" and "intention" are easily understood and thus not unconstitutionally vague. The terms convey a clear, unequivocal, and definite meaning. *Roberts*, 2012-Ohio-5684 at ¶ 21; *See Merriam Webster's Collegiate Dictionary* 794 (10th Ed. 1993) (defining "notice" as "warning or intimation of something: announcement" or "notification by one of the parties to an agreement or relation of intention of terminating it at a specified time"); *Id.* at 608 (defining "intention" as "a determination to act in a certain way: resolve" or "what one intends to do or bring about.") The Court does not find these terms—when read in context and construed in accordance with their ordinary, customary usage—to be at all ambiguous to an individual of common intelligence.

Even if the terms were coined ambiguous, these provisions of R.C. 9.67 would still survive Defendants' vagueness challenge. "A statute is ambiguous when its language is subject to more than one reasonable interpretation." *Lang*, 2012-Ohio-5366 at ¶ 12. It is true that these terms have more than one meaning (although the Court believes that when read in context, these other potential definitions are unreasonable). It is also true that R.C. 9.67 does not define the terms "notice" and "intention." When a statute is silent or ambiguous, courts are charged with construing the language in a manner reflecting the General Assembly's intent, the object sought to be obtained by the statute, and the circumstances under which the statute was enacted. *Clark*, 91 Ohio St.3d at

47

274; R.C. 1.49; *Family Medicine Found., Inc.*, 2002-Ohio-4034 at ¶ 9. As stated many times, R.C. 9.67 was enacted in response to then Cleveland Browns owner Art Modell moving the team to Baltimore, the day before voters approved a renewal of tax support for the stadium in which the Browns played. He provided no "warning or intimation" nor an "announcement" of a "determination" to move the Browns to Baltimore. Thus, it is clear that the General Assembly sought to prevent future owners playing in a taxpayer-funded stadium and receiving public financial assistance from up-and-leaving without "announc[ing]" to the political subdivision in which the team plays its home games "what [the owner] intends to do or bring about." There simply is no other manner by which to construe R.C. 9.67 to operate sensibly. *Burton*, 154 Ohio St. at 268.

    *b)*    *Opportunity to Purchase*

    Despite initially claiming the phrase to be vague, Defendants state that it simply means "the opportunity to put forward an offer for Defendants' consideration and nothing more." (Mot. to Dismiss at 16.) As noted above, they claim, however, that Plaintiffs attempt to expand the meaning of that phrase so as to include a substantive requirement of continuing court oversight and enforcement. Defendants further contend that Plaintiffs' interpretation of R.C. 9.67's "opportunity to purchase" provision has "made ambiguous whether [the provision] could somehow require an 'obligation to sell.' " (Reply at 20.) Again, however, Plaintiffs' interpretation of R.C. 9.67 is not on trial at the motion to dismiss stage raising a void-for-vagueness challenge—the statute's words and phrases themselves are what the Court must analyze. This Court need only ask whether Defendants have carried their burden of demonstrating that the "opportunity to purchase" phrase is so substantially incomprehensible that it cannot be understood by individuals of common intelligence and therefore fails to provide "sufficient standards to prevent arbitrary and

discriminatory enforcement." *Klein*, 2003-Ohio-4779 at ¶ 16. The Court finds that Defendants have failed to carry said burden.

Plaintiffs liken the "opportunity to purchase" provision to option contracts and rights of first refusal. They cite the following authority for that proposition: *Nat'l City Bank v. Welch*, 188 Ohio App. 3d 641, 2010-Ohio-2981, ¶ 13 (10th Dist.); *Control Data Corp. v. Controlling Bd. of Ohio*, 16 Ohio App. 3d 30, 36-37 (10th Dist. 1983) (option in contract gave the lottery commission an "opportunity to purchase" certain equipment); *cf. also Gress v. Ft. Loramie*, 100 Ohio St. 35 (1919) (giving the public an "opportunity to purchase" a streetcar line). They claim this is the common ordinary usage of the term employed by courts and therefore sufficient to defeat Defendants' Motion to Dismiss. The Court is not convinced by Plaintiffs' definition of the phrase; it need not stretch the phrase's meaning so far in order to overrule Defendants' void-for-vagueness challenge of the same.

The phrase "opportunity to purchase" in the context of R.C. 9.67 has a more sensible, less constitutionally threatening meaning than that advanced by Plaintiffs. *See Merriam Webster's Collegiate Dictionary* 816 (10th Ed. 1993) (defining "opportunity" as "a good chance for advancement or progress"); *Id.* at 948 (defining "purchase" as "to obtain by paying money or its equivalent: buy"). The Court does not find the opportunity-to-purchase provision to be ambiguous in any way. Read in context, the phrase is clearly read by an individual of common intelligence to mean a chance to buy. It is further clear that such a construction expresses the General Assembly's intent in enacting R.C. 9.67. It merely sought to give six-month window to a political subdivision investing public dollars into a professional sports team, during which time the political subdivision would have a chance to retain the team through a purchase—the same chance the state affords any

49

out-of-state purchaser. Accordingly, the Court rejects Defendants' argument that the "opportunity to purchase" provision of R.C. 9.67 is unconstitutionally void for vagueness.

### c)    Reside in the Area

Defendants also argue that R.C. 9.67's requirement that a team owner give "the political subdivision or any individual or group of individuals *who reside in the area* the opportunity to purchase the team" is impermissibly vague because the statute does not define what "in the area" means. (Mot. to Dismiss at 17, citing R.C. 9.67 (emphasis added).) They claim that, in theory, the phrase "could apply to residents who live in the city where the team's stadium sits, the county that encompasses the stadium, some grouping of nearby towns and/or counties, or the state as a whole." *Id.* According to Defendants, as a result of the absence of a clear definition of who is entitled to the "opportunity to purchase," a team owner runs the risk of attempting "to comply with the statute only to later find itself deemed noncompliant and unable to successfully participate in interstate commerce for another six months." *Id.* at 17-18.

As Plaintiffs correctly note, the problem with Defendants' argument that the phrase "reside in the area" is ambiguous and unconstitutionally vague is that they fail to read the words in context as Ohio law requires. R.C. 1.42. When read in connection with "political subdivision," it is clear that "in the area" means the area surrounding the political subdivision in which the team plays most of its home games. "Area" as used in R.C. 9.67 simply means "the surface included within a set of lines" or "a geographical region," which, when read in context is clearly understand by persons of normal intelligence to mean the area within the geographical region of the political subdivision in which the team plays most of its homes games. *Merriam Webster's Collegiate Dictionary* 61 (10th Ed. 1993).

50

Simply because the General Assembly could have chosen a more precise phrase than "in the area" does not render R.C. 9.67 void for vagueness. *Roth v. United States*, 354 U.S. 476 (1957). Accordingly, the Court overrules Defendants' void-for-vagueness challenge to R.C. 9.67's "reside in the area" provision.

### C.     Other Constitutional Arguments

Defendants also raise a host of additional constitutional arguments. To do so they claim that "what Plaintiffs actually seek in the third numbered paragraph of their demand for judgment is a process by which they can ask this Court to force a sale of Crew SC's operating rights in the event that they learn of an offer that they deem 'reasonable.' " (Mot. to Dismiss at 18.) Defendants contend that "[a]ny interpretation of R.C. 9.67 that could result in a forced sale of PSV's operating rights in Crew SC and equity interest in MLS would run headlong into additional serious difficulties, both constitutional and statutory." *Id*, at 19. Specifically, they argue that Ohio law does "not permit the taking of intangible property like that at issue in this case," and that "doing so would unconstitutionally be in violation of the Contracts Clause of the United States Constitution and its Ohio counterpart." *Id.*

Plaintiffs correctly characterize Defendants' position as one of asking this Court to construe R.C. 9.67 in a manner which avoids raising constitutional issues. First, the Court has already done that above. Constitutional avoidance issues come into play only "when deciding which of two plausible statutory constructions to adopt * * *." *Clark v. Suarez Martinez*, 543 U.S. 371, 380 (2005). The Court has above set forth the sole interpretation of R.C. 9.67 when its terms are given their reasonable, ordinary, and customary meaning.

Defendants' takings and Contracts-Clause claims are also premature. Indeed, there is not a single contract submitted as part of the evidence in this case thus far. Moreover, the claims depend upon a speculative manner by which this Court will enforce R.C. 9.67. The Court is not now deciding how R.C. 9.67 should be enforced; it is simply concluding that Defendants have failed to show beyond doubt that from the face of the complaint Plaintiffs are unable to prove a set of facts warranting relief, and that R.C. 9.67 is not unconstitutional. Just because a statute *could* "under some conceivable set of circumstances is insufficient to render it wholly invalid * * *." *Salerno*, 481 U.S. at 745.

Accordingly, the Court declines at this juncture to consider Defendants' takings and Contracts-Clause claims. Defendants' Motion to Dismiss on those bases is also overruled.

## V.    CONCLUSION

A motion to dismiss for failure to state a claim, coupled with a constitutional challenge, is a heavy burden for the movant/challenger to overcome. To survive a Civ.R. 12(B)(6) challenge, Plaintiffs need only to demonstrate that their Amended Complaint contains a short and plain statement of the claim and a conceivable set of facts under which they are entitled to relief. Given the standards of review and presumption of constitutionality afforded to lawfully enacted legislation, Defendants were, from the beginning, faced with a tall obstacle to climb. They would need to overcome the presumption of constitutionality by showing that there is no set of facts under which R.C. 9.67 could constitutionally operate. At the motion to dismiss stage, this is simply a mountain which Defendants are unable to ascend.

Specifically, Defendants have failed to carry the weighty burden of convincing this Court that R.C. 9.67 does not apply to them. To state a claim under R.C. 9.67, Plaintiffs' Amended

Complaint need only allege that a professional sports team playing most of its home games in a tax-supported facility receives financial assistance from the state or a political subdivision thereof. It does.

Moreover, R.C. 9.67 simply does not burden the Defendants in the manner they allege. It does not obligate them to sell to the city or local investors, nor does it require them to return the tax support and other financial assistance received. It also does not preclude Defendants from soliciting out-of-state offers during the six-month notice period, nor preclude the team from using such offers to drive-up its economic value. Finally, R.C. 9.67 does not prevent the team's owner from pursuing relocation during the six-month period during which the city or local investors are putting together offers to purchase, including the owner negotiating agreements in connection with a relocation. To be sure, nothing during the pendency of this action prevented Defendants from taking steps to relocate to Austin.

These facts are clear by simply reading the plain text of R.C. 9.67, and giving its words, in context their ordinary meaning, and construing any words or phrases to express the legislature's intent and objective in enacting the statute. Plaintiffs' Amended Complaint sufficiently pleads the facts necessary to show that R.C. 9.67 applies to Defendants. Moreover, Defendants' have failed to overcome R.C. 9.67's presumption of constitutionality. The statute is neither facially or purposefully discriminatory, nor does it have an impermissible discriminatory effect. Thus, R.C. 9.67 survives Defendants' dormant Commerce Clause challenge.

Further, the Court is not convinced Defendants possess the requisite standing to bring their Privileges and Immunities claim. Even if they do, their arguments still fail because they characterize too broadly the interests at stake in R.C. 9.67. There is no fundamental right to have

preferred access to purchase a sports team. Besides, that is not what R.C. 9.67 grants to in-state purchasers.

Defendants' void-for-vagueness challenge also fails. Applying the rules of statutory interpretation, none of the challenged provisions are unconstitutionally vague. Finally, the Court finds Defendants' takings and Contracts-Clause claims to be speculative and premature. The Court therefore declines to consider then at the motion to dismiss stage.

Based upon the foregoing reasoning, the Court finds Defendants' Motion to Dismiss for failure to state a claim pursuant to Civ.R. 12(B)(6) not well-taken. Therefore, the motion is hereby **DENIED.**

Since settlement negotiations are continuing pursuant to the Court's May 8, 2018 Order, the Court will continue to monitor said discussions, and the terms of the May 8, 2018 Order remain in effect. It is FURTHER ORDERED that this matter is hereby **STAYED**, and Defendants need not file an Answer to Plaintiffs' Amended Complaint until further order of the Court.

**IT IS SO ORDERED.**

Copies electronically to all counsel.

Franklin County Court of Common Pleas

**Date:**            12-03-2018

**Case Title:**      OHIO STATE ATTORNEY GENERAL MIKE DEWINE ET AL -VS-
                     PRECOURT SPORTS VENTURES LLC ET AL

**Case Number:**     18CV001864

**Type:**            ENTRY

It Is So Ordered.

/s/ Judge Jeffrey M. Brown

0E429 - J56

Court Disposition

Case Number: 18CV001864

Case Style: OHIO STATE ATTORNEY GENERAL MIKE DEWINE ET
AL -VS- PRECOURT SPORTS VENTURES LLC ET AL

Motion Tie Off Information:

1. Motion CMS Document Id: 18CV0018642018-04-1999970000
   Document Title: 04-19-2018-MOTION TO DISMISS -
DEFENDANT: MAJOR LEAGUE SOCCER LLC
   Disposition: MOTION DENIED